1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4     THE HONORABLE ANDRÉ BIROTTE JR., JUDGE PRESIDING

5

6    DOMINIC ARCHIBALD AND NATHANAEL   )
     PICKETT I AS INDIVIDUALS AND AS   )
7    SUCCESSOR IN INTEREST TO NATHANAEL )
     H. PICKETT II, DECEASED,,         )
8                                      )
                       Plaintiffs,     )
9                                      )
              vs.                      )   No. EDCV 16-01128-AB-SP
10                                     )
     COUNTY OF SAN BERNARDINO, et al., )
11                                     )
                       Defendants.     )
12   _____)

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16            Los Angeles, California

17        Thursday, March 8, 2018, 9:23 A.M.

18

19   Day 3 of Jury Trial, Page 375 through 490, Inclusive

20

21                    PAT CUNEO CSR 1600, CRR-CM
                      Official Reporter
22                    First Street Courthouse
                      350 W. First Street
23                    Room 4311
                      Los Angeles, California 90012-4565
24                    213-894-1782
                      patcuneo1600@gmail.com
25                    www.patcuneo.com

376

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFF ARCHIBALD:

3                          LAW OFFICES OF DALE K. GALIPO
                           BY:   DALE K. GALIPO, ATTORNEY AT LAW
4                          AND   HANG DIEU LE, ATTORNEY AT LAW
                           AND   MARCEL SINCICH, ATTORNEY AT LAW
5                          21800 Burbank Boulevard
                           Suite 310
6                          Woodland Hills, California  91367
                           818-347-3333
7                          dalekgalipo@yahoo.com

8
     FOR PLAINTIFF PICKETT:
9
                           LAW OFFICES OF ROBERT D. CONAWAY
10                         BY:   ROBERT DEAN CONAWAY
                                 ATTORNEY AT LAW
11                         P.O. Box 2655
                           Apple Valley, California  92307
12                         760-503-9010
                           rdconaway@gmail.com
13

14   FOR THE DEFENDANTS:   ALVAREZ-GLASMAN & COLVIN
                           BY:   VINCENT C. EWING, ATTORNEY AT LAW
15                         13181 Crossroads Parkway North
                           Suite 400
16                         City of Industry, California 91746
                           562-699-5500
17                         vewing@agclawfirm.com

18

19

20

21

22

23

24

25

Day 3 of Jury Trial, March 8, 2018, A.M. Session

377

**I N D E X**

| | PAGE |
|---|---|
| PROCEEDINGS | |
| DEFENSE CASE-IN-CHIEF (OUT OF ORDER) | 387 |
| PLAINTIFFS' CASE-IN-CHIEF (RESUMED) | 416 |

**CHRONOLOGICAL INDEX OF WITNESSES**

| DEFENDANTS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| MARYANN SAVORY | 387 | 404 | 414 | | | 3 |

| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| SCOTT DeFOE | | 420 | 439 | 447 | | 3 |
| SCOTT McCORMICK | 465 | | | | | 3 |

**ALPHABETICAL INDEX OF WITNESSES**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| DeFOE, SCOTT | | 420 | 439 | 447 | | 3 |
| McCORMICK, SCOTT | 465 | | | | | 3 |
| SAVORY, MARYANN | 387 | 404 | 414 | | | 3 |

```
 1                            EXHIBITS

 2
    PLAINTIFFS'                          FOR          IN
 3  EXHIBIT      DESCRIPTION      IDENTIFICATION    EVIDENCE    VOL

 4   14-1    X-ray . . . . . . . . . . . . .484        3

 5   14-2    Photograph. . . . . . . . . . .469        3

 6   14-3    Photograph. . . . . . . . . . .479        3

 7   14-6    Photograph. . . . . . . . . . .482        3

 8   14-7    Photograph. . . . . . . . . . .482        3

 9   14-8    Photograph. . . . . . . . . . .477        3

10   14-9    Photograph. . . . . . . . . . .478        3

11   14-12   Photograph. . . . . . . . . . .485        3

12   14-13   Photograph. . . . . . . . . . .475        3

13   14-14   Photograph. . . . . . . . . . .470        3

14   14-15   Photograph. . . . . . . . . . .471        3

15   14-18   Photograph. . . . . . . . . . .485        3

16

17                            EXHIBITS

18
    DEFENDANTS'                          FOR          IN
19  EXHIBIT      DESCRIPTION      IDENTIFICATION    EVIDENCE    VOL

20   126A    Photograph. . . . . . . . . . .398        3

21   126B    Photograph. . . . . . . . . . .399        3

22   126C    Photograph. . . . . . . . . . .399        3

23   126D    Photograph. . . . . . . . . . .399        3

24

25
```

```
 1      LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 8, 2018; 9:23 A.M.

 2                              -oOo-

 3          (The following was held outside the jury's presence:)

 4              THE CLERK:  All rise.

 5              This United States District Court is now in

 6      session.  The Honorable André Birotte Jr., United States

 7      District Judge, Presiding.

 8              Please be seated.

 9              Calling Civil Case 16-1128, Dominic Archibald vs.

10      County of San Bernardino, et al.  Jury Trial Day 3.

11              Counsel, please state your appearances.

12              MR. GALIPO:  Good morning, Your Honor.

13      Dale Galipo with Marcel Sincich from my office on behalf of

14      the plaintiff Dominic Archibald.

15              THE COURT:  Good morning to you both.

16              MR. SINCICH:  Good morning, Your Honor.

17              MR. CONAWAY:  Good morning.  Robert Conaway for

18      Nathanael Pickett.

19              THE COURT:  All right.  Good morning, sir.

20              MR. EWING:  Good morning, Your Honor.  Vince Ewing

21      for defendant County of San Bernardino and defendant

22      Kyle Woods.

23              THE COURT:  All right.  Good morning.  Where is

24      Deputy Woods?

25              MR. EWING:  Between the time you were walking out,
```

1    I didn't get a chance to --

2              THE COURT:  Oh, that's fine.   That's fine.

3              All right.   So I understand there are two issues

4    the parties want to discuss or one?

5              MR. EWING:   One or two.

6              THE COURT:   Okay.

7              MR. EWING:   The first one, I've discussed it with

8    Mr. Galipo and we would like to take Nurse Practitioner

9    MaryAnn Savory out of order because she had some scheduling

10   issues.

11             She works at a Trauma 3 facility out in Riverside

12   County.   She's explained to me that if she doesn't appear

13   for her shift this afternoon, they will be down one nurse.

14             THE COURT:   Got it.

15             MR. EWING:   And I've explained that to Mr. Galipo

16   and we talked about it.

17             THE COURT:   All right.   Any objection to that?

18             MR. GALIPO:   No, with a qualification.

19             THE COURT:   There always is.

20             MR. GALIPO:   Right.

21             So I had anticipated -- and I'm not faulting

22   anyone for this -- that we might finish with Mr. DeFoe

23   yesterday.   I didn't know.

24             So I subpoenaed the medical examiner who came all

25   the way from Riverside who got here at 8:30 this morning.   I

1    explained to him that we have to finish with Mr. DeFoe and
2    then he'll testify which I anticipate it to be about 10:00,
3    10:15.
4              I only plan to be 30 minutes with the medical
5    examiner.  Mr. Ewing, the same.  So I would like to call the
6    nurse after the medical examiner and before I present other
7    evidence just because I think out of respect for the medical
8    examiner, he was subpoenaed for 8:30 and I don't want to
9    take a chance at pushing him too far so he doesn't get done
10   before noon.
11             THE COURT:  And with respect to the nurse
12   practitioner, her issue is she needs to be back by 1:30?  Is
13   that the issue?
14             MR. EWING:  She needs to be back -- her shift
15   starts at 12:00 in Riverside County so --
16             THE COURT:  She needs to leave at 11:00.
17             MR. EWING:  I would say at the latest and then I
18   certainly appreciate the point that counsel has made.  I
19   would say this, dancing a sensitivity issue, he's a coroner.
20   She's a nurse in a Trauma 3 hospital.
21             THE COURT:  Right.
22             MR. EWING:  We also made a point to excuse a
23   cardiologist because of the responsibilities that he had.
24             THE COURT:  Oh, in the jury; right, right.
25             MR. EWING:  Yes.

1          THE COURT:  Okay.  All right.

2          MR. GALIPO:  That with a peremptory challenge.

3          THE COURT:  Right, right.  Yeah, that's a lot

4    different.  Exactly.

5          Well, I mean, look.  I guess, Mr. Galipo, it seems

6    to me -- I mean, the examiner, I appreciate the fact he has

7    been here and I surmise he had to get up at 0 dark 30 to get

8    here.

9          But we got a nurse practitioner who's presumably

10   needed on -- like needed on the spot; and so my preference

11   would be to -- well, let me just -- are we going to call her

12   now or are we going to finish with DeFoe?  What's the

13   thought?

14         MR. EWING:  The proposition was to call her now

15   and get her on her way.  I believe I have approximately 20

16   minutes.  The proffer would be that she was the first

17   treating medical professional and she'll talk about Kyle's

18   injuries.

19         THE COURT:  So your proffer would be to get her on

20   first, about 40 minutes total, 20 each, I think?

21         All right.  Mr. Galipo, you said about 20 minutes?

22         MR. GALIPO:  That's correct.

23         THE COURT:  So 40 minutes with her and then bring

24   back Mr. DeFoe?

25         MR. EWING:  Yes.

```
 1            THE COURT:  And then the examiner?
 2            MR. EWING:  Well, that's up to Mr. Galipo.
 3            THE COURT:  Or would you want to do -- I mean,
 4   again, we're juggling here.  Would you want to do the nurse
 5   practitioner, the medical examiner, and then DeFoe?
 6            MR. GALIPO:  No.  Mr. DeFoe would like to get done
 7   with his testimony.  My preference would be sensitive to the
 8   issue, if we can finish with Mr. DeFoe, then call the nurse,
 9   and then I'll just have to explain to Dr. McCormick and
10   apologize that there's one more witness that has to go
11   before him and then I'll call Dr. McCormick.
12            THE COURT:  All right.  Okay.
13            MR. GALIPO:  I just would like to finish him.  If
14   we have to go to 12:15 or 12:20 just to get it done, I would
15   appreciate that.
16            THE COURT:  All right.  Well, then, this is on you
17   then, on both of you.  Let's -- I mean, finish DeFoe, nurse
18   practitioner, because then I think that would get her on the
19   road by, I would hope, between 10:30 and 11:00, I would
20   think.
21            MR. EWING:  My preference would be the different
22   order which would be nurse, then DeFoe, then McCormick.  I
23   would respectfully make the point that she is a nurse.  I
24   don't know -- I'm not trying to discount Mr. DeFoe's other
25   obligations.  They may have a financial component.
```

1        But Trauma 3 Center she has said to me:  If I'm

2   not there, we're just down one nurse.

3        THE COURT:  Right.  But correct me if I'm wrong,

4   she needs to be there for the afternoon shift not this

5   morning.

6        MR. EWING:  She needs to be there by noon.  So my

7   concern is if we take too long with Mr. DeFoe, so I have him

8   on cross now.  I predict I have approximately 30 minutes

9   left with him.

10        THE COURT:  So now -- which is ten minutes less

11   than you say yesterday.

12        MR. EWING:  Okay.

13        THE COURT:  All right?  And that's fine.

14        MR. EWING:  So that's my prediction; and then I

15   don't know.  That's the part that has me a little

16   uncomfortable and it's creating some mild heartburn and that

17   is I don't know how long Mr. Galipo will have him on after

18   I'm done.

19        THE COURT:  I'm going to assume based on prior

20   experience maybe 15 to 20 minutes.  So would that be a fair

21   estimate?

22        MR. GALIPO:  Yes, it would, Your Honor.

23        THE COURT:  All right.

24        MR. GALIPO:  Look.  I'll submit to whatever works.

25   I just think that -- not that it makes a big difference --

```
 1    both Mr. DeFoe and the medical examiner are being paid

 2    hourly for their time here and I have to pay it.  I don't

 3    mind.

 4             I don't think the nurse is being paid that hourly

 5    for being here; but if he wants to call her first, I'll just

 6    have to explain to Mr. DeFoe that's the way it is.  So I

 7    just want to get them done this morning if possible.

 8             THE COURT:  Right.  All right.  Okay.

 9             Look.  Let's all endeavor to get it done this

10    morning.  Let's call the nurse practitioner now, get her in

11    and get her out.

12             Now, Mr. Ewing, I think Mr. Galipo is being

13    gracious.  I think the Court is trying to extend you some

14    courtesies here.  So we need to move this along then.

15             All right.  So let's call her and then we'll go

16    back -- we'll go nurse, DeFoe, examiner.  Or unless you want

17    the examiner before DeFoe.

18             MR. GALIPO:  No, that's fine, Your Honor.

19             THE COURT:  Okay.  So we'll go nurse, DeFoe, and

20    medical examiner.

21             MR. EWING:  Thank you.  Thank you, Your Honor, and

22    thank you, Counsel.

23             MR. GALIPO:  You're welcome.

24             I just want to explain that to Mr. DeFoe.

25             THE COURT:  Yes.  And blame me.
```

| | |
|---|---|
| 1 | MR. GALIPO:  I'm not going to blame anyone.  I'll |
| 2 | be right back. |
| 3 | THE COURT:  All right. |
| 4 | MR. EWING:  I'm going to retrieve -- |
| 5 | THE COURT:  All right.  Great. |
| 6 | *(Pause in the proceedings.)* |
| 7 | MR. GALIPO:  Okay.  It's taken care of without |
| 8 | blaming anyone. |
| 9 | THE COURT:  All right.  Thank you for working |
| 10 | through this. |
| 11 | Let's bring in the jury and we will -- is the |
| 12 | nurse practitioner here?  All right.  Perfect. |
| 13 | *(Pause in the proceedings.)* |
| 14 | THE CLERK:  All rise for the jury. |
| 15 | *(The jurors entered the courtroom.)* |
| 16 | THE CLERK:  Please be seated. |
| 17 | THE COURT:  All right.  Good morning, ladies and |
| 18 | gentlemen.  What we're going to do -- and I don't know if I |
| 19 | mentioned this to you during the voir dire process -- from |
| 20 | time to time in trials, because of various schedules, the |
| 21 | parties agree to call witnesses what's called out of order. |
| 22 | We have a scenario today.  We have a witness, |
| 23 | because of her schedule, needs to be called now and so we're |
| 24 | going to call her first and then resume with the testimony |
| 25 | of Mr. DeFoe thereafter.  All right? |

| | |
|---|---|
| 1 | All right.  So, Mr. Ewing, you may proceed. |
| 2 | DEFENSE CASE-IN-CHIEF (OUT OF ORDER) |
| 3 | MR. EWING:  Thank you, Your Honor. |
| 4 | At this time the defense calls MaryAnn Savory. |
| 5 | THE COURT:  All right.  Ma'am, if you'd step |
| 6 | forward, please. |
| 7 | **MARYANN SAVORY, DEFENDANT'S WITNESS, SWORN** |
| 8 | THE CLERK:  Please raise your right hand. |
| 9 | Do you solemnly swear that the testimony you shall |
| 10 | give in the cause now before this Court shall be the truth, |
| 11 | the whole truth, and nothing but the truth, so help you God? |
| 12 | THE WITNESS:  I do. |
| 13 | THE CLERK:  Thank you.  Please be seated. |
| 14 | Please state and spell your name for the record. |
| 15 | THE WITNESS:  MaryAnn Savory. |
| 16 | M-a-r-y-A-n-n S-a-v-o-r-y. |
| 17 | THE COURT:  All right, Mr. Ewing, you may proceed. |
| 18 | MR. EWING:  Thank you. |
| 19 | **DIRECT EXAMINATION** |
| 20 | BY MR. EWING: |
| 21 | Q.   Good morning, Ms. Savory. |
| 22 | A.   Good morning. |
| 23 | Q.   What do you do for a living? |
| 24 | A.   I'm a nurse practitioner. |
| 25 | Q.   How long have you been doing that? |

1    A.    I've been an RN since 1977 and a nurse practitioner

2    since 1995.

3    Q.    Where do you work?

4    A.    Loma Linda University and Medical Center and then I

5    always work private family practice.

6    Q.    On November 19th of 2015, where did you work?

7    A.    Barstow Community Hospital.

8    Q.    Do you remember a person coming into the hospital who

9    was employed as a deputy sheriff?

10   A.    I do.

11   Q.    Do you see that person in court?

12   A.    I do.

13   Q.    Can you point him out for the jury?

14   A.    (Witness complies.)

15         MR. EWING:  May the record reflect that the

16   witness has identified Deputy Kyle Woods?

17         THE COURT:  Yes, the record will so reflect.

18         MR. EWING:  Thank you.

19   Q.    Nurse Savory, what do you recall about your interaction

20   with Deputy Woods?

21   A.    I reason I predominantly remember him because, I do see

22   a lot of people who are hurt and injured and sick, is the

23   degree of how upset he was.  He was -- he was scared, he was

24   shaking, and he was crying.

25         And I just -- he was so taken aback by, you know,

1    everything that happened to him, he stood in my mind; and he

2    was one of those cases that I'll probably remember the rest

3    of my life.

4    Q.    Did he tell you what happened that night, November

5    19th, 2015?

6    A.    He -- in the process of my, you know, examining him, he

7    gave me the medical history and how his injury occurred;

8    that's correct.

9    Q.    Did you have an opportunity to review a report that you

10   prepared as a result of your contact with Deputy Woods?

11   A.    Yes, sir, I did.

12   Q.    Did you refresh your recollection?

13   A.    Yes, sir, I did.  What I can tell you is --

14              MR. GALIPO:  I apologize, Your Honor.  It calls

15   for hearsay at this point.

16              THE COURT:  Mr. Ewing?

17              MR. EWING:  May I approach the witness?

18              THE COURT:  No, no.  There's an objection.  What's

19   the response to the objection?

20              MR. EWING:  It's an official record prepared in

21   the course and scope of her duties and she will authenticate

22   it.  She prepared it.

23              MR. GALIPO:  Still calls for hearsay, Your Honor.

24              MR. EWING:  And it's also called to rebut the

25   impeachment evidence of the plaintiffs that the defendant

1    was not injured; and it's relevant and it's called to meet

2    that impeachment evidence.

3                THE COURT:   She can testify and review the record

4    as to what her observations were, but the document is not

5    coming in.

6                MR. EWING:   That's correct.

7                THE COURT:   All right.   So you may approach with

8    the record.

9                MR. EWING:   Thank you.

10                   *(Pause in the proceedings.)*

11   BY MR. EWING:

12   Q.    The Madam Clerk has placed the document before you.   In

13   the upper right-hand corner, do you see a number on that

14   document?   On the blue tab?

15   A.    Yes, I do.

16   Q.    What's it say?

17   A.    The number on the top there is that, the 1516CV --

18   Q.    No, not that number.   The three-digit number.

19   A.    I beg your pardon?

20   Q.    The three-digit number.

21   A.    102.

22   Q.    Defense Exhibit 102?

23   A.    Correct.

24   Q.    Thank you.

25                Have you had an opportunity to look at that

1  document before?

2  A.    Yes, sir.

3  Q.    Do you recognize that document?

4  A.    Yes, sir.

5  Q.    How do you recognize that document?

6  A.    I wrote it.

7  Q.    Thank you.

8         And did you refresh your recollection about the

9  incident on November 19th, 2015, when Deputy Kyle Woods

10 presented himself to you?

11 A.    Yes, sir.

12 Q.    And based on that recollection, what do you recall

13 about what Kyle Woods told you as to the nature and extent

14 of his injuries?

15        MR. GALIPO:  Objection.  Calls for hearsay.

16        THE COURT:  Why don't we have the witness describe

17 what those injuries were.

18 BY MR. EWING:

19 Q.    Please.

20 A.    What -- do you want me to do -- I mean, I can tell you

21 what I remember because a lot of Kyle's injuries I remember.

22 Q.    Please do.

23 A.    When I remember is he telling me that -- when I asked

24 him where he hurt, he told me face, head, and hands.  And we

25 go head to toe, you know.  We touch everything.  We push.

1    And those were the areas where he was hurt.

2           He was tearful and trembling; and when I asked how

3    did this occur, I don't know how we got to the point -- this

4    point but where we started our discussion was somebody

5    sitting on him.

6           MR. GALIPO:  I apologize.  This calls for hearsay,

7    Your Honor, and lacks foundation as to how this occurred.

8           MR. EWING:  The proffer, Your Honor, is this.

9           THE COURT:  Let's sidebar, please.

10           *(The following was held at the bench:)*

11           THE COURT:  All right.  Mr. Ewing, maybe I

12    misunderstood.  I thought the purpose of this witness's

13    testimony was to describe the injuries that she observed and

14    the treatment she provided for Deputy Woods on the date of

15    the incident.

16           MR. EWING:  That's correct.

17           THE COURT:  So tell me what your basis is to

18    introduce statements that he made to her describing this

19    incident and what happened out in the field.

20           MR. EWING:  The basis of those statements to

21    overcome the hearsay objection would be the exited

22    utterance, the present-sense impression that he was

23    experiencing.  She's already testified he was crying, he was

24    upset, and so forth.

25           However, I can, depending on the Court's ruling on

1    that exception to the hearsay objection, I can guide the

2    witness and instruct her to describe the injuries as the

3    Court understood that she would testify; and that was my

4    testimony as well.  I didn't frankly anticipate her jumping

5    into that.

6              THE COURT:  All right, Mr. Galipo, anything you

7    wish to say?

8              MR. GALIPO:  Yes.  Just that I agree.  My

9    understanding was she was to describe injuries.  So if she's

10   going to start talking about what she was told about the

11   incident or what she was told about different things, I'm

12   going to object as hearsay.  If she's going to describe the

13   injuries as she observed them, then that I think is fair.

14             MR. EWING:  If I may, Your Honor, I think we have

15   an understanding.  I'm not interested in having her describe

16   what Kyle told her, even though I do feel that there's a

17   valid exception for that hearsay objection.  That's not what

18   I'm intending to call her for.

19             THE COURT:  So the record is clear, the objection

20   that Mr. Galipo had made was a hearsay objection.  I'm going

21   to sustain the objection because I don't think there has

22   been an adequate foundation laid to show that these

23   statements that he made to the nurse at the time were either

24   an excited utterance or present-sense impression.

25             So all right.  You can move forward and ask the

1    witness to describe the injuries -- describe what she

2    observed with respect to his medical condition.

3                MR. EWING:   Thank you.

4                THE COURT:   All right.   Thank you.

5       *(The following was in open court in the jury's presence:)*

6                THE COURT:   All right, Mr. Ewing, you may proceed.

7                MR. EWING:   Thank you.

8    Q.   Nurse Savory, I'd like you to describe for the jury the

9    injuries that you perceived and treated without going into

10   what Kyle told you.

11               Just tell the jury what you perceived and what you

12   treated with respect to the nature and extent of the

13   injuries that Kyle had.

14   A.   He had facial trauma, he had facial bruising, he had

15   tenderness in the back of his head.   He had cervical neck

16   tenderness and he had confusions and tenderness in both

17   hands and wrists.

18               MR. EWING:   May I have a moment, Your Honor?

19               THE COURT:   Yes.

20                    *(Pause in the proceedings.)*

21               (An exhibit was displayed on the screen.)

22   BY MR. EWING:

23   Q.   Nurse Savory, do you see what has been marked as

24   Defendant's Exhibit 126 on the screen?

25   A.   The number is cut off but I see a picture, yes.

1  Q.    And can you describe what you see in that photograph?
2  A.    I see facial contusions.  I see swelling at the bridge
3  of his nose.  He has contusions all periorbital on both eyes
4  and --
5  Q.    Excuse me, Nurse Savory.  Can you slow down a bit?
6  A.    Sorry.
7  Q.    That's okay.
8  A.    He had swelling and discoloration about both eyes,
9  across the bridge of his nose, and between both eyebrows.
10 Q.    And can you -- you can point to the screen.  Can you
11 point to the bruising that you just described to the nose?
12        And if you actually touch the screen and circle
13 it --
14 A.    (Witness complies.)
15 Q.    Thank you.  Thank you.
16        Anywhere else?
17 A.    (Indicating.)
18 Q.    And do you see any injuries to Mr. Woods' lips?
19 A.    Possibly minor right in here (indicating).
20 Q.    Can you mark it, please.
21 A.    (Witness complies.)
22 Q.    And how long have you been working as a nurse?
23 A.    I've been a nurse since 1977 and nurse practitioner
24 since 1995.
25 Q.    Do you treat people with similar injuries?

1    A.    Yes.

2    Q.    How many times have you done so?

3    A.    It would be very hard for me to tell because depending

4    on where I'm working, I see between 10 and 45 patients a

5    day.  I work seven days a week and I've worked for many,

6    many years.

7    Q.    Was it your impression that Mr. Woods was not injured

8    when he presented himself to you?

9    A.    No, sir.  It was my impression he was seriously

10   injured.  Particularly as young as he is, I take whether or

11   not to use CAT scan under consideration and I don't expose a

12   young person to CAT scan unless I feel it's medically

13   indicated because of a long-term cancer consequence.

14          And so I was seriously concerned that he had

15   facial trauma, could have had facial fractures and could

16   have had head trauma including, you know, a bleeder, a

17   subdural that was developing and his neck as well.

18   Q.    What did you do in response to the injuries that you

19   testified about just now?

20   A.    I ordered an LV imaging.  I ordered cat scans and both

21   for his head, face, and neck and X-rays for hands and

22   wrists, both sides.

23   Q.    Now, these types of orders that you made, would you

24   make those types of orders if someone was not injured?

25   A.    No, sir.

1        (An exhibit was displayed on the screen.)

2        THE COURT:  Counsel, none of these documents have

3 been admitted into evidence.  Do the parties stipulate that

4 they're going to be admitted?

5        MR. EWING:  Counsel and I -- per agreement, I

6 showed them to counsel before the witness took the stand and

7 we, by agreement, have -- would ask the Court to admit these

8 documents in evidence.

9        THE COURT:  So what documents?  126?

10        MR. EWING:  126.

11        THE COURT:  All right.

12        Are you about to show another document?

13        MR. EWING:  I am.

14        THE COURT:  And what document is that?

15        MR. EWING:  This series is Defense 126.

16        THE COURT:  All right.  All right.  So then -- so

17 the record is clear, is it 126A, 126-1, -2, or how have you

18 designated those?

19        MR. EWING:  One moment, Your Honor.

20        *(Pause in the proceedings.)*

21        MR. EWING:  First, if I may clear the screen.

22        THE COURT:  I'll do it for you if you can't.

23        MR. EWING:  Thank you, Your Honor.

24        And then with respect to the documents in the

25 Defendants' Exhibit Binder, they're all under Defense 126.

| | |
|---|---|
| 1 | This first document the defense would ask that the Court |
| 2 | admit it as Defense 126A. |
| 3 | THE COURT:  All right.  So any objection to 126A? |
| 4 | MR. GALIPO:  No, Your Honor. |
| 5 | THE COURT:  All right.  So 126A will be admitted. |
| 6 | MR. EWING:  Thank you, Your Honor. |
| 7 | *(Exhibit 126A received in evidence.)* |
| 8 | (The exhibit was displayed on the screen.) |
| 9 | THE COURT:  So, again, I'm not used to the |
| 10 | exhibits being published before they're admitted.  So walk |
| 11 | me through what exhibits you're going to use. |
| 12 | What number is this? |
| 13 | MR. EWING:  This would be 126B per agreement and |
| 14 | permission to publish; and I would note for the Court that |
| 15 | these are consistent with the plaintiff's exhibits, they're |
| 16 | essentially the same photographs, just a little larger. |
| 17 | THE COURT:  All right.  So then can you walk me |
| 18 | through just so I know what exhibits you're going to |
| 19 | introduce and let me confirm that they are with stipulation |
| 20 | so they can be admitted and then published to this jury. |
| 21 | MR. EWING:  Yes, Your Honor.  Thank you. |
| 22 | Defendant's Exhibit 126A which as previously shown. |
| 23 | THE COURT:  All right. |
| 24 | MR. EWING:  Per agreement. |
| 25 | Defendants 126B which was previously shown to |

```
 1    counsel --
 2              THE COURT:  All right.
 3              MR. EWING:  -- per agreement.
 4              Defendants 126C which was previously shown to
 5    counsel per agreement and permission to publish.
 6              THE COURT:  So just those three with this witness?
 7              MR. EWING:  That's correct.
 8              THE COURT:  All right.  So any objection to those
 9    exhibits, Mr. Galipo?
10              MR. GALIPO:  No, Your Honor.
11              THE COURT:  So 126A, B, and C will be admitted.
12              You may proceed.
13              MR. EWING:  Your Honor, I apologize.  Defendants'
14    126D shown to counsel, per agreement, permission to publish.
15    That's one additional exhibit.
16              THE COURT:  All right.  So any objection to
17    Exhibit 126D, Mr. Galipo?
18              MR. GALIPO:  No.
19              THE COURT:  So 126A through D are admitted.  You
20    may now proceed and publish them.
21              MR. EWING:  Thank you.
22              (Exhibit 126B received in evidence.)
23              (Exhibit 126C received in evidence.)
24              (Exhibit 126D received in evidence.)
25
```

400

1   BY MR. EWING:

2   Q.    Nurse Savory, do you see the exhibit before you marked

3   as Defendants' 126B?

4   A.    Yes, sir.

5   Q.    Do you recognize that exhibit?

6   A.    Yes, sir.

7   Q.    What does it depict?

8   A.    It depicts a small laceration and contusion on his

9   right hand.  No.  Yeah, right hand.

10  Q.    I'm going to --

11  A.    Hand.

12  Q.    Okay.  That's fine.

13        And is that -- would you describe that as an

14  injury?

15  A.    Yes.

16  Q.    And is that something you saw on November 19, 2015 --

17  A.    Yes.

18  Q.    -- when Kyle Woods presented himself to you?

19  A.    Yes.

20  Q.    And if you -- based on your training and experience,

21  what did you do with that injury?

22  A.    I ordered X-rays, did a physical exam.  And we would

23  have dressed and treated the wound.

24  Q.    Next would be Defendants' 126D.

25        (The exhibit was displayed on the screen.)

1    BY MR. EWING:

2    Q.    Are you able to see that photo?

3    A.    Yes, sir.

4    Q.    Do you recognize that photo?

5    A.    Yes.   That would be his other hand.

6    Q.    And what does that photo depict?

7    A.    Soft tissue swelling, contusion, and possible fracture

8    of the hand joint.

9    Q.    Can you circle the area of the hand that you perceived

10   as injured?

11   A.    (Witness complies.)

12         MR. EWING:  If the Court could indulge Counsel.

13   Thank you.

14         THE COURT:  All right.

15         This is why I get paid the extra $50 for.

16         All right.

17         MR. EWING:  The last would be Defense 126D.

18         (The exhibit was displayed on the screen.)

19   BY MR. EWING:

20   Q.    Do you see that photo?

21   A.    Yes, sir.

22   Q.    Do you recognize it?

23   A.    Yes, sir.

24   Q.    What does that photo depict?

25   A.    Those are both of his hands.

1    Q.    And what does the photo show?

2    A.    Injuries to both of his hands.   Probably worse injuries

3    to the hand that has the armband on it but injuries to both

4    hands.

5    Q.    When you say armband for the jury to distinguish --

6    thank you.   And can you circle the injuries that you just

7    testified about?

8    A.    (Witness complies.)

9    Q.    What did you do in response to seeing those injuries?

10   A.    Ordered X-rays and did a physical exam.

11   Q.    What else did you observe with respect to Mr. Woods

12   when he presented himself to you?  Not what he told you but

13   what did you observe?

14   A.    He also had tenderness to the back of his scalp.   He

15   was, as, you know, I alluded to earlier, he was extremely

16   upset.   He was shaking, trembling.   He was tearful on

17   several occasions.

18         And he just -- he -- it's hard for me to describe

19   to you just how upset he was but that's just the part that

20   stands out in my mind is, you know, he was hurt, he was

21   frightened, he was remorseful.   He just was --

22   Q.    Okay.   Again, we're not -- without going into what Kyle

23   told you.

24   A.    Right.

25   Q.    What did you do in response to the observations you've

1   just testified about with respect to your medical

2   profession.  Did you make any orders?  Did you talk to

3   doctors?  What did you do?

4   A.    I went ahead and did the physical exam and made sure

5   that I, you know, that we had appropriate testing to

6   determine how seriously ill he was -- I mean, how seriously

7   injured he was.

8           I don't remember if we offered any counseling at

9   that point.  I did consult with my attending physician, you

10  know, to make sure he was on board; and he agreed with the

11  treatment plan that I had, you know, prescribed and the

12  diagnostic plan.

13  Q.    With respect to the injuries to Mr. Woods -- to the

14  back of Mr. Woods' head that you talked about, did you

15  examine the back of his head?

16  A.    Yes, sir.

17  Q.    And, again, not going into what he told you, did you

18  observe anything?

19  A.    It was mild soft tissue swelling but extremely tender

20  and I was concerned that he could have had either a

21  traumatic brain injury or that he could have had a fracture.

22  Q.    And what did you do in response to that examination?

23  A.    CAT-scanned his head.

24  Q.    Without -- again, without talking about anything that

25  Mr. Woods told you, is there anything else that you can

1   recall about this incident that you haven't testified about
2   now?
3   A.   I did find some tenderness in the neck area that was
4   consistent with the mechanism of injury.  I was concerned
5   that he could have had a spinal injury.
6        I ordered a CAT scan of his cervical spine and
7   then for the facial trauma again.  I was concerned for
8   either fractures around his eye, his facial bones, or his
9   nose and so I ordered CAT scans for his face.
10        MR. EWING:   Thank you, Nurse Savory.
11        THE COURT:   Mr. Galipo?
12        MR. GALIPO:   Yes.   Thank you, Your Honor.
13                  **CROSS-EXAMINATION**
14   BY MR. GALIPO:
15   Q.   Good morning.
16   A.   Good morning, sir.
17   Q.   The hospital you work at, is that a county hospital?
18   A.   It's Barstow Community Hospital.
19   Q.   And is that a county hospital or not?
20   A.   No.
21   Q.   Okay.  In any event, prior to today have you talked to
22   anyone about this case?  Let's say in the last week.
23   A.   Umm, Barstow called me on -- I want to say Monday and
24   said somebody was there to serve a subpoena.
25        Umm, I gave them my contact information.  I

1    received a subpoena on Tuesday.  I spoke to the attorney

2    about possible dates that, you know, for my -- to be able to

3    testify because unfortunately I already had a full work

4    schedule.

5    Q.    When did you first speak to the attorney?

6    A.    Umm, I believe it was Tuesday night but I -- I believe

7    it was Tuesday night.

8    Q.    Okay.  And have you spoken to him at all since then?

9    A.    Yes, sir.  I spoke to him in the process of determining

10   when I could get off work to come.  I had spoke to him

11   several times because I was trying to -- I was supposed to

12   be at work at 7:00 this morning and I had to get someone to

13   cover the first part of my shift.

14   Q.    Okay.  How about this morning?  Did you speak to him

15   this morning?

16   A.    For a short period of time, yes, sir.

17   Q.    And was Kyle Woods in the room when you were all

18   speaking together this morning?

19   A.    Yes, sir.

20   Q.    And that was before you testified; correct?

21   A.    Umm, yes, sir.

22   Q.    Now, do you still have Exhibit 102 in front of you?

23   A.    Yes, sir.

24   Q.    And are you saying that you generated that document?

25   A.    I generated -- is it okay if we go through it page by

1   page?

2   Q.   Well, right now I just want to know if you generated a

3   portion or portions of that document.

4   A.   I generated portions of it, yes, sir.

5          MR. GALIPO:   Okay.   And I'm going to put

6   Exhibit 28-2 up.

7          (The exhibit was displayed on the screen.)

8   BY MR. GALIPO:

9   Q.   Do you remember some photographs being taken of

10  Kyle Woods while he was at the hospital?

11  A.   I was not immediately his care provider so I was not in

12  the room when they were taking the photographs.

13         I want to tell you that I believe I think I

14  remember that they did but I was not paying attention so I

15  can't tell you for sure.

16  Q.   Okay.   Is that generally how he appeared when you saw

17  him?

18  A.   Generally?  Yes, sir.

19  Q.   Okay.   Well, you would agree he's not crying or

20  trembling in this photograph?

21  A.   In that photograph?  I will agree with you, yes, sir.

22  Q.   All right.   And, in fact, you didn't note anywhere in

23  the report that he was crying or trembling, did you?

24  A.   Yes, I did, sir.

25  Q.   You said he was crying?

1    A.    No, I said he was tremulous.  He had a tremor.  If you

2    give me a minute, I'll find it for you.

3    Q.    My question is:  Did you say he was crying anywhere?

4    A.    No, sir.

5    Q.    Okay.  Was he bleeding when you saw him?

6    A.    Dripping blood, no, sir.  Dried blood, yes, sir.

7    Q.    Oh, really?  Where is the dry blood in this picture?

8    A.    On his hand and up his nose.

9    Q.    Can you see any blood in this picture?

10   A.    In this picture, no, sir.

11   Q.    The injuries to his hands, do you know if those would

12   be consistent with punching someone in their face or head?

13   A.    They could be, sir.

14   Q.    Okay.  Did you see any lacerations on him?

15   A.    Yes, sir.

16   Q.    Where?

17   A.    His hand, sir.

18   Q.    Okay.  Again, those would be consistent with punching

19   someone in the face or head; correct?

20   A.    They could be.

21   Q.    His face, did you see any lacerations?

22   A.    No, sir.

23   Q.    How about the back of his head?  Let me show you a

24   picture to the back of his head, Exhibit 15-13.

25          (The exhibit was displayed on the screen.)

1    BY MR. GALIPO:

2    Q.    Did you see any lacerations to the back of his head?

3    A.    He did not have lacerations to the best of my memory,

4    sir.  He had soft tissue swelling and tenderness.

5    Q.    Well, tenderness has a subjective component to it,

6    doesn't it?

7    A.    And laceration has a superficial component.  A

8    laceration is an indicator of deep injury.

9    Q.    Well, wouldn't you agree that even in a non-serious

10   injury you could have a laceration?

11   A.    Correct.

12   Q.    And in this case you already told us he had no

13   lacerations on his head or face; isn't that correct?

14   A.    You don't have to have a laceration to have a serious

15   injury, sir.

16   Q.    Okay.  But you would agree he didn't have any

17   lacerations?

18   A.    Correct, sir.

19   Q.    Okay.  Now, clearly it's not indicated that he had a

20   concussion.  Would you agree with that?

21   A.    No, sir.

22   Q.    You would agree?

23   A.    If I clearly felt that there was no potential for a

24   concussion, I would have never subjected him to that much

25   radiation for a CAT scan, sir.

1    Q.    There's no diagnosis of a concussion -- Would you agree

2    with that? -- in this record.

3    A.    The reason I'm looking is because I tend to use the

4    diagnosis "head injury" interchangeably with "concussion."

5    So I would like to look at my actual wording I used.

6    Q.    Sure.

7    A.    (Looking at document.)

8    Q.    Do you see the word "concussion" anywhere in there?

9    A.    Yes, in my differential.

10   Q.    You see the word "concussion"?

11   A.    I'm sorry.   "Close head injury."

12   Q.    Okay.  Now, you didn't -- you would agree that he

13   didn't have any teeth knocked out.  Would you agree with

14   that?

15   A.    Yes, sir.

16   Q.    He didn't have a busted lip.  Would you agree with

17   that?

18   A.    In terms of a laceration that required suturing, I'll

19   agree with that.

20   Q.    Right.  He didn't come in with black eyes, did he?

21            And you can look at this picture again if you

22   want.

23            (The exhibit was displayed on the screen.)

24            THE WITNESS:  I'm going to tell you is he did not

25   have black eyes at the time this picture was taken.

1    Sometimes bruising takes a while before it's visibly

2    present.  I don't know what he looked like a day or two

3    afterwards.

4          At the time that I saw him, it was more evident on

5    the pictures that are larger but he had the beginning of

6    bruising showing all around both eyes.

7          I don't see it in this picture but it was evident

8    in the other picture.

9    Q.    I see.  The marks on his nose, do you know if those

10   could be consistent with someone wearing glasses?

11   A.    Umm, I guess you're going to have to show me

12   specifically which marks you're referring to.  I don't see

13   little glasses marks.  I see the big soft-tissue swelling.

14   Q.    Okay.  This section where it goes through the different

15   parts and says whether it's negative for any injury, did you

16   do that or did the doctor do that?

17   A.    I did that.

18   Q.    Okay.  So when you put eyes, you put negative for

19   injury, don't you?

20   A.    His eyeballs were negative for injury.

21   Q.    Right.  And cardiovascular, negative.  Respiratory,

22   negative for shortness of breath.  Cough, wheezing and chest

23   pain; correct?

24   A.    Correct.

25   Q.    You put that?

1   A.    Yes.

2   Q.    Negative for abdominal pain.  You put that?

3   A.    Yes.

4   Q.    Back, negative for injury and pain.  You put that?

5   A.    Yes.

6   Q.    Skin, negative for injury, rash, and discoloration.

7   You put that?

8   A.    Yes.

9   Q.    Neural.  Negative for headache, weakness, numbness,

10  tingling, and seizure.  You put that?

11  A.    I'm looking at it.  I want to see it again.  (Looking

12  at document.)  Yes.

13  Q.    Okay.  Neck.  You put negative for -- negative for pain

14  at rest, swelling, and bony tenderness, didn't you?

15  A.    And positive for pain with movement and tenderness.

16  Q.    I thought you just said he had a neck contusion to this

17  jury.

18  A.    No, I said he had finger -- he had tenderness to my

19  touch.

20  Q.    Would you agree you put negative with respect to the

21  neck, negative for pain at rest, negative for swelling, and

22  negative for bony tenderness?

23  A.    Yes.

24  Q.    In fact, your impression was he was in no acute

25  distress; correct?

1    A.    My impression was physically he was in no acute

2    distress.

3    Q.    And you indicated that, true?

4    A.    Yes.

5    Q.    Correct?

6    A.    Yes.

7    Q.    Also, the neuro exam at the top of the next page, did

8    you do that or did a doctor do that?

9    A.    I did.

10   Q.    And you indicated his memory was intact; correct?

11   A.    His memory was intact to the best of my ability to know

12   that, yes.

13   Q.    You also -- can you turn to the third page.  It might

14   be the fourth page.

15          Let me see if I can direct you to the right page.

16   I guess it's --

17          MR. GALIPO:  May I approach just to make sure

18   we're looking at the same document with the witness?

19          THE COURT:  All right.  You may.

20          MR. GALIPO:  My pages aren't numbered so well so I

21   just want to see.

22   Q.    Do you have a page similar to this?

23   A.    Yeah.  And that's not mine.  That's a staff nurse.

24   Q.    That's a staff nurse.  That was my next question.

25          You would agree there was no indication of loss of

1   consciousness?

2          THE COURT:  I'm sorry, Mr. Galipo.   The court

3   reporter is not going to be able to hear.

4          MR. GALIPO:   Oh, I'm sorry.

5   Q.    You would agree that there was no indication of loss of

6   consciousness;  correct?

7   A.    I can't agree to -- I can't agree to that because when

8   I did my history of asking him for the description of what

9   happened to him and what he was experiencing,  part of what

10  he was experiencing was like a waxing and waning of almost

11  blacking out of vision.

12          And I do not know for a fact if there was a

13  complete loss of consciousness or just an almost loss of

14  consciousness which is part of the reason I did the cat

15  scan.

16  Q.    I take it you haven't seen a video of this incident; is

17  that true?

18  A.    I don't even -- I don't know what the incident was,

19  sir, and I almost prefer it to be that way.

20  Q.    Okay.   And didn't you note -- you checked his vision,

21  didn't you?

22  A.    That I don't remember.   I'll have to -- I would have to

23  go back through the records again and see if they did a

24  visual acuity.

25          MR. GALIPO:   May I have a moment to look at my

1    notes, Your Honor?

2            THE COURT:   Absolutely.

3                (Pause in the proceedings.)

4    BY MR. GALIPO:

5    Q.    I take it after these diagnostic tests were done he was

6    released from the hospital?

7    A.    Correct.

8    Q.    You didn't feel that he needed to stay in the hospital,

9    did you?

10   A.    No, sir.

11           MR. GALIPO:   Thank you.   That's all I have, Your

12   Honor.

13           THE COURT:   Mr. Ewing?

14           MR. EWING:   Thank you, Your Honor.

15                    **REDIRECT EXAMINATION**

16   BY MR. EWING:

17   Q.    Nurse Savory, is it your testimony today that when

18   Kyle Woods presented himself to you, you perceived him as

19   injured?

20   A.    Yes.

21   Q.    You talked about the physical components of Mr. Woods'

22   injuries.   Did you perceive any -- an emotional component to

23   his injuries?

24           MR. GALIPO:   I'm going to object.   This calls for

25   speculation, lacks foundation.

```
 1            THE COURT:   Sustained.
 2   BY MR. EWING:
 3   Q.    What did you observe with Mr. Woods with respect to the
 4   emotional component?  Was he crying?
 5   A.    He was --
 6            MR. GALIPO:   Cumulative.  It calls for speculation
 7   and lacks foundation as to why he was emotional.
 8            THE COURT:   Sustained.
 9            I think we covered this during direct.
10            THE WITNESS:   He was --
11   BY MR. EWING:
12   Q.    No.  When he sustains the objection, you're not to
13   respond to the question.
14   A.    Sorry.
15            THE COURT:   Next question?
16            MR. EWING:   I have nothing further.
17            MR. GALIPO:   No further questions, Your Honor.
18            THE COURT:   Thank you, ma'am.
19            You may step down.
20            THE WITNESS:   Thank you.
21            MR. GALIPO:   I believe, Your Honor, we're going to
22   continue with Mr. DeFoe's testimony.  We're going to try and
23   get him from the hallway.
24            THE COURT:   All right.  Great.  Thank you.
25            MR. EWING:   If I may briefly --
```

| | |
|---|---|
| 1 | THE COURT:  Yes. |
| 2 | PLAINTIFFS' CASE-IN-CHIEF RESUMED |
| 3 | **SCOTT DeFOE, PLAINTIFFS' WITNESS, RESUMED** |
| 4 | THE COURT:  All right, Mr. DeFoe, you may resume |
| 5 | the witness stand.  I'll remind you that you're still under |
| 6 | oath. |
| 7 | I believe Mr. Ewing was conducting his examination |
| 8 | and so we'll continue with that. |
| 9 | MR. EWING:  Before we resume, may we approach? |
| 10 | THE COURT:  All right. |
| 11 | *(The following was held at the bench:)* |
| 12 | MR. GALIPO:  We're going to object to this. |
| 13 | THE COURT:  Hold on a second. |
| 14 | Mr. Ewing, what's the issue? |
| 15 | MR. EWING:  Mr. DeFoe has testified that he |
| 16 | believed that Mr. Pickett didn't know how to spell his name. |
| 17 | To impeach him and on relevance, not to enter it |
| 18 | as the truth of the matter asserted, I'm seeking to examine |
| 19 | him on Mr. Pickett's signature on this official record which |
| 20 | is a DMV record that the defense has obtained. |
| 21 | If the Court could see it. |
| 22 | THE COURT:  All right.  Let me take a look at it. |
| 23 | (Looking at document.)  Okay.  And so I'm not sure I |
| 24 | understand.  You're saying that the witness has said -- and |
| 25 | if my memory serves me correctly, the witness has indicated |

| | |
|---|---|
| 1 | he did not know or he wasn't sure if Mr. Pickett knew how to |
| 2 | spell and that was his assumption, speculation, or opinion. |
| 3 | How does showing a signature, A, prove that he can |
| 4 | spell and, B, why is that relevant? |
| 5 | MR. EWING:  So that was essentially his testimony. |
| 6 | The question -- the line of questioning following that |
| 7 | testimony was:  On what basis did you make that conclusion? |
| 8 | And he based it upon essentially the audio record. |
| 9 | I said:  Did you review any records that, you |
| 10 | know, helped you formulate your opinion here today as an |
| 11 | expert? |
| 12 | Yes, I did. |
| 13 | I said:  Did you review any records that indicated |
| 14 | that Nate couldn't spell his name? |
| 15 | No, I didn't. |
| 16 | THE COURT:  Okay.  And is this part of the record |
| 17 | what you're showing? |
| 18 | MR. EWING:  No.  And, again, this would not be -- |
| 19 | we're not seeking to introduce this for the truth of the |
| 20 | matter, just to meet the assertion that -- to impeach him to |
| 21 | meet the assertion that Nate Pickett couldn't spell his |
| 22 | name. |
| 23 | THE COURT:  Okay.  But then I guess that leads to |
| 24 | -- I'm not sure I see the relevance but tell me why do you |
| 25 | believe the signature is proof that he can spell his name. |

1          Is it because the letters on there?  Because, I

2    mean, some might argue there are plenty of people who are

3    illiterate that can form -- can write signatures.  So walk

4    me through why.

5          MR. EWING:  Sure.  It appears to be a California

6    identification record, not a drivers license, and those

7    records and drivers licenses and IDs are signed by the

8    person who possesses them; and the letters show from what I

9    see P-i-c-k-e-t-t.

10          THE COURT:  Okay.

11          MR. EWING:  Not P-i-g-g-e-t which is the name that

12    he confirmed with Deputy Woods.

13          THE COURT:  All right.  Well, look.  I'm just

14    going to say I don't see the relevance.  The witness said he

15    didn't think that the guy could spell, he didn't look at

16    this document, and so I'm not going to allow any inquiry

17    with respect to that.

18          Now, two other things while I have you here at

19    sidebar or one.  I neglected to mention earlier, Juror

20    No. 8, whose last name escapes me right now --

21          MR. EWING:  Ardaz?

22          THE COURT:  No, no.  Juror No. 8 in the front row.

23    He has indicated to my courtroom clerk that he's not feeling

24    well.  He's going to try, for lack of a better term, weather

25    the storm but he may seek to be excused.

1          Now, I will note as an aside he was the juror who

2    is a plumber who indicated that he would prefer not to be

3    here because my sense was that he was self-employed.

4          MR. GALIPO:  Right.

5          THE COURT:  So I'm just letting you all know that

6    we may have an issue with a juror seeking to be excused.

7    That's number one.

8          Number two, to the extent I wasn't clear,

9    Mr. Conaway, I'm assuming by virtue of the fact that you

10   have not explicitly said you wish to examine witnesses; that

11   you don't wish to examine that witness?  Is that a fair

12   assumption?

13         MR. CONAWAY:  That's correct.

14         THE COURT:  All right.  So I will continue under

15   that assumption; but if there are witnesses that you do wish

16   to examine, please let the Court know and we will allow you

17   that opportunity.

18         All right?

19         MR. CONAWAY:  Very good.

20         THE COURT:  All right.  So let's move forward.

21         MR. EWING:  Thank you.

22         THE COURT:  Thank you.

23     *(The following was in open court in the jury's presence:)*

24         THE COURT:  All right, Mr. Ewing, you may proceed.

25         MR. EWING:  Thank you.

1          **CROSS-EXAMINATION**

2     BY MR. EWING:

3     Q.    Good morning, Mr. DeFoe.

4     A.    Good morning.

5            MR. EWING:  If I may have a moment, Your Honor?

6            THE COURT:  Yes.

7            MR. EWING:  Thank you.

8                 *(Pause in the proceedings.)*

9     BY MR. EWING:

10    Q.    Mr. DeFoe, based on your experience, can you describe

11    for the jury the less-lethal options that Deputy Woods had

12    available to him on November 19th, 2015?

13    A.    OC spray which is pepper spray; a Taser we mentioned

14    yesterday which is most likely the Taser Model X26.  I don't

15    know if he had his impact weapon on his belt at the time

16    either an asp or a baton as well for less-lethal force

17    options.

18    Q.    And with respect to the tools that an officer has

19    available to him when he is grappling or ground fighting

20    with a subject, what tools did he have available to him that

21    you haven't just described?

22    A.    Personally body weapons.  That would be your hands,

23    your fists, things such as that.  Knees, feet also.

24    Q.    When you're going to detain someone, is there a

25    technique called wristlock?

1  A.    Yes.

2  Q.    And can you describe that to the jury?

3  A.    Well, there are different forms of wristlocks.  It's

4  basically to control that wrist, to limit that wrist's

5  movement, typically used at a lower-level use of force, also

6  to effect the handcuffing technique.

7         You just want to immobilize that specific wrist

8  typically for handcuffing to bring that to the small of the

9  back to then apply the handcuffs.

10 Q.    Can you just from where you're seated demonstrate how

11 you might reach out to effectuate a wristlock for a subject?

12 A.    Well, it depends.  It depends on where that person's

13 hand is at the time.  You can obviously grab to control the

14 wrist, bring that wrist to the small of the back.  You can

15 try to control the fingers into a wristlock.  There's

16 different variations depending on where you're positioned.

17 If you're facing that person, if the person is facing you,

18 if you're on the ground.  There are different variations.

19 Q.    And what position is the officer's hand trained to be

20 when he's attempting to effectuate a wristlock?

21 A.    I was --

22 Q.    You just demonstrated it looked like your palm was

23 down.  Are you reaching for a wrist when you did that?

24 A.    Could be.  Could be reaching for the wrist to basically

25 go over that person's hand to come underneath to control

1   that wrist would be one way to apply a wristlock.

2   Q.    Do you ever apply a wristlock with the palm up?

3   A.    It depends.  You can.  I mean, that's primarily for

4   pain compliance but you can with the palm up.

5   Q.    In this case involving Kyle Woods, are you aware of him

6   attempting to effectuate a handcuffing by using a wristlock

7   technique?

8   A.    I do not.  I don't know that he went to grab at -- grab

9   or grab at his arm prior to Mr. Pickett fleeing.

10  Q.    And when Mr. Woods went to grab Mr. Pickett's arm, do

11  you have any idea of how Mr. Woods did that?

12  A.    You're talking based on the video or talking initially?

13  Q.    Based on the video, based on the description of the

14  incident in the record that you reviewed to prepare you for

15  your testimony.

16  A.    Well, he reached out to grab at his wrist prior to

17  Mr. Pickett fleeing.  Now, that was -- that's not shown on

18  the video that I reviewed.

19  Q.    Did you see it in any description of the incident in

20  the reports that you reviewed to prepare you for your

21  testimony?

22  A.    Just that he reached out to grab his wrist or arm at

23  that time.

24  Q.    And is there any indication of how Deputy Woods reached

25  towards Nate Pickett?

1  A.    No.

2  Q.    You talked yesterday about gun retention training and I

3  believe your testimony was essentially, if you're ground

4  fighting, that you shouldn't pull out your gun.

5        Is that correct?

6  A.    Yes.

7  Q.    If you're ground fighting and you're in fear for your

8  life or great bodily injury, would that be a time to pull

9  out your gun?

10  A.    It would only have to be an immediate defense of life

11  because now you're introducing that weapon or that gun into

12  an altercation which creates more of a hazard or more of a

13  risk, as I mentioned yesterday, because it limits you to

14  only one arm.

15        Typically officers are going to draw on their

16  dominant hand and then for one -- which is their strong hand

17  typically -- which will limit their movement and obviously

18  allow them to have one hand at that time.

19  Q.    So if I'm to understand you, if you are ground fighting

20  and you're in immediate fear for your life and it's imminent

21  or great bodily injury, that would be a time during that

22  ground-fight for an officer to use his gun?

23  A.    No, I didn't testify to that.  It would only be in

24  immediate defense of life.

25        Ground fighting, I mean, officers fight all the

1    time on the ground.  They use force.  There can be strikes,

2    kicks, different variations of force on the ground.

3            It's only in immediate defense of life and only as

4    the last resort when you've used some of the other options

5    that I previously mentioned prior to.

6            In addition to the Taser we mentioned, just for

7    your edification is it fires two probes but it can also be

8    used like in a stun-gun mode for your -- to simplify things

9    where it just emits voltage from the Taser which is used for

10   pain compliance.

11           But you don't need to be concerned about darts or

12   firing or distance.  It can be used up close and personal,

13   that being to side of the ribcage or extremities, wherever

14   you decide to target that area.

15   Q.    Yesterday did you talk about the use of deadly force

16   and great bodily injury?  Did you tell the jury about that

17   yesterday?

18           MR. GALIPO:  Objection.  Vague as phrased.

19           THE COURT:  Overruled.

20           THE WITNESS:  I don't understand the question.

21   BY MR. EWING:

22   Q.    Sure.  So when an officer is going to use deadly force,

23   that is, when that officer has a reasonable fear of death or

24   great bodily injury; is that correct?

25   A.    That's correct.

1  Q.    Okay.  Did you tell the jury anything about the fear of
2  great bodily injury yesterday?
3  A.    I don't know if I told them about it.  We talked a
4  little bit about subjective fear yesterday.
5  Q.    Right.  So there's a learning domain with respect to
6  use of deadly force and you testified about that learning
7  domain yesterday, didn't you?
8  A.    I believe I did, yes.
9  Q.    This is one of the things that you do as an expert
10 witness for the plaintiffs?  You talk about that learning
11 domain and the use of deadly force; correct?
12 A.    Yes.
13 Q.    Did you mention great bodily injury at all yesterday in
14 your testimony about the use of deadly force in the context
15 of your discussion on Learning Domain 20?
16 A.    I don't know.  I may have.  I don't know if that
17 question came up.
18 Q.    Can you tell the jury now about that learning domain
19 and great bodily injury and use of deadly force and fear for
20 great bodily injury?  Can you tell the jury what that means
21 and what it's all about?  What's an officer trained to do?
22 A.    I don't understand your question.
23 Q.    Can you tell the jury about great bodily injury and the
24 use of deadly force?
25 A.    To define great bodily injury?

1  Q.    With respect to Learning Domain 20.

2  A.    Sure.  It's defined as serious bodily harm or injury

3  according to POST Learning Domain No. 20, Chapter 3-5.

4          It means a serious impairment of physical

5  condition including but not limited to loss of

6  consciousness, concussion, bone fracture, protracted loss or

7  impairment of any function of any bodily member or organ, a

8  wound requiring extensive suturing and serious

9  disfigurement.

10 Q.    You've reviewed the record and you've listened to the

11 audio in this particular case.  Do you know whether or not

12 Kyle Woods has testified either in a written report or in

13 his testimony in this case that he felt like he was losing

14 consciousness?

15 A.    He testified to that, yes.

16 Q.    And that loss of consciousness would be one of the

17 forms of great bodily injury that you testified about?

18 A.    It would be if in fact he was losing consciousness.

19 Q.    But you didn't examine him.  You weren't there so you

20 wouldn't know.

21 A.    No.  But what I did do is I watched the video.  I

22 looked at what he testified to; that being there were 10 to

23 20 strikes.  No evidence of injury to the face or to the

24 back of the head that would be indicative of that.

25          I also listened to his transmissions following the

1    use of deadly force where he requested assistance.  He got

2    on the air.  Did some other things that weren't consistent

3    with someone about to be knocked out or losing consciousness

4    at that time.

5            In addition, if you're losing consciousness, to

6    get your weapon system out of your holster requires some

7    manipulation especially when on the ground so that in

8    itself, if you're about to be knocked out at that time, it

9    would require some motor skills to be able to take that

10   weapon out of your holster.

11   Q.   Mr. DeFoe, safe to say, I think you mentioned this

12   yesterday, you're not a medical professional, are you?

13   A.   Oh, no, sir.

14   Q.   And you didn't diagnosis Kyle Woods at the time that

15   this happened?

16   A.   No.

17   Q.   So you don't whether he was losing consciousness or

18   not, do you?

19   A.   I do not.

20   Q.   It's just your opinion?

21   A.   Yes, sir.

22           MR. EWING:   May I have a moment, Your Honor?

23           THE COURT:   Absolutely.

24               *(Pause in the proceedings.)*

25

BY MR. EWING:

Q.   You're aware that Kyle Woods has testified that he did not use the pepper spray when he was fighting on the ground with Nate; correct?

A.   He didn't use pepper spray at all during this incident.

Q.   That's right.  And that's one of the less-lethal tools that was available to Deputy Woods on the night of the incident?

A.   Yes.

Q.   And the other less-lethal tool that he had available to him, I believe, too, would be his fists; correct?

A.   His fists, yes.

Q.   And you're aware that he used his fist in the fight with Nate Pickett?

A.   Yes.

Q.   Now, is it your assumption -- you talked many times about the number of full-force blows that you believe Deputy Woods sustained.

       Is it your understanding from reviewing the record and talking to your counsel and so forth in preparation for this case, including the deposition testimony of Kyle Woods, that every one of those punches from Nate Pickett struck Kyle Woods?

A.   Well, when I looked at the video, I didn't see any punches strike Kyle Woods in the face; and, secondly, he

1   testified to 10 to 20 times in the face-mouth area.

2   Q.    So you -- you've been a patrol officer.  You also

3   practice martial arts; is that correct?

4   A.    Yes.

5   Q.    So -- and you testified that you've ground fought

6   people before; correct?

7   A.    Yes.

8   Q.    In the course of your duties as a police officer?

9   A.    And in the course of duties as my hobby.

10  Q.    Right.  And so in martial arts you have also ground

11  fought with people?

12  A.    Yes.

13  Q.    When you punch someone, does every one of your blows

14  land?

15  A.    Do all of them land?  No.  But if I articulate in a use

16  of force report that I was struck 10 to 20 times, that

17  assumption would be that in fact I was hit 10 to 20 times

18  or, conversely, if I punch someone 10 to 20 times and struck

19  them, not punched at them but struck them 10 or 20 times,

20  then I'm opining or at least testifying or noting that I

21  actually hit that person that many times.

22  Q.    Did you find anywhere in Kyle Woods' deposition

23  transcript or the reports that you viewed of this incident

24  where Kyle Woods said that he was struck 15 to 20 times or

25  10 to 20 times in the nose?

1    A.    No.

2    Q.    When a person is fighting, ground fighting and so

3    forth, and a description of a punch is one that has landed,

4    is it possible that it could have hit his arm?

5    A.    It could have but you wouldn't testify that you were

6    punched in the face 10 to 20 times.  You'd say you were

7    struck in the arm.

8    Q.    Did Kyle Woods -- do you believe, based on this

9    description, the description of his fight, do you believe

10   that Kyle Woods was lying there without defending himself?

11   A.    No, to the contrary.

12   Q.    Do you believe that Nate was lying there without

13   defending himself?

14   A.    At what point?

15   Q.    During their fight.

16   A.    Well, the initial part of the video that you see, he's

17   lying on his back in a defensive position with his hands

18   visible.

19   Q.    At that point -- they weren't fighting at that point,

20   were they?  So I'm asking you about when they were fighting,

21   do you believe that Nate was lying there without defending

22   himself?

23   A.    Well, he was trying to defend himself, as you can see

24   in the video when he's got him in guard position and he's

25   striking him to the side of the face, that being

1  Deputy Woods is striking Mr. Pickett to the side of the

2  face.

3          Once again, as we mentioned yesterday, a normal

4  reaction for those of us, or even those that aren't

5  conversant with defensive fighting or boxing, whatnot, are

6  going to automatically come up to defend yourself if you're

7  being struck.

8  Q.    Is there a difference between trying to defend yourself

9  and defending yourself?

10  A.    Well, you're hopeful that --

11  Q.    You made that distinction?

12  A.    Well, if there is a distinction, hopefully, for one, if

13  you're effective, then obviously you're going to be able to

14  defend yourself.

15          If I try to thwart a blow or strike and I'm not

16  effective and I get struck, I attempted to obviously defend

17  myself but it wasn't a value and I ended up getting hit.

18          Typically with a boxer, you'll see a counterpunch

19  or the minute he -- you'll watch a boxing match.  The minute

20  a good boxer will -- a punch will be thrown.  A good boxer

21  will automatically counterpunch and he's countering to that

22  attack.

23  Q.    So when Kyle radioed that Nate -- radios that Nate was

24  resisting and then you heard in the audio that Kyle say,

25  "Stop resisting."

1      Do you know what Kyle was referring to after
2  having watched the video?
3  A.    Well, at different times I know he testified that he
4  was trying to turn him over on to his stomach because he was
5  unable to effectively use his Taser -- and we spoke about
6  that yesterday -- because the front of his torso was in fact
7  exposed so he's trying to turn him over to his stomach to
8  effect a handcuffing technique.
9      At that point then he sat him up, was behind him
10  and then he was striking him.  So the resisting part I don't
11  know if that preceded the request for backup or advising
12  Dispatch or not.  So I don't know what juncture you're
13  talking about in the video.
14  Q.    I'm referring to the video and audio where you hear
15  Kyle say, "Stop resisting" when he's attempting to arrest
16  Nate.  Do you recall that portion of the video and the
17  audio?
18  A.    Yes.
19  Q.    And what does that mean to you:  Stop resisting?
20  A.    You're telling that person to stop resisting.
21  Q.    And to your understanding from reviewing the video and
22  audio in this case, did Nate stop?
23  A.    Well, eventually he was shot.  So he eventually --
24  eventually he was -- eventually he stopped.
25  Q.    That didn't answer the question.  Did Nate stop?

1          MR. GALIPO:  I'm going to object to the question

2    as vague as phrased, Your Honor, and vague as to point in

3    time.

4          THE COURT:  Sustained.

5    BY MR. EWING:

6    Q.    Point in time when Kyle was attempting to arrest Nate

7    and he said, "Stop resisting," did Nate stop?

8    A.    I don't know what point in time because there's

9    different points of time.  There are points when he tried to

10   turn him over.  There were points that he was striking Nate

11   that can be seen on video.

12         And then there was a point where shortly after

13   that he advised Nate he was going to shoot him and then

14   obviously then we heard the gunshots.

15   Q.    I'll walk you through it.  Let's take it to the point

16   where Nate runs away from Kyle and falls to the ground.  And

17   before they start fighting, Kyle attempts to arrest Nate.

18         And at the point where it appears that in the

19   video that Nate is seated and Kyle is attempting to put him

20   in handcuffs, Kyle utters, "Stop resisting."

21         At that point in their encounter did Nate stop?

22   A.    No.  But at that same time that you mention Nate was

23   also being struck with --

24   Q.    That was --

25         MR. GALIPO:  Your Honor, can he be allowed to

1    finish his question?

2          MR. EWING:  I'd like to walk him through because

3    the objection was vague as to time.

4          THE COURT:  So ask the next question, please.

5          MR. EWING:  Thank you.

6    Q.    When Kyle uttered to Nate, "Turn over.  Turn over" and

7    you see in the video Kyle attempting to turn Nate over,

8    again, the point in time in this video is when Nate has run

9    from Kyle and tripped over the stairs and fallen to the

10   ground and this is just after Kyle utters, "Stop resisting"

11   and then Kyle utters, "Turn over."

12         This is before Kyle pulls out his gun.  Does Nate

13   stop?

14   A.    No.  But if he was turning him over himself at that

15   time so Kyle -- excuse me -- Deputy Woods was using force at

16   that time.

17         And another thing about verbal commands is that if

18   I give you a command, I need to afford you an opportunity to

19   comply to that command.

20         So if I tell you to stop resisting, I need to

21   afford you an opportunity to stop resisting.  If I give you

22   a command to turn over, I need to give you -- afford you the

23   time to turn over.  I have to give a reasonable amount -- a

24   person a reasonable amount of time to comply before I

25   immediately begin to use force again.

1   Q.    In that moment where Kyle said to Nate "Turn over," do

2   you see in the video Nate turning over?

3   A.    No.  What I see in the video -- and we can play the

4   video if you'd like -- is I see him turning Mr. Pickett

5   over, grabbing him and trying to turn him on to his stomach

6   at that point.

7   Q.    So at this point, Nate has run from Kyle --

8         MR. GALIPO:   Objection.  I apologize.

9   BY MR. EWING:

10  Q.    At this point Nate has run from Kyle.  He's tripped

11  over the stairs.  He's on the ground.  Kyle approaches him.

12  This is after Kyle has reholstered his Taser and he attempts

13  to arrest and handcuff Nate and he says, "Stop resisting"

14  and he says, "Turn over."

15        At that moment -- this is before Kyle pulls out

16  his gun, before they're grappling on the ground -- the

17  information that Kyle has available to him is that Nate has

18  run and but for that trip over the stairs would it be

19  reasonable to assume that if he hadn't tripped he would have

20  kept going?

21  A.    I don't know.  I don't know where apartment No. 45

22  where he was staying was in relation to the stairs.  If he

23  was running to the actual apartment he was staying at or the

24  room, I know it was close by.  Obviously the area is small

25  so I don't know where he would have ended up had he not

1    tripped.

2    Q.    So had he not tripped, would it be reasonable to assume

3    from the evidence that you've reviewed in this case that

4    Nate would have kept running?

5    A.    He may have.

6    Q.    Did it appear to you that he was attempting to get away

7    from Kyle?

8    A.    Absolutely.

9    Q.    So at the point where Kyle now is trying to turn Nate

10   and he's saying, "Turn over.  Stop resisting," Kyle also

11   just before that radios to Dispatch.

12            Do you recall what he radioed to Dispatch?

13   A.    Something to the form of resisting.

14   Q.    You listened to the entire audio of Kyle's belt

15   recording?

16   A.    I did.

17   Q.    Did you have an impression of Kyle's emotional state

18   immediately following the shooting?

19            MR. GALIPO:  I'm going to object as calls for

20   speculation and lacks foundation.

21            THE COURT:  Sustained.

22   BY MR. EWING:

23   Q.    Did you hear Kyle's voice immediately after the

24   shooting?

25   A.    Yes.

1    Q.    How did he sound?

2    A.    Winded.

3    Q.    Did you have any other impression from what you heard

4    of Kyle's voice after that shooting?

5    A.    He sounded winded.

6    Q.    Did you hear him interact with Deputy Tommy Dickey?

7    A.    I believe so, yes.   That would be Officer No. 2 on the

8    belt recording?

9    Q.    Did you hear Kyle complain about pain to his face or

10   burning?

11   A.    He did say that, yes.

12   Q.    Did Kyle complain about pain to the back of his head?

13          MR. GALIPO:   I'm going to object as irrelevant.

14   Calls for speculation as phrased.

15          THE COURT:   I'll allow it.

16          THE WITNESS:   I don't see anywhere about the back

17   of the head unless I'm missing it.   He just talks about his

18   face and there's profanity in there.   It's on page 7 of the

19   exhibit.

20          MR. EWING:   May I have a moment, Your Honor?

21          THE COURT:   Yes, sir.

22          MR. EWING:   I'm almost done here.

23              (Pause in the proceedings.)

24   BY MR. EWING:

25   Q.    You talked earlier about great bodily injury and

1    Learning Domain 20?

2    A.    That's correct.

3    Q.    Is part of the great bodily injury included in Learning

4    Domain 20 concussion?

5              MR. GALIPO:   Objection.   Asked and answered and

6    cumulative.

7              THE COURT:   Well, overruled.

8              THE WITNESS:   Yeah.   As I mentioned as I read, it

9    does state concussion as one of the factors.

10   BY MR. EWING:

11   Q.    So is it possible that if Kyle was complaining about

12   pain to his face or his head that he may have sustained a

13   concussion?

14             MR. GALIPO:   Objection.   Lacks foundation, Your

15   Honor.

16             THE COURT:   Sustained.

17   BY MR. EWING:

18   Q.    Is concussion one of the great bodily injuries included

19   in Learning Domain 20?

20             MR. GALIPO:   Objection.   Cumulative.

21             THE COURT:   Sustained.

22   BY MR. EWING:

23   Q.    Were you aware that Kyle sustained a fractured nose in

24   this case?

25   A.    Yes.

1    Q.    And is a fracture part of Learning Domain 20, great

2    bodily injury?

3    A.    It says bone fracture, yes.

4    Q.    Do you have any opinion as to how Kyle sustained that

5    fractured nose?

6    A.    I don't.

7    Q.    Is it possible that Nate punched him in the nose?

8    A.    It's possible.

9          MR. EWING:   Thank you, Your Honor.

10         I have nothing further.

11         THE COURT:   All right.

12         Mr. Galipo?

13         MR. GALIPO:   Thank you.

14                     **REDIRECT EXAMINATION**

15   BY MR. GALIPO:

16   Q.    Mr. DeFoe, I have some follow-up.   Are officers trained

17   it's okay to shoot someone for fighting with them?

18   A.    No.

19   Q.    Are they trained it's okay to shoot someone if someone

20   strikes them in the face?

21   A.    No.

22   Q.    In your opinion should any force at all have been used

23   on Mr. Pickett?

24   A.    No.

25   Q.    Why not?

1  A.    There's no crime.  As I mentioned, there's no call for

2  service.  Mr. Pickett wasn't under the influence.

3  Mr. Pickett wasn't trespassing.  He lived at the motel.

4        The consensual encounter, I believe, was elevated

5  to a detention.  He had a right to walk away or run away.

6  If someone runs away, the evidence of flight in itself does

7  not justify reasonable suspicion for a detention.

8        You can't pat somebody down unless you have a

9  lawful right to detain them which, once again, you need

10  reasonable suspicion and that being that you're connecting

11  them to some type of criminal activity at that time; and

12  there's no information that any criminal activity was

13  occurring at that time.

14  Q.    Let me just stop you for a second.

15        Are all these items that you've indicated so far

16  part of the totality of the circumstances that you

17  considered in deciding whether or not it was reasonable to

18  detain him, arrest him, and use force and deadly force

19  against him?

20  A.    Yes.

21  Q.    All right.  Can you continue with why you believe no

22  force at all should have been used against him, let alone

23  deadly force?

24  A.    As I mentioned, Deputy Woods could have ran after him.

25  That would have been fine; and if he developed more

1    information running after him or if he ran into a room or
2    continued running, we're taught that we contain.
3           If we find out later that he was wanted on a crime
     or something came back, maybe a warrant, that we contain the
5    area.  That means we establish a perimeter or we call out
6    K-9, we call out additional resources, and then we pick it
7    up from there.
8           If he would have ran inside of a room, if he would
9    have got voluntary consent to go inside, he could have done
10   that.  Or in fact he could have wrote a search warrant if he
11   ran in a room and he was wanted for some type of crime.
12          So any type of force to stop his movement, I
13   believe, was unreasonable at that time.
14          When he approached him to threaten to tase him and
15   Kyle -- excuse me -- Mr. Pickett said it himself was "What
16   for?  Why is this happening?  What did I do?"
17          That was kind of the theme throughout this entire
18   incident because he didn't know why he was being stopped.
19   Provided his name and date of birth at that time.
20   Q.   Let me stop you for one moment.
21          You were asked a few questions by counsel.  He
22   went through the transcript with you.  There were some
23   "yeahs" in response.  Just because someone says "yeah" a few
24   times, does that mean they are consenting and they don't
25   have a right to walk or run away?

1    A.    No.    They have a right to walk away.    When we're

2    stopped by the police and if we're pulled over or we're

3    detained, maybe a traffic stop, it's what we would

4    reasonably believe -- what a reasonable person would

5    believe.

6              Are they free to leave at that time?    Would you

7    feel that a reasonable person would feel that they can just

8    walk away and leave at that time?

9    Q.    Okay.    So once he started to walk away, in your opinion

10   was it appropriate for Deputy Woods to grab him or try to

11   grab him?

12   A.    No.

13   Q.    Do you ever hear on the tape Deputy Woods saying:    I

14   want to detain you.    I want to arrest you.    Put your hands

15   behind your back or anything like that?

16   A.    No.

17   Q.    And after Nate fell down, you described the fall.    We

18   saw it on the video.    What should Deputy Woods have done at

19   that point?    Should he have physically grabbed Nate or not?

20   A.    No.

21   Q.    Can you explain that to the jury?

22   A.    Well, for one, you know, you don't know what you don't

23   know so you don't want to tie up with someone.    You don't

24   want to tie up and jump on the ground.

25              For one, he'd not committed a crime.    If he fell

1   down, for one you'd want to see if he was okay because as we
2   saw the fall was pretty violent at that time.
3           And once again, if you're still waiting on
4   information, you still don't know, keep a distance from him.
5   Detain him.  Wait for backup to come and then approach him
6   if he stays on the ground.
7           Once again, if he gets up and he runs again, let
8   him run.  If he runs, contain, wait for resources.  You're
9   not going to want to approach him at that time because he's
10  not committed a crime.  At that point there's no crime
11  that's occurred up to that point.
12  Q.   In terms of subjective fear based on the POST
13  standards, is it okay for an officer to get in a fight with
14  someone and then say:  Gee, I was afraid I was going to
15  black out and then kill the person?
16  A.   No.  Fear has to be reasonable based on the set of
17  facts at that time.  It has to be reasonable.
18  Q.   These -- I'm sorry.  Go ahead.
19  A.   I'm finished, sir.
20  Q.   Based on your review of the video and the materials in
21  this case, who was the aggressor physically?
22  A.   Deputy Woods.
23  Q.   Why do you say that?
24  A.   Because at every juncture from the initial grab, to
25  approaching him on the ground, to trying to flip him over on

1    to his stomach, the initial head strikes of Mr. Pickett, and

2    then ultimately the use of lethal force.

3    Q.    And you indicated in watching the video you see

4    multiple strikes by Deputy Woods to Mr. Pickett's face and

5    head?

6    A.    Yes.

7    Q.    Do you see any strikes on the video from Mr. Pickett to

8    Deputy Woods in his face?

9    A.    No.

10   Q.    And that's something you considered in reviewing this

11   case?

12   A.    Yes.

13   Q.    Now, in terms of the POST standards on deadly force,

14   does it have to be immediate or imminent?

15   A.    Yes.

16   Q.    And does it have to be reasonable?

17   A.    Yes.

18   Q.    So in your view of the shooting in this case and

19   considering the totality of the circumstances you've been

20   talking about, do you think that the use of deadly force was

21   reasonable?

22   A.    No.

23   Q.    And can you again reiterate why not?

24   A.    A, it's looked -- there's severity of the crime.   There

25   was no crime that occurred obviously and deadly force can

1   only occur at immediate defense of life for your life or
2   someone else's life.
3   Q.    The punches we talked about -- and you said you looked
4   at the video; you looked at the pictures -- how about the
5   gun?  Once Deputy Woods took out his gun --
6            MR. EWING:  Objection, Your Honor.  Beyond the
7   scope of cross.
8            THE COURT:  Overruled.
9   BY MR. GALIPO:
10  Q.    Once Deputy Woods took out his gun, pointed it up to
11  Nate's chest and said he's going to shoot him, let's assume
12  hypothetically he never touched the gun for purposes of this
13  hypothetical, what would your opinion be on whether the
14  shooting was appropriate or not?
15  A.    It would be inappropriate.
16  Q.    Okay.  Let's assume just for hypothetical purposes,
17  even though there's no fingerprints, DNA, gunshot residue,
18  or anything and you don't see it on the video, let's just
19  assume hypothetically that Deputy Woods put the gun up to
20  Nate's chest under these facts of this case, said, "I'm
21  going to shoot you" and Nate's hand went to try to push the
22  gun away from his chest for one second.
23            Do you have that in mind?
24  A.    Yes.
25  Q.    Is it then okay to kill him?

1   A.   No.

2   Q.   Why not?

3   A.   Because he's already told him he's going to shoot

4   him --

5            MR. EWING:  Same objection, Your Honor.  Beyond

6   the scope and cumulative.  This was covered yesterday.

7            THE COURT:  Overruled.

8            THE WITNESS:  He already told him that he was

9   going the shoot him, took the gun out; and I think it would

10  be any reasonable person, if you had a gun pointed to your

11  chest, a normal reaction would be to try to push that weapon

12  away.

13  BY MR. GALIPO:

14  Q.   With respect to your opinions in this case, would it

15  make any difference to your ultimate opinions as to whether

16  Mr. Pickett could or could not spell his name?

17  A.   No.

18            MR. GALIPO:  May I have a moment to look at my

19  notes, Your Honor?

20            THE COURT:  Absolutely.

21                *(Pause in the proceedings.)*

22            MR. GALIPO:  Thank you.

23            That's all I have, Your Honor.

24            THE COURT:  Mr. Ewing?

25            MR. EWING:  Thank you, Your Honor.

```
 1                    (Counsel conferred.)

 2          MR. EWING:  May I have a moment, Your Honor?

 3          THE COURT:  Yes.

 4                    (Counsel conferred.)

 5          MR. EWING:  Thank you, Your Honor.

 6                    RECROSS-EXAMINATION

 7    BY MR. EWING:

 8    Q.    Mr. DeFoe, you've testified a few times now that you're

 9    aware that Nate lived at the motel.  How did you know that?

10    A.    Based on the testimony from people that worked at the

11    motel as well as the -- I guess the room key that was found

12    in his pocket.

13    Q.    In this case, did you see a -- in the review of the

14    records for this case, did you see a lease agreement?

15    A.    No.

16    Q.    And would it surprise you to know that there is a lease

17    agreement with respect to Nate Pickett for the

18    El Rancho Motel?

19          MR. GALIPO:  I'm going object as irrelevant and

20    403.

21          THE COURT:  What's the relevance, Counsel?

22          MR. EWING:  The lease agreement -- may we

23    approach, Your Honor, before I --

24          THE COURT:  All right.

25                    (The following was held at the bench:)
```

1          THE COURT:   Mr. Ewing?

2          MR. EWING:   Mr. DeFoe has testified consistently

3    that Nate Pickett lived at the motel.   If you look at the

4    period of time on this lease, which is the plaintiff's

5    exhibit, it shows that the lease expired on November 1st.

6    This incident happened on November 19th.

7          THE COURT:   Okay.

8          MR. GALIPO:   He never saw that lease agreement.

9          THE COURT:   Here's a couple of questions.   So is

10   there -- are you contesting that he did not live at this

11   hotel?

12         MR. EWING:   We don't know and I don't know how he

13   knows.

14         THE COURT:   Well, he said based on the hotel key

15   in his pocket and then --

16         MR. EWING:   He had his -- I heard that, yes.

17         THE COURT:   I'm just saying this is what he

18   testified to.

19         MR. EWING:   Right.

20         THE COURT:   So I'm not sure.   This is a document

21   that he did not see?   I just want to make sure.   This is a

22   document -- let me rephrase the question.

23         Did DeFoe review this document in forming his

24   opinion?

25         MR. EWING:   I'm assuming he did because it's part

1   of plaintiff's exhibits?

2          MR. GALIPO:  He did not and he said he did not.

3          MR. EWING:  And it's part of the deposition

4   transcripts.

5          THE COURT:  Wait, wait, wait.  A part of whose

6   deposition?

7          MR. EWING:  Dominic Archibald's deposition.

8          THE COURT:  No.  I get that.  But is it a part of

9   DeFoe's deposition transcript?

10          MR. EWING:  No.  But I examined him and asked him

11   if he reviewed all the transcripts in this case in

12   preparation for his testimony and he said yes.

13          MR. GALIPO:  He just said he didn't review the

14   lease agreement.  It's a lease agreement he had nothing to

15   do with it.  It's a hearsay document.  What is he intending

16   to try to do?

17          MR. EWING:  It's not --

18          THE COURT:  Hold on.  Hold on, guys.  You've got

19   to stop this.  Let me ask the questions here.

20          You want to ask Mr. DeFoe whether he's reviewed

21   this particular lease agreement; right?

22          MR. EWING:  Correct.

23          THE COURT:  And if he says no, then what?

24          MR. EWING:  Are you aware that Mr. Pickett may not

25   have lived at the El Rancho Motel?

1    THE COURT:  Again, so he's going to object to say

2    irrelevant because he says he didn't review this.  If he

3    says he didn't review this, then how are you intending to

4    get evidence to suggest he did not live there?

5    MR. EWING:  My offer again is I asked him whether

6    he reviewed all of the deposition transcripts and this is

7    part of the deposition transcripts.  It's attached as an

8    exhibit to the deposition.

9    THE COURT:  Okay.  So then let me stop you there.

10   You can ask this witness if he reviewed this document.  If

11   he says no, I don't see how you can get any further in your

12   questioning.  But tell me why you believe I'm wrong.

13   MR. EWING:  Sure.  The offer would be for

14   impeachment purposes only.  I'm not seeking to admit it and

15   the relevance is to challenge the expert's opinion that Nate

16   had a right to be there and that he -- and the officer's

17   suspicion that he might have been trespassing.

18   THE COURT:  But wait, wait.  Is Deputy Woods going

19   to say that he thought -- I'm sorry.  He indicated that he

20   thought he was trespassing?

21   MR. EWING:  Right.

22   THE COURT:  Is Deputy Woods going to suggest that

23   that was based on some document he reviewed or just because

24   he was walking in the parking lot?

25   MR. EWING:  The latter.

1      THE COURT:  Right.  So how is this relevant then?

2    I mean, there's no evidence one way or the other, at least

3    from what I understand of the case and what I've heard to

4    suggest that Mr. Pickett did not live at the residence.

5      Are you calling a hotel custodian to say he didn't

6    have a right to be there?

7      MR. EWING:  No.

8      THE COURT:  But then you're trying to present him

9    with this lease document that he may or may not have

10   reviewed.

11     MR. EWING:  To impeach his testimony that he lived

12   there and that he had a right to be there.

13     THE COURT:  No, but wait.  Did he say

14   specifically -- I just want to make sure I'm clear.  Did

15   Mr. DeFoe say specifically that Mr. Pickett lived there or

16   he said:  I believe he lived there based on a hotel key that

17   was found in his pocket?

18     MR. EWING:  My understanding is the testimony of

19   DeFoe is similar to what you said but he bolstered it with:

20   It's my understanding that Nate had a right to be there

21   because he lived there.

22     And I asked him:  How do you know he lived there?

23     And he said because of the key found in his

24   pocket.

25     THE COURT:  Okay.  I'm going to allow you to ask

1    the following.  You can ask him if he looked at this.  If he
2    says he didn't look at this, I don't understand.  Then the
3    questioning stops.
4                    MR. EWING:  I understand.
5                    THE COURT:  All right.  Okay.
6        *(The following was in open court in the jury's presence:)*
7                    THE COURT:  All right, Mr. Ewing, you may proceed.
8                    MR. EWING:  Thank you.
9    Q.    Mr. DeFoe, you testified about a key in Nate's pocket?
10   A.    Yes.
11   Q.    And that's how you established that Nate lived at the
12   motel?
13   A.    That Mr. Mena -- the manager Raul Mena stated he'd been
14   a tenant for about a month at the motel in his testimony.
15   Q.    So is it possible that on November 19th, 2015, that
16   that month had expired?
17   A.    I have no idea.
18   Q.    Did you go out to the motel?
19   A.    No.
20   Q.    Did you see the key?
21   A.    No.
22   Q.    Did you go to the room where Nate -- you've testified
23   Nate may have been going to.  I think it was 45.
24   A.    I've seen -- Pardon me but I've seen pictures of the
25   key.

1   Q.    Did you test the key to see if it worked on the room at

2   the El Rancho Motel?

3               MR. GALIPO:   Your Honor, I will object under 403.

4   Since he never went to the hotel, I don't think he tested

5   the key.

6               THE COURT:   Sustained.

7   BY MR. EWING:

8   Q.    Do you know whether the key works or not on room 45?

9   A.    No idea.

10  Q.    So your testimony was that Nate had a right to be where

11  he was?  I believe that was your testimony yesterday.

12  A.    That's correct.

13  Q.    But you don't know for sure, do you, whether he lived

14  at the El Rancho Motel on November 19th, 2015?

15  A.    According to El Rancho Motel manager Raul Mena stated

16  Mr. Pickett was a tenant of the motel and had been for a

17  month and that's --

18              MR. EWING:   Objection.  Hearsay.

19              THE COURT:   Overruled, Counsel.  You asked him the

20  basis for this.

21              THE WITNESS:   Also, Mr. Kennedy stated --

22  according to witness James Kennedy, he stated:  I told him,

23  yes, he do live here.  I help take care of him and he has a

24  mental problem.

25              In addition, there were several people that

1    mentioned that they helped Mr. Pickett clean his room on

2    occasion as well.  I remember reading that.

3    Q.    In those statements from Mr. Mena, Kennedy, and others

4    were pertaining to November 19th, 2015?

5    A.    Yes.  They were asked at their deposition and the

6    statements they provided to the San Bernardino County

7    Sheriffs.

8    Q.    Are you aware whether or not those people spoke to

9    Kyle Woods on the night of the incident?

10   A.    Spoke to him?  I don't know if they spoke to him.  I

11   know people were yelling some things according to testimony.

12   But having a conversation, I don't know what point.

13   Q.    You heard the audio, you watched the video, did you

14   hear anybody saying:  Nate Pickett lives in room 45 at the

15   El Rancho Motel to Kyle Woods?

16   A.    No.

17   Q.    And you are aware that Kyle Woods was investigating to

18   see whether Nate might be trespassing?

19   A.    That's what he stated, yes.

20   Q.    With respect to your testimony on Kyle telling Nate

21   that he was being arrested, is it your testimony that that

22   is required under POST or under San Bernardino County

23   policies?  Do you have to tell somebody, "I'm arresting

24   you"?

25   A.    You should if you can.

1   Q.    And with respect to Deputy Kyle Woods detaining or

2   attempting to detain Nate Pickett, is it your testimony that

3   POST or the San Bernardino County Sheriff's Department

4   required Kyle Woods to tell Nate, "I'm going to detain you"?

5   A.    No.

6   Q.    Was Kyle required to say to Nate Pickett, "I'm going to

7   handcuff you"?

8   A.    No.

9   Q.    You heard the audio, you watched the video, and you

10  have the transcript of the communications or a portion of it

11  between Nate and Kyle.

12        You talked about it a moment ago or counsel talked

13  about it a moment ago with respect to the "yeahs" and

14  "yeahs"; and with respect to the number of "yeahs," did you,

15  just a cursory review of a couple of pages, do you see more

16  than three "yeahs"?

17  A.    I do.

18  Q.    With respect to the communication between Nate and

19  Kyle, do you recall hearing Kyle ask Nate had he been

20  arrested before?

21  A.    Yes.

22  Q.    And do you recall Nate's response?

23  A.    "Yeah."

24  Q.    And do you recall hearing in the audio Kyle telling

25  Nate, "Okay, Nate.  Turn around."  This is the point in the

1    encounter with Nate where Kyle is attempting to detain him.

2         Do you recall that portion of the audio and the

3    video?

4    A.    I'm looking at the document right now.  (Looking at

5    document.)  He stated -- are you talking about at the time

6    prior to?  Yes, he said, "All right, Nate.  Go and turn

7    around for me."

8    Q.    Based on your training and experience, what do you

9    think Kyle was trying to do?

10   A.    Handcuff him.

11   Q.    Do you think Nate understood Kyle's -- was that a

12   command?  Is that called a command?

13   A.    Command, request, order.  I don't know which way you

14   phrased it.

15   Q.    Did Nate comply?

16   A.    No.

17   Q.    Do you have any impression from your review of the

18   records, listening to the audio, watching the video, as to

19   whether or not Nate understood that request or command?

20   A.    I have no idea if he understood it or not.  He just

21   stated "no."

22   Q.    And what happened after that?

23   A.    He fled.

24         MR. EWING:  Thank you.

25         Nothing further.

1    THE COURT:  Mr. Galipo?

2    MR. GALIPO:  No further questions, Your Honor.

3    THE COURT:  All right.  May this witness be

4  excused?

5    MR. GALIPO:  Yes, Your Honor.

6    MR. EWING:  Yes.

7    THE COURT:  Thank you, sir.  You may step down.

8    MR. GALIPO:  May I go get the next witness?

9    THE COURT:  Why don't we take a ten-minute recess.

10   Ladies and gentlemen, please do not form or

11  express any opinion about this case until the matter is

12  finally submitted to you.

13   Don't talk to anyone, don't allow anyone to talk

14  to you, and do not conduct any research of any kind on any

15  subject matter connected with this case.

16   We'll take a ten-minute recess until 11:15.

17   THE CLERK:  All rise for the jury.

18   *(The jurors exited the courtroom.)*

19  *(The following was held outside the jury's presence:)*

20   THE CLERK:  Please be seated.

21   THE COURT:  All right.  Thank you.  You may step

22  down and you are excused.

23   So, Mr. Galipo, we have the medical examiner?

24   MR. GALIPO:  Yeah.  We'll do the medical examiner

25  and then if it's good we'll take our lunch break.

THE COURT:  All right.  So my intention is to push through and see if we can conclude the examination of the examiner before we take a lunch break.  If that means pushing into 12:15, 12:30, that's what we'll do.

MR. GALIPO:  That would be very much appreciated.

THE COURT:  Then this afternoon, who do you have lined up?

MR. GALIPO:  We are still deciding.  I may call Ms. Archibald briefly and I'm going to discuss with counsel whether there's going to be anyone else but we intend to rest very early this afternoon.

THE COURT:  All right.  And so, Mr. Ewing, I assume you've made the appropriate phone calls to have your witnesses lined up for this afternoon?

MR. EWING:  Yes.

THE COURT:  All right, great.

All right.  So let's take a recess and we'll come back; and just have the medical examiner on the bench ready to be called up.  All right?

MR. GALIPO:  The only outstanding issue that we're still trying to work out is that slow -- the video slowdown.

THE COURT:  Okay.

MR. GALIPO:  If you recall, that was part of the stipulation but counsel wanted me to agree as to how much it had been slowed down just so the jury and he still is

1   working on that.

2          I'm just hoping that they're not going to try to

3   back out of our agreement because I made that as part of the

4   agreement and whatever he wants to put in, the stip as to

5   how much it's slowed down, I'm fine with.

6          THE COURT:   Okay.

7          MR. EWING:   Just so we're clear.

8          THE COURT:   All right.

9          MR. EWING:   We don't have an agreement.   We're

10  talking about an agreement.

11         THE COURT:   All right.

12         MR. EWING:   An agreement has terms.   We haven't

13  agreed to those terms entirely.   We're almost there.   But if

14  we don't agree to all those terms, meaning if counsel

15  doesn't agree to my terms, we don't have an agreement.

16         And then what that would look like would be that

17  we would go ahead and stand on our video synching and our

18  expert, lay the foundation and go forward in that manner.

19         THE COURT:   And help me understand.   To the extent

20  there is or isn't a stipulation, what would happen?   Would a

21  video get played at a slowed-down version and would someone

22  testify as the video is being played or would it just be

23  played in a slowed-down version?

24         MR. GALIPO:   First of all, to answer your question

25  directly, I think it would just be played in a slowed-down

1  version.

2        Now, whether someone wants to use it with a

3  witness in the slowed-down version or not, my recollection

4  of the stipulation is that the agreement was I would allow

5  for their synchronization without them calling their expert.

6        I wouldn't have to call mine and the slow-motion

7  video would come in.  But counsel wanted to make sure there

8  was something in there about how much it was slowed down.

9        Now, what I'm concerned about, I'm waiting for

10  counsel to say:  Well, what do you want me to agree to

11  because I'm willing to agree to it; and he hasn't told me.

12        So what I'm concerned about is they don't make any

13  proffer of what they want me to agree to so they say there

14  is not agreement because I didn't agree to anything because

15  they never gave me anything to agree to in terms of how much

16  it's slowed down and then the video just doesn't come in.

17        So I hope that's not taking place.  I'm not

18  suggesting it is.  But I'm not going to rest my case

19  technically until that issue is resolved.

20        MR. EWING:  If I may, Your Honor, this is just

21  with respect to our communications.  I believe the -- I

22  can't frankly remember who offered the stip.  We have our

23  video and we have our expert to testify about that video.

24        THE COURT:  Is the expert going to testify that:

25  I slowed this video down?  Or is the expert going to talk

1   about what's contained in the video?

2            MR. EWING:  He's going to talk about:  I synched

3   the audio with the video and the video is poor quality and

4   this is the type of camera it was shot on and so on and so

5   forth.

6            What I received during the course of this trial

7   for the first time was the slowed-down version of the video.

8   So I had a chance to cursorily review that just yesterday;

9   and, frankly, I'm not going to be bullied but that's kind of

10  what it feels like, being a little pressured and I -- hold

11  on.

12           (Counsel overtalking; not reported.)

13           THE COURT:  You guys are grownups.

14           MR. EWING:  Exactly.

15           THE COURT:  There's no issue of bullying.  It's

16  trying to resolve an issue that, at least in the Court's

17  opinion, should be resolved.  There's no dispute about the

18  video, is there?

19           MR. EWING:  Absolutely not and --

20           THE COURT:  And let me finish.

21           And there's no dispute about -- well, I'll ask

22  you.  Is there an issue with respect to the slowed-down

23  version of the video?

24           MR. EWING:  Allow me to first, not -- not

25  intending to disparage, I'm making a comment about the time

1   that I received the slowed-down video.

2           THE COURT:  I get it.

3           MR. EWING:  The pressure of -- and so that's why

4   that phrase "bullying" was used, not to say anything about

5   counsel.  It's just -- it feels like:  Okay.  Well, make a

6   decision very quickly without having adequately reviewed our

7   version of this video.

8           I emphasize "our version of this video."

9           Your comment, Your Honor, about there is no

10  dispute about the video, the dispute lies in the timing of

11  the video.

12          The defense position is the video is not

13  frame-by-frame and it does not accurately depict what

14  happened that night; and that's what our expert will come in

15  and talk about.

16          He'll say there's skipping in this video.  So we

17  attempted to -- we talked about working out the timing

18  issues; and it seems as if the burden for coming up with the

19  math on that was shifted solely to the defense.

20          When I think if we are agreeing to a stipulation,

21  that that math should be worked out by both parties.  If it

22  works and they can agree on it, great, in terms of how much

23  time is elapsed from the video, how many frames skip and so

24  forth.

25          But if we can't work out the math, the defense is

1  very comfortable relying upon the expert's testimony about
2  the same subject matter.
3          THE COURT:  All right.  Okay.  But it seems to me
4  that this could be easily resolved.  They just want to play
5  the video slowed down.
6          You want to call your expert to say it doesn't
7  represent the entirety of the incident.  Call your expert
8  and do that.
9          I mean, I think -- maybe I'm wrong on this and
10 I'll ask Mr. Galipo and Mr. Conaway -- is your issue about
11 whether or not the video will come in; your video will come
12 in?
13         MR. GALIPO:  Yeah, that's the only --
14         THE COURT:  And so let's figure out if that video
15 is going to come in.  If you want to have your expert come
16 in and say it doesn't represent the entirety of it, then let
17 your expert do it.
18         MR. GALIPO:  I think we're on the same page
19 because counsel just said he has no objection to the
20 slow-motion video coming in so I think we're good.
21         THE COURT:  Okay.  And so you can call your expert
22 and say it doesn't represent the entirety.  All right.  Once
23 again demonstrating why I get paid the extra 50 dollars than
24 you all.
25         All right.  So let's take a brief recess, come

1  back, and we'll have the medical examiner begin their

2  testimony.

3          MR. GALIPO:  Thank you, Your Honor.

4          THE CLERK:  All rise.  This court is in recess.

5                      *(Recess.)*

6          THE CLERK:  All rise for the jury.

7            *(The jurors entered the courtroom.)*

8          THE CLERK:  Please be seated.

9              *(Pause in the proceedings.)*

10         THE CLERK:  All rise.

11         This United States District Court is once again in

12  session.

13         Please be seated.

14         THE COURT:  Mr. Galipo, do you want to call your

15  next witness, please.

16         MR. GALIPO:  Yes, thank you, Your Honor.  We'd

17  like to call Dr. Scott McCormick.

18         THE COURT:  All right, Doctor, if you would step

19  forward, please.

20      **SCOTT McCORMICK, PLAINTIFF'S WITNESS, SWORN**

21         THE CLERK:  Please raise your right hand.

22         Do you solemnly swear that the testimony you shall

23  give in the cause now before this Court shall be the truth,

24  the whole truth, and nothing but the truth, so help you God?

25         THE WITNESS:  I do.

```
1          THE CLERK:   Thank you.   Please be seated.
2          Please state and spell your name for the record.
3          THE WITNESS:   Mark Scott McCormick.
4   M-a-r-k S-c-o-t-t M-c-C-o-r-m-i-c-k.
5          THE COURT:   All right.   You may proceed.
6          MR. GALIPO:   Thank you.
7                     DIRECT EXAMINATION
8   BY MR. GALIPO:
9   Q.    Good morning, Dr. McCormick.
10  A.    Good morning.
11  Q.    Where do you currently work?
12  A.    I work for the Riverside County Sheriff-Coroner's
13  Office.
14  Q.    And did you perform the autopsy on Nathanael Pickett?
15  A.    Yes, I did.
16  Q.    And you're here pursuant to a subpoena?
17  A.    Yes.
18  Q.    How long have you worked at the medical office you're
19  at now?
20  A.    I've been there since July of 2001.
21  Q.    How long have you been a medical doctor in the State of
22  California?
23  A.    That same period of time.
24  Q.    Okay.   And I take it you do autopsies on a regular
25  basis?
```

1   A.    That's correct.

2   Q.    And essentially document injuries on autopsy, determine

3   the cause and manner of death?

4   A.    Injuries and medical disease in order to determine the

5   cause of death, yes.

6   Q.    Okay.  Do you have an estimate as to how many autopsies

7   you have performed so far in your medical career?

8   A.    At last count which was in January, a little over 4,500

9   autopsies.

10  Q.    Okay.  And have some of those been death by gunshot

11  wounds?

12  A.    Yes.

13  Q.    Okay.  And did you prepare an autopsy report at some

14  point?

15  A.    Yes, I did.

16  Q.    And do you have a copy of that report with you here

17  today?

18  A.    I do.

19  Q.    I believe for the Court and counsel it's Exhibit 10 but

20  if you have a copy you're probably okay.

21  A.    Yes.

22  Q.    First of all, can you tell us when you did the autopsy?

23  A.    The autopsy was on the 23rd of November in 2015.

24  Q.    Okay.  And I take it that was done at the coroner's

25  office in Riverside?

1    A.    That's correct.

2    Q.    As part of your autopsy, did you look for evidence of

3    any external injuries?

4    A.    Yes, I did.

5    Q.    And separate from the gunshot wounds, which we'll talk

6    about in a moment, what evidence was there of external

7    injuries separate from the gunshot wounds?

8    A.    There were several abrasions or scrape-type injuries,

9    two of them on the face, some on the extremities on the

10   arms.

11   Q.    Okay.  Can you -- with respect to the abrasions, let me

12   also ask you this.

13          Do you at some point during the autopsy,

14   especially if it's gunshot wounds, take an X-ray of the

15   body?

16   A.    Yes, we take X-rays of all suspected traumatic gunshot

17   wound injuries.

18   Q.    And what is the benefit of taking an X-ray if it's a

19   gunshot wound case?

20   A.    The X-ray helps identify if there are any bullets

21   remaining within the body and it gives us the location of

22   those remaining bullets to help recover them during the

23   autopsy procedure.

24   Q.    Okay.  There should be an exhibit book, probably

25   several of them somewhere close.  One of them is a black

1      book that says "Plaintiff's Exhibit Binder" on it.

2             Is that the one before you?

3      A.    Yes, it is.

4      Q.    Can you -- there are some tabs.  Can you please turn to

5      Tab 14.

6      A.    (Witness complies.)  Okay.

7      Q.    And there should be on the bottom right some page

8      indicators.  Can you turn to 2 of 21?

9      A.    Okay.

10     Q.    Is this a photograph taken of Nathanael Pickett's face

11     during part of the autopsy process maybe at the beginning?

12     A.    This appears to be a photograph of Mr. Pickett near the

13     beginning or at the beginning of the autopsy.

14     Q.    Okay.  And does this photograph show injuries to his

15     face?

16     A.    Yes.

17     Q.    And you further describe the injuries in the autopsy

18     report?

19     A.    That's correct.

20     Q.    And I don't expect you to have it memorized so can you

21     tell the jury what the injuries were to his face?

22     A.    Above the left eyebrow, there's a one-inch abrasion or

23     scrape injury of the skin.  And then lateral to the eyebrow

24     or -- I'm sorry -- lateral to the orbit, to the left of his

25     left eye, there's a one-and-a-half inch abrasion or

1   scrape-type injury.

2   Q.    Okay.  And does this photograph in your opinion

3   accurately show what his face looked like when he was

4   brought to you for the autopsy?

5   A.    Yes.

6          MR. GALIPO:  Okay.

7          I would move to admit this Exhibit 14-2.

8          THE COURT:  Any objection?

9          MR. EWING:  No objection.

10         THE COURT:  All right.  14-2 will be admitted.

11         *(Exhibit 14-2 received in evidence.)*

12         MR. GALIPO:  May I confer with my clients for just

13  a moment?

14         THE COURT:  Yes.

15              *(Pause in the proceedings.)*

16         (The exhibit was displayed on the screen.)

17  BY MR. GALIPO:

18  Q.    And that's a picture of the facial area of Mr. Pickett?

19  A.    Yes.

20  Q.    Are those injuries to his face consistent with blunt

21  force trauma?

22  A.    Yeah.  They're abrasions.  I would characterize those

23  as blunt impact injuries.

24  Q.    In your opinion, would they be at least consistent with

25  someone being punched in the face?

```
 1   A.    They could be from that, yes.
 2   Q.    Okay.  Can you look at 14-21?
 3         THE COURT:  Counsel, just to be clear, so page 21
 4   of 21?
 5         MR. GALIPO:  Oh, I misspoke, Your Honor.  I'm
 6   sorry.  It's Exhibit 14, page 14 of 21.  I misspoke.  I
 7   apologize.
 8         THE WITNESS:  Okay.
 9   BY MR. GALIPO:
10   Q.    And does that show more of a closeup of the one injury
11   on his face?
12   A.    It's a closeup of the abrasion lateral to the orbit.
13         MR. GALIPO:  Okay.  I would move to admit this
14   exhibit.
15         MR. EWING:  No objection.
16         THE COURT:  All right.  14 -- what are we going to
17   call it?
18         MR. GALIPO:  14-14.
19         THE COURT:  14-14 will be admitted.
20         MR. GALIPO:  Thank you.
21         (Exhibit 14-14 received in evidence.)
22         (The exhibit was displayed on the screen.)
23   BY MR. GALIPO:
24   Q.    And is that injury at least consistent with someone
25   being punched in that area?
```

1    A.    It could be, yes.

2    Q.    And then 14-15, the next one, does that show another

3    injury to his face?

4    A.    Yes.   That's a depiction of the abrasion above the left

5    eyebrow.

6                 MR. GALIPO:   I move to admit 14-15, please.

7                 MR. EWING:   No objection.

8                 THE COURT:   All right.   It will be admitted.

9                 *(Exhibit 14-15 received in evidence.)*

10                (The exhibit was displayed on the screen.)

11   BY MR. GALIPO:

12   Q.    Okay.   So this is an injury above one of the eyebrows;

13   is that correct?

14   A.    That's correct.

15   Q.    In addition to the injuries to the face, you mention

16   there was a few other areas of injury on him?

17   A.    Yes.

18   Q.    And can you tell the jury where those were, please.

19   A.    They were small abrasions on the back of the left arm

20   below the elbow.   Also a small abrasion on the anterior part

21   of the left ankle and a scabbed or healing abrasion on the

22   back of the right hand.

23   Q.    Okay.   I'd like to talk about the gunshot wounds.   When

24   you're doing an autopsy involving gunshot wounds, are you

25   looking to identify the different gunshot wounds?

1    A.    Yes.

2    Q.    And is one of the things you look for as to whether the

3    wounds appear to be entrance wounds or exit wounds?

4    A.    Yes.

5    Q.    Can you explain to the jury how generally you can tell

6    the difference between a wound that's an entrance as opposed

7    to an exit?

8    A.    Entrance wounds typically have a persistent tissue

9    defect meaning there's a piece of skin that's missing.  If

10   you push the edges of the wound toward each other, they

11   don't completely match up.  That's typical of an entrance

12   wound.

13          An exit wound tends to be more of a tear in the

14   skin.  The edges of the wound would match up again so

15   there's no missing skin there.

16          Also, entrance wounds often have an abrasion

17   collar.  As the bullet passes through the skin, it scrapes

18   the edges of the skin as it's passing through and creates an

19   area of abrasion surrounding that persistent tissue defect.

20          The exit wound does not have that abrasion because

21   the skin is being broken as it's pushed out from the inside.

22   So those two things are common in entrance wounds but not

23   exit wounds.

24          Entrance wounds may also have evidence of soot or

25   stippling or muzzle stamp which would be indications of

1    range of fire; and those findings would not be present in an
2    exit wound.
3    Q.    Okay.  So I just want you -- you used the word "muzzle
4    stamp."  Can you tell the jury what that means?
5    A.    Muzzle stamp is a discoloration or sometimes burning or
6    searing of the skin that surrounds the entrance wound.  It
7    typically has some pattern to it, either round or
8    rectangular, and it's indicative of the end of the barrel of
9    the gun being in contact or in very, very close proximity to
10   the skin surface when the gun is fired.
11   Q.    So if the end or barrel of the gun, for example, is
12   pushed up to the chest, if you will, in this case, how would
13   that leave a muzzle stamp?
14   A.    The heat and the energy coming out the end of the
15   barrel of the gun sear the skin or impact the skin creating
16   an impression similar to the end of the gun.
17   Q.    Okay.  So sometimes is there actually an imprint that
18   matches, if you will, the barrel of the gun seen on the
19   skin?
20   A.    I don't know if it matches it in a forensic sense that
21   you could, you know, say this gun made this mark or not but
22   it, in general, the shape is usually fairly similar.
23   Q.    Okay.  You've had training and experience with regards
24   to recognizing muzzle stamps?
25   A.    Yes.

1   Q.    And as to what they mean in terms of the gun being

2   pressed up against generally the skin at the time of

3   discharge?

4   A.    Yes.

5   Q.    Okay.  In this case, did you note in doing the autopsy

6   any -- what appear to be any muzzle stamps related to the

7   entrance wounds?

8   A.    There were marks on the skin surrounding both of the

9   entrance wounds that were consistent with muzzle stamp to

10  both the center -- the bullet or the entrance one at the

11  center of the heft and also the one to the left lateral part

12  of the chest.

13  Q.    And are those both consistent in your opinion with the

14  barrel of the gun being pressed up against or into the chest

15  at the time of discharge?

16  A.    Again, I'm not sure how to characterize it as pressed

17  against but it's the barrel or the end of the gun was in

18  contact with or very, very close proximity to the skin or to

19  the chest.

20  Q.    Okay.  Now, in your report, you identify the two

21  gunshot wounds; is that correct?

22  A.    That's correct.

23  Q.    And would it be fair to say you were attempting to

24  describe them without specifically giving an opinion as to

25  which one occurred first?

1    A.    Correct.   There's no indication of the order in which

2    the two gunshot wounds occurred based on my examination.

3    Q.    All right.   So one of the gunshots was to the left

4    medial chest?

5    A.    Yes.

6    Q.    And the other gunshot was to where?

7    A.    It was lower and further to the left, the lower part of

8    the chest on the left side.

9    Q.    Okay.   Can you turn to Exhibit 14-13.

10   A.    (Witness complies.)   Okay.

11   Q.    Does that show the -- does this photograph show both

12   gunshot wounds?

13   A.    Yes, it does.

14   Q.    Okay.   And does it accurately show the location of

15   those gunshot wounds?

16   A.    Yes.

17            MR. GALIPO:   I'd like to move Exhibit 14-13 into

18   evidence.

19            MR. EWING:   I have no objection.

20            THE COURT:   All right.   14-13 will be admitted.

21            *(Exhibit 14-13 received in evidence.)*

22            (The exhibit was displayed on the screen.)

23   BY MR. GALIPO:

24   Q.    Did you take some closeups of those gunshot wounds?

25   A.    Our photographer under my direction took closeups of

1    these wounds, yes.

2    Q.    Okay.  And let me first -- let's just talk about the

3    two gunshot wounds.  In your report do you first describe

4    the gunshot wound that's closer to the middle of the chest?

5    A.    Yes.

6    Q.    Okay.  And you, I think, have already indicated that

7    it's your opinion there is a muzzle stamp associated with

8    that entrance wound?

9    A.    Yes.

10   Q.    So can you tell us after the bullet entered the body

11   what did it pass through in the body?

12   A.    It entered through the chest wall.  It went through the

13   heart, through the left lung, through the back of the chest

14   wall, and the bullet was recovered just underneath the skin,

15   on the skin of the back.

16   Q.    Okay.  Did that bullet completely exit the back?

17   A.    No, it did not.

18   Q.    Okay.  So when you say it was recovered just under the

19   skin of the back, can you explain to the jury what that

20   means?

21   A.    Sure.  Based on the X-rays, based on my palpation or

22   feeling the surface, I could feel the bullet underneath the

23   skin.  So I made a small incision in the skin in order to

24   recover the bullet.

25   Q.    Okay.  Can you look at Exhibit 14-8, please.

1    A.    (Witness complies.)

2    Q.    And does that show the area of where that bullet was?

3    A.    Yes, it does.

4    Q.    Okay.

5              MR. EWING:   No objection.

6              MR. GALIPO:   14-8, Your Honor, by agreement.

7              THE COURT:   All right.  It will be admitted.

8              *(Exhibit 14-8 received in evidence.)*

9              (The exhibit was displayed on the screen.)

10   BY MR. GALIPO:

11   Q.    Okay.  That shows the area where the bullet was and it

12   was recovered then under the skin?

13   A.    That's correct.

14   Q.    And 14-9, does that show the opening of the skin and

15   the recovery of the bullet?

16   A.    Yes, it does.

17              *(Counsel conferred.)*

18   BY MR. GALIPO:

19   Q.    And which bullet would that be if you know?  The one

20   that entered more closer to the center of the chest or the

21   one that entered from the side?

22   A.    This was the bullet that entered near the center of the

23   chest.

24              MR. GALIPO:   Okay.  14-9 by agreement, Your Honor.

25              THE COURT:   All right.  14-9 will be admitted.

478

```
 1              (Exhibit 14-9 received in evidence.)

 2              (The exhibit was displayed on the screen.)

 3    BY MR. GALIPO:

 4    Q.    Is that where you opened the skin and that's where the

 5    bullet was found?

 6    A.    That's correct.

 7    Q.    Okay.  So what was the -- I'm going to put this back

 8    up.  This is Exhibit 14-13.

 9              (The exhibit was displayed on the screen.)

10    BY MR. GALIPO:

11    Q.    What was the trajectory of that bullet through the

12    body?  In other words, I take it, it was front to back?

13    A.    That's correct.

14              MR. EWING:  Objection; vague.  Please clarify.

15              THE COURT:  The objection is overruled.

16    BY MR. GALIPO:

17    Q.    Doctor, can you just explain to the jury the general

18    trajectory of that bullet within the body?

19              MR. EWING:  Objection; vague again.  That bullet.

20              THE COURT:  The objection is overruled.

21    BY MR. GALIPO:

22    Q.    You may respond, Doctor.

23    A.    So we describe the trajectory with respect to standard

24    anatomic position which is the body upright, facing forward,

25    hands at the side, palms up.
```

479

| | |
|---|---|
| 1 | So the trajectory with respect to its path through |
| 2 | the body, the bullet that entered near the center of the |
| 3 | chest went from the front of the body toward the back of the |
| 4 | body.  It went from the right side of his body toward the |
| 5 | left side of his body and slightly upward. |
| 6 | Q.   Okay.  And I take it that shot was ultimately a fatal |
| 7 | shot? |
| 8 | A.   In this case I believe so, yes. |
| 9 | Q.   Okay.  Now, the other bullet -- and I want to show you |
| 10 | another exhibit of that, 14-3. |
| 11 | *(Counsel conferred.)* |
| 12 | MR. GALIPO:   14-3 but we're going to modify and |
| 13 | crop it for privacy purposes. |
| 14 | MR. EWING:   No objection to the modification. |
| 15 | THE COURT:   All right.  14-3 as modified will be |
| 16 | admitted. |
| 17 | *(Exhibit 14-3 received in evidence.)* |
| 18 | MR. GALIPO:   I'm just going to put it up.  I've |
| 19 | folded it over. |
| 20 | (The exhibit was displayed on the screen.) |
| 21 | BY MR. GALIPO: |
| 22 | Q.   Sorry for the -- but in any event, does that show the |
| 23 | wound from a side perspective? |
| 24 | A.   Yes, it does. |
| 25 | Q.   And what did -- and, obviously, you talked already |

1    about the muzzle stamp.  Let's see if I can zoom in a little

2    bit.  Can you explain the muzzle stamp what you see there?

3    A.    There's discoloration or darkening of the skin around

4    the entrance wound.  There is a vague rectangular pattern to

5    it which is, I believe, consistent with a muzzle stamp or

6    contact with the skin at the time of discharge.

7    Q.    Okay.  And then what did that -- what did that bullet

8    pass through in the body after it entered the body?

9    A.    This went through the left lateral part of the lower

10   part of the ribcage.  It went through the upper pole of the

11   left kidney, through the colon or the large bowel, and

12   through the -- when it went through the kidney, it tore the

13   ureter which carries the urine down to the bladder and also

14   the renal artery and the renal vein securing blood to and

15   from the kidney, and then into the second lumbar vertebral

16   body so into the lower part of the spine.

17   Q.    And what was the general trajectory of that shot within

18   the body?

19   A.    This one again with respect to standard anatomic

20   position, entering on the left lateral part of the lower

21   part of the chest, went from front to back and from left to

22   right with no discernible upward or downward deflection so

23   pretty much just flat.

24   Q.    Was that shot also a fatal shot?

25   A.    I believe it's a contributory in this case.  Bleeding

481

1    from the renal vessels would contribute to internal

2    bleeding.  This shot just by itself might not be a fatal

3    shot but it's contributory in this case.

4    Q.    Okay.  Now, did you note internal blood loss at the

5    time of autopsy?

6    A.    Yes.

7    Q.    And the blood would generally come from the damage to

8    the internal organs?

9    A.    Damage to the internal organs and the vessels in the

10   body, yes.

11   Q.    What blood loss did you find in the autopsy?

12   A.    In the chest there was about one thousand milliliters

13   or about a liter of blood in the left side of the chest,

14   blood mostly coming from the heart in that case.

15         In the abdominal cavity or the peritoneal cavity,

16   there was less blood, there's maybe about a hundred

17   milliliters of blood from the injuries to the kidney and the

18   vessels there.

19   Q.    And just by comparison, generally speaking, I'm sure it

20   depends on someone's height and weight, but how much blood

21   do we have in our system?

22   A.    On average we have about four to five liters of blood

23   in our system.

24   Q.    Okay.  So a thousand would be, depending, it would be

25   20 or 25 percent of our total blood supply?

1    A.    That's correct.

2    Q.    Now, generally speaking, are gunshot wounds and wounds

3    passing through vital organs painful?

4    A.    There's, in this case, there's torn tissue, skin,

5    muscle, some broken ribs associated with the wound to the

6    center.  I would expect there would be some pain.  We all

7    experience pain differently but I think that would be

8    painful.

9    Q.    Okay.  And in this case would it take some time for the

10   person to die from the internal blood loss?

11   A.    No.  It would be -- the presence of that much blood in

12   the chest would suggest that there was some -- it took some

13   time for that blood to collect so there would be some

14   interval between the gunshot wounds and death.

15   Q.    Okay.  Did you take a few -- looking at 14-6 and 14-7,

16   did you take a few closeups of the gunshot wounds to

17   document the muzzle stamp?

18   A.    Yes.

19             MR. GALIPO:  Okay.  And by agreement, Your Honor,

20   14-6 and 14-7?

21             THE COURT:  All right.  Those exhibits will be

22   admitted.

23                 *(Exhibit 14-6 received in evidence.)*

24                 *(Exhibit 14-7 received in evidence.)*

25             (The exhibit was displayed on the screen.)

1    BY MR. GALIPO:

2    Q.    14-6 and this is zoomed in a little bit.  Maybe I can

3    try to focus it but --

4          Okay.  Does this show part of the muzzle stamp you

5    were referring to?

6    A.    Yes.

7          (The exhibit was displayed on the screen.)

8    BY MR. GALIPO:

9    Q.    And 14-7, does this also show the muzzle stamp you were

10   referring to?

11   A.    Yes.

12   Q.    Now, with respect to Mr. Pickett's hands, did you note

13   any injuries to his hands, either the left hand or the right

14   hand?

15   A.    On the back of the right hand there was a scabbed

16   linear abrasion.

17   Q.    Okay.  Now, if someone has a scab, by the time you do

18   an autopsy, does that give you any information as a forensic

19   pathologist as to when that injury occurred?

20   A.    That kind of injury is an older injury, probably a day

21   or more old.  So not from the time of this incident.

22   Q.    Okay.  So the fact that it was healing and scabbed

23   would indicate to you that it happened at some time prior to

24   the incident related to his death?

25   A.    That's correct.

| | |
|---|---|
| 1 | Q.    Okay.   Other than the healing scab that was old, did |
| 2 | you note any other injuries on Mr. Pickett's hands? |
| 3 | A.    No, I did not. |
| 4 | Q.    What was his height and weight? |
| 5 | A.    He was five foot nine inches and 174 pounds. |
| 6 | Q.    And what was your determination as to cause of death in |
| 7 | this matter? |
| 8 | A.    Cause of death was gunshot wounds to chest. |
| 9 | Q.    Showing you Exhibit 14-1, is that the X-ray that shows |
| 10 | where the bullets came to rest in the body? |
| 11 | A.    Yes. |
| 12 | MR. GALIPO:   By agreement, Your Honor? |
| 13 | THE COURT:   All right.   That exhibit will be |
| 14 | admitted. |
| 15 | *(Exhibit 14-1 received in evidence.)* |
| 16 | (The exhibit was displayed on the screen.) |
| 17 | BY MR. GALIPO: |
| 18 | Q.    Okay.   So I take it what I'm pointing to with my pen, |
| 19 | is that where a bullet came to rest? |
| 20 | A.    That's correct. |
| 21 | Q.    And here as well? |
| 22 | A.    Yes. |
| 23 | Q.    And you have described the pathways to the jury? |
| 24 | A.    Yes. |
| 25 | Q.    And did you -- what do you do -- do you take the |

1   bullets -- when you take the bullets out of the body, do you

2   photograph or document those?

3   A.   We photograph them and then seal them in evidence

4   containers, yes.

5   Q.   Okay.  Is 14-21 a photo of one of the bullets that was

6   removed?  No.  14-12.  I keep misspeaking.  I think I'm

7   getting hungry.

8   A.   Yes.  This is a photograph of the bullet that was

9   recovered from just under the skin.

10          MR. GALIPO:  Okay.  By agreement, Your Honor,

11   14-12?

12          THE COURT:  All right.  14-12 will be admitted.

13          *(Exhibit 14-12 received in evidence.)*

14          (The exhibit was displayed on the screen.)

15   BY MR. GALIPO:

16   Q.   All right.  And then is 14-18 the other bullet?

17   A.   Yes.  That's the one that was recovered from the lumbar

18   spine.

19          MR. GALIPO:  By agreement, 14-18?

20          THE COURT:  14-18 will be admitted.

21          *(Exhibit 14-18 received in evidence.)*

22          (The exhibit was displayed on the screen.)

23   BY MR. GALIPO:

24   Q.   Okay.  Do you have a general understanding that these

25   are hollow-point bullets where the petals open up to some

1    extent after they enter the body?

2    A.    Yes.

3    Q.    And is that what we're seeing here; some of the petals

4    opening up in these pictures?

5    A.    Yes.

6    Q.    And what did you determine to be the manner of death in

7    this case?

8    A.    Well, in Riverside County the manner of death is

9    determined by the coroner or the deputy coroner.

10   Q.    Your understanding that was determined to be homicide

11   just because it's death at the hands of another?

12   A.    That was my understanding, yes.

13              MR. GALIPO:   Okay.

14              Thank you.   That's all that I have at this time,

15   Your Honor.

16              THE COURT:   Mr. Ewing?

17              MR. EWING:   I have nothing.   Thank you.

18              THE COURT:   All right.   Doctor, you may step down.

19              All right.   And while the doctor is doing so,

20   given Mr. Galipo's hunger pangs, maybe we should take this

21   opportunity now to take a lunch recess.   So we'll take a

22   one-hour recess.   Have you back at 1:00 o'clock.

23              Please do not talk or do not form or express any

24   opinion about the case until the matter is finally submitted

25   to you.   Don't talk to anyone about the case, don't allow

1    anyone to talk to you about the case, and do not conduct any

2    research of any kind on any subject matter connected with

3    this case.

4            So we'll see you back at 1:00 o'clock.   Thank you.

5            THE CLERK:   All rise for the jury.

6                  *(The jurors exited the courtroom.)*

7        *(The following was held outside the jury's presence:)*

8            THE CLERK:   Please be seated.

9            THE COURT:   Mr. Galipo, do you intend on calling

10   any further witnesses today?

11           MR. GALIPO:   Well, we're going to have that

12   discussion over lunch.   But if anyone is called, it would be

13   either Dominic Archibald or Nathanael Pickett, one or both

14   very briefly, but we're having that discussion.

15           THE COURT:   All right.   And then with respect to

16   the video, the slow-motion video?

17           MR. GALIPO:   I think we're good now so as long as

18   there is an agreement.   I might have misunderstood counsel

19   so I apologize.

20           Because as long as counsel is okay with it being

21   played subject to whatever discussion anyone wants to have

22   about it, then I'm fine.

23           I just want to make sure it got into evidence so I

24   would move it into evidence and probably, you know, ask it

25   to be played before I rest or --

| | |
|---|---|
| 1 | THE COURT:  Just played or played with a witness |
| 2 | or -- |
| 3 | MR. GALIPO:  I think the easier thing to do, once |
| 4 | it's in evidence, I could use it with either, you know, |
| 5 | Mr. Kelsey is on the stand or where Deputy Woods is back on |
| 6 | the stand.  I just wanted to make sure I didn't, you know, |
| 7 | forfeit my right to get it introduced. |
| 8 | THE COURT:  All right.  Okay.  Fair enough. |
| 9 | All right.  And then, Mr. Ewing, if Mr. Galipo |
| 10 | calls a couple of witnesses, I think you indicated that your |
| 11 | run of the show would be Deputy Woods, Mr. Kelsey, and then |
| 12 | perhaps Tommy Dickey.  Were those the three? |
| 13 | MR. EWING:  Yes.  Deputy Woods, ride-along Bill |
| 14 | Kelsey, Deputy Tommy Dickey. |
| 15 | THE COURT:  And then -- well, we've already dealt |
| 16 | with the Barstow Community nurse. |
| 17 | MR. EWING:  We're done with the nurse and then I |
| 18 | would be -- I would probably run out.  I don't know where we |
| 19 | would be on time at that point. |
| 20 | THE COURT:  Okay. |
| 21 | MR. EWING:  But I have Clarence Chapman, expert, |
| 22 | and Parris Ward, expert, for Monday. |
| 23 | THE COURT:  And remind me.  I know the name |
| 24 | Parris Ward.  Remind me who is Parris Ward again? |
| 25 | MR. EWING:  Perris is going to testify about the |

1    audio-video synch.

2              THE COURT:  Oh, that's right.  Okay.  Perfect.

3              MR. EWING:  And Clarence is police practices.

4              THE COURT:  Got it.  All right.

5              Now, I assume you're going to refer to them by

6    their last names during the testimony?

7              MR. EWING:  I will.

8              THE COURT:  All right.  Perfect.

9              All right.  So let's take a lunch recess.  We'll

10   see you all back at 1:00 o'clock.  Thank you.

11             THE CLERK:  All rise.  This Court is in recess.

12             *(At 12:03 p.m., a luncheon recess was taken.)*

13

14                          -oOo-

15

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE

2

3          I, PAT CUNEO, CSR 1600, hereby certify that

4    pursuant to Section 753, Title 28, United States Code, the

5    foregoing is a true and correct transcript of the

6    stenographically reported proceedings held in the

7    above-entitled matter and that the transcript page format is

8    in conformance with the regulations of the Judicial

9    Conference of the United States.

10

11   Date:  March 20, 2018

12

13

14

15

16                      /s/ PAT CUNEO                    _

17                      PAT CUNEO, OFFICIAL REPORTER
                        CSR NO. 1600
18

19

20

21

22

23

24

25

**MR. CONAWAY: [3]** 379/16 419/12 419/18
**MR. EWING: [126]**
**MR. GALIPO: [85]** 379/11 380/17 380/19 382/1 382/21 383/5 383/12 384/21 384/23 385/17 385/22 385/25 386/6 389/13 389/22 391/14 392/5 393/7 398/3 399/9 399/17 404/11 406/4 412/16 412/19 413/3 413/24 414/10 414/23 415/5 415/16 415/20 416/11 419/3 424/17 432/25 433/24 435/7 436/18 437/12 438/4 438/13 438/19 439/12 446/17 446/21 447/18 448/7 449/1 449/12 453/2 457/1 457/4 457/7 457/23 458/4 458/7 458/19 458/22 459/23 463/12 463/17 464/2 464/15 465/5 469/5 469/11 470/4 470/12 470/17 470/19 471/5 475/16 477/5 477/23 479/11 479/17 482/18 484/11 485/9 485/18 486/12 487/10 487/16 488/2
**MR. SINICH: [1]** 379/15
**THE CLERK: [16]** 379/3 386/13 386/15 387/7 387/12 457/16 457/19 464/3 464/5 464/7 464/9 464/24 464/25 487/4 487/7 489/10
**THE COURT: [186]**
**THE WITNESS: [13]** 387/11 387/14 409/23 415/9 415/19 424/19 437/15 438/7 446/7 453/20 464/24 465/2 470/7

**$**

**$50 [1]** 401/15

**-**

**-2 [1]** 397/17
**-oOo [2]** 379/2 489/14

**.**

**.398 [1]** 378/20
**.399 [3]** 378/21 378/22 378/23
**.469 [1]** 378/5
**.470 [1]** 378/13
**.471 [1]** 378/14
**.475 [1]** 378/12
**.477 [1]** 378/9
**.478 [1]** 378/10
**.479 [1]** 378/6
**.482 [2]** 378/7 378/8
**.484 [1]** 378/4
**.485 [2]** 378/11 378/15

**/**

**/s [1]** 490/16

**1**

**10 [10]** 396/4 426/22 429/1 429/16 429/17 429/18 429/19 429/25 430/6 466/19
**102 [3]** 390/21 390/22 405/22
**10:00 [1]** 381/2
**10:15 [1]** 381/3
**10:30 [1]** 383/19
**1128 [1]** 379/9
**11:00 [2]** 381/16 383/19
**11:15 [1]** 457/16
**12 [5]** 378/11 485/6 485/11 485/12

485/13
**126 [3]** 394/24 397/9 397/10 397/15 397/25
**126-1 [1]** 397/17
**126A [9]** 378/20 397/17 398/2 398/3 398/5 398/7 398/22 399/11 399/19
**126B [5]** 378/21 398/13 398/25 399/22 400/3
**126C [3]** 378/22 399/4 399/23
**126D [6]** 378/23 399/14 399/17 399/24 400/24 401/17
**12:00 [1]** 381/15
**12:03 [1]** 489/12
**12:15 [2]** 383/14 458/4
**12:20 [1]** 383/14
**12:30 [1]** 458/4
**13 [7]** 378/12 407/24 475/9 475/17 475/20 475/21 478/8
**13181 [1]** 376/15
**14 [8]** 378/13 468/5 470/6 470/6 470/16 470/18 470/19 470/21
**14-1 [2]** 378/4 484/15
**14-12 [5]** 378/11 485/6 485/11 485/12 485/13
**14-13 [3]** 378/12 475/20 475/21
**14-14 [4]** 378/13 470/18 470/19 470/21
**14-15 [4]** 378/14 471/2 471/6 471/9
**14-18 [5]** 378/15 485/16 485/19 485/20 485/21
**14-2 [4]** 378/5 469/7 469/10 469/11
**14-21 [2]** 470/2 485/5
**14-3 [5]** 378/6 479/10 479/12 479/15 479/17
**14-6 [5]** 378/7 482/15 482/20 482/23 483/2
**14-7 [5]** 378/8 482/15 482/20 482/24 483/9
**14-8 [3]** 378/9 477/6 477/8
**14-9 [5]** 378/10 477/14 477/24 477/25 478/1
**15 [6]** 378/14 384/20 429/24 471/2 471/6 471/9
**1516CV [1]** 390/17
**16-01128-AB-SP [1]** 375/9
**1600 [3]** 375/21 490/3 490/17
**174 [1]** 484/5
**1782 [1]** 375/24
**18 [5]** 378/15 485/16 485/19 485/20 485/21
**19 [1]** 400/16
**1977 [2]** 388/1 395/23
**1995 [2]** 388/2 395/24
**19th [8]** 388/6 389/5 391/9 420/12 448/6 452/15 453/14 454/4
**1:00 [3]** 486/22 487/4 489/10
**1:30 [1]** 381/12
**1st [1]** 448/5

**2**

**20 [22]** 382/15 382/20 382/21 384/20 425/15 426/1 426/3 426/23 429/1 429/16 429/17 429/18 429/19 429/24 429/25 430/6 438/1 438/4 438/19 439/1 481/25 490/11
**2001 [1]** 465/20
**2015 [9]** 388/6 389/5 391/9 400/16 420/12 452/15 453/14 454/4 466/23
**2018 [3]** 375/17 379/1 490/11

**21 [6]** 468/8 470/2 470/3 470/4 470/6 485/5
**213-894-1782 [1]** 375/24
**21800 [1]** 376/5
**23rd [1]** 466/23
**25 [1]** 481/25
**2655 [1]** 376/11
**28 [1]** 490/4

**3**

**30 [3]** 381/4 382/7 384/8
**310 [1]** 376/5
**3333 [1]** 376/6
**350 [1]** 375/22
**375 [1]** 375/19
**387 [3]** 377/3 377/9 377/20

**4**

**4,500 [1]** 466/8
**40 [2]** 382/20 382/23
**400 [1]** 376/15
**403 [2]** 447/20 453/3
**404 [2]** 377/9 377/20
**414 [2]** 377/9 377/20
**416 [1]** 377/4
**420 [2]** 377/12 377/18
**4311 [1]** 375/23
**439 [2]** 377/12 377/18
**447 [2]** 377/12 377/18
**45 [5]** 396/4 435/21 452/23 453/8 454/14
**4565 [1]** 375/23
**465 [2]** 377/13 377/19
**490 [1]** 375/19

**5**

**50 [1]** 463/23
**5500 [1]** 376/16
**562-699-5500 [1]** 376/16

**7**

**753 [1]** 490/4
**760-503-9010 [1]** 376/12
**7:00 [1]** 405/12

**8**

**818-347-3333 [1]** 376/6
**8:30 [2]** 380/25 381/8

**9**

**90012-4565 [1]** 375/23
**9010 [1]** 376/12
**91367 [1]** 376/6
**91746 [1]** 376/16
**92307 [1]** 376/11
**9:23 [2]** 375/17 379/1

**A**

**A.M [2]** 375/17 379/1
**AB [1]** 375/9
**aback [1]** 388/25
**abdominal [2]** 411/2 481/15
**ability [1]** 412/11
**able [5]** 401/2 405/2 413/3 427/9 431/13
**about [91]** 380/16 381/2 382/17 382/20 382/21 388/19 391/8 391/13 393/10 393/10 393/11 395/8 396/19

**A**

**about...** [78] 397/12 402/7 403/1 403/14 403/24 404/1 404/4 404/22 405/2 405/14 407/23 414/21 423/2 424/11 424/15 424/16 425/1 425/3 425/4 425/6 425/10 425/14 425/18 425/21 425/23 426/17 427/3 427/8 428/17 430/20 432/5 432/13 434/17 437/9 437/12 437/16 437/17 437/25 438/11 444/20 445/3 445/4 452/9 452/14 455/12 455/13 456/5 457/11 459/10 460/8 460/9 460/12 460/23 461/1 461/2 461/17 461/21 461/25 462/4 462/9 462/10 462/15 462/17 463/1 463/10 467/6 471/23 476/2 480/1 481/12 481/16 481/21 482/22 486/24 486/25 487/1 487/22 488/25
**above** [4] 468/22 471/4 471/12 490/7
**above-entitled** [1] 490/7
**abrasion** [10] 468/22 468/25 470/12 471/4 471/20 471/21 472/16 472/19 472/20 483/16
**abrasions** [4] 467/8 467/11 469/22 471/19
**Absolutely** [5] 414/2 427/23 436/8 446/20 461/19
**according** [4] 426/3 453/15 453/22 454/11
**accurately** [3] 462/13 469/3 475/14
**across** [1] 395/9
**activity** [2] 440/11 440/12
**actual** [2] 409/5 435/23
**actually** [3] 395/12 429/21 473/17
**acuity** [1] 413/24
**acute** [2] 411/24 412/1
**addition** [4] 424/6 427/5 453/25 471/15
**additional** [2] 419/15 441/6
**adequate** [1] 393/22
**adequately** [1] 462/6
**admit** [6] 397/7 398/2 450/14 469/7 470/13 471/6
**admitted** [18] 397/3 397/4 398/5 398/10 398/20 399/11 399/19 469/10 470/19 471/8 475/20 477/7 477/25 479/16 482/22 484/14 485/12 485/20
**advised** [1] 433/13
**advising** [1] 432/11
**afford** [3] 434/18 434/21 434/22
**afraid** [1] 443/14
**after** [16] 381/6 384/17 414/5 432/1 433/12 434/10 435/12 436/23 437/4 440/24 441/1 442/17 456/22 476/10 480/8 486/1
**afternoon** [5] 380/13 384/4 458/6 458/11 458/14
**afterwards** [1] 410/3
**again** [28] 383/4 398/9 402/22 403/17 403/24 404/7 407/18 420/21 411/11 413/23 417/18 431/3 434/8 434/25 440/9 443/3 443/7 443/7 444/23 450/1 450/5 463/23 464/11 472/14 474/16 478/19 480/19 488/24
**against** [5] 440/19 440/22 474/2 474/14 474/17
**agclawfirm.com** [1] 376/17
**aggressor** [1] 443/21

**ago** [2] 455/12 455/13
**agree** [27] 380/21 393/8 406/19 406/21 408/9 408/16 408/20 408/22 409/11 409/12 409/13 409/16 409/19 411/20 412/25 413/5 413/7 413/7 458/24 459/14 459/15 460/10 460/11 460/13 460/14 460/15 462/22
**agree to** [1] 413/7
**agreed** [2] 403/10 459/13
**agreeing** [1] 462/20
**agreement** [29] 397/5 397/7 398/13 398/24 399/3 399/5 399/14 447/14 447/17 447/22 448/8 449/14 449/14 449/21 459/3 459/4 459/9 459/10 459/12 459/15 460/4 460/14 477/6 477/24 482/19 484/12 485/10 485/19 487/18
**ahead** [3] 403/4 443/18 459/17
**air** [1] 427/2
**al** [2] 375/10 379/10
**all** [126]
**allow** [9] 418/16 419/16 423/18 437/15 451/25 457/13 460/4 461/24 486/25
**allowed** [1] 433/25
**alluded** [1] 402/15
**almost** [5] 413/10 413/13 413/19 437/22 459/13
**alone** [1] 440/22
**along** [2] 385/14 488/13
**ALPHABETICAL** [1] 377/15
**already** [8] 392/23 405/3 408/12 446/3 446/8 476/6 479/25 488/15
**also** [22] 381/22 389/24 402/14 412/7 412/13 420/23 421/5 424/7 426/25 429/2 429/10 433/23 436/10 453/21 467/12 471/20 472/16 472/24 474/11 480/13 480/24 483/9
**altercation** [1] 423/12
**ALVAREZ** [1] 376/14
**ALVAREZ-GLASMAN** [1] 376/14
**always** [2] 380/19 388/5
**am** [1] 397/13
**amount** [2] 434/23 434/24
**anatomic** [2] 478/24 480/19
**ANDRÉ** [2] 375/4 379/6
**Angeles** [3] 375/16 375/23 379/1
**ankle** [1] 471/21
**another** [5] 397/12 434/17 471/2 479/10 486/11
**answer** [2] 432/25 459/24
**answered** [1] 438/5
**anterior** [1] 471/20
**anticipate** [2] 381/2 393/4
**anticipated** [1] 380/21
**any** [54] 380/17 395/18 398/3 399/8 399/16 403/2 403/8 404/21 407/9 407/14 407/21 408/2 408/16 409/13 410/15 414/22 417/9 417/13 418/16 422/11 422/19 422/24 426/7 426/7 428/24 437/3 439/4 439/22 440/12 441/12 444/7 446/10 446/15 450/11 456/17 457/11 457/14 457/14 457/14 460/12 467/3 467/20 469/8 474/6 474/6 474/6 479/22 483/13 483/18 484/2 486/23 487/1 487/2 487/2 487/10
**anybody** [1] 454/14
**anyone** [11] 380/22 386/1 386/8 404/22 457/13 457/13 458/10 486/25

487/1 487/12 487/21
**anything** [10] 395/16 395/18 403/24 403/25 425/1 442/15 445/18 460/14 460/15 462/4
**anywhere** [6] 395/16 406/22 407/3 409/8 429/22 437/16
**apartment** [2] 435/21 435/23
**apologize** [7] 383/10 389/14 392/6 399/13 435/8 470/7 487/19
**appear** [4] 380/12 436/6 472/3 474/6
**appearances** [2] 376/1 379/11
**appeared** [1] 406/16
**appears** [3] 418/5 433/18 468/12
**Apple** [1] 376/11
**apply** [3] 421/9 422/1 422/2
**appreciate** [3] 381/18 382/6 383/15
**appreciated** [1] 458/5
**approach** [7] 389/17 390/7 412/17 416/9 443/5 443/9 447/23
**approached** [1] 441/14
**approaches** [1] 435/11
**approaching** [1] 443/25
**appropriate** [4] 403/5 442/10 445/14 458/13
**approximately** [2] 382/15 384/8
**ARCHIBALD** [6] 375/6 376/2 379/9 379/14 458/9 487/13
**Archibald's** [1] 449/7
**Ardaz** [1] 418/21
**are** [51] 380/3 382/11 382/12 385/1 388/22 397/12 398/15 398/19 399/19 401/2 401/25 405/24 410/5 418/2 418/2 418/7 419/15 421/3 421/18 421/23 422/5 423/15 423/19 427/12 431/5 433/9 439/16 439/19 440/15 441/24 442/6 448/10 449/24 450/3 451/5 454/8 454/17 456/5 457/22 458/8 461/13 462/20 467/20 468/4 469/20 470/16 471/24 472/22 474/13 482/2 485/25
**area** [11] 401/9 404/3 424/14 429/1 435/24 441/5 469/18 470/25 472/9 477/2 477/11
**areas** [2] 392/1 471/16
**aren't** [2] 412/20 431/4
**argue** [1] 418/2
**arm** [7] 422/9 422/10 422/22 423/1 430/4 430/7 471/19
**armband** [2] 402/3 402/5
**arms** [1] 467/10
**around** [5] 404/8 410/6 455/25 456/7 480/3
**arrest** [6] 432/15 433/6 433/17 435/13 440/18 442/14
**arrested** [2] 454/21 455/20
**arresting** [1] 454/23
**artery** [1] 480/14
**articulate** [1] 429/15
**arts** [2] 429/3 429/10
**as** [84] 375/6 375/6 388/9 389/10 390/4 391/13 392/7 393/2 393/4 393/12 393/13 394/23 395/22 396/10 396/10 396/17 398/2 398/22 400/3 400/13 401/10 402/15 414/18 415/7 416/18 417/10 419/1 420/16 420/23 423/13 424/3 424/18 425/9 426/2 429/8 429/9 430/23 431/3 433/2 433/2 433/2 434/3 436/19 437/13 437/14 438/8 438/8 438/9 439/4 440/1 440/24 443/1 446/15

**A**

**as... [31]** 447/11 447/11 447/19 450/7
454/2 456/18 458/24 459/3 459/4
459/22 462/18 466/6 467/2 469/23
472/2 472/6 472/17 472/18 472/21
474/1 474/16 474/24 479/15 483/18
483/19 484/6 484/21 487/17 487/17
487/20 487/20
**aside [1]** 419/1
**ask [14]** 393/25 397/7 398/1 434/4
449/19 449/20 450/10 451/25 452/1
455/19 461/21 463/10 467/12 487/24
**asked [9]** 391/23 392/2 438/5 441/21
449/10 450/5 452/22 453/19 454/5
**asking [2]** 413/8 430/20
**asp [1]** 420/16
**asserted [1]** 416/18
**assertion [2]** 417/20 417/21
**assistance [1]** 427/1
**associated [2]** 476/7 482/5
**assume [8]** 384/19 435/19 436/2
445/11 445/16 445/19 458/13 489/5
**assuming [2]** 419/9 448/25
**assumption [5]** 417/2 419/12 419/15
428/16 429/17
**at [142]**
**attached [1]** 450/7
**attack [1]** 431/22
**attempted [2]** 431/16 462/17
**attempting [10]** 421/20 422/6 432/15
433/6 433/19 434/7 436/6 455/2 456/1
474/23
**attempts [2]** 433/17 435/12
**attending [1]** 403/9
**attention [1]** 406/14
**attorney [7]** 376/3 376/4 376/4 376/10
376/14 405/1 405/5
**audio [14]** 417/8 426/11 431/24
432/14 432/17 432/22 436/14 454/13
455/9 455/24 456/2 456/18 461/3 489/1
**audio-video [1]** 489/1
**authenticate [1]** 389/21
**automatically [2]** 431/6 431/21
**autopsies [3]** 465/24 466/6 466/9
**autopsy [17]** 465/14 466/2 466/13
466/22 466/23 467/2 467/13 467/23
468/11 468/13 468/17 469/4 471/24
474/5 481/5 481/11 483/18
**available [6]** 420/12 420/19 420/20
428/7 428/10 435/17
**average [1]** 481/22
**aware [8]** 422/5 428/2 428/13 438/23
447/9 449/24 454/8 454/17
**away [11]** 433/16 436/6 440/5 440/5
440/6 441/25 442/1 442/8 442/9 445/22
446/12

**B**

**back [40]** 381/12 381/14 382/24
385/16 386/2 394/15 402/14 403/14
403/15 407/23 407/24 408/2 411/4
413/23 421/9 421/14 426/24 430/17
437/12 437/16 441/4 442/15 458/18
459/3 464/1 471/19 471/22 476/13
476/15 476/16 476/19 478/7 478/12
479/3 480/21 483/15 486/22 487/4
488/5 489/10

**backup [2]** 432/11 443/5
**barrel [6]** 473/8 473/11 473/15 473/18
474/14 474/17
**Barstow [4]** 388/7 404/18 404/23
488/16
**based [20]** 384/19 391/12 400/20
417/8 420/10 422/12 422/13 422/13
430/8 443/12 443/16 443/20 447/10
448/14 450/23 451/16 456/8 475/2
476/21 476/21
**basically [2]** 421/4 421/24
**basis [2]** 392/17 392/20 417/7 453/20
465/25
**baton [1]** 420/16
**be [144]**
**because [43]** 380/9 381/7 381/23
383/18 386/20 386/23 388/21 391/21
393/21 396/3 396/13 405/3 405/11
409/3 413/7 418/1 418/1 419/3 423/11
423/13 432/4 432/6 433/8 434/2 441/18
441/23 443/1 443/9 443/24 446/3
448/25 450/2 450/23 451/21 451/23
459/3 460/11 460/14 460/14 463/19
472/20 486/11 487/20
**been [22]** 382/7 387/25 388/1 393/22
394/23 395/22 395/23 397/3 429/2
439/22 440/22 440/25 444/19 450/17
452/13 452/23 453/16 455/19 458/25
465/20 465/21 466/10
**before [26]** 381/6 381/10 383/11
385/17 387/10 390/12 391/1 397/6
398/10 400/2 405/20 410/1 416/9 429/6
433/17 434/12 434/24 435/15 435/16
436/11 447/23 455/20 458/3 464/23
462/7 487/25
**beg [1]** 390/19
**begin [2]** 434/25 464/1
**beginning [4]** 410/5 468/11 468/13
468/13
**behalf [1]** 379/13
**behind [2]** 432/9 442/15
**being [23]** 385/1 385/4 385/5 385/12
398/10 406/9 424/13 426/22 430/25
431/7 433/23 440/10 441/18 454/21
459/22 461/10 469/25 470/25 472/21
473/9 474/1 474/14 487/20
**believe [29]** 382/15 405/6 405/6
406/13 415/21 416/7 417/25 423/3
425/8 428/11 428/17 430/8 430/9
430/12 430/21 437/7 440/4 440/21
441/13 442/4 442/5 450/12 451/16
453/11 460/21 466/19 479/8 480/5
480/25
**believed [1]** 416/16
**below [1]** 471/20
**belt [3]** 420/15 436/14 437/8
**bench [4]** 392/10 416/11 447/25
458/18
**benefit [1]** 467/18
**BERNARDINO [6]** 375/10 379/10
379/21 454/6 454/22 455/3
**best [2]** 408/3 412/11
**better [1]** 418/24
**between [9]** 379/25 383/19 395/9
396/4 431/8 455/11 455/18 472/6
482/14
**Beyond [2]** 445/6 446/5
**big [2]** 384/25 410/13

**Bill [1]** 488/13
**Bill or [1]** 418/7
**Binder [2]** 397/25 468/9
**BIROTTE [2]** 375/4 379/6
**birth [1]** 441/19
**bit [4]** 395/5 425/4 480/2 483/2
**black [4]** 409/20 409/25 443/15 467/25
**blacking [1]** 413/11
**bladder [1]** 480/13
**blame [2]** 385/25 386/1
**blaming [1]** 386/8
**bleeder [1]** 396/16
**bleeding [3]** 407/5 480/25 481/2
**blood [18]** 407/6 407/6 407/7 407/9
480/14 481/4 481/7 481/11 481/13
481/14 481/16 481/17 481/20 481/22
481/25 482/10 482/11 482/13
**blow [1]** 431/15
**blows [2]** 428/17 429/13
**blue [1]** 390/14
**blunt [2]** 469/20 469/23
**board [1]** 403/10
**bodily [17]** 423/8 423/21 424/16
424/24 425/2 425/19 425/19 425/20
425/23 425/25 426/2 426/7 426/17
437/25 438/3 438/18 439/2
**body [21]** 420/22 467/15 467/21
476/10 476/11 478/12 478/18 478/24
479/2 479/3 479/4 479/4 479/5 480/8
480/8 480/16 480/18 481/10 484/10
485/1 486/1
**bolstered [1]** 451/19
**bone [2]** 426/6 439/3
**bones [1]** 404/8
**bony [2]** 411/14 411/22
**book [2]** 467/24 468/1
**both [19]** 379/15 383/17 385/1 394/16
395/3 395/8 395/9 396/20 396/22
401/25 402/2 402/3 410/6 462/21 474/8
474/10 474/13 475/11 487/13
**bottom [1]** 468/7
**Boulevard [1]** 376/5
**bowel [1]** 480/11
**Box [1]** 376/11
**boxer [3]** 431/18 431/20 431/20
**boxing [2]** 431/5 431/19
**brain [1]** 403/21
**break [2]** 457/25 458/3
**breath [1]** 410/22
**bridge [2]** 395/2 395/9
**brief [1]** 463/25
**briefly [3]** 415/25 458/9 487/14
**bring [4]** 382/23 386/11 421/8 421/14
**broken [2]** 472/21 482/5
**brought [1]** 469/4
**bruising [4]** 394/14 395/11 410/1
410/6
**bullet [22]** 472/17 474/10 476/10
476/14 476/16 476/20 476/24 477/2
477/11 477/15 477/19 477/22 478/5
478/11 478/18 478/19 479/2 479/9
480/7 484/19 485/8 485/16
**bullet or [1]** 474/10
**bullets [7]** 467/20 467/22 484/10
485/1 485/1 485/5 485/25
**bullied [1]** 461/9
**bullying [2]** 461/15 462/4
**Burbank [1]** 376/5
**burden [1]** 462/18

**B**

burning [2] 437/10 473/5
busted [1] 409/16
but [66] 382/9 384/1 384/3 385/5
387/11 390/4 392/4 394/25 402/3
402/12 402/19 403/19 405/6 406/14
408/16 410/5 410/7 417/23 417/24
418/25 419/15 422/4 424/7 424/11
426/5 426/19 426/21 429/15 429/19
430/5 431/17 433/22 434/14 435/18
449/8 449/10 450/12 450/18 451/8
451/13 451/19 452/24 453/13 454/12
458/10 458/24 459/13 460/7 460/18
461/9 462/25 463/3 464/24 466/19
472/22 473/21 474/17 479/12 479/22
481/3 481/20 482/7 483/3 487/12
487/14 488/21

**C**

CALIFORNIA [9] 375/2 375/16 375/23
376/6 376/11 376/16 379/1 418/5
465/22
call [22] 381/5 382/11 382/14 383/8
383/11 385/5 385/10 385/15 386/21
386/24 393/18 440/1 441/5 441/6 458/8
460/6 463/6 463/7 463/21 464/14
464/17 470/17
called [9] 386/21 386/23 389/24 390/1
404/23 420/25 456/12 458/19 487/12
calling [4] 379/9 451/5 460/5 487/9
calls [11] 387/4 389/14 389/23 391/15
392/6 414/24 415/6 436/19 437/14
458/13 488/10
came [5] 380/24 425/17 441/4 484/10
484/19
camera [1] 461/4
can [75] 383/8 388/13 389/13 390/3
391/20 392/25 393/1 393/25 395/1
395/5 395/10 395/10 395/10 395/20
398/17 398/20 401/9 402/6 403/25
407/9 409/21 412/13 412/15 417/3
417/25 418/3 418/3 420/10 421/2
421/10 421/13 421/14 422/3 422/3
424/1 424/7 424/12 425/18 425/20
425/23 430/23 433/11 433/25 435/3
440/21 442/7 442/21 444/23 444/25
450/10 450/11 452/1 454/25 458/2
462/22 463/21 466/22 467/11 468/4
468/4 468/8 468/20 470/2 471/18 472/5
472/5 473/4 475/9 476/10 476/19
476/25 478/17 480/1 480/2 483/2
can't [7] 397/22 406/15 413/7 413/7
440/8 460/22 462/25
cancer [1] 396/13
cardiologist [1] 381/23
cardiovascular [1] 410/21
care [3] 386/7 406/11 453/23
career [1] 466/7
carries [1] 480/13
case [40] 377/3 377/4 379/9 387/2
404/22 408/12 416/2 422/5 426/11
426/13 428/21 432/22 436/3 438/24
443/21 444/11 444/18 445/20 446/14
447/13 447/14 449/11 451/3 457/11
457/15 460/18 467/19 473/12 474/5
479/8 480/25 481/3 481/14 482/4 482/9
486/7 486/24 486/25 487/1 487/3

**Case 16-1128 [1]** 379/9
**CASE-IN-CHIEF [4]** 377/3 377/4 387/2
416/2
cases [1] 389/2
cat [8] 396/11 396/12 396/20 403/23
404/6 404/9 408/25 413/14
CAT-scanned [1] 403/23
cause [6] 387/10 464/23 466/3 466/5
484/6 484/8
cavity [2] 481/15 481/15
center [8] 384/1 388/4 474/10 474/11
477/20 477/22 479/2 482/6
CENTRAL [1] 375/2
certainly [1] 381/18
CERTIFICATE [1] 490/1
certify [1] 490/3
cervical [2] 394/15 404/6
challenge [2] 382/2 450/15
chance [3] 380/1 381/9 461/8
Chapman [1] 488/21
Chapter [1] 426/3
Chapter 3-5 [1] 426/3
characterize [2] 469/22 474/16
checked [1] 413/20
chest [22] 410/22 445/11 445/20
445/22 446/11 473/12 474/12 474/14
474/19 475/4 475/8 476/4 476/12
476/13 477/20 477/23 479/3 480/21
481/12 481/13 482/12 484/8
CHIEF [4] 377/3 377/4 387/2 416/2
CHRONOLOGICAL [1] 377/6
circle [3] 395/12 401/9 402/6
circumstances [2] 440/16 444/19
City [1] 376/16
Civil [1] 379/9
Clarence [2] 488/21 489/3
Clarence Chapman [1] 488/21
clarify [1] 478/14
clean [1] 454/1
clear [7] 393/19 397/17 397/21 419/8
451/14 459/7 470/3
clearly [2] 408/19 408/23
clerk [1] 390/12 418/23
clients [1] 469/12
close [6] 409/11 424/12 435/24 467/25
473/9 474/18
closer [2] 476/4 477/20
closeup [2] 470/10 470/12
closeups [3] 475/24 475/25 482/16
CM [1] 375/21
Code [1] 490/4
collar [1] 472/17
collect [1] 482/13
colon [1] 480/11
COLVIN [1] 376/14
come [15] 405/10 409/20 421/25 431/6
443/5 458/17 460/7 460/16 462/14
463/11 463/11 463/15 463/15 463/25
481/7
comfortable [1] 463/1
coming [6] 388/8 390/5 462/18 463/20
473/14 481/14
command [7] 434/18 434/19 434/22
456/12 456/12 456/13 456/19
commands [1] 434/17
comment [2] 461/25 462/9
committed [2] 442/25 443/10
common [1] 472/22

communication [1] 455/18
communications [2] 455/10 460/21
Community [3] 388/7 404/18 488/16
comparison [1] 481/19
complain [2] 437/9 437/12
complaining [1] 438/11
complete [1] 413/13
completely [2] 472/11 476/16
compliance [2] 422/4 424/10
complies [8] 388/14 395/14 395/21
401/11 402/8 468/6 475/10 477/1
comply [3] 434/19 434/24 456/15
component [5] 383/25 408/5 408/7
414/22 415/4
components [1] 414/21
CONAWAY [5] 376/9 376/10 379/17
419/9 463/10
concern [1] 384/7
concerned [7] 396/14 403/20 404/4
404/7 424/11 460/9 460/12
conclude [1] 458/2
conclusion [1] 417/7
concussion [11] 408/20 408/24 409/1
409/4 409/8 409/10 426/6 438/4 438/9
438/13 438/18
condition [2] 394/2 426/5
conduct [2] 457/14 487/1
conducting [1] 416/7
confer [1] 469/12
Conference [1] 490/9
conferred [4] 447/1 447/4 477/17
479/11
confirm [1] 398/19
confirmed [1] 418/12
conformance [1] 490/8
confusions [1] 394/16
connected [2] 457/15 487/2
connecting [1] 440/10
consciousness [11] 413/1 413/6
413/13 413/14 426/6 426/14 426/16
426/18 427/3 427/5 427/17
consensual [1] 440/4
consent [1] 441/9
consenting [1] 441/24
consequence [1] 396/13
consideration [1] 396/11
considered [2] 440/17 444/10
considering [1] 444/19
consistent [12] 398/15 404/4 407/12
407/18 410/10 427/2 469/20 469/24
470/24 474/9 474/13 480/5
consistently [1] 448/2
consult [1] 403/9
contact [5] 389/10 404/25 473/9
473/18 480/6
contain [3] 441/2 441/4 443/8
contained [1] 461/1
containers [1] 485/4
contesting [1] 448/10
context [1] 425/14
continue [4] 415/22 416/8 419/14
440/21
continued [1] 441/2
contrary [1] 430/11
contribute [1] 481/1
contributory [2] 480/25 481/3
control [4] 421/2 421/13 421/15
421/25

**C**

contusion [3] 400/8 401/7 411/16
contusions [2] 395/2 395/3
conversant [1] 431/5
conversation [1] 454/12
conversely [1] 429/18
copy [2] 466/16 466/20
corner [1] 390/13
coroner [3] 381/19 486/9 486/9
coroner's [2] 465/12 466/24
correct [46] 382/22 384/3 389/8 390/6
 390/23 392/16 399/7 405/20 407/19
 408/11 408/13 408/18 410/23 410/24
 411/25 412/5 412/10 413/6 414/7
 419/13 423/5 424/24 424/25 425/11
 428/4 428/11 429/3 429/6 438/2 449/22
 453/12 466/1 467/1 468/19 471/13
 471/14 472/1 474/22 475/1 477/13
 478/6 478/13 482/1 483/25 484/20
 490/5
correctly [1] 416/25
Cough [1] 410/22
could [28] 396/15 396/15 401/12
 403/20 403/21 404/5 405/10 407/13
 407/20 408/10 410/10 416/21 418/15
 421/24 421/24 430/4 430/5 440/24
 441/9 441/10 446/16 446/16 463/4
 470/1 471/1 473/21 476/22 488/4
couldn't [2] 417/14 417/21
counsel [32] 376/1 379/11 381/18
 385/22 397/2 397/5 397/6 399/1 399/5
 399/14 401/12 428/20 441/21 447/1
 447/4 447/21 453/19 455/12 458/9
 458/24 459/14 460/7 460/10 461/12
 462/5 463/19 466/19 470/3 477/17
 479/11 487/18 487/20
counseling [1] 403/8
count [1] 466/8
countering [1] 431/21
counterpunch [2] 431/18 431/21
county [12] 375/10 379/10 379/21
 380/12 381/15 404/17 404/19 454/6
 454/22 455/3 465/12 486/8
couple [4] 448/9 455/15 488/10
course [4] 389/21 429/8 429/9 461/6
court [21] 375/1 379/5 385/13 387/10
 388/11 393/3 394/5 397/7 398/1 398/14
 401/12 413/2 416/21 419/16 419/23
 452/6 464/4 464/11 464/23 466/19
 489/11
Court's [2] 392/25 461/16
courtesies [1] 385/14
Courthouse [1] 375/22
courtroom [5] 386/15 418/23 457/18
 464/7 487/6
cover [1] 405/13
covered [2] 415/9 446/6
creates [2] 423/12 472/18
creating [2] 384/16 473/15
crime [8] 440/1 441/3 441/11 442/25
 443/10 443/10 444/24 444/25
criminal [2] 440/11 440/12
crop [1] 479/13
cross [7] 377/8 377/11 377/17 384/8
 404/13 420/1 445/7
CROSS-EXAMINATION [2] 404/13
 420/1

Crossroads [1] 376/15
CRR [1] 375/21
CRR-CM [1] 375/21
crying [7] 388/24 392/23 406/19
 406/23 406/25 407/3 415/4
CSR [3] 375/21 490/3 490/17
cumulative [4] 415/6 438/6 438/20
 446/6
CUNEO [4] 375/21 490/3 490/16
 490/17
currently [1] 465/11
cursorily [1] 461/8
cursory [1] 455/15
custodian [1] 451/5
cut [1] 394/25

**D**

DALE [3] 376/3 376/3 379/13
Dale Galipo [1] 379/13
dalekgalipo [1] 376/7
damage [2] 481/7 481/9
dancing [1] 381/19
dark [1] 382/7
darkening [1] 480/3
darts [1] 424/11
date [3] 392/14 441/19 490/11
dates [1] 396/5
day [5] 375/19 379/10 396/5 410/2
 483/20
days [1] 396/5
deadly [13] 424/15 424/22 425/6
 425/11 425/14 425/19 425/24 427/1
 440/18 440/23 444/13 444/20 444/25
dealt [1] 488/15
DEAN [1] 376/10
death [11] 424/23 466/3 466/5 466/10
 482/14 483/24 484/6 484/8 486/6 486/8
 486/11
DECEASED [1] 375/7
decide [1] 424/14
deciding [2] 440/17 458/8
decision [1] 462/6
deep [1] 408/8
defect [2] 472/9 472/19
defend [5] 430/23 431/6 431/8 431/14
 431/16
defendant [3] 379/21 379/21 389/25
DEFENDANT'S [3] 387/7 394/24
 398/22
Defendant's Exhibit 126A [1] 398/22
Defendants [4] 375/11 376/14 398/25
 399/4
DEFENDANTS' [6] 377/7 378/18
 397/25 399/13 400/3 400/24
defending [4] 430/10 430/13 430/21
 431/9
defense [17] 377/3 387/2 387/4
 390/22 397/15 397/25 398/1 398/2
 401/17 416/20 423/10 423/24 424/3
 445/1 462/12 462/19 462/25
Defense Exhibit 102 [1] 390/22
defensive [2] 430/17 431/5
define [1] 425/25
defined [1] 426/2
deflection [1] 480/22
deFOE [33] 377/12 377/18 380/22
 381/1 382/12 382/24 383/5 383/6 383/8
 383/17 383/22 384/7 385/1 385/6

385/16 385/17 385/19 385/24 386/25
 416/3 416/4 418/15 426/9 426/10
 427/11 439/16 447/8 448/2 448/23
 449/20 451/15 451/19 452/9
DeFoe's [3] 383/24 415/22 449/9
degree [1] 388/23
demonstrate [1] 421/10
demonstrated [1] 421/22
demonstrating [1] 463/23
Department [1] 455/3
depending [4] 392/25 396/3 421/16
 481/24
depends [4] 421/12 421/12 422/3
 481/20
depict [4] 400/7 401/6 401/24 462/13
depiction [1] 471/4
depicts [1] 400/8
deposition [10] 428/21 429/22 449/3
 449/6 449/7 449/9 450/6 450/7 450/8
 454/5
deputy [33] 379/24 388/9 388/16
 388/20 389/10 391/9 392/14 418/12
 420/11 422/24 428/7 428/18 431/1
 434/15 437/6 440/24 442/10 442/13
 442/18 443/22 444/4 444/8 445/5
 445/10 445/19 450/18 450/22 455/1
 486/9 488/5 488/11 488/13 488/14
Deputy Woods [25] 388/20 389/10
 392/14 418/12 420/11 422/24 428/7
 428/18 431/1 434/15 440/24 442/10
 442/13 442/18 443/22 444/4 444/8
 445/5 445/10 445/19 450/18 450/22
 488/5 488/11 488/13
describe [18] 391/16 392/13 393/2
 393/9 393/12 393/15 394/1 394/1 394/8
 395/1 400/13 402/18 420/10 421/2
 468/17 474/24 476/3 478/23
described [4] 395/11 420/21 442/17
 484/23
describing [1] 392/18
description [8] 378/3 378/19 413/8
 422/13 422/19 430/3 430/9 430/9
designated [1] 397/18
detain [8] 420/24 440/9 440/18 442/14
 443/5 455/2 455/4 456/1
detained [1] 442/3
detaining [1] 455/1
detention [2] 440/5 440/7
determination [1] 484/6
determine [4] 403/6 466/2 466/4 486/6
determined [2] 486/9 486/10
determining [1] 405/9
developed [1] 440/25
developing [1] 396/17
diagnosis [3] 409/1 409/4 427/14
diagnostic [2] 403/12 414/5
Dickey [3] 437/6 488/12 488/14
did [127]
didn't [32] 380/1 380/23 393/4 406/22
 408/16 409/12 409/13 409/16 409/20
 411/14 413/20 413/21 414/8 416/16
 417/15 418/15 418/15 423/23 425/7
 426/19 427/14 428/5 428/24 432/25
 441/18 449/13 450/2 450/3 451/5 452/2
 460/14 488/6
die [1] 482/10
DIEU [1] 376/4
difference [4] 384/25 431/8 446/15

**D**

difference... [1] 472/6
different [11] 382/4 383/21 393/11
410/14 421/3 421/16 421/18 424/2
432/3 433/9 471/25
differential [1] 409/9
differently [1] 482/7
digit [2] 390/18 390/20
dire [4] 377/8 377/11 377/17 386/19
direct [7] 377/8 377/11 377/17 387/19
412/15 415/9 465/7
direction [1] 475/25
directly [1] 459/25
discernible [1] 480/22
discharge [3] 474/3 474/15 480/6
discoloration [4] 395/8 411/6 473/5
480/3
discount [1] 383/24
discuss [2] 380/4 458/9
discussed [1] 380/7
Discussion [5] 392/4 425/15 487/12
487/14 487/21
disease [1] 466/4
disfigurement [1] 426/9
disparage [1] 461/25
Dispatch [3] 432/12 436/11 436/12
displayed [21] 394/21 397/1 398/8
400/25 401/18 406/7 407/25 409/23
469/16 470/22 471/10 475/22 477/9
478/2 478/9 479/20 482/25 483/7
484/16 485/14 485/22
dispute [4] 461/17 461/21 462/10
462/10
distance [2] 424/12 443/4
distinction [2] 431/11 431/12
distinguish [1] 402/5
distress [2] 411/25 412/2
DISTRICT [5] 375/1 375/2 379/5 379/7
464/11
DIVISION [1] 375/3
DMV [1] 416/20
DNA [1] 445/17
do [124]
doctor [8] 410/16 412/8 464/18 465/21
478/17 478/22 486/18 486/19
doctors [1] 403/3
document [28] 390/4 390/12 390/14
391/1 391/3 391/5 397/12 397/14 398/1
405/24 406/3 409/7 411/12 412/18
416/23 418/16 448/20 448/22 448/23
449/15 450/10 450/23 451/9 456/4
456/5 466/2 482/17 485/2
documents [4] 397/2 397/8 397/9
397/24
does [32] 400/7 401/6 401/24 402/1
417/3 429/13 432/19 434/12 438/9
440/6 441/24 444/14 444/16 462/13
468/14 469/2 470/10 471/2 472/20
475/11 475/15 475/13 475/24 477/2
477/3 477/14 477/16 479/22 479/24
483/4 483/9 483/18
doesn't [8] 380/12 381/9 408/6 459/15
460/16 463/6 463/16 463/22
doing [4] 387/25 471/24 474/5 486/19
dollars [1] 463/23
domain [11] 425/5 425/7 425/11
425/15 425/18 426/1 426/3 438/1 438/4

438/19 439/11
dominant [1] 423/16
DOMINIC [5] 375/6 379/9 379/11
449/7 487/13
Dominic Archibald [2] 379/14 487/13
Dominic Archibald's [1] 449/7
don't [68] 381/8 383/24 384/15 384/17
385/2 385/4 386/18 391/16 392/3
393/21 396/11 403/8 408/14 410/2
410/7 410/12 410/19 413/18 413/18
413/22 418/14 419/11 420/14 422/8
424/11 424/20 425/3 425/16 425/16
425/22 427/17 432/10 432/12 433/8
435/21 435/21 435/25 437/16 439/6
441/24 442/22 442/22 442/23 442/23
443/4 445/18 448/12 448/12 450/11
452/2 453/4 453/13 454/10 454/12
456/13 457/9 457/13 457/13 459/9
459/14 459/15 460/12 468/20 472/11
473/20 486/25 486/25 488/18
done [13] 381/9 383/6 383/14 384/18
385/7 385/9 396/2 414/5 437/22 441/9
442/18 466/24 488/17
down [25] 380/13 384/2 395/5 415/19
421/23 440/8 442/17 443/1 457/7
457/22 458/25 459/5 459/21 459/23
459/25 460/3 460/8 460/16 460/25
461/7 461/22 462/1 463/5 480/13
486/18
downward [1] 480/22
Dr. [4] 383/9 383/11 464/17 465/9
Dr. McCormick [3] 383/9 383/11 465/9
Dr. Scott McCormick [1] 464/17
draw [1] 423/15
dressed [1] 400/23
Dried [1] 407/6
Dripping [1] 407/6
drivers [2] 418/6 418/7
dry [1] 407/7
during [10] 386/19 415/9 423/21 428/5
430/15 461/6 467/13 467/22 468/11
489/6
duties [3] 389/21 429/8 429/9

**E**

each [2] 382/20 472/10
earlier [3] 402/15 418/19 437/25
early [1] 458/11
easier [1] 488/3
easily [1] 463/4
EDCV [1] 375/9
edges [3] 472/10 472/14 472/18
edification [1] 424/7
effect [2] 421/6 432/8
effective [2] 431/13 431/16
effectively [1] 432/5
effectuate [3] 421/11 421/20 422/6
either [9] 393/23 403/20 404/8 420/16
426/12 473/7 483/13 487/13 488/4
El [6] 447/18 449/25 453/2 453/14
453/15 454/15
El Rancho Motel [5] 447/18 449/25
453/2 453/14 454/15
elapsed [1] 462/23
elbow [1] 471/20
elevated [1] 440/4
else [4] 395/16 402/11 403/25 458/10
else's [1] 445/2

emits [1] 424/9
emotional [4] 411/22 415/4 415/7
436/17
emphasize [1] 462/8
employed [2] 388/9 419/3
encounter [3] 433/21 440/4 456/1
end [5] 473/8 473/11 473/14 473/16
474/17
endeavor [1] 385/9
ended [2] 431/17 435/25
energy [1] 473/14
enough [1] 488/8
enter [2] 416/17 486/1
entered [9] 386/15 464/7 476/10
476/12 477/20 477/21 477/22 479/2
480/8
entering [1] 480/20
entire [2] 436/14 441/17
entirely [1] 459/13
entirety [3] 463/7 463/16 463/22
entitled [1] 490/7
entrance [13] 472/3 472/6 472/8
472/11 472/16 472/22 472/24 473/6
474/7 474/9 474/10 476/8 480/4
escapes [1] 418/20
especially [2] 427/7 467/14
essentially [5] 398/16 417/5 417/8
423/3 466/2
establish [1] 441/5
established [1] 452/11
estimate [2] 384/2 466/6
et [2] 375/10 379/10
even [5] 393/16 408/9 413/18 431/4
445/17
event [2] 404/21 479/22
eventually [4] 432/23 432/23 432/24
432/24
ever [2] 422/2 442/13
every [3] 428/22 429/13 443/24
everything [2] 389/1 391/25
evidence [36] 378/3 378/19 381/7
389/25 390/2 397/3 397/8 398/7 399/22
399/23 399/24 426/23 436/3 440/6
450/4 451/2 467/2 467/6 469/11 470/21
471/9 472/24 475/18 475/21 477/8
478/1 479/17 482/23 482/24 484/15
485/3 485/13 485/21 487/23 487/24
488/4
evident [2] 410/4 410/7
EWING [19] 376/14 379/20 381/5
385/12 387/1 387/17 389/16 392/11
394/6 414/13 416/7 416/14 419/24
446/24 448/1 452/7 458/12 486/16
488/9
Exactly [2] 382/4 461/14
exam [4] 400/22 402/10 403/4 412/7
examination [11] 387/19 403/22
404/13 414/15 416/7 420/1 439/14
447/6 458/2 465/7 475/2
examine [6] 403/15 416/18 419/10
419/11 419/16 426/19
examined [1] 449/10
examiner [16] 380/24 381/5 381/6
381/8 382/6 383/1 383/5 385/1 385/16
385/17 385/20 457/23 457/24 458/3
458/18 464/1
examining [1] 389/6
example [1] 473/11

**E**

exception [2] 393/1 393/17
excited [1] 393/24
excuse [4] 381/22 395/5 434/15
441/15
excused [4] 418/25 419/6 457/4
457/22
exhibit [66] 378/3 378/19 390/22
394/21 394/24 397/1 397/25 398/7
398/8 398/22 399/15 399/17 399/22
399/23 399/24 400/2 400/5 400/25
401/18 405/22 406/6 406/7 407/24
407/25 409/23 437/19 448/5 450/8
466/19 467/24 468/1 469/7 469/11
469/16 470/6 470/14 470/21 470/22
471/9 471/10 475/9 475/17 475/21
475/22 476/25 477/8 477/9 478/1 478/2
478/8 478/9 479/10 479/17 479/20
482/23 482/24 482/25 483/7 484/9
484/13 484/15 484/16 485/13 485/14
485/21 485/22
Exhibit 10 [1] 466/19
Exhibit 102 [1] 405/22
Exhibit 14 [1] 470/6
Exhibit 14-1 [1] 484/9
Exhibit 14-13 [3] 475/9 475/17 478/8
Exhibit 14-8 [1] 476/25
Exhibit 15-13 [1] 407/24
Exhibit 28-2 [1] 406/6
exhibits [9] 378/1 378/17 398/10
398/11 398/15 398/18 399/9 449/1
482/21
exit [7] 472/3 472/7 472/13 472/20
472/23 473/2 476/16
exited [3] 392/21 457/18 487/6
expect [2] 468/20 482/6
experience [6] 384/20 400/20 420/10
456/8 473/23 482/7
experiencing [3] 392/23 413/9 413/10
expert [15] 417/11 425/9 459/18 460/5
460/23 460/24 460/25 462/14 463/6
463/7 463/15 463/17 463/21 488/21
488/22
expert's [2] 450/15 463/1
expired [2] 448/5 452/16
explain [8] 383/9 385/6 385/24 442/21
472/5 476/19 478/17 480/2
explained [3] 380/12 380/15 381/1
explicitly [1] 419/10
expose [1] 396/11
exposed [1] 432/7
express [2] 457/11 486/23
extend [1] 385/13
extensive [1] 426/8
extent [5] 391/13 394/12 419/8 459/19
486/1
external [2] 467/3 467/6
extra [2] 401/15 463/23
extremely [2] 401/15 403/19
extremities [2] 424/13 467/9
eye [2] 404/8 468/25
eyeballs [1] 410/20
eyebrow [3] 468/22 468/23 471/5
eyebrows [2] 395/9 471/12
eyes [6] 395/3 395/8 409/20 409/25
410/6 410/18

**F**

face [29] 391/24 396/21 404/9 407/12
407/19 407/21 408/13 426/23 428/25
429/1 430/6 430/25 431/2 437/9 437/18
438/12 439/20 444/4 444/8 467/9
468/10 468/15 468/21 469/3 469/20
469/25 470/11 471/3 471/15
face-mouth [1] 429/1
facial [8] 394/14 394/14 395/2 396/15
396/15 404/7 404/8 469/18
facility [1] 380/11
facing [3] 421/17 421/17 478/24
fact [10] 382/6 406/22 411/24 413/12
419/9 426/18 429/17 432/6 441/10
483/22
factors [1] 438/9
facts [2] 443/17 445/20
fair [5] 384/20 393/13 419/11 474/23
488/8
fairly [1] 473/22
fall [2] 442/17 443/2
fallen [1] 434/9
falls [1] 433/16
family [1] 388/5
far [3] 381/9 440/15 466/7
fatal [3] 479/6 480/24 481/2
faulting [1] 380/21
fear [8] 423/7 423/20 424/23 425/1
425/4 425/19 443/12 443/16
feel [6] 393/16 396/12 414/8 442/7
442/7 476/22
feeling [2] 418/23 476/22
feels [2] 461/10 462/5
feet [1] 420/23
fell [2] 442/17 442/25
felt [2] 408/23 426/13
few [6] 441/21 441/23 447/8 471/16
482/15 482/16
field [1] 392/19
fight [6] 423/22 423/25 428/13 430/9
430/15 443/13
fighting [13] 420/19 423/4 423/7
423/19 423/25 428/3 430/2 430/2
430/19 430/20 431/5 433/17 439/17
figure [1] 463/14
finally [2] 457/12 486/24
financial [1] 383/25
find [5] 404/3 407/2 429/22 441/3
481/11
findings [1] 473/1
fine [8] 380/2 380/2 384/13 385/18
400/12 440/25 459/5 487/22
finger [1] 411/18
fingerprints [1] 445/17
fingers [1] 421/15
finish [8] 380/22 381/1 382/12 383/8
383/13 383/17 434/1 461/20
finished [1] 443/19
fire [1] 473/1
fired [1] 473/10
fires [1] 424/7
firing [1] 424/12
first [18] 375/22 375/22 380/7 382/16
382/20 385/5 386/24 397/21 398/1
405/5 405/13 459/24 461/7 461/24
466/22 474/25 476/2 476/3
fist [1] 428/13

fists [3] 420/23 428/11 428/12
five [2] 481/22 484/5
flat [1] 480/23
fled [1] 456/23
fleeing [2] 422/9 422/17
flight [1] 440/6
flip [1] 443/25
focus [1] 483/3
folded [1] 479/19
follow [1] 439/16
follow-up [1] 439/16
following [13] 379/3 392/10 394/5
416/11 417/6 419/23 426/25 436/18
447/25 452/1 452/6 457/19 487/7
foot [1] 484/5
force [27] 420/16 421/5 424/1 424/2
424/15 424/22 425/6 425/11 425/14
425/19 425/24 427/1 428/17 429/16
434/15 434/25 439/22 440/18 440/18
440/22 440/23 441/12 444/2 444/13
444/20 444/25 469/21
foregoing [1] 490/5
forensic [2] 473/20 483/18
forfeit [1] 488/7
form [4] 418/3 436/13 457/10 486/23
format [1] 490/7
forming [1] 448/23
forms [2] 421/3 426/17
formulate [1] 417/10
forth [5] 392/24 428/20 430/3 461/5
462/24
forward [6] 387/6 393/25 419/20
459/18 464/19 478/24
fought [2] 429/5 429/11
found [4] 447/11 451/17 451/23 478/5
foundation [7] 392/7 393/22 414/25
415/7 436/20 438/14 459/18
four [1] 481/22
fourth [1] 412/14
fracture [5] 401/7 403/21 426/6 439/1
439/3
fractured [2] 438/23 439/5
fractures [2] 396/15 404/8
frame [2] 462/13 462/13
frame-by-frame [1] 462/13
frames [1] 462/23
frankly [3] 393/4 460/22 461/9
free [1] 442/6
frightened [1] 402/21
from what [1] 418/8
front [6] 405/22 418/22 432/6 478/12
479/3 480/21
full [2] 405/3 428/17
full-force [1] 428/17
function [1] 426/7
further [9] 415/16 415/17 439/10
450/11 456/25 457/2 468/17 475/7
487/10

**G**

GALIPO [23] 376/3 376/3 379/13
380/8 380/15 382/5 382/21 383/2
384/17 385/12 393/6 393/20 399/9
399/17 404/11 413/2 439/12 457/1
457/23 463/10 464/14 487/9 488/9
Galipo's [1] 486/20
gave [3] 389/7 404/25 460/15
Gee [1] 443/14

**G**

**general [4]** 473/22 478/17 480/17 485/24
**generally [7]** 406/19 406/18 472/5 474/2 481/7 481/19 482/2
**generated [4]** 405/24 405/25 406/2 406/4
**gentlemen [2]** 386/18 457/10
**get [29]** 380/1 381/9 382/7 382/7 382/15 382/19 383/6 383/14 383/18 385/7 385/9 385/10 385/11 401/15 405/10 405/12 415/23 427/6 431/16 436/6 443/13 449/8 450/4 450/11 457/8 459/21 462/2 463/23 488/7
**gets [1]** 443/7
**getting [2]** 431/17 485/7
**give [8]** 387/10 407/2 434/18 434/21 434/22 434/23 464/23 483/18
**given [1]** 486/20
**gives [1]** 467/21
**giving [1]** 474/24
**GLASMAN [1]** 376/14
**glasses [2]** 410/10 410/13
**gmail.com [2]** 375/24 376/12
**go [17]** 383/10 383/14 385/15 385/16 385/19 391/25 405/25 413/23 421/25 441/9 443/18 452/18 452/22 456/6 457/8 459/17 459/18
**God [2]** 387/11 464/24
**goes [1]** 410/14
**going [69]** 382/11 382/12 384/19 386/1 386/4 386/18 386/24 393/10 393/12 393/12 393/20 394/9 397/4 398/11 398/18 400/10 402/22 403/17 406/5 409/24 410/11 413/3 414/24 415/21 415/22 416/12 418/14 418/16 418/24 420/24 423/15 424/22 431/6 431/13 431/1 433/13 435/20 436/19 437/13 443/9 443/14 445/11 445/21 446/3 446/9 447/19 450/1 450/18 450/22 451/25 452/23 455/4 455/6 458/9 458/10 459/2 460/18 460/24 460/25 461/2 461/9 463/15 470/16 478/7 479/12 479/18 487/11 488/25 489/5
**good [22]** 379/12 379/15 379/16 379/17 379/19 379/20 379/23 386/17 387/21 387/22 404/15 404/16 419/19 420/3 420/4 431/20 431/20 457/25 463/20 465/9 465/10 487/17
**got [10]** 380/14 380/25 382/9 392/3 427/1 430/24 441/9 449/18 487/23 489/4
**grab [10]** 421/13 422/8 422/8 422/9 422/10 422/16 422/22 442/10 442/11 443/24
**grabbed [1]** 442/19
**grabbing [1]** 435/5
**gracious [1]** 385/13
**grappling [2]** 420/19 435/16
**ground [21]** 420/19 421/18 423/3 423/7 423/19 423/22 423/25 424/1 424/2 427/7 428/3 429/5 429/10 430/2 433/16 434/10 435/11 435/16 442/24 436/8 445/25
**ground-fight [1]** 423/22
**grownups [1]** 461/13
**guard [1]** 430/24
**guess [5]** 382/5 410/11 412/16 417/23 447/11
**guide [1]** 393/1
**gun [26]** 423/2 423/4 423/9 423/11 423/22 424/8 434/12 435/16 445/5 445/5 445/10 445/12 445/19 445/22 446/9 446/10 473/9 473/10 473/11 473/15 473/16 473/18 473/21 474/1 474/14 474/17
**gunshot [22]** 445/17 466/10 467/5 467/7 467/14 467/16 467/19 471/23 471/24 471/25 474/21 475/2 475/6 475/12 475/15 475/24 476/3 476/4 482/2 482/14 482/16 484/8
**gunshots [2]** 433/14 475/3
**guy [1]** 418/15
**guys [2]** 449/18 461/13

**H**

**had [52]** 380/9 380/21 381/23 382/7 390/25 393/20 394/13 394/14 394/14 394/14 394/15 394/16 395/8 396/14 396/15 396/16 402/14 403/15 403/11 403/20 403/21 404/5 405/3 405/10 405/12 407/1 408/4 408/12 408/19 410/5 411/16 411/18 411/18 420/11 420/15 428/10 435/25 436/2 440/5 446/10 448/16 449/14 450/16 451/12 451/20 452/16 453/10 453/16 455/19 458/25 461/8 473/23
**hadn't [1]** 435/19
**half [1]** 468/25
**hallway [1]** 415/23
**hand [23]** 387/8 390/13 400/9 400/9 400/11 401/5 401/8 401/9 402/3 407/8 407/17 421/13 421/19 421/25 423/16 423/16 423/18 445/21 464/21 471/22 483/13 483/14 483/15
**handcuff [3]** 435/13 455/7 456/10
**handcuffing [4]** 421/6 421/8 422/6 432/8
**handcuffs [2]** 421/9 433/20
**hands [15]** 391/24 394/17 396/21 401/25 402/2 402/4 407/11 420/22 430/17 442/14 478/25 483/12 483/13 484/2 486/11
**HANG [1]** 376/4
**happen [1]** 459/20
**happened [9]** 389/1 389/4 392/19 413/9 427/15 448/6 456/22 462/14 483/23
**happening [1]** 441/16
**hard [2]** 396/3 402/18
**harm [1]** 426/2
**has [37]** 381/18 382/6 383/10 384/1 384/15 388/16 390/12 393/21 394/23 395/3 402/3 408/5 408/7 416/15 416/20 416/24 416/25 418/23 420/18 424/23 426/12 428/2 430/3 434/8 435/7 435/10 435/12 435/17 435/17 443/16 443/17 448/2 453/23 459/12 463/19 473/7 483/17
**hasn't [1]** 460/11

**have [139]** 
**have to [1]** 415/22
**haven't [4]** 404/1 413/16 420/21 459/12
**having [5]** 393/15 432/2 454/12 462/6 487/14
**hazard [1]** 423/12
**he [261]**
**he'd [2]** 442/25 452/13
**he'll [2]** 381/2 462/16
**he's [21]** 381/19 406/19 418/23 418/24 421/20 430/16 430/24 430/24 431/21 432/7 432/15 435/10 435/11 436/10 443/9 445/11 446/3 446/3 449/20 450/1 461/2
**head [22]** 391/24 391/25 394/15 396/16 396/21 403/14 403/15 403/23 407/12 407/19 407/23 407/24 408/2 408/13 409/4 409/11 426/24 437/12 437/17 438/12 444/1 444/5
**headache [1]** 411/9
**healing [3]** 471/21 483/22 484/1
**hear [7]** 413/3 432/14 436/23 437/6 437/9 442/13 454/14
**heard [7]** 431/24 433/14 437/3 448/16 451/3 454/13 455/9
**hearing [2]** 455/19 455/24
**hearsay [11]** 389/15 389/23 391/15 392/6 392/21 393/1 393/12 393/17 393/20 449/15 453/18
**heart [2]** 476/13 481/14
**heartburn [1]** 384/16
**heat [1]** 473/14
**heft [1]** 474/11
**height [2]** 481/20 484/4
**held [7]** 379/3 392/10 416/11 447/25 457/19 487/7 490/6
**help [5]** 387/11 453/23 459/19 464/24 467/22
**helped [2]** 417/10 454/1
**helps [1]** 467/20
**her [24]** 380/13 381/12 381/14 382/11 382/14 382/15 382/15 382/19 382/23 383/18 385/5 385/10 385/11 385/15 386/23 386/24 389/21 390/4 392/18 393/2 393/4 393/15 393/16 393/18
**here [19]** 380/25 382/7 382/8 383/4 385/2 385/5 385/14 386/12 395/19 417/10 418/18 419/3 437/22 449/19 453/23 465/16 466/16 484/21 486/3
**Here's [1]** 448/9
**hereby [1]** 490/3
**Hills [1]** 376/6
**him [91]** 381/1 381/9 383/11 383/13 384/7 384/9 384/17 388/13 388/21 389/1 389/6 391/24 392/5 405/8 405/9 405/10 405/14 406/17 407/5 407/14 408/24 410/4 413/8 413/9 414/18 415/23 416/17 416/19 417/20 420/12 420/19 420/20 422/5 426/19 428/10 430/24 430/25 432/4 432/7 432/9 432/9 432/10 433/10 433/13 433/19 434/2 434/14 435/4 435/5 435/15 435/11 437/6 437/7 439/7 440/18 440/18 440/19 440/22 440/24 441/1 441/14 441/14 442/10 442/11 443/14 443/25 443/5 443/8 443/9 443/25 445/11 445/25 446/3 446/4 446/8 446/9

him... **[14]** 449/10 449/10 450/5 451/8
451/22 452/1 453/19 453/22 453/23
454/10 454/10 456/1 456/10 471/16

**himself [11]** 391/10 396/8 400/18
402/12 414/18 430/10 430/13 430/22
430/23 434/14 441/15

**his [103]** 383/7 389/7 391/14 394/2
394/15 395/3 395/9 396/17 396/21
400/8 401/5 401/25 402/2 402/14
403/15 403/23 404/6 404/8 404/8 404/8
404/9 406/11 407/8 407/8 407/11
407/17 407/21 407/23 407/24 408/2
408/13 410/9 410/20 412/10 412/11
413/20 414/23 416/7 416/16 417/2
417/5 417/14 417/21 417/25 420/15
420/15 422/9 422/16 422/22 423/22
426/13 426/25 428/11 428/12 428/13
430/4 430/9 430/17 430/17 432/4 432/5
432/6 432/7 434/1 434/12 435/5 435/12
435/16 437/9 437/12 437/17 438/12
438/12 441/12 441/19 444/1 444/8
445/5 445/10 445/22 446/16 447/12
448/15 448/16 448/23 449/12 451/11
451/17 451/23 452/14 454/1 468/14
468/21 468/24 469/3 469/20 470/11
471/3 479/4 479/5 483/13 483/24 484/4

**history [2]** 389/7 413/8

**hit [4]** 429/17 429/21 430/4 431/17

**hobby [1]** 429/9

**hold [4]** 416/13 449/18 449/18 461/10

**hollow [1]** 485/25

**hollow-point [1]** 485/25

**holster [2]** 427/6 427/10

**homicide [1]** 486/10

**Honor [55]** 379/12 379/16 379/20
384/22 385/18 385/21 387/3 389/14
389/23 392/7 392/8 393/14 394/18
397/19 397/23 398/4 398/6 398/21
399/10 399/13 404/12 414/1 414/12
414/14 415/17 415/21 420/5 427/22
433/2 433/25 437/20 438/15 439/9
445/6 446/5 446/19 446/23 446/25
447/2 447/5 447/23 453/3 457/2 457/5
460/20 462/9 464/3 464/16 470/5 477/6
477/24 482/19 484/12 485/10 486/15

**HONORABLE [2]** 375/4 379/6

**hope [1]** 383/19 460/17

**hopeful [1]** 431/10

**hopefully [1]** 431/12

**hoping [1]** 459/2

**hospital [10]** 381/20 388/7 388/8
404/17 404/17 404/18 404/19 406/10
414/6 414/8

**hotel [5]** 448/11 448/14 451/5 451/16
453/4

**hour [1]** 486/22

**hourly [2]** 385/2 385/4

**how [46]** 384/17 387/25 388/23 389/7
391/5 392/2 392/3 392/7 395/22 396/2
397/17 402/19 403/6 403/6 405/14
406/16 407/23 416/16 417/1 417/3
421/10 422/11 422/24 437/1 439/4
445/4 447/9 448/12 450/3 450/11 451/1
451/22 452/11 458/24 459/5 460/8
460/15 462/22 462/23 465/18 465/21
466/6 472/5 473/12 474/16 481/20

**However [1]** 392/25

**hundred [1]** 381/16

**hunger [1]** 486/20

**hungry [1]** 485/7

**hurt [4]** 388/22 391/24 392/1 402/20

**hypothetical [2]** 445/13 445/16

**hypothetically [2]** 445/12 445/19

**I**

**I'd [4]** 394/8 434/2 471/23 475/17

**I'll [15]** 383/9 383/11 384/24 385/5
386/1 389/2 397/22 407/2 409/18
413/22 416/5 433/15 437/15 461/21
463/10

**I'm [78]** 380/21 383/24 384/1 384/3
384/18 384/19 386/1 386/4 387/24
393/11 393/15 393/18 393/20 396/4
398/9 400/10 406/5 409/3 409/11
409/24 411/11 413/2 413/4 414/24
416/18 416/23 417/24 418/13 418/16
419/5 419/9 423/19 429/20 430/20
431/15 432/14 433/1 436/19 437/13
437/17 437/22 443/18 443/19 445/20
447/19 448/17 448/20 448/25 450/12
450/14 450/19 451/14 451/25 454/23
455/4 455/6 456/4 458/9 459/2 459/5
460/9 460/9 460/11 460/12 460/17
460/18 461/9 461/25 463/9 468/24
470/5 474/16 478/7 479/18 481/19
484/18 485/6 487/22

**I've [10]** 380/7 380/15 388/1 395/23
396/5 451/3 452/24 452/24 465/20
479/18

**idea [4]** 422/11 452/17 453/9 456/20

**identification [3]** 378/3 378/19 418/6

**identified [1]** 388/16

**identify [3]** 467/20 471/25 474/20

**IDs [1]** 418/7

**if [120]**

**II [1]** 375/7

**ill [1]** 403/6

**ill he [1]** 403/6

**illiterate [1]** 418/3

**imaging [1]** 396/20

**immediate [6]** 423/10 423/20 423/24
424/3 444/14 445/1

**immediately [4]** 406/11 434/25 436/18
436/23

**imminent [2]** 423/20 444/14

**immobilize [1]** 421/7

**impact [3]** 420/15 469/23 473/15

**impairment [2]** 426/4 426/7

**impeach [3]** 416/17 417/20 451/11

**impeachment [3]** 389/25 390/2 450/14

**impression [10]** 392/22 393/24 396/7
396/9 411/24 412/1 436/17 437/3
456/17 473/16

**imprint [1]** 473/17

**inappropriate [1]** 445/15

**inch [2]** 468/22 468/25

**inches [1]** 484/5

**incident [18]** 391/9 392/15 392/19
393/11 404/1 413/16 413/18 422/14
422/19 428/5 428/8 429/23 441/18
448/6 454/9 463/7 483/21 483/24

**incision [1]** 476/23

**included [2]** 438/3 438/18

**including [3]** 396/16 426/5 428/21

**Inclusive [1]** 375/19

**INDEX [1]** 377/6 377/15

**indicate [1]** 483/23

**indicated [13]** 396/13 408/19 412/3
412/10 416/25 417/13 418/23 419/2
440/15 444/3 450/19 476/6 488/10

**indicating [1]** 395/17 395/19

**indication [4]** 412/25 413/5 422/24
475/1

**indications [1]** 472/25

**indicative [2]** 426/24 473/8

**indicator [1]** 408/8

**indicators [1]** 468/8

**INDIVIDUALS [1]** 375/6

**indulge [1]** 401/12

**Industry [1]** 376/16

**influence [1]** 440/2

**information [6]** 404/25 435/17 440/12
441/1 443/4 483/18

**initial [3]** 430/16 443/24 444/1

**initially [1]** 422/12

**injured [8]** 388/22 390/1 396/7 396/10
396/24 401/10 403/7 414/19

**injuries [39]** 382/18 391/14 391/17
391/21 392/13 393/2 393/9 393/13
394/1 394/9 394/13 395/18 395/25
396/18 402/2 402/2 402/3 402/6 402/9
403/13 407/11 414/22 414/23 438/18
466/2 466/4 467/3 467/7 467/8 467/17
468/14 468/17 468/21 469/20 469/23
471/15 481/17 483/13 484/2

**injury [42]** 389/7 400/14 400/21
403/21 404/4 404/5 404/8 408/20
408/15 409/4 409/11 410/15 410/19
410/20 411/4 411/6 423/8 423/21
424/16 424/24 425/2 425/13 425/19
425/20 425/23 425/25 426/2 426/17
426/23 437/25 438/3 439/2 468/23
469/1 470/10 470/24 471/3 471/12
471/16 483/19 483/20 483/20

**inquiry [1]** 418/16

**inside [3]** 441/8 441/9 472/21

**instruct [1]** 393/2

**intact [2]** 412/10 412/11

**intend [2]** 458/10 487/9

**intending [4]** 393/18 449/15 450/3
461/25

**intention [1]** 458/1

**interact [1]** 437/6

**interaction [1]** 388/19

**interchangeably [1]** 409/4

**INTEREST [1]** 375/7

**interested [1]** 393/15

**internal [5]** 481/1 481/4 481/8 481/9
482/10

**interval [1]** 482/14

**introduce [3]** 392/18 398/19 417/19

**introduced [1]** 488/7

**introducing [1]** 423/11

**investigating [1]** 454/17

**involving [2]** 422/5 471/24

**irrelevant [3]** 437/13 447/19 450/2

**is [199]**

**isn't [2]** 408/13 459/20

**issue [12]** 381/12 381/13 381/19 383/8
416/14 419/6 458/20 460/19 461/15
461/16 461/22 463/10

**issues [3]** 380/3 380/10 462/18

**I**

**it [202]**

**it's [51]** 384/16 386/7 389/20 389/24
390/1 390/1 396/12 402/18 404/18
408/19 410/1 419/15 412/16 421/3
423/20 424/3 425/21 426/2 427/20
437/18 439/8 439/17 439/19 442/3
444/24 448/25 449/3 449/14 449/15
449/17 450/7 451/20 457/25 459/5
460/16 461/15 462/5 466/19 467/14
467/18 470/6 470/12 472/18 472/21
473/8 474/17 476/7 480/25 481/3
486/11 488/4

**items [1]** 440/15

**its [1]** 479/1

**itself [3]** 427/8 440/6 481/2

**J**

**James [1]** 453/22

**James Kennedy [1]** 453/22

**January [1]** 466/8

**joint [1]** 401/8

**JR [2]** 375/4 379/6

**JUDGE [2]** 375/4 379/7

**Judicial [1]** 490/8

**juggling [1]** 383/4

**July [1]** 465/20

**jump [1]** 442/24

**jumping [1]** 393/4

**juncture [2]** 432/12 443/24

**juror [4]** 418/19 418/22 419/1 419/6

**jurors [4]** 386/15 457/18 464/7 487/6

**jury [30]** 375/19 379/10 381/24 386/11
386/14 388/13 394/8 394/11 398/20
402/5 411/17 420/11 421/2 424/16
425/1 425/18 425/20 425/23 442/21
457/17 458/25 464/6 468/21 471/18
472/5 473/4 476/19 478/17 484/23
487/5

**jury's [6]** 379/3 394/5 419/23 452/6
459/19 487/7

**just [83]** 381/7 382/11 383/9 383/13
383/14 384/2 384/25 385/5 385/7
385/24 388/25 393/8 394/11 395/11
396/19 398/16 398/18 399/6 402/6
402/18 402/19 402/19 402/21 403/1
406/2 411/16 412/17 412/21 413/13
417/20 418/13 419/5 420/21 421/7
421/10 421/22 422/22 424/6 424/9
427/20 434/10 436/11 437/17 440/14
441/23 442/7 445/16 445/18 448/17
448/21 449/13 450/23 451/14 455/15
456/20 458/18 458/25 459/2 459/7
459/22 459/25 460/16 460/20 461/8
462/5 463/4 463/19 469/12 470/3 473/3
476/2 476/14 476/18 478/17 479/18
480/23 481/2 481/19 485/9 486/11
487/23 488/1 488/6

**justify [1]** 440/7

**K**

**K-9 [1]** 441/6

**keep [2]** 443/4 485/6

**Kelsey [3]** 488/5 488/11 488/14

**Kennedy [3]** 453/21 453/22 454/3

**kept [2]** 435/20 436/4

**key [10]** 447/11 448/14 451/16 451/23
452/9 452/20 452/25 453/1 453/5 453/8

**kicks [1]** 424/2

**kidney [4]** 480/11 480/12 480/15
481/17

**kill [2]** 443/15 445/25

**kind [5]** 441/17 457/14 461/9 483/20
487/2

**Knees [1]** 420/23

**knew [1]** 417/1

**knocked [3]** 409/13 427/3 427/8

**know [69]** 380/23 383/24 384/15
384/17 386/18 388/25 389/6 391/25
392/3 396/16 398/18 402/15 402/20
403/5 403/10 403/11 405/2 406/2
407/11 410/2 410/9 412/11 413/12
413/18 416/16 417/1 417/10 419/5
419/16 420/15 422/8 425/3 425/16
425/16 426/11 426/20 432/1 432/3
432/11 432/12 433/8 435/21 435/21
435/24 435/25 441/18 442/22 442/22
442/23 443/4 447/9 447/16 448/12
448/12 451/22 453/8 453/13 454/10
454/11 454/12 456/13 473/20 473/21
477/19 487/24 488/4 488/6 488/18
488/23

**knows [1]** 448/13

**Kyle [68]** 379/22 388/16 391/9 391/13
393/16 394/10 394/13 400/18 402/22
405/17 406/10 414/18 422/5 426/12
427/14 428/2 428/21 428/23 428/25
429/22 429/24 430/8 430/10 431/23
431/24 432/1 432/15 433/6 433/16
433/17 433/19 433/20 434/6 434/7
434/9 434/10 434/11 434/12 434/15
435/1 435/7 435/10 435/11 435/12
435/15 435/17 436/7 436/9 436/10
437/9 437/12 438/11 438/23 439/4
441/15 454/9 454/15 454/17 454/20
455/1 455/4 455/6 455/11 455/19
455/19 455/24 456/1 456/9

**Kyle Woods [22]** 379/22 388/16
391/13 400/18 405/17 406/10 414/18
422/5 426/12 427/14 428/2 428/21
428/23 428/25 429/24 430/8 430/10
454/9 454/15 454/17 455/1 455/4

**Kyle Woods' [1]** 429/22

**Kyle's [7]** 382/17 391/21 436/14
436/17 436/23 437/4 456/11

**L**

**laceration [6]** 400/8 408/7 408/8
408/10 408/14 409/18

**lacerations [6]** 407/14 407/21 408/2
408/3 408/13 408/17

**lack [1]** 418/24

**lacks [5]** 392/7 414/25 415/7 436/20
438/14

**ladies [2]** 386/17 457/10

**laid [1]** 393/22

**land [2]** 429/14 429/15

**landed [1]** 430/3

**large [1]** 480/11

**larger [2]** 398/16 410/5

**last [6]** 401/17 404/22 418/20 424/4
466/8 489/6

**later [1]** 441/3

**lateral [6]** 468/23 468/24 470/12
474/11 480/9 480/20

**latest [1]** 381/17

**latter [1]** 450/25

**LAW [7]** 376/3 378/3 376/4 376/4
376/9 376/10 376/14

**lawful [1]** 440/9

**lay [1]** 459/18

**LE [1]** 376/4

**leads [1]** 417/23

**learning [11]** 425/5 425/6 425/10
425/15 425/18 426/1 426/3 438/1 438/3
438/19 439/1

**lease [10]** 447/14 447/16 447/22 448/4
448/5 448/8 449/14 449/14 449/21
451/9

**least [5]** 429/20 451/2 461/16 469/24
470/24

**leave [4]** 381/16 442/6 442/8 473/13

**left [19]** 384/9 468/22 468/24 468/25
471/4 471/19 471/21 474/11 475/3
475/7 475/8 476/13 479/5 480/9 480/11
480/20 480/21 481/13 483/13

**less [6]** 384/10 420/11 420/16 428/6
428/10 481/16

**less-lethal [4]** 420/11 420/16 428/6
428/10

**let [17]** 382/11 398/19 407/23 412/15
416/22 419/16 440/14 440/22 441/20
443/7 448/22 449/19 450/9 461/20
463/16 467/11 476/2

**let's [18]** 383/17 385/9 385/10 385/15
386/11 392/9 404/22 419/20 433/15
445/11 445/16 445/18 458/17 463/14
463/25 476/2 480/1 489/9

**lethal [5]** 420/11 420/16 428/6 428/10
444/2

**letters [2]** 418/1 418/8

**letting [1]** 419/5

**level [1]** 421/5

**license [1]** 418/6

**licenses [1]** 418/7

**lies [1]** 462/10

**life [9]** 389/3 423/8 423/10 423/20
423/24 424/3 445/1 445/1 445/2

**like [22]** 380/8 381/5 382/10 383/6
383/13 394/8 409/5 410/2 413/10
421/22 424/8 426/13 434/2 435/4
442/15 459/16 461/10 462/5 464/17
469/3 471/23 475/17

**likely [1]** 420/14

**limit [2]** 421/4 423/17

**limited [1]** 426/5

**limits [1]** 423/13

**Linda [1]** 388/4

**line [1]** 417/6

**linear [1]** 483/16

**lined [2]** 458/7 458/14

**lip [1]** 409/16

**lips [1]** 395/18

**listened [3]** 426/10 426/25 436/14

**listening [1]** 456/18

**liter [1]** 481/13

**liters [1]** 481/22

**little [8]** 384/15 398/16 410/13 425/4
461/10 466/8 480/1 483/2

**live [4]** 448/10 450/4 451/4 453/23

**lived [11]** 440/3 447/9 448/3 449/25
451/11 451/15 451/16 451/21 451/22
452/11 453/13

**lives [1]** 454/14

**L**

**living [1]** 387/23
**location [2]** 467/21 475/14
**Loma [1]** 388/4
**long [9]** 384/7 384/17 387/25 395/22
396/13 465/18 465/21 487/17 487/20
**long-term [1]** 396/13
**look [18]** 382/5 384/24 385/9 390/25
409/5 409/21 413/25 416/22 418/13
418/15 446/18 448/3 452/2 459/16
467/2 470/2 472/2 476/25
**looked [9]** 410/2 421/22 426/22
428/24 444/24 445/3 445/4 452/1 469/3
**looking [10]** 409/3 409/7 411/11
411/11 412/18 416/23 456/4 456/4
471/25 482/15
**Los [3]** 375/16 375/23 379/1
**losing [5]** 426/13 426/18 427/3 427/5
427/17
**loss [10]** 412/25 413/5 413/13 413/13
426/5 426/6 426/16 481/4 481/11
482/10
**lot [4]** 382/3 388/22 391/21 450/24
**lower [6]** 421/5 475/7 475/7 480/9
480/16 480/20
**lower-level [1]** 421/5
**lumbar [2]** 480/15 485/17
**lunch [5]** 457/25 458/3 486/21 487/12
489/9
**luncheon [1]** 489/12
**lung [1]** 476/13
**LV [1]** 396/20
**lying [4]** 430/10 430/12 430/17 430/21

**M**

**M-a-r-k [1]** 465/4
**M-a-r-y-A-n-n S-a-v-o-r-y [1]** 387/16
**M-c-C-o-r-m-i-c-k [1]** 465/4
**ma'am [2]** 387/5 415/18
**Madam [1]** 390/12
**made [4]** 381/18 381/22 392/18
393/20 393/23 396/23 403/4 431/11
458/13 459/3 473/21 476/23
**make [14]** 383/23 396/24 403/2 403/10
412/17 417/7 446/15 448/21 451/14
460/7 460/12 462/5 487/23 488/6
**makes [1]** 384/25
**making [1]** 461/25
**manager [2]** 452/13 453/15
**manipulation [1]** 427/7
**manner [4]** 459/18 466/3 486/6 486/8
**many [7]** 396/2 396/5 396/6 428/16
429/21 462/23 466/6
**MARCEL [2]** 376/4 379/13
**March [3]** 375/17 379/1 490/11
**mark [3]** 395/20 465/3 473/21
**marked [2]** 394/23 400/2
**marks [4]** 410/9 410/12 410/13 474/8
**martial [2]** 429/3 429/10
**MARYANN [6]** 377/9 377/20 380/9
387/4 387/7 387/15
**MaryAnn Savory [3]** 380/9 387/4
387/15
**match [3]** 431/19 472/11 472/14
**matches [2]** 473/18 473/20
**materials [1]** 443/20
**math [3]** 462/19 462/21 462/25

**matter [9]** 416/18 417/20 457/11
457/18 462/3 464/2 466/24 487/2 490/7
**may [47]** 383/25 387/1 387/17 388/15
389/17 390/7 393/14 394/6 394/18
397/21 399/12 399/20 412/17 412/19
413/25 415/19 415/25 416/4 416/9
418/25 419/6 419/24 420/5 425/16
427/22 436/5 437/20 438/12 446/18
447/2 447/22 449/24 451/9 451/9 452/7
452/23 457/3 457/7 457/8 457/21 458/8
460/20 465/5 469/12 472/24 478/22
486/18
**maybe [9]** 384/20 392/11 441/4 442/3
463/9 468/11 481/16 483/2 486/20
**McCORMICK [9]** 377/13 377/19 383/9
383/11 383/22 464/17 464/20 465/3
465/9
**me [51]** 380/12 382/6 382/11 384/1
384/3 384/15 385/25 389/7 391/20
391/23 391/24 392/17 395/5 396/3
398/11 398/17 398/19 402/18 404/23
407/2 407/23 410/11 412/15 416/22
416/25 417/24 418/4 418/20 434/15
440/14 441/15 441/20 448/22 449/19
450/9 450/12 452/24 456/7 458/24
459/19 460/10 460/11 460/13 460/15
461/20 461/24 463/3 467/11 476/2
488/23 488/24
**mean [14]** 382/5 382/6 383/3 383/17
391/20 403/6 418/2 422/3 423/25
432/19 441/24 451/2 463/9 474/1
**meaning [2]** 459/14 472/9
**means [6]** 425/20 426/4 441/5 458/3
473/4 476/20
**mechanism [1]** 404/4
**medial [1]** 475/4
**medical [21]** 380/24 381/4 381/6 381/7
382/17 383/5 385/1 385/20 388/4 389/7
394/2 403/1 427/12 457/23 457/24
458/18 464/1 465/18 465/21 466/4
466/7
**medically [1]** 396/12
**meet [3]** 390/1 417/20 417/21
**member [1]** 426/7
**memorized [1]** 468/20
**memory [4]** 408/3 412/10 412/11
416/25
**Mena [4]** 452/13 452/13 453/15 454/3
**mental [1]** 453/24
**mention [4]** 418/19 425/13 433/22
471/15
**mentioned [11]** 386/19 420/13 423/13
424/5 424/6 427/11 431/3 438/8 440/1
440/24 454/1
**middle [1]** 476/4
**might [8]** 380/22 412/13 418/2 421/11
450/17 454/18 481/2 487/18
**mild [2]** 384/16 403/19
**milliliters [2]** 481/12 481/17
**mind [4]** 385/3 389/1 402/20 445/23
**mine [2]** 412/23 460/6
**minor [1]** 395/19
**minute [5]** 407/2 431/19 431/19 457/9
457/16
**minute he [1]** 431/19
**minutes [8]** 381/4 382/16 382/20
382/21 382/23 384/8 384/10 384/20
**missing [3]** 437/17 472/9 472/15

**misspeaking [1]** 485/6
**misspoke [2]** 470/5 470/6
**misunderstood [2]** 392/12 487/18
**mode [1]** 424/8
**Model [1]** 420/14
**modification [1]** 479/14
**modified [1]** 479/15
**modify [1]** 479/12
**moment [15]** 394/18 397/19 413/25
420/5 427/22 435/1 435/15 437/20
441/20 446/18 447/2 455/12 455/13
467/6 469/13
**Monday [2]** 404/23 488/22
**month [3]** 452/14 452/16 453/17
**more [10]** 383/10 410/4 423/12 423/12
440/25 455/15 470/10 472/13 477/20
483/21
**morning [24]** 379/12 379/15 379/16
379/17 379/19 379/20 379/23 380/25
384/5 385/7 385/10 386/17 387/21
387/22 404/15 404/16 405/12 405/14
405/15 405/18 420/3 420/4 465/9
465/10
**most [1]** 420/14
**mostly [1]** 481/14
**motel [14]** 440/3 447/9 447/11 447/18
448/3 449/25 452/12 452/14 452/18
453/2 453/14 453/15 453/16 454/15
**motion [3]** 460/6 463/20 487/16
**motor [1]** 427/9
**mouth [1]** 429/1
**move [8]** 385/14 393/25 419/20 469/7
470/13 471/6 475/17 487/24
**movement [4]** 411/15 421/5 423/17
441/12
**Mr [2]** 385/24 392/11
**Mr. [101]** 380/8 380/15 380/22 381/1
381/5 382/5 382/21 382/24 383/2 383/6
383/8 383/24 384/7 384/17 385/1 385/6
385/12 385/12 386/25 387/1 387/17
389/16 393/6 393/20 394/6 395/18
396/7 399/9 399/17 402/11 403/13
403/14 403/25 404/11 413/2 414/13
414/21 415/3 415/22 416/4 416/7
416/14 416/15 416/16 416/19 417/1
419/9 419/24 420/3 420/10 422/9
422/10 422/10 422/11 422/17 427/11
431/1 435/4 439/12 439/16 439/23
440/2 440/3 441/15 444/1 444/4 444/7
446/16 446/24 447/8 447/8 448/2
449/20 449/24 451/4 451/15 451/15
452/7 452/9 452/13 453/16 453/21
454/1 454/3 457/1 457/23 458/12
463/10 463/10 464/14 468/12 469/18
483/12 484/2 486/16 486/20 487/9
488/5 488/9 488/9 488/11
**Mr. Conaway [2]** 419/9 463/10
**Mr. DeFoe [20]** 380/22 381/1 382/24
383/6 383/8 384/7 385/1 385/6 386/25
416/4 416/15 420/3 420/10 427/11
439/16 447/8 448/2 449/20 451/15
452/9
**Mr. DeFoe's [2]** 383/24 415/22
**Mr. Ewing [16]** 381/5 385/12 387/1
387/17 389/16 394/6 414/13 416/7
416/14 419/24 446/24 448/1 452/7
458/12 486/16 488/9
**Mr. Galipo [20]** 380/8 380/15 382/5

## M

**Mr. Galipo... [17]** 382/21 383/2 384/17 385/12 393/6 393/20 399/9 399/17 404/11 413/2 439/12 457/1 457/23 463/10 464/14 487/9 488/9
**Mr. Galipo's [1]** 486/20
**Mr. Kelsey [2]** 488/5 488/11
**Mr. Kennedy [1]** 453/21
**Mr. Mena [2]** 452/13 454/3
**Mr. Pickett [20]** 416/16 417/1 422/9 422/17 431/1 435/4 439/23 440/2 440/3 441/15 444/1 444/7 446/16 449/24 451/4 451/15 453/16 454/1 468/12 469/18
**Mr. Pickett's [4]** 422/10 444/4 483/12 484/2
**Mr. Pickett's signature [1]** 416/19
**Mr. Woods [7]** 396/7 402/11 403/13 403/25 415/3 422/10 422/11
**Mr. Woods' [3]** 395/18 403/14 414/21
**Ms. [2]** 387/21 458/9
**Ms. Archibald [1]** 458/9
**Ms. Savory [1]** 387/21
**much [10]** 408/24 458/5 458/24 459/5 460/8 460/15 462/22 480/23 481/20 482/11
**multiple [1]** 444/4
**muscle [1]** 482/5
**muzzle [14]** 472/25 473/3 473/5 473/13 473/24 474/6 474/9 476/7 480/1 480/2 480/5 482/17 483/4 483/9
**my [47]** 379/13 382/10 383/7 383/21 384/6 384/14 389/1 389/3 389/6 393/3 393/8 396/9 402/20 403/9 404/25 405/2 405/13 407/3 408/3 409/5 409/9 411/18 412/1 412/11 412/20 412/24 413/8 413/25 416/25 418/23 419/3 429/9 446/18 450/5 451/18 451/20 458/1 459/15 460/3 460/18 469/12 475/2 475/25 476/21 484/18 486/12 488/7
**myself [1]** 431/17

## N

**name [11]** 387/14 416/16 417/14 417/22 417/25 418/11 418/20 441/19 446/16 465/2 488/23
**names [1]** 489/6
**Nate [62]** 417/14 417/21 422/25 428/4 428/14 428/22 430/12 430/21 431/23 431/23 432/16 432/22 432/25 433/6 433/7 433/10 433/13 433/16 433/17 433/19 433/21 433/22 434/6 434/7 434/8 434/12 435/1 435/2 435/7 435/10 435/13 435/17 436/4 436/9 439/7 442/17 442/19 447/9 447/17 448/3 450/15 451/20 452/11 452/22 452/23 453/10 454/14 454/18 454/20 455/2 455/4 455/6 455/11 455/18 455/19 455/25 455/25 456/1 456/6 456/11 456/15 456/19
**Nate Pickett [5]** 417/21 447/17 448/3 454/14 455/2
**Nate's [5]** 445/11 445/20 445/21 452/9 455/22
**NATHANAEL [6]** 375/6 375/7 379/18 465/14 468/10 487/13
**Nathanael Pickett [3]** 379/18 465/14

487/13
**Nathanael Pickett's [1]** 468/10
**nature [2]** 391/13 394/12
**near [3]** 468/12 477/22 479/2
**neck [7]** 394/15 396/17 396/21 404/3 411/13 411/16 411/21
**need [6]** 385/14 424/11 434/18 434/20 434/22 440/9
**needed [3]** 382/10 382/10 414/8
**needs [6]** 381/12 381/14 381/16 384/4 384/6 386/23
**negative [15]** 410/15 410/18 410/20 410/21 410/22 411/2 411/4 411/6 411/9 411/13 411/13 411/20 411/21 411/21 411/22
**neglected [1]** 418/19
**Neural [1]** 411/9
**neuro [1]** 412/7
**never [5]** 408/24 445/12 448/8 453/4 460/15
**next [8]** 400/24 412/7 412/24 415/15 434/4 457/8 464/15 471/2
**night [6]** 389/4 405/6 405/7 428/7 454/9 462/14
**nine [1]** 484/5
**no [105]** 375/9 380/18 383/6 385/18 389/18 389/18 390/18 396/9 396/25 398/4 399/10 399/18 400/9 404/20 407/1 407/4 407/6 407/10 407/22 408/12 408/21 408/23 409/1 411/18 411/24 412/1 412/25 413/5 414/10 415/12 415/17 417/15 417/18 418/22 418/22 423/1 423/23 426/21 426/23 427/13 427/16 429/15 430/1 430/11 433/22 434/14 435/3 435/21 439/18 439/21 439/24 440/1 440/1 440/12 440/21 442/1 442/12 442/16 442/20 443/10 443/16 444/9 444/22 444/25 445/17 446/1 446/17 447/15 449/8 449/10 449/23 450/11 451/2 451/7 451/13 452/17 452/19 452/21 453/9 454/16 455/5 455/8 456/16 456/20 456/21 457/2 461/15 461/17 461/21 462/9 463/19 469/9 470/15 471/7 472/15 475/1 475/19 476/17 477/5 479/14 480/22 482/11 484/3 485/6 490/17
**No. [4]** 418/20 418/22 426/3 437/7
**No. 2 [1]** 437/7
**No. 20 [1]** 426/3
**No. 8 [2]** 418/20 418/22
**non [1]** 408/9
**non-serious [1]** 408/9
**none [1]** 397/2
**noon [2]** 381/10 384/6
**normal [2]** 431/3 446/11
**North [1]** 376/15
**nose [10]** 395/3 395/9 395/11 404/9 407/8 410/9 429/25 438/23 439/5 439/7
**not [110]** 380/21 383/24 384/2 384/4 384/25 386/1 390/1 390/4 390/18 393/15 393/17 396/7 396/11 396/24 398/9 402/12 402/22 403/17 404/19 406/11 406/11 406/14 406/19 408/3 408/19 409/24 412/23 413/3 413/12 415/12 416/17 416/23 417/1 417/18 417/19 417/24 418/6 418/11 418/16 418/23 419/2 419/10 422/8 422/17

426/5 426/11 427/12 427/18 427/19 428/3 429/19 431/25 432/1 243/25 436/2 439/25 440/7 440/17 442/19 442/25 443/9 443/10 444/23 445/14 446/2 446/16 448/10 448/20 448/21 449/2 449/12 449/17 449/24 450/4 450/14 451/4 451/9 453/8 454/8 456/19 456/20 457/10 457/14 459/2 460/3 460/14 460/17 460/17 460/18 461/9 461/12 461/19 461/24 461/24 462/4 462/12 462/13 463/11 472/20 472/22 473/1 473/21 474/16 476/17 481/2 483/21 484/3 486/23 486/23 487/1
**note [8]** 398/14 406/22 413/20 419/1 474/5 481/4 483/12 484/2
**notes [2]** 414/1 446/19
**nothing [7]** 387/11 415/16 439/10 449/14 456/25 464/24 486/17
**noting [1]** 429/20
**November [11]** 388/6 389/4 391/9 400/16 420/12 448/5 448/6 452/15 453/14 454/4 466/23
**now [41]** 379/5 382/12 382/14 384/8 384/10 385/10 385/12 386/23 387/10 396/19 396/23 399/20 404/2 405/22 406/2 408/19 409/12 418/18 418/20 419/1 422/17 423/11 425/18 428/16 436/9 444/13 447/8 456/4 460/2 460/9 464/23 465/19 474/20 479/9 481/4 482/2 483/12 483/17 486/21 487/17 489/5
**number [11]** 390/13 390/17 390/18 390/18 390/20 394/25 398/12 419/7 419/8 428/17 455/14
**numbered [1]** 412/20
**numbness [1]** 411/9
**nurse [34]** 380/8 380/13 381/6 381/11 381/20 382/9 383/4 383/8 383/17 383/22 383/23 384/2 385/4 385/10 385/16 385/19 386/12 387/24 388/1 388/19 393/23 394/8 394/23 395/5 395/22 395/23 395/23 400/2 404/10 412/23 412/24 414/17 488/16 488/17
**Nurse Savory [6]** 394/8 394/23 395/5 400/2 404/10 414/17

## O

**o'clock [3]** 486/22 487/4 489/10
**oath [1]** 416/6
**object [9]** 393/12 414/24 416/12 433/1 436/19 437/13 447/19 450/1 453/3
**objection [35]** 380/17 389/18 389/19 391/15 392/21 393/1 393/17 393/19 393/20 393/21 398/3 399/8 399/16 415/12 424/18 434/3 435/8 438/5 438/14 438/20 445/6 446/5 453/18 463/19 469/8 469/9 470/15 471/7 475/15 475/19 476/17 477/5 478/14 478/15 478/19 478/20 479/14
**obligations [1]** 383/25
**observations [2]** 390/4 402/25
**observe [4]** 402/11 402/13 403/18 415/3
**observed [3]** 392/13 393/13 394/2
**obtained [1]** 416/20
**obviously [8]** 421/13 423/17 431/13 431/16 433/14 435/24 444/25 479/25
**OC [1]** 420/13

occasion [1] 454/2
occasions [1] 402/17
occur [2] 392/3 445/1
occurred [7] 389/7 392/7 443/11
 444/25 474/25 475/2 483/19
occurring [1] 440/13
off [2] 394/25 405/10
offer [2] 450/5 450/13
offered [2] 403/8 460/22
office [4] 379/13 465/13 465/18
 466/25
officer [9] 420/18 423/22 424/22
 424/23 425/21 429/2 429/8 437/7
 443/13
officer's [2] 421/19 450/16
officers [3] 423/15 423/25 439/16
OFFICES [2] 376/3 376/9
official [4] 375/21 389/20 416/19
 490/17
often [1] 472/16
Oh [7] 380/2 381/24 407/7 413/4
 427/13 470/5 489/2
okay [105] 380/6 382/1 383/12 384/12
 385/8 385/19 386/7 395/7 400/12
 402/22 404/21 405/8 405/14 405/25
 406/5 406/16 406/19 407/5 407/14
 407/18 408/16 408/19 409/12 410/14
 410/18 411/13 413/20 416/23 417/16
 417/23 418/10 425/1 439/17 439/19
 442/9 443/1 443/13 445/16 445/25
 448/7 450/9 451/25 452/5 455/25
 458/22 459/6 462/5 463/3 463/21
 465/24 466/6 466/10 466/13 466/22
 466/24 467/11 467/24 468/6 468/9
 468/14 469/2 469/6 470/2 470/8 470/13
 471/12 471/23 473/3 473/17 473/23
 474/5 474/20 475/9 475/10 475/14
 476/2 476/6 476/16 476/18 476/25
 477/4 477/11 477/24 478/7 479/6 479/9
 480/7 481/4 481/24 482/9 482/15
 482/19 483/4 483/17 483/22 484/1
 484/18 485/5 485/10 485/24 486/13
 487/20 488/8 488/20 489/2
old [2] 483/21 484/1
older [1] 483/20
on [166]
once [10] 431/3 440/9 442/9 443/3
 443/7 445/5 445/10 463/22 464/11
 488/3
one [50] 380/4 380/5 380/7 380/13
 383/10 384/2 389/2 397/19 399/15
 418/19 419/7 422/1 423/14 423/16
 423/18 425/9 426/16 428/6 428/22
 429/13 430/3 431/12 438/9 438/18
 441/20 442/22 442/25 443/1 445/22
 451/2 467/25 468/2 468/22 468/25
 470/10 471/2 471/12 472/2 474/10
 474/11 474/25 475/3 477/19 477/21
 480/19 481/12 485/5 485/17 486/22
 487/13
one-and-a-half [1] 468/25
one-hour [1] 486/22
one-inch [1] 468/22
only [10] 381/4 423/10 423/14 423/23
 424/3 424/3 445/1 450/14 458/20
 463/13

oOo [2] 379/2 489/14
open [4] 392/5 419/23 432/6 485/25
opened [1] 478/4
opening [2] 477/14 486/4
opining [1] 429/20
opinion [17] 417/2 417/10 427/20
 439/4 439/22 442/9 445/13 448/24
 450/15 457/11 461/17 469/2 469/24
 474/13 474/24 476/7 486/24
opinions [2] 446/14 446/15
opportunity [6] 389/9 390/25 419/17
 434/18 434/21 486/21
opposed [1] 472/6
options [3] 420/11 420/17 424/4
or [141]
orbit [2] 468/24 470/12
order [9] 377/3 380/9 383/22 386/21
 387/2 456/13 466/4 475/1 476/23
ordered [6] 396/20 396/20 400/22
 402/10 404/6 404/9
orders [3] 396/23 396/24 403/2
organ [1] 426/7
organs [3] 481/8 481/9 482/3
other [18] 381/6 383/24 401/5 410/8
 418/18 424/4 427/2 428/10 437/3 451/2
 471/16 472/10 475/6 478/12 479/9
 484/1 484/2 485/16
others [1] 454/3
our [15] 392/4 457/25 459/3 459/17
 459/17 460/21 460/22 462/3 462/6
 462/8 462/14 475/25 481/21 481/23
 481/25
out [42] 377/3 379/25 380/9 380/11
 381/7 385/11 386/21 387/2 388/13
 392/19 402/20 409/13 413/11 421/11
 422/16 422/22 423/4 423/9 427/3 427/6
 427/8 427/10 434/12 435/15 441/3
 441/5 441/6 443/15 445/5 445/10 446/9
 452/18 458/21 459/3 462/17 462/21
 462/25 463/14 472/21 473/14 485/1
 488/18
outside [3] 379/3 457/19 487/7
outstanding [1] 458/20
over [24] 421/25 432/4 432/7 433/10
 434/6 434/6 434/7 434/9 434/11 434/14
 434/22 434/23 435/1 435/2 435/5
 435/11 435/14 435/18 436/10 442/2
 443/25 466/8 479/19 487/12
overcome [1] 392/21
overruled [7] 424/19 437/8 445/8
 446/7 453/19 478/15 478/20
overtalking [1] 461/12

**P**

P-i-c-k-e-t-t [1] 418/9
P-i-g-g-e-t [1] 418/11
p.m [1] 489/12
P.O [1] 376/11
page [15] 375/19 377/2 405/25 406/1
 412/7 412/13 412/14 412/15 412/22
 437/18 463/18 468/7 470/3 470/6 490/7
pages [2] 412/20 455/15
paid [4] 385/1 385/4 401/15 463/23
pain [13] 410/23 411/2 411/4 411/13
 411/15 411/21 422/4 424/10 437/9
 437/12 438/12 482/6 482/7
painful [2] 482/3 482/8
palm [3] 421/22 422/2 422/4

palms [1] 478/25
palpation [1] 476/21
pangs [1] 486/20
pardon [1] 390/19 452/24
parking [1] 450/24
Parkway [1] 376/15
Parris [3] 488/22 488/24 488/24
Parris Ward [3] 488/22 488/24 488/24
part [29] 384/15 402/19 405/13 413/9
 413/14 417/16 430/16 432/10 438/3
 439/1 440/16 448/25 449/3 449/5 449/8
 450/7 458/23 459/3 467/2 468/11
 471/20 474/11 475/7 480/9 480/10
 480/16 480/20 480/21 483/4
particular [2] 426/11 449/21
Particularly [1] 396/10
parties [3] 384/9 386/21 397/3 462/21
parts [1] 410/15
pass [2] 476/11 480/8
passes [1] 472/17
passing [2] 472/18 482/3
pat [5] 375/21 440/8 490/3 490/16
 490/17
patcuneo1600 [1] 375/24
path [1] 479/1
pathologist [1] 483/19
pathways [1] 484/23
patients [1] 396/4
patrol [1] 429/2
pattern [2] 473/7 480/4
Pause [12] 386/6 386/13 390/10
 394/20 397/20 414/3 420/8 427/24
 437/23 446/21 464/9 469/15
pay [1] 385/2
paying [1] 406/14
pen [1] 484/18
people [9] 388/22 395/25 418/2 429/6
 429/11 447/10 453/25 454/8 454/11
pepper [2] 420/13 428/3 428/5
per [6] 397/5 398/13 398/24 399/3
 399/5 399/14
perceive [1] 414/22
perceived [4] 394/9 394/11 401/9
 414/18
percent [1] 481/25
peremptory [1] 382/2
Perfect [3] 386/12 489/2 489/8
perform [1] 465/14
performed [1] 466/7
perhaps [1] 424/12
perimeter [1] 441/5
period [3] 405/16 448/4 465/23
periorbital [1] 395/3
peritoneal [1] 481/15
permission [3] 398/14 399/5 399/14
Perris [1] 488/25
persistent [2] 472/8 472/19
person [15] 388/8 388/11 396/12
 418/8 421/17 421/17 429/21 430/2
 432/20 434/24 442/4 442/7 443/15
 446/10 482/10
person's [2] 421/12 421/25
personal [1] 424/12
Personally [1] 420/22
perspective [1] 479/23
pertaining [1] 454/4
petals [2] 485/25 486/3
phone [1] 458/13

**P**

**photo [7]** 401/2 401/4 401/6 401/20 401/24 402/1 485/5
**photograph [26]** 378/5 378/6 378/7 378/8 378/9 378/10 378/11 378/12 378/13 378/14 378/15 378/20 378/21 378/22 378/23 395/1 406/20 406/21 468/10 468/12 468/14 469/2 475/11 485/2 485/3 485/8
**photographer [1]** 475/25
**photographs [3]** 398/16 406/9 406/12
**phrase [1]** 462/4
**phrased [4]** 424/18 433/2 437/14 456/14
**physical [5]** 400/22 402/10 403/4 414/21 426/4
**physically [3]** 412/1 442/19 443/21
**physician [1]** 403/9
**pick [1]** 441/6
**PICKETT [35]** 375/6 375/7 376/8 379/18 416/16 417/1 417/21 422/9 422/17 422/25 428/14 428/22 431/1 435/4 439/23 440/2 440/3 441/15 444/1 444/7 446/16 447/17 448/3 449/24 451/4 451/15 453/16 454/1 454/14 455/2 455/6 465/14 468/12 469/18 487/13
**Pickett's [6]** 416/19 422/10 444/4 468/10 483/12 484/2
**picture [10]** 394/25 407/7 407/9 407/10 407/24 409/21 409/25 410/7 410/8 469/18
**pictures [4]** 410/5 445/4 452/24 486/4
**piece [1]** 472/9
**place [1]** 460/17
**placed [1]** 390/12
**plaintiff [3]** 376/2 376/8 379/14
**plaintiff's [5]** 398/15 448/4 449/1 464/20 468/1
**plaintiffs [3]** 375/8 389/25 425/10
**PLAINTIFFS' [5]** 377/4 377/10 378/2 416/2 416/3
**plan [3]** 381/4 403/11 403/12
**play [2]** 435/3 463/4
**played [8]** 459/21 459/22 459/23 459/25 487/21 487/25 488/1 488/1
**please [29]** 379/8 379/11 386/16 387/6 387/8 387/13 387/14 391/19 391/22 392/9 395/20 419/16 434/4 457/10 457/20 464/8 464/13 464/15 464/19 464/21 465/1 465/2 468/4 471/6 471/18 476/25 478/14 486/23 487/8
**plenty [1]** 418/2
**plumber [1]** 419/2
**pocket [5]** 447/12 448/15 451/17 451/24 452/9
**point [35]** 381/18 381/22 383/23 388/13 389/15 392/3 392/4 395/10 395/11 403/9 430/14 430/19 430/19 432/9 433/2 433/8 433/12 433/15 433/18 433/21 434/8 435/6 435/7 435/10 436/9 442/19 443/10 443/11 454/12 455/25 466/14 467/13 485/25 488/19
**pointed [2]** 445/10 446/10
**pointing [1]** 484/18
**points [3]** 433/9 433/9 433/10

**role [1]** 480/10
**police [3]** 429/8 422/2 489/3
**policies [1]** 454/23
**poor [1]** 461/3
**portion [4]** 406/3 432/16 455/10 456/2
**portions [2]** 406/3 406/4
**position [6]** 421/19 430/17 430/24 462/12 478/24 480/20
**positioned [1]** 421/16
**positive [1]** 411/15
**possesses [1]** 418/8
**possible [8]** 385/7 401/7 405/2 430/4 438/11 439/7 439/8 452/15
**Possibly [1]** 395/19
**POST [5]** 426/3 443/12 444/13 454/22 455/3
**potential [1]** 408/23
**pounds [1]** 484/5
**practice [2]** 388/5 429/3
**practices [1]** 489/3
**practitioner [10]** 380/8 381/12 382/9 383/5 383/18 385/10 386/12 387/24 388/1 395/23
**preceded [1]** 432/11
**predict [1]** 384/8
**prediction [1]** 384/14
**predominantly [1]** 388/21
**prefer [2]** 413/19 419/2
**preference [3]** 382/10 383/7 383/21
**preparation [2]** 428/20 449/12
**prepare [3]** 422/14 422/20 466/13
**prepared [3]** 389/10 389/20 389/22
**prescribed [1]** 403/11
**presence [7]** 379/3 394/5 419/23 452/6 457/19 482/11 487/7
**present [6]** 381/6 392/22 393/24 410/2 451/8 473/1
**present-sense [2]** 392/22 393/24
**presented [5]** 391/10 396/8 400/18 402/12 414/18
**PRESIDING [2]** 375/4 379/7
**pressed [3]** 474/2 474/14 474/16
**pressure [1]** 462/3
**pressured [1]** 461/10
**presumably [1]** 382/9
**pretty [2]** 443/2 480/23
**previously [4]** 398/22 398/25 399/4 424/5
**primarily [1]** 422/3
**prior [7]** 384/19 404/21 422/9 422/16 424/5 456/6 483/23
**privacy [1]** 479/13
**private [1]** 388/5
**probably [7]** 389/2 402/2 466/20 467/24 483/20 487/24 488/18
**probes [1]** 424/7
**problem [1]** 453/24
**procedure [1]** 467/23
**proceed [8]** 387/1 387/17 394/4 399/12 399/20 419/24 452/7 465/5
**proceedings [15]** 375/14 377/2 386/6 386/13 390/10 394/20 397/20 414/3 420/8 427/24 437/23 446/21 464/9 469/15 490/6
**process [4]** 386/19 389/6 405/9 468/11
**profanity [1]** 437/18
**profession [1]** 403/2

**professional [2]** 382/17 427/12
**proffer [4]** 382/18 382/19 392/8 460/13
**proof [1]** 417/25
**proposition [1]** 382/14
**protracted [1]** 426/6
**prove [1]** 417/3
**provided [3]** 392/14 441/19 454/6
**provider [1]** 406/11
**proximity [2]** 473/9 474/18
**publish [4]** 398/14 399/5 399/14 399/20
**published [2]** 398/10 398/20
**pull [2]** 423/4 423/8
**pulled [1]** 442/2
**pulls [2]** 434/12 435/15
**punch [4]** 429/13 429/18 430/3 431/20
**punched [5]** 429/19 430/6 439/7 469/25 470/25
**punches [3]** 428/22 428/25 445/3
**punching [2]** 407/12 407/18
**purpose [1]** 392/12
**purposes [4]** 445/12 445/16 450/14 479/13
**pursuant [2]** 465/16 490/4
**push [5]** 391/25 445/21 446/11 458/1 472/10
**pushed [2]** 472/21 473/12
**pushing [2]** 381/9 458/4
**put [16]** 406/5 410/18 410/18 410/25 411/2 411/4 411/7 411/10 411/13 411/20 433/19 442/14 445/19 459/4 478/7 479/18

**Q**

**qualification [1]** 380/18
**quality [1]** 461/3
**question [14]** 407/3 412/24 415/13 415/15 417/6 424/20 425/17 425/22 432/25 433/1 434/1 434/4 448/22 459/24
**questioning [3]** 417/6 450/12 452/3
**questions [5]** 415/17 441/21 448/9 449/19 457/2
**quickly [1]** 462/6

**R**

**radiation [1]** 408/25
**radioed [2]** 431/23 436/12
**radios [2]** 431/23 436/11
**raise [2]** 387/8 464/21
**ran [4]** 440/24 441/1 441/8 441/11
**Rancho [6]** 447/18 449/25 453/2 453/14 453/15 454/15
**range [1]** 473/1
**rash [1]** 411/6
**Raul [2]** 452/13 453/15
**ray [5]** 378/4 467/14 467/18 467/20 484/9
**rays [5]** 396/21 400/22 402/10 467/16 476/21
**rdconaway [1]** 376/12
**reach [1]** 421/11
**reached [3]** 422/16 422/22 422/24
**reaching [2]** 421/23 421/24
**reaction [2]** 431/4 446/11
**read [1]** 438/8
**reading [1]** 454/2
**ready [1]** 458/18

**R**

really [1] 407/7
reason [3] 388/21 409/3 413/14
reasonable [15] 424/23 434/23 434/24
 435/19 436/2 440/7 440/10 440/17
 442/4 442/7 443/16 443/17 444/16
 444/21 446/10
reasonably [1] 442/4
rebut [1] 389/24
recall [10] 388/19 391/12 404/1 432/16
 436/12 455/19 455/22 455/24 456/2
 458/23
received [19] 398/7 399/22 399/23
 399/24 405/1 461/6 462/1 469/11
 470/21 471/9 475/21 477/8 478/1
 479/17 482/23 482/24 484/15 485/13
 485/21
recess [11] 457/9 457/16 458/17
 463/25 464/4 464/5 486/21 486/22
 489/9 489/11 489/12
recognize [5] 391/3 391/5 400/5 401/4
 401/22
recognizing [1] 473/24
recollection [4] 389/12 391/8 391/12
 460/3
record [18] 387/14 388/15 388/17
 389/20 390/3 390/8 393/19 397/17
 409/2 416/19 416/20 417/8 417/16
 418/6 422/14 426/10 428/19 465/2
recording [2] 436/15 437/8
records [6] 413/23 417/9 417/13 418/7
 447/14 456/18
recover [2] 467/22 476/24
recovered [5] 476/14 476/18 477/12
 485/9 485/17
recovery [1] 477/15
RECROSS [4] 377/8 377/11 377/17
 447/6
RECROSS-EXAMINATION [1] 447/6
rectangular [2] 473/8 480/4
REDIRECT [5] 377/8 377/11 377/17
 414/15 439/14
refer [1] 489/5
referring [5] 410/12 432/1 432/14
 483/5 483/10
reflect [2] 388/15 388/17
refresh [2] 389/12 391/8
regards [1] 473/23
regular [1] 465/24
regulations [1] 490/8
reholstered [1] 435/12
reiterate [1] 444/23
related [2] 474/6 483/24
relation [1] 435/22
released [1] 414/6
relevance [5] 416/17 417/24 418/14
 447/21 450/15
relevant [3] 390/1 417/4 451/1
relying [1] 463/1
remaining [2] 467/21 467/22
remember [12] 388/8 388/21 389/2
 391/21 391/21 391/23 403/8 406/9
 406/14 413/22 454/2 460/22
remind [3] 416/5 488/23 488/24
remorseful [1] 402/21
removed [1] 485/6
renal [3] 480/14 480/14 481/1

rephrase [1] 448/22
report [9] 389/9 406/23 426/12 429/16
 466/13 466/16 468/18 474/20 476/3
reported [2] 461/12 490/6
reporter [3] 375/21 413/3 490/17
REPORTER'S [1] 375/14
reports [2] 422/20 429/23
represent [3] 463/7 463/16 463/22
request [3] 432/11 456/13 456/19
requested [1] 427/1
require [1] 427/9
required [7] 409/18 454/22 455/4
 455/6
requires [1] 427/6
requiring [1] 426/8
research [2] 457/14 487/2
residence [1] 451/4
residue [1] 445/17
resisting [14] 431/24 431/25 432/10
 432/15 432/19 432/20 433/7 433/20
 434/10 434/20 434/21 435/13 436/10
 436/13
resolve [1] 461/16
resolved [3] 460/19 461/17 463/4
resort [1] 424/4
resources [2] 441/6 443/8
respect [29] 381/7 381/11 394/2
 394/12 397/24 402/11 403/1 403/13
 411/20 415/3 418/17 420/18 425/5
 426/1 446/14 447/17 454/20 455/1
 455/13 455/14 455/18 460/21 461/22
 467/11 478/23 479/1 480/19 483/12
 487/15
respectfully [1] 383/23
Respiratory [1] 410/21
respond [2] 415/13 478/22
response [7] 389/19 396/18 402/9
 402/25 403/22 441/23 455/22
responsibilities [1] 381/23
rest [8] 389/2 411/14 411/21 458/11
 460/18 484/10 484/19 487/25
result [1] 389/10
resume [3] 386/24 416/4 416/9
RESUMED [3] 377/4 416/2 416/3
retention [1] 423/2
retrieve [1] 386/4
review [13] 389/9 390/3 417/9 417/19
 443/20 447/13 448/23 449/13 450/2
 450/3 455/15 456/17 461/8
reviewed [12] 422/14 422/18 422/20
 426/10 436/3 449/11 449/20 450/6
 450/10 450/23 451/10 462/6
reviewing [5] 428/19 432/21 444/10
ribcage [2] 424/13 480/10
ribs [1] 482/5
ride [1] 488/13
ride-along [1] 488/13
right [137]
right-hand [1] 390/13
rise [8] 379/4 386/14 457/17 464/4
 464/6 464/10 487/5 489/11
risk [1] 423/13
Riverside [6] 380/11 380/25 381/15
 465/12 466/25 486/8
RN [1] 388/1
road [1] 383/19
ROBERT [3] 376/9 376/10 379/17
Robert Conaway [1] 379/17

room [13] 375/23 405/17 406/12
 435/24 441/1 441/8 448/17 447/11
 452/22 453/1 453/8 454/1 454/14
round [1] 473/7
row [1] 418/22
ruling [1] 392/25
run [9] 434/8 435/7 435/10 435/18
 440/5 441/25 443/8 488/11 488/18
running [4] 435/23 436/4 441/1 441/2
runs [4] 433/16 440/6 443/7 443/8

**S**

S-c-o-t-t [1] 465/4
safe [1] 427/11
said [28] 382/21 384/1 404/24 406/25
 407/1 411/16 411/18 416/24 417/9
 417/13 418/14 419/10 429/24 433/7
 435/1 441/15 445/3 445/11 445/20
 448/14 449/2 449/12 449/13 451/16
 451/19 451/23 456/6 463/19
same [8] 381/5 398/16 412/18 433/22
 446/5 463/2 463/18 465/23
SAN [6] 375/10 379/10 379/21 454/6
 454/22 455/3
San Bernardino [2] 454/6 454/22
sat [1] 432/9
SAVORY [14] 377/9 377/20 380/9
 387/4 387/7 387/15 387/21 388/19
 394/8 394/23 395/5 400/2 404/10
 414/17
saw [7] 400/16 406/16 407/5 410/4
 442/18 443/2 448/8
say [33] 381/17 381/19 384/1 390/16
 393/7 402/5 404/22 404/23 407/3
 418/14 427/11 430/6 431/24 432/15
 437/11 443/14 443/23 450/1 450/19
 451/5 451/13 451/15 455/6 460/10
 460/13 462/4 462/16 463/6 463/16
 463/22 473/21 474/23 476/18
saying [6] 405/24 416/24 436/10
 442/13 448/17 454/14
says [11] 410/15 435/13 435/14 439/3
 441/23 449/23 450/2 450/3 450/11
 452/2 468/1
scab [2] 483/17 484/1
scabbed [3] 471/21 483/15 483/22
scalp [1] 402/14
scan [5] 396/11 396/12 404/6 408/25
 413/15
scanned [1] 403/23
scans [2] 396/20 404/9
scared [1] 388/23
scenario [1] 386/22
schedule [2] 386/23 405/4
schedules [1] 386/20
scheduling [1] 380/9
scope [3] 389/21 445/7 446/6
SCOTT [8] 377/12 377/13 377/18
 377/19 416/3 464/17 464/20 465/3
scrape [3] 468/23 469/1
scrape-type [2] 467/8 469/1
scrapes [1] 472/17
screen [25] 394/21 394/24 395/10
 395/12 397/1 397/21 398/8 400/25
 401/18 406/7 407/25 409/23 469/16
 470/22 471/10 475/22 477/9 478/2
 478/9 479/20 482/25 483/7 484/16
 485/14 485/22

# S

**seal** [1] 485/3
**sear** [1] 473/15
**search** [1] 441/10
**searing** [1] 473/6
**seated** [10] 379/8 386/16 387/13 421/10 433/19 457/20 464/8 464/13 465/1 487/8
**second** [4] 416/13 440/14 445/22 480/15
**secondly** [1] 428/25
**section** [2] 410/14 490/4
**securing** [1] 480/14
**see** [58] 388/11 388/21 390/13 394/23 394/25 395/1 395/2 395/3 395/18 396/4 400/2 401/2 401/20 407/9 407/14 407/21 408/2 408/9 409/10 410/7 410/9 410/12 410/13 411/11 412/15 412/21 413/23 416/21 417/24 418/9 418/14 422/19 428/24 430/16 430/23 431/18 435/7 435/2 435/3 435/4 437/16 443/1 444/3 444/7 445/18 447/13 447/14 447/25 450/11 452/20 453/1 454/18 455/15 458/2 480/1 480/2 487/4 489/10
**seeing** [2] 402/9 486/3
**seek** [1] 418/25
**seeking** [4] 416/18 417/19 419/6 450/14
**seems** [3] 382/5 462/18 463/3
**seen** [5] 413/16 433/11 452/24 452/24 473/18
**seizure** [1] 411/10
**self** [1] 419/3
**self-employed** [1] 419/3
**sense** [4] 392/22 393/24 419/3 473/20
**sensitive** [1] 383/7
**sensitivity** [1] 381/19
**separate** [2] 467/5 467/7
**series** [1] 397/15
**serious** [5] 408/9 408/14 426/2 426/4 426/8
**seriously** [4] 396/9 396/14 403/6 403/6
**serve** [1] 404/24
**serves** [1] 416/25
**service** [1] 440/2
**session** [2] 379/6 464/12
**set** [1] 443/16
**seven** [1] 396/5
**several** [5] 402/17 405/11 453/25 467/8 467/25
**severity** [1] 444/24
**shaking** [2] 388/24 402/16
**shall** [4] 387/9 387/10 464/22 464/23
**shape** [1] 473/22
**she** [22] 380/9 380/11 380/12 381/12 381/14 381/16 382/16 383/23 384/1 384/4 384/6 389/21 389/22 390/3 392/13 392/14 393/3 393/9 393/10 393/11 393/13 394/1
**she'll** [1] 382/17
**she's** [5] 380/12 381/20 392/23 393/9 393/12
**sheriff** [2] 388/9 465/12
**Sheriff's** [1] 455/3
**Sheriff-Coroner's** [1] 465/12
**Sheriffs** [1] 454/7

**shift** [4] 380/13 381/14 384/4 405/13
**shifted** [1] 462/19
**shoot** [7] 433/13 439/17 439/19 445/11 445/21 446/3 446/9
**shooting** [5] 436/18 436/24 437/4 444/18 445/14
**short** [1] 405/16
**shortly** [1] 433/12
**shortness** [1] 410/22
**shot** [9] 432/23 461/4 479/6 479/7 480/17 480/24 480/24 481/2 481/3
**should** [10] 439/22 440/22 442/18 442/19 454/25 461/17 462/21 467/24 467/8 486/20
**shouldn't** [1] 423/4
**show** [20] 393/22 397/12 402/1 407/23 410/11 418/8 468/14 469/3 470/10 471/2 475/11 475/11 475/14 477/2 477/14 479/9 479/22 483/4 483/9 488/11
**showed** [1] 397/6
**showing** [4] 410/6 417/3 417/17 484/9 422/17
**shown** [5] 398/22 398/25 399/4 399/14 422/17
**shows** [3] 448/5 477/11 484/9
**sick** [1] 388/22
**side** [10] 424/13 430/25 431/1 475/8 477/21 478/25 479/4 479/5 479/23 481/13
**sidebar** [2] 392/9 418/19
**sides** [1] 396/22
**signature** [3] 416/19 417/3 417/25
**signatures** [1] 418/3
**signed** [1] 418/7
**similar** [5] 395/25 412/22 451/19 473/16 473/22
**simplify** [1] 424/8
**since** [7] 388/1 388/2 395/23 395/24 405/8 453/4 465/20
**SINCICH** [2] 376/4 379/13
**sir** [45] 379/19 389/11 389/13 391/2 391/4 391/11 396/9 396/25 400/4 400/6 401/3 401/21 401/23 403/16 404/16 405/9 405/16 405/19 405/21 405/23 406/4 406/18 406/21 406/24 407/4 407/6 407/6 407/10 407/13 407/15 407/17 407/22 408/4 408/15 408/18 408/21 408/25 409/15 413/19 414/10 427/13 427/21 437/21 443/19 457/7
**sitting** [1] 392/5
**skills** [1] 427/9
**skin** [28] 411/6 468/23 472/9 472/14 472/15 472/17 472/18 472/21 473/6 473/10 473/15 473/15 473/19 474/2 474/8 474/18 476/14 476/15 476/19 476/23 476/23 477/12 477/14 478/4 480/3 480/6 482/4 485/9
**skip** [1] 462/23
**skipping** [1] 462/16
**slightly** [1] 479/5
**slow** [5] 395/5 458/21 460/6 463/20 487/16
**slow-motion** [3] 460/6 463/20 487/16
**slowdown** [1] 458/21
**slowed** [13] 458/25 459/5 459/21 459/23 459/25 460/3 460/8 460/16 460/25 461/7 461/22 462/1 463/5
**slowed-down** [7] 459/21 459/23

459/25 460/3 461/7 461/22 462/1
**small** [7] 400/8 420/6 421/14 438/24 471/19 471/20 476/23
**so** [150]
**soft** [4] 401/7 403/19 408/4 410/13
**soft-tissue** [1] 410/13
**solely** [1] 462/19
**solemnly** [2] 387/9 464/22
**some** [33] 380/9 384/16 385/13 404/3 406/9 418/2 424/4 427/2 427/6 427/9 439/16 440/11 441/11 441/22 450/23 454/11 466/10 466/13 467/9 467/13 468/4 468/7 473/7 475/24 482/5 482/6 482/9 482/12 482/12 482/13 483/23 485/25 486/3
**somebody** [4] 392/4 404/24 440/8 454/23
**someone** [22] 396/24 405/12 407/12 407/19 410/10 420/24 427/3 429/13 429/18 439/17 439/19 439/19 440/6 441/23 442/23 443/14 445/2 459/21 460/2 469/25 470/24 483/17
**someone's** [1] 481/20
**something** [5] 400/16 436/13 441/4 444/10 460/8
**sometimes** [3] 410/1 473/5 473/17
**somewhere** [1] 467/25
**soot** [1] 472/24
**sorry** [10] 395/6 409/11 413/2 413/4 415/14 443/18 450/19 468/24 470/6 479/22
**sound** [1] 437/1
**sounded** [1] 437/5
**SP** [1] 375/9
**speak** [2] 405/5 405/14
**speaking** [3] 405/18 481/19 482/2
**specific** [1] 421/7
**specifically** [4] 410/12 451/14 451/15 474/24
**speculation** [5] 414/25 415/6 417/2 436/20 437/14
**spell** [10] 387/14 416/16 417/2 417/4 417/14 417/21 417/25 418/15 446/16 465/2
**spinal** [1] 404/5
**spine** [3] 404/4 480/16 485/18
**spoke** [7] 405/1 405/9 405/10 432/5 454/8 454/10 454/10
**spoken** [1] 405/8
**spot** [1] 382/10
**spray** [4] 420/13 420/13 428/3 428/5
**staff** [2] 412/23 412/24
**stairs** [4] 434/9 435/11 435/18 435/22
**stamp** [12] 472/25 473/4 473/5 473/13 474/9 476/7 480/1 480/2 480/5 482/17 483/4 483/9
**stamps** [2] 473/24 474/6
**stand** [5] 397/6 416/5 459/17 488/5 488/6
**standard** [2] 478/23 480/19
**standards** [2] 443/13 444/13
**stands** [1] 402/20
**start** [2] 393/10 433/17
**started** [2] 392/4 442/9
**starts** [1] 381/15
**state** [6] 379/11 387/14 436/17 438/9 465/2 465/21
**stated** [7] 452/13 453/15 453/21

**S**

**stated... [4]** 453/22 454/19 456/5
456/21

**statements [5]** 392/18 392/20 393/23
454/3 454/6

**STATES [6]** 375/1 379/5 379/6 464/11
490/4 490/9

**stay [1]** 414/8

**staying [2]** 435/22 435/23

**stays [1]** 443/6

**stenographically [1]** 490/6

**step [6]** 387/5 415/19 457/7 457/21
464/18 486/18

**still [8]** 389/23 405/22 416/5 443/3
443/4 458/8 458/21 458/25

**stip [2]** 459/4 460/22

**stippling [1]** 472/25

**stipulate [1]** 397/3

**stipulation [5]** 398/19 458/24 459/20
460/4 462/20

**stomach [4]** 432/4 432/7 435/5 444/1

**stood [1]** 389/1

**stop [22]** 431/25 432/15 432/19
432/20 432/22 432/25 433/7 433/7
433/20 433/21 434/10 434/13 434/20
434/21 435/13 436/10 440/14 441/12
441/20 442/3 449/19 450/9

**stopped [3]** 432/24 441/18 442/2

**stops [1]** 452/3

**storm [1]** 418/25

**Street [2]** 375/22 375/22

**strike [2]** 428/25 431/15

**strikes [6]** 424/1 426/23 439/20 444/1
444/4 444/7

**striking [4]** 430/25 431/1 432/10
433/10

**strong [1]** 423/16

**struck [9]** 428/22 429/16 429/18
429/19 429/24 430/7 431/7 431/16
433/23

**stun [1]** 424/8

**stun-gun [1]** 424/8

**subdural [1]** 396/17

**subject [6]** 420/20 421/11 457/15
463/2 487/2 487/21

**subjected [1]** 408/24

**subjective [3]** 408/5 425/4 443/12

**submit [1]** 384/24

**submitted [2]** 457/12 486/24

**subpoena [3]** 404/24 405/1 465/16

**subpoenaed [2]** 380/24 381/8

**SUCCESSOR [1]** 375/7

**such [1]** 420/23

**suggest [4]** 450/4 450/22 451/4
482/12

**suggesting [1]** 460/18

**Suite [2]** 376/5 376/15

**superficial [1]** 408/7

**supply [1]** 481/25

**supposed [1]** 405/11

**sure [22]** 403/4 403/10 406/15 409/6
412/17 416/23 417/1 417/24 418/5
424/22 426/2 448/20 448/21 450/13
451/14 453/13 460/7 474/16 476/21
481/19 487/23 488/6

**surface [2]** 473/10 476/22

**surmise [1]** 382/7

**surprise [1]** 447/16

**surrounding [2]** 472/19 474/18

**surrounds [1]** 475/6

**suspected [1]** 467/16

**suspicion [3]** 440/7 440/10 450/17

**sustain [1]** 393/21

**sustained [11]** 415/1 415/8 428/18
433/4 436/21 438/12 438/16 438/21
438/23 439/4 453/6

**sustains [1]** 415/12

**suturing [2]** 409/18 426/8

**swear [2]** 387/9 464/22

**swelling [8]** 395/2 395/8 401/7 403/19
408/4 410/13 411/14 411/21

**SWORN [2]** 387/7 464/20

**synch [1]** 489/1

**synched [1]** 461/2

**synching [1]** 459/17

**synchronization [1]** 460/5

**system [3]** 427/6 481/21 481/23

**T**

**tab [2]** 390/14 468/5

**tabs [1]** 468/4

**take [33]** 380/8 381/9 384/7 396/10
413/16 414/5 416/22 427/9 433/15
453/23 457/9 457/16 457/25 458/3
458/17 463/25 465/24 466/24 467/14
467/16 475/24 478/12 479/6 482/9
482/15 482/16 484/18 484/25 485/1
486/20 486/21 486/21 489/9

**taken [6]** 386/7 388/25 406/9 409/25
468/10 489/12

**takes [1]** 410/1

**taking [3]** 406/12 460/17 467/18

**talk [15]** 382/17 403/2 424/15 425/10
457/13 457/13 460/25 461/2 462/15
467/5 471/23 476/2 486/23 486/25
487/1

**talked [13]** 380/16 403/14 404/21
414/21 423/2 425/3 428/16 437/25
445/3 455/12 455/12 462/17 479/25

**talking [9]** 393/10 403/24 422/12
422/12 428/20 432/13 444/20 456/5
459/10

**talks [1]** 437/17

**tape [1]** 442/13

**target [1]** 424/14

**tase [1]** 441/14

**Taser [6]** 420/13 420/14 424/6 424/9
432/5 435/12

**taught [1]** 441/2

**tear [1]** 472/13

**tearful [2]** 392/2 402/16

**technically [1]** 460/19

**technique [4]** 420/25 421/6 422/7
432/8

**teeth [1]** 409/13

**tell [25]** 389/4 389/13 391/20 392/17
394/11 396/3 406/13 406/15 409/24
417/24 424/16 425/1 425/18 425/20
425/23 434/20 450/12 454/23 455/4
466/22 468/21 471/18 472/5 473/4
476/10

**telling [4]** 391/23 432/20 454/20
455/24

**ten [3]** 384/10 457/9 457/16

**ten-minute [2]** 457/9 457/16

**tenant [2]** 452/14 453/16

**tend [1]** 409/3

**tender [1]** 403/19

**tenderness [11]** 394/15 394/16 394/16
402/14 404/3 408/4 408/5 411/14
411/15 411/18 411/22

**tends [1]** 472/13

**term [2]** 396/13 418/24

**terms [10]** 409/18 443/12 444/13
459/12 459/13 459/14 459/15 460/15
462/22 474/1

**test [1]** 453/1

**tested [1]** 453/4

**testified [21]** 392/23 396/19 402/7
403/1 404/1 405/20 416/15 425/6
426/12 426/15 426/17 426/22 428/2
429/1 429/5 432/3 447/8 448/2 448/18
452/9 452/22

**testify [10]** 381/2 390/3 393/3 405/3
423/23 430/5 459/22 460/23 460/24
488/25

**testifying [1]** 429/20

**testimony [30]** 383/7 386/24 387/9
392/13 393/4 414/17 415/22 417/5
417/7 422/15 422/21 423/3 425/14
426/13 428/21 447/10 449/12 451/11
451/18 452/14 453/10 453/11 454/11
454/20 454/21 455/2 463/1 464/2
464/22 489/6

**testing [1]** 403/5

**tests [1]** 414/5

**than [4]** 384/11 455/16 463/23 484/1

**thank [52]** 385/21 385/21 385/22 386/9
387/3 387/13 387/18 388/18 390/9
390/24 391/7 394/3 394/4 394/7 395/15
395/15 397/23 398/6 398/21 399/21
401/13 402/6 404/10 404/12 414/11
414/14 415/18 415/20 415/24 419/21
419/22 419/25 420/7 434/5 439/9
439/13 446/22 446/25 447/5 452/8
456/24 457/7 457/21 464/3 464/16
465/1 465/6 470/20 486/14 486/17
487/4 489/10

**that [494]**

**that's [65]** 380/2 380/2 382/3 382/22
383/2 384/13 384/14 384/15 385/6
385/18 389/8 390/6 392/16 393/17
395/7 399/7 399/15 400/12 402/19
412/23 412/23 412/24 414/11 419/7
419/13 422/3 422/17 424/25 428/6
428/6 438/2 443/11 444/10 446/23
452/11 453/12 453/17 454/19 458/4
460/17 461/9 462/3 462/14 463/13
466/1 467/1 468/19 469/18 471/4
471/14 472/6 472/9 472/11 474/22
476/4 477/13 478/4 478/6 478/13 482/1
483/25 484/20 485/17 486/14 489/2

**their [12]** 385/2 407/12 423/15 423/16
423/17 430/15 433/21 454/5 460/5
460/5 464/1 489/9

**them [25]** 385/7 393/13 397/6 399/20
404/25 418/8 423/18 425/3 429/15
429/19 429/19 429/19 439/17 439/20
440/9 440/11 460/5 467/9 467/22
467/25 467/25 474/24 485/3 485/3
489/5

**theme [1]** 441/17

**then [68]** 381/2 381/17 382/23 383/1

**T**

**then...** [64] 383/5 383/8 383/9 383/11 383/16 383/17 383/18 383/22 383/22 384/14 385/14 385/15 386/24 388/4 393/13 397/16 397/24 398/17 398/20 404/7 405/8 417/23 421/9 423/16 429/20 431/13 431/24 432/9 432/10 433/12 433/13 433/14 434/11 441/6 443/5 443/14 443/15 444/2 445/25 448/15 449/23 450/3 450/9 451/1 451/8 452/2 457/25 458/6 459/16 460/16 463/16 468/23 471/2 477/12 480/7 480/15 485/3 485/16 487/15 487/22 488/9 488/11 488/15 488/17

**there** [80] 380/3 380/19 384/2 384/4 384/6 390/17 393/21 403/25 404/24 408/23 409/8 412/25 413/5 413/12 418/1 418/2 419/15 420/24 421/3 421/18 422/24 424/1 426/19 426/22 430/10 430/12 430/21 431/8 431/12 433/9 433/10 433/12 437/18 441/7 441/22 444/24 447/16 448/10 450/4 450/9 450/16 451/6 451/12 451/12 451/15 451/16 451/20 451/21 451/22 453/25 459/13 459/20 460/7 460/8 460/13 461/18 461/22 462/9 465/20 467/6 467/8 467/20 467/24 468/4 468/7 471/16 472/15 473/17 474/8 476/7 480/2 480/4 481/12 481/16 481/18 482/6 482/12 482/13 483/15 487/18

**there's** [29] 383/10 389/18 393/16 391/9 421/15 425/5 433/8 437/18 440/1 440/1 440/12 443/10 444/24 445/17 451/2 458/10 461/15 461/17 461/21 462/16 468/22 468/25 472/9 472/15 475/1 480/3 481/16 482/4 482/4

**thereafter** [1] 386/25

**these** [12] 393/22 396/23 397/2 397/7 398/15 414/5 440/15 443/18 445/20 476/1 485/24 486/4

**they** [36] 380/13 383/25 398/19 398/20 406/12 406/14 407/13 407/20 413/23 424/1 430/19 430/20 430/20 433/17 439/19 441/24 441/24 442/1 442/6 442/7 454/1 454/5 454/6 454/10 460/12 460/13 460/15 462/22 463/4 469/24 470/1 471/19 472/10 474/1 486/1

**they're** [7] 397/4 397/25 398/10 398/15 435/16 459/2 469/22

**thing** [2] 434/17 488/3

**things** [9] 393/11 418/18 420/23 424/8 425/9 442/2 454/11 472/2 472/22

**think** [32] 381/7 382/20 383/18 383/20 384/25 385/4 385/12 385/13 393/13 393/14 393/21 406/13 415/9 418/15 427/11 444/20 446/9 452/23 453/4 456/9 456/11 459/25 462/20 463/9 462/20 460/20 476/6 482/7 485/6 487/17 488/3 488/10

**third** [1] 412/13

**this** [161]

**those** [34] 389/2 391/17 392/1 392/20 396/24 397/18 399/6 399/8 401/25 402/9 407/11 407/18 410/9 418/6 428/22 431/4 431/4 454/2 454/8 459/13 459/14 466/10 467/22 469/20 469/22

**though** [2] 393/16 445/17

**thought** [5] 382/13 392/12 411/16 450/19 450/20

**thousand** [2] 481/12 481/24

**threaten** [1] 441/14

**three** [5] 390/18 390/20 399/6 455/16 488/12

**three-digit** [2] 390/18 390/20

**through** [29] 375/19 386/10 398/11 398/18 399/19 405/25 410/14 413/23 418/4 433/15 434/2 441/22 458/2 472/17 472/18 476/11 476/12 476/12 476/13 476/13 478/11 479/1 480/8 480/9 480/10 480/11 480/12 480/12 482/3

**through D** [1] 399/19

**throughout** [1] 441/17

**thrown** [1] 431/20

**Thursday** [2] 375/17 379/1

**thwart** [1] 431/15

**tie** [2] 442/23 442/24

**time** [56] 379/25 385/2 386/20 386/20 387/4 393/23 405/16 409/25 410/4 420/15 421/13 422/23 423/8 423/18 423/21 424/1 427/4 427/8 427/14 433/3 433/6 433/8 433/9 433/22 434/3 434/8 434/15 434/16 434/23 434/24 440/11 440/13 441/13 441/19 442/6 442/8 443/2 443/9 443/17 448/4 456/5 461/7 461/25 462/23 465/23 474/2 474/15 480/6 481/5 482/9 482/13 483/17 483/21 483/23 486/14 488/19

**times** [15] 396/2 405/11 428/16 429/1 429/16 429/17 429/18 429/19 429/21 429/24 429/25 430/6 432/3 441/24 447/8

**timing** [2] 462/10 462/17

**tingling** [1] 411/10

**tissue** [7] 401/7 403/19 408/4 410/13 472/8 472/19 482/4

**Title** [1] 490/4

**to first** [1] 461/24

**today** [6] 386/22 404/21 414/17 417/10 466/17 487/10

**toe** [1] 391/25

**together** [1] 405/18

**told** [16] 391/13 391/24 393/10 393/11 393/16 394/10 402/12 402/23 403/17 403/25 408/12 425/3 446/3 446/8 453/22 460/11

**Tommy** [3] 437/6 488/12 488/14

**Tommy Dickey** [3] 437/6 488/12 488/14

**too** [3] 381/9 384/7 428/11

**took** [6] 397/6 445/5 445/10 446/9 475/25 482/12

**tool** [1] 428/10

**tools** [3] 420/18 420/20 428/6

**top** [2] 390/17 412/7

**tore** [1] 480/12

**torn** [1] 482/4

**torso** [1] 432/6

**total** [2] 382/20 481/25

**totality** [2] 440/16 444/19

**touch** [3] 391/25 395/12 411/19

**touched** [1] 445/12

**toward** [3] 472/10 479/3 479/4

**towards** [1] 422/8

**traffic** [1] 442/3

**trained** [4] 421/19 425/21 439/16 439/19

**training** [4] 400/20 423/2 456/8 473/23

**trajectory** [5] 478/11 478/18 478/23 479/1 480/17

**transcript** [7] 375/14 429/23 441/22 449/9 455/10 490/5 490/7

**transcripts** [4] 449/4 449/11 450/6 450/7

**transmissions** [1] 426/25

**trauma** [8] 380/11 381/20 384/1 394/14 396/15 396/16 404/7 469/21

**traumatic** [2] 403/21 467/16

**treat** [1] 395/25

**treated** [3] 394/9 394/12 400/23

**treating** [1] 382/17

**treatment** [2] 392/14 403/11

**trembling** [4] 392/2 402/16 406/20 406/23

**tremor** [1] 407/1

**tremulous** [1] 407/1

**trespassing** [4] 440/3 450/17 450/20 454/18

**trial** [3] 375/19 379/10 461/6

**trials** [1] 386/20

**tried** [1] 433/9

**trip** [1] 435/18

**tripped** [5] 434/9 435/10 435/19 436/1 436/2

**true** [3] 412/3 413/17 490/5

**truth** [8] 387/10 387/11 387/11 416/18 417/19 464/23 464/24 464/24

**try** [10] 415/22 418/24 421/15 431/15 442/10 445/21 446/11 449/16 459/2 483/3

**trying** [14] 383/24 385/13 405/11 430/23 431/8 432/4 432/7 435/5 436/9 443/25 451/8 456/9 458/21 461/16

**Tuesday** [3] 405/1 405/6 405/7

**turn** [20] 412/13 432/4 432/7 433/10 434/6 434/6 434/7 434/11 434/22 434/23 435/1 435/5 435/14 436/9 436/10 455/25 456/6 468/4 468/8 475/9

**turning** [3] 434/14 435/2 435/4

**two** [11] 380/3 380/5 410/2 418/18 419/8 424/7 467/9 472/22 474/20 475/2 476/3

**type** [6] 440/11 441/11 441/12 461/4 467/8 469/1

**types** [2] 396/23 396/24

**typical** [1] 472/11

**typically** [7] 421/5 421/8 423/15 423/17 431/18 472/8 473/7

**U**

**ultimate** [1] 446/15

**ultimately** [2] 444/2 479/6

**Umm** [5] 404/23 404/25 405/6 405/21 410/11

**unable** [1] 432/5

**uncomfortable** [1] 384/16

**under** [13] 396/11 397/25 416/5 419/14 440/2 445/20 453/3 454/22 454/22 475/25 476/18 477/12 485/9

**underneath** [3] 421/25 476/14 476/22

# U

**understand [9]** 380/3 416/24 423/19 424/20 425/22 451/3 452/2 452/4 459/19

**understanding [9]** 393/9 393/15 428/19 432/21 451/18 451/20 485/24 486/10 486/12

**understood [4]** 393/3 456/11 456/19 456/20

**unfortunately [1]** 405/3

**UNITED [6]** 375/1 379/5 379/6 464/11 490/4 490/9

**University [1]** 388/4

**unless [4]** 385/16 396/12 437/17 440/8

**unreasonable [1]** 441/13

**until [4]** 457/11 457/16 460/19 486/24

**up [34]** 382/7 383/2 406/6 407/8 422/2 422/4 424/12 425/17 431/6 431/17 432/9 435/25 439/16 441/7 442/23 442/24 443/7 443/11 445/10 445/19 458/7 458/14 458/19 462/18 472/11 472/14 473/12 474/2 474/14 478/8 478/25 479/18 485/25 486/4

**upon [2]** 417/8 463/1

**upper [2]** 390/13 480/10

**upright [1]** 478/24

**upset [4]** 388/23 392/24 402/16 402/19

**upward [2]** 479/5 480/22

**ureter [1]** 480/13

**urine [1]** 480/13

**us [5]** 408/12 431/4 466/22 467/21 476/10

**use [24]** 396/11 398/11 409/3 421/5 423/22 424/1 424/15 424/22 425/6 425/11 425/14 425/19 425/24 427/1 428/3 428/5 429/15 432/5 434/25 440/18 444/2 444/20 460/2 488/4

**used [12]** 398/9 409/5 421/5 424/4 424/8 424/9 424/12 428/13 439/22 440/22 462/4 473/3

**using [2]** 422/6 434/15

**usually [1]** 473/22

**utterance [2]** 392/22 393/24

**uttered [1]** 434/6

**utters [3]** 433/20 434/10 434/11

# V

**vague [7]** 424/18 433/2 433/2 434/3 478/14 478/19 480/4

**valid [1]** 393/17

**Valley [1]** 376/11

**value [1]** 431/17

**variations [3]** 421/16 421/18 424/2

**various [1]** 386/20

**vein [1]** 480/14

**verbal [1]** 434/17

**version [8]** 459/21 459/23 460/1 460/3 461/7 461/23 462/7 462/8

**vertebral [1]** 480/15

**very [11]** 396/3 419/19 458/5 458/11 462/6 463/1 473/9 473/9 474/18 474/18 487/14

**vessels [3]** 481/1 481/9 481/18

**vewing [1]** 376/17

**video [61]** 413/16 422/12 422/13 422/18 426/21 428/24 430/16 430/24
432/2 432/13 432/14 432/16 432/21 433/1 433/19 433/21 434/8 435/3 435/4 442/7 442/8 443/20 444/3 444/7 445/4 445/18 454/13 455/9 456/3 456/18 458/21 459/17 459/21 459/22 460/7 460/16 460/23 460/23 460/25 461/1 461/3 461/3 461/7 461/18 461/23 462/1 462/7 462/8 462/10 462/11 462/12 462/16 462/23 463/5 463/11 463/11 463/14 463/20 487/16 487/16 489/1

**view [1]** 444/18

**viewed [1]** 429/23

**Vince [1]** 379/20

**VINCENT [1]** 376/14

**violent [1]** 443/2

**virtue [1]** 419/9

**visible [1]** 430/18

**visibly [1]** 410/1

**vision [2]** 413/11 413/20

**visual [1]** 413/24

**vital [1]** 482/3

**voice [2]** 436/23 437/4

**voir [3]** 377/7 377/10 377/16 386/19

**VOL [5]** 377/8 377/11 377/17 378/3 378/19

**voltage [1]** 424/9

**voluntary [1]** 441/9

# W

**wait [8]** 443/5 443/8 449/5 449/5 449/5 450/18 450/18 451/13

**waiting [2]** 443/3 460/9

**walk [10]** 398/10 398/17 418/3 433/15 434/2 440/5 441/25 442/1 442/8 442/9

**walking [2]** 379/25 450/24

**wall [2]** 476/12 476/14

**waning [1]** 413/10

**want [33]** 380/4 381/8 383/3 383/4 385/7 385/16 385/24 391/20 404/23 406/2 406/13 409/22 411/11 412/21 421/7 442/14 442/14 442/23 442/24 443/1 443/9 448/21 449/20 451/14 460/10 460/13 463/4 463/6 463/15 464/14 473/3 479/9 487/23

**wanted [5]** 441/3 441/11 458/24 460/7 488/6

**wants [4]** 385/5 459/4 460/2 487/21

**Ward [3]** 488/22 488/24 488/24

**warrant [2]** 441/4 441/10

**was [250]**

**wasn't [5]** 417/1 419/8 431/17 440/2 440/3

**watch [1]** 431/19

**watched [4]** 426/21 432/2 454/13 455/9

**watching [2]** 444/3 456/18

**waxing [1]** 413/10

**way [7]** 380/25 382/15 385/6 413/19 422/1 451/2 456/13

**we [78]** 380/8 380/16 380/22 381/1 381/22 382/9 382/11 382/12 383/8 383/14 384/7 385/14 386/11 386/22 386/22 391/16 391/24 391/25 391/25 392/3 392/4 393/14 397/7 400/22 403/5 403/8 405/25 415/9 416/9 416/9 419/6 419/16 420/13 424/6 425/3 431/3 432/5 433/14 435/3 441/2 441/3 441/4 441/5 441/5 441/6 441/6 442/3 442/17 443/1
443/2 444/25 445/18 445/19 446/14 447/5 447/15 447/21 448/8 449/2 449/3 451/19 453/14 453/23 454/16 454/18 459/14 459/15 459/17 460/22 460/23 462/16 462/17 462/20 462/25 467/16 470/16 478/23 481/21 481/22 482/6 485/3 486/20 488/18

**We'd [1]** 464/16

**we'll [14]** 385/15 385/16 385/19 416/8 457/16 457/24 457/25 458/4 458/17 464/1 467/5 486/21 487/4 489/9

**we're [26]** 383/4 384/2 386/18 386/23 402/22 412/18 415/21 415/22 416/12 417/19 441/2 442/1 442/2 442/2 458/20 459/7 459/9 459/13 463/18 463/20 479/12 486/3 487/11 487/14 487/17 488/17

**we've [1]** 488/15

**weakness [1]** 411/9

**weapon [5]** 420/15 423/11 427/6 427/10 446/11

**weapons [1]** 420/22

**wearing [1]** 410/10

**weather [1]** 418/24

**week [2]** 396/5 404/22

**weight [2]** 481/20 484/4

**welcome [1]** 385/23

**well [36]** 382/5 382/11 383/2 383/16 393/4 396/17 406/2 406/19 408/5 408/9 412/20 418/13 418/24 420/16 421/3 421/12 422/16 428/24 430/16 430/23 431/10 431/12 432/3 432/23 438/7 442/22 447/11 448/14 454/2 460/10 461/21 462/5 484/21 486/8 487/11 488/15

**went [13]** 403/4 422/8 422/10 441/22 445/21 453/4 476/12 479/3 479/4 480/9 480/10 480/12 480/21

**were [32]** 379/25 390/4 391/17 392/1 393/23 405/17 406/12 410/20 414/5 426/22 430/5 430/6 430/20 430/20 433/10 438/23 441/21 441/22 453/25 454/4 454/5 454/11 467/8 468/21 471/18 471/19 474/8 474/9 474/23 483/5 483/9 488/12

**weren't [3]** 426/19 427/2 430/19

**WESTERN [1]** 375/3

**what [118]**

**what's [8]** 382/12 386/21 389/18 390/16 416/14 425/21 447/21 461/1

**whatever [3]** 384/24 459/4 487/21

**whatnot [1]** 431/5

**wheezing [1]** 410/22

**when [50]** 391/9 391/23 391/23 392/2 396/8 400/18 402/5 402/12 405/5 405/10 405/17 406/12 406/16 407/5 410/18 413/7 414/17 415/12 420/19 420/24 421/20 421/23 422/10 424/4 424/22 424/23 427/7 428/3 428/24 429/13 430/2 430/20 430/24 431/23 432/15 433/6 433/9 434/6 434/8 441/14 442/1 442/20 466/22 469/3 471/23 473/10 476/18 480/12 483/19 485/1

**where [40]** 379/23 388/3 388/6 391/24 392/1 392/4 396/4 407/7 407/16 410/14 421/10 421/12 421/16 424/9 427/1 429/24 432/14 433/12 433/16 433/18 435/1 435/21 435/22 435/25 436/9 452/22 453/10 456/1 465/11 471/18

**W**

**where... [10]**  475/6 477/2 477/11
478/4 478/4 484/10 484/19 485/25
488/5 488/18
**wherever [1]**  424/13
**whether [18]**  396/10 410/15 426/11
427/17 440/17 445/13 446/15 449/20
450/5 453/8 453/13 454/8 454/18
456/19 458/10 460/2 463/11 472/2
**which [28]**  381/2 383/22 384/10
398/22 398/25 399/4 410/12 413/14
416/19 418/11 420/13 420/14 423/12
423/16 423/17 424/9 440/9 448/4
456/13 466/8 467/5 472/25 474/25
475/1 477/19 478/24 480/5 480/13
**while [4]**  406/10 410/1 418/18 486/19
**who [12]**  380/24 380/25 388/8 388/22
418/2 418/8 419/1 419/2 443/21 458/6
460/22 488/24
**who's [1]**  382/9
**whole [2]**  387/11 464/24
**whose [2]**  418/20 449/5
**why [17]**  391/16 401/15 415/7 417/4
417/24 418/4 439/25 440/21 441/16
441/18 443/23 444/23 446/2 450/12
457/9 462/3 463/23
**will [33]**  380/13 384/17 386/11 388/17
389/21 398/5 399/11 406/21 419/1
419/14 419/16 423/17 431/20 431/20
431/21 453/3 462/14 463/11 463/11
469/10 470/19 471/8 473/12 473/18
475/20 477/7 477/25 479/15 482/21
484/13 485/12 485/20 489/7
**willing [1]**  460/11
**winded [2]**  437/2 437/5
**wish [4]**  393/7 419/10 419/11 419/15
**within [3]**  467/21 478/18 480/17
**without [11]**  386/7 394/9 402/22
403/24 403/24 430/10 430/12 430/21
460/5 462/6 474/24
**witness [37]**  377/8 377/11 377/17
383/10 386/22 387/7 388/14 388/16
389/17 391/16 393/2 394/1 395/14
395/21 397/6 399/6 401/11 402/8
412/18 416/3 416/5 416/24 416/25
418/14 419/11 425/10 450/10 453/22
457/3 457/8 460/3 464/15 464/20 468/6
475/10 477/1 488/1
**witness's [1]**  392/12
**witnesses [8]**  377/6 377/15 386/21
419/10 419/15 458/14 487/10 488/10
**Woodland [1]**  376/6
**Woods [56]**  379/22 379/24 388/16
388/20 389/10 391/9 391/13 392/14
396/7 400/18 402/11 403/13 403/25
405/17 406/10 414/18 415/3 418/12
420/11 422/5 422/10 422/11 422/24
426/12 427/14 428/2 428/7 428/18
428/21 428/23 428/25 429/24 430/8
430/10 431/1 434/15 440/24 442/10
442/13 442/18 443/22 444/4 444/8
445/5 445/10 445/19 450/18 450/22
454/9 454/15 454/17 455/1 455/4 488/5
488/11 488/13
**Woods' [4]**  395/18 403/14 414/21
429/22
**word [3]**  409/8 409/10 473/3

**wording [1]**  409/5
**words [1]**  478/12
**work [12]**  388/3 388/5 388/6 398/9
404/17 405/3 405/10 405/12 458/21
462/25 465/11 465/12
**worked [5]**  396/5 447/10 453/1 462/21
465/18
**working [5]**  386/9 395/22 396/4 459/1
462/17
**works [4]**  380/11 384/24 453/8 462/22
**worse [1]**  402/2
**would [124]**
**wouldn't [4]**  408/9 426/20 430/5 460/6
**wound [17]**  400/23 426/8 467/17
467/19 472/9 472/10 472/12 472/13
472/14 472/20 473/2 473/6 476/4 476/8
479/23 480/4 482/5
**wounds [29]**  466/11 467/5 467/7
467/14 471/23 471/24 471/25 472/3
472/3 472/3 472/8 472/16 472/22
472/23 472/24 474/7 474/9 474/21
475/2 475/12 475/15 475/24 476/1
476/3 482/2 482/2 482/14 482/16 484/8
**wrist [9]**  421/4 421/7 421/14 421/14
421/23 421/24 422/1 422/16 422/22
**wrist's [1]**  421/4
**wristlock [7]**  420/25 421/11 421/15
421/20 422/1 422/2 422/6
**wristlocks [1]**  421/3
**wrists [2]**  394/17 396/22
**write [1]**  418/3
**written [1]**  426/12
**wrong [3]**  384/3 450/12 463/9
**wrote [2]**  391/6 441/10
**www.patcuneo.com [1]**  375/25

**X**

**X-ray [5]**  378/4 467/14 467/18 467/20
484/9
**X-rays [5]**  396/21 400/22 402/10
467/16 476/21
**X26 [1]**  420/14

**Y**

**yahoo.com [1]**  376/7
**yeah [9]**  382/3 400/9 412/23 438/8
441/23 455/23 457/24 463/13 469/22
**yeahs [5]**  441/23 455/13 455/14
455/14 455/16
**years [1]**  396/6
**yelling [1]**  454/11
**yes [137]**
**yesterday [17]**  380/23 384/11 420/14
423/2 423/13 424/15 424/17 425/2
425/4 425/7 425/13 427/12 431/3 432/6
446/6 453/11 461/8
**you [573]**
**you'd [4]**  387/5 430/6 435/4 443/1
**you'll [2]**  431/18 431/19
**you're [41]**  385/23 398/11 398/18
410/11 410/12 415/12 416/5 416/24
417/17 420/24 421/10 421/16 421/17
421/18 422/12 423/3 423/7 423/7
423/11 423/20 427/5 427/8 427/12
422/8 428/13 431/6 431/10 431/13
431/13 432/12 432/20 440/10 443/3
443/8 447/8 451/8 465/16 465/18
466/20 471/24 489/5

**you've [14]**  402/25 424/4 426/10
426/10 429/2 429/9 436/3 440/15
444/19 447/8 449/18 452/22 458/14
473/23
**young [2]**  396/10 396/12
**your [140]**
**yourself [4]**  431/6 431/8 431/9 431/14

**Z**

**zoom [1]**  480/1
**zoomed [1]**  483/2