| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | CENTRAL DISTRICT OF CALIFORNIA |
| 3 | WESTERN DIVISION |
| 4 | THE HONORABLE ANDRÉ BIROTTE JR., JUDGE PRESIDING |

```
DOMINIC ARCHIBALD AND NATHANAEL    )
PICKETT I AS INDIVIDUALS AND AS    )
SUCCESSOR IN INTEREST TO NATHANAEL )
H. PICKETT II, DECEASED,           )
                                   )
               Plaintiffs,         )
                                   )
        vs.                        )    No. EDCV 16-01128-AB-SP
                                   )
COUNTY OF SAN BERNARDINO, et al.,  )
                                   )
               Defendants.         )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS


Los Angeles, California

Monday, March 12, 2018, 1:22 P.M.


Day 4 of Jury Trial, Page 722 through 839, Inclusive


PAT CUNEO CSR 1600, CRR-CM
Official Reporter
First Street Courthouse
350 W. First Street
Room 4311
Los Angeles, California 90012-4565
213-894-1782
patcuneo1600@gmail.com
www.patcuneo.com

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFF ARCHIBALD:

3                        LAW OFFICES OF DALE K. GALIPO
                         BY:   DALE K. GALIPO, ATTORNEY AT LAW

4                        AND   HANG DIEU LE, ATTORNEY AT LAW
                       AND   MARCEL SINCICH, ATTORNEY AT LAW

5                        21800 Burbank Boulevard
                       Suite 310

6                        Woodland Hills, California  91367
                       818-347-3333

7                        dalekgalipo@yahoo.com

8

9    FOR PLAINTIFF PICKETT:

10                      LAW OFFICES OF ROBERT D. CONAWAY
                     BY:   ROBERT DEAN CONAWAY

11                        ATTORNEY AT LAW
                     P.O. Box 2655

12                      Apple Valley, California  92307
                     760-503-9010

13                      rdconaway@gmail.com

14    FOR THE DEFENDANTS:  ALVAREZ-GLASMAN & COLVIN
                     BY:   VINCENT C. EWING, ATTORNEY AT LAW

15                      13181 Crossroads Parkway North
                     Suite 400

16                      City of Industry, California 91746
                     562-699-5500

17                      vewing@agclawfirm.com

18

19

20

21

22

23

24

25

**I N D E X**

| | PAGE |
|---|---|
| PROCEEDINGS | |
| DISCUSSION RE PROPOSED JURY INSTRUCTIONS | 725 |
| DEFENSE CASE-IN-CHIEF RESUMED | 763 |
| DISCUSSION RE PROPOSED JURY INSTRUCTIONS AND SPECIAL VERDICT FORM | 825 |

**CHRONOLOGICAL INDEX OF WITNESSES**

| DEFENDANTS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| CLARENCE CHAPMAN | | 764 | 823 | | | 4 |

**ALPHABETICAL INDEX OF WITNESSES**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| CHAPMAN, CLARENCE | | 764 | 823 | | | 4 |

1    LOS ANGELES, CALIFORNIA; MONDAY, MARCH 12, 2018; 1:22 P.M.

2                              -oOo-

3        *(The following was held outside the jury's presence:)*

4            THE CLERK:  Please be seated.

5    DISCUSSION RE JURY INSTRUCTIONS AND SPECIAL VERDICT FORM

6            THE COURT:  All right.  Let's try to go through

7    these instructions.

8            Have the parties had a chance to review the

9    closing instructions and special verdict form that we

10   provided before the lunch break?

11           Mr. Galipo?

12           MR. GALIPO:  Closing instructions, yes.  If there

13   was a special verdict form, somehow it didn't get to me.  I

14   apologize.

15           THE COURT:  Okay.  So if we can, we'll make sure

16   we'll get that to you.

17           Mr. Ewing?

18           MR. EWING:  Yes.

19           MR. GALIPO:  It has now gotten to me.  All right.

20           THE COURT:  So let's talk about the instructions

21   first.  I suppose probably the most efficient way to deal

22   with it is to see whether our disputes are issues that

23   either side wishes to raise.

24           Mr. Galipo, do you want to go first and tell me

25   where you have any issues or concerns or --

1          MR. GALIPO:  Well, I could say that Instructions 1

2     through 5 are appropriate instructions.  6, evidence for a

3     limited purpose, I don't recall if we had any.

4          THE COURT:  I don't think if we did but that's why

5     I posed the question.

6          MR. GALIPO:  I would say that we don't need it at

7     this point in time unless something changes.

8          THE COURT:  All right.  Let me ask.

9          Mr. Ewing, do you have a position with respect to

10    that specific instruction?

11         MR. EWING:  I agree that we don't need 6.

12         THE COURT:  We'll delete that.  Okay.

13         MR. GALIPO:  7, 8, 9, 10, appropriate.  11, the

14    Court has a note, keep or delete.

15         THE COURT:  On the opinion testimony of lay

16    witnesses.  I just can't recall.  Did we have any lay

17    witnesses that provided any opinions?

18         MR. GALIPO:  I guess it depends how you define it.

19    Because we did have Kelsey testify and we did have Dickey

20    testify.  I don't know if they -- they weren't designated as

21    experts but they kind of gave opinions as to what they

22    observed.

23         Whether they were technically opinions or not as

24    opposed to observations and impressions, I think is somewhat

25    vague.  But you'll remember Dickey was the first responding

```
 1    officer.
 2              THE COURT:  Right.
 3              MR. GALIPO:  And Kelsey was the Citizen on Patrol.
 4    That's what I could think of.
 5              THE COURT:  Right.  I guess my question is that
 6    did they provide any opinions or did they just indicate what
 7    they observed?
 8              MR. GALIPO:  I think the latter.
 9              THE COURT:  All right.
10              MR. GALIPO:  So I don't think we really need it.
11              THE COURT:  Mr. Ewing, you're standing so I assume
12    you have a position with respect to this instruction.
13              MR. EWING:  I agree with counsel.
14              THE COURT:  All right.
15              MR. EWING:  We don't need 10.
16              THE COURT:  Okay.  So we will delete the
17    instruction involving opinion testimony of lay witnesses.
18              What about 13?
19              MR. GALIPO:  I would propose that we keep it.
20              THE COURT:  Okay.
21              Mr. Ewing, do you have a differing position?
22              MR. EWING:  A moment, please.
23              THE COURT:  Sure.
24                  (Pause in the proceedings.)
25              MR. EWING:  12 and 13 are fine.
```

```
1          THE COURT:   No.   13, about stipulations of fact.
2          MR. EWING:   No problem.   That's acceptable.
3          THE COURT:   All right.   So we'll keep that.
4     All right.   What about 16?
5          MR. GALIPO:   Oh, I have a question on 15.
6          THE COURT:   15.   Okay; great.
7          MR. GALIPO:   So this is proposed Instruction 15.
8     I realize the numbers are going to change.   This is
9     currently on page 17.
10         THE COURT:   Correct.
11         MR. GALIPO:   So my question -- I know this is an
12    introductory instruction for the 1983 claims and I think it
13    is appropriate.
14         The question that came to my mind whether or not
15    in the introductory paragraph we want to include the claims
16    for unreasonable detention, arrest without probable cause,
17    and excessive force as opposed to just excessive force.
18         I think the way it's worded now is certainly
19    appropriate as a preliminary instruction to an excessive
20    force case and we have that.   I just didn't know whether or
21    not we should include the other 1983 claims or not in this
22    introductory instruction.
23         THE COURT:   It would seem to me perhaps we should
24    just to be complete.
25         Mr. Ewing, do you have a position with respect to
```

1  that?

2          MR. EWING:  I don't.  I don't have an objection to

3  including those claims.

4          THE COURT:  So we'll add the additional 1983

5  claims in that introductory paragraph as well.

6          MR. GALIPO:  Right.  And then I didn't know,

7  assuming we do that, whether in the, you know, lines 21, 22,

8  23, whether we should say "on that claim" or "on those

9  claims."  So whatever.  Either way.

10         THE COURT:  Right.  I think it should be -- it

11 should match.  It should be if we have a number of claims on

12 those claims.

13         MR. GALIPO:  Yes.  So --

14         THE COURT:  All right.  Okay.

15         MR. GALIPO:  So I'm up to 16?

16         THE COURT:  Yes.

17         MR. GALIPO:  I think in terms of lines 22 and 23

18 it would be appropriate to say a person, you know, you seize

19 another person.  I don't know if we have to particularize

20 this to Mr. Pickett or not.  I thought this was just a

21 general statement of the law.

22         THE COURT:  That was my perception or assumption

23 as well.

24         Mr. Ewing, do you have any thoughts with respect

25 to that instruction?

1    MR. EWING:  I agree that a defendant seizes

2  another person and so on and so forth.  So I agree with the

3  deletion of Mr. Pickett's name.

4    THE COURT:  Okay.  So then I will keep that.

5    All right.  17?

6    MR. GALIPO:  From the plaintiff's perspective we

7  think it's appropriate.

8    THE COURT:  All right.

9    Mr. Ewing?

10    MR. EWING:  I have no objection.

11    THE COURT:  All right.  18.

12    Mr. Galipo?

13    MR. GALIPO:  Yes.

14    THE COURT:  So this, in essence, we have

15  combined -- well, I tried to combine both parties'

16  positions.

17    I think, Mr. Galipo, you indicated that if there

18  was going to be language regarding the obstructing and

19  resisting, et cetera, that there should be language that

20  talks about if the force is unreasonable, then someone can

21  defend him or herself.

22    MR. GALIPO:  Correct.  And did I miss that?

23  Because --

24    THE COURT:  Look on line -- on page 23, line 12

25  through 14.

1          *(Pause in the proceedings.)*

2          MR. GALIPO:  Okay.  That's fine.  And I just --

3    the only concern I had, the way it reads, so if you look at

4    page 22, lines 21 through 25, and then 23, lines 1 through

5    3, I was thinking that that language should follow those.

6          It seems to -- in other words, lines 5 through 8

7    we talk about the identification issue.  I just want to make

8    sure the jury understands to the extent they think

9    Mr. Pickett was using any force, if we're giving them those

10   two laws on that, I thought that maybe we could take lines

11   12 through 14 and move it up, if you will, to follow the two

12   instructions on the violation of the law just so the jury

13   will consider that together.

14         THE COURT:  Let me at least share with you the

15   thinking behind it is, look, we outline what the state laws

16   are.  Okay?  So one, two, three.

17         And then we say an unlawful detention is not a

18   lawful performance of a police officer's duties.  So if a

19   police officer uses unreasonable force, the arrestee can use

20   reasonable force to protect.

21         But, you know, that was at least the thinking if

22   your proposal would be to put lines 12 through 13 on page 23

23   beneath line 3 on that same page.

24         MR. GALIPO:  Well, yes.  I understand the Court's

25   thinking and I think there's good logic to that.  I just

1    want to make sure the jurors are able to put those two

2    concepts together.

3           So if the concept is, you know, you can't resist

4    an officer or use any force unless the officer is using

5    unreasonable force against you; and I was just hoping to tie

6    it up.  Now, I --

7           THE COURT:  Just so I can follow your thinking,

8    then would you also say that line 10 needs to be moved up?

9    Or -- because line 10 on page 22 talks about an unlawful

10   detention is not a lawful performance of an officer's duty.

11          Although I guess maybe -- no.  I guess that should

12   probably remain.

13          MR. GALIPO:  I'm okay with that remaining.

14          THE COURT:  All right.

15          MR. GALIPO:  So I think the wording of the

16   instruction is fine perhaps moving that up or combining

17   it --

18          THE COURT:  After line 3.

19          MR. GALIPO:  Yes.  And then I have one other

20   comment on this instruction.

21          THE COURT:  Yes.

22          MR. GALIPO:  So on 18, it's a crime to trespass on

23   private property.  Again, I'm not so sure the jury has the

24   definition of trespassing or knows what that even means

25   because clearly people, you know, walk into motel parking

1   lots.

2          And it could be to do anything from rent a room to

3   visit someone who's staying at the motel or maybe they're

4   staying there or have friends.

5          So I just don't want to give the jury the

6   misconception that walking into a motel parking lot is

7   trespassing in and of itself.

8          THE COURT:  Well, I can appreciate the concern but

9   I don't think, based on the testimony, that's going to be an

10  issue because I think there was testimony to say that he had

11  a room key to that location.

12         MR. GALIPO:  Right.  Okay.  So that's my comments

13  with respect to that instruction.

14         THE COURT:  Mr. Conaway.

15         MR. CONAWAY:  A suggested clean-up would be

16  perhaps that he has no right to be there.

17         THE COURT:  I'm sorry.

18         MR. CONAWAY:  It's a crime to trespass on private

19  property where a person has no right to be there.

20         THE COURT:  All right.  Let me think about that.

21         Mr. Ewing?

22         MR. EWING:  My thought on the formatting, it

23  sounds like you're considering is that the law should be set

24  forth as they are on page 22 beginning at line 22 -- line

25  21; and then on page 23, beginning at line 1 and then

1    beginning at line 5.

2              And then following with 18, I believe, on page 23,

3    should be moved up to be formatted with all of the laws and

4    then the portions that are highlighted at line 23 and line

5    12 should follow those laws.

6              That's the formatting that the defense would

7    recommend.

8              THE COURT:   But you said line 23?

9              MR. EWING:   Page 23, line 10, and page 23, line

10   12, the highlighted portion.   It's --

11             THE COURT:   You're saying that should remain and,

12   if anything, move "under State law it is a crime to trespass

13   on private property" up beneath "the falsely representing."

14             MR. EWING:   Yes.

15             THE COURT:   Yes.   I actually think -- I think

16   that's the way the jury instruction is designed and I don't

17   think it is unnecessarily confusing.

18             And, I mean, Mr. Galipo, I mean look.   I've seen

19   you at your -- in your craft.   You are going to adequately

20   explain to the jurors this instruction so I don't think that

21   there's going to be confusion.

22             I worry about putting -- if the language of 12 and

23   13 sort of in the middle when we're articulating all of the

24   laws at issue.

25             MR. GALIPO:   That's okay, Your Honor.   I'll be

1    able to argue it adequately.

2         THE COURT:  All right.  So then we're going to

3    move "under state law it is a crime to trespass on private

4    property," line 18, to basically where line 10 is.

5         MR. GALIPO:  But I would at least -- that's fine.

6    But I would join in Mr. Conaway's request "if you have no

7    right to be there."  Because I think that is an accurate

8    statement of the law.  You can't trespass on property if you

9    have a right to be there.

10        THE COURT:  So the proposal "It is a crime to

11   trespass on private property where you have no right to be

12   there."  Is that the proposal?

13        MR. GALIPO:  Yes.

14        MR. CONAWAY:  I join in that amendment.

15        THE COURT:  Mr. Ewing, your thoughts?

16        MR. EWING:  "It is a crime to trespass on private

17   property where you have no right to be there."

18        THE COURT:  That is the proposal.

19        MR. EWING:  No objection.

20        THE COURT:  Okay.  "Have no right to be" I guess

21   is really grammatically correct.  "No right to be."

22        MR. GALIPO:  Yeah.

23        THE COURT:  So we'll put that language in.  We'll

24   move that up so it has all the laws.  Then followed by the

25   gray edits where "unlawful detention" and "if a police

1    officer uses unreasonable force."  All right.

2              19.

3              MR. GALIPO:  We are fine with 19.  The only -- is

4    No. 10, I take it that's from the Ninth Circuit 9.25?

5              THE COURT:  I believe that is from 9.25.  I left

6    it in my chambers, unfortunately.  Let me doublecheck if I

7    have an extra copy here.

8              MR. GALIPO:  If that's part of the model, then I'm

9    fine with it.  I just couldn't remember because I know they

10   changed it recently.

11             THE COURT:  Yeah.  Actually 9.25, it is actually

12   No. 12.  Whether there was probable cause for a reasonable

13   officer to believe that the suspect had committed a crime;

14   and it has involving the infliction or threatening

15   infliction of serious physical harm.

16             I put in simply whether the suspect had committed

17   a crime, period.

18             MR. GALIPO:  I'm agreeable to the instruction as

19   proposed.

20             THE COURT:  All right.

21             And, Mr. Ewing, I'll give you a chance as well so

22   have no fear.

23             Number 20.

24             MR. GALIPO:  So here's my question with respect to

25   -- first of all, I think the instruction as stated is

1    appropriate.

2              THE COURT:  All right.

3              MR. GALIPO:  I think it may have been used in a

4    recent case in this Court and it's a correct statement of

5    the law.

6              The question that I have that I wanted to share

7    with Your Honor and counsel is that in the damage phase,

8    which we're not there and we don't know if we're going to

9    get there or not, the two categories of damages are wrongful

10   death and survival damages.

11             THE COURT:  Right.

12             MR. GALIPO:  In the Fourteenth Amendment claim, if

13   we prevailed on it, would entitle us to wrongful death

14   damages, in essence, not survival damages.

15             THE COURT:  Right.

16             MR. GALIPO:  So because we have battery and

17   negligence, which are wrongful death claims --

18             THE COURT:  Right.

19             MR. GALIPO:  -- if we find unreasonable force, the

20   plaintiffs get wrongful death damages based on their

21   battery/wrongful death claim and they would also with the

22   negligence claim and therefore I'm not so sure we need this

23   because it's a different standard, it's a different

24   question, it's a different instruction and it really doesn't

25   get us any other damages that we would get if there was a

1    finding of unreasonable force because we get the wrongful

2    death damages anyway under the battery claim.

3            So if we're all on the same page on that, I might

4    be willing to talk to my clients about withdrawing this

5    claim.  If we're not and someone thinks that I need this to

6    get wrongful death damages -- and I don't think that's the

7    case -- then I think the instruction is a correct statement

8    of the law.

9            THE COURT:  All right, Mr. Ewing, there's a lot

10   there to digest; and in fairness, I mean, you're sort of the

11   odd man out because we just had this issue litigated in the

12   trial just two weeks ago on this issue about wrongful death

13   and the damages that you get from it.

14           So do you need some time to think about that one?

15           MR. EWING:  No, and I certainly heard what counsel

16   proposed and I'd be certainly open to counsel's proposal

17   that if they eliminate that claim altogether, then the

18   defense could live with the instruction.

19           THE COURT:  So then I just want to make sure.

20   Let's get it on the record, Mr. Galipo.  You would dismiss

21   what claims in order to not -- or do you need to dismiss any

22   claims to moot this instruction?

23           MR. GALIPO:  I don't think we need to dismiss any

24   claims but I just want to make sure.  It's important to me

25   that the Court and counsel are in agreement that if the jury

1   finds unreasonable force, which is part of the battery
2   claim --
3           THE COURT:  Right.
4           MR. GALIPO:  -- and it was a cause of death, then
5   we're entitled to wrongful death damages.
6           And I believe if that's the case and one could
7   argue that this Fourteenth Amendment standard is a different
8   standard and arguably a higher standard than that, then I
9   don't know that I need it because it doesn't get me any
10  extra damages.
11          Now, I don't want to dismiss it and have someone
12  argue later on in the damage phase:  Well, you're not
13  entitled to wrongful death damages and you should have never
14  dismissed it and it was up to you to dismiss it.
15          I don't think that's the law but I just want to
16  make sure we're all on the same page.
17          THE COURT:  What's your view on this, Mr. Ewing?
18          MR. EWING:  The proposed instruction that we're
19  considering, I have no objection to this instruction at all
20  so.
21          THE COURT:  Right.  But I think Mr. Galipo's point
22  is that he doesn't believe this instruction is necessary
23  because if he prevails on the unreasonable force, it gets
24  him the wrongful death damages and he doesn't need a finding
25  of shocking the conscience in order to get that.

| | |
|---|---|
| 1 | So his argument is, by and large, that this |
| 2 | instruction is not necessary, period. |
| 3 | MR. EWING:  Right.  And I respectfully disagree |
| 4 | with that.  It's taking away some of the defense's argument |
| 5 | and that's one of the reasons why we would advance that we |
| 6 | need this instruction. |
| 7 | We certainly intend to argue the standard that's |
| 8 | set forth in the instruction on whether or not it's been |
| 9 | proved in this case. |
| 10 | THE COURT:  But do you disagree with the notion |
| 11 | that if Mr. Galipo is able to prove the battery charges, |
| 12 | that he's entitled to wrongful death damages? |
| 13 | MR. EWING:  I don't disagree with that notion. |
| 14 | However, the defense wants the opportunity to argue the |
| 15 | standard that's set forth in this instruction. |
| 16 | THE COURT:  All right. |
| 17 | MR. GALIPO:  So I guess what it comes down to |
| 18 | then, as long as we're all on the same page there, I'll talk |
| 19 | to counsel and see if we're willing to withdraw it. |
| 20 | Because if we withdraw it and it's not given, I |
| 21 | don't think it would be proper to argue it if it's not |
| 22 | before the jury. |
| 23 | THE COURT:  Correct.  So I'm inclined to give it |
| 24 | unless the claim is withdrawn. |
| 25 | MR. GALIPO:  Understood. |

1        THE COURT:  All right.  Next Instruction 21.

2        MR. GALIPO:  Plaintiff is fine with it as phrased.

3        THE COURT:  All right.  22.

4        MR. GALIPO:  Again, with the Court's

5    modifications, we are fine with it but we agree with the

6    Court's modifying it and I think the rest can simply be

7    argued.

8        THE COURT:  Just so we're clear, as it relates to

9    line 14, that Nathanael Pickett II died, is that adequate or

10   do you want "died or suffered injury, damage, loss or harm

11   or death"?

12       MR. GALIPO:  Well, personally, my perspective is

13   since the battery and negligence claims are essentially

14   wrongful death claims, it should really be death.

15       I mean, that he died and that it was a substantial

16   factor in causing death.  I think that should be the same

17   for the battery and the negligence.

18       THE COURT:  All right.  So then I'm going to

19   delete the phrase "suffered injury, damage, loss, harm or

20   death" and just say that "Nathanael Pickett II died" and

21   then the next on line 17, that "the unreasonable force was a

22   substantial factor in causing Nathanael Pickett II's death."

23       MR. GALIPO:  Agreed.

24       THE COURT:  Okay.  23.

25       MR. GALIPO:  I think 23 is fine.  I don't know --

1    I don't think -- well, the false arrest claim clearly is
2    being presented under federal law.
3              THE COURT:  Right.
4              MR. GALIPO:  I don't think we have a separate jury
5    instruction on the false arrest claim under state law
6    because I think under State law in fact the defense has the
7    burden of proving the probable cause, so I think it should
8    just say "as it relates to plaintiff's state law claims or
9    state law claims for battery and negligence."
10             THE COURT:  And not false arrest.  I need to just
11   check.
12             MR. GALIPO:  I think it's in the pleading perhaps.
13   It may be in the pleading.  I don't have it in front of me.
14   It gets a little confusing because under state law, which is
15   a benefit to us I guess, the defense has to prove that they
16   have probable cause and arguably under federal law, we have
17   to prove that there was no probable cause.
18             So I think to give both instructions will be too
19   confusing to the jury so.
20             THE COURT:  And I thought it was pled as a state
21   law claim and in fact I think our final pretrial conference
22   even refers to the false arrest as a state law claim.
23             MR. GALIPO:  Well, I've had to look at that.  It
24   may be both under federal and state but I can doublecheck
25   that.

| | |
|---|---|
| 1 | THE COURT:  Okay. |
| 2 | MR. GALIPO:  Because the instruction we're giving |
| 3 | on is the federal instruction.  If it's just a state law |
| 4 | claim, then the instruction has to be modified because then |
| 5 | its defense would have the burden of proving probable cause. |
| 6 | Not us. |
| 7 | THE COURT:  All right.  So I need to look at that. |
| 8 | Okay.  All right. |
| 9 | MR. GALIPO:  And the same would apply to the next |
| 10 | instruction; and I might suggest, Your Honor, since the |
| 11 | negligence instruction which starts on page 32, Instruction |
| 12 | 25 -- |
| 13 | THE COURT:  All right. |
| 14 | MR. GALIPO:  -- also talks about substantial |
| 15 | factor, the Court might want to consider giving the two |
| 16 | causation instructions after battery and negligence. |
| 17 | THE COURT:  But wait.  Walk me through exactly |
| 18 | what you're asking. |
| 19 | MR. GALIPO:  Okay.  So if you look at Instruction |
| 20 | 25 on page 32 -- |
| 21 | THE COURT:  All right. |
| 22 | MR. GALIPO:  -- we have the same issue obviously |
| 23 | which should be death. |
| 24 | THE COURT:  So -- |
| 25 | MR. GALIPO:  So really that should say that |

1    Deputy Woods was negligent and we just really need two

2    factors and the negligence was a substantial factor in

3    causing Nathanael Pickett II's death.

4                THE COURT:   Okay.

5                MR. GALIPO:   Now, if you notice, substantial

6    factor is used in that negligence instruction.

7                THE COURT:   Right.

8                MR. GALIPO:   So the Court may want to consider

9    giving the definition of substantial factor following the

10   two liability instructions so they get battery, they get

11   negligence, and then they get causation.

12               It really doesn't matter.   It's just a suggestion.

13   Right now you have the causation instructions in between

14   battery and negligence.   Either way, it's okay.   But maybe

15   it makes sense to give them liability and then give them

16   causation right after this.

17               THE COURT:   Okay.   I think we can make that

18   change.

19               MR. GALIPO:   And then 26 we're fine with.   27 is

20   fine but I don't think the language from 13 to 15 should

21   remain in because it talks about reducing damages by the

22   percentage of comparative fault; and they're not even being

23   instructed on damages at this point.

24               Lines 13 through 15 on proposed Instruction 27, I

25   think, should be deleted.

```
 1          THE COURT:  And do we not ask for a percentage in
 2   this?
 3          MR. GALIPO:  We can ask for a percentage; but when
 4   you say the plaintiff's damages are reduced, they're going
 5   to have all kinds of questions.  What damages are we
 6   referring to?  Why aren't we being asked about damages?
 7          THE COURT:  Maybe this should be deferred to a
 8   damages phase if there is one.
 9          MR. GALIPO:  Correct.
10          THE COURT:  Okay.
11          MR. GALIPO:  Just lines 13 through 15.
12          THE COURT:  All right.
13          MR. CONAWAY:  It's on Question 12 of the special
14   verdict form.  It's covered.
15          THE COURT:  Okay.  All right.
16          MR. GALIPO:  Again, I'm fine with 28; but if we're
17   going to be consistent, we probably need to say that the use
18   of unreasonable force or the use of force was a substantial
19   factor in causing his death rather than harm.
20          THE COURT:  Hold on.  What lines?  Oh, okay.
21          MR. CONAWAY:  18.
22          THE COURT:  So we would delete 18.
23          MR. GALIPO:  Correct.
24          THE COURT:  That Deputy Woods' use of force was a
25   substantial factor in causing Nathanael Pickett's death.
```

1          MR. GALIPO:  Correct.

2          THE COURT:  Okay.

3          MR. GALIPO:  And the rest of it we're fine with.

4    We're fine with -- 29, as I understand it, just so the

5    record is clear, that's being requested by the defense.  The

6    self-defense instruction.

7          THE COURT:  Right.

8          MR. GALIPO:  And so we think it's appropriately

9    worded.

10          THE COURT:  Right.  The question I have that I

11    want to discuss with you all, is it that plaintiff's harm

12    was because they were acting in self-defense and in defense

13    of another or is it just self-defense?

14          And the reason why I ask that is that I heard

15    Mr. Graham talk about defense, defense of others.  I can't

16    recall -- and, obviously, Mr. Ewing, you'll assist me in

17    this -- whether there was testimony from the deputy about

18    self-defense of others.

19          MR. GALIPO:  I don't recall any.

20          THE COURT:  I have -- my memory is a little fuzzy

21    on that point and so that's the reason why I asked, why I

22    wonder if that shaded language would be appropriate.

23          I seem to recall some mention of others but I

24    can't remember if it was in the context of what our police

25    training is or was it related to the specific facts in this

1   case.

2            And look.  We're talking about if there was

3   another, it would be either Kelsey or others in the

4   vicinity.  I just -- I don't have a strong recollection

5   about it.

6            But, Mr. Ewing, you want to assist us at this

7   point if you have any input?

8            MR. EWING:  Sure.  My recollection is that during

9   his testimony Kyle said that he was concerned for his own

10   safety and that of Bill Kelsey, that is, if --

11            THE COURT:  Specifically Kelsey or was it just

12   others?

13            MR. EWING:  Bill Kelsey.  Because he said, if I

14   recall, if Nate succeeded in knocking me out, he could get

15   my gun and potentially kill me and go after Bill or kill

16   Bill.

17            THE COURT:  Okay.

18            All right.  Look, I think in the abundance of

19   caution, I think we do keep it in.  I don't think there is

20   any undue prejudice by keeping "and defense of another" in

21   there because the topic was discussed, I think, buy both

22   experts.

23            MR. GALIPO:  I understand, Your Honor.

24            THE COURT:  All right.

25            MR. GALIPO:  So --

1          THE COURT:   What about -- I'm sorry.

2          MR. GALIPO:   30 is fine.   31 is fine.   32.   So 32

3    is the Bane Act.

4          THE COURT:   I'm sorry.   I just want to be sure.

5    Let's go to 30 if we could.   That was language that I

6    proposed.   I just want to make sure the parties are

7    comfortable, specifically lines 9 through 12.

8          You're okay with --

9          MR. GALIPO:   I am.

10         THE COURT:   Okay.   Perfect.   And I'll give

11   Mr. Ewing a chance in a moment.   So all right.

12         What now?   You want to jump to what instruction?

13         MR. GALIPO:   I'm up to 32.

14         THE COURT:   32.   Okay.

15         MR. GALIPO:   So this is a state claim under the

16   Bane Act which is Civil Code Section 52.1.

17         THE COURT:   Right.

18         MR. GALIPO:   Generally the courts have held, both

19   the Ninth Circuit and the State Court of Appeals, both in

20   published decisions, that is a violation of the Constitution

21   including using excessive force is an automatic violation of

22   the Bane Act.

23         And, again, I'm not so sure we need this because,

24   from my perspective, if they find the force was excessive or

25   unreasonable, that's going to satisfy the Fourth Amendment

1    excessive force claim, the battery claim, and the Bane Act
2    claim.
3           And although there are some other damages you
4    could potentially get under the Bane Act, I'm just wondering
5    whether we need it or not because if we're going to keep it
6    in, then we need a question on the verdict form.
7           I don't think currently there's a separate Bane
8    Act question on the verdict form, although I do think the
9    evidence supports this finding under the facts of this case.
10          So maybe I can doublecheck with my clients on this
11   one when I'm talking to them about the Fourteenth Amendment
12   to see if we still need this.
13          THE COURT:  Okay.  Why don't you do that?
14          MR. GALIPO:  And then the rest of the
15   instructions, Your Honor, I believe I'll doublecheck, are
16   concluding instructions and we have no objection to those.
17          THE COURT:  Mr. Conaway, is there anything you
18   want to --
19          MR. GALIPO:  There's one instruction that I didn't
20   see but maybe I missed it.
21          THE COURT:  All right.
22          MR. GALIPO:  So currently the way the verdict form
23   is set up, the last question is the predicate question to
24   punitive damages.
25          THE COURT:  Right.

1          MR. GALIPO:  It just asks, "Do you find that the

2    conduct of Deputy Woods was malicious or oppressive or done

3    in reckless disregard of the decedent's rights?"

4          THE COURT:  Right.

5          MR. GALIPO:  And what we had proposed and maybe

6    I'm missing it, it's just what those definitions were.

7    Conduct is malicious if X --

8          THE COURT:  Oh.

9          MR. GALIPO:  -- oppressive Y, and reckless

10   disregard.  Just so if they have to answer that question,

11   they'll have something in the instructions guiding them on

12   the definitions.

13         THE COURT:  Let me look at that one.

14         MR. GALIPO:  And we did propose something on that

15   one and we could resubmit it or hand a copy if we need to.

16         THE COURT:  I may have made the error on that

17   front.  But I'll look at that issue as well.

18         All right.  Mr. Conaway?

19         MR. CONAWAY:  Number 32, on behalf of my client I

20   believe it should stay in.

21         THE COURT:  I'm sorry.  Instruction 32?

22         MR. CONAWAY:  Instruction 32 on the Bane Act, yes.

23         THE COURT:  And I'm sorry.  What is your position?

24         MR. CONAWAY:  Position it should stay in.  I'm

25   satisfied with the language that's there.

1          THE COURT:  Well, now, just to be clear, I think

2     based on the prior comments if we keep this in we need to

3     change the language to delete No. 2 and then put in that

4     "Deputy Woods' conduct was a substantial factor in causing

5     Nathanael Pickett's death."

6          MR. CONAWAY:  I don't agree with that as to the

7     Bane Act because there were blows, there were injuries

8     sustained prior to his death.

9          THE COURT:  So you would say that the language as

10    proposed would be fine only as it relates to the Bane Act?

11         MR. CONAWAY:  Correct, Your Honor.

12         THE COURT:  Is there any concern that that might

13    run the risk of some confusion between those two claims

14    where in one claim we're saying "causing the death" and

15    another claim we're saying just "causing harm."

16         MR. CONAWAY:  Well, the separate instruction, the

17    special instruction is addressed as to the Bane Act.  I

18    don't see where that would be a problem.

19         THE COURT:  Mr. Galipo?

20         MR. GALIPO:  Yeah.  I'll discuss it with

21    Mr. Conaway.  I do agree with him that the Bane Act similar

22    to the Fourth Amendment is a survival claim and the harm

23    language is actually correct.

24         THE COURT:  All right.  Okay.

25         Mr. Ewing?

1            MR. EWING:  Thank you, Your Honor.

2            I took notes and opined a bit as we went through

3    these.  I don't have a strong objection or even a weak

4    objection to what we've covered thus far and the other

5    homework that opposing counsel will do with respect to the

6    predicate question punitive damages instruction.

7            THE COURT:  All right.  Okay.

8            So then what I'm going to do in the next five to

9    ten minutes or maybe a little longer is -- let me take a

10   recess, try to reconfigure some of these instructions, get

11   another copy out to you all and, hopefully, finalize these

12   instructions.

13           Mr. Galipo?

14           MR. GALIPO:  Yes.

15           The only other comment I would like to make is --

16   and, again, to the extent I know the Court is considering

17   the timing for this afternoon, in going over my notes from

18   Mr. Chapman, I'm probably going to be an hour and maybe

19   slightly over in my cross and then I know there's going to

20   be some time for redirect.

21           THE COURT:  And let me just stop you there.

22           Look, take as much time as both sides need.  I did

23   not mean to suggest by the sidebar that I was trying to

24   curtail the examination.  It's just he had made a

25   representation it was 40 minutes; I knew it was longer.

1          I wanted to figure do we go and finish at least

2     part of it before lunch or not?  Whatever time you need is

3     whatever time you need.  If we need to go into tomorrow,

4     we'll go into tomorrow.  I mean, so --

5          MR. GALIPO:  I understand.  Thank you, Your Honor.

6     Because -- yes, that's all I wanted to say on that.

7          THE COURT:  All right.

8          With respect to the special verdict form, I

9     guess -- I guess it was -- I mean, Mr. Ewing you had

10    proposed a special verdict form that I don't think it's on

11    the docket but I think it was given to my court clerk that

12    based on the prior rulings on the instructions, I'm not

13    inclined to give the proposed language that you have

14    proposed.

15         I believe it's from the defense with respect to

16    Questions 1 and 7.  But I want to know apart from that, have

17    you reviewed the special verdict form that I provided you

18    all at lunch prior to lunch and do you have any vehement

19    objections or issues that you wish to bring to the Court's

20    attention with respect to the special verdict form?

21         MR. EWING:  I have reviewed the special verdict

22    form provided to me just before lunch and I have no

23    objections to that form.

24         THE COURT:  Okay.  All right.

25         Mr. Conaway, do you have any objections to the

1    special verdict form?

2         MR. CONAWAY:  As I reviewed it, no.

3         THE COURT:  All right.  And Mr. Galipo?

4         MR. GALIPO:  I'm reading it as we speak, Your

5    Honor.

6         THE COURT:  All right.

7         MR. GALIPO:  Could I have just one second?

8         THE COURT:  Yes.  Use your Evelyn Woods

9    speed-reading skills at this time; and for you youngsters

10   they probably don't even remember what that is.  It's an old

11   speed-reading class in my younger days.

12        MR. CONAWAY:  Evelyn Woods.

13        THE COURT:  Right.

14        MR. CONAWAY:  Yes.

15        MR. GALIPO:  So, again, depending on what we

16   decide with the Fourteenth Amendment claim, we may or may

17   not need Question 7.  So I'll figure that out because that's

18   the Fourteenth Amendment question.

19        THE COURT:  Right.  And, again, I don't want to

20   put a time crunch on you; but when do you think you'll be

21   able to find that out?  Well, I guess with respect -- well,

22   the reason I ask is that I would like to at least conclude

23   testimony and instruct the jury today.

24        MR. GALIPO:  Absolutely.

25        THE COURT:  So I would need any proposed changes.

1          MR. GALIPO:  Is it my understanding that the Court

2     is going to take five or ten minutes after we finish our

3     discussion to review this?

4          THE COURT:  Right.

5          MR. GALIPO:  I'll try to find out right during

6     that time.

7          THE COURT:  Okay; great.

8          And, Mr. Galipo, if you could -- the one

9     instruction that I wasn't sure about, I need a little

10    clarification.

11         Instruction No. 15, you had proposed some

12    additional language or --

13         MR. GALIPO:  Let me grab that.  What page is it

14    on, Your Honor?

15         THE COURT:  On page 17.  This is the 1983 claims

16    against the defendant.

17         MR. GALIPO:  Oh, okay.

18         So, essentially, it would say:  "In order to

19    prevail on their 1983 claims," plural, "for unreasonable

20    detention," comma, "arrest without probable cause," comma,

21    "and excessive force."

22         THE COURT:  All right.

23         MR. GALIPO:  And then when we say "that claim" on

24    lines 21 and 23, I think they should be "those claims"; and

25    when we say "they are required to prove under the

1    instructions for excessive force" on line 21, we'd have to

2    put in again "unreasonable detention and arrest without

3    probable cause" just to be consistent.

4              THE COURT:  All right.

5              Mr. Ewing, how does that sound?

6              MR. EWING:  I would propose to eliminate the two

7    words "in order" so as to start the sentence with "To

8    prevail on their Section 1983 claims for" --

9              THE COURT:  Okay.

10             MR. EWING:  And you have a competing description

11   of two actions, and I would recommend that we harmonize the

12   two.  One is called the unreasonable detention and the other

13   one is called arrest without probable cause.

14             Well, the detention requires reasonable suspicion.

15   So do you want to say "a detention without reasonable

16   suspicion" to be consistent with the "arrest without

17   probable cause" or do you want to say "unreasonable

18   detention" and then "unreasonable arrest"?

19             Those would be like the two comments that I have

20   on those two to harmonize that sentence and hopefully make

21   it flow a little more smoothly and be more understandable.

22             THE COURT:  Mr. Galipo, any thoughts on that?

23             MR. GALIPO:  I'm flexible if we can put

24   "unreasonable detention" and "unreasonable arrest," I think

25   they'll get the general idea.

1        THE COURT:  Okay.  All right.

2                *(Pause in the proceedings.)*

3        THE COURT:  All right.  Okay.  So anything further

4   that we need to discuss or any objections that either side

5   wishes to -- any further objections that either side wishes

6   to make at this time?

7        Mr. Galipo?

8        MR. GALIPO:  No, Your Honor.

9        THE COURT:  All right.

10       Mr. Ewing?

11       MR. EWING:  No, Your Honor.

12       THE COURT:  All right.  So let me take this back

13  for a moment, work on this; and then, Mr. Galipo, if you

14  could confer with your clients and then advise our courtroom

15  clerk as to any answers if you get any answers with respect

16  to the claims so that we can act accordingly.

17       All right?

18       MR. GALIPO:  Yes, Your Honor.

19       THE COURT:  All right.  Thank you all.

20       THE CLERK:  All rise.

21       This Court is in recess.

22                     *(Recess.)*

23    *(The following was held outside the jury's presence:)*

24       THE CLERK:  All rise.

25       This United States District Court is once again in

1    session.   Please be seated.

2             THE COURT:   All right.   Counsel, hopefully you

3    have some positive news.

4             MR. GALIPO:   I don't know if it's positive or

5    negative but I do have some news.

6             THE COURT:   Okay.

7             MR. GALIPO:   So having discussed the Fourteenth

8    Amendment issue with the clients and explaining to them our

9    ability to get wrongful death damages under the battery

10   claim, we are agreeing to withdraw the Fourteenth Amendment

11   claim.

12            THE COURT:   To withdraw.   Okay.   So let's figure

13   out what that means exactly.

14            MR. GALIPO:   Well, it means two things.   It would

15   mean withdrawing the instruction.

16            THE COURT:   So wait.   Instruction -- hold on.   I

17   just want to -- what instruction number?

18            MR. GALIPO:   Let me see if I can find it, Your

19   Honor.   I think it's Instruction 20 on page 26.   I'm going

20   off the old numbering.

21            THE COURT:   Right.   Okay.

22            All right.

23            MR. GALIPO:   And it would also mean taking out

24   Question 7 on the verdict form.

25            THE COURT:   All right.

1              MR. GALIPO:  But because we want to keep -- we're

2      going to keep the Bane Act in, we have drafted a question to

3      replace 7 --

4              THE COURT:  Okay.

5              MR. GALIPO:  -- on the verdict form which would be

6      the Bane Act question.

7              THE COURT:  All right.  So let's -- so, Mr. Ewing,

8      I assume -- well, if they dismiss the claim, they dismiss

9      the claim.

10             So is there any position you take with respect to

11     dismissal of that interference with familial relationship

12     claim?

13             MR. EWING:  No.

14             THE COURT:  And so do you concur with that claim

15     being dismissed, then Closing Jury Instruction No. 20 on the

16     original draft entitled "Fourteenth Amendment Interference

17     with Familial Relationship" should also be deleted?

18             MR. EWING:  I do.

19             THE COURT:  You concur.  All right.

20             And then do you further concur that Question 7 on

21     the verdict form also needs to be deleted?

22             MR. EWING:  Yes.

23             THE COURT:  All right.  Great.

24             So we will make those changes.

25             Now, what is your proposal for the question for

```
1    the Bane Act?
2              MR. GALIPO:  So just tracking the language of
3    Instruction 32 on page 40 -- let's see.  I think I'm getting
4    some help from Ms. Le here.  Thank you.
5              THE COURT:  Ms. Le to the rescue.
6              MR. GALIPO:  Yes.  Thank you.
7              "Did Deputy Woods violently cause harm to
8    Nathanael Pickett II to prevent him from exercising his
9    right from being unreasonably detained or arrested without
10   probable cause?"
11             And I would suggest that looking at Instruction
12   32, that it should just include "not to be unreasonably
13   detained or arrested without probable cause" under Item 1.
14   Just to be consistent.
15             THE COURT:  But keep No. 2 in line 10 "that
16   Nathanael Pickett" --
17             MR. GALIPO:  Yes, yes.  That has to be kept
18   because it is technically a survival claim under state law.
19             THE COURT:  So let me just read the question back
20   just so I'm clear.
21             "Did Deputy Woods violently cause harm to
22   Nathanael Pickett II to prevent him from exercising his
23   rights from being unreasonably detained or arrested without
24   probable cause?"
25             MR. GALIPO:  Correct.
```

1        THE COURT:  All right.  Have you had a chance to

2   discuss this with Mr. Ewing or Mr. --

3        MR. GALIPO:  I have not.  Not the wording of that

4   question.

5        THE COURT:  Do you want to take a moment,

6   Mr. Ewing?

7        MR. EWING:  Yes.  Thank you.

8        THE COURT:  Take your time.

9              *(Pause in the proceedings.)*

10        MR. EWING:  I'm ready, Your Honor.

11        THE COURT:  All right.

12        MR. EWING:  I don't have an objection to the

13   general phrase.  I would offer some wordsmithing again along

14   the same lines as the wordsmithing I offered before the

15   judge left -- Your Honor left the bench; and that would be

16   "from being unreasonably detained or unreasonably arrested."

17   And the reason for that is --

18        THE COURT:  Just to be consistent?

19        MR. EWING:  Yes.

20        THE COURT:  All right.  Any further changes?

21        MR. EWING:  No.

22        THE COURT:  All right.

23        So let's see.  Okay.  How does this sound?

24        "Did Deputy Woods violently cause harm to

25   Nathanael Pickett II to prevent him from exercising his

1   right not to be unreasonably detained or unreasonably

2   arrested?"

3           Do you want me to read that again, Mr. Galipo?

4           MR. GALIPO:  It's not necessary.  I heard it and

5   we would be okay with that language.

6           THE COURT:  Mr. Ewing?

7           MR. EWING:  I'm fine with this language.  Thank

8   you.

9           THE COURT:  So we'll use that language as Question

10  7 in the special verdict form.

11          All right.  Is there anything further as it

12  relates to jury instructions or verdict form?

13          MR. GALIPO:  No, Your Honor.

14          THE COURT:  All right.  Mr. Ewing?

15          MR. EWING:  No, Your Honor.  Thank you.

16          THE COURT:  So we'll continue to make the changes.

17  What I'm going to do is I'm just going to make sure we get

18  these changes going.  We'll bring the jury in.  We'll resume

19  cross-examination.

20          My hope is that after examination of the witness

21  I'll have the instructions.  We'll take a brief recess.

22  I'll give them to you all for final approval and then we'll

23  instruct the jury.

24          Probably -- you should be relieved, we probably

25  will not close today unless -- and this is key -- unless I

| | |
|---|---|
| 1 | get some indication from this jury that they want to stay |
| 2 | late this evening. |
| 3 | But if I don't get such an indication, we'll |
| 4 | instruct and then resume closing tomorrow morning.  All |
| 5 | right? |
| 6 | All right.  So let's take a five-minute recess |
| 7 | while I get this together and then we'll bring the jury in. |
| 8 | Thank you. |
| 9 | THE CLERK:  All rise. |
| 10 | This Court is in recess. |
| 11 | *(Recess.)* |
| 12 | THE CLERK:  All rise for the jury. |
| 13 | *(The jurors entered the courtroom.)* |
| 14 | THE CLERK:  Please be seated. |
| 15 | *(Pause in the proceedings.)* |
| 16 | THE CLERK:  All rise. |
| 17 | This United States District Court is once again in |
| 18 | session. |
| 19 | Please be seated. |
| 20 | DEFENSE CASE-IN-CHIEF RESUMED |
| 21 | THE COURT:  All right, Mr. Galipo, you may begin |
| 22 | cross-examination. |
| 23 | MR. GALIPO:  Thank you, Your Honor. |
| 24 | /// |
| 25 | /// |

**CROSS-EXAMINATION**

BY MR. GALIPO:

Q.    Good afternoon, Mr. Chapman.

A.    Good afternoon, Counsel.

Q.    How many times would you estimate you've had your deposition taken?

A.    Oh, in the neighborhood of 200 times.

Q.    And how about trial testimony?

A.    About the same.

Q.    And would you agree that in terms of trial testimony you're almost always retained in a police case by the defense?

A.    That is correct.  I'm retained by the defense.

Q.    And, in fact, every single time you've testified in court as a police practice expert in a civil case, with the possible exception of one time, has been for the defense, the police officer or police agency involved; is that true?

A.    Because they are my client.  They retain me.  That is a correct statement.

Q.    And so it's been approximately 199 times that you've testified in court on behalf of your client, the police agencies that retain you?

A.    I wouldn't say 199 but that's an approximation.  That's just because I'm not retained by the plaintiff.

Q.    Okay.  And in almost every one of those cases, there

1  was an allegation by either someone who survived or the

2  family members of someone who died that the officers used

3  excessive force; is that fair?

4  A.    No.   There are many other causes of action besides

5  excessive force and Fourth Amendment violations of civil

6  rights.

7  Q.    Don't the majority of those cases, Mr. Chapman, involve

8  allegations of excessive force?

9  A.    If it's a civil rights violation of the Fourth

10  Amendment, yes.  But I handle many other cases besides that.

11  Q.    My question is would you agree the majority of the

12  cases that you're retained on by your client involved

13  allegations of excessive force?

14  A.    That might be a fair statement, yes.

15  Q.    And is it also a fair statement, sir, that in every

16  single case that you've come to court and testified before a

17  jury like we have here today, your opinion has been the

18  force was not excessive?

19  A.    Yes, or I wouldn't come to court.

20  Q.    Right.   And in many of those cases people died.   Would

21  you agree with that?

22  A.    I wouldn't say many of those cases, no.

23  Q.    In many of those cases unarmed people were shot.   Would

24  you agree with that?

25  A.    I wouldn't say many of those cases.   There were some

1   cases that that was the fact pattern; correct.

2   Q.    Well, what would your estimate be of how many cases

3   unarmed people were shot?

4   A.    I don't really have an estimate.  I think the majority

5   of the cases that I handle that are in regards to excessive

6   force, there is no death involved.

7           I do handle what we call OIS cases,

8   officer-involved shootings where individuals are wounded but

9   I wouldn't say the majority of my cases or even many of my

10  cases are death cases.

11  Q.    But every single time there is an allegation of

12  excessive force, whether it's a shooting or some other types

13  of force and you have come to court to offer testimony, you

14  have testified every single time that the force was not

15  excessive; isn't that true?

16  A.    That is my opinion or I wouldn't be here.  I don't

17  choose my cases.

18  Q.    Well, isn't it true, sir, that in every one of those

19  cases when it's a civil case you're compensated for your

20  time?

21  A.    This is my livelihood.  This is how I make my living,

22  yes.  This is my job.  This is my work.  I'm compensated,

23  yes.

24  Q.    And how much per hour are you compensated for your

25  livelihood?

1    A.    Currently I charge $350 an hour.

2    Q.    And how many hours would you estimate you've worked on

3    this case?

4    A.    This case approximately 30 hours.

5    Q.    Now, who's paying you if you know?

6    A.    I would believe it would be the County of

7    San Bernardino but that's not my client.  My client is a

8    contract law firm.

9    Q.    You also charge $350 an hour for your time here in

10   court today?

11   A.    Yes.

12   Q.    Now, you indicated you went to the scene; is that

13   correct?

14   A.    That is correct.

15   Q.    And you wrote a report at some time in this case; is

16   that correct?

17   A.    Prior to going to the scene; correct.

18   Q.    Well, actually, when did you go to the scene?

19   A.    This past Saturday.

20   Q.    So in your report did you understand you were supposed

21   to include in there all the documents you had reviewed up to

22   that point in time?

23   A.    That is correct and that's what I did, yes, sir.

24   Q.    And also you're supposed to include all the opinions

25   you have up to that point in time?

1    A.    That is correct.

2    Q.    And then you had your deposition taken by me at some

3    point in this case; is that correct?

4    A.    That's correct.

5    Q.    And you understood you're supposed to get prepared for

6    a deposition and at the time of your deposition give all the

7    opinions and the bases for them at the time of the

8    deposition?

9    A.    And that's what I did, yes, sir.

10   Q.    Well, first of all, would you agree that at no time

11   before you wrote your report expressing all your opinions

12   did you go to the scene?

13   A.    That's correct.

14   Q.    And at no point up until the time your deposition was

15   taken by me did you go to the scene?

16   A.    That's correct.

17   Q.    In fact, I asked you at the time of your deposition if

18   you had gone to the scene and you told me no at that time;

19   correct?

20   A.    That is correct.

21   Q.    So how many hours did you spend from the time you left

22   your home going to Barstow and coming back when you went to

23   the scene on Saturday?

24   A.    Approximately 45 minutes at the scene, the

25   El Rancho Motel.

1    Q.    And how long was the trip up there?

2    A.    Oh, it was about two and a half hours.

3    Q.    And about two and a half hours back?

4    A.    A little longer.  It was heavy traffic but, yeah, about

5    two hours, 45 minutes back.

6    Q.    All together six or seven hours?

7    A.    Approximately, yes.

8    Q.    And you charged $350 an hour for that, didn't you?

9    A.    For my time in Barstow.  I charged mileage for the

10   actual trip.

11   Q.    Now, when was the last time you had made an arrest in a

12   police uniform?

13   A.    Approximately 2003.

14   Q.    Did you say that you studied some constitutional law

15   specializing in civil rights violations.

16   A.    At the University of Virginia under the auspices of the

17   Federal Bureau of Investigation in Quantico, Virginia.  It

18   was an elective course.

19         The academy lasts six months and students are free

20   to choose courses of their liking or what they would like to

21   be more instructed on.

22   Q.    And is it your understanding, Mr. Chapman, that

23   unreasonably detaining someone is a civil rights violation?

24   A.    Yes, it could be search and seizure, that's true.

25   Q.    And arresting someone without probable cause is a civil

1    rights violation?

2    A.    Could be a violation of search and seizure Fourth

3    Amendment; that's correct.

4    Q.    And using excessive force against someone is a civil

5    rights violation?

6    A.    Could be a civil rights violation, due process, yes.

7    Q.    Could be?  Isn't it by definition based on POST

8    standards and your understanding, if you unreasonably detain

9    someone, that is a civil rights violation, isn't it?

10   A.    Well, that's sort of what I do.  It depends on what the

11   evaluation of the illegal detention happens to be.  If it

12   falls outside the constructs of the Constitution which is

13   protected by civil rights, then yes, it would be a violation

14   but the mere allegation doesn't make it so.

15   Q.    Not the allegation.  But if someone is arrested without

16   probable cause, that is a civil rights violation; true?

17   A.    If that determination is made, that is true.  But that

18   would be made other than -- a trier of fact.

19   Q.    Right.  And the same thing with excessive force.  If

20   excessive force is used, that is a civil rights violation;

21   correct?

22   A.    If that is a finding of a trier of fact other than

23   myself, that would be self-evident.

24   Q.    Well, let's talk about the trier of fact for a moment.

25   The trier of fact in this case is the jury; isn't that true?

1    A.    That is true.

2    Q.    And isn't it also true that in any situation, whether a

3    detention was unreasonable, whether someone was arrested

4    without probable cause, or whether there was excessive

5    force, would depend on the facts?

6    A.    It would depend on the facts of the case; correct.

7    Q.    And the jury, as you understand it, decides the facts;

8    correct?

9    A.    The jury evaluates the facts, yes.

10   Q.    And decides the facts; correct?

11   A.    Some of the facts are decided that are contained in the

12   investigative materials that are submitted to me for review.

13   That review is then transmitted through my opinions to the

14   jury who is the trier of fact and they reach a conclusion as

15   to the validity of those facts.

16   Q.    Okay.  Well, let's talk about the validity of those

17   facts.  So one of the facts that you assumed in your report

18   was that Mr. Pickett forcefully punched with full-force

19   punches Deputy Woods in the face 10 to 20 times.

20            That's one of the facts you put in your report;

21   correct?

22   A.    That was transmitted to me by the statements of

23   Mr. Woods; that's correct.

24   Q.    And his sworn deposition testimony; true?

25   A.    That's what I'm referring to, yes.

1   Q.    Okay.   And you also put in your report you reviewed

2   other evidence to see whether or not some of the facts you

3   were given were supported by other evidence.

4           You recall writing that in your first page of your

5   report?

6   A.    Yes, I do.

7   Q.    Okay.   So I assume some of the evidence you looked at

8   were photographs of Mr. Woods face; is that correct?

9   A.    That's correct.

10          (The exhibit was displayed on the screen.)

11  BY MR. GALIPO:

12  Q.    All right.   And showing you Exhibit 28-2, you looked at

13  that photograph; correct?

14  A.    I have it here on the monitor, yes.

15          (The exhibit was displayed on the screen.)

16  BY MR. GALIPO:

17  Q.    28-1, you've seen that before; correct?

18  A.    Correct.

19          (The exhibit was displayed on the screen.)

20  BY MR. GALIPO:

21  Q.    15-13, the back of his head, you've seen that before?

22  A.    Correct.

23          (The exhibit was displayed on the screen.)

24  BY MR. GALIPO:

25  Q.    15-1, you've seen that before?

1    A.    Yes, I have.

2    Q.    Let me give you a hypothetical.  Assuming

3    hypothetically that Deputy Woods was never punched once

4    forcefully in the face not even one time, did you assume

5    that for a moment?

6    A.    I can assume that, Counsel.

7    Q.    Okay.  And in fact you don't see any punches landed by

8    Mr. Pickett to Deputy Woods' face in the video; isn't that

9    true?

10   A.    It's not discernible; that is true.

11   Q.    Well, are you aware that the defense has a video expert

12   Parris Ward?

13   A.    Yes, I'm aware of that.

14   Q.    You've work with him on other cases before; is that

15   correct?

16   A.    Yes, I have.

17   Q.    And you said you read his report if I understood your

18   testimony on direct; correct?

19   A.    I believe so, yes.

20   Q.    And are you aware that Mr. Parris Ward looked at every

21   single frame -- 27, 28 per second -- in reviewing this case?

22   A.    Yes.  I discussed that with Mr. Ward.

23   Q.    And are you aware that Mr. Ward, the defense video

24   expert, didn't see one punch, not one, by Mr. Pickett?  Are

25   you aware of that?

A.    I'm aware that he told me that but it was because of
mechanical failure of the video-recording device.

Q.    I see.   So all these 10 or 20 punches you're suggesting
you can't see not even one of them because of some
mechanical failure?  Is that your testimony?

A.    Counsel, we're talking about two different things.
We're talking about the sworn testimony of Deputy Woods and
we're talking about a mechanical recordation from a video
camera that has its inbred fallacies of recording frames per
second; and we all know that every one of those frames was
not captured on the video.   I'm going more for the sworn
testimony of Deputy Woods vis-à-vis his deposition.

Q.    Well, you're not suggesting, are you, in the one-second
gap or half-a-second gap that all these 10 to 20 punches
happened to occur during that half of a second?  You're not
suggesting that, are you?

A.    Counsel, I'm not suggesting that there was only
one-second-and-a-half gap.  I'm not a video expert.  But I
do know through testimony of Mr. Ward that the video camera
is flawed.

        Every video camera is flawed.   No video camera on
this planet can capture real-life moment.  Movement.  It all
has a deficit in its frame advance depending on the
sophistication of -- and the expertise of the material if
you will.

1    Q.   Well, let me ask you this.  In watching the video, do

2    you see multiple punches by Deputy Woods to Mr. Pickett?

3    A.   You could see that in the video, yes.

4    Q.   So those are visible?

5    A.   I could see those visible but more so because

6    Deputy Woods had a very light-colored shirt on.  He had a

7    tan sheriff's department shirt on.

8         Mr. Pickett had dark clothing on.  We all know

9    that camera 10, camera 11 viewpoints were several yards away

10   he, if not more, from the actual occurrence.  So color --

11   reflective color was very important at that point to

12   decipher any kind of physical activity.

13   Q.   Okay.  So let me get back to my hypothetical question.

14   Assume hypothetically that Mr. Pickett didn't throw one

15   punch, not even one punch at Deputy Woods.

16        Could you assume that?

17   A.   I have assumed that.

18   Q.   Do you think if that's true it was okay to kill him?

19   A.   If Mr. Pickett hadn't thrown a punch?

20   Q.   That's my question.

21   A.   Well, if that's not an assault and then it doesn't

22   constitute an imminent threat to the deputy, then absolutely

23   you can't shoot someone.

24   Q.   Right.  In fact, even if hypothetically -- let's just

25   say he threw a few punches and we can't see it in the video.

1    Even if there were a few punches thrown and let's just

2    assume that none landed on Deputy Woods' face.

3              Can you assume that for a moment?

4    A.    I can assume that.

5    Q.    Would you agree it would have been inappropriate then

6    to shoot him?

7    A.    Well, wait a minute now.  You're talking about punches

8    thrown, nonspecific.  You didn't say where.  And the -- and

9    I testified earlier to the trier of fact this morning that

10   the justification for the application of deadly force is

11   contingent upon the imminent danger that it presents to the

12   deputy in regards to great bodily harm and the possibility

13   of death.

14             Now, unless you can be more specific as to where

15   those blows go and the potential of great bodily harm, I

16   really can't give you an answer as much as I'd like to.

17   Q.    Well, first of all, you already told me in your

18   deposition you can't shoot someone for fighting; correct?

19   A.    Yes you can shoot someone for fighting if you think

20   your life is in jeopardy.

21   Q.    Okay.  Let me just be clear on this.  You -- and you

22   told me this in your deposition -- that deadly force is only

23   appropriate in a life-threatening situation which is what

24   you told this jury; correct?

25   A.    I told this jury in the a.m. today, yes.

1   Q.    So if the trier of fact, the jury, concludes that this

2   was not a life-threatening situation, hypothetically, you

3   would agree the use of deadly force would be excessive if

4   that's what the trier of fact concluded.   Would you agree?

5   A.    No, your conflating two different things.   You're

6   conflating the responsibility of the trier of fact to reach

7   a conclusion based on the evidence in this case and you're

8   conflating it with my opinion.   Those are two separate

9   different things, Counsel.

10  Q.    Let's assume, Mr. Chapman, hypothetically that this was

11  not a life-threatening intimation.   Can you assume that?

12  A.    Now, that I can assume.

13  Q.    Then would you agree that deadly force would be

14  excessive?

15  A.    If it's not a life-threatening situation or the

16  possibility of producing great bodily harm, deadly force

17  would not be justified.

18  Q.    Okay.   So let's go back to my hypothetical.   You

19  already said if he didn't throw any punches, it would be

20  excessive; correct?

21  A.    Yes.   If he didn't throw any punches and there's no

22  additional ancillary threat -- now, threats can be present

23  outside of the realm of physical assault so just so we're

24  clear on that.

25  Q.    Okay.   I just want to increase my hypothetical.   Let's

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | just assume, even though we can't see it on the video, just            |
| 2  | for argument's sake, let's say he threw a few punches that              |
| 3  | cannot did not strike Deputy Woods in the face and did not              |
| 4  | produce a life-threatening situation.  Can you assume that?             |
| 5  | A.    Now, not producing a live-threatening situation, that I           |
| 6  | can assume.                                                             |
| 7  | Q.    And then you would agree, based on the POST standards,            |
| 8  | it would be your opinion that the shooting would be                     |
| 9  | excessive; correct?                                                     |
| 10 | A.    Yes, if it's not life-threatening, you can't shoot                |
| 11 | someone.                                                                |
| 12 | Q.    In fact, you can't even shoot someone for merely having          |
| 13 | a gun in their hand; isn't that true?                                   |
| 14 | A.    It depends on where they're pointing it.                          |
| 15 | Q.    Well, have you ever seen someone with a gun in their             |
| 16 | hand in your career?                                                    |
| 17 | A.    Oh, numerous times.                                               |
| 18 | Q.    Dozens of times you told me at your deposition;                   |
| 19 | correct?                                                                |
| 20 | A.    Okay.  Dozens.  Numerous dozens, yes, lots.                       |
| 21 | Q.    How many of those people did you shoot with a gun in             |
| 22 | their hand?                                                             |
| 23 | A.    Absolutely none.                                                  |
| 24 | Q.    And you told me in your deposition you've seen people            |
| 25 | with knives in their hands, suspects, over a hundred times;            |

1    correct?

2    A.    That's correct.

3    Q.    How many of those people did you shoot?

4    A.    They never threatened me.  I didn't shoot any of them.

5    People with the guns never pointed them at me.  I never shot

6    them.

7    Q.    Okay.  And you even told me at the time of your

8    deposition that 12 or 15 times you thought someone was

9    reaching for your gun as a police officer; correct?

10   A.    Oh, yes, that's happened many times in fights, yes.

11   Q.    How many of those people did you shoot?

12   A.    None.  They let go.

13   Q.    I see.  So based on your experience, all the people

14   you've seen with guns in their hand, knives in their hand,

15   reaching for your gun allegedly, you didn't shoot any of

16   them; isn't that true?

17   A.    They never threatened my life, no.

18   Q.    And that's the key, isn't it, threatening one's life?

19   A.    That's the key.

20   Q.    Now, you talked about your understanding of some of the

21   facts and I take it you reviewed Deputy Woods' statement;

22   correct?

23   A.    Yes, I did.

24   Q.    And his deposition; correct?

25   A.    Correct.

1    Q.    Mr. Kelsey's statement?

2    A.    Yes.

3    Q.    Mr. Kelsey's deposition?

4    A.    Correct.

5    Q.    You reviewed the deposition of a witness named Kennedy?

6    A.    Yes.

7    Q.    Okay.  And you listened to the audio and watched the

8    video; correct?

9    A.    Correct.

10   Q.    Looked at photos; correct?

11   A.    Correct.

12   Q.    So doesn't Deputy Woods say that the reason that he

13   decided to do a consensual encounter on Mr. Pickett is

14   because Mr. Pickett looked at him five or ten times in a

15   five-to-ten-second period?

16   A.    Yes.

17   Q.    And if I'm doing my math right, five or ten times in

18   five to ten seconds would be one per second, wouldn't it?

19   Ten times in ten seconds would be one per second?

20   A.    I'm not going to disagree with your math.

21   Q.    And didn't Deputy Woods in a statement say that

22   Mr. Pickett kind of glanced -- kind of looked at me.  Is

23   that what he said in his statement?

24   A.    Yes, that's what he said.

25   Q.    Right.  Kind of looked at me.  He also said in his

1    statement that he saw that Mr. Pickett hopped the fence,
2    didn't he?
3    A.    That's what he said, yes.
4    Q.    Then at the time of his deposition he admitted he never
5    saw him hop the fence; isn't that true?
6    A.    That's true.
7    Q.    He never saw him running either; isn't that also true?
8    A.    That's true.
9    Q.    He didn't have any information he committed any crime;
10   is that correct?
11   A.    At that point; correct.
12   Q.    In fact, we know now certainly that Mr. Pickett was not
13   trespassing; correct?
14   A.    No.
15   Q.    We don't know that?
16   A.    No.
17   Q.    Why would you think he was trespassing if he lived
18   there, sir?
19   A.    I've never seen proof that he lived there.  Is there a
20   rental contract in existence that I haven't seen?
21   Q.    I guess there is because it was brought up by defense
22   counsel during the trial.  You weren't aware that there's a
23   lease agreement?
24   A.    A lease agreement that expired on November 1st?
25   Q.    Oh, so you did see the lease agreement?

1   A.    No.

2   Q.    Oh, then how do you know there's a lease agreement that

3   allegedly expired on November 1st?

4   A.    Because in the D.A.'s summary of this case they said

5   that there was a lease agreement that was signed on

6   October 1st, 2015, in the sum of $550.  That was for a

7   one-month lease for a unit in the El Rancho.  I believe it

8   was Unit No. 45.  This incident occurred, Counsel, on

9   November 19th.  I want to see the November 1st lease and

10  I haven't seen that.

11  Q.    Mr. Chapman, first of all, wasn't there a key found in

12  Mr. Pickett's pocket for Room No. 45?

13  A.    That doesn't substantiate rightful ownership of the

14  unit.

15  Q.    Weren't his belongings found in the room by his mother

16  after the death?

17  A.    Doesn't substantiate a contract for a rental agreement

18  in the absence of actually a signed contract.

19  Q.    Wasn't the lease month to month, sir?

20  A.    That's my point.  I want to see the lease agreement

21  from November the 1st.  This incident occurred on November

22  the 19th.  If that is in fact the case, then the suspicion

23  of trespassing is sustained.

24  Q.    Well, sir, didn't Mr. Woods -- didn't Kyle Woods say in

25  his deposition that if Mr. Pickett didn't hop the fence,

1    there was no reasonable suspicion to detain him for

2    trespassing?  Do you recall that testimony?

3    A.    I didn't take that into account.

4    Q.    You didn't take that into account.  I didn't ask you

5    whether you took it into account.  I asked you whether you

6    recalled that testimony.

7    A.    Oh, okay.  Yes.  The testimony was made.

8    Q.    Now, he gave his name and date of birth; correct?

9    A.    He gave a name.

10   Q.    Didn't he give the name of Nathanael Pickett?  Can't

11   you hear it on the audio?

12   A.    Well, Counsel, it was Nathanael Pigget, P-i-g-g-e-t,

13   Pigget.  His name is P-i-c-k-e-t.

14   Q.    Sir, didn't he pronounce it Pickett when he was first

15   asked his name?

16   A.    Well, now, that's up to interpretation on whether it's

17   Pickett or Pigget.

18   Q.    He gave his correct date of birth; correct?

19   A.    Yes.  July 3rd, 1986.

20   Q.    Let me ask you this question with respect to trespass.

21   Since you -- you would agree that if someone was staying

22   there, they had a right to be there?

23   A.    No, I wouldn't agree to that.

24   Q.    Wouldn't agree with that.  I see.

25          How about if someone was visiting someone at the

1   motel?  Do you think they had a right to be there then?
2   A.    Yes, I would.
3   Q.    Okay.  But you think if someone was actually saying at
4   the hotel they would not have a right to be there?
5   A.    Oh, Counsel, that's not what I said.  I said that just
6   because someone lives there doesn't mean they have a right
7   to live there.  They could be homesteading.  There could be
8   an intrusion into a unit that was otherwise unoccupied.
9   There's a lot of reasons why someone doesn't have legal
10  justification for having residency there.
11  Q.    All right.  Let me --
12  A.    Regardless of the fact that they are a resident.
13  Q.    Let me ask you this, Mr. Chapman.  You said there was a
14  no trespassing sign?
15  A.    There's a no trespassing sign in front of the location.
16  Q.    And according to Deputy Woods the gate was locked;
17  right?  That's what he testified to or that's what he said
18  in his statement that the gate was locked and he had to jump
19  over the gate?
20  A.    Okay.  There's two gates.  There's a vehicle gate that
21  Deputy Woods' car was parked on the apron off of Main Street
22  between First and Second.
23       There is a pedestrian gate that is further down,
24  probably about 20 to 25 feet west of the vehicle gate.  So
25  when you say "gate," I think we should try to be a little

1    bit more specific.

2    Q.    Did Deputy Woods say that a certain gate was locked and

3    he jumped over it?

4    A.    He jumped over, yeah, part of a fence.

5    Q.    Right.  And he said it was locked; right?

6    A.    The vehicle gate was locked.   The pedestrian gate was

7    not.

8    Q.    Well, are you saying that -- was Deputy Woods

9    trespassing by jumping over a gate?

10   A.    No.  Deputy Woods is a police officer who is following

11   up on reasonable suspicion on posted property that

12   prohibited trespassing; and he saw an individual that he

13   questioned their right to be there and he exercised his

14   authority on a consensual encounter to inquire further as to

15   whether or not the person was justified being on the

16   property.  That doesn't make him a suspect, Counsel.

17   Q.    Okay.  So let me ask you this:  You have stated in your

18   direct testimony that the citizen has no duty to talk to the

19   police officer in a consensual encounter; is that correct?

20   A.    That's what I informed the jury of this morning.  You

21   don't have to talk to a police officer.

22   Q.    Right.  I mean, Mr. Pickett didn't have to give him his

23   name or date of birth; correct?

24   A.    No.  Didn't.

25   Q.    You would agree with me?

1    A.    Yes.

2    Q.    And he could have walked away; correct?

3    A.    I think I testified to that this morning.

4    Q.    And if he walked away, the officer should just let him

5    go.  Would you agree?

6    A.    Yeah.  The officer has no basis to detain him at that

7    point.  It's a consensual encounter.

8    Q.    Right.  In fact in this case you're also aware that

9    Mr. Pickett was not under any stimulant like

10   methamphetamine; correct?

11   A.    At what point in time?

12   Q.    At any point in time.

13   A.    No, he wasn't under -- the toxicology report from the

14   coroner's office showed that he only had small amounts --

15   Q.    Sir, sir, listen to my question.  Was there any

16   stimulant in his system?  Yes or no?

17   A.    At what point in time, Counsel?

18   Q.    At any point in time was there any stimulant in his

19   system?

20   A.    It didn't show in the toxicology report at the autopsy,

21   no.

22   Q.    Sir, isn't it true that Mr. Pickett was not under the

23   influence of methamphetamine?  He gave his name and date of

24   birth and he wasn't trespassing because he lived there.

25   Isn't that all true, sir?

1    A.    That is not true.

2    Q.    What part is not true?

3    A.    He gave a name.   He did not give his name.

4    Q.    Whose name did he give?   John Smith?

5    A.    No.   Nathanael Pigget, P-i-g-g-e-t.

6    Q.    What else is not true about what I said, sir?

7    A.    We haven't established about the rental contract; and

8    if in fact he had no residency permission to be on the

9    property, it could be interpreted as trespass based on

10   further investigation.

11   Q.    Are you aware, sir, that Dominic Archibald, the mother

12   of Nathanael Pickett, testified in this case that she helped

13   secure the lease.   He was living there at the time.   She

14   helped secure the payments for the lease and talked to the

15   manager.   And in fact, after this, went there, talked to the

16   manager and secured his belongings which were in his room.

17         Are you aware of that or not?

18   A.    All information that Deputy Woods did not have at the

19   time of the contact.   That's all information that I did not

20   have at the time that I formed my opinions in my Rule 26

21   report.

22         So it's after the fact.   I'm not disputing it.

23   That could be true.   But it was not available to me and it

24   certainly wasn't available to Deputy Woods at the time that

25   he made his consensual encounter contact.

1    Q.    So let's go to the time of the contact.  You've heard

2    the belt recording, correct?

3    A.    Yes, I have.

4    Q.    Did Deputy Woods ever ask Mr. Pickett any questions

5    about him being under the influence?

6    A.    No.

7    Q.    Did he ever ask any -- well, let me ask you this.

8    Statements are normally given, based on your experience, in

9    these types of cases within three days of the shooting;

10   correct?

11   A.    That's not correct.

12   Q.    Isn't that what you told me in your deposition; they're

13   generally given within three days?

14   A.    They can be but they're all over the place.

15   Q.    Didn't you say in your deposition, sir, they're

16   generally given within three days?

17   A.    They can be generally given within three days.

18   Q.    And this one was given 28 days later?

19   A.    We said generally so that qualifies it, doesn't it?

20   Q.    So let's assume hypothetically that at the time of this

21   incident Deputy Woods did not think Mr. Pickett was under

22   the influence of drugs, did not think he was trespassing,

23   was trying to check his name out, then the shooting happened

24   and then 28 days later, after conferring with a lawyer, came

25   up with a story that he thought Mr. Pickett was under the

1   influence and trespassing and had punched him repeatedly in

2   the face.  Can you just assume that for a second?

3   A.   I can assume it.

4   Q.   And if it's true, then you would agree that the

5   detention was unreasonable, the arrest was without probable

6   cause, and there was excessive force in this case?

7   A.   It would be pure speculation but, yes, it would be

8   wrong.  If I'm assuming your hypothetical, it's not true.

9   Q.   Now, at the time of your deposition, do you recall

10  telling me that your understanding was that Deputy Woods was

11  over Mr. Pickett when he fired the shots?

12  A.   That was one of my statements.

13  Q.   Did you also tell me in your deposition that you didn't

14  know where Mr. Pickett's hands were at the time of the

15  shots?

16  A.   That was one of my statements.

17  Q.   And did you also tell me in your deposition that your

18  understanding was that Deputy Woods never actually saw

19  Mr. Pickett's hand on his gun?

20  A.   That was one of my statements.

21  Q.   And you were an expert witness when you came to take

22  your deposition; correct?

23  A.   Yes.

24  Q.   And I was paying you $350 an hour for that; correct?  I

25  had to be pay that?

1    A.    Begrudgingly.

2    Q.    Did I seem like I was being hesitant about paying you?

3    A.    Well, your hand was shaking when you filled out the

4    check.

5    Q.    I see.  In any event, during that testimony that's what

6    you told me; right?

7    A.    Yes.  It was a mistake and I corrected my mistake, yes.

8    Q.    Well, you also had mistakes in your report, don't you?

9    A.    There's only one that comes to mind and that is when

10   Deputy Woods asked Mr. Pickett if he had been arrested and I

11   put in a footnote it was no and it should have been yes.

12   Q.    Okay.  Well, I'm going to go through your report with

13   you in a moment.

14   A.    You know, my report had no such mistakes in it.

15   Q.    I'm sorry?

16   A.    My report had no such mistakes as far as position of

17   Mr. Pickett's hand on Deputy Woods' gun.  It had no mistakes

18   as far as the position of the body of Mr. Pickett over the

19   body of Deputy Woods.  You're aware of that.

20   Q.    We're going to go over your report in a moment,

21   Mr. Chapman.

22   A.    Okay.

23   Q.    Would you agree, sir, that the timing between the shots

24   was only one second, not two to five seconds as testified to

25   by Deputy Woods?

1   A.    I don't know what the timing was other than the fact

2   that Deputy Woods estimated that he pulled his weapon out of

3   his holster and five seconds later he fired the shots.

4   Q.    Well, you don't know what the timing was.  Didn't you

5   write in your report there was only one second between the

6   shots?

7   A.    Well, if you consider the fact that Deputy Woods says

8   that Mr. Pickett continued to hit him for three seconds,

9   within that five seconds it only leaves two seconds left and

10  in those two seconds two shots were fired.

11  Q.    Well, let's talk about that.  By the way, you reviewed

12  Mr. Kelsey's statement and deposition?

13  A.    Yes, I did.

14  Q.    And is it true that Mr. Kelsey, first of all, never

15  even saw Mr. Pickett crossing the street let alone looking

16  at Deputy Woods five or ten times?

17  A.    That's what he testified to, yes.

18  Q.    And he also testified that when Deputy Woods initially

19  pulled out his Taser, he was about 13 feet away from

20  Mr. Pickett, didn't he?

21  A.    That's what Mr. Kelsey said; correct.

22  Q.    And 13 feet would be a distance that you could tase

23  someone; correct?

24  A.    That is correct.

25  Q.    Okay.  And Mr. Pickett also testified that he was

1    watching the altercation from about 12 feet away initially;

2    isn't that true?

3              MR. EWING:  I would object on the -- you said

4    "Mr. Pickett."

5              MR. GALIPO:  Oh, Mr. Kelsey.  I apologize.

6    Q.    Mr. Kelsey testified that he was watching the beginning

7    of the altercation from about 12 feet away.

8    A.    Yes.  You could actually see him in the video.

9    Q.    And he in fact testified that the one who started

10   punching between the two was Kyle Woods punching

11   Mr. Pickett.  Isn't is that what Mr. Kelsey says?

12   A.    He says that's what he saw.

13   Q.    And in fact Mr. Kelsey says he never saw Mr. Pickett

14   land one punch; isn't that true?

15   A.    From his position.  From his perspective, yes.

16   Q.    Well, it's also consistent with the video, isn't it?

17   A.    What is consistent with the video, Counsel, is

18   Mr. Kelsey was behind Deputy Woods so therefore his vision

19   was obstructed by Deputy Woods' body.

20   Q.    You think that Mr. -- as the entire altercation went

21   on, you're saying Mr. Kelsey was behind Deputy Woods?

22   A.    It's undisputed from the video that Mr. Kelsey is in

23   the parking lot.  Deputy Woods is in the breezeway having a

24   struggle with Mr. Pickett.

25              Mr. Kelsey has to come from the parking lot to the

| | |
|---|---|
| 1 | breezeway which is westbound.  The only thing between |
| 2 | Mr. Kelsey and Mr. Pickett is Deputy Woods. |
| 3 | Q.   Mr. Chapman, didn't Mr. Kelsey at some point approach |
| 4 | Mr. Pickett? |
| 5 | A.   Yes, he did. |
| 6 | Q.   And even during that time he says he never saw |
| 7 | Mr. Pickett land a punch; isn't that true? |
| 8 | A.   It's a different point in time.  That's true. |
| 9 | Q.   Well, at no point in time did Mr. Kelsey say he saw |
| 10 | Mr. Pickett land a punch.  Would you agree? |
| 11 | A.   Mr. Kelsey was moving all the time.  He was never |
| 12 | stationary.  The situation was dynamic.  It was a dynamic |
| 13 | struggle.  So people are in different places, different |
| 14 | movements. |
| 15 | And so it's not a freeze-frame where Mr. Kelsey |
| 16 | could see everything that Deputy Woods can see.  It's |
| 17 | impossible for him to see that.  So I'm not disputing his |
| 18 | testimony and I'm not disputing your statement. |
| 19 | It is possible that Mr. Kelsey didn't see it but |
| 20 | it's still possible that it actually occurred from the |
| 21 | perspective of Deputy Woods. |
| 22 | Q.   And then you said you reviewed the deposition of a |
| 23 | Mr. Kennedy? |
| 24 | A.   I believe he was the manager at the El Rancho Motel. |
| 25 | Q.   Well, you referenced him in your report; correct? |

1    A.    Yes.

2    Q.    And you indicated that Mr. Kennedy never saw any

3    punches landed either by Mr. Pickett on Deputy Woods; isn't

4    that true?

5    A.    That's what he testified to.

6    Q.    And he certainly never saw Mr. Pickett reaching for

7    Deputy Woods' gun based on his testimony; correct?

8    A.    That's what he testified to, yes.

9    Q.    Now, let's assume for a moment that Deputy Woods never

10   saw Mr. Pickett crossing the street looking at him five or

11   ten times within a five-or-ten-second period.

12         Can you assume that?

13   A.    I've assumed that.

14   Q.    Do you think it was appropriate for Deputy Woods to

15   jump the fence and contact Mr. Pickett in the gated area?

16   A.    No.   If there was no suspicious activity and if he

17   didn't see Mr. Pickett behave in that manner, then there

18   wouldn't be the justification that is stated for him

19   initiating the consensual encounter.

20   Q.    All right.  Do you have a copy of your report handy?

21   A.    I have it right here.

22   Q.    Can you turn it to page 2, please.

23   A.    (Witness complies.)  Got it.

24   Q.    Okay.   You see in the last paragraph on page 2 you have

25   a sentence about four lines up that says, "At this point

1    Deputy Woods began a casual conversation"?

2    A.    Yes.

3    Q.    And I think you told this jury this morning that, you

4    know, a police officer, like anyone else, can walk up to

5    someone and have a casual conversation with him; right?

6    A.    Yes.

7    Q.    And the person, if they want to talk to them, they can.

8    If they don't want to, they don't have to; correct?

9    A.    They don't have to, no.

10   Q.    Do you consider, sir, a casual conversation to be

11   having a spotlight from a police vehicle directed at someone

12   and, within seconds of the conversation, the person is asked

13   if they're on probation or parole; ever been arrested?

14         You consider that to be a casual conversation

15   between just ordinary people on the street?

16   A.    It can be, yes.

17   Q.    Really?

18   A.    Oh, absolutely, between a police officer?

19   Q.    No.  But you said it's just a casual conversation like

20   normal people on the street.  You think a casual

21   conversation with normal people on the street includes:

22   Hey, how you doin'?  How's your night goin'?  Are you on

23   probation or parole?  Can I pat you down?  You ever been

24   arrested?  You think that's a casual conversation?

25   A.    It could be, yes.  You don't have to respond to it and

1    I don't carry around a spotlight in my pocket to shine on

2    people that I don't know that I walk up and talk to.

3    Q.    Are you aware, sir, that according to Mr. Kelsey there

4    was a spotlight directed at Mr. Pickett when the

5    conversation started?

6    A.    That's what he testified to.

7    Q.    And you think the ordinary person, if a uniformed

8    police officer walks up to them, there's a spotlight on

9    them, the officer jumps the gate, starts asking him

10   questions like that, the ordinary person would know they

11   could just walk away and didn't have to talk to the officer?

12   A.    I would imagine so.  I think I would avoid an

13   individual who asked me questions like that.  I think it's

14   kind of insane.

15   Q.    Kind of insane?

16   A.    Kind of insane.

17   Q.    Well, that's something you and I agree on, sir.  Okay.

18   A.    But a police officer, it's different.

19   Q.    I see.

20        THE COURT:  Next question, please.

21        MR. GALIPO:  Thank you.

22   Q.    Now, are you aware, sir, from listening to the audio in

23   this case that when an officer approached Deputy Woods

24   afterwards, he said, "Did he grab your gun?"  And

25   Deputy Woods said, "I don't know"?

1    A.    Yes.   That would be Deputy Dickey.

2    Q.    Well, actually, it was Detective Rios, wasn't it?

3    A.    It could have been, yes.   There were two deputies that

4    showed up.

5    Q.    I see.   And in fact the testimony in evidence is that

6    never at any time on the day of the incident did

7    Deputy Woods say that Mr. Pickett was trying to grab his

8    gun; isn't that true?

9    A.    He never volunteered that statement that I know of.   I

10   don't know whether he did or not.

11   Q.    Right.   In fact the first time that surfaces is 28 days

12   later in a statement when his attorneys are present; right?

13   A.    No.   As you stated, on the audiotape -- if you say it

14   was Detective Rios -- he said, "Did he grab your gun?"   And

15   then there was a response by Deputy Woods.

16   Q.    And the response is "I don't know," isn't it?

17   A.    It's really kind of hard to decipher but it's plausible

18   it could have been that but it was muddled.

19   Q.    I see.   So again I guess you would agree with me, sir,

20   if in fact this was not a life-threatening situation for

21   Deputy Woods, you would agree he shouldn't have shot

22   Mr. Pickett?

23   A.    Well, not based on that premise but, yes, in the

24   abstract, yes, if there is no life-threatening situation,

25   there's no imminent threat to life, great bodily harm, it

1    cannot be a justification for use of deadly force.

2    Q.    Let me ask you few questions about deadly force.   You

3    would agree -- first of all, POST says that it only can be

4    used in a life-threatening situation.   You have already

5    covered that; correct?

6    A.    Or -- no.   A situation that could cause great bodily

7    harm.

8    Q.    It says it's a last resort; correct?

9    A.    It does say it's a last resort.

10   Q.    Only to be used in the direst of circumstances?

11   A.    Absolutely.

12   Q.    When no other reasonable options are available?

13   A.    Reverence of life.

14   Q.    Right.   And it also says that subjective fear is

15   insufficient to use deadly force; right?

16   A.    That's right.

17   Q.    So it's not enough that an officer says:   Oh, gee, I

18   was afraid for my life.   I thought I was going to die.

19   That's not like the pass to just kill anyone, is it?

20   A.    I think I testified this morning about the sufficiency

21   of fear.   There has to be a foundation of the element of

22   threat that can be viewed objectively.

23   Q.    Right.

24   A.    Yes.

25   Q.    And you would agree that in a situation when an officer

1    overreacts and shoots someone, if it's an overreaction and

2    there wasn't that real imminent life-threatening situation,

3    that would be an example of excessive force; correct?

4    A.    Well, you're saying two things at the same time.  If

5    it's an overreactions and then there was no imminent threat

6    to the officer's life, well, then, on both cases the

7    shooting would be not justified.

8    Q.    Right.  So either if it was an overreaction or if it

9    wasn't life-threatening, the shooting would not be

10   justified; right?

11   A.    It would not be justified.

12   Q.    And in fact you can't use -- generally speaking,

13   there's a category in POST for assaultive behavior; correct?

14   A.    Yes.

15   Q.    And assaultive behavior would include kicks and

16   punches, generally?

17   A.    Yes, that's true.

18   Q.    And according to POST, you can't shoot someone in an

19   assaultive situation; correct?  Has to be life-threatening?

20   A.    Yes.  Assaultive situation would have to transition to

21   life-threatening; correct.

22   Q.    In fact didn't Deputy Woods say in his initial

23   statement he doesn't even remember when he got struck in the

24   nose?

25   A.    That's what he said.

800

1  Q.   And the glasses were not broken in this case.  Is that

2  your understanding?

3  A.   They were knocked off and landed on the ground.

4  Q.   Not broken; correct?

5  A.   As far as the photograph that I saw of the crime scene,

6  they didn't appear to be broken.

7  Q.   Isn't it true that several times through the audio

8  and -- Nate said that he just wanted to go to his house,

9  didn't he?

10  A.   I think he said he wanted to go, yes.

11  Q.   And in fact deputy Woods said in his deposition he got

12  the impression that Nate just wanted to go on his way.

13  Isn't that what he said?

14  A.   On his way, yes.

15  Q.   Now, are you saying -- strike that.

16        You would agree that officers are trained that if

17  they're using unreasonable force against a citizen, the

18  citizen has a right to defend themselves?

19  A.   I think I answered that in my deposition.

20  Q.   And the answer is?

21  A.   And my answer is there has to be an evaluative

22  component to that.  It can't be the person who is being

23  arrested because, Counsel, no one wants to be arrested; and

24  it has to go to state of mind.

25        It has to go to the suitability of that individual

1  to make that decision and it has to override 834(a) of the

2  Penal Code which states that no citizen will use force or

3  weapons to resist an arrest by a peace officer in the State

4  of California.

5          So if it's arbitrary for anyone being arrested to

6  believe that their arrest is being unlawful, excessive, or

7  unnecessary, then what you're saying is it's okay to fight

8  the police officer.

9  Q.    Sir, I'm just asking you questions and my next question

10  is, based on your review of the materials, did Deputy Woods

11  ever tell Nate he was under arrest?

12  A.    No.

13  Q.    Did he ever tell him he was detaining him?

14  A.    No.

15  Q.    Did he ever tell him to put his hands behind his back?

16  A.    No.   Told him turn around.

17  Q.    Is it your testimony, sir, that you think Nate was

18  punching Deputy Woods in between the first and second shot?

19  A.    That's what Deputy Woods testified to.

20  Q.    Right.   But he also testified that Nate threw two or

21  three more punches to his face after the second shot.   Isn't

22  that what he testified to?

23  A.    That's what he testified to; correct.

24  Q.    And you're aware, sir, from reviewing the autopsy

25  report that there's muzzle stamp with both shots; correct?

1    A.    Both shots; correct.

2    Q.    Which means that that gun is essentially to that area

3    at the time of the shots; correct?

4    A.    It absorbs stippling and soot, yes.

5    Q.    Right.

6    A.    It was called a contact shot.

7    Q.    So I guess when Deputy Woods said in his deposition

8    that the barrel of the gun was two or three feet away from

9    the chest at the time of discharge, you would agree that's

10   not accurate?

11   A.    No.  I would say two to three feet away would not be

12   accurate.

13   Q.    Okay.  And are you -- and you're aware that -- you

14   might have already answered this -- that Deputy Woods claims

15   that Mr. Pickett punched him in the face two or three times

16   after the second shot?  You're aware of that testimony?

17   A.    Yes.

18   Q.    And are you aware the second shot went right through

19   his heart?

20           MR. EWING:  Objection.  That misstates the

21   testimony of the coroner.  He did not say which bullet went

22   through where in which order.

23           THE COURT:  The objection is overruled.

24           THE WITNESS:  Yeah, there's no telling the

25   sequence of bullets in any autopsy report.  The medical

1    examiners can't make that determination.

2    BY MR. GALIPO:

3    Q.    Are you aware, sir, that a bullet went through Nate's

4    heart?

5    A.    I do believe one of them did, yes.

6    Q.    Okay.  Now, I want to ask you a question about this

7    name being in the system.

8          You said someone's been arrested, their name has

9    to be in the system or words to that effect.  Do you recall

10   that testimony?

11   A.    Yes, that's a reasonable expectation.

12   Q.    Okay.  Now, if someone is arrested and not booked,

13   would their name be in the system?

14   A.    Arrest -- how could you be arrested and not booked?

15   Q.    Well, let's just assume someone is handcuffed out in

16   the field.  In their mind they think that's arrested and,

17   after some time, they're let go.  They're never brought to

18   the police station.  In that case would the person's name be

19   in the system?

20   A.    The keyword is in their mind.  So if they're in their

21   mind they were arrested and they were never physically

22   arrested and booked, their name would not be in the system.

23   It would be in their mind.

24   Q.    What if, generally speaking, a person is arrested out

25   of state.  Let's just say they're generally speaking.

1    They're arrested out of state for some type of a

2    misdemeanor.   Would that necessarily be in the system in

3    California?

4    A.    It could be.   The California system connects with what

5    we call the NCIC system that does talk on a national basis.

6    It would depend on the misdemeanor that actually could end

7    up in a national database which feeds into the California

8    CLETS system.

9    Q.    Maybe yes, maybe no; correct?

10   A.    Maybe yes.   Maybe no.

11   Q.    How about a juvenile?  Do you know if a juvenile is

12   arrested whether that's in the system?

13   A.    It depends on the crime.

14   Q.    Maybe yes, maybe no; correct?

15   A.    Depends on the crime.

16   Q.    Do you know if someone, hypothetically, has a record

17   and it's expunged, whether that's in the system or not?

18   A.    That I don't know.   That's an administrative issue.

19   Q.    Now, you testified that Deputy Woods warned Mr. Pickett

20   that if he didn't stop what he was doing he was going to

21   shoot him?

22   A.    Three times.

23   Q.    Well, actually what he says is, "I'm going to shoot

24   you.  I'm going to shoot you.  I'm going to shoot you."  No,

25   strike that.   "I'm going to shoot you.  I'm going to shoot

1  you.  I'm going to shoot."

2          MR. EWING:  Objection.  That misstates the

3  testimony -- I mean the audio.  The audio is the best

4  evidence.

5          THE COURT:  I'll allow the question.

6          THE WITNESS:  Verbatim, I don't remember.  But

7  what I do remember I think he said, "Stop.  I'll shoot you"

8  and then he says, "I'm going to shoot you."

9          First warning, "Stop.  I'm going to shot you."

10  Second warning, "Stop.  I'm going to shoot you."  Third

11  warning, "I'm going to shoot you."

12  Q.    Well, isn't the transcription, "Stop" and then he says,

13  "I'm going to shoot you.  I'm going to shoot you.  I'm going

14  to shoot you"?

15  A.    Yes.

16  Q.    Let me ask you this.  Assuming it's not

17  life-threatening, if an officer gives a warning he's going

18  to shoot and it's not life-threatening, does that justify

19  the shooting?

20  A.    No, the mere warning can't stand as a justification for

21  use of deadly force.

22  Q.    Do you recall in reviewing Mr. Kelsey's statement, or

23  deposition, Mr. Kelsey indicating he saw a white gentleman

24  walking through the gate while Mr. Pickett was talking to

25  Deputy Woods?

1    A.    I believe so.

2    Q.    In fact in your review of Mr. Kennedy's deposition, he

3    also indicated that Nate was not on top of Deputy Woods;

4    isn't that true?

5    A.    That's what Mr. Kennedy said, yes.

6    Q.    And you can't see in this video Nate actually on top of

7    Deputy Woods; isn't that true?

8    A.    It's indiscernible; correct.

9    Q.    In fact, don't you think the fact -- you've seen

10   pictures of the bullet wounds; correct?

11   A.    Yes.  I reviewed the autopsy photographs.

12   Q.    Looking at Exhibit 14-13, don't you think the fact that

13   one of the bullet wounds is to the side might indicate that

14   they were in a more side-to-side position?

15   A.    Well, I'm not a trajectory expert and I'm certainly not

16   a medical expert; and I would think that the evidence as

17   viewed would speak for itself.  But that's not conclusive

18   because of my lack of expertise in that area.

19   Q.    Okay.  You looked at photographs of the uniform of

20   Deputy Woods; correct?

21   A.    Correct.

22          (The exhibit was displayed on the screen.)

23   BY MR. GALIPO:

24   Q.    Showing you Exhibit 15-18.  Did you see any blood on

25   the front of his uniform?

1    A.    No, sir.

2          (The exhibit was displayed on the screen.)

3    BY MR. GALIPO:

4    Q.    How about 15-19?  Any blood on the front of his uniform

5    in that picture?

6    A.    Not that I can see.

7    Q.    Did you see a picture of Mr. Pickett's face after this?

8    A.    Yes.  In the autopsy photographs, yes.

9    Q.    And do you think that his face was consistent with

10   being struck in the face?  His pictures?

11   A.    I can't tell.

12   Q.    Well, let me show it to you with apologies to the

13   family.

14         (The exhibit was displayed on the screen.)

15   BY MR. GALIPO:

16   Q.    Does it look like maybe his face might have been struck

17   during this incident?

18   A.    I can't tell.

19         (The exhibit was displayed on the screen.)

20   BY MR. GALIPO:

21   Q.    Well, look at his face and then look at the face of

22   Kyle Woods and tell me if you can tell who appears to have

23   been struck?  There's Kyle Woods and there's Mr. Pickett.

24   What do you think?

25   A.    Well, what I think, Counsel, it's undeniable that

1  Mr. Pickett tripped over the stairs as he was running away
2  from Deputy Woods and he landed on his face or at least he
3  landed on his stomach.
4          So you're trying -- well, you're asking me to
5  opine on the exact causation of those injuries; and based on
6  my review of the videotape there is a very reliable
7  explanation for how those facial injuries occurred to
8  Mr. Pickett beyond the blows administered by Deputy Woods.
9  Q.   So are you saying that you believe Mr. Pickett was
10 already injured after he fell down those steps before
11 Deputy Woods ever contacted him?
12 A.   No, sir.  I'm not saying that at all.  I'm just saying
13 there's another possibility as to the causation of those
14 injuries based on the evidence.
15 Q.   Would you agree, sir, that after Mr. Pickett fell down
16 and at the point where Deputy Woods was 12 or 13 feet away
17 from him, that would be a range that he could use a Taser if
18 he needed to?
19 A.   I would say it wouldn't, no.  That would not be
20 appropriate.
21 Q.   Would not be appropriate to tase him?
22 A.   Well, from where you said he was, 13 feet away.
23 Q.   What if he took a step closer and got to seven feet?
24 Do you think it would be appropriate then?
25 A.   Well, that's sort of the whole point here.  Because I

1    did go out to the scene and I did walk down those stairs.

2    Those stairs are a gradation downward.

3    Q.    Do you have my question in mind?  Whether you think it

4    would be appropriate from seven feet or not?

5    A.    Okay.  I'll answer your question.   No.

6    Q.    And how about pepper spray?  You think that would be

7    not appropriate?

8    A.    I think I explained that this morning why not because

9    of the oil composition of pepper spray and very high

10   probability of cross-contamination it would not have been

11   appropriate at that point.

12   Q.    So the Taser is less than lethal; correct?

13   A.    Yes.

14   Q.    Pepper spray is less than lethal?

15   A.    No.  It's less lethal.  There's no such thing as less

16   than lethal.

17   Q.    Well, let's say less lethal if you're comfortable with

18   that.  And so was a baton generally less lethal; correct?

19   A.    Yes.  Less lethal.  Anything can kill you.

20   Q.    Well, would you agree that gunshots to the chest

21   probably is a higher likelihood to kill someone than using a

22   a Taser or pepper spray?

23   A.    I can't answer that question.

24   Q.    You can't?

25   A.    No.

1          MR. GALIPO:  Okay.

2          May I have a moment to look at my notes, Your

3   Honor?

4          THE COURT:  Absolutely.

5              *(Pause in the proceedings.)*

6   BY MR. GALIPO:

7   Q.   I take it you would agree that if Deputy Woods was not

8   about to be knocked out, then the use of deadly force would

9   be inappropriate.  Would you agree with that?

10  A.   If you're speaking of a hypothetical?

11  Q.   Yes.

12  A.   Okay.  I'm sorry.  I didn't hear you preface it.

13          Yes.  Hypothetically, if Deputy Woods was not on

14  the verge of being knocked out by having his head banged on

15  the concrete and losing consciousness, losing control in the

16  ability to defend himself and maintain control and

17  possession of his weapon, then there's no imminent threat to

18  life and therefore the use of deadly force would be

19  inappropriate.

20          (The exhibit was displayed on the screen.)

21  BY MR. GALIPO:

22  Q.   And Exhibit 15-13, have you seen pictures of the back

23  of his head?

24  A.   I've seen this photograph, yes.

25  Q.   And have you reviewed medical records?

1   A.    Yes, I have.

2   Q.    Are you aware there is no indication of loss of

3   consciousness or concussion; is that correct?

4   A.    That I don't know.

5   Q.    Now, I have a few more questions in your report and I'm

6   almost done.

7         Can you turn to page 5 of 14, please.

8   A.    (Witness complies.)  Got it.

9   Q.    Your conclusion of the summary of the facts, do you see

10  where you indicated after the second shot Pickett finally

11  stopped his threatening actions?

12  A.    Yes.

13  Q.    When you put that in your report, did you take into

14  consideration Deputy Woods' claim that Mr. Pickett punched

15  him two or three more times in the face after the second

16  shot?

17  A.    Yes, I did.

18  Q.    Going to page 7 of your report --

19  A.    Got it.

20  Q.    -- under your -- Roman numeral V-1, would you agree

21  that under a consensual encounter citizens are under no

22  obligation to cooperate with law enforcement officers and

23  are free to leave or otherwise not communicate?

24  A.    I believe I related that to the jury this morning in

25  the a.m.  Yes.

1   Q.    And you indicated, also, that generally speaking
2   Mr. Pickett was being cooperative; correct?
3   A.    It seemed like that to me.
4   Q.    And shortly thereafter he ended up dead; is that true?
5   A.    Well, there's a lot packed into the "shortly
6   thereafter" but that was the outcome of the encounter.
7   Q.    Did you also put in your report that any peace officer
8   who elevates a consensual encounter by improper behavior can
9   violate the Fourth Amendment rights of the citizen?
10  A.    That's training and as a law enforcement professor
11  that's what I taught in my class to my students, yes.
12  Q.    And that police officers should not pursue a consensual
13  encounter if a citizen refuses to cooperate?
14  A.    Absolutely, they should not.
15  Q.    You also indicated in your report that there might have
16  been a mistake or a miscommunication regarding the spelling
17  of Mr. Pickett's name; correct?
18  A.    That is correct.
19  Q.    So assuming that to be true, that there was a mistake
20  or miscommunication, are you suggesting that forms the basis
21  of reasonable suspicion to detain or arrest someone?
22  A.    It could be, yes.  Not arrest, not arrest.  That's not
23  a crime.  But detain pending further investigation,
24  absolutely.
25  Q.    Now, here is what I want to ask you.  You're saying at

1    the time that Deputy Woods told Mr. Pickett to turn around,

2    are you saying there was a detention at that point or an

3    arrest?

4    A.    That was a physical detention at that point.

5    Q.    Physical detention.   Okay.

6          So what did suddenly happen after seven minutes in

7    your mind so you went from this consensual encounter to now

8    he can detain him?  What happened?  What was new?

9    A.    Okay.  If you listen to the videotape, there is

10   repeated requests by Deputy Woods to his dispatch center to

11   get what we call a return on his transmission for a records

12   check.  He asked twice at least:  Is there any return on my

13   name?

14         There was no return on his name.  I'm telling you

15   what happened in this seven minutes.  Also, there was the

16   exhibit of the objective symptoms of intoxication.  All of

17   these things kind of happened.

18         We talked about the twitching.  We talked about

19   the anxiety, the appearance of nervousness.  We talked about

20   the fact of the matter that the questions were not being

21   answered as to where he lived.  He says I don't know.  That

22   there was continued confusion about the spelling of the

23   name.

24         At that point in time it rose to the state of mind

25   of the officer that perhaps further investigation would have

1   been appropriate based on the foundation of those elements.

2          At that point in time, that constituted a physical

3   detention.  We talked about the continuum going along a

4   linear line from a consensual encounter.  Information is

5   gleaned.  That information indicates there could be a

6   possibility of a violation of the law but not violation of

7   law, reasonable suspicion, physical detention and --

8   Q.    Go ahead.  I'm sorry.

9   A.    And then it transitions to what we call probable cause

10  and at that point probable cause can constitute an arrest.

11  Q.    Well, I guess --

12  A.    That's the way it's taught.

13  Q.    I see.  What I'm asking is what happened in that last

14  30 seconds that all of a sudden there was no reasonable

15  suspicion to now suddenly there is?  What happened in the

16  last 30 seconds?

17  A.    Cumulative.  It was all those things I'm telling you

18  were building.  We talked about these building blocks and it

19  gets to a point where it justifies -- it gets to critical

20  mass, if you will, not to be overly dramatic, but critical

21  mass that transitions the line between a consensual

22  encounter and a physical detention.

23  Q.    And these statements of Deputy Woods 28 days later

24  about Mr. Pickett's hands are shaking or his eyes tremoring,

25  is there anything that was done at that time on the

1   recording on the dispatch that would justify that he

2   actually observed that at the time as opposed to made it up

3   28 days later?

4   A.    Made it up?

5   Q.    Well, I'm just asking you, sir, because he said he got

6   punched 10 or 20 times in the face.  We see the pictures.

7   I'm just asking is there anything contemporaneous with

8   something he said on the recording or the dispatch that

9   would be consistent with the observations he's now saying he

10  made?

11  A.    No, there was nothing there.  But if he made it up,

12  then he falsified his report and he would be guilty of a

13  felony so that's a totally different question that you just

14  asked me.

15  Q.    Well, I wanted to ask you about that also.  You said

16  that he wrote a report.  You reviewed his report.  Did

17  Deputy Woods write any report in this case?

18  A.    No.  He gave a statement and then he submitted to an

19  interview and then he submitted to a deposition, I believe,

20  that was taken by you.

21  Q.    So in review, you would agree that the only person that

22  says he was punched in the face forcefully 10 or 20 times is

23  Deputy Woods because Mr. Kelsey didn't see it, Mr. Kennedy

24  didn't see it, and it's not on the video.  Would you agree

25  with that?

1    A.    Yes.   As the evidence presents.

2    Q.    And we also have the picture; correct?

3    A.    Of his broken nose.   Broke his nose somehow.

4    Q.    Well, I want to ask you about that.   Isn't it true that

5    it doesn't -- did you review the medical records or not?

6    A.    I did.

7    Q.    Okay.   Isn't it true that the only thing it says it's

8    possibly consistent with a broken nose?   It doesn't even

9    confirm that it was broken?   Isn't that what the medical

10   records say, sir?

11   A.    I don't know about that.   The medical records that I

12   read said that there was a possible broken nose and a

13   possible concussion.   I'm looking at the photograph and his

14   nose is swollen.

15   Q.    Well, the medical records don't mention concussion

16   anywhere in there, sir, isn't that true?   We had the nurse

17   testify from the hospital.

18   A.    Well, there was a mention of conclusion somewhere.

19   Maybe it was Deputy Woods but he definitely had a broken

20   nose.

21   Q.    Well, that's not what the medical records say.   The

22   medical records say it's possibly consistent; isn't that

23   right?

24   A.    Okay.   I don't -- it's outside of my realm of

25   expertise.   I don't have any medical training so I really

1    shouldn't be going down that road.

2    Q.    And lastly, sir, the only person who says that

3    Mr. Pickett was grabbing at his gun is Deputy Woods again

4    because Kennedy didn't see it, Kelsey didn't see it.  It's

5    not on the video.  He never said:  He's going for my gun;

6    and when asked that night, "Did he grab your gun," he said,

7    "I don't know"; is that right?

8    A.    I don't know about the "I don't know"; but all I do

9    know is the only person out of all those three people --

10   four people you mentioned that had a gun was Deputy Woods.

11         And Deputy Woods had control of that gun and he

12   was the only one who could actually decipher any kind of

13   tugging and pulling on that gun because he had the handle

14   end of the gun.

15         Nobody else had the gun.  Seeing it and feeling it

16   is two different things which sets up and constitutes

17   imminent threat.

18   Q.    Well, sir, isn't is true -- and you mentioned this --

19   that officers are taught gun retention so, number one,

20   they're not to put their gun in an area that could be

21   grabbed; and, number two, if they feel someone is going for

22   their gun, they should pull it back to their body if they

23   can to protect it?

24   A.    That's not true.

25   Q.    What part is not true?

818

1  A.    Okay.  You're making it seem absolute that Learning

2  Domain 33 says weapons retention; that officers should never

3  put their gun in a place where it can be confiscated or

4  taken away from them except in a life-threatening situation.

5       So there's a hierarchy.  Is it more critical to

6  not place your gun where it can be taken away from you or to

7  put that gun in a position when you're losing consciousness

8  and you feel that your life is being taken away from you and

9  that's your last resort, that it's okay to put that gun

10 someplace where you can save and protect your life.

11 Q.    So what I'm getting at, sir, does POST say that if you

12 actually feel someone is grabbing for your gun, you should

13 pull it back towards you?

14 A.    In those situations.  POST also says in Learning Domain

15 20, Chapter 4, you can use deadly force in defense of your

16 life.

17 Q.    All right.  Two more questions I have for you.

18      Number one, would you agree in the POST Learning

19 Domain 33 that talks about gun retention nowhere does it say

20 you should shoot the person?

21      In 33, would you agree it doesn't say, if you

22 think someone is possibly going for your gun, you should

23 shoot them?

24 A.    It's 33, Chapter 6, and you are correct.  It doesn't

25 say that.  It says it in Learning Domain 20, Chapter 4.

1   Q.   Well, Learning Domain 20, nowhere in it and nowhere in

2   POST does it say if someone is going for your gun you should

3   shoot them.  Isn't that true?  It says it nowhere in POST

4   with those words or words to that effect?

5   A.   Well, not those words.  Nobody would write it the way

6   you just said it.  But POST Learning Domain 20 says if

7   somebody takes your gun and you feel that your life is in

8   jeopardy, imminent danger, you can use deadly force to

9   protect yourself.  It's never going to say it in those

10  words.

11  Q.   Sir, it doesn't say that anywhere in POST Learning

12  Domain 20 if someone takes your gun?

13  A.   No, it doesn't.  It will never say that.

14  Q.   All right.  And it also doesn't say anywhere in POST

15  that if you get in a fight with someone you can shoot them;

16  isn't that true?

17  A.   It doesn't say that.

18  Q.   Okay.  My last question for you, sir, is:  Did you

19  think in your mind when looking at this case that the fact

20  that Deputy Woods at least testified in deposition that his

21  gun was two or three feet from the chest when he fired is

22  inconsistent with the autopsy report saying that the gun was

23  pressed to the body at both shots; and if the gun was

24  pressed to the body at both shots, it's inconsistent with

25  someone trying to pull your gun away from you because the

1   gun is already pressed against their body?

2   A.    That's not true.   The range of motion of an arm can go

3   from zero all the way out to 36 inches on my arm because

4   that's how long it is.   So we've got zero to 36.   So it's

5   here (indicating) all the way out to here (indicating).

6   Here (indicating) is zero; out there (indicating) 36.

7   Q.    So are you suggesting that Deputy Woods thought someone

8   was grabbing for his gun so he extended his arm and put it

9   to the chest and fired two shots?

10   A.    Well, can't it both be true, Counsel?   Can it at some

11   point in time in a dynamic struggle that is ongoing that the

12   gun could be back 36 inches and at some point in time thrust

13   forward while the individual deputy is losing consciousness

14   according to him.   Is it possible?

15   Q.    Well, I guess we're going to have to figure that out.

16         MR. GALIPO:   May I have a moment to look at my

17   notes, Your Honor?

18         THE COURT:   Absolutely.

19         MR. GALIPO:   (Looking at document.)

20             *(Pause in the proceedings.)*

21         MR. GALIPO:   Oh, one other point in your report.

22   Q.    Did you put somewhere in your report that you thought

23   Deputy Woods acted appropriately for someone having a mental

24   impairment or disability?

25   A.    Could you say the question again?   Inappropriately or

1    appropriately?

2    Q.    Can you look at page 13 or 14 of your report?

3    A.    Uh-huh.  I see it.

4    Q.    The last two lines you say, "In his initial contact was

5    consistent with good tactics and training in handling people

6    with mental disabilities."  Do you see that?

7    A.    I don't see that.  What page are you on?

8    Q.    Page 13 of 14.

9    A.    And what exhibit?

10   Q.    Number 13, the last two lines.

11   A.    Starting with "therefore"?

12   Q.    Correct.

13   A.    Okay.  I've got it.

14   Q.    You see your reference to his initial contact was

15   consistent with good tactics and training and handling

16   people with mental disabilities?

17   A.    Absolutely.

18   Q.    Well, didn't Deputy Woods say he never even considered

19   the possibility that Mr. Pickett had a mental impairment?

20   A.    That's what the sentence says.  It says, "Regardless of

21   his ignorance of Mr. Pickett's mental condition."

22          That's information that came later from

23   Mr. Kennedy and possibly the family of Mr. Pickett.

24   Obviously, Deputy Woods was ignorant of that.

25          And I wrote it right here, "Regardless of his

1    ignorance, his approach was consistent with Learning Domain

2    37 dealing with persons with mental disabilities."

3              Calm, cool, cajoling, nonthreatening.  Slow, not

4    high volume, no screaming, no yelling.  Listen to the audio.

5    Q.   Well, that all changed after he told Mr. Pickett to

6    turn around, tried to grab him, pointed his Taser at him,

7    punched him in the face about ten times and then shot and

8    killed him.  Wouldn't you agree it escalated a little bit?

9    A.   All those things that you just said are responses to

10   the behavior and actions of Mr. Pickett.

11   Q.   Well --

12   A.   Not -- not the approach by Mr. Woods.  What I'm talking

13   about here is when you approach someone there's always an

14   assumption that there could be some incapacitation or

15   disability to that person.

16             So you never come on strong.  You never start

17   screaming and yelling at everybody.  It's what I told you

18   before.  You got a uniform on, you got a gun on, you got a

19   badge on, that's intimidating by itself.

20             So you can de-escalate that by modulating your

21   tone, by calming down, by approaching somebody in a

22   collegial, cajoling fashion.

23             I think one point didn't Deputy Woods talk about

24   the weather?  And he says, "Kind of cold out here tonight?

25   Oh, boy, it's kind of cold tonight, you know."

1          I mean, that's not authoritarian.  That's not

2    being officious.  That's trying to create a relationship

3    through conversation with the goal of obtaining information.

4               MR. GALIPO:  No further questions, Your Honor.

5               THE COURT:  All right.

6               Mr. Ewing?

7               MR. EWING:  Thank you, Your Honor.

8                      **REDIRECT EXAMINATION**

9    BY MR. EWING:

10   Q.   Mr. Chapman, based on the line of questions that

11   counsel has examined you on just now, has your opinion

12   changed from that you gave this morning regarding

13   Deputy Woods' contact with Nate Pickett?

14   A.   No, it has not.  It has not.

15   Q.   Has anything posed to you by counsel in his

16   hypothetical questions or the citations to deposition

17   testimony and different reports and so forth caused you to

18   alter your opinion in any way the opinion that you offered

19   this morning with respect to Deputy Woods' use of force in

20   this case?

21   A.   No, it has not.

22               MR. EWING:  I have nothing further.  Thank you.

23               MR. GALIPO:  No further questions, Your Honor.

24               THE COURT:  May this witness be excused?

25               MR. EWING:  Yes.

824

```
1        THE COURT:  Thank you, sir.  You may step down.
2        Mr. Ewing, do you want to call your next witness?
3        MR. EWING:  Thank you, Your Honor.
4        Mr. Chapman concludes the defense witnesses in
5   this case.  Subject to the admission and motion to enter all
6   exhibits at this point and a couple of motions, the defense
7   rests.
8        THE COURT:  All right.  Thank you.
9        Mr. Galipo, do you wish to put on a rebuttal case
10  at this time?
11       MR. GALIPO:  No, Your Honor.
12       THE COURT:  All right.
13       All right, ladies and gentlemen of the jury, so
14  the parties have submitted their case to you.
15  Unfortunately, I have not resolved all the jury instructions
16  in this case.
17       I'm going to be working with the lawyers this
18  evening to do so, so I'm going to ask that you come back
19  tomorrow morning at 9:00 a.m. and I promise you at 9:00
20  a.m., assuming all of you are here at that time, we will get
21  you in the box, I will instruct you, give you the
22  instructions on the law in this case.
23       The parties, I believe, have 45 minutes each to
24  argue the case so I anticipate that you will have the case
25  to begin your deliberations by the lunch hour.
```

1          And in anticipation of that, we will likely order

2    lunch for you so you don't have to worry about lunch

3    tomorrow.  All right?

4          So once again, do not form or express an opinion

5    about this case until the matter is finally submitted to

6    each of you.

7          Do not talk about this case with anyone, don't

8    allow anyone to talk to you about this case, and do not

9    conduct any research of any kind on any subject matter

10   connected with this case.

11         Have a good evening, everyone, and I will see you

12   tomorrow at 9:00 a.m.

13         THE CLERK:  All rise for the jury.

14             *(The jurors exited the courtroom.)*

15      *(The following was held outside the jury's presence:)*

16         THE CLERK:  Please be seated.

17         DISCUSSION RE PROPOSED JURY INSTRUCTIONS

18         THE COURT:  Mr. Galipo, was one other area -- I

19   had some notes up here -- that I neglected to touch base

20   with you on regarding -- I think it was the false arrest.

21   Let me see my notes.

22             *(Pause in the proceedings.)*

23         THE COURT:  This was with respect to the false

24   arrest claim, Mr. Galipo.  I think there's an issue --

25   there's a state claim and a federal claim.

```
 1            Are you intending to exercise -- to pursue both
 2    theories under state and federal?
 3            MR. GALIPO:  Well, I think the instructions are
 4    adequate that we previously discussed on it.  I don't
 5    think -- would it make any difference to the Court if we
 6    just agreed that a "yes" answer would satisfy both claims
 7    and a "no" answer would satisfy both claims?
 8            THE COURT:  Right.  But the only issue is the
 9    instruction.  I think it says "as it relates to the state
10    law claim for false arrest."
11            MR. GALIPO:  I think that I'll just -- I'll have
12    to -- may I have a moment to talk to my --
13            THE COURT:  Yes.  We'll take a recess.  It was one
14    area that I know we didn't close the loop on.  So we'll take
15    a ten-minute recess.  Talk with opposing counsel and
16    cocounsel as well; and let's figure out what we're going to
17    do because I think we'll need to add some instructions
18    depending on the answer.
19            All right?
20            MR. GALIPO:  Thank you.
21            THE COURT:  So let's take ten minutes, please.
22            THE CLERK:  All rise.
23            This Court is in recess.
24                      (Recess.)
25        (The following was held outside the jury's presence:)
```

1          THE CLERK:  All rise.

2          This United States District Court is once again in

3     session.   Please be seated.

4          THE COURT:  Well, we've given you a new version of

5     jury instructions.   Have the parties had a chance to review

6     them all?

7          Mr. Galipo?

8          MR. GALIPO:  Yes, Your Honor.

9          THE COURT:  All right.

10         Mr. Conaway?

11         MR. CONAWAY:  Yes, I have.   The spelling is still

12    incorrect for Mr. Nathaniel's first name.

13         THE COURT:  Are you sure?   That came from the

14    Complaint.

15         MR. CONAWAY:  I'm just advising the Court that

16    it's incorrect.   That's all.   N-a-t-h-i-e-l.

17         THE COURT:  Wait.  I'm sorry.  Can you spell the

18    last name again, please.

19         MR. CONAWAY:  N-a-t-h-a-n-i-e-l.

20         THE COURT:  All right.   Well, okay.   I'm not sure

21    how to deal with that because the Complaint, I looked it

22    over when you raised it.   That's how his name has been

23    listed throughout this litigation; and I'm concerned about

24    changing it particularly because in the opening instructions

25    we spelled it that way.

```
 1              So I'm not inclined to change it but if there's a
 2    vehement objection, then let me know so.
 3              Mr. Ewing, have you had a chance to review the
 4    instructions?
 5              MR. EWING:  Yes, Your Honor.
 6              THE COURT:  All right.  So let's -- Mr. Galipo, do
 7    you want to step to the lectern and let me know what issues
 8    or concerns that you have and then has there been a
 9    resolution on the false arrest state law claim?
10              MR. GALIPO:  Yeah, I think we'll just proceed
11    under federal law on that.
12              THE COURT:  Okay.  So then -- all right.  Let me
13    make sure we get to this --
14              MR. GALIPO:  Assuming that the instructions will
15    stay the same as they are now.
16              THE COURT:  Well, they would with the
17    exception of --
18              MR. GALIPO:  That one preparatory language.
19              THE COURT:  Actually, I think there's two.  Well,
20    I'm sorry.  Yes.  The preparatory language would have to
21    change in two instructions.
22              MR. GALIPO:  That's fine, Your Honor.
23              THE COURT:  So Instruction 34 on the causation, it
24    says -- it would read "as it relates to plaintiff's state
25    law claims for negligence and battery."
```

1          MR. GALIPO:  Correct.

2          THE COURT:  And then delete "false arrest."

3          And then similarly, for multiple causes in

4   Instruction 25, "as it relates to plaintiff's state law

5   claims for negligence and battery" and delete "and false

6   arrest."

7          All right.  So we'll make those changes.

8          Mr. Galipo, any other changes or issues that you

9   wanted to discuss?  I highlighted the areas where we made

10   the most recent changes.

11          I should say that my courtroom clerk who has been

12   working very diligently on that did that; and I think the

13   first change starts on Instruction No. 13 of the newest set.

14          Could you look at that?  It says, "In order to

15   prevail on their 1983 claims for unreasonable detention,

16   unreasonable arrest, and excessive force."  That's at line 5

17   and 6.

18          And then at line 21, we've added "unreasonable

19   detention, unreasonable arrest, and/or excessive force"; and

20   then at line 23, we talk about "If on the other hand the

21   plaintiffs have failed to prove any one or more of the

22   elements as to a claim, your verdict should be for the

23   defendants on that claim."

24          Any objection to that proposed language,

25   Mr. Galipo?

1          MR. GALIPO:  No, Your Honor.

2          THE COURT:  Mr. Conaway?

3          MR. CONAWAY:  No.

4          THE COURT:  Mr. Ewing?

5          MR. EWING:  No, Your Honor.

6          THE COURT:  All right.  The next change that I

7    note is on Instruction No. 19, battery by a peace officer.

8          Line 5 talks about "by using unreasonable force to

9    detain" and we've added "or arrest him."  Similarly, on line

10   10, we've also put "to detain or arrest."  The "or arrest"

11   is the additional language.

12         Any objection to that proposed language,

13   Mr. Galipo?

14         MR. GALIPO:  No, Your Honor.

15         And if you look -- if we can go back just for a

16   second on the same issue --

17         THE COURT:  Yes.

18         MR. GALIPO:  -- on Instruction No. 16 on page 21,

19   the last paragraph, lines 15 through 17.

20         THE COURT:  All right.

21         MR. GALIPO:  "Would it be appropriate if a police

22   officer uses unreasonable or excessive force in making a

23   detention or arrest?"  To be consistent?

24         THE COURT:  Well, it's interesting because -- that

25   Instruction No. 16 talks about probable cause arrest.

1          MR. GALIPO:  Oh, I see.

2          THE COURT:  And this one is talking -- 19 is

3   battery by peace officer.

4          MR. GALIPO:  I'm okay the way it is.  I can just

5   argue that, I think.

6          THE COURT:  I think, yes.

7          All right.  Any objection to the proposed

8   instruction on 19?

9          Mr. Galipo?

10          MR. GALIPO:  No.

11          THE COURT:  Mr. Conaway?

12          MR. CONAWAY:  No.

13          THE COURT:  Mr. Ewing?

14          MR. EWING:  No.

15          THE COURT:  All right.

16          The next area I think -- or that might be the last

17   area for change.  Oh, no, I'm sorry.  Oh, no.  We talked

18   about 24 already and 25 so that I think those are the only

19   changes that I made.

20          But do the parties wish to raise any other

21   objections to any of this set of instructions?

22          Mr. Galipo?

23          MR. GALIPO:  No, Your Honor.

24          The only -- the only issue I just want to put on

25   the record, Instruction 29 deals with the Bane Act.

1          THE COURT:  Yes.

2          MR. GALIPO:  And I believe this was language

3     agreed upon by the parties.

4          THE COURT:  Earlier, yes.

5          MR. GALIPO:  Right.

6          And there is some case law including Ninth Circuit

7     case law that states a Fourth Amendment violation of

8     excessive force by itself satisfies the Bane Act.

9          But I think we can leave it the way it is here and

10    address it if we need to post verdict.  I don't think it's

11    going to make a difference because if they find, you know,

12    the force was excessive and unreasonable, it gets us to

13    damages.  But in all candor, there's a lot of cases on the

14    Bane Act that say a lot of different things.

15         THE COURT:  Right.  That's true.

16         MR. GALIPO:  And it's really unclear.  Some of it

17    seems confusing to me.  We have the language to prevent him

18    from exercising his right not to be unreasonably detained or

19    unreasonably arrested.  But we've agreed on it and I just

20    wanted to put that on the record.

21         The other thing, aside from the instructions, I

22    don't -- so I don't forget at the end, we are also going to

23    make a Rule 50A motion at the appropriate time on behalf of

24    the plaintiffs.

25         THE COURT:  Right.  And what I'll do, we won't

1    deal with it tonight.  We'll deal with it while the jury is

2    deliberating.

3            MR. GALIPO:  That would be fine.

4            THE COURT:  All right?

5            Mr. Conaway, any other objections?

6            MR. CONAWAY:  None other than the name.  That

7    would be a stipulation potentially in the event of a

8    verdict.  I think that's all.

9            THE COURT:  All right.  Okay.

10           Mr. Ewing, any other issues with this set of jury

11   instructions which I intend to give to the jury tomorrow?

12           MR. EWING:  No.

13           THE COURT:  All right.

14           MR. GALIPO:  Would it be appropriate?  It seems my

15   recollection is for the most part he was referred to as

16   either Mr. Pickett or Nate during the trial.

17           THE COURT:  Yes.

18           MR. GALIPO:  I don't know.  Does it make any sense

19   to put Nate rather than Nathanael if there's a spelling

20   issue?

21           THE COURT:  Well, again, I'm just going with - I

22   mean, I'm going with how the case was filed, the original

23   Complaint.  I would prefer to do that just to keep the

24   docket as clean as possible.

25           Look.  At the end of the day, if there is a

1    verdict, I don't think Mr. Ewing is going to say:  I'm not

2    going to stipulate that the Nathanael in this case, we don't

3    know who that person is.

4              MR. GALIPO:  I understand.  Okay.  That's fine,

5    Your Honor.

6              THE COURT:  All right.  Obviously, you all have

7    referred to parties by their first names so you'll do what

8    you need to do during closing.

9              Speaking of closing arguments, now I think I had

10   said against my better judgment and the wisdom that I

11   allowed each side 45 minutes to argue the case.

12             Is that your understanding, Counsel?

13             Mr. Galipo?

14             MR. GALIPO:  Yes, it is.

15             THE COURT:  All right.

16             Mr. Ewing?

17             MR. GALIPO:  45 minutes each side and ten for

18   rebuttal.

19             THE COURT:  Right.  All right.

20             And so I guess this begs the question, Mr. Galipo

21   and Mr. Conaway, do you each intend on using 45 minutes to

22   argue before the jury or Mr. Galipo is going to argue on

23   behalf of all the plaintiffs?

24             MR. GALIPO:  Our intent is for me to argue on

25   behalf of all the plaintiffs in this phase.  Obviously, if

1    we get to the next phase, Mr. Conaway will have something to

2    say because he's arguing for damages on behalf of his client

3    so I'll do the 45 minutes and then I'll --

4            THE COURT:  On behalf of both clients?

5            MR. GALIPO:  That's correct.  And then --

6            THE COURT:  Mr. Conaway, I just want to make sure

7    on the record you agree to that; correct?

8            MR. CONAWAY:  I am agreeable to that.

9            THE COURT:  All right.  You discussed that with

10   your client and your client agrees with that; correct?

11           MR. CONAWAY:  Yes.

12           MR. GALIPO:  The only thing I would ask the Court

13   to consider since I'm doing it on behalf of both plaintiffs,

14   maybe for rebuttal, if the Court would consider giving me

15   another five minutes only because -- I know that sounds

16   silly but, you know --

17           THE COURT:  It doesn't sound silly.  It's just

18   from our time together and you're doing the job for your

19   client, you give an inch, you want more.

20           Every lawyer wants more time so if you are

21   reasonable with your time, I will allow you some leeway and

22   that applies to the defense as well so.

23           MR. GALIPO:  Thank you, Your Honor.

24           THE COURT:  All right.

25           Mr. Ewing, I assume you have no issue -- or you

1    have no issues with the time limits or at least understand
2    what the time limits are?
3              MR. EWING:  I do understand the time limits.  I
4    have no issue.
5              THE COURT:  All right.  Okay.
6              Is there anything further that we need to discuss
7    this evening?  Mr. Galipo or Mr. Conaway?
8              MR. GALIPO:  I don't believe so that I can think
9    of.  So my understanding is the Court would instruct in the
10   morning?
11             THE COURT:  Correct.
12             MR. GALIPO:  And then following that, we'll do the
13   closing?
14             THE COURT:  Correct.  So I'll instruct, closing
15   argument, defense closing, and I will likely try to run
16   through -- I mean, maybe take a break between the
17   plaintiff's closing and defense closing just to give our
18   court reporter a breather and then go to the defense
19   closing, the rebuttal, and then let the jury have it and
20   then we'll deal with the motions.
21             MR. GALIPO:  That will be fine.
22             THE COURT:  All right?
23             MR. CONAWAY:  That's acceptable.
24             THE COURT:  All right.
25             Mr. Ewing?

1           MR. EWING:   That schedule is acceptable to the

2    defense.

3           THE COURT:   All right.   Well, then, everyone --

4    oh, did we talk about the special verdict form?   Any issues

5    or concerns with the special verdict form from either side?

6           MR. GALIPO:   No.   I believe it's acceptable on

7    behalf of the plaintiff.

8           THE COURT:   All right.

9           Mr. Conaway?

10          MR. CONAWAY:   Acceptable.

11          THE COURT:   All right.

12          Mr. Ewing?

13          MR. EWING:   The special verdict form is acceptable

14    to the defense.

15          THE COURT:   All right.   So I think we're all set

16    to go then.   We'll make the cleanups that we just discussed

17    today.   I will have a final set ready to go tomorrow and

18    with the jurors as well.

19          Let's have everyone here -- just be here a little

20    before 9:00 o'clock.   The jurors -- we have one or two that

21    seem to come consistently five or ten minutes late.   Let's

22    hope it's not the case tomorrow but otherwise we'll start

23    with our closings first thing in the morning.

24          Mr. Ewing?

25          MR. EWING:   One other request, Your Honor.   I'd

838

| | |
|---|---|
| 1 | ask Madam Clerk if I could have the jury instructions and |
| 2 | the special verdict forms e-mailed to me.  I have to report |
| 3 | back to a client. |
| 4 | THE COURT:  Oh. |
| 5 | MR. EWING:  The client has requested them. |
| 6 | THE COURT:  All right.  So I don't think that's an |
| 7 | issue.  We'll get them to both sides this evening. |
| 8 | MR. EWING:  Thank you. |
| 9 | THE COURT:  All right.  Well, have a good evening, |
| 10 | everyone.  Look forward to hearing the closing arguments |
| 11 | tomorrow. |
| 12 | THE CLERK:  All rise. |
| 13 | This Court is adjourned. |
| 14 | (At 5:14 p.m. proceedings were concluded.) |
| 15 | |
| 16 | -oOo- |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1                        CERTIFICATE

 2

 3          I, PAT CUNEO, CSR 1600, hereby certify that

 4   pursuant to Section 753, Title 28, United States Code, the

 5   foregoing is a true and correct transcript of the

 6   stenographically reported proceedings held in the

 7   above-entitled matter and that the transcript page format is

 8   in conformance with the regulations of the Judicial

 9   Conference of the United States.

10

11   Date:  March 20, 2018

12

13

14

15

16                         /s/ PAT CUNEO                    _

17                         PAT CUNEO, OFFICIAL REPORTER
                           CSR NO. 1600
18

19

20

21

22

23

24

25
```

**MR. CONAWAY: [24]** 733/14 733/17
735/13 745/12 745/20 750/18 750/21
750/23 751/5 751/10 751/15 754/1
754/11 754/13 827/10 827/14 827/18
830/2 831/11 833/5 835/7 835/10
836/22 837/9
**MR. EWING: [53]** 725/17 726/10
727/12 727/14 727/21 727/24 728/1
729/1 729/25 730/9 733/21 734/8
734/13 735/15 735/18 738/14 739/17
740/2 740/12 747/7 747/12 751/25
753/20 756/5 756/9 757/10 759/12
759/17 759/21 761/6 761/9 761/11
761/18 761/20 762/6 762/14 792/2
802/19 805/1 823/6 823/21 823/24
824/2 828/4 830/4 831/13 833/11 836/2
836/25 837/12 837/24 838/4 838/7
**MR. GALIPO: [156]**
**THE CLERK: [12]** 725/3 757/19
757/23 763/8 763/11 763/13 763/15
825/12 825/15 826/21 826/25 838/11
**THE COURT: [229]**
**THE WITNESS: [2]** 802/23 805/5

**$**

**$350 [4]** 767/1 767/9 769/8 789/24
**$550 [1]** 782/6

**-**

**-oOo [2]** 725/2 838/16

**/**

**/s [1]** 839/16

**1**

**10 [15]** 726/13 727/15 732/8 732/9
734/9 735/4 736/4 760/15 771/19 774/3
774/14 775/9 815/6 815/22 830/10
**11 [2]** 726/13 775/9
**12 [15]** 722/17 725/1 727/25 730/24
731/11 731/22 734/5 734/10 734/22
736/12 745/13 748/7 779/8 792/1
808/16
**12 feet [1]** 792/7
**13 [15]** 727/18 727/25 728/1 731/22
734/23 744/20 744/24 745/11 772/21
806/12 810/22 821/2 821/8 821/10
829/13
**13 feet [4]** 791/19 791/22 808/16
808/22
**13181 [1]** 723/15
**14 [6]** 730/25 731/11 741/9 811/7
821/2 821/8
**15 [9]** 728/5 728/6 728/7 744/20
744/24 745/11 755/11 779/8 830/19
**15-1 [1]** 772/25
**15-13 [1]** 772/21
**15-19 [1]** 807/4
**16 [4]** 728/4 729/15 830/18 830/25
**16-01128-AB-SP [1]** 722/9
**1600 [3]** 722/21 839/3 839/17
**17 [5]** 728/9 730/5 741/21 755/15
830/19
**1782 [1]** 722/24
**18 [7]** 730/11 732/22 734/2 735/4
745/21 745/22 806/24
**19 [6]** 736/2 736/3 807/4 830/7 831/2

831/8
**1983 [7]** 722/12 728/21 729/4 755/15
755/19 756/8 829/4
**1986 [1]** 783/19
**199 [2]** 764/20 764/23
**19th [2]** 792/9 792/22
**1:22 [2]** 722/17 725/1
**1st [5]** 781/24 782/3 782/6 782/9
782/21

**2**

**20 [15]** 736/23 758/19 759/15 771/19
774/3 774/14 784/24 815/6 815/22
818/15 818/25 819/1 819/6 819/12
839/11
**200 [1]** 764/7
**2003 [1]** 769/13
**2015 [1]** 782/6
**2018 [3]** 722/17 725/1 839/11
**21 [8]** 729/7 731/4 733/25 741/1
755/24 756/1 829/18 830/18
**213-894-1782 [1]** 722/24
**21800 [1]** 723/5
**22 [7]** 729/7 729/17 731/4 732/9
733/24 733/24 741/3
**23 [15]** 729/8 729/17 730/24 731/4
731/22 733/25 734/2 734/4 734/8 734/9
734/9 741/24 741/25 755/24 829/20
**24 [1]** 831/18
**25 [5]** 731/4 743/12 743/20 829/4
831/18
**25 feet [1]** 784/24
**26 [3]** 744/19 758/19 787/20
**2655 [1]** 723/11
**27 [3]** 744/19 744/24 773/21
**28 [8]** 745/16 773/21 788/18 788/24
797/11 814/23 815/3 839/4
**28-1 [1]** 772/17
**29 [2]** 746/4 831/25

**3**

**30 [5]** 748/2 748/5 767/4 814/14
814/16
**31 [1]** 748/2
**310 [1]** 723/5
**32 [11]** 743/11 743/20 748/2 748/2
748/13 748/14 750/19 750/21 750/22
760/3 760/12
**33 [4]** 818/2 818/19 818/21 818/24
**3333 [1]** 723/6
**34 [1]** 828/23
**350 [1]** 722/22
**36 [2]** 820/4 820/6
**36 inches [2]** 820/3 820/12
**37 [1]** 822/2
**3rd [1]** 783/19

**4**

**40 [2]** 752/25 760/3
**400 [1]** 723/15
**4311 [1]** 722/23
**45 [9]** 768/24 769/5 782/8 782/12
824/23 834/11 834/17 834/21 835/3
**4565 [1]** 722/23

**5**

**50A [1]** 832/23
**52.1 [1]** 748/16

**5500 [1]** 723/16
**562-699-5500 [1]** 723/16
**5:14 [1]** 838/14

**7**

**722 [1]** 722/19
**725 [1]** 724/3
**753 [1]** 839/4
**760-503-9010 [1]** 723/12
**763 [1]** 724/4
**764 [2]** 724/11 724/16

**8**

**818-347-3333 [1]** 723/6
**823 [2]** 724/11 724/16
**825 [1]** 724/5
**834 [1]** 801/1
**839 [1]** 722/19

**9**

**9.25 [3]** 736/4 736/5 736/11
**90012-4565 [1]** 722/23
**9010 [1]** 723/12
**91367 [1]** 723/6
**91746 [1]** 723/16
**92307 [1]** 723/11
**9:00 [4]** 824/19 824/19 825/12 837/20

**A**

**a.m [5]** 776/25 811/25 824/19 824/20
825/12
**AB [1]** 722/9
**ability [2]** 758/9 810/16
**able [4]** 732/1 735/1 740/1 754/21
**about [77]** 725/20 727/18 728/1 728/4
730/20 731/7 732/9 733/20 734/22
738/4 738/12 738/14 743/14 744/21
745/6 746/15 746/17 747/2 747/5 748/1
749/11 755/9 764/8 764/9 769/2 769/3
769/4 770/24 771/16 774/6 774/7 774/8
776/7 779/20 783/25 784/24 787/6
787/7 788/5 790/2 791/11 791/19 792/1
792/7 794/25 798/2 798/20 803/6
804/11 807/4 809/6 810/8 813/18
813/18 813/19 813/22 814/3 814/18
814/24 815/15 816/4 816/11 817/8
818/19 822/7 822/13 822/23 825/2
825/5 825/7 825/8 827/23 829/20 830/8
830/25 831/18 837/4
**above [1]** 839/7
**above-entitled [1]** 839/7
**absence [1]** 782/18
**absolute [1]** 818/1
**absolutely [10]** 754/24 775/22 778/23
795/18 798/11 810/4 812/14 812/24
820/18 821/17
**absorbs [1]** 802/4
**abstract [1]** 797/24
**abundance [1]** 747/18
**academy [1]** 769/19
**acceptable [6]** 728/2 836/23 837/1
837/6 837/10 837/13
**according [4]** 784/16 796/3 799/18
820/14
**accordingly [1]** 757/16
**account [3]** 783/3 783/4 783/5
**accurate [3]** 735/7 802/10 802/12
**act [18]** 748/3 748/16 748/22 749/1

**A**

act... **[14]** 749/4 749/8 750/22 751/7 751/10 751/17 751/21 757/16 759/2 759/6 760/1 831/25 832/8 832/14

acted **[1]** 820/23

acting **[1]** 746/12

action **[1]** 765/4

actions **[3]** 756/11 811/11 822/10

activity **[2]** 775/12 794/16

actual **[2]** 769/10 775/10

actually **[18]** 734/15 736/11 736/11 751/23 767/18 782/18 784/3 789/18 792/8 793/20 797/2 804/6 804/23 806/6 815/2 817/12 818/12 828/19

add **[2]** 729/4 826/17

added **[1]** 829/18 830/9

additional **[4]** 729/4 755/12 777/22 830/11

address **[1]** 832/10

addressed **[1]** 751/17

adequate **[2]** 741/9 826/4

adequately **[2]** 734/19 735/1

adjourned **[1]** 838/13

administered **[1]** 808/8

administrative **[1]** 804/18

admission **[1]** 824/5

admitted **[1]** 781/4

advance **[2]** 740/5 774/23

advise **[1]** 757/14

advising **[1]** 827/15

afraid **[1]** 798/18

after **[20]** 732/18 743/16 744/16 747/15 755/2 762/20 782/16 787/15 787/22 788/24 801/21 802/16 803/17 807/7 808/10 808/15 811/10 811/15 813/6 822/5

afternoon **[3]** 752/17 764/3 764/4

afterwards **[1]** 796/24

again **[19]** 732/23 741/4 745/16 748/23 752/16 754/15 754/19 756/2 757/25 761/13 762/3 763/17 797/19 817/3 820/25 825/4 827/2 827/18 833/21

against **[6]** 732/5 755/16 770/4 800/17 820/1 834/10

agclawfirm.com **[1]** 723/17

agencies **[1]** 764/22

agency **[1]** 764/17

ago **[1]** 738/12

agree **[43]** 726/1 727/13 730/1 730/2 741/5 751/6 751/21 764/10 765/11 765/21 765/24 768/10 776/5 777/3 777/4 777/13 778/7 783/21 783/23 783/24 785/25 786/5 789/4 790/23 793/10 796/17 797/19 797/21 798/3 798/25 800/16 802/9 808/15 809/20 810/7 810/9 811/20 815/21 815/24 818/18 818/21 822/8 835/7

agreeable **[2]** 736/18 835/8

agreed **[4]** 741/23 826/6 832/3 832/19

agreeing **[1]** 758/10

agreement **[8]** 738/25 781/23 781/24 781/25 782/2 782/5 782/17 782/20

agrees **[1]** 835/10

ahead **[1]** 814/8

al **[1]** 722/10

all **[165]**

allegation **[4]** 765/1 766/11 770/14

770/15

allegations **[2]** 765/8 769/13

allegedly **[2]** 779/15 782/3

allow **[3]** 805/5 825/8 835/21

allowed **[1]** 834/11

almost **[3]** 764/11 764/25 811/6

alone **[1]** 791/15

along **[2]** 761/13 814/3

ALPHABETICAL **[1]** 724/13

already **[7]** 776/17 777/19 798/4 802/14 808/10 820/1 831/18

also **[33]** 732/8 737/21 743/14 758/23 759/17 759/21 765/15 767/9 767/24 771/2 772/1 780/25 781/7 786/8 789/13 789/17 790/8 791/18 791/25 792/16 798/14 801/20 806/3 812/1 812/7 812/15 813/15 815/15 816/2 818/14 819/14 830/10 832/22

alter **[1]** 823/18

altercation **[3]** 792/1 792/7 792/20

although **[3]** 732/11 749/3 749/8

altogether **[1]** 738/17

ALVAREZ **[1]** 723/14

ALVAREZ-GLASMAN **[1]** 723/14

always **[2]** 764/11 822/13

am **[2]** 748/9 835/8

amendment **[16]** 735/14 737/12 739/7 748/25 749/11 751/22 754/16 754/18 758/8 758/10 759/16 765/5 765/10 770/3 812/9 832/7

amounts **[1]** 786/14

ancillary **[1]** 777/22

and/or **[1]** 829/19

ANDRÉ **[1]** 722/4

Angeles **[3]** 722/16 722/23 725/1

another **[9]** 729/19 730/2 746/13 747/3 747/20 751/15 752/11 808/13 835/15

answer **[9]** 750/10 776/16 800/20 800/21 809/5 809/23 826/6 826/7 826/18

answered **[3]** 800/19 802/14 813/21

answers **[2]** 757/15 757/15

anticipate **[1]** 824/24

anticipation **[1]** 825/1

anxiety **[1]** 813/19

any **[69]** 725/25 726/3 726/16 726/17 727/6 729/24 731/9 732/4 737/25 738/21 738/23 739/9 746/19 747/7 747/20 751/12 753/18 753/25 754/25 756/22 757/4 757/5 757/15 757/15 759/10 761/20 771/2 773/7 775/12 777/19 777/21 779/4 779/15 781/9 781/9 786/9 786/12 786/15 786/18 786/18 788/4 788/7 790/5 794/2 797/6 802/25 806/24 807/4 812/7 813/12 815/17 816/25 817/12 823/18 825/9 825/9 825/9 826/5 829/8 829/21 829/24 830/12 831/7 831/20 831/21 833/5 833/10 833/18 837/4

anyone **[5]** 795/4 798/19 801/5 825/7 825/8

anything **[10]** 733/2 734/12 749/17 757/3 762/11 809/19 814/25 815/7 823/15 836/6

anyway **[1]** 738/2

anywhere **[3]** 816/16 819/11 819/14

apart **[1]** 753/16

apologies **[1]** 807/12

apologize **[2]** 725/14 792/5

Appeals **[1]** 748/19

appear **[1]** 800/6

appearance **[1]** 813/19

APPEARANCES **[1]** 723/1

appears **[1]** 807/22

Apple **[1]** 723/11

application **[1]** 776/10

applies **[1]** 835/22

apply **[1]** 743/9

appreciate **[1]** 733/8

approach **[4]** 793/3 822/1 822/12 822/13

approached **[1]** 796/23

approaching **[1]** 822/21

appropriate **[20]** 726/2 726/13 728/13 728/19 729/18 730/7 737/1 746/22 776/23 794/14 808/20 808/21 808/24 809/4 809/7 809/11 814/1 830/21 832/23 833/14

appropriately **[3]** 746/8 820/23 821/1

approval **[1]** 762/22

approximately **[5]** 764/20 767/4 768/24 769/7 769/13

approximation **[1]** 764/23

apron **[1]** 784/21

arbitrary **[1]** 801/5

ARCHIBALD **[3]** 722/6 723/2 787/11

are **[78]** 725/22 726/2 727/25 728/8 731/16 732/1 733/24 734/4 734/19 736/3 737/9 737/17 738/25 741/5 741/13 745/4 745/5 748/6 749/3 749/15 755/25 758/10 764/18 765/4 766/5 766/8 766/10 766/24 769/19 771/11 771/11 771/12 773/11 773/20 773/23 773/24 774/13 774/16 775/4 777/8 784/12 785/8 787/11 787/17 788/8 793/13 795/22 796/3 796/22 797/12 798/12 800/15 800/16 802/13 802/18 803/3 808/9 809/2 811/2 811/21 811/23 812/20 813/2 814/24 817/19 818/24 820/7 821/7 822/9 824/20 826/1 826/3 827/13 828/15 831/18 832/22 835/20 836/2

area **[8]** 794/15 802/2 806/18 817/20 825/18 826/14 831/16 831/17

area I **[1]** 831/16

areas **[1]** 829/9

aren't **[1]** 745/6

arguably **[2]** 739/8 742/16

argue **[12]** 735/1 739/7 739/12 740/7 740/14 740/21 824/24 831/5 834/11 834/22 834/22 834/24

argued **[1]** 741/7

arguing **[1]** 835/2

argument **[3]** 740/1 740/4 836/15

argument's **[1]** 778/2

arguments **[2]** 834/9 838/10

arm **[3]** 820/2 820/3 820/8

around **[4]** 796/1 801/16 813/1 822/6 742/22 755/20 756/2 756/13 756/16 756/18 756/24 769/11 789/5 801/3 801/6 801/11 803/14 812/21 812/22 812/22 813/3 814/10 825/20 825/24 826/10 828/9 829/2 829/6 829/16 829/19 830/9 830/10 830/10 830/23 830/25

**arrest [35]** 728/16 742/1 742/5 742/10

**A**

**arrested [23]** 760/9 760/13 760/23 761/16 762/2 770/15 771/3 790/10 795/13 795/24 800/23 800/23 801/5 803/8 803/12 803/14 803/16 803/21 803/22 803/24 804/1 804/12 832/19

**arrestee [1]** 731/19

**arresting [1]** 769/25

**articulating [1]** 734/23

**as [74]** 722/6 722/6 726/20 726/21 726/23 728/17 728/19 729/5 729/23 733/24 736/18 736/21 736/25 740/18 740/18 741/2 741/8 742/8 742/20 742/22 746/4 750/17 751/6 751/9 751/10 751/17 752/2 752/22 752/22 754/2 754/4 756/7 757/15 761/14 762/9 762/11 764/15 771/7 771/14 776/14 776/16 776/16 779/9 785/14 787/9 790/16 790/16 790/18 790/18 790/24 792/20 797/13 800/5 800/5 805/20 806/16 808/1 808/13 809/15 812/10 813/21 815/2 816/1 826/9 826/16 828/15 828/24 829/4 829/22 833/15 833/24 833/24 835/22 837/18

**aside [1]** 832/21

**ask [22]** 726/8 745/1 745/3 746/14 754/22 775/1 783/4 783/20 784/13 785/17 788/4 788/7 788/7 798/2 803/6 805/16 812/25 815/15 816/4 824/18 835/12 838/1

**asked [11]** 745/6 746/21 768/17 783/5 783/15 790/10 795/12 796/13 813/12 815/14 817/6

**asking [7]** 743/18 796/9 801/9 808/4 814/13 815/5 815/7

**asks [1]** 750/1

**assault [2]** 775/21 777/23

**assaultive [4]** 799/13 799/15 799/19 799/20

**assist [2]** 746/16 747/6

**assume [23]** 727/11 759/8 772/7 773/4 773/6 775/14 775/16 776/2 776/3 776/4 777/10 777/11 777/12 778/1 778/4 778/6 788/20 789/2 789/3 794/9 794/12 803/15 835/25

**assumed [3]** 771/17 775/17 794/13

**assuming [7]** 729/7 773/2 789/8 805/16 812/19 824/20 828/14

**assumption [2]** 729/22 822/14

**at [129]**

**attention [1]** 753/20

**ATTORNEY [5]** 723/3 723/4 723/4 723/10 723/14

**attorneys [1]** 797/12

**audio [7]** 780/7 783/11 796/22 800/7 805/3 805/3 822/4

**audiotape [1]** 797/13

**auspices [1]** 769/16

**authoritarian [1]** 823/1

**authority [1]** 785/14

**automatic [1]** 748/21

**autopsy [6]** 786/20 801/24 802/25 806/11 807/8 819/22

**available [1]** 787/23 787/24 798/12

**avoid [1]** 796/12

**aware [19]** 773/11 773/13 773/20 773/23 773/25 774/1 781/22 786/8

787/11 787/17 790/19 796/3 796/22 800/14 802/19 802/18 803/3 811/2

**away [17]** 740/4 775/9 786/2 786/4 791/19 792/1 792/7 796/11 802/8 802/11 808/1 808/16 808/22 818/4 818/6 818/8 819/25

**B**

**back [16]** 757/12 760/19 768/22 769/3 769/5 772/21 775/13 777/18 801/15 810/22 817/22 818/13 820/12 824/18 830/15 838/3

**badge [1]** 822/19

**Bane [17]** 748/3 748/16 748/22 749/1 749/4 749/7 750/22 751/7 751/10 751/17 751/21 759/2 759/6 760/1 831/25 832/8 832/14

**banged [1]** 810/14

**barrel [1]** 802/8

**Barstow [2]** 768/22 769/9

**base [1]** 825/19

**based [17]** 733/9 737/20 751/2 753/12 770/7 777/7 778/7 779/13 787/9 788/8 794/7 797/23 801/10 808/5 808/14 814/1 823/10

**bases [1]** 768/7

**basically [1]** 735/4

**basis [3]** 786/6 804/5 812/20

**baton [1]** 809/18

**battery [17]** 737/16 737/21 738/2 739/1 740/11 741/13 741/17 742/9 743/16 744/10 744/14 749/1 758/9 828/25 829/5 830/7 831/3

**battery/wrongful [1]** 737/21

**be [172]**

**because [56]** 726/19 730/23 732/9 732/25 733/10 735/7 736/9 737/16 737/23 738/1 738/11 739/9 739/23 740/20 742/6 742/14 743/2 743/4 744/21 746/12 747/13 747/21 748/23 749/5 751/7 753/6 754/17 759/1 760/18 764/18 764/24 774/1 774/4 775/5 780/14 781/21 782/4 784/6 786/24 800/23 806/18 808/25 809/8 815/5 815/5 817/4 817/13 819/25 820/3 826/17 827/21 827/24 830/24 832/11 835/2 835/15

**been [21]** 737/3 740/8 764/16 764/20 765/17 776/5 790/10 790/11 795/13 795/23 797/3 797/18 803/8 807/16 807/23 809/10 812/16 814/1 827/22 828/8 829/11

**before [15]** 725/10 740/22 753/2 753/22 761/14 765/16 768/11 772/17 772/21 772/25 773/14 808/10 822/18 834/22 837/20

**began [1]** 795/1

**begin [2]** 763/21 824/25

**beginning [4]** 733/24 733/25 734/1 792/6

**Begrudgingly [1]** 790/1

**begs [1]** 834/20

**behalf [9]** 750/19 764/21 832/23 834/23 834/25 835/2 835/4 835/13 837/7

**behave [1]** 794/17

**behavior [4]** 799/13 799/15 812/8

822/10

**behind [4]** 731/15 792/18 792/21 801/15

**being [21]** 742/2 744/22 745/6 746/5 759/15 760/9 760/23 761/16 785/15 788/5 790/2 800/22 801/5 801/6 803/7 807/10 810/14 812/2 813/20 818/8 823/2

**believe [22]** 734/2 736/5 736/13 739/6 739/22 749/15 750/20 753/15 767/6 773/19 782/7 793/24 801/6 803/5 806/1 808/9 811/24 815/19 824/23 832/2 836/8 837/6

**belongings [2]** 782/15 787/16

**belt [1]** 788/2

**bench [1]** 761/15

**beneath [2]** 731/23 734/13

**benefit [1]** 742/15

**BERNARDINO [2]** 722/10 767/7

**besides [2]** 765/4 765/10

**best [1]** 805/3

**better [1]** 834/10

**between [12]** 744/13 751/13 784/22 790/23 791/5 792/10 793/1 795/15 795/18 801/18 814/21 836/16

**beyond [1]** 808/8

**Bill [4]** 747/10 747/13 747/15 747/16

**BIROTTE [1]** 722/4

**birth [4]** 783/8 783/18 785/23 786/24

**bit [3]** 752/2 785/1 822/8

**blocks [1]** 814/18

**blood [2]** 806/24 807/4

**blows [3]** 751/7 776/15 808/8

**bodily [5]** 776/12 776/15 777/16 797/25 798/6

**body [7]** 790/18 790/19 792/19 817/22 819/23 819/24 820/1

**booked [3]** 803/12 803/14 803/22

**both [19]** 730/15 742/18 742/24 747/21 748/18 748/19 752/22 799/6 801/25 802/1 819/23 819/24 820/10 826/1 826/6 826/7 835/4 835/13 838/7

**Boulevard [1]** 723/5

**box [2]** 723/11 824/21

**boy [1]** 822/25

**break [2]** 725/10 836/16

**breather [1]** 836/18

**breezeway [2]** 792/23 793/1

**brief [1]** 762/21

**bring [3]** 753/19 762/18 763/7

**Broke [1]** 816/3

**broken [8]** 800/1 800/4 800/6 816/3 816/8 816/9 816/12 816/19

**brought [2]** 781/21 803/17

**building [2]** 814/18 814/18

**bullet [4]** 802/21 803/3 806/10 806/13

**bullets [1]** 802/25

**Burbank [1]** 723/5

**burden [2]** 742/7 743/5

**Bureau [1]** 769/17

**but [71]** 726/4 726/21 726/25 731/21 733/8 734/8 735/5 735/6 738/24 739/15 739/21 740/10 741/5 742/24 743/17 744/14 744/20 745/3 745/16 746/23 747/6 749/20 750/17 753/11 753/16 754/20 758/5 759/1 760/15 763/3 764/23 765/10 766/8 766/11 767/7 769/4 770/14 770/15 770/17 774/1

**B**

but... [31]  774/18 775/5 784/3 787/23
788/14 789/7 793/19 795/19 796/18
797/17 797/18 797/23 801/20 805/6
806/17 812/6 812/23 828/23 814/20
815/11 816/19 817/8 819/6 826/8 828/1
831/20 832/9 832/13 832/19 835/16
837/22
buy [1]  747/21

**C**

cajoling [2]  822/3 822/22
CALIFORNIA [11]  722/2 722/16
722/23 723/6 723/11 723/16 725/1
801/4 804/3 804/4 804/7
call [5]  766/7 804/5 813/11 814/9
824/2
called [3]  756/12 756/13 802/6
Calm [1]  822/3
calming [1]  822/21
came [5]  728/14 788/24 789/21 821/22
827/13
camera [6]  774/9 774/19 774/21
774/21 775/9 775/9
can [60]  725/15 730/20 731/19 732/7
733/8 741/6 742/24 744/17 745/3
749/10 756/23 757/16 758/18 773/6
794/22 776/3 776/4 776/14 776/19
777/11 777/12 777/22 778/4 778/6
788/14 788/17 789/2 789/3 793/16
794/12 794/22 795/4 795/7 795/16
795/23 798/3 798/22 807/6 807/22
809/19 811/7 812/8 813/8 814/10
817/23 818/3 818/6 818/10 818/15
819/8 819/15 820/2 820/10 821/2
822/20 827/17 830/15 831/4 832/9
836/8
can't [25]  726/16 732/3 735/8 746/15
746/24 774/4 775/23 775/25 776/16
776/18 778/1 778/10 778/12 783/10
799/12 799/18 800/22 803/1 805/20
806/6 807/11 807/18 809/23 809/24
820/10
candor [1]  832/13
cannot [2]  778/3 798/1
capture [1]  774/22
captured [1]  774/11
car [1]  784/21
career [1]  778/16
carry [1]  796/1
case [49]  724/4 728/20 737/4 738/7
739/6 740/9 747/1 749/9 763/20 764/11
764/15 765/16 766/19 767/3 767/4
767/15 768/3 770/25 771/6 773/21
777/7 782/4 782/22 786/8 787/12 789/6
796/23 800/1 803/18 815/17 819/19
823/20 824/5 824/9 824/14 824/16
824/22 824/24 824/24 825/5 825/7
825/8 825/10 832/6 832/7 833/22 834/2
834/11 837/22
CASE-IN-CHIEF [2]  724/4 763/20
cases [21]  764/25 765/7 765/10
765/12 765/20 765/22 765/23 765/25
766/1 766/2 766/5 766/7 766/9 766/10
766/10 766/17 766/19 773/14 788/9
799/6 832/13
casual [7]  795/1 795/5 795/10 795/14
795/19 795/20 795/24
categories [1] 799/9
category [1]  799/13
causation [7]  743/16 744/11 744/13
744/16 808/5 808/13 828/23
cause [25]  728/16 736/12 739/4 742/7
742/16 742/17 743/5 755/20 756/3
756/13 756/17 760/7 760/10 760/13
760/21 760/24 761/24 769/25 770/16
771/4 789/6 798/6 814/10 830/25
caused [1]  823/17
causes [1]  765/4 829/3
causing [8]  741/16 741/22 744/3
745/19 745/25 751/4 751/14 751/15
caution [1]  747/19
center [1]  813/10
CENTRAL [1]  722/2
certain [1]  785/2
certainly [8]  728/18 738/15 738/16
740/7 781/12 787/24 794/6 806/15
CERTIFICATE [1]  839/1
certify [1]  839/3
cetera [1]  730/19
chambers [1]  736/6
chance [12]  725/8 736/21 748/11 761/1
827/5 828/3
change [8]  728/8 744/18 751/3 828/1
828/21 829/13 830/6 831/17
changed [3]  736/10 822/5 823/12
changes [10]  726/7 754/25 759/24
761/20 762/16 762/18 829/7 829/8
829/10 831/19
changing [1]  827/24
CHAPMAN [13]  724/11 724/16 752/18
764/3 765/7 769/22 777/10 782/11
784/13 790/21 793/3 823/10 824/4
Chapter [3]  818/15 818/24 818/25
Chapter 4 [2]  818/15 818/25
Chapter 6 [1]  818/24
charge [2]  767/1 767/9
charged [2]  769/8 769/9
charges [1]  740/11
check [4]  742/11 788/23 790/4 813/12
chest [4]  802/9 809/20 819/21 820/9
CHIEF [2]  724/4 763/20
choose [2]  766/17 769/20
CHRONOLOGICAL [1]  724/8
Circuit [3]  736/4 748/19 832/6
circumstances [1]  798/10
citations [1]  823/16
citizen [7]  727/3 785/18 800/17 800/18
801/2 812/9 812/13
citizens [1]  811/21
City [1]  723/16
civil [14]  748/16 764/15 765/5 765/9
766/19 769/15 769/23 769/25 770/4
770/6 770/9 770/13 770/16 770/20
claim [38]  729/8 737/12 737/21 737/22
738/2 738/5 738/17 739/2 740/24 742/1
742/5 742/21 742/22 743/4 748/15
749/1 749/1 749/2 751/14 751/15
751/22 754/16 755/23 758/10 758/11
759/8 759/9 759/12 759/14 760/18
811/14 825/24 825/25 825/25 826/10
828/9 829/22 829/23
claims [28]  728/12 728/15 728/21
729/3 729/5 729/9 729/11 729/12
737/17 738/21 738/22 738/24 741/13
741/14 742/8 742/9 751/13 755/13
753/15 755/24 758/8 757/16 802/14
826/6 826/7 828/25 829/5 829/15
CLARENCE [2]  724/11 724/16
clarification [1]  755/10
class [2]  754/11 812/11
clean [2]  733/15 833/24
clean-up [1]  733/15
cleanups [1]  837/16
clear [6]  741/8 746/5 751/1 760/20
776/21 777/24
clearly [2]  732/25 742/1
clerk [4]  753/11 757/15 829/11 838/1
CLETS [1]  804/8
client [12]  750/19 764/18 764/21
765/12 767/7 767/7 835/2 835/10
835/10 835/19 838/3 838/5
clients [5]  738/4 749/10 757/14 758/8
835/4
close [2]  762/25 826/14
closer [1]  808/23
closing [13]  725/9 725/12 759/15
763/4 834/8 834/9 836/13 836/14
836/15 836/17 836/17 836/19 838/10
closings [1]  837/23
clothing [1]  775/8
CM [1]  722/21
cocounsel [1]  826/16
Code [3]  748/16 801/2 839/4
cold [2]  822/24 822/25
collegial [1]  822/22
color [2]  775/10 775/11
colored [1]  775/6
COLVIN [1]  723/14
combine [1]  730/15
combined [1]  730/15
combining [1]  732/16
come [7]  765/16 765/19 766/13 792/25
822/16 824/18 837/21
comes [2]  740/17 790/9
comfortable [2]  748/7 809/17
coming [1]  768/22
comma [2]  755/20 755/20
comment [2]  732/20 752/15
comments [3]  733/12 751/2 756/19
committed [3]  736/13 736/16 781/9
communicate [1]  811/23
comparative [1]  744/22
compensated [3]  766/19 766/22
766/24
competing [1]  756/10
Complaint [3]  827/14 827/21 833/23
complete [1]  728/24
complies [2]  794/23 811/8
component [1]  800/22
composition [1]  809/9
CONAWAY [16]  723/9 723/10 733/14
749/17 750/18 751/21 753/25 827/10
830/2 831/11 833/5 834/21 835/1 835/6
836/7 837/9
Conaway's [1]  735/6
concept [1]  732/3
concepts [1]  732/2
concern [3]  731/3 733/8 751/12
concerned [2]  747/9 827/23
concerns [2]  725/25 828/8 837/5
conclude [1]  754/2
concluded [2]  777/4 838/14

# C

concludes [2] 777/1 824/4
concluding [1] 749/16
conclusion [4] 771/14 777/7 811/9 816/18
conclusive [1] 806/17
concrete [1] 810/15
concur [3] 759/14 759/19 759/20
concussion [3] 811/3 816/13 816/15
condition [1] 821/21
conduct [4] 750/2 750/7 751/4 825/9
confer [1] 757/14
conference [2] 742/21 839/9
conferring [1] 788/24
confirm [1] 816/9
confiscated [1] 818/3
conflating [3] 777/5 777/6 777/8
conformance [1] 839/8
confusing [4] 734/17 742/14 742/19 832/17
confusion [3] 734/21 751/13 813/22
connected [1] 825/10
connects [1] 804/4
conscience [1] 739/25
consciousness [4] 810/15 811/3 818/7 820/13
consensual [12] 780/13 785/14 785/19 786/7 787/25 794/19 811/21 812/8 812/12 813/7 814/4 814/21
consider [8] 731/13 743/15 744/8 791/7 795/10 795/14 835/13 835/14
consideration [1] 811/14
considered [1] 821/18
considering [3] 733/23 739/19 752/16
consistent [15] 745/17 756/3 756/16 760/14 761/18 792/16 792/17 807/9 815/9 816/8 816/22 821/5 821/15 822/1 830/23
consistently [1] 837/21
constitute [2] 775/22 814/10
constituted [1] 814/2
constitutes [1] 817/16
Constitution [2] 748/20 770/12
constitutional [1] 769/14
constructs [1] 770/12
contact [8] 787/19 787/25 788/1 794/15 802/6 821/4 821/14 823/13
contacted [1] 808/11
contained [1] 771/11
contamination [1] 809/10
contemporaneous [1] 815/7
context [1] 746/24
contingent [1] 776/11
continue [1] 762/16
continued [2] 791/8 813/22
continuum [1] 814/3
contract [5] 767/8 781/20 782/17 782/18 787/7
control [3] 810/15 810/16 817/11
conversation [10] 795/1 795/5 795/10 795/12 795/14 795/19 795/21 795/24 796/5 823/3
cool [1] 822/3
cooperate [2] 811/22 812/13
cooperative [1] 812/2
copy [4] 736/7 750/15 752/11 794/20
coroner [1] 802/21
coroner's [1] 786/14
correct [12] 728/21 750/22 735/21 737/4 738/7 740/23 745/9 745/23 746/1 751/11 751/23 760/25 764/13 764/19 766/1 767/13 767/14 767/16 767/17 767/23 768/1 768/3 768/4 768/13 768/16 768/19 768/20 770/3 770/21 771/6 771/8 771/10 771/21 771/23 772/8 772/9 772/13 772/17 772/18 772/22 773/15 773/18 776/18 776/24 777/20 778/9 778/19 779/1 779/2 779/9 779/22 779/24 779/25 780/4 780/8 780/9 780/10 780/1 781/10 781/11 781/13 783/8 783/18 783/18 785/19 785/23 786/2 786/10 788/2 788/10 788/11 789/22 789/24 791/21 791/23 791/24 793/25 794/7 795/8 798/5 798/8 799/3 799/13 799/19 799/21 800/4 801/23 801/25 802/1 802/3 804/9 804/14 806/8 806/10 806/20 806/21 809/12 809/18 811/3 812/2 812/17 812/18 816/2 818/24 821/12 829/1 835/5 835/7 835/10 836/11 836/14 839/5
corrected [1] 790/7
could [46] 726/1 727/4 731/10 733/2 738/18 739/6 747/14 748/5 749/4 750/15 754/7 755/8 757/14 769/24 770/2 770/6 770/7 775/3 775/5 775/16 784/7 784/7 786/2 787/9 787/23 791/22 792/8 793/16 795/25 796/11 797/3 797/18 798/6 803/14 804/4 804/6 808/17 812/22 814/5 817/12 817/20 820/12 820/25 822/14 829/14 838/1
couldn't [1] 736/9
counsel [27] 723/1 727/13 737/7 738/15 738/25 740/19 752/5 758/2 764/4 773/6 774/6 774/17 777/9 781/22 782/8 783/12 784/5 785/16 786/17 792/17 800/23 807/25 820/10 823/11 823/15 826/15 834/12
counsel's [1] 738/16
COUNTY [2] 722/10 767/6
couple [1] 824/6
course [1] 769/18
courses [1] 769/20
court [29] 722/1 726/14 737/4 738/25 743/15 744/8 748/19 752/16 753/11 755/1 757/21 757/25 763/10 763/17 764/15 764/21 765/16 765/19 766/13 767/10 826/5 826/23 827/2 827/15 835/12 835/14 836/9 836/18 838/13
Court's [4] 731/24 741/4 741/6 753/19
Courthouse [1] 722/22
courtroom [4] 757/14 763/13 825/14 829/11
courts [1] 748/18
covered [3] 745/14 752/4 798/5
craft [1] 734/19
create [1] 823/2
crime [13] 732/22 733/18 734/12 735/3 735/10 735/16 736/13 736/17 781/9 800/5 804/13 804/15 812/23
critical [3] 814/19 814/20 818/5
cross [7] 724/10 724/15 752/19 762/19 763/22 764/1 809/10
cross-contamination [1] 809/10
cross-examination [3] 762/19 763/22

764/1
Crossing [2] 791/15 794/10
Crossroads [1] 723/15
CRR [1] 722/21
CRR-CM [1] 722/21
crunch [1] 754/20
CSR [3] 722/21 839/3 839/17
Cumulative [1] 814/17
CUNEO [4] 722/21 839/3 839/16 839/17
currently [4] 728/9 749/7 749/22 767/1
curtail [1] 752/24

# D

D.A.'s [1] 782/4
DALE [2] 723/3 723/3
dalekgalipo [1] 723/7
damage [4] 737/7 739/12 741/10 741/19
damages [26] 737/9 737/10 737/14 737/14 737/20 737/25 738/2 738/6 738/13 739/5 739/10 739/13 739/24 740/12 744/21 744/23 745/4 745/5 745/6 745/8 749/3 749/24 752/6 758/9 832/13 835/2
danger [2] 776/11 819/8
dark [1] 775/8
database [1] 804/7
date [5] 783/8 783/18 785/23 786/23 839/11
day [3] 722/19 797/6 833/25
days [10] 754/11 788/9 788/13 788/16 788/17 788/18 788/24 797/11 814/23 815/3
de [1] 822/20
de-escalate [1] 822/20
dead [1] 812/4
deadly [13] 776/10 776/22 777/3 777/13 777/16 798/1 798/2 798/15 805/21 810/8 810/18 818/15 819/8
deal [5] 725/12 827/21 833/1 833/1 836/20
dealing [1] 822/2
deals [1] 831/25
DEAN [1] 723/10
death [31] 737/10 737/13 737/17 737/20 737/21 738/2 738/6 738/12 739/4 739/5 739/13 739/24 740/12 741/11 741/14 741/14 741/16 741/20 741/22 743/23 744/3 745/19 745/25 751/5 751/8 751/14 758/9 766/6 766/10 776/13 782/16
DECEASED [1] 722/7
decedent's [1] 750/3
decide [1] 754/16
decided [2] 771/11 780/13
decides [2] 771/7 771/10
decipher [3] 775/12 797/17 817/12
decision [1] 801/1
decisions [1] 748/20
defend [3] 730/21 800/18 810/16
defendant [2] 730/1 755/16
defendants [3] 722/11 723/14 829/23
DEFENDANTS' [1] 724/9
defense [33] 724/4 734/6 738/18 740/14 742/6 742/15 743/5 746/5 746/6 746/12 746/12 746/13 746/15 746/15 746/18 747/20 753/15 763/20 764/12

**D**

defense... **[14]** 764/13 764/16 773/11 773/23 781/21 818/15 824/4 824/6 835/22 836/15 836/17 836/18 837/2 837/14

defense's **[1]** 740/4
deferred **[1]** 745/7
deficit **[1]** 774/23
define **[1]** 726/18
definitely **[1]** 816/19
definition **[3]** 732/24 744/9 770/7
definitions **[2]** 750/6 750/12
delete **[8]** 726/12 726/14 727/16 741/19 745/22 751/3 829/2 829/5
deleted **[3]** 744/25 759/17 759/21
deletion **[1]** 730/3
deliberating **[1]** 833/2
deliberations **[1]** 824/25
department **[1]** 775/7
depend **[3]** 771/5 771/6 804/6
depending **[3]** 754/15 774/23 826/18
depends **[5]** 726/18 770/10 778/14 804/13 804/15
deposition **[35]** 764/6 768/2 768/6 768/6 768/8 768/14 768/17 771/24 774/12 776/18 776/22 778/18 778/24 779/8 779/24 780/3 780/5 781/4 782/25 788/12 788/15 789/9 789/13 789/17 789/22 791/12 793/22 800/11 800/19 802/7 805/23 806/2 815/19 819/20 823/16
deputies **[1]** 797/3
deputy **[97]** 744/1 745/24 746/17 750/2 751/4 760/7 760/21 761/24 771/19 773/3 773/8 774/7 774/12 775/2 775/6 775/15 775/22 776/2 776/12 778/3 779/21 780/12 780/21 784/16 784/21 785/2 785/8 785/10 787/18 787/24 788/4 788/21 789/10 789/17 790/10 790/17 790/19 790/25 791/2 791/7 791/16 791/18 792/18 792/19 792/21 792/23 793/2 793/16 793/21 794/3 794/7 794/9 794/14 795/1 796/23 796/25 797/1 797/7 797/15 797/21 799/22 800/11 801/10 801/18 801/19 802/7 802/14 804/19 805/25 806/3 806/7 806/20 808/2 808/8 808/11 808/16 810/7 810/13 811/14 813/1 813/10 814/23 815/17 815/23 816/19 817/3 817/10 817/11 819/20 820/7 820/13 820/23 821/18 821/24 822/23 823/13 823/19

**Deputy Dickey [1]** 797/1
deputy Woods **[79]** 744/1 750/2 760/7 760/21 761/24 771/19 773/3 774/7 774/12 775/2 775/6 775/15 778/3 780/12 780/21 784/16 785/2 785/8 785/10 787/18 787/24 788/4 788/21 789/10 790/10 790/17 790/19 790/25 791/2 791/7 791/16 791/18 792/18 792/21 792/23 793/2 793/16 793/21 794/3 794/9 794/14 795/1 796/23 796/25 797/7 797/15 797/21 799/22 800/11 801/10 801/18 802/14 804/19 805/25 806/3 806/7 806/20 808/2 808/8 808/11 808/16 810/7 810/13 813/1 813/10 814/23

815/17 815/23 816/19 817/3 817/11 819/20 820/7 820/23 821/24 821/24 822/23

**Deputy Woods' [11]** 745/24 751/4 773/8 776/2 779/21 784/21 790/17 792/19 794/7 823/13 823/19

description **[1]** 756/10
designated **[1]** 726/20
designed **[1]** 734/16
detain **[8]** 770/8 783/1 786/6 812/21 812/23 813/8 830/9 830/10
detained **[6]** 760/9 760/13 760/23 761/16 762/1 832/18
detaining **[2]** 769/23 801/13
**Detective [2]** 797/2 797/14
**Dickey [3]** 726/19 726/25 797/1
did **[68]** 726/4 726/16 726/19 726/19 727/6 727/6 730/22 750/14 752/22 760/7 760/21 761/24 767/18 767/20 767/23 768/9 768/12 768/15 768/21 769/14 773/4 778/3 778/3 778/21 779/3 779/11 779/23 781/25 785/2 787/3 787/4 787/18 787/19 788/4 788/7 788/21 788/22 789/13 789/17 790/2 791/13 793/5 793/9 796/24 797/6 797/10 797/14 801/10 801/13 801/15 802/21 803/5 806/24 807/7 809/1 809/1 811/13 811/17 812/7 813/6 815/16 816/5 816/6 817/6 819/18 820/22 829/12 837/4
didn't **[46]** 725/13 728/20 729/6 749/19 769/8 773/24 775/14 776/8 777/19 777/21 779/4 779/15 780/21 781/2 781/9 782/24 782/24 782/25 783/3 783/4 783/4 783/10 783/14 785/22 785/24 786/20 788/15 789/13 791/4 791/20 793/3 793/19 794/17 796/11 799/22 800/6 800/9 804/20 810/12 815/23 815/24 817/4 817/4 821/18 822/23 826/14
die **[1]** 798/18
died **[6]** 741/9 741/10 741/15 741/20 765/2 765/20
**DIEU [1]** 723/4
difference **[2]** 826/5 832/11
different **[15]** 737/23 737/23 737/24 739/7 774/6 777/5 777/9 793/8 793/13 793/13 796/18 815/13 817/16 823/17 832/14
differing **[1]** 727/21
digest **[1]** 738/10
diligently **[1]** 829/12
**DIRE [2]** 724/10 724/15
direct **[4]** 724/10 724/15 773/18 785/18
directed **[2]** 795/11 796/4
direst **[1]** 798/10
disabilities **[3]** 821/6 821/16 822/2
disability **[2]** 820/24 822/15
disagree **[4]** 740/3 740/10 740/13 780/20

discernible **[1]** 773/10
**discharge [1]** 802/5
discuss **[6]** 746/11 751/20 757/4 761/2 829/9 836/6
discussed **[6]** 747/21 758/7 773/22 826/4 835/9 837/16
discussion **[5]** 724/3 724/5 725/5 755/3 825/17
dismiss **[7]** 738/20 738/21 738/23 739/11 739/14 759/8 759/8
dismissal **[1]** 759/11
dismissed **[2]** 739/14 759/15
dispatch **[3]** 813/10 815/1 815/8
displayed **[9]** 772/10 772/15 772/19 772/23 806/22 807/2 807/14 807/19 810/20
disputes **[1]** 725/22
disputing **[3]** 787/22 793/17 793/18
disregard **[2]** 750/3 750/10
distance **[1]** 791/22
**DISTRICT [5]** 722/1 722/2 757/25 763/17 827/2
**DIVISION [1]** 722/3
do **[76]** 725/24 726/9 727/21 728/25 729/7 729/24 733/2 738/14 738/21 740/10 741/10 745/1 747/19 749/8 749/13 750/1 751/21 752/5 752/8 753/1 753/18 753/25 754/20 756/15 756/17 758/5 759/14 759/18 759/20 761/5 762/3 762/17 766/7 770/10 772/6 774/19 775/1 775/18 780/13 782/2 783/2 784/1 789/9 794/14 794/20 795/10 803/5 803/9 804/11 804/16 805/7 805/22 807/9 807/24 808/24 809/3 811/9 817/8 821/6 824/2 824/4 824/18 825/4 825/7 825/8 826/17 828/6 831/20 832/25 833/23 834/7 834/8 834/21 835/3 836/3 836/12
docket **[2]** 753/11 833/24
document **[1]** 820/19
documents **[1]** 767/21
does **[10]** 756/5 761/23 798/9 804/5 805/18 807/16 818/11 818/19 819/2 833/18
doesn't **[24]** 737/24 739/9 739/22 739/24 744/12 770/14 775/21 780/12 782/13 782/17 784/6 784/9 785/16 788/19 799/23 816/5 816/8 818/21 818/24 819/11 819/13 819/14 819/17 835/17
doin' **[1]** 795/22
doing **[4]** 780/17 804/20 835/13 835/18
**Domain [8]** 818/2 818/14 818/19 818/25 819/1 819/6 819/12 822/1
**DOMINIC [2]** 722/6 787/11
**Dominic Archibald [1]** 787/11
don't **[84]** 726/3 726/4 726/6 726/11 726/20 727/10 727/15 729/2 729/2 729/19 733/5 733/9 734/16 734/20 737/8 738/6 738/23 739/9 739/11 739/15 740/13 740/21 741/25 742/1 742/4 742/13 744/20 746/19 747/4 747/19 749/7 749/13 751/6 751/18 752/3 753/10 754/10 754/19 758/4 761/12 763/3 765/7 766/4 766/16 773/7 781/15 785/21 790/8 791/1 791/4 795/8 795/8 795/9 795/25 796/1 796/2 796/25

**don't...** [27]  797/10 797/16 804/18
805/6 806/9 806/12 811/4 813/21
816/11 816/15 816/24 816/25 817/7
817/8 817/8 821/7 825/2 825/7 826/4
832/10 832/22 832/22 833/18 834/1
834/2 836/8 838/6
**done** [3]  750/2 811/6 814/25
**doublecheck** [4]  736/6 742/24 749/10
749/15
**down** [9]  740/17 784/23 795/23
808/10 808/15 809/1 817/1 822/21
824/1
**downward** [1]  809/2
**dozens** [3]  778/18 778/20 778/20
**draft** [1]  759/16
**drafted** [1]  759/2
**dramatic** [1]  814/20
**drugs** [1]  788/22
**due** [1]  770/6
**during** [9]  747/8 755/5 774/15 781/22
790/5 793/6 807/17 833/16 834/8
**duties** [1]  731/18
**duty** [2]  732/10 785/18
**dynamic** [3]  793/12 793/12 820/11

**E**

**e-mailed** [1]  838/2
**each** [5]  824/23 825/6 834/11 834/17
834/21
**earlier** [2]  776/9 832/4
**EDCV** [1]  722/9
**edits** [1]  735/25
**effect** [2]  803/9 819/4
**efficient** [1]  725/21
**either** [12]  725/23 729/9 744/14 747/3
757/4 757/5 765/1 781/7 794/3 799/8
833/16 837/5
**El** [3]  768/25 782/7 793/24
**El Rancho** [1]  782/7
**El Rancho Motel** [2]  768/25 793/24
**elective** [1]  769/18
**element** [1]  798/21
**elements** [2]  814/1 829/22
**elevates** [1]  812/8
**eliminate** [2]  738/17 756/6
**else** [3]  787/6 795/4 817/15
**encounter** [13]  780/13 785/14 785/19
786/7 787/25 794/19 811/21 812/6
812/8 812/13 813/7 814/4 814/22
**end** [4]  804/6 817/14 832/22 833/25
**ended** [1]  812/4
**enforcement** [2]  811/22 812/10
**enough** [1]  798/17
**enter** [1]  824/5
**entered** [1]  763/13
**entire** [1]  792/20
**entitle** [1]  737/13
**entitled** [5]  739/5 739/13 740/12
759/16 839/7
**error** [1]  750/16
**escalate** [1]  822/20
**escalated** [1]  822/8
**essence** [1]  730/14 737/14
**essentially** [3]  741/13 755/18 802/2
**established** [1]  787/7
**estimate** [4]  764/5 766/2 766/4 767/2

**estimated** [1]  791/2
**et** [2]  722/11 730/19
**et cetera** [1]  730/19
**evaluates** [1]  771/9
**evaluation** [1]  770/11
**evaluative** [1]  800/21
**Evelyn** [2]  754/8 754/12
**even** [19]  732/24 742/22 744/22 752/3
754/10 766/9 773/4 774/4 775/15
775/24 776/1 778/1 778/12 779/7
791/15 793/6 799/23 816/8 821/18
**evening** [6]  763/2 824/18 825/11 836/7
838/7 838/9
**event** [2]  790/5 833/7
**ever** [9]  778/15 788/4 788/7 795/13
795/23 801/11 801/13 801/15 808/11
**every** [10]  764/14 764/25 765/15
766/11 766/14 766/18 773/20 774/10
774/21 835/20
**everybody** [1]  822/17
**everyone** [4]  825/11 837/3 837/19
838/10
**everything** [1]  793/16
**evidence** [11]  726/2 749/9 772/2 772/3
772/7 777/7 797/5 805/4 806/16 808/14
816/1
**evident** [1]  770/23
**EWING** [37]  723/14 725/17 726/9
727/11 727/21 728/25 729/24 730/9
733/21 735/15 736/21 738/9 739/17
746/16 747/6 748/11 751/25 753/9
756/5 757/10 759/7 761/2 761/6 762/6
762/14 823/6 824/2 828/3 830/4 831/13
833/10 834/1 834/16 835/25 836/25
837/12 837/24
**exact** [1]  808/5
**exactly** [2]  743/17 758/13
**examination** [6]  752/24 762/19 762/20
763/22 764/1 823/8
**examined** [1]  823/11
**examiners** [1]  803/1
**example** [1]  799/3
**except** [1]  818/4
**exception** [2]  764/16 828/17
**exception of** [1]  828/17
**excessive** [32]  728/17 728/17 728/19
748/21 748/24 749/1 755/21 756/1
765/3 765/5 765/8 765/13 765/18 766/5
766/12 766/15 770/4 770/19 770/20
771/4 777/3 777/14 777/20 778/9 789/6
799/3 801/6 829/16 829/19 830/22
832/8 832/12
**excused** [1]  823/24
**exercise** [1]  826/1
**exercised** [1]  785/13
**exercising** [4]  760/8 760/22 761/25
832/18
**exhibit** [15]  772/10 772/12 772/15
772/19 772/23 806/12 806/22 806/24
807/2 807/14 807/19 810/20 810/22
813/16 821/9
**Exhibit 14-13** [1]  806/12
**Exhibit 15-13** [1]  810/22
**Exhibit 15-18** [1]  806/24
**Exhibit 28-2** [1]  772/12
**exhibits** [1]  824/6
**existence** [1]  781/20
**exited** [1]  825/14

**expectation** [1]  803/11
**expecting** [2]  779/13 785/8
**expert** [7]  764/15 773/11 773/24
774/18 789/21 806/15 806/16
**expertise** [3]  774/24 806/18 816/25
**experts** [2]  726/2 747/22
**expired** [2]  781/24 782/3
**explain** [1]  734/20
**explained** [1]  809/8
**explaining** [1]  758/8
**explanation** [1]  808/7
**express** [1]  825/4
**expressing** [1]  768/11
**expunged** [1]  804/17
**extended** [1]  820/8
**extent** [2]  731/8 752/16
**extra** [2]  736/7 739/10
**eyes** [1]  814/24

**F**

**face** [20]  771/19 772/8 773/4 773/8
776/2 778/3 789/2 801/21 802/15 807/7
807/9 807/10 807/16 807/21 807/21
808/2 811/15 815/6 815/22 822/7
**facial** [1]  808/7
**fact** [41]  728/1 742/6 742/21 764/14
766/1 768/17 770/18 770/22 770/24
770/25 771/14 773/7 775/24 776/9
777/1 777/4 777/6 778/12 781/12
782/22 784/12 786/8 787/8 787/15
787/22 791/1 791/7 792/9 792/13 797/5
797/11 797/20 799/12 799/22 800/11
806/2 806/9 806/9 806/12 813/20
819/19
**factor** [9]  741/16 741/22 743/15 744/2
744/6 744/9 745/19 745/25 751/4
**factors** [1]  744/2
**facts** [15]  746/25 749/9 771/5 771/6
771/7 771/9 771/10 771/11 771/15
771/17 771/17 771/20 772/2 779/21
811/9
**failed** [1]  829/21
**failure** [2]  774/2 774/5
**fair** [3]  765/3 765/14 765/15
**fairness** [1]  738/10
**fallacies** [1]  774/9
**falls** [1]  770/12
**false** [10]  742/1 742/5 742/10 742/22
825/20 825/23 826/10 828/9 829/2
829/5
**falsely** [1]  734/13
**falsified** [1]  815/12
**familial** [2]  759/11 759/17
**family** [3]  765/2 807/13 821/23
**far** [4]  752/4 790/16 790/18 800/5
**fashion** [1]  822/22
**fault** [1]  744/22
**fear** [3]  736/22 798/14 798/21
**federal** [8]  742/2 742/16 742/24 743/3
769/17 825/25 826/2 828/11
**feeds** [1]  804/7
**feel** [4]  817/21 818/8 818/12 819/7
**feeling** [1]  817/15
**feet** [12]  784/24 791/19 791/22 792/1
792/7 802/8 802/11 808/16 808/22
808/23 809/4 819/21
**fell** [2]  808/10 808/15
**felony** [1]  815/13

**F**

**fence [5]** 781/1 781/5 782/25 785/4 794/15
**few [5]** 775/25 776/1 778/2 798/2 811/5
**field [1]** 803/16
**fight [2]** 801/7 819/15
**fighting [2]** 776/18 776/19
**fights [1]** 779/10
**figure [5]** 753/1 754/17 758/12 820/15 826/16
**filed [1]** 833/22
**filled [1]** 790/3
**final [3]** 742/21 762/22 837/17
**finalize [1]** 752/11
**finally [2]** 811/10 825/5
**find [7]** 737/19 748/24 750/1 754/21 755/5 758/18 832/11
**finding [4]** 738/1 739/24 749/9 770/22
**finds [1]** 739/1
**fine [22]** 727/25 731/2 732/16 735/5 736/3 736/9 741/2 741/5 741/25 744/19 744/20 745/16 746/3 746/4 748/2 748/2 751/10 762/7 828/22 833/3 834/4 836/21
**finish [2]** 753/1 755/2
**fired [5]** 789/11 791/3 791/10 819/21 820/9
**firm [1]** 767/8
**first [21]** 722/22 722/22 725/21 725/24 726/25 736/25 768/10 772/4 776/17 782/11 783/14 784/22 791/14 797/11 798/3 801/18 805/9 827/12 829/13 834/7 837/23
**five [15]** 752/8 755/2 763/6 780/14 780/15 780/17 780/18 790/24 791/3 791/9 791/16 794/10 794/11 835/15 837/21
**five-minute [1]** 763/6
**five-or-ten-second [1]** 794/11
**five-to-ten-second [1]** 780/15
**flawed [2]** 774/20 774/21
**flexible [1]** 756/23
**flow [1]** 756/21
**follow [4]** 731/5 731/11 732/7 734/5
**followed [1]** 735/24
**following [8]** 725/3 734/2 744/9 757/23 785/10 825/15 826/25 836/12
**footnote [1]** 790/11
**force [61]** 728/17 728/17 728/20 730/20 731/9 731/19 731/20 732/4 732/5 736/1 737/19 738/1 739/1 739/23 741/21 745/18 745/18 745/24 748/21 748/24 749/1 755/21 756/1 765/3 765/5 765/8 765/13 765/18 766/6 766/12 766/13 766/14 770/4 770/19 770/20 771/5 771/18 776/10 776/22 777/3 777/13 777/16 789/6 798/1 798/2 798/15 799/3 800/17 801/2 805/21 810/8 810/18 815/5 819/8 823/19 826/19 829/19 830/8 830/22 832/8 832/12
**forcefully [3]** 771/18 773/4 815/22
**foregoing [1]** 839/5
**forget [1]** 832/22
**form [24]** 724/5 725/5 725/9 725/11 745/14 749/6 749/8 749/22 753/8
**753/10 753/17 753/20 753/22 753/23 754/1 756/24 759/9 759/21 762/10 762/12 825/4 837/4 837/5 837/11**
**format [1]** 839/7
**formatted [1]** 734/3
**formatting [2]** 733/22 734/6
**formed [1]** 787/20
**forms [2]** 812/20 838/2
**forth [5]** 730/2 733/24 740/8 740/15 823/17
**forward [2]** 820/13 838/10
**found [2]** 782/11 782/15
**foundation [2]** 798/21 814/1
**four [2]** 794/25 817/10
**Fourteenth [5]** 737/12 739/7 749/11 754/16 754/18 758/7 758/10 759/16
**Fourth [7]** 748/25 751/22 765/5 765/9 770/2 812/9 832/7
**frame [3]** 773/21 774/23 793/15
**frames [2]** 774/9 774/10
**free [2]** 769/19 811/23
**freeze [1]** 793/15
**freeze-frame [1]** 793/15
**friends [1]** 733/4
**front [5]** 742/13 750/17 784/15 806/25 807/4
**full [1]** 771/18
**full-force [1]** 771/18
**further [14]** 757/3 757/5 759/20 761/20 762/11 784/23 785/14 787/10 812/23 813/25 823/4 823/22 823/23 836/6
**fuzzy [1]** 746/20

**G**

**GALIPO [32]** 723/3 723/3 725/11 725/24 730/12 730/17 734/18 738/20 740/11 751/19 752/13 754/3 755/8 756/22 757/7 757/13 762/3 763/21 824/9 825/18 825/24 827/7 828/6 829/8 829/25 830/13 831/9 831/22 834/13 834/20 834/22 836/7
**Galipo's [1]** 739/21
**gap [3]** 774/14 774/14 774/18
**gate [13]** 784/16 784/18 784/19 784/20 784/23 784/24 784/25 785/2 785/6 785/6 785/9 796/9 805/24
**gated [1]** 794/15
**gates [1]** 784/20
**gave [8]** 726/21 783/8 783/9 783/18 786/23 787/3 815/18 823/12
**gee [1]** 798/17
**general [3]** 729/21 756/25 761/13
**generally [11]** 748/18 788/13 788/16 788/17 788/19 799/12 799/16 803/24 803/25 809/18 812/1
**gentleman [1]** 805/23
**gentlemen [1]** 824/13
**get [33]** 725/13 725/16 737/9 737/20 737/25 737/25 738/1 738/6 738/13 738/20 739/9 739/25 744/10 744/10 744/11 747/14 749/4 752/10 756/25 757/15 758/9 762/17 763/1 763/3 763/7 768/5 775/13 813/11 819/15 824/20 828/13 835/1 838/7
**gets [5]** 739/23 742/14 814/19 814/19 832/12
**getting [2]** 760/3 818/11

**give [20]** 733/5 736/21 740/23 742/18 744/15 744/15 748/10 753/13 762/22
**given [9]** 740/20 753/11 772/3 788/8 788/13 788/16 788/17 788/18 827/4
**gives [1]** 805/17
**giving [5]** 731/9 743/2 743/15 744/9 835/14
**glanced [1]** 780/22
**GLASMAN [1]** 723/14
**glasses [1]** 800/1
**gleaned [1]** 814/5
**gmail.com [2]** 722/24 723/12
**go [30]** 725/6 725/24 747/15 748/5 753/1 753/3 753/4 767/18 768/12 768/15 776/15 777/18 779/12 786/5 788/1 790/12 790/20 800/8 800/10 800/12 800/24 800/25 803/17 809/1 814/8 820/2 830/15 836/18 837/16 837/17
**goal [1]** 823/3
**goin' [1]** 795/22
**going [63]** 728/8 730/18 733/9 734/19 734/21 735/2 737/8 741/18 745/4 745/17 748/25 749/5 752/8 752/17 752/18 752/19 755/2 758/19 759/2 762/17 762/17 762/18 767/17 768/22 774/11 780/20 790/12 790/20 798/18 804/20 804/23 804/24 804/24 804/25 804/25 805/1 805/8 805/9 805/10 805/11 805/13 805/13 805/13 805/17 811/18 814/3 817/1 817/5 817/21 818/22 819/2 819/9 820/15 824/17 824/18 826/16 832/11 832/22 833/21 833/22 834/1 834/2 834/22
**gone [1]** 768/18
**good [7]** 731/25 764/3 764/4 821/5 821/15 821/15 838/9
**got [12]** 794/23 799/23 800/11 808/23 811/8 811/19 815/5 820/4 821/13 822/18 822/18 822/18
**gotten [1]** 725/19
**grab [6]** 755/13 796/24 797/7 797/14 817/6 822/6
**grabbed [1]** 817/21
**grabbing [3]** 817/3 818/12 820/8
**gradation [1]** 809/2
**Graham [1]** 746/15
**grammatically [1]** 735/21
**gray [1]** 735/25
**great [8]** 728/6 755/7 759/23 776/12 776/15 777/16 797/25 798/6
**ground [1]** 800/3
**guess [16]** 726/18 727/5 732/11 732/11 735/20 740/17 742/15 753/9 753/9 754/21 781/21 797/19 802/7 814/11 820/15 834/20
**guiding [1]** 750/11
**guilty [1]** 815/12
**gun [43]** 747/15 778/13 778/15 778/21 779/9 779/15 789/19 790/17 794/7 796/24 797/8 797/14 802/2 802/8 817/3 817/5 817/6 817/10 817/11 817/13 817/14 817/15 817/19 817/20 817/22 818/3 818/6 818/7 818/9 818/12 818/19 818/22 819/2 819/7 819/12 819/21

**G**

**gun... [7]** 819/22 819/23 819/25 820/1
820/8 820/12 822/18
**guns [2]** 779/5 779/14
**gunshots [1]** 809/20

**H**

**had [44]** 725/8 726/3 731/3 733/10
736/13 736/16 738/11 742/23 750/5
752/24 753/9 755/11 761/1 764/5
767/21 768/2 768/18 769/11 775/6
775/6 775/8 783/22 784/1 784/18
786/14 787/8 789/1 789/25 790/8
790/10 790/14 790/16 790/17 816/16
816/19 817/10 817/11 817/13 817/15
821/19 825/19 827/5 828/3 834/9
**hadn't [1]** 775/19
**half [5]** 769/2 769/3 774/14 774/15
774/18
**half-a-second [1]** 774/14
**hand [10]** 750/15 778/13 778/16
778/22 779/14 779/14 789/19 790/3
790/17 829/20
**handcuffed [1]** 803/15
**handle [2]** 765/10 766/5 766/7 817/13
**handling [2]** 821/5 821/15
**hands [4]** 778/25 789/14 801/15
814/24
**handy [1]** 794/20
**HANG [1]** 723/4
**happen [1]** 813/6
**happened [8]** 774/15 779/10 788/23
813/8 813/15 813/17 814/13 814/15
**happens [1]** 770/11
**hard [1]** 797/17
**harm [15]** 736/15 741/10 741/19
745/19 746/11 751/15 751/22 760/7
760/21 761/24 776/12 776/15 777/16
797/25 798/7
**harmonize [2]** 756/11 756/20
**has [38]** 725/19 726/14 732/23 733/16
733/19 735/24 736/14 742/6 742/15
743/4 760/17 764/16 765/17 773/11
774/9 774/23 785/18 786/6 792/25
798/21 799/19 800/18 800/21 800/24
800/25 801/1 803/8 804/16 823/11
823/11 823/14 823/14 823/15 823/21
827/22 828/8 829/11 838/5
**have [148]**
**haven't [3]** 781/20 782/10 787/7
**having [7]** 758/7 778/12 784/10 792/23
795/11 810/14 820/23
**he [159]**
**he's [5]** 740/12 805/17 815/9 817/5
835/2
**head [3]** 772/21 810/14 810/23
**hear [2]** 783/11 810/12
**heard [4]** 738/15 746/14 762/4 788/1
**hearing [1]** 838/10
**heart [2]** 802/19 803/4
**heavy [1]** 769/4
**held [6]** 725/3 748/18 757/23 825/15
826/25 839/6
**help [1]** 760/4
**helped [2]** 787/12 787/14
**here [20]** 736/7 760/4 765/17 766/16
767/9 772/14 794/21 808/25 812/25
820/5 820/5 820/6 821/25 822/13
822/14 824/23 825/19 832/9 837/19
837/19
**here's [1]** 736/24
**hereby [1]** 839/3
**herself [1]** 730/21
**hesitant [1]** 790/2
**Hey [1]** 795/22
**hierarchy [1]** 818/5
**high [2]** 809/9 822/4
**higher [2]** 739/8 809/21
**highlighted [3]** 734/4 734/10 829/9
**Hills [1]** 723/6
**him [45]** 730/21 739/24 751/21 760/8
760/22 761/25 773/14 775/18 776/6
780/14 781/5 781/7 783/1 785/16
785/22 786/4 786/6 788/5 789/1 791/8
792/8 793/17 793/25 794/10 794/18
795/5 796/9 801/13 801/13 801/15
801/16 802/15 804/21 808/11 808/17
808/21 811/15 813/8 820/14 822/6
822/6 822/7 822/8 830/9 832/17
**himself [1]** 810/16
**his [90]** 740/1 745/19 747/9 747/9
751/8 760/8 760/22 761/25 771/24
772/21 773/17 774/12 779/24 780/23
780/25 781/4 782/15 782/15 782/25
783/8 783/13 783/15 783/18 784/18
785/13 785/22 786/16 786/18 786/23
787/3 787/16 787/16 787/25 788/21
789/19 791/2 791/3 791/19 792/15
792/15 792/18 793/17 794/7 797/7
797/12 799/22 800/8 800/11 800/12
800/14 801/15 801/15 801/21 802/7
802/19 806/25 807/4 807/9 807/10
807/16 807/21 808/2 808/3 810/14
810/17 810/23 811/11 813/10 813/11
813/14 814/24 815/12 815/16 816/3
816/3 816/13 817/3 819/20 820/8 820/8
821/4 821/14 821/21 821/25 822/1
822/6 823/15 827/22 832/18 835/2
**hit [1]** 791/8
**hold [2]** 745/20 758/16
**holster [1]** 791/3
**home [1]** 768/22
**homesteading [1]** 784/7
**homework [1]** 752/5
**Honor [36]** 734/25 737/7 743/10
747/23 749/15 751/11 752/1 753/5
754/5 755/14 757/8 757/11 757/18
758/19 761/10 761/15 762/13 762/15
763/23 810/3 820/17 823/4 823/7
823/23 824/3 824/11 827/8 828/5
828/22 830/1 830/5 830/14 831/23
834/5 835/23 837/7
**HONORABLE [1]** 722/4
**hop [2]** 781/5 782/25
**hope [2]** 762/20 837/22
**hopefully [3]** 752/11 756/20 758/2
**hoping [1]** 732/5
**hopped [1]** 781/1
**hospital [1]** 816/17
**hotel [1]** 784/4
**hour [7]** 752/18 766/24 767/1 767/9
769/8 789/24 824/25
**hours [7]** 767/2 767/4 768/21 769/2
769/3 769/5 769/6
**house [1]** 800/8

**how [26]** 726/18 756/5 761/23 764/5
764/8 766/2 766/21 766/24 767/2
768/21 769/1 778/21 779/3 779/11
782/2 783/25 795/22 803/14 804/11
807/4 808/7 809/6 820/4 827/21 827/22
833/22
**How's [1]** 795/22
**However [1]** 740/14
**huh [1]** 821/3
**hundred [1]** 778/25
**hypothetical [7]** 773/2 775/13 777/18
777/25 789/8 810/10 823/16
**hypothetically [8]** 773/3 775/14
775/24 777/2 777/10 788/20 804/16
810/13

**I**

**I'd [3]** 738/16 776/16 837/25
**I'll [20]** 734/25 736/21 740/18 748/10
749/15 750/17 751/20 754/17 755/5
762/21 762/22 805/5 805/7 809/5
826/11 826/11 832/25 835/3 835/3
836/14
**I'm [92]** 729/15 732/13 732/23 733/17
736/8 736/18 737/22 740/23 741/18
745/16 748/1 748/4 748/13 748/23
749/4 749/11 750/6 750/17 750/23
750/24 752/8 752/18 753/12 754/4
756/23 758/19 760/3 760/20 761/10
762/7 762/17 762/17 764/13 764/24
766/22 771/25 773/13 774/1 774/11
774/17 774/18 780/17 780/20 787/22
789/8 790/12 790/15 793/17 793/18
801/9 804/23 804/24 804/24 804/25
804/25 805/1 805/8 805/9 805/10
805/11 805/13 805/13 805/13 806/15
806/15 808/12 808/12 810/12 811/5
813/14 814/8 814/13 814/17 815/5
815/7 816/13 818/11 822/12 824/17
824/18 827/15 827/17 827/20 827/23
828/1 828/20 831/4 831/17 833/21
833/22 834/1 835/13
**I've [6]** 734/18 742/23 781/19 794/13
810/24 821/13
**idea [1]** 756/25
**identification [1]** 731/7
**if [158]**
**ignorance [2]** 821/21 822/1
**ignorant [1]** 821/24
**II [6]** 722/7 741/9 741/20 760/8 760/22
761/25
**II's [2]** 741/22 744/3
**illegal [1]** 770/11
**imagine [1]** 796/12
**imminent [8]** 775/22 776/11 797/25
799/2 799/5 810/10 817/17 819/8
**impairment [2]** 820/24 821/19
**important [2]** 738/24 775/11
**impossible [1]** 793/17
**impression [1]** 800/12
**impressions [1]** 726/24
**improper [1]** 812/8
**inappropriate [3]** 776/5 810/9 810/19
**Inappropriately [1]** 820/25
**inbred [1]** 774/9
**incapacitation [1]** 822/14
**inch [1]** 835/19
**inches [2]** 820/3 820/12

**I**

**incident [5]** 782/8 782/21 788/21
797/6 807/17
**inclined [3]** 740/23 753/13 828/1
**include [6]** 728/15 728/21 760/12
767/21 767/24 799/15
**includes [1]** 795/21
**including [3]** 729/3 748/21 832/6
**Inclusive [1]** 722/19
**inconsistent [2]** 819/10 819/24
**incorrect [2]** 827/12 827/16
**increase [1]** 777/25
**INDEX [2]** 724/8 724/13
**indicate [2]** 727/6 806/13
**indicated [7]** 730/17 767/12 794/2
806/3 811/10 812/1 812/15
**indicates [1]** 814/5
**indicating [5]** 805/23 820/5 820/5
820/6 820/6
**indication [3]** 763/1 763/3 811/2
**indiscernible [1]** 806/8
**individual [4]** 785/12 796/13 800/25
820/13
**individuals [2]** 722/6 766/8
**Industry [1]** 723/16
**infliction [2]** 736/14 736/15
**influence [3]** 786/23 788/5 788/22
789/1
**information [7]** 781/9 787/18 787/19
814/4 814/5 821/22 823/3
**informed [1]** 785/20
**initial [3]** 799/22 821/4 821/14
**initially [2]** 791/18 792/1
**initiating [1]** 794/19
**injured [1]** 808/10
**injuries [4]** 751/7 808/5 808/7 808/14
**injury [2]** 741/10 741/19
**input [1]** 747/7
**inquire [1]** 785/14
**insane [3]** 796/14 796/15 796/16
**instruct [6]** 754/23 762/23 763/4
824/21 836/9 836/14
**instructed [2]** 744/23 769/21
**instruction [63]** 726/10 727/12 727/17
728/7 728/12 728/19 728/22 729/25
732/16 732/20 733/13 734/16 734/20
736/18 736/25 737/24 738/7 738/18
738/22 739/18 739/19 739/22 740/2
740/6 740/8 740/15 741/1 742/5 742/3
743/3 743/4 743/10 743/11 743/11
743/19 744/6 744/24 746/6 748/12
749/19 750/21 750/22 751/16 751/17
752/6 755/9 755/11 758/15 758/16
758/17 758/19 759/15 760/11 760/11
826/9 828/23 829/4 829/13 830/7
830/18 830/25 831/8 831/25
**instructions [37]** 724/3 724/5 725/5
725/7 725/9 725/12 725/20 726/1 726/2
731/12 742/18 743/16 744/10 744/13
749/15 749/16 750/11 752/10 752/12
753/12 756/1 762/12 762/21 824/15
824/22 825/17 826/3 826/17 827/5
827/24 828/4 828/14 828/21 831/21
832/21 833/11 838/1
**insufficient [1]** 798/15
**intend [3]** 740/7 833/11 834/21
**intending [1]** 826/1

**intent [1]** 834/24
**INTEREST [1]** 722/7
**interesting [1]** 830/24
**interference [2]** 759/11 759/16
**interpretation [1]** 783/16
**interpreted [1]** 787/9
**interview [1]** 815/19
**intimation [1]** 777/11
**intimidating [1]** 822/19
**intoxication [1]** 813/16
**introductory [4]** 728/12 728/15 728/22
729/5
**intrusion [1]** 784/8
**investigation [4]** 769/17 787/10
812/23 813/25
**investigative [1]** 771/12
**involve [1]** 765/7
**involved [4]** 764/17 765/12 766/6
766/8
**involving [2]** 727/17 736/14
**is [270]**
**isn't [37]** 766/15 766/18 770/7 770/9
770/25 771/2 773/8 778/13 779/16
779/18 781/5 781/7 786/22 786/25
788/12 792/2 792/11 792/14 792/16
793/7 794/3 797/8 797/16 800/7 800/13
801/21 805/12 806/4 806/7 816/4 816/7
816/9 816/16 816/22 817/18 819/3
819/16
**issue [17]** 731/7 733/10 734/24 738/11
738/12 743/22 750/17 758/8 804/18
825/24 826/8 830/16 831/24 833/20
835/25 836/4 838/7
**issues [8]** 725/22 725/25 753/19 828/7
829/8 833/10 836/1 837/4
**it [313]**
**it's [85]** 728/18 730/7 732/22 733/18
734/10 737/4 737/23 737/23 737/24
738/24 740/4 740/8 740/20 740/21
742/12 743/3 744/12 744/14 745/13
745/14 746/8 750/6 752/24 753/10
753/15 754/10 758/4 758/19 762/4
764/20 765/9 766/12 766/19 773/10
777/15 778/10 783/16 786/7 787/22
789/4 789/8 792/16 792/22 793/8
793/15 793/16 793/20 795/19 796/13
796/18 797/17 797/17 798/8 798/9
798/17 799/1 799/5 801/5 801/7 804/17
805/16 805/18 806/8 807/25 809/15
814/12 815/24 816/7 816/22 816/24
817/4 818/9 818/24 819/9 819/24 820/4
822/17 822/25 827/16 830/24 832/10
832/16 835/17 837/6 837/22
**Item [1]** 760/13
**Item 1 [1]** 760/13
**its [3]** 743/5 774/9 774/23
**itself [4]** 733/7 806/17 822/19 832/8

**J**

**jeopardy [2]** 776/20 819/8
**job [2]** 766/22 835/18
**John [1]** 787/4
**join [2]** 735/6 735/14
**JR [1]** 722/4
**judge [2]** 722/4 761/15
**judge left [1]** 761/15
**judgment [1]** 834/10
**Judicial [1]** 839/8

**July [1]** 783/19
**July 3rd [1]** 783/19
**jump [3]** 748/12 784/18 794/15
**jumped [2]** 785/3 785/4
**jumping [1]** 785/9
**jumps [1]** 796/9
**jurors [6]** 732/1 734/20 763/13 825/14
837/18 837/20
**jury [43]** 722/19 724/2 724/5 725/5
731/8 731/12 732/23 733/5 734/16
738/25 740/22 742/4 742/19 754/23
759/15 762/12 762/18 762/23 763/1
763/7 763/12 765/17 770/25 771/7
771/9 771/14 776/24 776/25 777/1
785/20 795/3 811/24 824/13 824/15
825/13 825/17 827/5 833/1 833/10
833/11 834/22 836/19 838/1
**jury's [4]** 725/3 757/23 825/15 826/25
**just [94]** 726/16 727/6 728/17 728/20
728/24 729/20 731/2 731/7 731/12
731/25 732/5 732/7 733/5 736/9 738/11
738/12 738/19 738/24 739/15 741/8
741/20 742/8 742/10 743/3 744/1
744/12 745/11 746/4 746/13 747/4
747/11 748/4 748/6 749/4 750/1 750/6
750/10 751/1 751/15 752/21 752/24
753/22 754/7 756/3 758/17 760/2
760/12 760/14 760/19 760/20 761/18
762/12 764/24 775/24 776/1 776/21
777/23 777/25 778/1 778/1 784/5 786/4
789/2 795/15 795/19 796/11 798/19
800/8 800/12 801/9 803/15 803/25
808/12 815/5 815/7 815/13 819/6 822/9
823/11 826/6 826/11 827/15 828/10
830/15 831/4 831/24 832/19 833/21
833/23 835/6 835/17 836/17 837/16
837/19
**justification [5]** 776/10 784/10 794/11
798/1 805/20
**justified [5]** 777/17 785/15 799/7
799/10 799/11
**justifies [1]** 814/19
**justify [2]** 805/18 815/1
**juvenile [2]** 804/11 804/11

**K**

**keep [11]** 726/14 727/19 728/3 730/4
747/19 749/5 751/2 759/1 759/2 760/15
833/23
**keeping [1]** 747/20
**Kelsey [26]** 726/19 727/3 747/3 747/10
747/11 747/13 791/14 791/21 792/5
792/6 792/11 792/13 792/18 792/21
792/22 792/25 793/2 793/3 793/9
793/11 793/15 793/19 796/3 805/23
815/23 817/4
**Kelsey's [4]** 780/1 780/3 791/12
805/22
**Kennedy [7]** 780/5 793/23 794/2 806/5
815/23 817/4 821/23
**Kennedy's [1]** 806/2
**kept [1]** 760/17
**key [5]** 733/11 762/25 779/18 779/19
782/11
**keyword [1]** 803/20
**kicks [1]** 799/15
**kill [6]** 747/15 747/15 775/18 798/19
809/19 809/21

# K

killed [1] 822/8
kind [14] 726/21 775/12 780/22 780/22
780/25 796/14 796/15 796/16 797/17
813/17 817/12 822/24 822/25 825/9
kinds [1] 745/5
knew [1] 752/25
knives [2] 778/25 779/14
knocked [3] 800/3 810/8 810/14
knocking [1] 747/14
know [55] 726/20 728/11 728/20 729/6
729/7 729/18 729/19 731/21 732/3
732/25 736/9 737/8 739/9 741/25
752/16 752/19 753/16 758/4 767/5
774/10 774/19 775/8 781/12 781/15
782/2 789/14 790/14 791/1 791/4 795/4
796/2 796/10 796/25 797/9 797/10
797/16 804/11 804/16 804/18 811/4
813/21 816/11 817/7 817/8 817/8 817/9
822/25 826/14 828/2 828/7 832/11
833/18 834/3 835/15 835/16
knows [1] 732/24
Kyle [5] 747/9 782/24 792/10 807/22
807/23
Kyle Woods [4] 782/24 792/10 807/22
807/23

# L

lack [1] 806/18
ladies [1] 824/13
land [3] 792/14 793/7 793/10
landed [6] 773/7 776/2 794/3 800/3
808/2 808/3
language [25] 730/18 730/19 731/5
734/22 735/23 744/20 746/22 748/5
750/25 751/3 751/9 751/23 753/13
755/12 760/2 762/5 762/7 762/9 828/18
828/20 829/24 830/11 830/12 832/2
832/17
large [1] 740/1
last [14] 749/23 769/11 794/24 798/8
798/9 814/13 814/16 818/9 819/18
821/4 821/10 827/18 830/19 831/16
lastly [1] 817/2
lasts [1] 769/19
late [2] 763/2 837/21
later [8] 739/12 788/18 788/24 791/3
797/12 814/23 815/3 821/22
latter [1] 727/8
law [41] 723/3 723/3 723/4 723/4
723/9 723/10 723/14 729/21 731/12
733/23 734/12 735/3 735/8 737/5 738/8
739/15 742/2 742/5 742/6 742/8 742/9
742/14 742/16 742/21 742/22 743/3
760/18 767/8 769/14 811/22 812/10
814/6 814/7 824/22 826/10 828/9
828/11 828/25 829/4 832/6 832/7
lawful [2] 731/18 732/10
laws [6] 731/10 731/15 734/3 734/5
734/24 735/24
lawyer [2] 788/24 835/20
lawyers [1] 824/17
lay [3] 726/15 726/16 727/17
LE [3] 723/4 760/4 760/5
Learning [8] 818/1 818/14 818/18
818/25 819/1 819/6 819/11 822/1
lease [11] 781/23 781/24 781/25 782/2

782/5 782/7 782/9 782/19 782/20
782/22 782/25
least [9] 731/44 732/1 735/5 753/1
754/22 808/2 813/12 819/20 836/1
leave [2] 811/23 832/9
leaves [1] 791/9
lectern [1] 828/7
leeway [1] 835/21
left [5] 736/5 761/15 761/15 768/21
791/9
legal [1] 784/9
less [7] 809/12 809/14 809/15 809/15
809/17 809/18 809/19
let [32] 726/8 731/14 733/20 736/6
750/13 752/9 752/21 755/13 757/12
758/18 760/19 773/2 775/1 775/13
776/21 779/12 783/20 784/11 784/13
785/17 786/4 788/7 791/15 798/2
803/17 805/16 807/12 825/21 828/2
828/7 828/12 836/19
let's [29] 725/6 725/20 738/20 748/5
758/12 759/7 760/3 761/23 763/6
770/24 771/16 775/24 776/1 777/10
777/18 777/25 778/2 788/1 788/20
791/11 794/9 803/15 803/25 809/17
826/16 826/21 828/6 837/19 837/21
lethal [7] 809/12 809/14 809/15 809/16
809/17 809/18 809/19
liability [2] 744/10 744/15
life [29] 774/22 776/20 776/23 777/2
777/11 777/15 778/4 778/10 779/17
779/18 797/20 797/24 797/25 798/4
798/13 798/18 799/2 799/6 799/9
799/19 799/21 805/17 805/18 810/18
814/8 818/8 818/10 818/16 819/7
life-threatening [16] 776/23 777/2
777/11 777/15 778/4 778/10 797/20
797/24 798/4 799/2 799/6 799/9
799/21 805/17 805/18 818/4
light [1] 775/6
light-colored [1] 775/6
like [16] 733/23 752/15 754/22 756/19
765/17 769/20 776/16 786/9 790/2
795/4 795/19 796/10 796/13 798/19
807/16 812/3
likelihood [1] 809/21
likely [2] 825/1 836/15
liking [1] 769/20
limited [1] 726/3
limits [3] 836/1 836/2 836/3
line [29] 730/24 730/24 731/23 732/8
732/9 732/18 733/24 733/24 733/25
734/1 734/4 734/4 734/8 734/9 734/9
735/4 735/4 741/9 741/21 756/1 760/15
814/4 814/21 823/10 829/16 829/18
829/20 830/8 830/9
linear [1] 814/4
lines [17] 729/7 729/17 731/4 731/4
731/6 731/10 731/22 744/24 745/11
745/20 748/7 755/24 761/14 794/25
821/4 821/10 830/19
listed [1] 827/23
listen [3] 786/15 813/9 822/4
listened [1] 780/7
listening [1] 796/22
litigated [1] 738/11
litigation [1] 827/23
little [9] 742/14 746/20 752/9 755/9

756/21 769/4 784/25 822/8 837/19
live [3] 738/18 778/5 784/7
live-threatening [1] 778/5
lived [4] 781/17 781/19 786/24 813/21
livelihood [2] 766/21 766/25
lives [1] 784/6
living [2] 766/21 787/13
location [2] 733/11 784/15
locked [5] 784/16 784/18 785/2 785/5
785/6
logic [1] 731/25
long [3] 740/18 769/1 820/4
longer [3] 752/9 752/25 769/4
look [22] 730/24 731/3 731/15 734/18
742/23 743/7 743/19 747/2 747/18
750/13 750/17 752/22 807/16 807/21
807/21 810/2 820/16 821/2 829/14
830/15 833/25 838/10
looked [9] 772/7 772/12 773/20
780/10 780/14 780/22 780/25 806/19
827/21
looking [7] 760/11 791/15 794/10
806/12 816/13 819/19 820/19
loop [1] 826/14
Los [3] 722/16 722/23 725/1
losing [4] 810/15 810/15 818/7 820/13
loss [3] 741/10 741/19 811/2
lot [8] 733/6 738/9 784/9 792/23
792/25 812/5 832/13 832/14
lots [2] 733/1 778/20
lunch [8] 725/10 753/2 753/18 753/18
753/22 824/25 825/2 825/2

# M

Madam [1] 838/1
made [13] 750/16 752/24 769/11
770/17 770/18 783/7 787/25 815/2
815/4 815/10 815/11 829/9 831/19
mailed [1] 838/2
Main [1] 784/21
maintain [1] 810/16
majority [4] 765/7 765/11 766/4 766/9
make [27] 725/15 731/7 732/1 738/19
738/24 739/16 744/17 748/6 752/15
756/20 757/6 759/24 762/16 762/17
766/21 770/14 785/16 801/1 803/1
826/5 828/13 829/7 832/11 832/23
833/18 835/6 837/16
makes [1] 744/15
making [1] 818/1 830/22
malicious [2] 750/2 750/7
man [1] 738/11
manager [3] 787/15 787/16 793/24
manner [1] 794/17
many [15] 764/5 765/4 765/10 765/20
765/22 765/23 765/25 766/2 766/9
767/2 768/21 778/21 779/3 779/10
779/11
MARCEL [1] 723/4
March [3] 722/17 725/1 839/11
mass [2] 814/20 814/21
match [1] 729/11
material [1] 774/24
materials [2] 771/12 801/10
math [2] 780/17 780/20
matter [5] 744/12 813/20 825/5 825/9
839/7
may [13] 737/3 742/13 742/24 744/8

# M

**may... [9]** 750/16 754/16 754/16 763/21 810/2 820/16 823/24 824/1 826/12

**maybe [20]** 731/10 732/11 733/3 744/14 745/7 749/10 749/20 750/5 752/9 752/18 804/9 804/9 804/10 804/10 804/14 804/14 807/16 816/19 835/14 836/16

**me [73]** 725/13 725/19 725/24 726/8 728/23 731/14 733/20 736/6 738/24 739/9 742/13 743/17 746/16 747/14 747/15 750/13 752/9 752/21 753/22 755/13 757/12 758/18 760/19 762/3 764/18 768/2 768/15 768/18 771/12 771/22 773/2 774/1 775/1 775/13 776/17 776/21 776/22 778/18 778/24 779/4 779/5 779/7 780/22 780/25 783/20 784/11 784/13 785/17 785/25 787/23 788/7 788/12 789/10 789/13 789/17 790/6 796/13 797/19 798/2 805/16 807/12 807/22 808/4 812/3 815/14 825/21 828/2 828/7 828/12 832/17 834/24 835/14 838/2

**mean [15]** 734/18 734/18 738/10 741/15 752/23 753/4 753/9 758/15 758/23 784/6 785/22 805/3 823/1 833/22 836/16

**means [4]** 732/24 758/13 758/14 802/2

**mechanical [3]** 774/2 774/5 774/8

**medical [10]** 802/25 806/16 810/25 816/5 816/9 816/11 816/15 816/21 816/22 816/25

**members [1]** 765/2

**memory [1]** 746/20

**mental [6]** 820/23 821/6 821/16 821/19 821/21 822/2

**mention [3]** 746/23 816/15 816/18

**mentioned [2]** 817/10 817/18

**mere [2]** 770/14 805/20

**merely [1]** 778/12

**methamphetamine [2]** 786/10 786/23

**middle [1]** 734/23

**might [10]** 738/3 743/10 743/15 751/12 765/14 802/14 806/13 807/16 812/15 831/16

**mileage [1]** 769/9

**mind [11]** 728/14 790/9 800/24 803/16 803/20 803/21 803/23 809/3 813/7 813/24 819/19

**minute [3]** 763/6 776/7 826/15

**minutes [15]** 752/9 752/25 755/2 768/24 769/5 813/6 813/15 824/23 826/21 834/11 834/17 834/21 835/3 835/15 837/21

**miscommunication [2]** 812/16 812/20

**misconception [1]** 733/6

**misdemeanor [2]** 804/2 804/6

**miss [1]** 730/22

**missed [1]** 749/20

**missing [1]** 750/6

**misstates [2]** 802/20 805/2

**mistake [4]** 790/7 790/7 812/16 812/19

**mistakes [4]** 790/8 790/14 790/16 790/17

**model [1]** 736/8

**modifications [1]** 741/5

**modified [1]** 743/4

**modifying [1]** 741/6

**modulating [1]** 822/20

**moment [14]** 727/22 748/11 757/13 761/5 770/24 773/5 774/22 776/3 790/13 790/20 794/9 810/2 820/16 826/12

**Monday [2]** 722/17 725/1

**monitor [1]** 772/14

**month [3]** 782/7 782/19 782/19

**months [1]** 769/19

**moot [1]** 738/22

**more [17]** 756/21 756/21 769/21 774/11 775/5 775/10 776/14 785/1 801/21 806/14 811/15 811/15 818/5 818/17 829/21 835/19 835/20

**morning [13]** 763/4 776/9 785/20 786/3 795/3 798/20 809/8 811/24 823/12 823/19 824/19 836/10 837/23

**most [3]** 725/21 829/10 833/15

**motel [6]** 732/25 733/3 733/6 768/25 784/1 793/24

**mother [2]** 782/15 787/11

**motion [3]** 820/2 824/5 832/23

**motions [2]** 824/6 836/20

**move [4]** 731/11 734/12 735/3 735/24

**moved [2]** 732/8 734/3

**Movement [1]** 774/22

**movements [2]** 793/14

**moving [2]** 732/16 793/11

**Mr [6]** 749/17 761/2 792/20 821/21 827/12 837/24

**Mr. [198]**

**Mr. Chapman [11]** 752/18 764/3 765/7 769/22 777/10 782/11 784/13 790/21 793/3 823/10 824/4

**Mr. Conaway [13]** 733/14 750/18 751/21 753/25 827/10 830/2 831/11 833/5 834/21 835/1 835/6 836/7 837/9

**Mr. Conaway's [1]** 735/6

**Mr. Ewing [35]** 725/17 726/9 727/11 727/21 728/25 729/24 730/9 733/21 735/15 736/21 738/9 739/17 746/16 747/6 748/11 751/25 753/9 756/5 757/10 759/7 761/2 761/6 762/6 762/14 823/6 824/2 828/3 830/4 831/13 833/10 834/1 834/16 835/25 836/25 837/12

**Mr. Galipo [30]** 725/11 725/24 730/12 730/17 734/18 738/20 740/11 751/19 752/13 754/3 755/8 756/22 757/7 757/13 762/3 763/21 824/9 825/18 825/24 827/7 828/6 829/8 829/25 830/13 831/9 831/22 834/13 834/20 834/22 836/7

**Mr. Galipo's [1]** 739/21

**Mr. Graham [1]** 746/15

**Mr. Kelsey [19]** 791/14 791/21 792/5 792/6 792/11 792/13 792/18 792/21 792/22 792/25 793/2 793/3 793/9 793/11 793/15 793/19 796/3 805/23 815/23

**Mr. Kelsey's [4]** 780/1 780/3 791/12 805/22

**Mr. Kennedy [5]** 793/23 794/2 806/5 815/23 821/23

**Mr. Kennedy's [1]** 806/2

**Mr. Parris Ward [1]** 773/20

**Mr. Pickett [61]** 729/20 731/9 771/18

773/8 773/24 775/2 775/8 775/14 775/19 780/13 788/14 790/22 791/1 781/12 782/25 785/22 786/9 786/22 788/4 788/21 788/25 789/11 790/10 790/18 791/8 791/15 791/20 791/25 792/4 792/11 792/13 792/24 793/2 793/4 793/7 793/10 794/3 794/6 794/10 794/15 794/17 796/4 797/7 797/22 802/15 804/19 805/24 807/23 808/1 808/8 808/9 808/15 811/14 812/2 813/1 817/3 821/19 821/23 822/5 822/10 833/16

**Mr. Pickett's [8]** 730/3 782/12 789/14 789/19 790/17 807/7 812/17 814/24

**Mr. Ward [3]** 773/22 773/23 774/19

**Mr. Woods [4]** 771/23 772/8 782/24 822/12

**Ms. [2]** 760/4 760/5

**Ms. Le [2]** 760/4 760/5

**much [3]** 752/22 766/24 776/16

**muddled [1]** 797/18

**multiple [2]** 775/2 829/3

**muzzle [1]** 801/25

**my [76]** 727/5 728/11 728/14 729/22 733/12 733/22 736/6 736/24 738/4 741/12 746/20 747/8 747/15 748/24 749/10 750/19 752/17 752/19 753/11 754/11 755/1 762/20 764/18 765/11 766/9 766/9 766/16 766/17 766/21 766/21 766/22 766/22 767/7 767/7 769/9 771/13 775/13 775/20 777/8 777/18 777/25 779/17 780/17 782/20 786/15 787/20 787/20 789/12 789/16 789/20 790/7 790/14 790/16 796/1 798/18 800/19 800/21 801/9 806/18 808/6 809/3 810/2 812/11 812/11 813/12 816/24 817/5 819/18 820/3 820/16 825/21 826/12 829/11 833/14 834/10 836/9

**myself [1]** 770/23

# N

**N-a-t-h-a-n-i-e-l [1]** 827/19

**N-a-t-h-i-e-l [1]** 827/16

**name [25]** 730/3 783/8 783/9 783/10 783/13 783/15 785/23 786/23 787/3 787/3 787/4 788/23 803/7 803/8 803/13 803/18 803/22 812/17 813/13 813/14 813/23 827/12 827/18 827/22 833/6

**named [1]** 780/5

**names [1]** 834/7

**Nate [11]** 747/14 800/8 800/12 801/11 801/17 801/20 806/3 806/6 823/13 833/16 833/19

**Nate Pickett [1]** 823/13

**Nate's [1]** 803/3

**NATHANAEL [18]** 722/6 722/7 741/9 741/20 741/22 744/3 745/25 751/5 760/8 760/16 760/22 761/25 783/10 783/12 787/5 787/12 832/9 834/2

**Nathanael Pickett [3]** 760/16 783/10 787/12

**Nathanael Pickett II [5]** 741/9 741/20 760/8 760/22 761/25

**Nathanael Pickett's [2]** 745/25 751/5

**Nathanael Pigget [1]** 783/12

**Nathaniel's [1]** 827/12

**national [2]** 804/5 804/7

**N**

**NCIC [1]** 804/5
**necessarily [1]** 804/2
**necessary [3]** 739/22 740/2 762/4
**need [34]** 726/6 726/11 727/10 727/15
737/22 738/5 738/14 738/21 738/23
739/9 739/24 740/6 742/10 743/7 744/1
745/17 748/23 749/5 749/6 749/12
750/15 751/2 752/22 753/2 753/3 753/3
754/17 754/25 755/9 757/4 826/17
832/10 834/8 836/6
**needed [1]** 808/18
**needs [2]** 732/8 759/21
**negative [1]** 758/5
**neglected [1]** 825/19
**negligence [13]** 737/17 737/22 741/13
741/17 742/9 743/11 743/16 744/2
744/6 744/11 744/14 828/25 829/5
**negligent [1]** 744/1
**neighborhood [1]** 764/7
**nervousness [1]** 813/19
**never [28]** 739/13 773/3 779/4 779/5
779/5 779/17 781/4 781/7 781/19
789/18 791/14 792/13 793/6 793/11
794/2 794/6 794/9 797/6 797/9 803/17
803/21 817/5 818/2 819/9 819/13
821/18 822/16 822/16
**new [2]** 813/8 827/4
**newest [1]** 829/13
**news [2]** 758/3 758/5
**next [10]** 741/1 741/21 743/9 752/8
796/20 801/9 824/2 830/6 831/16 835/1
**night [2]** 795/22 817/6
**Ninth [3]** 736/4 748/19 832/6
**no [120]**
**No. [11]** 736/4 751/3 755/11 759/15
760/15 782/8 782/12 829/13 830/7
830/18 830/25
**No. 10 [1]** 736/4
**No. 13 [1]** 829/13
**No. 15 [1]** 755/11
**No. 16 [2]** 830/18 830/25
**No. 19 [1]** 830/7
**No. 2 [2]** 751/3 760/15
**No. 20 [1]** 759/15
**No. 45 [2]** 782/8 782/12
**Nobody [2]** 817/15 819/5
**none [4]** 776/2 778/23 779/12 833/6
**nonspecific [1]** 776/8
**nonthreatening [1]** 822/3
**normal [2]** 795/20 795/21
**normally [1]** 788/8
**North [1]** 723/15
**nose [3]** 799/24 816/3 816/3 816/8
816/12 816/14 816/20
**not [155]**
**note [2]** 726/14 830/7
**notes [6]** 752/2 752/17 810/2 820/17
825/19 825/21
**nothing [2]** 815/11 823/22
**notice [1]** 744/5
**notion [2]** 740/10 740/13
**November [6]** 781/24 782/3 782/9
782/9 782/21 782/21
**November 19th [1]** 782/9
**November 1st [2]** 781/24 782/9
**now [36]** 725/19 728/18 732/6 739/11

744/5 744/13 748/12 751/1 759/25
760/18 767/22 769/1 776/14
777/12 777/22 779/5 779/20 781/12
783/8 783/16 789/9 794/9 796/22
800/15 803/6 803/12 804/19 811/5
812/25 813/7 814/15 815/9 823/11
828/15 834/9
**nowhere [4]** 818/19 819/1 819/1 819/3
**number [8]** 729/11 736/23 750/19
758/17 817/19 817/21 818/18 821/10
**numbering [1]** 758/20
**numbers [1]** 728/8
**numeral [1]** 811/20
**numerous [2]** 778/17 778/20
**nurse [1]** 816/16

**O**

**o'clock [1]** 837/20
**object [1]** 792/3
**objection [15]** 729/2 730/10 735/19
739/19 749/16 752/3 752/4 761/12
802/20 802/23 805/2 828/2 829/24
830/12 831/7
**objections [7]** 753/19 753/23 753/25
757/4 757/5 831/21 833/5
**objective [1]** 813/16
**objectively [1]** 798/22
**obligation [1]** 811/22
**observations [2]** 726/24 815/9
**observed [3]** 726/22 727/7 815/2
**obstructed [1]** 792/19
**obstructing [1]** 730/18
**obtaining [1]** 823/3
**obviously [5]** 743/22 746/16 821/24
834/6 834/25
**occur [1]** 774/15
**occurred [4]** 782/8 782/21 793/20
808/7
**occurrence [1]** 775/10
**October [1]** 782/6
**October 1st [1]** 782/6
**odd [1]** 738/11
**off [3]** 758/20 784/21 800/3
**offer [2]** 761/13 766/13
**offered [2]** 761/14 823/18
**office [1]** 786/14
**officer [31]** 727/1 731/19 732/4 732/4
736/1 736/13 764/17 766/8 779/9
785/10 785/19 785/21 786/4 786/6
795/4 795/18 796/8 796/9 796/11
796/18 796/23 798/17 798/25 801/3
801/8 805/17 812/7 813/25 830/7
830/22 831/3
**officer's [3]** 731/18 732/10 799/6
**officer-involved [1]** 766/8
**officers [6]** 765/2 800/16 811/22
812/12 817/19 818/2
**OFFICES [2]** 723/3 723/9
**Official [2]** 722/21 839/17
**officious [1]** 823/2
**oh [22]** 728/5 745/20 750/8 755/17
764/7 769/2 778/17 779/10 781/25
782/2 783/7 784/5 792/5 795/18 798/17
820/21 822/25 831/1 831/17 831/17
837/4 838/4
**oil [1]** 809/9
**OIS [1]** 766/7
**okay [87]** 725/15 726/12 727/16

727/20 728/6 729/14 730/4 731/2
731/16 732/13 733/12 734/25 735/20
741/24 743/1 743/8 743/19 744/4
744/14 744/17 745/10 745/15 745/20
746/2 747/17 748/8 748/10 748/14
749/13 751/24 752/7 753/24 755/7
755/17 756/9 757/1 757/3 758/6 758/12
758/21 759/4 761/23 762/5 764/25
771/16 772/1 772/7 773/7 775/13
775/18 776/21 777/18 777/25 778/20
779/7 780/7 783/7 784/3 784/20 785/17
790/12 790/22 791/25 794/24 796/17
801/7 802/13 803/6 803/12 806/19
809/5 810/1 810/12 813/5 813/9 816/7
816/24 818/1 818/9 819/18 821/13
827/20 828/12 831/4 833/9 834/4 836/5
**old [2]** 754/10 758/20
**on [223]**
**once [5]** 757/25 763/17 773/3 825/4
827/2
**one [56]** 731/16 732/19 738/14 739/6
740/5 745/8 749/11 749/19 750/13
750/15 751/14 754/7 755/8 756/12
756/13 764/16 764/25 766/18 771/17
771/20 773/4 773/24 773/24 774/4
774/10 774/13 774/18 775/14 775/15
780/18 780/19 782/7 788/18 789/12
789/16 789/20 790/9 790/24 791/5
792/9 792/14 800/23 803/5 806/13
817/12 817/19 818/18 820/21 822/23
825/18 826/13 828/18 829/21 831/2
837/20 837/25
**one's [1]** 779/18
**one-month [1]** 782/7
**one-second [1]** 774/13
**one-second-and-a-half [1]** 774/18
**ongoing [1]** 820/11
**only [25]** 731/3 736/3 751/10 752/15
774/17 776/22 786/14 790/9 790/24
791/5 791/9 793/1 798/3 798/10 815/21
816/7 817/2 817/9 817/12 826/8 831/18
831/24 831/24 835/12 835/15
**oOo [2]** 725/2 838/16
**open [1]** 738/16
**opening [1]** 827/24
**opine [1]** 808/5
**opined [1]** 752/2
**opinion [10]** 726/15 727/17 765/17
766/16 777/8 778/8 823/11 823/18
823/18 825/4
**opinions [9]** 726/17 726/21 726/23
727/6 767/24 768/7 768/11 771/13
787/20
**opportunity [1]** 740/14
**opposed [2]** 726/24 728/17 815/2
**opposing [2]** 752/5 826/15
**oppressive [2]** 750/2 750/9
**options [1]** 798/12
**or [139]**
**order [7]** 738/21 739/25 755/18 756/7
802/22 825/1 829/14
**ordinary [3]** 795/15 796/7 796/10
**original [2]** 759/16 833/22
**other [28]** 728/21 731/6 732/19 737/25
749/3 752/4 752/15 756/12 765/4
765/10 766/12 770/18 770/22 772/2
772/3 773/14 791/1 798/12 820/21
825/18 829/8 829/20 831/20 832/21

**O**

**other... [4]** 833/5 833/6 833/10 837/25
**others [5]** 746/15 746/18 746/23 747/3 747/12
**otherwise [3]** 784/8 811/23 837/22
**our [10]** 725/22 742/21 746/24 755/2 757/14 758/8 834/24 835/18 836/17 837/23
**out [25]** 738/11 747/14 752/11 754/17 754/21 755/5 758/13 758/23 788/23 790/3 791/2 791/19 803/15 803/24 804/1 809/1 810/8 810/14 817/9 820/3 820/5 820/6 820/15 822/24 826/16
**outcome [1]** 812/6
**outline [1]** 731/15
**outside [7]** 725/3 757/23 770/12 777/23 816/24 825/15 826/25
**over [13]** 752/17 752/19 778/25 784/19 785/3 785/4 785/9 788/14 789/11 790/18 790/20 808/1 827/22
**overly [1]** 814/20
**overreaction [2]** 799/1 799/8
**overreactions [1]** 799/5
**overreacts [1]** 799/1
**override [1]** 801/1
**overruled [1]** 802/23
**own [1]** 747/9
**ownership [1]** 782/13

**P**

**P-i-c-k-e-t [1]** 783/13
**P-i-g-g-e-t [2]** 783/12 787/5
**p.m [3]** 722/17 725/1 838/14
**P.O [1]** 723/11
**packed [1]** 812/5
**page [32]** 722/19 724/2 728/9 730/24 731/4 731/22 731/23 732/9 733/24 733/25 734/2 734/9 734/9 738/3 739/16 740/18 743/11 743/20 755/13 755/15 758/19 760/3 772/4 794/22 794/24 811/7 811/18 821/2 821/7 821/8 830/18 839/7
**paragraph [4]** 728/15 729/5 794/24 830/19
**parked [1]** 784/21
**parking [4]** 732/25 733/6 792/23 792/25
**Parkway [1]** 723/15
**parole [2]** 795/13 795/23
**Parris [2]** 773/12 773/20
**Parris Ward [1]** 773/12
**part [7]** 736/8 739/1 753/2 785/4 787/2 817/25 833/15
**particularize [1]** 729/19
**particularly [1]** 827/24
**parties [8]** 725/8 748/6 824/14 824/23 827/5 831/20 832/3 834/7
**parties' [1]** 730/15
**pass [1]** 798/19
**past [1]** 767/19
**pat [5]** 722/21 795/23 839/3 839/16 839/17
**patcuneo1600 [1]** 722/24
**Patrol [1]** 727/3
**pattern [1]** 766/1
**Pause [8]** 727/24 731/1 757/2 761/9 763/15 810/5 820/20 825/22

**pay [1]** 789/25
**paying [3]** 767/5 789/24 790/2
**payments [1]** 787/14
**peace [4]** 801/3 812/7 830/7 831/3
**pedestrian [1]** 784/23 785/6
**Penal [1]** 801/2
**pending [1]** 812/23
**people [19]** 732/25 765/20 765/23 766/3 778/21 778/24 779/3 779/5 779/11 779/13 793/13 795/15 795/20 795/21 796/2 817/9 817/10 821/5 821/16
**pepper [4]** 809/6 809/9 809/14 809/22
**per [5]** 766/24 773/21 774/9 780/18 780/19
**percentage [3]** 744/22 745/1 745/3
**perception [1]** 729/22
**Perfect [1]** 748/10
**performance [2]** 731/18 732/10
**perhaps [5]** 728/23 732/16 733/16 742/12 813/25
**period [4]** 736/17 740/2 780/15 794/11
**permission [1]** 787/8
**person [17]** 729/18 729/19 730/2 733/19 785/15 795/7 795/12 796/7 796/10 800/22 803/24 815/21 817/2 817/9 818/20 822/15 834/3
**person's [1]** 803/18
**personally [1]** 741/12
**persons [1]** 822/2
**perspective [5]** 730/6 741/12 748/24 792/15 793/21
**phase [5]** 737/7 739/12 745/8 834/25 835/1
**photograph [4]** 772/13 800/5 810/24 816/13
**photographs [4]** 772/8 806/11 806/19 807/8
**photos [1]** 780/10
**phrase [2]** 741/19 761/13
**phrased [1]** 741/2
**physical [8]** 736/15 775/12 777/23 813/4 813/5 814/2 814/7 814/22
**physically [1]** 803/21
**PICKETT [78]** 722/6 722/7 723/8 729/20 731/9 741/9 741/20 741/22 744/3 760/8 760/16 760/22 761/25 771/18 773/8 773/24 775/2 775/8 775/14 775/19 780/13 780/14 780/22 781/1 781/12 782/25 783/10 783/14 783/17 785/22 786/9 786/22 787/12 788/4 788/21 788/25 789/11 790/10 790/18 791/8 791/15 791/20 791/25 792/4 792/11 792/13 792/24 793/2 793/4 793/7 793/10 794/3 794/6 794/10 794/15 794/17 796/4 797/7 797/22 802/15 804/19 805/24 807/23 808/1 808/8 808/9 808/15 811/10 811/14 812/2 813/1 817/3 821/19 821/23 822/5 822/10 823/13 833/16
**Pickett's [11]** 730/3 745/25 751/5 782/12 789/14 789/19 790/17 807/7 812/17 814/24 821/21
**picture [3]** 807/5 807/7 816/2
**pictures [4]** 806/10 807/10 810/22 815/6
**Pigget [4]** 783/12 783/13 783/17 787/5
**place [3]** 788/14 818/3 818/6

**places [1]** 793/19
**plaintiff [5]** 723/2 723/8 741/2 764/24 837/7
**plaintiff's [7]** 730/6 742/8 745/4 746/11 828/24 829/4 836/17
**plaintiffs [7]** 722/8 737/20 829/21 832/24 834/23 834/25 835/13
**planet [1]** 774/22
**plausible [1]** 797/17
**pleading [2]** 742/12 742/13
**please [12]** 725/4 727/22 758/1 763/14 763/19 794/22 796/20 811/7 825/16 826/21 827/3 827/18
**pled [1]** 742/20
**plural [1]** 755/19
**pocket [2]** 782/12 796/1
**point [35]** 726/7 739/21 744/23 746/21 747/7 767/22 767/25 768/3 768/14 775/11 781/11 782/20 786/7 786/11 786/12 786/17 786/18 793/3 793/8 793/9 794/25 808/16 808/25 809/11 813/2 813/4 813/24 814/2 814/10 814/19 820/11 820/12 820/21 822/23 824/6
**pointed [2]** 779/5 822/6
**pointing [1]** 778/14
**police [23]** 731/18 731/19 735/25 746/24 764/11 764/16 764/17 764/17 764/21 769/12 779/9 785/10 785/19 785/21 795/4 795/11 795/18 796/8 796/18 801/8 803/18 812/12 830/21
**portion [1]** 734/10
**portions [1]** 734/4
**posed [2]** 726/5 823/15
**position [12]** 726/9 727/12 727/21 728/25 750/23 750/24 759/10 790/16 790/18 792/15 806/14 818/7
**positions [1]** 730/16
**positive [2]** 758/3 758/4
**possession [1]** 810/17
**possibility [5]** 776/12 777/16 808/13 814/6 821/19
**possible [7]** 764/16 793/19 793/20 816/12 816/13 820/14 833/24
**possibly [4]** 816/8 816/22 818/22 821/23
**post [14]** 770/7 778/7 798/3 799/13 799/18 818/11 818/14 818/18 819/2 819/3 819/6 819/11 819/14 832/10
**posted [1]** 785/11
**potential [1]** 776/15
**potentially [3]** 747/15 749/4 833/7
**practice [1]** 764/15
**predicate [2]** 749/23 752/6
**preface [1]** 810/12
**prefer [1]** 833/23
**prejudice [1]** 747/20
**preliminary [1]** 728/19
**premise [1]** 797/23
**preparatory [2]** 828/18 828/20
**prepared [1]** 768/5
**presence [4]** 725/3 757/23 825/15 826/25
**present [2]** 777/22 797/12
**presented [1]** 742/2
**presents [2]** 776/11 816/1
**PRESIDING [1]** 722/4
**pressed [3]** 819/23 819/24 820/1

**P**

pretrial [1]  742/21
prevail [3]  755/19 756/8 829/15
prevailed [1]  737/13
prevails [1]  739/23
prevent [4]  760/8 760/22 761/25
  832/17
previously [1]  826/4
prior [5]  751/2 751/8 753/12 753/18
  767/17
private [6]  732/23 733/18 734/13
  735/3 735/11 735/16
probability [1]  809/10
probable [20]  728/16 736/12 742/7
  742/16 742/17 743/5 755/20 756/3
  756/13 756/17 760/10 760/13 760/24
  769/25 770/16 771/4 789/5 814/9
  814/10 830/25
probably [9]  725/21 732/12 745/17
  752/18 754/10 762/24 762/24 784/24
  809/21
probation [2]  795/13 795/23
problem [2]  728/2 751/18
proceed [1]  828/10
proceedings [12]  722/14 724/2 724/24
  731/1 757/2 761/9 763/15 810/5 820/20
  825/22 838/14 839/6
process [1]  770/6
produce [1]  778/4
producing [2]  777/16 778/5
professor [1]  812/10
prohibited [1]  785/12
promise [1]  824/19
pronounce [1]  783/14
proof [1]  781/19
proper [1]  740/21
property [10]  732/23 733/19 734/13
  735/4 735/8 735/11 735/17 785/11
  785/16 787/9
proposal [6]  731/22 735/10 735/12
  735/18 738/16 759/25
propose [3]  727/19 750/14 756/6
proposed [19]  724/3 724/5 728/7
  736/19 738/16 739/18 744/24 748/6
  750/5 751/10 753/10 753/13 753/14
  754/25 755/11 825/17 829/24 830/12
  831/7
protect [4]  731/20 817/23 818/10
  819/9
protected [1]  770/13
prove [5]  740/11 742/15 742/17
  755/25 829/21
proved [1]  740/9
provide [1]  727/6
provided [4]  725/10 726/17 753/17
  753/22
proving [2]  742/7 743/5
published [1]  748/20
pull [3]  817/22 818/13 819/25
pulled [2]  791/2 791/19
pulling [1]  817/13
punch [7]  773/24 775/15 775/15
  775/19 792/14 793/7 793/10
punched [8]  771/18 773/3 789/1
  802/15 811/14 815/6 815/22 822/7
punches [14]  771/19 773/7 774/3
  774/14 775/2 775/25 776/1 776/7

777/19 777/21 778/2 794/3 799/16
  800/21
punching [3]  792/10 792/10 801/18
punitive [2]  749/24 752/6
pure [1]  789/7
purpose [1]  726/3
pursuant [1]  839/4
pursue [2]  812/12 826/1
put [25]  731/22 732/1 735/23 736/16
  751/3 754/20 756/2 756/23 772/1
  772/1 790/11 801/15 811/13 812/7
  817/20 818/3 818/7 818/9 820/8 820/22
  824/9 830/10 831/24 832/20 833/19
putting [1]  734/22

**Q**

qualifies [1]  788/19
Quantico [1]  769/17
question [42]  726/5 727/5 728/5
  728/11 728/14 736/24 737/6 737/24
  745/13 746/10 749/6 749/8 749/23
  749/23 750/10 752/6 754/17 754/18
  758/24 759/2 759/6 759/20 759/25
  760/19 761/4 762/9 765/11 775/13
  775/20 783/20 786/15 796/20 801/9
  803/6 805/5 809/3 809/5 809/23 815/13
  819/18 820/25 834/20
questioned [1]  785/13
questions [14]  745/5 753/16 788/4
  796/10 796/13 798/2 801/9 811/5
  813/20 818/17 823/4 823/10 823/16
  823/23

**R**

raise [2]  725/23 831/20
raised [1]  827/22
Rancho [3]  768/25 782/7 793/24
range [1]  808/17 820/2
rather [2]  745/19 833/19
rdconaway [1]  723/12
RE [4]  724/3 724/5 725/5 825/17
reach [2]  771/14 777/6
reaching [3]  779/9 779/15 794/6
read [5]  760/19 762/3 773/17 816/12
  828/24
reading [3]  754/4 754/9 754/11
reads [1]  731/3
ready [2]  761/10 837/17
real [2]  774/22 799/2
real-life [1]  774/22
realize [1]  728/8
really [13]  727/10 735/21 737/24
  741/14 743/25 744/1 744/12 766/4
  776/16 795/17 797/17 816/25 832/16
realm [2]  777/23 816/24
reason [5]  746/14 746/21 754/22
  761/17 780/12
reasonable [12]  731/20 736/12 756/14
  756/15 783/1 785/11 798/12 803/11
  812/21 814/7 814/14 835/21
reasons [2]  740/5 784/9
rebuttal [4]  824/9 834/18 835/14
  836/19
recall [11]  726/3 726/16 746/16 746/19
  746/23 747/14 772/4 783/2 789/9 803/9
  805/22
recalled [1]  783/6
recent [2]  737/4 829/10

recently [1]  736/10
recess [11]  752/10 757/2 757/22
  762/21 763/6 763/10 763/11 826/13
  826/15 826/23 826/24
reckless [2]  750/3 750/9
recollection [3]  747/4 747/8 833/15
recommend [2]  734/7 756/11
reconfigure [1]  752/10
record [6]  738/20 746/5 804/16 831/25
  832/20 835/7
recordation [1]  774/8
recording [5]  774/2 774/9 788/2 815/1
  815/8
records [8]  810/25 813/11 816/5
  816/10 816/11 816/15 816/21 816/22
RECROSS [2]  724/10 724/15
redirect [4]  724/10 724/15 752/20
  823/8
reduced [1]  745/4
reducing [1]  744/21
reference [1]  821/14
referenced [1]  793/25
referred [2]  833/15 834/7
referring [2]  745/6 771/25
refers [1]  742/22
reflective [1]  775/11
refuses [1]  812/13
regarding [4]  730/18 812/16 823/2
  825/20
Regardless [3]  784/12 821/20 821/25
regards [2]  766/5 776/12
regulations [1]  839/8
related [2]  746/25 811/24
relates [7]  741/8 742/8 751/10 762/12
  826/9 828/24 829/4
relationship [3]  759/11 759/17 823/2
reliable [1]  808/6
relieved [1]  762/24
remain [3]  732/12 734/11 744/21
remaining [1]  732/13
remember [7]  726/25 736/9 746/24
  754/10 799/23 805/6 805/7
rent [1]  733/2
rental [3]  781/20 782/17 787/7
repeated [1]  813/10
repeatedly [1]  789/1
replace [1]  759/3
report [35]  767/15 767/20 768/11
  771/17 771/20 772/1 772/5 773/17
  786/13 786/20 787/21 790/8 790/12
  790/14 790/16 790/20 791/5 793/25
  794/20 801/25 802/25 811/5 811/13
  811/18 812/7 812/15 815/15 815/16
  815/16 815/17 819/22 820/21 820/22
  821/2 838/2
reported [1]  839/6
reporter [3]  722/21 836/18 839/17
REPORTER'S [1]  722/14
reports [1]  823/17
representation [1]  752/25
representing [1]  734/13
request [2]  735/6 837/25
requested [2]  746/5 838/5
requests [1]  813/10
required [1]  755/25
requires [1]  756/14
rescue [1]  760/5
research [1]  825/9

**R**

**residency [2]** 784/10 787/8
**resident [1]** 784/12
**resist [2]** 732/3 801/3
**resisting [1]** 730/19
**resolution [1]** 828/9
**resolved [1]** 824/15
**resort [3]** 798/8 798/9 818/9
**respect [16]** 726/9 727/12 728/25
729/24 733/13 736/24 752/5 753/8
753/15 753/20 754/21 757/15 759/10
783/20 823/19 825/23
**respect to [1]** 736/24
**respectfully [1]** 740/3
**respond [1]** 795/25
**responding [1]** 726/25
**response [2]** 797/15 797/16
**responses [1]** 822/9
**responsibility [1]** 777/6
**rest [3]** 741/6 746/3 749/14
**rests [1]** 824/7
**resubmit [1]** 750/15
**resume [2]** 762/18 763/4
**RESUMED [2]** 724/4 763/20
**retain [2]** 764/18 764/22
**retained [4]** 764/11 764/13 764/24
765/12
**retention [3]** 817/19 818/2 818/19
**return [3]** 813/11 813/12 813/14
**Reverence [1]** 798/13
**review [11]** 725/8 755/3 771/12 771/13
801/10 806/2 808/6 815/21 816/5 827/5
828/3
**reviewed [12]** 753/17 753/21 754/2
767/21 772/1 779/21 780/5 791/11
793/22 806/11 810/25 815/16
**reviewing [3]** 773/21 801/24 805/22
**right [173]**
**rightful [1]** 782/13
**rights [14]** 750/3 760/23 765/6 765/9
769/15 769/23 770/1 770/5 770/6 770/9
770/13 770/16 770/20 812/9
**Rios [2]** 797/2 797/14
**rise [9]** 757/20 757/24 763/9 763/12
763/16 825/13 826/22 827/1 838/12
**risk [1]** 751/13
**road [1]** 817/1
**ROBERT [2]** 723/9 723/10
**Roman [1]** 811/20
**room [6]** 722/23 733/2 733/11 782/12
782/15 787/16
**rose [1]** 813/24
**Rule [2]** 787/20 832/23
**Rule 26 [1]** 787/20
**Rule 50A [1]** 832/23
**rulings [1]** 753/12
**run [2]** 751/13 836/15
**running [2]** 781/7 808/1

**S**

**safety [1]** 747/10
**said [43]** 734/8 747/9 747/13 773/17
777/19 780/23 780/24 780/25 781/3
782/4 784/5 784/5 784/13 784/17 785/5
787/6 788/19 791/21 792/3 793/22
795/19 796/24 796/25 797/14 799/25
800/8 800/10 800/11 800/13 802/7

803/8 805/7 806/5 808/22 815/5 815/8
815/15 816/12 816/17 816/19 822/9
834/10
**sake [1]** 778/2
**same [13]** 731/23 738/3 739/16 740/18
741/16 743/9 743/22 761/14 764/9
770/19 799/4 828/15 830/16
**SAN [2]** 722/10 767/7
**San Bernardino [1]** 767/7
**satisfied [1]** 750/25
**satisfies [1]** 832/8
**satisfy [3]** 748/25 826/6 826/7
**Saturday [2]** 767/19 768/23
**save [1]** 818/10
**saw [15]** 781/1 781/5 781/7 785/12
789/18 791/15 792/12 792/13 793/6
793/9 794/2 794/6 794/10 800/5 805/23
**say [63]** 726/1 726/6 729/8 729/18
731/17 732/8 733/10 741/20 742/8
743/25 745/4 745/17 751/9 753/6
755/18 755/23 755/25 756/15 756/17
764/23 765/22 765/25 766/9 769/14
775/25 776/8 778/2 780/12 780/21
782/24 784/25 785/2 788/15 793/9
797/7 797/13 798/9 799/22 802/11
802/21 803/25 808/19 809/17 816/10
816/21 816/22 818/11 818/19 818/21
818/25 819/2 819/9 819/11 819/13
819/14 819/17 820/25 821/4 821/18
829/11 832/14 834/1 835/2
**saying [16]** 734/11 751/14 751/15
784/3 785/8 792/21 799/4 800/15 801/7
808/9 808/12 808/12 812/21 825/2
815/9 819/22
**says [28]** 791/7 792/11 792/12 792/13
793/6 794/25 798/3 798/8 798/14
798/17 804/23 805/8 805/12 813/21
815/22 816/7 817/2 818/2 818/14
818/25 819/3 819/6 821/20 821/20
822/24 826/9 828/24 829/14
**scene [10]** 767/12 767/17 767/18
768/12 768/15 768/18 768/23 768/24
800/5 809/1
**schedule [1]** 837/1
**screaming [2]** 822/4 822/17
**screen [9]** 772/10 772/15 772/19
772/23 806/22 807/2 807/14 807/19
810/20
**search [2]** 769/24 770/2
**seated [6]** 725/4 758/1 763/14 763/19
825/16 827/3
**second [23]** 754/7 773/21 774/10
774/13 774/14 774/15 774/18 780/15
780/18 780/19 784/22 789/2 790/24
791/5 794/11 801/21 802/16
802/18 805/10 811/10 811/15 830/16
**seconds [11]** 780/18 780/19 790/24
791/3 791/8 791/9 791/10 795/12
814/14 814/16
**Section [3]** 748/16 756/8 839/4
**Section 1983 [1]** 756/8
**Section 52.1 [1]** 748/16
**secure [2]** 787/13 787/14
**secured [1]** 787/16
**see [52]** 725/22 740/19 749/12 749/20
751/18 758/18 760/3 761/23 772/2
773/7 773/24 774/3 774/4 775/2 775/3
775/5 775/25 778/1 779/13 781/25

782/9 782/20 783/24 790/5 792/8
792/18 793/16 793/17 793/19 794/17
794/24 796/19 797/5 797/19 806/6
806/24 807/6 807/7 811/9 814/13 815/6
815/23 815/24 817/4 817/4 821/3 821/6
821/7 821/14 825/11 825/21 831/1
**Seeing [1]** 817/15
**seem [5]** 728/23 746/23 790/2 818/1
837/21
**seemed [1]** 812/3
**seems [3]** 731/6 832/17 833/14
**seen [13]** 734/18 772/17 772/21
772/25 778/15 778/24 779/14 781/19
781/20 782/10 806/9 810/22 810/24
**seize [1]** 729/18
**seizes [1]** 730/1
**seizure [2]** 769/24 770/2
**self [5]** 746/6 746/12 746/13 746/16
770/23
**self-defense [4]** 746/6 746/12 746/13
746/18
**self-evident [1]** 770/23
**sense [2]** 744/15 833/18
**sentence [4]** 756/7 756/20 794/25
821/20
**separate [4]** 742/4 749/7 751/16 777/8
**sequence [1]** 802/25
**serious [1]** 736/15
**session [3]** 758/1 763/18 827/3
**set [9]** 733/23 740/8 740/15 749/23
829/13 831/21 833/10 837/15 837/17
**sets [1]** 817/16
**seven [5]** 769/6 808/23 809/4 813/6
813/15
**seven feet [2]** 808/23 809/4
**several [2]** 775/9 800/7
**shaded [1]** 746/22
**shaking [2]** 790/3 814/24
**share [2]** 731/14 737/6
**she [2]** 787/12 787/13
**sheriff's [1]** 775/7
**shine [1]** 796/1
**shirt [2]** 775/6 775/7
**shocking [1]** 739/25
**shoot [31]** 775/23 776/6 776/18
776/19 778/10 778/12 778/21 779/3
779/4 779/11 779/15 799/18 804/21
804/23 804/24 804/24 804/25 804/25
805/1 805/7 805/8 805/10 805/11
805/13 805/13 805/14 805/18 818/20
818/23 819/3 819/15
**shooting [7]** 766/12 778/8 788/9
788/23 799/7 799/9 805/19
**shootings [1]** 766/8
**shoots [1]** 799/1
**shortly [2]** 812/4 812/5
**shot [13]** 765/23 766/3 779/5 797/21
801/18 801/21 802/6 802/16 802/18
805/9 811/10 811/16 822/7
**shots [12]** 789/11 789/15 790/23 791/3
791/6 791/10 801/25 802/1 802/3
819/23 819/24 820/9
**should [41]** 728/21 728/23 729/8
729/10 729/11 729/11 730/19 731/5
732/11 733/23 734/3 734/5 734/11
739/13 741/14 741/16 742/7 743/23
743/25 744/20 744/25 745/7 750/20
750/24 755/24 759/17 760/12 762/24

**should... [13]** 784/25 786/4 790/11
812/12 812/14 817/22 818/2 818/12
818/20 818/22 819/2 829/11 829/22
**shouldn't [2]** 797/21 817/1
**show [2]** 786/20 807/12
**showed [2]** 786/14 797/4
**showing [2]** 772/12 806/24
**side [9]** 725/23 757/4 757/5 806/13
806/14 806/14 834/11 834/17 837/5
**side-to-side [1]** 806/14
**sidebar [1]** 752/23
**sides [2]** 752/22 838/7
**sign [2]** 784/14 784/15
**signed [2]** 782/5 782/18
**silly [2]** 835/16 835/17
**similar [1]** 751/21
**similarly [2]** 829/3 830/9
**simply [2]** 736/16 741/6
**since [4]** 741/13 743/10 783/21 835/13
**SINCICH [1]** 723/4
**single [5]** 764/14 765/16 766/11
766/14 773/21
**sir [37]** 765/15 766/18 767/23 768/9
781/18 782/19 782/24 783/14 786/15
786/15 786/22 786/25 787/6 787/11
788/15 790/23 795/10 796/3 796/17
796/22 797/19 801/9 801/17 801/24
803/3 807/1 808/12 808/15 815/5
816/10 816/16 817/2 817/18 818/11
819/11 819/18 824/1
**situation [16]** 771/2 776/23 777/2
777/15 778/4 778/5 793/12 797/20
797/24 798/4 798/6 798/25 799/2
799/19 799/20 818/4
**situations [1]** 818/14
**six [2]** 769/6 769/19
**skills [1]** 754/9
**slightly [1]** 752/19
**Slow [1]** 822/3
**small [1]** 786/14
**Smith [1]** 787/4
**smoothly [1]** 756/21
**so [177]**
**some [34]** 738/14 740/4 746/23 749/3
751/13 752/10 752/20 755/11 758/3
758/5 760/4 761/13 763/1 765/25
766/12 767/15 768/2 769/14 771/11
772/2 772/7 774/4 779/20 793/3 803/17
804/1 820/10 820/12 822/14 825/19
826/17 832/6 832/16 835/21
**somebody [2]** 819/7 822/21
**somehow [2]** 725/13 816/3
**someone [45]** 730/20 733/3 738/5
739/11 765/1 765/2 769/23 769/25
770/4 770/9 770/15 771/3 775/23
776/18 776/19 778/11 778/12 778/15
779/8 783/21 783/25 783/25 784/3
784/6 784/9 791/23 795/5 795/11 799/1
799/18 803/12 803/15 804/16 809/21
812/21 817/21 818/12 818/22 819/2
819/12 819/15 819/25 820/7 820/23
822/13
**someone's [1]** 803/8
**someplace [1]** 818/10
**something [6]** 726/7 750/11 750/14
796/17 815/8 835/1

**somewhat [3]** 726/24
**somewhere [12]** 818/8 820/22
**soot [1]** 802/4
**sophistication [1]** 774/24
**sorry [11]** 733/17 748/1 748/4 750/21
750/23 790/15 810/12 814/8 827/17
828/20 831/17
**sort [4]** 734/23 738/10 770/10 808/25
**sound [3]** 756/5 761/23 835/17
**sounds [2]** 733/23 835/15
**SP [1]** 722/9
**speak [2]** 754/4 806/17
**speaking [6]** 799/12 803/24 803/25
810/10 812/1 834/9
**special [17]** 724/5 725/5 725/9 725/13
745/13 751/17 753/8 753/10 753/17
753/20 753/21 754/1 762/10 837/4
837/5 837/13 838/2
**specializing [1]** 769/15
**specific [8]** 726/10 746/25 776/14
785/1
**specifically [2]** 747/11 748/7
**speculation [1]** 789/7
**speed [2]** 754/9 754/11
**speed-reading [2]** 754/9 754/11
**spell [1]** 827/17
**spelled [1]** 827/25
**spelling [2]** 812/16 813/22 827/11
833/19
**spend [1]** 768/21
**spotlight [4]** 795/11 796/1 796/4 796/8
**spray [4]** 809/6 809/9 809/14 809/22
**stairs [3]** 808/1 809/1 809/2
**stamp [1]** 801/25
**stand [1]** 805/20
**standard [6]** 737/23 739/7 739/8 739/8
740/7 740/15
**standards [2]** 770/8 778/7
**standing [1]** 727/11
**start [3]** 756/7 822/16 837/22
**started [2]** 792/9 796/5
**Starting [1]** 821/11
**starts [3]** 743/11 796/9 829/13
**state [26]** 731/15 734/12 735/3 742/5
742/6 742/18 742/19 742/24 742/20
742/22 742/24 743/3 748/15 748/19
760/18 800/24 801/3 803/25 804/1
813/24 825/25 826/2 826/9 828/9
828/24 829/4
**stated [4]** 736/25 785/17 794/18
797/13
**statement [20]** 729/21 735/8 737/4
738/7 764/19 765/14 765/15 779/21
780/1 780/21 780/23 781/1 784/18
791/12 793/18 797/9 797/12 799/23
805/22 815/18
**statements [6]** 771/22 788/8 789/12
789/16 789/20 814/23
**states [8]** 722/1 757/25 763/17 801/2
827/2 832/7 839/4 839/9
**station [1]** 803/18
**stationary [1]** 793/12
**stay [4]** 750/20 750/24 763/1 828/15
**staying [3]** 733/3 733/4 783/21
**stenographically [1]** 839/6
**step [3]** 808/23 824/1 828/7
**steps [1]** 808/10
**still [3]** 749/12 793/20 827/11

**stimulant [3]** 786/9 786/16 786/18
**stippling [1]** 802/4
**stipulate [1]** 834/2
**stipulation [1]** 833/7
**stipulations [1]** 728/1
**stomach [1]** 808/3
**stop [6]** 752/21 804/20 805/7 805/9
805/10 805/12
**stopped [1]** 811/11
**story [1]** 788/25
**street [8]** 722/22 722/22 784/21
791/15 794/10 795/15 795/20 795/21
**strike [3]** 778/3 800/15 804/25
**strong [3]** 747/4 752/3 822/16
**struck [4]** 799/23 807/10 807/16
807/23
**struggle [3]** 792/24 793/13 820/11
**students [2]** 769/19 812/11
**studied [1]** 769/14
**subject [2]** 824/5 825/9
**subjective [1]** 798/14
**submitted [5]** 771/12 815/18 815/19
824/14 825/5
**substantial [9]** 741/15 741/22 743/14
744/2 744/5 744/9 745/18 745/25 751/4
**substantiate [2]** 782/13 782/17
**succeeded [1]** 747/14
**SUCCESSOR [1]** 722/7
**such [4]** 763/3 790/14 790/16 809/15
**sudden [1]** 814/14
**suddenly [2]** 813/6 814/15
**suffered [2]** 741/10 741/19
**sufficiency [1]** 798/20
**suggest [3]** 743/10 752/23 760/11
**suggested [1]** 733/15
**suggesting [6]** 774/3 774/13 774/16
774/17 812/20 820/7
**suggestion [1]** 744/12
**suitability [1]** 800/25
**Suite [2]** 723/5 723/15
**sum [1]** 782/6
**summary [2]** 782/4 811/9
**supported [1]** 772/3
**supports [1]** 749/9
**suppose [1]** 725/21
**supposed [3]** 767/20 767/24 768/5
**sure [19]** 725/15 727/23 731/8 732/1
732/23 737/22 738/19 738/24 739/16
747/8 748/4 748/6 748/23 755/9 762/17
827/13 827/20 828/13 835/6
**surfaces [1]** 797/11
**survival [4]** 737/10 737/14 751/22
760/18
**survived [1]** 765/1
**suspect [3]** 736/13 736/16 785/16
**suspects [1]** 778/25
**suspicion [8]** 756/14 756/16 782/22
783/1 785/11 812/21 814/7 814/15
**suspicious [1]** 794/16
**sustained [2]** 751/8 782/23
**swollen [1]** 816/14
**sworn [3]** 771/24 774/7 774/11
**symptoms [1]** 813/16
**system [13]** 786/16 786/19 803/7
803/9 803/13 803/19 803/22 804/2
804/4 804/5 804/8 804/12 804/17

**T**

**take [21]** 731/10 736/4 752/9 752/22 755/2 757/12 759/10 761/5 761/8 762/21 763/6 779/21 783/3 783/4 789/21 810/7 811/13 826/13 826/14 826/21 836/16

**taken [7]** 764/6 768/2 768/15 815/20 818/4 818/6 818/8

**takes [2]** 819/7 819/12

**taking [2]** 740/4 758/23

**talk [21]** 725/20 731/7 738/4 740/18 746/15 770/24 771/16 785/18 785/21 791/11 795/7 796/2 796/11 804/5 822/23 825/7 825/8 826/12 826/15 829/20 837/4

**talked [9]** 779/20 787/14 787/15 813/18 813/18 813/19 814/3 814/18 831/17

**talking [9]** 747/2 749/11 774/6 774/7 774/8 776/7 805/24 822/12 831/2

**talks [7]** 730/20 732/9 743/14 744/21 819/19 830/8 830/25

**tan [1]** 775/7

**tase [2]** 791/22 808/21

**Taser [5]** 791/19 808/17 809/12 809/22 822/6

**taught [3]** 812/11 814/12 817/19

**technically [2]** 726/23 760/18

**tell [10]** 725/24 789/13 789/17 801/11 801/13 801/15 807/11 807/18 807/22 807/22

**telling [4]** 789/10 802/24 813/14 814/17

**ten [16]** 752/9 755/2 780/14 780/15 780/17 780/18 780/19 780/19 791/16 794/11 794/11 822/7 826/15 826/21 834/17 837/21

**ten-minute [1]** 826/15

**terms [2]** 729/17 764/10

**testified [24]** 764/14 764/21 765/16 766/14 776/9 784/17 786/3 787/12 790/24 791/17 791/18 791/25 792/6 792/9 794/5 794/8 796/6 798/20 801/19 801/20 801/22 801/23 804/19 819/20

**testify [3]** 726/19 726/20 816/17

**testimony [30]** 726/15 727/17 733/9 733/10 746/17 747/9 754/23 764/8 764/10 766/13 771/24 773/18 774/5 774/7 774/12 774/19 783/2 783/6 783/7 785/18 790/5 793/18 794/7 797/5 801/17 802/16 802/21 803/10 805/3 823/17

**than [17]** 739/8 745/19 770/18 770/22 791/1 809/12 809/14 809/16 809/21 833/6 833/19

**Thank [19]** 752/1 753/5 757/19 760/4 760/6 761/7 762/7 762/15 763/8 763/23 796/21 823/7 823/22 824/1 824/3 824/8 826/20 835/23 838/8

**that [644]**

**that's [110]** 726/4 727/4 728/2 731/2 733/9 733/12 734/6 734/16 734/25 735/5 736/4 736/8 738/6 739/6 739/15 740/7 740/17 740/15 746/5 746/21 748/25 750/25 753/6 754/17 764/23 764/23 767/7 767/23 768/4 768/9 768/13 768/16 769/24 770/3 770/10

774/20 771/23 771/25 772/9 775/18 775/20 775/2 777/4 792/12 822/3 779/18 779/19 780/24 781/3 781/8 781/8 782/20 783/16 784/5 784/17 784/17 785/20 787/19 788/11 790/5 791/17 791/21 792/12 793/8 794/5 794/8 795/24 796/6 796/17 798/16 798/19 799/17 799/25 801/19 801/23 802/9 803/11 803/16 804/12 804/17 804/18 806/5 806/17 806/25 812/10 812/11 812/22 814/12 815/13 816/21 817/24 818/9 820/2 820/4 821/20 821/22 822/19 823/1 823/1 823/2 827/16 827/22 828/22 829/16 832/15 833/8 834/4 835/5 836/23 838/6

**their [27]** 737/20 755/19 756/8 769/20 778/13 778/15 778/22 778/25 779/14 779/14 785/13 801/6 803/8 803/13 803/16 803/20 803/20 803/22 803/23 817/20 817/22 817/22 818/3 820/1 824/14 829/15 834/7

**them [24]** 731/9 744/15 744/15 749/11 750/11 758/8 762/22 768/7 774/4 779/4 779/5 779/6 779/16 795/7 796/8 796/9 803/5 818/4 818/23 819/3 819/15 827/6 838/5 838/7

**themselves [1]** 800/18

**then [88]** 729/6 730/4 730/20 731/4 731/17 732/8 732/19 733/25 733/25 734/2 734/4 735/2 735/24 736/8 738/7 738/17 738/19 739/4 739/8 740/18 741/18 741/21 743/4 743/4 744/11 744/15 744/19 749/6 749/14 751/3 752/8 752/19 755/23 756/18 757/13 757/14 759/15 759/20 762/22 763/4 763/7 768/2 770/13 771/13 775/21 775/22 776/5 777/13 778/7 781/4 782/2 782/22 784/1 788/23 788/24 789/4 793/22 794/17 797/15 799/5 799/6 801/7 805/8 805/12 807/21 808/24 810/8 810/17 814/9 815/12 815/18 815/19 822/7 828/2 828/8 828/12 829/2 829/3 829/18 829/20 835/3 835/5 836/12 836/18 836/19 836/20 837/3 837/16

**theories [1]** 826/2

**there [103]** 725/12 730/17 730/19 733/4 733/10 733/16 733/19 735/7 735/9 735/12 735/17 736/12 737/8 737/9 737/25 738/10 740/18 742/17 745/8 746/17 747/2 747/19 747/21 749/3 749/17 750/25 751/7 751/7 751/12 752/21 759/10 762/11 764/25 765/4 765/25 766/6 766/11 767/21 769/1 771/4 774/17 776/1 781/18 781/19 781/19 781/21 782/5 782/11 783/1 783/22 783/22 784/1 784/4 784/6 784/7 784/7 784/10 784/13 784/23 785/13 786/15 786/18 786/24 787/13 787/15 789/6 791/5 794/16 794/17 796/13 797/3 797/15 797/24 798/21 799/2 799/5 800/21 808/6 811/2 812/15 812/19 813/2 813/9 813/12 813/14 813/15 813/22 814/5 814/14 814/15 814/25 815/7 815/11 815/11 816/12 816/16 816/18 820/6 822/14 828/8 832/6 833/25 836/6

**there's [33]** 731/25 734/21 738/9

749/7 749/19 752/19 777/21 781/22 775/20 775/21 777/4 792/12 822/3 762/2 764/3 784/8 784/16 784/20 784/20 790/9 796/8 797/25 799/13 801/25 802/24 807/23 807/23 808/13 809/15 810/17 812/5 818/5 822/13 825/24 825/25 828/1 828/19 832/13 833/19

**thereafter [2]** 812/4 812/6

**therefore [4]** 737/22 792/18 810/18 821/11

**these [11]** 725/7 752/3 752/10 752/11 762/18 774/3 774/14 788/9 813/17 814/18 814/23

**these statements [1]** 814/23

**they [61]** 726/20 726/20 726/21 726/21 726/23 727/6 727/7 731/8 733/24 736/9 737/21 738/17 742/15 744/10 744/10 744/11 746/12 748/24 750/10 754/10 755/24 755/25 759/8 759/8 763/1 764/18 764/18 769/20 771/14 779/4 779/12 779/17 782/4 783/22 784/1 784/4 784/6 784/7 784/12 788/14 788/17 795/7 795/7 795/8 795/9 795/9 796/10 800/3 800/6 803/16 803/21 803/21 806/14 812/14 817/21 817/22 817/22 828/15 828/16 832/11

**they'll [2]** 750/11 756/25

**they're [15]** 733/3 744/22 745/4 778/14 788/12 788/14 788/15 795/13 800/17 803/17 803/17 803/20 803/25 804/1 817/20

**thing [7]** 770/19 793/1 809/15 816/7 832/21 835/12 837/23

**things [10]** 758/14 774/6 777/5 777/9 799/4 813/17 814/17 817/16 822/9 832/14

**think [118]** 726/4 726/24 727/4 727/8 727/10 728/12 728/18 729/10 729/17 730/7 730/17 731/8 731/25 732/15 733/9 733/10 733/20 734/15 734/15 734/17 734/20 735/7 736/25 737/3 738/6 738/7 738/14 738/23 739/15 739/21 740/21 741/6 741/16 741/25 742/1 742/4 742/6 742/7 742/12 742/18 742/21 744/17 744/20 744/25 746/8 747/18 747/19 747/19 747/21 749/7 749/8 751/1 753/10 753/11 754/20 755/24 756/24 758/19 760/3 766/4 775/18 776/19 781/17 784/1 784/4 784/25 786/3 788/21 788/22 792/20 794/14 795/3 795/20 795/24 796/7 796/12 796/13 798/20 800/10 800/19 801/17 803/16 805/7 806/9 806/12 806/16 807/9 807/24 807/25 808/24 809/3 809/6 809/8 818/22 819/19 822/23 825/20 825/24 826/3 826/5 826/9 826/11 826/17 828/10 828/19 829/12 831/5 831/6 831/16 831/18 832/9 832/10 833/8 834/1 834/9 836/8 837/15 838/6

**thinking [5]** 731/5 731/15 731/21 731/25 732/7

**thinks [1]** 738/5

**Third [1]** 805/10

**this [144]**

**those [48]** 729/3 729/8 729/12 731/5 731/9 732/1 734/5 749/16 750/6 751/5 755/24 756/19 756/20 759/24 764/25 765/7 765/20 765/22 765/23 765/25

**T**

**those... [28]** 766/18 771/15 771/16 774/10 775/4 775/5 776/15 777/8 778/21 779/3 779/11 791/10 808/5 808/7 808/10 808/13 809/1 809/2 814/1 814/17 817/9 818/14 819/4 819/5 819/9 822/9 829/7 831/18

**though [1]** 778/1

**thought [9]** 729/20 731/10 733/22 742/20 779/8 788/25 798/18 820/7 820/22

**thoughts [3]** 729/24 735/15 756/22

**threat [7]** 775/22 777/22 797/25 798/22 799/5 810/17 817/17

**threatened [2]** 779/4 779/17

**threatening [20]** 736/14 776/23 777/2 777/11 777/15 778/4 778/5 778/10 779/18 797/20 797/24 798/4 799/2 799/9 799/19 799/21 805/17 805/18 811/11 818/4

**threats [1]** 777/22

**three [14]** 731/16 788/9 788/13 788/16 788/17 791/8 801/21 802/8 802/11 802/15 804/22 811/15 817/9 819/21

**threw [3]** 775/25 778/2 801/20

**through [25]** 722/19 725/6 726/2 730/25 731/4 731/4 731/6 731/11 731/22 743/17 744/24 745/11 748/7 752/2 771/13 774/19 790/12 800/7 802/18 802/22 803/3 805/24 823/3 830/19 836/16

**throughout [1]** 827/23

**throw [3]** 775/14 777/19 777/21

**thrown [3]** 775/19 776/1 776/8

**thrust [1]** 820/12

**thus [1]** 752/4

**tie [1]** 732/5

**time [70]** 726/7 738/14 752/20 752/22 753/2 753/3 754/9 754/20 755/6 757/6 761/8 764/14 764/16 766/11 766/14 766/20 767/9 767/15 767/22 767/25 768/6 768/7 768/10 768/14 768/17 768/18 768/21 769/9 769/11 773/4 779/7 781/4 786/11 786/12 786/17 786/18 787/13 787/19 787/20 787/24 788/1 788/20 789/9 789/14 793/6 793/8 793/9 793/11 797/6 797/11 799/4 802/3 802/9 803/17 813/1 813/24 814/2 814/25 815/2 820/11 820/12 824/10 824/20 832/23 835/18 835/20 835/21 836/1 836/2 836/3

**times [21]** 764/5 764/7 764/20 771/19 778/17 778/18 778/25 779/8 779/10 780/14 780/17 780/19 791/16 794/11 800/7 802/15 804/22 811/15 815/6 815/22 822/7

**timing [4]** 752/17 790/23 791/1 791/4

**Title [1]** 839/4

**today [6]** 754/23 762/25 765/17 767/10 776/25 837/17

**together [5]** 731/13 732/2 763/7 769/6 835/18

**told [16]** 768/18 774/1 776/17 776/22 776/24 776/25 778/18 778/24 779/7 788/12 790/6 795/3 801/16 813/1 822/5 822/17

**tomorrow [10]** 753/3 753/4 763/4

**tone [1]** 822/2

**tonight [3]** 822/24 822/25 833/1

**too [1]** 742/18

**took [3]** 752/2 783/5 808/23

**top [2]** 806/3 806/6

**topic [1]** 747/21

**totally [1]** 815/13

**touch [1]** 825/19

**towards [1]** 818/13

**toxicology [2]** 786/13 786/20

**tracking [1]** 760/2

**traffic [1]** 769/4

**trained [1]** 800/16

**training [5]** 746/25 812/10 816/25 821/5 821/15

**trajectory [1]** 806/15

**transcript [3]** 722/14 839/5 839/7

**transcription [1]** 805/12

**transition [1]** 799/20

**transitions [2]** 814/9 814/21

**transmission [1]** 813/11

**transmitted [2]** 771/13 771/22

**tremoring [1]** 814/24

**trespass [9]** 732/22 733/18 734/12 735/3 735/8 735/11 735/16 783/20 787/9

**trespassing [13]** 732/24 733/7 781/13 781/17 782/23 783/2 784/14 784/15 785/9 785/12 786/24 788/22 789/1

**trial [6]** 722/19 738/12 764/8 764/10 781/22 833/16

**tried [2]** 730/15 822/6

**trier [9]** 770/18 770/22 770/24 770/25 771/14 776/9 777/1 777/4 777/6

**trip [2]** 769/1 769/10

**tripped [1]** 808/1

**true [52]** 764/17 766/15 766/18 769/24 770/16 770/17 770/25 771/1 771/2 771/24 773/9 773/10 775/18 778/13 779/16 781/5 781/6 781/7 781/8 786/22 786/25 787/1 787/2 787/6 787/23 789/4 789/8 791/14 792/2 792/14 793/7 793/8 794/4 797/8 799/17 800/7 806/4 806/7 812/4 812/19 816/4 816/7 816/16 817/18 817/24 817/25 819/3 819/16 818/19 822/15 835/5

**try [5]** 725/6 752/10 755/5 784/25 836/15

**trying [6]** 752/23 788/23 797/7 808/4 819/25 823/2

**tugging [1]** 817/13

**turn [5]** 794/22 801/16 811/7 813/1 822/6

**twice [1]** 813/12

**twitching [1]** 813/18

**two [45]** 731/10 731/11 731/16 732/1 737/9 738/12 743/15 744/1 744/10 751/13 756/6 756/11 756/12 756/19 756/20 758/14 769/2 769/3 769/5 774/6 777/5 777/8 784/20 790/24 791/9 791/10 791/10 792/10 797/3 799/4 801/20 802/8 802/11 802/15 811/15 817/16 817/21 818/17 819/21 820/9 821/4 821/10 828/21 837/20

**type [1]** 804/1

**types [2]** 766/12 788/9

**U**

**Uh [1]** 821/3

**Uh-huh [1]** 821/3

**unarmed [2]** 765/23 766/3

**unclear [1]** 832/16

**undeniable [1]** 807/25

**under [29]** 734/12 735/3 738/2 742/2 742/5 742/6 742/14 742/16 742/24 748/15 749/4 749/9 755/25 758/9 760/13 760/18 769/16 786/9 786/13 786/22 788/5 788/21 788/25 801/11 811/20 811/21 811/21 826/2 828/11

**understand [9]** 731/24 746/4 747/23 753/5 767/20 771/7 834/4 836/1 836/3

**understandable [1]** 756/21

**understanding [9]** 755/1 769/22 770/8 779/20 789/10 789/18 800/2 834/12 836/9

**understands [1]** 731/8

**understood [3]** 740/25 768/5 773/17

**undisputed [1]** 792/22

**undue [1]** 747/20

**unfortunately [2]** 736/6 824/15

**uniform [5]** 769/12 806/19 806/25 807/4 822/18

**uniformed [1]** 796/7

**unit [4]** 782/7 782/8 782/14 784/8

**UNITED [6]** 722/1 757/25 763/17 827/2 839/4 839/9

**University [1]** 769/16

**unlawful [4]** 731/17 732/9 735/25 801/6

**unless [6]** 726/7 732/4 740/24 762/25 762/25 776/14

**unnecessarily [1]** 734/17

**unnecessary [1]** 801/7

**unoccupied [1]** 784/8

**unreasonable [29]** 728/16 730/20 731/19 732/5 736/1 737/19 738/1 739/1 739/23 741/21 745/18 748/25 755/19 756/2 756/12 756/17 756/18 756/24 756/24 771/3 789/5 800/17 829/15 829/16 829/18 829/19 830/8 830/22 832/12

**unreasonably [11]** 760/9 760/12 760/23 761/16 761/16 762/1 762/1 769/23 770/8 832/18 832/19

**until [2]** 768/14 825/5

**up [32]** 729/15 731/11 732/6 732/8 732/16 733/15 734/3 734/13 735/24 739/14 748/13 749/23 767/21 767/25 768/14 769/1 781/21 783/16 785/11 788/25 794/25 795/4 796/2 796/8 797/4 804/7 812/4 815/2 815/4 815/11 817/16 825/19

**upon [2]** 776/11 832/3

**us [6]** 737/13 737/25 742/15 743/6 747/6 832/12

**use [19]** 731/19 732/4 745/17 745/18 745/24 754/8 762/9 777/3 798/1 798/15 799/12 801/2 805/21 808/17 810/8 810/18 818/15 819/8 823/19

**used [6]** 737/3 744/6 765/2 770/20 798/4 798/10

**uses [3]** 731/19 736/1 830/22

**using [8]** 731/9 732/4 748/21 770/4 800/17 809/21 830/8 834/21

**V**

**V-1 [1]** 811/20
**vague [1]** 726/25
**validity [2]** 771/15 771/16
**Valley [1]** 723/11
**vehement [2]** 753/18 828/2
**vehicle [4]** 784/20 784/24 785/6
795/11
**Verbatim [1]** 805/6
**verdict [27]** 724/5 725/5 725/9 725/13
745/14 749/6 749/8 749/22 753/8
753/10 753/17 753/20 753/21 754/1
758/24 759/5 759/21 762/10 762/12
829/22 832/10 833/8 834/1 837/4 837/5
837/13 838/2
**verge [1]** 810/14
**version [1]** 827/4
**very [5]** 775/6 775/11 808/6 809/9
829/12
**vewing [1]** 723/17
**vicinity [1]** 747/4
**video [22]** 773/8 773/11 773/23 774/2
774/8 774/11 774/18 774/19 774/21
774/21 775/1 775/3 775/25 778/1 780/8
792/8 792/16 792/17 792/22 806/6
815/24 817/5
**video-recording [1]** 774/2
**videotape [2]** 808/6 813/9
**view [1]** 739/17
**viewed [2]** 798/22 806/17
**viewpoints [1]** 775/9
**VINCENT [1]** 723/14
**violate [1]** 812/9
**violation [16]** 731/12 748/20 748/21
765/9 769/23 770/1 770/2 770/5 770/6
770/9 770/13 770/16 770/20 814/6
814/6 832/7
**violations [2]** 765/5 769/15
**violently [3]** 760/7 760/21 761/24
**Virginia [2]** 769/16 769/17
**vis [2]** 774/12 774/12
**vis-à-vis [1]** 774/12
**visible [2]** 775/4 775/5
**vision [1]** 792/18
**visit [1]** 733/3
**visiting [1]** 783/25
**VOIR [2]** 724/9 724/14
**VOL [2]** 724/10 724/15
**volume [1]** 822/4
**volunteered [1]** 797/9

**W**

**wait [4]** 743/17 758/16 776/7 827/17
**walk [6]** 732/25 743/17 795/4 796/2
796/11 809/1
**walked [2]** 786/2 786/4
**walking [2]** 733/6 805/24
**walks [1]** 796/8
**want [40]** 725/24 728/15 731/7 732/1
733/5 738/19 738/24 739/11 739/15
741/10 743/15 744/8 746/11 747/6
748/4 748/6 748/12 749/18 753/16
754/19 756/15 756/17 758/17 759/1
761/5 762/3 763/1 777/25 782/9 782/20
795/7 795/8 803/6 812/25 816/4 824/2
828/7 831/24 835/6 835/19
**wanted [9]** 737/6 753/1 753/6 800/8

**800/10** 800/12 815/15 829/9 832/20
**wants [3]** 740/14 800/23 832/20
**Ward [5]** 773/12 773/20 773/22 773/23
774/19
**warned [1]** 804/19
**warning [5]** 805/9 805/10 805/11
805/17 805/20
**was [211]**
**wasn't [9]** 755/9 782/11 782/19 786/13
786/24 787/24 792/7 799/2 799/9
**watched [1]** 780/7
**watching [3]** 775/1 792/1 792/6
**way [18]** 725/21 728/18 729/9 731/3
734/16 744/14 749/22 791/11 800/12
800/14 814/12 819/5 820/3 820/5
823/18 827/25 831/4 832/9
**we [132]**
**we'd [1]** 756/1
**we'll [27]** 725/15 725/16 726/12 728/3
729/4 735/23 735/23 753/4 762/9
762/16 762/18 762/18 762/21 762/22
763/3 763/7 826/13 826/14 826/17
828/10 829/7 833/1 836/12 836/20
837/16 837/22 838/7
**we're [31]** 731/9 734/23 735/2 737/8
737/8 738/3 738/5 739/5 739/16 739/18
740/18 740/19 741/8 743/2 744/19
745/16 746/3 746/4 747/2 749/5 751/14
751/15 759/1 774/6 774/7 774/8 777/23
790/20 820/15 826/16 837/15
**we've [7]** 752/4 820/4 827/4 829/18
830/9 830/10 832/19
**weak [1]** 752/3
**weapon [2]** 791/2 810/17
**weapons [2]** 801/3 818/2
**weather [1]** 822/24
**weeks [1]** 738/12
**well [92]** 726/1 729/5 729/23 730/15
731/24 733/8 736/21 739/12 741/12
742/1 742/23 750/17 751/1 751/16
754/21 754/21 756/14 758/14 759/8
766/2 766/18 767/18 768/10 770/10
770/24 771/16 773/11 774/13 775/1
775/21 776/7 776/17 778/15 782/24
783/12 783/16 785/8 788/7 790/3 790/8
790/12 791/4 791/7 791/11 792/16
793/9 793/25 796/17 797/2 797/23
799/4 799/6 803/15 804/23 805/12
806/15 807/12 807/21 807/25 808/4
808/22 808/25 809/17 809/20 812/5
814/11 815/5 815/15 816/4 816/15
816/18 816/21 817/18 819/1 819/5
820/10 820/15 821/18 822/5 822/11
826/3 826/16 827/4 827/20 828/16
828/19 830/24 833/21 835/22 837/3
837/18 838/9
**went [9]** 752/2 767/12 768/22 787/15
792/20 802/18 802/21 803/3 813/7
**were [27]** 726/23 746/12 750/6 751/7
751/7 765/23 765/25 766/3 767/20
772/3 772/3 772/8 775/9 776/1 787/16
789/14 789/21 791/10 797/3 800/1
800/3 803/21 803/21 806/14 813/20
814/18 838/14
**weren't [3]** 726/20 781/22 782/15
**west [1]** 784/24
**westbound [1]** 793/1
**WESTERN [1]** 722/3

**what [103]** 726/21 727/4 727/6 727/18
728/4 731/15 733/24 738/5 738/21
740/17 743/18 745/5 745/20 746/24
748/1 748/12 748/12 750/5 750/6
750/23 752/4 752/8 754/10 754/15
755/13 758/13 758/17 759/25 762/17
766/2 766/7 767/23 768/9 769/20
770/10 770/10 771/25 776/23 777/4
780/23 780/24 781/3 784/5 784/17
784/17 785/20 786/11 786/17 787/2
787/6 787/6 788/12 790/5 791/1 791/4
791/17 791/21 792/11 792/12 792/17
794/5 794/8 796/6 799/25 800/13 801/7
801/19 801/22 801/23 803/24 804/4
804/20 804/23 805/7 806/5 807/24
807/25 808/23 812/11 812/25 813/6
813/8 813/8 813/11 813/15 814/9
814/13 814/13 814/15 816/9 816/21
817/25 818/11 821/7 821/9 821/20
822/12 822/17 826/16 828/7 832/25
834/7 836/2
**What's [1]** 739/17
**whatever [3]** 729/9 753/2 753/3
**when [31]** 734/23 745/3 749/11 754/20
755/23 755/25 766/19 767/18 768/22
769/11 783/14 784/25 789/11 789/21
790/3 790/9 791/18 796/4 796/23
797/12 798/12 798/25 799/23 802/7
811/13 817/6 818/7 819/19 819/21
822/13 827/22
**where [24]** 725/25 733/19 735/4
735/11 735/17 735/25 751/14 751/18
766/8 776/8 776/14 778/14 789/14
793/15 802/22 808/16 808/22 811/10
813/21 814/19 818/3 818/6 818/10
829/9
**whether [24]** 725/22 726/23 728/14
728/20 729/7 729/8 736/12 736/16
740/8 746/17 749/5 766/12 771/2 771/3
771/4 772/2 783/5 783/5 783/16 785/15
797/10 804/12 804/17 809/3
**which [19]** 737/8 737/17 739/1 742/14
743/11 743/23 748/16 759/5 770/12
776/23 787/16 793/1 801/2 802/2
802/21 802/22 804/7 817/16 833/11
**while [4]** 763/7 805/24 820/13 833/1
**white [1]** 805/23
**who [13]** 765/1 765/2 771/14 785/10
792/9 796/13 800/22 807/22 812/8
817/2 817/12 829/11 834/3
**who's [2]** 733/3 767/5
**whole [1]** 808/25
**Whose [1]** 787/4
**why [10]** 726/4 740/5 745/6 746/14
746/21 746/21 749/13 781/17 784/9
809/8
**will [23]** 727/16 730/4 731/11 731/13
742/18 752/5 759/24 762/25 774/25
801/2 814/20 819/13 824/20 824/21
824/24 825/1 825/11 828/14 835/1
835/21 836/15 836/21 837/17
**willing [2]** 738/4 740/19
**wisdom [1]** 834/10
**wish [3]** 753/19 824/9 831/20
**wishes [3]** 725/23 757/5 757/5
**withdraw [4]** 740/19 740/20 758/10
758/12
**withdrawing [2]** 738/4 758/15

**W**

**withdrawn [1]** 740/24
**within [7]** 788/9 788/13 788/16 788/17
791/9 794/11 795/12
**without [13]** 728/16 755/20 756/2
756/13 756/15 756/16 760/9 760/13
760/23 769/25 770/15 771/4 789/5
**witness [9]** 724/10 724/15 762/20
780/5 789/21 794/23 811/8 823/24
824/2
**witnesses [6]** 724/8 724/13 726/16
726/17 727/17 824/4
**won't [1]** 832/25
**wonder [1]** 746/22
**wondering [1]** 749/4
**Woodland [1]** 723/6
**Woods [90]** 744/1 750/2 754/8 754/12
760/7 760/21 761/24 771/19 771/23
772/8 773/3 774/7 774/12 775/2 775/6
775/15 778/3 780/12 780/21 782/24
782/24 784/16 785/2 785/8 785/10
787/18 787/24 788/4 788/21 789/10
789/18 790/10 790/19 790/25 791/2
791/7 791/16 791/18 792/10 792/18
792/21 792/23 793/2 793/16 793/21
794/3 794/9 794/14 795/1 796/23
796/25 797/7 797/15 797/21 799/22
800/11 801/10 801/18 801/19 802/7
802/14 804/19 805/25 806/3 806/7
806/20 807/22 807/23 808/2 808/8
808/11 808/16 810/7 810/13 813/1
813/10 814/23 815/17 815/23 816/19
817/3 817/10 817/11 819/20 820/7
820/23 821/18 821/24 822/12 822/23
**Woods' [12]** 745/24 751/4 773/8 776/2
779/21 784/21 790/17 792/19 794/7
811/14 823/13 823/19
**worded [2]** 728/18 746/9
**wording [2]** 732/15 761/3
**words [7]** 731/6 756/7 803/9 819/4
819/4 819/5 819/10
**wordsmithing [2]** 761/13 761/14
**work [3]** 757/13 766/22 773/14
**worked [1]** 767/2
**working [2]** 824/17 829/12
**worry [2]** 734/22 825/2
**would [145]**
**wouldn't [12]** 764/23 765/19 765/22
765/25 766/9 766/16 780/18 783/23
783/24 794/18 808/19 822/8
**wounded [1]** 766/8
**wounds [2]** 806/10 806/13
**write [3]** 791/5 815/17 819/5
**writing [1]** 772/4
**wrong [1]** 789/8
**wrongful [14]** 737/9 737/13 737/17
737/20 737/21 738/1 738/6 738/12
739/5 739/13 739/24 740/12 741/14
758/9
**wrote [4]** 767/15 768/11 815/16
821/25
**www.patcuneo.com [1]** 722/25

**Y**

**yahoo.com [1]** 723/7
**yards [1]** 775/9
**yeah [8]** 735/22 736/11 751/20 769/4
785/4 786/6 802/24 828/10
**yelling [2]** 822/4 822/17
**yes [128]**
**you [475]**
**you'll [4]** 726/25 746/16 754/20 834/7
**you're [34]** 727/11 733/23 734/11
738/10 739/12 743/18 748/8 764/11
765/12 766/19 767/24 768/5 774/3
774/13 774/15 776/7 777/5 777/7 786/8
790/19 792/21 799/4 801/7 801/24
802/3 802/16 808/4 808/4 809/17
810/10 812/25 818/1 818/7 835/18
**you've [13]** 764/5 764/14 764/20
765/16 767/2 772/17 772/21 772/25
773/14 778/24 779/14 788/1 806/9
**younger [1]** 754/11
**youngsters [1]** 754/9
**your [150]**
**yourself [1]** 819/9

**Z**

**zero [3]** 820/3 820/4 820/6