1             UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5  DOMINIC ARCHIBALD AND     )
    NATHANAEL PICKETT,I, AS    )
6  INDIVIDUALS AND AS SUCCESSOR )
    IN INTEREST TO NATHANAEL H. )
7  PICKETT, II, DECEASED,     )
                        )
8             PLAINTIFFS,    )
                        )
9        vs.            ) No. CV 16-1128-AB
                        )
10 COUNTY OF SAN BERNARDINO, ET )
    AL.,                    )
11                        )
           DEFENDANTS.    )
12 _____)

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          WEDNESDAY, MARCH 7, 2018

17             9:14 A.M.

18          LOS ANGELES, CALIFORNIA

19

20   Day 2 of Jury Trial, Page 232 through 374, inclusive

21

22 _____

23       **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
         FEDERAL OFFICIAL COURT REPORTER
24      350 WEST FIRST STREET, ROOM 4311
        LOS ANGELES, CALIFORNIA 90012
25          cmjui.csr@gmail.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFF DOMINIC ARCHIBALD:

 3            LAW OFFICES OF DALE K. GALIPO
              BY:  DALE K. GALIPO, ATTORNEY AT LAW
 4                 HANG DIEU LE, ATTORNEY AT LAW
                   MARCEL SINCICH, ATTORNEY AT LAW
 5            21800 BURBANK BOULEVARD, SUITE 310
              WOODLAND HILLS, CALIFORNIA 91367
 6            (818) 347-3333

 7
      FOR THE PLAINTIFF NATHANAEL PICKETT, I:
 8
              LAW OFFICES OF ROBERT D. CONAWAY
 9            BY:  ROBERT D. CONAWAY, ATTORNEY AT LAW
              P.O. BOX 2655
10            APPLE VALLEY, CALIFORNIA 92307
              (760) 503-9010
11

12    FOR THE DEFENDANTS:

13            ALVAREZ-GLASMAN & COLVIN
              BY:  VINCENT C. EWING, ATTORNEY AT LAW
14            13181 CROSSROADS PARKWAY NORTH, SUITE 400
              CITY OF INDUSTRY, CALIFORNIA 91746
15            (562) 699-5500

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2                       MARCH 7, 2018

3


4
     PLAINTIFFS'
5    WITNESSES                                    PAGE

6    KYLE WOODS
         DIRECT EXAMINATION BY MR. GALIPO (RESUMED)   241
7
     SCOTT DEFOE
8        DIRECT EXAMINATION BY MR. GALIPO           278
         CROSS-EXAMINATION BY MR. EWING             326
9


10


11


12                       EXHIBITS

13   TRIAL
     EXHIBITS                   MARKED  ADMITTED  NOT ADMIT
14
     13-7                               244
15
     27-1                               254
16
     28-1, 28-2, 15-12, 15-13          249
17
     29-20, 29-26, 29-38,              272
18
     29-50, 29-55, 29-58, AND 29-60    272
19


20


21


22


23


24


25
```

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 7, 2018

 2                           9:14 A.M.

 3                             - - -

 4         (The following was heard in open court outside the

 5          presence of the jury:)

 6              THE CLERK:  Calling civil case CV 16-1128-AB,

 7    Dominic Archibald versus County of San Bernardino, et al.,

 8    jury trial, Day 2.

 9              Counsel, please step forward and state your

10    appearances.

11              MR. GALIPO:  Good morning, Your Honor.

12    Dale Galipo with Hang Dieu Le and Marcel Sincich on behalf

13    of Dominic Archibald.

14              THE COURT:  Good morning to you all.

15              MR. CONAWAY:  Robert Conaway on behalf of

16    Mr. Pickett.

17              THE COURT:  Good morning, sir.

18              MR. EWING:  Good morning, Your Honor.

19    Vincent Ewing for defendant County of San Bernardino and

20    defendant Kyle Woods.

21              THE COURT:  Good morning to you both.

22              I understand there is -- I have been informed

23    there is a couple of issues the parties wish to raise before

24    we bring in this jury.  What are those?

25              MR. CONAWAY:  The first is the final words of the
```

 1    dealing with the opening statement.  I am just concerned it

 2    was not a grounds for a mistrial -- approach the Court for

 3    that.  But there is a reference to being -- find my client

 4    not guilty.

 5         I am concerned that that begins to muddy the

 6    waters, the fact of the civil versus criminal separation.

 7         The second matter deals with the repeated

 8    mispronunciation of my name.  It's Conaway, not Conway, and

 9    I felt that should be noted so the record's correct.

10         THE COURT:  Well, maybe -- I'm not even sure.

11    Let's deal with the first issue first.

12         With respect to the not guilty reference in the

13    opening, I noted it.  No one objected at the time.  Be that

14    as it may, I think this jury is not idiots.  They know this

15    is a civil case.  I have talked to them at length.

16         I mean, I think there are -- I don't know in the

17    box how many jurors there are, but during the voir dire,

18    there were at least three or four people who served on

19    criminal cases.

20         I talked to them about the difference in the

21    standard of proof, opening statement is not evidence.

22         I don't think, Mr. Ewing -- I am going to give

23    Mr. Ewing a huge not -- I am assuming Mr. Ewing had a slip

24    of the tongue.  I don't think he is intending in arguing

25    that there is a higher standard in this case.

```
 1              To the extent you are lodging an objection, it's
 2   noted but overruled.
 3              With respect to your last name, I apologize.  My
 4   fast-talking New Jersey accent is such that you don't hear
 5   the A, but I will make a greater effort to make you feel
 6   more comfortable in that regard.
 7              MR. CONAWAY:  There was a reference to Mr. Ewing
 8   making the name Conway.  That was the reason.
 9              THE COURT:  Are you concerned that the jurors
10   don't know who he is referring to?
11              MR. CONAWAY:  I believe they know, yes.  But it's
12   just a respect matter.  I make my best effort to pronounce
13   people's names correctly.  So --
14              THE COURT:  All right.  Duly noted.
15              Anything else we need to address this morning?
16              Mr. Galipo?
17              MR. GALIPO:  Only that, Your Honor, we've been
18   working with defense counsel regarding the video issues.
19   Let me just let the Court know where we stand.
20              There is a recording of the incident because the
21   officer had a recording during the contact.  There is a
22   video from the El Rancho Motel.
23              THE COURT:  And I have reviewed the video.  I
24   guess what I reviewed is a four -- screen with four
25   different angles with the audio presumably merged with the
```

1    video from the hotel.  Is that the universe we're talking

2    about?

3              MR. GALIPO:  Yes.  What happened is each side

4    retained, in a sense, an audio video expert to deal with

5    those issues.  What we're trying to do with our stipulation

6    is to obviate the necessity for them to come in, both sides.

7              So we're agreeing to the foundation, I believe, of

8    the belt recording and the video, and we're very close to

9    agreeing to the foundation of the syncing.

10             The slow motion video, we're going to send to

11   counsel this morning just so he can see it, and then we'll

12   put a stipulation on the record.

13             But I'm pretty confident we're going to reach a

14   stipulation as to all the audio and video so that those

15   experts will not need to testify.

16             THE COURT:  All right.  Is there also a version of

17   the video that the defense is seeking to introduce as well

18   that's different than your slow motion video?

19             MR. GALIPO:  I don't believe -- just their

20   synchronization is what they wanted to introduce, if I am

21   understanding it correctly.

22             MR. EWING:  That's correct, Your Honor.

23             MR. GALIPO:  So we are going to play with the

24   officer and some portions with Mr. DeFoe some of the

25   non-synchronized video of the video and the audio.

```
 1              But as soon as we reach our stipulation, both
 2    sides will be able to use the synchronized version.
 3              THE COURT:  All right.  Anything further?
 4              Mr. Ewing, anything from the defense?
 5              MR. EWING:  Thank you, Your Honor.  On the initial
 6    issues for counsel, my apologies.  I meant no disrespect for
 7    the reference to not guilty -- muscle memory.  I apologize.
 8    I wear two hats with my work.
 9              And then with respect to working out the
10    stipulation, counsel accurately characterized the progress
11    of our conversations on that proposed stipulation.
12              The one piece that I had received was the
13    slowed-down version.  I would like to take a look at that.
14              My understanding that counsel is e-mailing that
15    over to me.  I believe we will be able to work out the
16    stipulation during the break and dispense with the experts
17    on that particular subject.
18              THE COURT:  All right.  I guess a matter that we
19    haven't discussed -- has there been or will there be a
20    motion with respect to the exclusion of witnesses in this
21    case?
22              MR. GALIPO:  Yes, Your Honor.  I thought we
23    discussed that at pretrial, but I can't remember.  But there
24    is and that would include Mr. Kelsey.
25              THE COURT:  Are there any other witnesses?
```

```
 1              I assume -- Mr. Ewing, I assume you make the same
 2   motion.
 3              MR. EWING:  Correct.  Counsel and I had worked it
 4   out without, really, the motion, and I had thought --
 5   excused Mr. Kelsey prior to testimony.
 6              THE COURT:  I didn't remember whether we discussed
 7   it in pretrial.  I just want to avoid any issue.
 8              MR. GALIPO:  There are no other witnesses, only
 9   parties.
10              THE COURT:  Parties.  Perfect.
11              If there is nothing further, let's bring in the
12   jury and resume this trial, please.
13         (The following was heard in open court in the presence
14          of the jury:)
15              THE COURT:  Good morning to you all.  Welcome to
16   Day 2 of our trial.  Hopefully, the scones were a nutritious
17   source of energy that you will be able to use throughout the
18   day today.
19              As I indicated, we're going to go until
20   1:00 o'clock.  We'll probably take two breaks and just push
21   through so we can get the maximum amount of testimony
22   possible.
23              So I just want to confirm does everyone have their
24   respective notebooks?  Yes?  All right.  Great.  And pens or
25   pencils.  All right.  Perfect.
```

```
 1            So, Mr. Galipo, you may resume.

 2            And, Deputy Woods, I will remind you you are still

 3   under oath.

 4                      KYLE WOODS,

 5            having been previously duly sworn,

 6                testified further as follows:

 7            MR. GALIPO:  Thank you, Your Honor.

 8                DIRECT EXAMINATION (RESUMED)

 9   BY MR. GALIPO:

10   Q    Good morning.

11   A    Good morning.

12   Q    Prior to the day of the incident, had you used your

13   Taser before in the drive stun mode?

14   A    Yes, I have.

15   Q    And how many occasions had you used your Taser in the

16   drive stun mode before the day of the incident?

17   A    Approximately two to five times.

18   Q    And do you recall talking about that with me during

19   your deposition?

20   A    Yes, I do.

21   Q    And do you recall indicating that the times, at least,

22   you used it, it was effective?

23   A    Correct.

24   Q    And you had your Taser on you at the time of this

25   incident; is that correct?
```

1    A    Yes.

2    Q    Was it an X26 Taser?

3    A    I can't recall if it's an X26 or X2.

4    Q    I think we talked about this yesterday, but the drive

5    stun mode is when you actually press it against the person,

6    delivering the shock.

7    A    Yes.

8    Q    The pepper spray, had you used that before the day of

9    the incident?

10   A    Yes.

11   Q    And what's your understanding as the distance you can

12   be when using pepper spray?

13   A    Approximately five feet.

14   Q    In training, had you ever been tased?

15   A    Yes, I have.

16   Q    How did it feel?

17   A    It hurts.

18   Q    And in training, had you ever been pepper sprayed?

19   A    Yes, I have.

20   Q    How did that feel?

21   A    It hurts.

22   Q    Now, would it be correct, based on your training, that

23   both the pepper spray and the Taser are less than lethal

24   options?

25   A    Yes.

1    Q    And did you have pepper spray on you at the time of

2    this incident?

3    A    Yes, I did.

4    Q    And you also had a police baton?

5    A    Yes, I did.

6    Q    What type of baton did you have?

7    A    It's called an RCB.

8    Q    What's it made out of, if you know?

9    A    Some kind of metal.

10   Q    You had a police radio on you; correct?

11   A    Yes.

12   Q    And you also had some type of recording device?

13   A    Yes.

14   Q    Where was the recording device on your person?

15   A    It was on my belt.

16   Q    And what do you need to do to activate it?

17   A    I have to push a button that turns it on.

18   Q    And when did you activate it in connection with your

19   contact with Mr. Pickett?

20   A    Prior to exiting my patrol vehicle.

21   Q    Okay.  And was it your understanding, during this

22   contact with Mr. Pickett, that everything was being

23   recorded?

24   A    Yes, it was.

25   Q    And you were aware of that at the time.  Is that fair?

```
 1   A    Yes.

 2   Q    Would it also be fair that Mr. Pickett most likely was

 3   unaware that everything was being recorded?

 4   A    Yes.

 5            MR. GALIPO:  May I approach counsel, Your Honor.

 6            THE COURT:  Yes.

 7            MR. GALIPO:  By agreement, Your Honor,

 8   Exhibit 13-7.

 9            THE COURT:  All right 13-7 will be admitted.

10       (Trial Exhibit 13-7 was admitted into evidence.)

11            MR. GALIPO:  May I publish, Your Honor.

12            THE COURT:  Yes.

13   BY MR. GALIPO:

14   Q    Do you recognize the general area that's shown in this

15   exhibit?

16   A    Yes.

17   Q    Do you see the El Rancho Motel in this exhibit?

18   A    Yes, I do.

19   Q    Okay.  I think, if it's working properly, if you touch

20   the screen -- why don't we start with this.

21            You indicated that you saw Mr. Pickett crossing

22   the intersection initially.  Is that correct?

23   A    Yes.

24   Q    And can you -- and you were at a -- you were stopped at

25   the time in your patrol vehicle?
```

1   A    Yes.

2   Q    Can you put a mark on the screen an X or whatever you

3   are comfortable with -- maybe an X -- to show where your

4   patrol vehicle was stopped when you saw Mr. Pickett crossing

5   the street.

6   A    Yes.

7   Q    Okay.  Can you put, kind of, a line showing which way

8   Mr. Pickett was crossing the street in front of you.

9        Okay.  And do you know which direction, that is,

10  that Mr. Pickett was walking?

11  A    I believe it's west.

12  Q    And what street was your car parked on?

13  A    On 2nd.

14  Q    Okay.  Now, you indicated -- I think, you said that

15  Mr. Pickett was out of your sight for about 10 or 20 seconds

16  or something like that?

17  A    Yes, that's correct.

18  Q    And during that time, I think you indicated that you

19  made a U-turn?

20  A    Yes.

21  Q    Where was -- where did you make your U-turn?  Where did

22  you go to make your U-turn?

23  A    Do you want me to show you on the screen?

24  Q    Sure.

25  A    Approximately in that area.

1   Q    So you turned -- are you saying that you turned -- did

2   you turn left at the intersection?

3   A    Yes.  I made a left-hand turn from the intersection off

4   of 2nd Street.

5   Q    Where was Mr. Pickett?  Can you make another X where

6   Mr. Pickett was when you saw him again.

7   A    He was approximately there.

8   Q    And you indicated that you at some point hopped a gate?

9   A    Yes, that's correct.

10  Q    Can you show us where the gate was that you hopped.

11  A    Yes.  Right around there.  The gate that's on the

12  picture isn't the gate that's -- how it was set up that

13  night.

14  Q    Okay.  So are you saying that, when you turned left

15  from the intersection, you didn't see Mr. Pickett to your

16  left walking?

17  A    That is correct.

18  Q    Did you ever tell your citizen on patrol who was in the

19  car with you, hey.  We need to check this guy out? or

20  something to that effect?

21  A    No, I did not.

22  Q    And when you approached Mr. Pickett and had this

23  initial conversation with him, your recording device would

24  have been turned on?

25  A    Yes.

```
 1  Q    And did the initial conversation happen close to the X
 2  we see on the screen, which is close to the office of
 3  El Rancho?
 4  A    Yes.
 5  Q    Did you ever ask him if he was under any medication?
 6  A    No, I did not.
 7  Q    Did you ever ask him if he was under the influence of
 8  anything?
 9  A    No, I did not.
10  Q    Did you ever comment to him regarding -- you claim you
11  saw something white in his mouth or white tongue or
12  something like that?
13  A    Yes.  He had a white coating on the back of his tongue.
14  Q    Did you ever comment to him about that?
15  A    No, I did not have time to.
16  Q    Did you ever indicate over your police radio that you
17  were out with someone who you thought was trespassing?
18  A    No, I did not.
19  Q    Did you ever indicate over your police radio that you
20  were out with someone that you thought was under the
21  influence?
22  A    No.  From my training and experience, I don't have to
23  let dispatch know what I am attempting to investigate or
24  what I believe.
25  Q    Well, isn't part of the purpose of the radio to let not
```

1   only dispatch but other officers know what's going on?

2   A     Yes.

3   Q     So if you thought someone was under the influence,

4   you're not saying it would be inappropriate to let other

5   officers and dispatch know that you are out with someone you

6   think could be under the influence of drugs, are you?

7   A     No.  From my training I personally -- or I've never

8   heard any of my partners put out over the radio that they're

9   out with someone that they believe was under the influence.

10  Q     Did you at any time yell out that -- strike that.

11        You have training with gun retention, don't you?

12  A     Yes.

13  Q     And I think we talked about this yesterday, but you

14  would agree that, based on your training -- and I think you

15  told me this in your deposition -- you can't shoot someone

16  for getting in a fight with them.

17  A     That's correct.

18  Q     And regarding gun retention, were you generally trained

19  not to put your gun in an area where it could potentially be

20  grabbed, if you can avoid it?

21  A     If you can avoid it, yes.  But if it's life and death,

22  you do what you -- you revert back to your training to try

23  to prevent gun retention.

24  Q     And getting back to life and death, that gets back to

25  the standard that applies to the use of deadly force; right?

1    It has to be life threatening?

2    A    That's correct.

3    Q    And you would agree, based on your training and the

4    understanding of the POST standards, if it's not life

5    threatening, you are not supposed to use deadly force.

6    Would you agree with that?

7    A    Yes, I agree with that.

8    Q    Now -- I might need someone's help in figuring out to

9    take off those marks.

10              THE COURT:  You --

11              MR. GALIPO:  Thank you, Judge.

12   Q    I want to show you a few additional pictures that I

13   believe were taken of you the day of the incident.

14              I believe there is no objection, Your Honor.  May

15   I state the exhibit numbers.

16              THE COURT:  Yes, please.

17              MR. GALIPO:  28-1, 28-2, 15-12, and 15-13.

18              THE COURT:  Any objection to those exhibits,

19   Mr. Ewing?

20              MR. EWING:  No, Your Honor.

21              THE COURT:  28-1 and -2 and 15-12 and -13 will be

22   admitted.

23              MR. GALIPO:  Thank you.

24       (Trial Exhibits 28-1, 28-2, 15-12, 15-13 were admitted

25        into evidence.)

```
 1            MR. GALIPO:  If I can figure out which way to put

 2   it here.

 3   Q    This is 15-12.

 4            Was that a photograph taken of the back of your

 5   head -- and I guess your entire back?

 6   A    Yes.

 7   Q    And does that show the back of your head?

 8   A    Yes.

 9   Q    And would you agree that you had no visible injury to

10   the back of your head?

11   A    Yes, that's correct, no visible injuries.

12   Q    And showing you Exhibit 15-13, is that more of a

13   close-up of the back of your head?

14   A    Yes, it is.

15   Q    And, again, you would agree there are no visible

16   injuries?

17   A    No visible injuries.

18   Q    Right.

19            Showing you 28-1, was that a photograph taken of

20   you an hour or so after the incident?

21   A    Yes, it was taken after the incident.

22   Q    And 28-2, also a photograph taken of you about an hour

23   after the incident?

24   A    Yes, after the incident.

25   Q    Now, you told us yesterday that you received 10 to 20
```

1    full-force punches to your face.  Do you recall that

2    testimony?

3    A    Yes, I do.

4    Q    And have you seen the video of this incident?

5    A    Yes, I have.

6    Q    And how many times would you estimate you have seen the

7    video of this incident?

8    A    Over approximately 20 times.

9    Q    Over 20 times.

10         And when was the last time that you have looked at

11   it?

12   A    Approximately a week ago.

13   Q    Would you agree in the video you see yourself punching

14   Nate in the face and head multiple times?

15   A    Yes, after he was striking me.

16   Q    And you indicated -- I think yesterday you think you

17   punched Nate 15 to 20 times.  Was that your estimate?

18   A    Approximately, yes.

19   Q    Now, have you -- you have seen photographs of Nate's

20   face after this incident, haven't you?

21   A    Yes.

22   Q    And we discussed it at the time of your deposition?

23   A    Yes.

24   Q    And would it be fair to say that his face was bloody

25   and injured?

```
1   A    Yes.  And I mean that's from when he fell.

2   Q    Well, right now I am not asking you what you believe as

3   to the cause of it.  I will ask you that in a second.

4          I am just wondering, when you saw pictures of his

5   face, would you agree that the pictures you saw, his face

6   was bloodied and injured?

7   A    Yes.

8   Q    And you in fact were punching him in the face, weren't

9   you?

10  A    Yes.

11  Q    So are you saying, sir, that you thought he injured

12  himself when he fell down?

13  A    Yes.  From seeing the photograph that you showed me in

14  deposition, yes.

15  Q    Well, did you ask him if he was okay, if he was hurt,

16  if he needed help?

17  A    No, I did not.  I was trying to put him in custody

18  before I asked him if he was okay.

19  Q    You were trying to put him in custody for what, sir,

20  after you saw him fall down?

21  A    I believed he was under the influence, possibly

22  trespassing, and he had ran from me.

23  Q    Well, let's just go over those points one more time.

24          As far as the trespassing, I think we covered this

25  yesterday, but you would agree, if he didn't hop the fence
```

1    and lived there, he certainly wasn't trespassing.

2    A    Correct, but I did not know that at the time.

3    Q    And you, obviously, are aware now that he didn't have

4    any methamphetamine in his system; correct?

5    A    That's correct.  I did not know that at the time.

6    Q    And running away from you, that was after you tried to

7    grab him, wasn't it?

8    A    Yes, that's correct.

9    Q    And your training with a consensual encounter, if it

10   is, in fact, a consensual encounter, meaning, you do not

11   have reasonable suspicion to detain someone -- I think we

12   talked about this yesterday also -- a person has a right to

13   walk or run away?

14   A    That's correct.

15   Q    But he never ran away from you, sir, until you tried to

16   grab him; isn't that true?

17   A    That is true.  And I was attempting to detain him.

18   Q    Did you ever tell him, "I am going to detain you" or "I

19   need to handcuff you" or anything like that?

20   A    No.  Because, when I went to tell him to turn around,

21   he immediately backed up and started running.

22        MR. GALIPO:  May I approach counsel, Your Honor.

23        THE COURT:  Yes.

24        MR. GALIPO:  Exhibit 27-1 by agreement,

25   Your Honor.

```
1              THE COURT:  All right.  Any objection?

2              MR. EWING:  No objection, Your Honor.

3              THE COURT:  27-1 will be admitted.

4          (Joint Exhibit 27-1 was admitted into evidence.)

5    BY MR. GALIPO:

6    Q    Is that a picture of your gun?

7    A    Yes, it looks like a picture of my gun.

8    Q    And what type of gun is that?

9    A    Glock 21.

10   Q    I think you told us yesterday it was .45 caliber?

11   A    That's correct.

12   Q    And the hollow point bullets, we can see some of those

13   in the bottom of the picture?

14   A    That's correct.

15   Q    And that's a semi-automatic weapon; is that correct?

16   A    Yes, it is.

17   Q    You have to press the trigger for each shot?

18   A    Yes.

19   Q    And you believe at the time of the second shot the

20   barrel of your gun where I am pointing was pressed against

21   Mr. Pickett's chest?

22   A    Yes.

23   Q    And at the time of the first shot, you are saying that

24   you think it was within two to four inches of his chest?

25   A    Approximately.
```

```
1    Q    Would it, Deputy Woods, have been pressing against his

2    body at the time of the first shot also?

3    A    No.

4    Q    Are you positive of that?

5    A    Yes.

6    Q    So regarding gun retention, I take it that there is a

7    section in the POST Learning Domain on gun retention, isn't

8    there?

9    A    Yes.

10   Q    And I believe that's in Learning Domain 33.

11   A    I'm not sure exactly what number from Learning Domain,

12   but it is one.

13   Q    Okay.  Fair enough.

14        But would you agree that they talk about, you

15   know, not putting your gun in an area where it could be

16   grabbed; and, if you sense that someone is reaching, whether

17   intentionally or inadvertently for your gun, they teach you

18   how to pull your gun back towards your body to keep it away

19   from the person?

20   A    Yes, if it's feasible at the time.

21   Q    And did you ever pull your gun back to your side --

22   A    No.

23   Q    -- at any time?

24   A    No, I did not.

25   Q    Well, it seems like, since you were putting it up to
```

 1   his chest, would you agree you weren't pulling it back away

 2   from him?

 3   A     No.   The only time I attempted to try to pull it back

 4   for a split second, when I saw him grab the top of my gun.

 5   But I didn't try to pull it back down towards my side.

 6   Q     Well, just so I understand your recollection, you had

 7   already told him that you were going to shoot him and were

 8   pointing the gun at his chest before, according to you, you

 9   saw his hand on the gun.   Is that correct?

10   A     That is correct.

11   Q     And how far are you estimating the barrel of your gun

12   was to his chest when you saw his hand on it?

13   A     Approximately two to three inches.

14   Q     Two to three inches.

15         So you have the barrel of the gun two to

16   three inches from his chest, and you are telling him you are

17   going to shoot him?

18   A     Yes.

19   Q     And then, according to you, you see his hand touch the

20   gun for one or two seconds?

21   A     I saw him grab the top of my gun.

22   Q     You are saying he grabbed the slide?

23   A     Yes.

24   Q     Are you aware, sir, if a slide is grabbed, the gun

25   won't function?

```
 1    A     That's not correct.
 2    Q     Well, are you saying, sir, that you then pushed the gun
 3    closer to his chest?
 4    A     When I fired the second shot, yes, it was up against
 5    his chest.
 6    Q     How about when you fired the first shot?
 7    A     No.
 8    Q     So if you are saying it was two to three inches from
 9    his chest when you saw his hand on it and you pulled your
10    gun back, how is it that you shot the first shot, according
11    to you, with your gun only two to four inches from his
12    chest?  Are you saying that you only pulled it back
13    one inch?
14    A     Approximately.  I just pulled it back a little bit.
15    Q     Are you trained that if someone -- if you believe
16    someone is reaching for your gun, one of the things you
17    could is to yell out "He's going for my gun" or words to
18    that effect?
19    A     Yes.
20    Q     Did you ever yell that out, sir?
21    A     No, I didn't have time to yell it out.  I was being
22    hit.
23    Q     I see.
24          So when we listen to the audio, are we going to
25    hear you saying, "He's going for my gun" or words to that
```

1   effect?

2   A    No.

3   Q    And is it your testimony now that his hand was not on

4   your gun at the time of the second shot?

5   A    Yes, from what I can recall his hand was not on my gun

6   when I fired the second shot.

7   Q    Would you, at least, agree with me, sir, at the time of

8   your deposition, you indicated his hand was on your gun at

9   the time you fired the second shot?

10  A    That I can recall, yes.

11  Q    Is there some reason why your answer has changed in

12  regard to that?

13  A    During my deposition I said I believed, if I can recall

14  that it was, but I wasn't a hundred percent positive that it

15  was on my gun when I fired the second round.

16          When I fired the first round, his hand was on my

17  gun.

18  Q    Are you aware, sir, that he has no injuries to his hand

19  or arm consistent with gunshots?

20  A    I'm sorry.  What do you mean by the question?

21  Q    Are you aware of any injury Nate had to his hand or arm

22  that would be consistent with being in close proximity to a

23  gunshot?

24  A    No.

25  Q    Now, after the incident after the shooting -- we talked

```
 1   about this at the end of the day yesterday -- you said you

 2   didn't call for medical because you didn't realize that Nate

 3   was shot?

 4   A    That's correct.

 5   Q    Well, wasn't he just laying there for -- laying,

 6   essentially, still for some period of time after you shot

 7   him?

 8   A    For a short period of time, yes; but I was blacking

 9   out.

10   Q    You were blacking out?

11        Well, weren't you -- didn't you dispatch shots

12   fired and telling backup units where you were?

13   A    Yes, for a short period of time I did.

14   Q    Well, didn't you notice blood coming out of Nate as he

15   was laying there?

16   A    No, I did not.

17   Q    And it's your testimony that the reason you didn't call

18   for any medical attention for him for a couple of minutes

19   was because you didn't realize he was shot?

20   A    That is correct.

21   Q    Did you think, sir, when you pressed the barrel of your

22   gun into the center of his chest and fired, you missed him?

23   A    At the time, yes.  I wasn't sure.

24   Q    Now, was there an Officer Rios that responded to the

25   scene at some point?
```

```
 1   A     Yes, there was.
 2              MR. GALIPO:  May have one moment, Your Honor.
 3              THE COURT:  Yes, absolutely.
 4   BY MR. GALIPO:
 5   Q     And you have listened to the belt recording before;
 6   correct?
 7   A     Yes.
 8   Q     Do you have an estimate as to how many times you have
 9   done that?
10   A     Over 20 times.
11   Q     And when was the last time?
12   A     Last night.
13   Q     Do you have an estimate as to how many meetings you
14   have attended regarding this case?
15   A     Approximately over 20.
16   Q     And didn't Detective Rios, towards the end of your
17   recording after he arrived on scene, ask you "Did he grab
18   your gun?"
19   A     I don't recall if that's what he asked me.
20   Q     Well, isn't that in the recording, sir, that you have
21   listened to over 20 times?
22   A     I don't recall if that's at the end of the recording or
23   not.
24   Q     Forget about where it is right now, in listening to
25   that recording over 20 times, sir, would you agree there is
```

 1   a point in the recording where Detective Rios asked you "Did

 2   he grab your gun?"

 3           MR. EWING:  Objection, Your Honor.  Best evidence

 4   the recording is.

 5           THE COURT:  Overruled.

 6           THE WITNESS:  I don't recall if that's what he

 7   asked me specifically, if he went for my gun or not.

 8   BY MR. GALIPO:

 9   Q    Do you think it might refresh your recollection to hear

10   that part of the recording?

11   A    Yes.

12           MR. GALIPO:  May I have one moment, Your Honor.

13           THE COURT:  Yes.

14           MR. EWING:  Your Honor, may we approach.

15           THE COURT:  All right.

16       (The following proceedings were held at sidebar.)

17           MR. EWING:  Okay.

18           THE COURT:  I want to wait for Mr. Conaway to get

19   here.

20           All right, Mr. Ewing.

21           MR. EWING:  The objection would be based on the

22   rule of completion.  Counsel and I walked and talked about

23   that, and my understanding is that he does not have an

24   objection to playing the entire recording.

25           My objection would be just playing an excerpt of

 1   it would be violative of that rule.  And the jury is

 2   entitled to hear the entire recording.

 3          MR. GALIPO:  What I would like to do is just play

 4   this one part as I am asking that question.  And then, as

 5   soon as I am done with that, I will play the whole

 6   recording.  And that way you will have both.

 7          MR. EWING:  I have no objection.

 8          THE COURT:  All right.  Let's do that, then.

 9          MR. GALIPO:  If I can find out how to play that

10   one part.  Otherwise, I will play the whole thing.

11          THE COURT:  Okay.  Fair enough.

12      (The following was heard in open court in the presence

13       of the jury:)

14          MR. GALIPO:  We just need one more moment.  We are

15   trying to get it together.  Your Honor, Exhibit 2 is the

16   audio belt recording of the incident.

17          THE COURT:  All right.

18          MR. GALIPO:  We're going to play the recording in

19   its entirety in one moment, but we're going to play a clip.

20   And I will just for purposes call it the 2-1, which is just

21   going to be a clip of this one part that I just referred to.

22          THE COURT:  All right.  You may do so.

23   BY MR. GALIPO:

24   Q   So I ask you to listen carefully, Deputy Woods, and see

25   if you can hear Detective Rios saying --

```
 1                    "Okay.  Listen.  You go that way,
 2            you go that way.  I am going to come and get
 3            you.  Okay?  I need you to go that way."
 4            And then he said, "Did he grab your gun?"
 5            And then you say, "I don't know."
 6            See if you can hear that.
 7            (Exhibit played.)
 8            MR. GALIPO:  Please stop that.  I think it was
 9     just cued up to the last part.  I will play it again.
10     Q    See if you hear Detective Rios say --
11                    "Did he grab your gun?" and you say,
12            "I don't know."
13            Can you just play that one more time, please.
14            (Exhibit played.)
15            MR. EWING:  My objection will be that counsel's
16     characterization of the audio recording and the statement in
17     it is inaccurate.
18            THE COURT:  Is there a transcript or -- couple
19     things.  Is there a transcript of the recording?
20            Secondly, is that available to be played in real
21     time as the video is being played?  I don't know if either
22     side has done that with this exhibit.
23            MR. GALIPO:  We have a transcript.  We have copies
24     for the jury, but we were going to pass them out at the time
25     we play the entire recording.
```

```
 1            THE COURT:  The objection is sustained.  But I
 2   will give you an opportunity to play the entire
 3   transcript -- entire video with the transcript so that the
 4   jurors can ascertain what was said.
 5            MR. GALIPO:  Fine.
 6   Q    Did you hear, in just listening to that, Detective Rios
 7   ask you "Did he grab your gun?"
 8   A    Yes.
 9   Q    And you said, "I don't know."  Isn't that true?
10   A    From what I hear now, I said, "I don't" --
11   Q    I think you have already told us that you never told
12   anyone -- anybody, Detective Rios or anyone else at the
13   scene that Mr. Pickett tried to grab your gun.  Is that
14   correct?
15   A    That's correct.
16            MR. GALIPO:  With the Court's permission, we would
17   like to play the audio of the incident and --
18            THE COURT:  From beginning to end?
19            MR. GALIPO:  Yes.  I may stop it a few times just
20   to ask a few questions, but, yes, we would like to do that.
21            THE COURT:  Do you have copies of transcripts to
22   give to the jurors, number one?
23            And, number two, is this connected to the Court's
24   audio so that it can come through the speakers as opposed to
25   pulling the microphone to the computer?
```

```
 1              MR. GALIPO:  I believe we have the transcripts.

 2         Do we have those?

 3              MS. LE:  Yes.

 4              MR. GALIPO:  And can I inquire of Miss Le and

 5    Mr. Sincich.

 6              THE COURT:  Ladies and gentlemen of the jury, this

 7    is -- I don't think I mentioned this to you, but this

 8    courtroom has been opened -- the courthouse for a year and a

 9    half.  So it's a new courtroom.

10         We have some new technology.  I want to make sure

11    we're using it for you also.  We just want to make sure we

12    get everything hooked up so you can hear and see the

13    evidence in the best possible light.

14              MR. GALIPO:  May I approach your clerk with the

15    transcript.

16              THE COURT:  I assume you have shown opposing

17    counsel copy of the transcripts.

18              MR. GALIPO:  It is Exhibit 3.

19              THE COURT:  All right.  You may approach the

20    clerk, and she will distribute those to the jurors.

21              MR. GALIPO:  I am going to ask some other

22    questions while they are trying to figure that out, if

23    that's okay.

24              THE COURT:  All right.

25              MR. GALIPO:  And they will let me know when we're
```

```
 1   are ready.
 2   Q    Do you think, when you were talking to Nate, that he
 3   would have known he was being detained?
 4   A    I'm sorry.  Can you rephrase the question.
 5   Q    One moment, please.
 6           THE COURT:  All right.
 7   BY MR. GALIPO:
 8   Q    The way you were talking to Nate, do you think he would
 9   have known that he was being detained?
10   A    No.
11           MR. EWING:  Objection.  Well --
12           THE COURT:  All right.
13   BY MR. GALIPO:
14   Q    And you never told him that; correct?
15   A    That's correct.
16   Q    And in your mind, was Nate then free to go?
17   A    No.
18   Q    How would he have known that if you didn't tell him
19   that and the way you were talking to him he wouldn't have
20   known he was being detained?
21   A    When I was getting ready to tell him he was detained
22   when I told him to turn around is when he took off running.
23   I didn't have time to tell him "You're being detained."
24   Q    Are you saying he was free to go before you told him to
25   turn around?
```

 1              MR. EWING:  Objection.  Vague as to time.

 2              THE COURT:  Sustained.

 3    BY MR. GALIPO:

 4    Q    Are you saying that Nate was free to go up to the time

 5    that you told him to turn around?

 6    A    No.

 7    Q    So how would he have known that, is my question, if you

 8    didn't tell him and, according to you, the way you were

 9    talking to him he wouldn't have known he was being detained?

10    A    There is no way.

11    Q    And you in fact had the impression that Nate just

12    wanted to go on his way; isn't that true?

13    A    Yes.

14              MR. GALIPO:  Okay.  I am getting a thumbs up, but

15    I am cautiously optimistic here.

16              THE COURT:  Hope springs eternal.

17              MR. GALIPO:  Yes.  And this would be Exhibit 2.

18              (Exhibit played.)

19    BY MR. GALIPO:

20    Q    Is that, in essence, the recording of the incident?

21    A    Yes.

22    Q    So when Detective Rios asked you "Did he grab your

23    gun?" that was towards the end of the recording?

24    A    Yes.

25    Q    And then you gave a statement 28 days later?

```
 1   A    An official statement, yes.

 2   Q    Now, you have seen a video of the incident as well; is

 3   that correct?

 4   A    Yes.

 5        MR. GALIPO:  With the Court's permission, we'd

 6   like to play Exhibit 1, which is the video.

 7        THE COURT:  All right.

 8        Any objection?

 9        MR. EWING:  Your Honor, may we approach briefly.

10        THE COURT:  All right.

11   (The following proceedings were held at sidebar.)

12        THE COURT:  Yes, Counsel.

13        MR. EWING:  Your Honor, this isn't an objection.

14   It's just -- the witness is crying, if we can either offer

15   him some tissue or give him a break.

16        MR. GALIPO:  Why don't we take a five-minute

17   break.  That way we can get the video hooked up.

18        THE COURT:  All right.  We'll take a recess.

19   We'll take a five-minute recess.

20        MR. EWING:  Thank you.

21   (The following was heard in open court in the presence

22    of the jury:)

23        THE COURT:  Ladies and gentlemen, we're going to

24   take a five-minute recess at this time.  Please do not form

25   or express any opinion about the case until the matter is
```

```
 1   submitted to you.  Don't talk to anyone about this case.

 2   Don't allow anyone to talk to you about this case and do not

 3   conduct any research of any kind on any subject matter

 4   concerned with this case.  We'll take a brief recess.  Thank

 5   you.

 6           THE CLERK:  All rise for the jury.

 7       (The following was heard in open court outside the

 8        presence of the jury:)

 9           THE COURT:  All right.  We'll take a brief recess

10   for you to get the audio together and then, when we come

11   back, we'll resume with the testimony.  All right.

12           MR. GALIPO:  Thank you, Your Honor.

13           THE CLERK:  All rise.  This Court is in recess.

14       (Recess taken 10:22 to 10:36 AM)

15           THE COURT:  All right, Counsel.  Was there an

16   issue you wanted to raise before we brought the jury back?

17           MR. GALIPO:  Just wanted to advise Your Honor we

18   have worked out an agreement to obviate the need to call in

19   the video experts.  And what it, basically, is the defense

20   through their expert prepared a synchronization of the video

21   although it has the four screens and the audio which I think

22   you may have already seen.

23           THE COURT:  All right.  Okay.

24           MR. GALIPO:  So we are going to agree to the

25   admissibility of that on the condition that the defense
```

1    agrees to the admissibility of the slow motion portion of

2    the video.  The only caveat is the defense wants to check

3    with their expert to see, whatever the terminology is, how

4    slow down it is or how many frames per second, and we'll

5    include that in the stipulation.

6              THE COURT:  All right.  So, then, my only request

7    would be that the parties prepare something so that I can

8    read into the record as it relates to the -- if there is an

9    agreement about how slowed down or sped up the video is.

10              MR. GALIPO:  That will be good.  I just want to

11   make sure that counsel agrees that we're on the same page.

12              MR. EWING:  Thank you, Your Honor.

13              Generally, that's the basis of the tentative stip

14   that we have here.  The agreement is that we're going to

15   have our experts, essentially, communicate with us and work

16   out the math.  And then we're going to arrive at that number

17   and agree on it and put something in writing for the Court

18   to read to the jury.

19              THE COURT:  All right.

20              MR. GALIPO:  That's fine.  And also we've agreed

21   on some stills that I'm going to introduce.

22              And was there a comment on this issue?

23              MR. CONAWAY:  Just the software that was used by

24   your expert, and you will get the technical data from us if

25   you needed it.

```
1              MR. GALIPO:  We'll work that out.

2              THE COURT:  We'll work that out.

3              MR. GALIPO:  The last point is we've agreed on

4    some stills, and, given that the synchronization is going to

5    be admitted -- and I was going to go over some of it with

6    Mr. DeFoe who was the next witness -- I think I am just

7    going to ask the deputy five to ten minutes more of

8    questioning, call Mr. DeFoe, and go over it with him so the

9    jury doesn't have to see it twice.

10             THE COURT:  Sounds good.  Can we bring in the

11   jury.

12             MR. GALIPO:  Yes.

13             THE COURT:  Let's bring in the jury, please.

14             You may want to sit down only because the jurors

15   are in my in my side of the hall; so it takes a while for

16   them to get here.  That's what causes some of the delays is

17   that I am literally walking from the other end of the

18   building to here.  The jury room is not available on this

19   side.

20             MR. GALIPO:  Thank you.

21        (The following was heard in open court in the presence

22         of the jury:)

23             THE COURT:  All right.  Mr. Galipo, you may

24   continue.

25             MR. GALIPO:  Thank you.
```

```
 1          We have by agreement, Your Honor, some still

 2   photos from the video, and can I indicate the exhibit

 3   numbers for the record?

 4          THE COURT:  Yes, please.

 5          MR. GALIPO:  29-20, 29-26, 29-38, 29-50, 29-55,

 6   29-58, and 29-60.

 7          THE COURT:  Any objection to 29-20, -26, -38, -50,

 8   -55, -58, and 60 being admitted into evidence, Mr. Ewing?

 9          MR. EWING:  No objection.

10          THE COURT:  So those items will be admitted.

11      (Trial Exhibits 29-20, 29-26, 29-38, 29-50, 29-55,

12       29-58, and 29-60 were admitted into evidence.)

13          MR. GALIPO:  Thank you.

14          THE COURT:  You may proceed.

15          MR. GALIPO:  We're going to get that going in just

16   a second.

17   Q    So you said you watched the video how many times?

18   A    Approximately over 20.

19   Q    Over 20 times.

20          And you would agree you see yourself in the video

21   punching Nate in the face multiple times; correct?

22   A    Yes.

23   Q    Would you also agree you do not see in the video Nate

24   landing a punch on your face?

25   A    No.  Due to the quality of the video, it skips
```

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    throughout the entire time I am contacting him.

 2    Q    So your punches to Nate's face, you can see on the

 3    video; correct?

 4    A    Yes.

 5    Q    But you are saying Nate's punches to your face, for

 6    some reason, you cannot see on the video?

 7    A    Yes, due to the quality of the video.

 8    Q    Do you think it's possible that the reason why you have

 9    no visible injuries on your face is because you were never

10    forcefully punched in your face, not even one time?

11    A    No.  I was forcefully punched to my face.

12    Q    How is it, sir, that you have no visible injuries to

13    your face?

14    A    I wasn't just laying there.  I was trying to protect

15    myself as he was hitting me.

16    Q    And you claim your back of your head was being knocked

17    into the cement and you have no injury on the back of your

18    head either.  Isn't that true?

19    A    No visible injury.

20    Q    Right.  And you are even saying Nate is hitting you in

21    the face after the second shot.  That's your testimony;

22    right?

23    A    Yes.

24    Q    I assume you can't see that on the video either?

25    A    No, you can't.  It skips.
```

1    Q    Are you saying, sir, it just happens to skip at the

2    time that Nate punches you in the face the 10 to 20 times

3    that you say Nate punched you in the face full force?  The

4    video just happens to skip each one of those 10 or 20 times?

5    A    Yes.  Because the video also skips during some of the

6    punches that I am throwing to him.

7    Q    But we can see your punches on the video, can't we?

8    A    Yes, but not all of them.

9    Q    How close is the station to where this happened?

10   A    Approximately two to three blocks away.

11   Q    Two to three blocks away.

12        So you knew that you could have backup there

13   within seconds; correct?

14   A    No.

15   Q    No?

16   A    No.  It depends where my partners are.

17   Q    People could even come from the station, if necessary,

18   could they?

19   A    On graveyard, there is only two to three of us working.

20   Q    Well, how long did it take backup to get there?

21   A    A few minutes.

22   Q    And is it your testimony -- strike that.

23        You see on the video, don't you, Mr. Kelsey, the

24   Citizen on Patrol, assisting you?

25   A    Yes.

```
1    Q    Is it your testimony you didn't know he was assisting

2    you?

3    A    Yes.

4    Q    Are you taught about situational awareness, like you

5    are supposed to be aware of what's going on around you?

6    A    Yes.

7              MR. GALIPO:  May have a moment to look at my

8    notes -- oh.

9    Q    Let me show you these real quick.

10             I think I am going to play the video with the next

11   witness, Your Honor, if that's okay.

12             THE COURT:  All right.

13   BY MR. GALIPO:

14   Q    This would be a still shot from the video; is this

15   correct?  This is 29-20.

16   A    Yes.

17   Q    Is that you standing up?

18   A    Yes.

19   Q    Are you pointing your Taser at Nate at that point?

20   A    Yes.

21   Q    Is that after he fell down the steps?

22   A    Yes.

23   Q    Showing you 29-26, are you atop of Nate at that point?

24   A    No.

25   Q    Is that you?  Am I pointing to you in this video?
```

```
 1   A      Yes.

 2   Q      29-38.  Can you tell what's happening in this frame?

 3   A      Yes.

 4   Q      What's happening?

 5   A      I am pushed up against the little pony wall, and Nate

 6   was pushing his body up against me.

 7   Q      Are you at Nate's back at that point?

 8   A      Yes.

 9   Q      Did you ever put your arm around his neck?

10   A      Around his neck, no.

11   Q      29-50, you are behind Nate at that point?

12   A      Yes.

13   Q      Isn't your arm around his neck, sir?

14   A      No.

15   Q      Where is your arm?

16   A      Around the top of his shoulder downwards.

17   Q      29-55, is that when your Citizen on Patrol, Mr. Kelsey,

18   is helping you out?

19   A      Yes, from the picture it seems like that's him.

20   Q      And Mr. Kelsey weighs about 290 pounds, doesn't he?

21   A      I do not know.

22   Q      29-58, you both on the ground?

23   A      Yeah.  By "both," who do you mean by "both"?

24   Q      You and Nate.

25   A      Yes.
```

1   Q    You're actually side to side, aren't you?

2   A    No.  This looks like it was right as I was pushing

3   myself out from underneath Nate.

4   Q    And 29-60, that's after the shots and you moved

5   yourself away from Nate; correct?

6   A    Yes.

7   Q    And it's your testimony at that point you didn't know

8   he was shot?

9   A    Yes.

10  Q    Thank you.  That's all I have at this time, Your Honor.

11          THE COURT:  All right.

12          Mr. Ewing, do you wish to examine this witness at

13  this time?

14          MR. EWING:  Not at this time.  Thank you.

15          THE COURT:  You may step down, sir.

16          MR. CONAWAY:  Your Honor, subject to recall.

17          THE COURT:  All right.  Absolutely.

18          MR. CONAWAY:  Thank you.

19          THE COURT:  Mr. Galipo, do you want to call your

20  next witness.

21          MR. GALIPO:  Yes.  May I get him from the witness

22  room?

23          THE COURT:  You may.

24          MR. GALIPO:  Plaintiff would like to call Scott

25  DeFoe, please.

```
 1                    THE COURT:  Sir, would you step forward.
 2                         SCOTT DEFOE,
 3                  having been first duly sworn,
 4                       testified as follows:
 5                    THE CLERK:  Do you solemnly swear that the
 6   testimony you shall give in the cause now before this Court
 7   shall be the truth, the whole truth, and nothing but the
 8   truth, so help you God?
 9                    THE WITNESS:  I do.
10                    THE CLERK:  Thank you.  Please be seated.
11                    Please state and spell your name for the record.
12                    THE WITNESS:  My name is Scott, last name is
13   DeFoe, D-e-F-o-e.
14                    THE COURT:  You may proceed, Counsel.
15                    MR. GALIPO:  Thank you, Your Honor.
16                         DIRECT EXAMINATION
17   BY MR. GALIPO:
18   Q    Good morning, Mr. DeFoe.
19   A    Good morning.
20   Q    Do you have a background in law enforcement?
21   A    Yes.
22   Q    What agency did you work for?
23   A    I initiate -- after I graduated from
24   Northeastern University in Boston, I was hired as a special
25   agent with United States Customs Service.
```

```
 1          I was assigned to an organized crime drug task

 2   force in San Francisco where I worked on major drug

 3   smuggling and money laundering investigations.

 4          Had an opportunity to work with the Los Angeles

 5   Police Department in 1989, realized how poorly I was being

 6   paid by the federal government and decided I was going to

 7   shift over to LAPD.

 8          I worked LAPD full time, sworn from November of

 9   1989 through June of 2010.  In addition, I maintain a

10   reserve status as a full-time reserve officer from June of

11   2010 to March of 2016.

12          In addition, I worked for the Riverside County

13   Sheriff's Department.  I decided I was going to get back

14   into law enforcement from 2013 to 2014 was the time.

15   Q    Okay.  Can you explain to the jury some of your

16   assignments with the Los Angeles Police Department.

17   A    Sure.  I worked patrol like all new officers do.  I

18   worked in 77th Division which is down in the South Central

19   part of Los Angeles.

20          After that, I went over and worked patrol over at

21   Northeast over by Dodger Stadium.  While there, I worked a

22   gang unit.  It was called CRASH back at that time.

23          In addition, I worked the Special Problems Unit;

24   so we worked in conjunction with detectives on solving

25   crimes and following up with detectives maybe on burglaries
```

1    or robberies, things such as that.

2          Eventually, I was promoted to a mid-level gang

3    unit focusing on major mid-level gang investigations in the

4    Rampart area, in Northeast area, plainclothes assignment.

5          I was in then hired as a vice officer which is a

6    promotion which focuses on bookmaking, prostitution,

7    gambling.  Once again, another plainclothes undercover

8    assignment.

9          From there I worked as a field training officer

10   where I trained new recruits coming out of the academy.

11   Deputies, they call it a corporal at LAPD.  We're like two

12   stripe on the uniform.

13         From there I was promoted to detective, which is a

14   civil service promotion.  I worked narcotics group in the

15   Wilshire area focusing on street buys, street narcotics,

16   mid-level narcotic transactions.

17         From there I was promoted to sergeant, went to

18   work in East L.A.  While I was a sergeant there, I ran a

19   16-officer gang detail focusing on gang crime, conducting

20   search warrants, things such as that.

21         After that, I worked -- I was getting my master's

22   degree in public administration from California State

23   Long Beach.  I worked the chief's office for about a year

24   and a half.

25         Also during that time I was assigned to the

```
 1    Rampart Corruption Task Force where we looked at corruption
 2    on police department.  That was, basically, I think around
 3    1997 through 1998.
 4              From there I was promoted to a Sergeant II+I at
 5    Metropolitan Division K-9 Platoon, and we covered all
 6    465 square miles of the city on K-9, police K-9, looking for
 7    people that may have fled from the police.
 8              In conjunction with that, we worked on tracking
 9    and trailing, maybe someone that's lost, a missing child,
10    you know, a parent with Alzheimer's, things such as that.
11              I was then promoted or actually it was a lateral
12    transfer to Special Weapons and Tactics where I was a
13    sergeant my last five years.
14              And SWAT, basically, it covers all 465 square
15    miles of the city and focusing on barricaded subject
16    incidents.  I ran our Crisis Negotiation Team which focuses
17    on negotiation, hostage negotiating.
18              In addition, I was tasked to go to Mumbai, India,
19    after the Mumbai terrorist attack to look at critical
20    infrastructure and focus on tactics and how we in law
21    enforcement would deal with a situation like what happened
22    in Mumbai.
23              Presently, I teach for the State Department
24    outside of the country and I'm scheduled to go to North
25    Africa in the month of August to teach.
```

```
 1   Q     Okay.  Thank you for that.
 2              I guess you've had, obviously, experience in
 3   patrol and also in supervising patrol officers?
 4   A     Yes, sir.  Yes.
 5   Q     Now, have you been requested to consult on cases
 6   involving the police as an expert witness since your
 7   retirement from the law enforcement?
 8   A     Primarily, over the past three years, I've been
 9   consulting both in security matters as well as
10   police-related matters.
11   Q     And at some point did my office ask you to take a look
12   at this particular case?
13   A     Yes.
14   Q     And have you reviewed various materials in this case?
15   A     Yes, I have.
16   Q     Did some of the materials include the statement of the
17   involved officer?
18   A     Yes.
19   Q     And of his Citizen on Patrol?
20   A     Yes.
21   Q     Also, their depositions?
22   A     That's correct.
23   Q     You've seen photos of the scene; correct?
24   A     Yes.
25   Q     It's my understanding you did not feel it was necessary
```

1    to go to the scene in this case because you had the photos

2    and the video of the incident?

3    A     That's correct.

4    Q     You've seen the video?

5    A     I have.

6    Q     You've listened to the audio?

7    A     Yes.

8    Q     Now, can you tell the ladies and gentlemen of the jury

9    what POST standards are and what the learning domains are?

10   A     All officers in the state of California go to a police

11   POST-certified academy; and POST stands for Peace Officer

12   Standards and Training.

13         And basically, POST is the overarching agency that

14   ensures that agencies comply with specific types of

15   training.  Everything from use of force to people with

16   disabilities, vehicle operations, things such as that.

17         There are 43 learning domains.  And throughout

18   your career regardless or irrespective of what agency you

19   work for, you will get ongoing perishable skills training in

20   those subject matters such as pursuits, as I mentioned, or

21   the use of force.

22         You're required -- there's 24 hours of perishable

23   skills training that you must complete every two years as a

24   peace officer.  That's in conjunction with whatever agency

25   you work for.  They'll have their own training on their

```
 1    specific policies.

 2              POST does not provide policies.  That's up to that

 3    respective agency, but it's more of the broad-ranged

 4    training that's based on best practices that officers will

 5    obviously have an opportunity to review in dealing with

 6    certain circumstances or situations.

 7    Q    Okay.  Now, are some of the issues that you looked at

 8    in this case -- do they include, for example, whether the

 9    detention of Mr. Pickett was reasonable or not?

10    A    Yes.

11    Q    And when you looked at that, were you looking to see

12    whether there was reasonable suspicion to detain him and the

13    scope and manner of the detention?

14    A    Yes.

15    Q    Can you explain those terms to the jury as taught by

16    POST.

17    A    Typically, we have an consensual encounter, and you may

18    have heard of that already up to this point.  But that's

19    basically just a face-to-face encounter where an officer

20    walks up to you and has a conversation, can ask you

21    questions but a reasonable person would believe they can

22    leave at any time.  You can leave.  You can walk away.  You

23    can refuse to answer questions.  You have a lawful right to

24    do that.

25              If you run, flight in itself does not establish
```

```
 1    reasonable suspicion.  And what reasonable suspicion is, is
 2    that it's basically what a reasonable officer would believe
 3    that that person that you're going to detain is somehow
 4    connected to a crime.
 5           And that could be an observation, maybe you see
 6    someone breaking into a car.  Maybe there's a call for
 7    service where you get a description of the person that, you
 8    know, may be involved in a potential crime.
 9           It could be a follow-up maybe as a detective
10    that's going out and knocking on a door to talk to someone;
11    and you can detain and we -- asked about scope, duration,
12    and intensity for a reasonable amount of time.
13           At that point you need to establish probable cause
14    which is the level to establish that you reasonably believe
15    that that person that you're going to arrest is guilty of
16    some type of crime.
17           Barring that, you cannot arrest them.  As it
18    relates to reasonable suspicion, it has to be based on some
19    set of facts that you know at the time or that you learn
20    while you're there to justify that detention.
21    Q    Okay.  So I'm going to get into the specifics and the
22    reasons for your opinions in a moment.
23           But have you formed an opinion, from reviewing all
24    the materials in this case, as to whether or not the
25    detention of Mr. Pickett was reasonable or not?
```

1   A    I believe the detention was unreasonable.  I believe

2   that the consensual encounter -- and it could be heard on

3   the belt recording -- on numerous occasions that Mr. Pickett

4   asked -- gave his name, his date of birth, asked why he was

5   being stopped, advised the officer that he needed to leave.

6         Mr. Pickett had not committed a crime.  At best,

7   according to the deputy's own statement that he glanced at

8   him in a crosswalk.  You cannot form reasonable suspicion

9   based on a hunch or an instinct.  It has to be based on some

10  set of facts that you know or have learned from someone.

11        In addition, I believe that there was no

12  reasonable suspicion to detain.  As I mentioned, no one had

13  called the police.  Mr. Pickett was not under the influence

14  of a controlled substance.

15        He was staying in Room No. 45.  He was simply not

16  trespassing.  We look at a trespassing call -- and I know

17  that's come up here -- is that there's typically three

18  parameters of trespassing that we look at.

19        A, that if you're interfering with someone's

20  lawful, you know, ability to do business such it may be a

21  vagrant or transient, you know, in front of a location and

22  it's maybe impeding the business.

23        Secondly, if it's a restricted area maybe like,

24  you know, a military installation or maybe a business that's

25  closed, a couple signs in there.  A reasonable person would

1  believe you're not free to enter there.

2         And lastly is at a motel but only when that

3  person -- or hotel maybe doesn't pay their bill.  So they

4  come in, they pay the one day, and they decide they want to

5  stay three months.

6         Well, you can arrest them or warn them for

7  trespassing; and then you call the police and then the

8  police would -- you use the police to make a citizen's

9  arrest to go ahead and arrest that person for trespassing.

10        None of those three apply to the facts in this

11 case.

12 Q    Okay.  So you say you have seen the video; is that

13 correct?

14 A    Yes.

15 Q    Let me ask you this:  Are officers trained and is there

16 a learning domain on the concept of recognizing someone who

17 might have a mental impairment?

18 A    Yes.  It's called people with disabilities.  It's

19 Learning Domain 37.  It's one of the 43 workbooks that I

20 spoke about.

21        And we know, and we know in all of our communities

22 now with the homeless population, they're coming directly

23 out of Proposition 47, which is a state proposition that

24 allowed for early release for certain offenders.  They're

25 not given psychotropic medication.  They're just let into

```
 1    the community.
 2              And with that, there's no treatment.  We have that
 3    problem with our vets coming back with posttraumatic stress
 4    disorder.
 5              Once again, either given the wrong type of
 6    medication or just a myriad of different types of
 7    medications now that are put back in our community and then,
 8    obviously, it becomes sometime a law enforcement-related
 9    issue.
10              With people with disabilities learning domain,
11    there's one of those critical learning domains that officers
12    are taught on a regular basis.
13              And they're taught active listening skills.
14    They're taught de-escalation techniques.  They're taught
15    diffusing techniques.
16              So when they come across someone that may be
17    mentally ill or experiencing a mental crisis, they're taught
18    certain strategies to hopefully bring the situation to a
19    successful result without having to use force, be caring and
20    compassionate because someone may be inflicted with a mental
21    issue that you may not know of at the time but may learn as
22    you're talking to that person.
23              And we also know that, when we see people that are
24    mentally ill and we see certain behaviors, that we can all
25    pretty much recognize that.
```

```
 1              And officers are trained specifically to recognize
 2   that because, unfortunately, as I previously mentioned,
 3   they're interacting with the public every day; and there's a
 4   large volume of people within our public, especially our
 5   homeless population, that are inflicted with mental illness
 6   issues.
 7   Q     Okay.  And officers are trained that people of all
 8   walks of life could have mental impairments?
 9   A     Oh, I think all of us have either friends, family
10   members, or someone we worked with or someone close to us
11   that are somehow impacted.
12   Q     Okay.  Now, how is this important?  So if an officer is
13   supposed to be looking for these signs and sees what he
14   believes may be an indication that the person could possibly
15   have a mental impairment, how are officers trained to handle
16   that type of situation?
17   A     You try to reduce environmental issues, like you turn
18   your radio down to obviously a manageable level.  You reduce
19   distractions, maybe not be flashing lights in people's eyes.
20              And you ask them.  You have a conversation with
21   them.  Have you taken any prescription medication?  Is there
22   something that you need?  And no different than you would if
23   a person had a medical issue.
24              But a lot of times there is such a negative
25   connotation with mental illness that people either won't
```

1   tell you or they won't take their medication.

2           So you're tasked to take that extra time by

3   reducing distractions, being caring and compassionate

4   without losing your tactical edge.

5           I understand that's a part of it.  And also

6   officers are not taught to diagnose people either.  They're

7   not -- not be able to differentiate between someone who's

8   paranoid schizophrenic or someone who is bipolar.

9           Though those -- such as bipolar disorder, they

10  give off some of the same cues as someone that may be under

11  the influence of something like a central nervous system

12  stimulant like methamphetamine or cocaine.  So we're taught

13  -- or Ritalin.

14          We're taught that, though we may consider that

15  person being under the influence of a drug, we also need to

16  equally consider that that person may be mentally ill.

17  Q    Okay.  Now, if an officer, hypothetically, thought that

18  someone was under the influence of a stimulant, is one of

19  the things that they would do is to see if the person's

20  pupils were dilated?

21  A    Well, first, they'd need to be trained.  Some of us

22  went through drug recognition expert training, and it's a

23  very intensive course that goes on for about a year.

24          There's a series of twelve steps to get involved

25  in determining if someone is under the influence or you're

1   assuming someone is under the influence of a controlled

2   substance.

3          And there's a myriad of things that you need to

4   do, but you can't do that if you don't have reasonable

5   suspicion to detain which I don't believe, based on my

6   review of the facts in this matter, that there was ever

7   reasonable suspicion to detain Mr. Pickett.

8          So look at people's pupils to see if it's beyond

9   what would normally be.  Like, for instance, if we're

10  sitting in this room right now.  If you checked our pupils,

11  it typically would be between two and four millimeters.

12         If you're under the influence of, say, like

13  methamphetamine, they might be higher, incredibly higher.

14  Maybe eight to ten millimeters in this type of environment.

15         So drug recognition experts or officers in the

16  field are taught there's a series of things you need to do

17  with that person to either eliminate or possibly assume that

18  there's a high likelihood or probability that they may be

19  under the influence of something.

20  Q    What would be, just for an example, some of the things

21  that officers are trained to do if, hypothetically, they

22  believe someone could be under the influence of a stimulant

23  other than looking at their pupils?

24  A    You'd ask them.  I mean, you'd ask the simple question.

25  I mean, are you taking anything?  Have you -- for one, as I

1   mentioned earlier, Ritalin will give off the same -- affects

2   your pupils as cocaine or methamphetamine will.

3           So it's important that you ask because someone may

4   be on Ritalin.  Are they on -- that's a prescribed drug.

5   Are they on methamphetamine?  No.

6           So we would need to ask them, you know, are you

7   taking anything?  And that would be:  Have you ingested any

8   illegal substances?  Are you taking any prescription

9   medication?  Are you sick, ill, or injured?

10          There's a number of things you ask on the front

11  end and that helps develop the information as you move

12  forward if you reasonably believe that that person or that

13  subject may be under the influence of a controlled

14  substance.

15  Q    Okay.  So if -- understanding your opinion is that it

16  was unreasonable to detain Mr. Pickett, at some point in

17  viewing the materials, including the video, did you see

18  Mr. Pickett running away and falling down some steps?

19  A    I did.

20  Q    And at that point, assuming it was unreasonable to

21  detain him, is the officer permitted, based on the POST

22  standards, to use any force --

23  A    No.

24  Q    -- against Mr. Pickett?

25  A    No.

1  Q    And I'm talking about any force:  Less than lethal,

2  grabbing, tasing, anything.

3  A    Well, this case is unique because Mr. Pickett, as I

4  mentioned, had not committed a crime.  There was not a call

5  for service.  There was nothing that he did.

6         He complied with the deputy's initial request:

7  Take your hands out of your pocket.  Gave his name and date

8  of birth.  Didn't need to do any of that.

9         And as I mentioned, by mere flight, if someone

10 runs, though officers don't like that when that happens,

11 nonetheless you can run after that person.  You can run

12 alongside that person.  You just can't use force unless you

13 heard something.

14        Maybe you're in foot pursuit of someone and now

15 you're hearing information on your radio that the person

16 you're looking for is wearing a white hat, black jacket, red

17 shoes, and, lo and behold, that's the person you're running

18 after.

19        That would be information that you could help

20 formulate reasonable suspicion based on the information

21 you're getting.

22        But if the person says:  I don't want to talk to

23 you anymore and just goes ahead and runs from you, they can

24 do that.

25        Now, you can run alongside.  You just can't use

```
 1    force to stop them, any type of force at all.  And that
 2    could be tackling them, using a less-than-lethal force
 3    option such as pepper spray.
 4         I know the word Taser, the device Taser has been
 5    brought up here, an impact weapon such as baton.  Hands,
 6    fists, feet, or anything like that would not be reasonable
 7    based on the set of facts as I mentioned.
 8    Q    Okay.  And we're going to look at the video in just a
 9    moment, Mr. DeFoe, and I want -- I'm going to ask you a few
10    questions as we play it.
11         But during your viewing of the video, did you --
12    you saw the portion where Nate fell down?
13    A    Yes.
14    Q    And how would you characterize the nature of the fall
15    based on what you observed?
16    A    Pretty violent fall, fell down on the stairs, landed on
17    his back, was in a defensive position.  Came up somewhat in
18    a defensive position with his hands and knees coming up.
19         And obviously listening to the audio, you know, he
20    was upset and asking "What for," you know, "Why is this
21    happening," was his questioning at that time.
22    Q    Okay.  Now, what would you expect a reasonably trained
23    officer to have done immediately after Nate fell in the
24    manner that he did?
25    A    I would ask him if he's okay.  Based on the fall, I
```

1    would request if he needed medical assistance.  That happens

2    at times.  You may be interacting with someone and they are

3    injured.

4              And I was taught that you complete an injury

5    report because you don't have probable cause to arrest.  You

6    don't have reasonable suspicion to detain.

7              You've elevated a consensual encounter into

8    reasonable suspicion based on a five- to seven-minute

9    question-and-answer session that occurred prior to

10   Mr. Pickett running.

11             And at that point you have someone who's not

12   really in your custody because he should not have been but

13   runs as a result of that custody.

14             It would be reasonable to summon an ambulance or

15   see if that person needs medical assistance because they

16   fell face-forward or body-forward down those stairs.

17   Q    Okay.  In your opinion, under those set of facts, would

18   it be appropriate to point your Taser at his chest with a

19   laser beam threatening to tase him at that point?

20   A    Taser is an intermediate use of force, and POST teaches

21   us certain levels of resistance.  And typically, he's

22   cooperative.  If I ask you to do something, you cooperate.

23             Passive nonresistance was typically like a

24   demonstrator, a person that will -- they're not offering any

25   physical resistance but they're not complying to your verbal

1   commands.  Ma'am, you need to get out of the sidewalk and

2   they tell you no.

3         There are certain force options that you can use

4   to, obviously, move that person that are reasonable.

5         Then you have -- next move would be resistive,

6   which means that the person is tensing, bracing, or running

7   away.  It means they're not striking you, hitting you, but

8   maybe they're pulling back from you.  Maybe they're running

9   from you.  There are other force options you can use for

10  that type of behavior.

11        Then you have assaultive behavior, which is

12  typically a fight.  You fight, punches, kicks.  And then you

13  can respond to, obviously, with a different set of force

14  options if that individual's behavior is assaultive.

15        And, lastly, is life threatening.  And that's when

16  you can use lethal force, and that can only be used in

17  immediate defense of life.

18  Q    Okay.  So in the first -- in the categories of

19  resistance, whether it's passive or active and assaultive,

20  an actual fight with punches and kicks being thrown,

21  pursuant to the POST standards, can officers use deadly

22  force?

23  A    No.

24  Q    Are officers trained that, if they get in a fight with

25  someone and there's some punches thrown, it's okay to shoot

1   them?

2   A    No.

3   Q    How about if they give them some warnings that they're

4   going to shoot them.  Is it then okay?

5   A    No.

6   Q    Well, let's say there's a fight going or a struggle

7   going on and the officer says:  Stop, stop, and the person

8   is still struggling, is it okay to shoot them then?

9   A    No.

10  Q    Why not?

11  A    Because it wouldn't be reasonable under those set of

12  facts that you mentioned.

13          MR. GALIPO:  Okay.  We're going to get into the

14  deadly force issues in a moment.  But, with the Court's

15  permission, I think we have an exhibit that actually syncs

16  the audio from the recording to the video that doesn't have

17  audio; and we'd like to play that for the jury, and then I

18  may ask to stop it at a few portions and ask Mr. DeFoe some

19  follow-up.

20          MR. EWING:  All right.  Let's hope it works.

21          MR. GALIPO:  Let's hope.

22          THE COURT:  And can we get the exhibit number?

23          MR. GALIPO:  114.

24          THE COURT:  114.  Thank you.

25          (Exhibit played.)

1  BY MR. GALIPO:

2  Q    So this is the beginning portion of it; is that

3  correct?

4  A    Yes.

5  Q    In your opinion, is there any reasonable suspicion to

6  detain him at this point?

7  A    No.  It was:  Can I talk to you?  Deputy Woods was

8  basically involved in a consensual encounter at that time;

9  and Mr. Pickett could have said, no, you can't and then

10  continued to walk to his room or he could have did what he

11  did and stopped and then, you know, be compliant with the

12  initial line of questioning.

13  Q    Okay.  So based on the POST standards and training,

14  because the average person may think if a police officer

15  approaches them, they might not know whether they could just

16  walk away or not or feel comfortable doing that.

17        But are you saying that the POST standards teach

18  police officers in this type of situation the person doesn't

19  have to talk to them and can just walk away?

20  A    Yes.  It's POST Learning Domain No. 15.

21        MR. GALIPO:  Okay.  Thank you.  Can we continue,

22  please.

23        (Playing exhibit.)

24  BY MR. GALIPO:

25  Q    So you mentioned a couple things in your testimony.

1    You were talking about acts of compliance.

2              In reviewing this, when Nate was asked to take his

3    hands out of his pockets and he did, was that a factor you

4    considered?

5    A    Yes.

6    Q    Why?

7    A    Well, he was being compliant and up to this point there

8    was no issue with Deputy Woods asking him to do these things

9    as well as asking him information such as his name and date

10   of birth.  That was all reasonable up to this point.

11   Q    Okay.  And did -- based on your review, did Nate -- was

12   Nate cooperative and compliant by giving his name and date

13   of birth?

14   A    Yes.

15             MR. GALIPO:  Okay.  Please continue.

16             (Exhibit played.)

17   BY MR. GALIPO:

18   Q    And just so we're clear because this is four screens,

19   but is it the bottom right screen, Camera 11, that you could

20   see the officer and Nate?

21   A    Yes.

22             MR. GALIPO:  Okay.  Please continue.

23             (Exhibit played.)

24   BY MR. GALIPO:

25   Q    So at that point when Nate says he wants to go to his

```
 1   house, should he have been permitted to go?

 2   A    I think this is the turning point where a reasonable

 3   person would not feel that it's free for them to leave; and

 4   I also mentioned earlier there were cues.  As we know, based

 5   on facts in the case, Mr. Pickett was not under the

 6   influence of any narcotic or controlled substance.

 7           We talked about Learning Domain 37.  We can pick

 8   up some of these cues from those people that are mentally

 9   ill.  I think a reasonable officer would, with training and

10   experience, would have recognized at this juncture that

11   there was more to this situation such as potentially that

12   Mr. Pickett was, in fact, mentally ill.

13           MR. GALIPO:  Okay.  Please continue.

14           (Exhibit played.)

15   BY MR. GALIPO:

16   Q    Do we see Nate starting to walk away at this point;

17   correct?

18   A    Yes.

19   Q    Based on POST standards, did he have every right to

20   walk away?

21   A    Prior to that, he could have walked away.  He could

22   have walked away prior to the time in which he did.  He was

23   respectful.  He called him "sir."  He wasn't being

24   disrespectful.

25           He was being detained at that point.  At that
```

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   point, the consensual encounter was elevated to a detention

 2   at that juncture.

 3            He told him he needed to be somewhere.  He was at

 4   that point telling him to hold on because he needed to run

 5   him for warrants.  And at that point a reasonable person

 6   would not have believed that they could, in fact, leave at

 7   that point.

 8            MR. GALIPO:  Okay.  Can we continue.

 9            (Exhibit played.)

10   BY MR. GALIPO:

11   Q    But up to this point in time, were there any aggressive

12   acts by Nate?

13   A    No.

14            (Exhibit played.)

15   BY MR. GALIPO:

16   Q    Okay.  So first of all, your opinion is that the

17   detention was unreasonable; correct?

18   A    In addition, it doesn't come up, but we heard the

19   Code 4 that he -- Deputy Woods had advised his Dispatch,

20   which means that everything is okay at this point.

21            So there's no crime at this point.  If you had

22   reason to believe that someone had done something wrong, it

23   would be a good time to request an additional unit, an

24   additional deputy to respond to your location.

25            But right now he's just looking to see if he can
```

```
 1    identify him in the system.  Mr. Pickett gave his correct
 2    name and correct date of birth.
 3              As I mentioned in my deposition, I believe that,
 4    based on his mental illness, he can't spell his name.  I
 5    think that may have been the issue with him when he was
 6    asked how to spell it.
 7              He didn't know how to spell it and actually came
 8    back and said:  I don't know how that's spelled.  That's
 9    your job, which I thought was kind of unique.
10    Q    Well, let me ask you this.  I take it, if there was no
11    reasonable suspicion to detain, then at most it was a just a
12    consensual encounter?
13    A    At what point?
14    Q    Well, if your opinion is he didn't have reasonable
15    suspicion to detain him, then the detention was
16    unreasonable; correct?
17    A    Yes.
18    Q    So if you have, based upon the POST standards, if you
19    have an unreasonable detention, the person could walk away,
20    can't they?
21    A    Yes.
22    Q    Okay.  So now we're up to the point where the officer
23    tells Nate to turn around and tries to initiate physical
24    contact.  Are you with me?
25    A    Yes.
```

```
 1   Q     Was that appropriate, in your opinion, at that point

 2   for the officer to try to grab or you handcuff Nate?

 3   A     No.

 4   Q     Why not?

 5   A     There's no crime.  A lot of times we -- people are

 6   arrested for what they call 148 of the Penal Code.  And

 7   that's for interfering, resisting, or delaying someone in

 8   the course and scope of their lawful duties, that being a

 9   peace officer.

10         There was no crime.  He wasn't -- there was no

11   call for service.  A crime had not occurred.  He provided

12   his information.

13         The information he was getting back from Dispatch

14   didn't line up.  But even if it did or didn't, nonetheless

15   there's still no crime at this juncture because he didn't

16   lie.

17         And even if he did lie initially or refused to

18   talk because you don't need to cooperate, that would have

19   been appropriate under the circumstances as well.

20   Q     Okay.  You indicated about the Code 4 and a request for

21   backup.  So, for example, if you think someone is

22   trespassing or under the influence, one of the options an

23   officer has is to call for backup to get another unit there?

24   A     Especially.  I mean, as a sergeant in my last 14 years,

25   you get ride-alongs.  Sometimes it's welcomed.  Sometimes
```

```
 1    you're kind of stuck with that ride-along for that night.

 2              But with that you take certain precautions when

 3    you're driving around with a civilian who's not armed.  You

 4    communicate if you're going to stop -- you typically don't

 5    get involved in things that aren't urgent.

 6              If you do, you typically would request a backup or

 7    request an additional unit.  Like, if you saw a crime in

 8    progress, you wouldn't approach that person because you have

 9    a civilian, a citizen with you.

10              In this case, you had Mr. Kelsey who was unarmed.

11    Never -- Deputy Woods never told Mr. Kelsey:  This is why

12    we're stopping.  This is why I'm coming over here to detain

13    him.

14              He just gets out of the car and arbitrarily, you

15    know, jumps a fence and starts walking towards Mr. Pickett,

16    which I think is important here.

17              If you reasonably believe at any point that you're

18    in fear or there's a necessity for call for a backup, you

19    simply get on the radio because he was conversing with

20    Dispatch.  Just send me another unit and then just have a

21    conversation.

22              If he walks away at that time, that's fine.  He's

23    not going far.  He's going to most likely -- he's staying in

24    Room No. 45.  He went to Room No. 45.

25              If something comes up after the fact, like, maybe
```

1    it comes back with a warrant, well, he's in Room No. 45.

2    You can just keep an eye on him until then.  You can't

3    restrict his movement until you get information that, in

4    fact, he would, in fact, have a warrant.

5              MR. GALIPO:  Okay.  Is it possible, Mr. Sincich,

6    just to go back a little bit so we can see the fall again.

7              (Exhibit played.)

8    BY MR. GALIPO:

9    Q    So you describe the fall as being significant.  You're

10   able to see that in the video?

11   A    Yes.

12   Q    And now he's threatening to tase him and you've already

13   told us you think that's inappropriate?

14   A    It's unreasonable, yes.

15   Q    All right.  Now, from watching the video and reviewing

16   the statement and deposition of Deputy Woods, are you aware

17   that Deputy Woods says that he punched Nate 15 to 20 times

18   in the head and face?

19   A    Yes.

20   Q    And you have seen photographs depicting injuries to

21   Nate's face?

22   A    I have.

23   Q    And based on your experience as a law enforcement

24   officer, those would be consistent with being punched?

25   A    Yes.  The assignments that I worked, I've had to

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   conduct probably over a hundred use of force investigations.

 2   So you look at force and look at the reasonableness of the

 3   force and you look if it's consistent with what that person

 4   said.

 5              In addition, I was a detective.  So you're looking

 6   at assault with a deadly weapon cases and battery cases.  So

 7   when someone states that they were punched or kicked or hit,

 8   the first thing you look at, is there any physical evidence

 9   of that occurring?

10              And when I looked at Mr. Pickett's injuries on his

11   face -- and, once again, not giving medical opinions.  It's

12   outside of my scope -- is -- that's inconsistent with

13   someone being punched 10 to 15 times while on the ground.

14   Q    Now, are you also aware that Deputy Woods contends that

15   Nate punched him in the face 10 to 20 times with full-force

16   punches?

17   A    Yes.

18   Q    And did you look at pictures of Deputy Woods's face

19   taken after the incident?

20   A    Approximately an hour after the incident, yes.

21   Q    And based on your experience in law enforcement and

22   investigating force incidents and assault incidents, what

23   were you looking for when you looked at his picture?

24   A    Well, there's a number of things.  I mean, those of us

25   who have been involved in martial arts most of our lives or
```

1   fighting or ground-fighting.

2          As we're taught in law enforcement is, if you're

3   going to be striking someone in a downward trajectory and

4   they're on the ground, especially in this matter where

5   there's cement, it's going to create much more damage

6   because the body doesn't have anywhere to move like, if we

7   were standing up boxing where you can take some of that

8   force along with it.

9          So when someone is down on the ground and they're

10  lying in a prone position and they're struck 20 times in the

11  mouth and in the face, if it doesn't kill them, it's going

12  to cause significant visible injury especially if it's

13  talking about mouth, nose, or you're going to have blood and

14  broken bones and such things such as that.

15         But those injuries will be very visible if a grown

16  man punches another grown man while they're on the ground 10

17  to 20 times.

18  Q    And 28-2, this is one of the photos that you've seen?

19  I'm holding it up.

20  A    Yes.

21  Q    And did it appear to you that Deputy Woods had been

22  forcefully punched in the face?

23  A    No.

24  Q    Now, on the video do you see Deputy Woods throwing some

25  punches at Nate?

```
 1   A      Yes.
 2           MR. GALIPO:   Let's continue with the video.
 3           (Exhibit played.)
 4   BY MR. GALIPO:
 5   Q    So at this point is the -- based on your viewing of the
 6   video, the deputy is behind Nate and Nate is in a seated
 7   position?
 8   A      Yes.
 9   Q    In your opinion, would it be appropriate for the deputy
10   now to start punching Nate in the face and head?
11   A    There was no reason to approach Mr. Pickett when he was
12   on the ground at all for any level of force.
13   Q    Okay.  So what should have been done given the facts
14   and circumstances?  Once Nate started running and then fell
15   down, what should the deputy have done at that point?
16   A    As I mentioned, I would have summoned medical
17   assistance.  He had not committed a crime.  He ran, and he
18   has a lawful right to run.
19           So the injuries occurred based on him tripping.
20   The deputy didn't cause those injuries directly, maybe
21   indirectly at that time.
22           So he should have asked if he was okay and then,
23   you know, get him medical assistance if he needed to do
24   that.
25   Q    Okay.  As opposed to going hands-on and trying to
```

1  handcuff him?

2  A    Well, initially, he threatened to tase him.  And the

3  Taser, which is an electronic control device.  If you

4  haven't seen one before, they look almost like a pistol.

5  They're hard plastic.  The model is an X26.

6         And what they do is they fire -- there's a

7  cartridge at the end of the Taser and it fires two darts and

8  they come out at eight degrees, basically.

9         The Taser is attached -- the cartridge is attached

10  to a wire, and, typically, in law enforcement, that wire is

11  21 to 25 feet.

12         The optimal distance for me to tase someone is

13  about seven to ten feet; and why that's important is Taser

14  darts, you're looking for optimal spread.  You want those

15  Taser darts to spread.

16         For every seven feet, you're going to get about a

17  12- to 13-inch spread.  What you're looking to do with a

18  Taser is you're looking to achieve neuromuscular

19  incapacitation.  And what that means is you want that body

20  to lock up.

21         So regardless if they're going through excited

22  delirium, maybe under the influence of methamphetamine, or

23  they're violent, you want that body to lock up.

24         The best way to do that is, if you can get to the

25  back for a number of reasons -- the back typically has

1    tighter-wearing clothing.  If you're wearing a sweatshirt or

2    something to the front, clothing will impact that because

3    the darts may not be able to get into the clothing.

4          But the back is typically the tightest part of

5    your clothing, and, in conjunction with that, it's the

6    largest muscle group.

7          So the optimal is to fire to the back in the large

8    muscle group; but, if you can't, then you need to fire to

9    the front of the torso.  Even from zero to seven feet in,

10   you will not achieve neuromuscular incapacitation but you

11   can still be used as a pain compliance tool.  It will still

12   work.

13         If you are close up, what you're looking to do is

14   split the belt line, which means you want one of the

15   probes -- not to get overly technical here -- but one of the

16   probes to go below the belt line and one above if you're

17   close and that person is facing you.

18         So the idea if you don't have that person's back,

19   that now you can't deploy a Taser, as former Taser

20   instructor and deployed the Taser in the field on numerous

21   occasions, I can tell you that it does work to the front.

22         It's just the achievable use, obviously, the most

23   desired use -- a better way to say it -- is to the back of

24   the body.

25         MR. GALIPO:  Okay.  Can we place continue with the

```
 1    video.
 2              (Exhibit played.)
 3    BY MR. GALIPO:
 4    Q    The shots sounded like they were about a second apart;
 5    is that fair?
 6    A    Yes.
 7    Q    Let's talk for a moment about the POST standards as
 8    they relate to deadly force.
 9              Is there a particular learning domain or chapter
10    that talks about the different POST standards that relate to
11    deadly force as opposed to other types of force?
12    A    Yes.
13    Q    Would it be fair to say that, because deadly force is
14    the highest level that's likely to cause death or serious
15    bodily injury, there are special rules?
16    A    Yes.
17    Q    Now, you've already told us that you can't shoot
18    someone for being assaultive or fighting with a police
19    officer; is that correct?
20    A    That's correct.
21    Q    Is that what less-than-lethal options are available?
22    A    Yes.
23    Q    By the way, do officers have training with respect to
24    getting into grappling or wrestling with someone and how to
25    use control holds and things of that nature?
```

1   A     They do and in conjunction we've not mentioned that

2   officers have OC spray as well and OC spray is great from a

3   distance of about 12 feet away maximum.

4           There's no issues of spraying OC or pepper spray

5   outside because you're not concerned about a

6   cross-contamination as we would if I were to spray someone

7   in the jury booth right now.

8           We all most likely would be impacted by that

9   spray.  Outdoors, it's unique because the air in itself will

10  assist with the ventilation.  So OC spray is about the least

11  of an intrusive manner to use force before you get into the

12  use of an Taser or an impact weapon or strikes or anything

13  such as that.

14          To answer Mr. Galipo's question, officers are

15  trained.  Ground fighting, they're trained obviously.

16  Weapon retention techniques, they're trained to do a number

17  of things obviously if the fight or the incident goes to the

18  ground.

19  Q     Okay.  So can you tell the ladies and gentlemen of the

20  jury about some of the POST teachings or standards that

21  relate to the use of deadly force.

22  A     Well, it's under Learning Domain Number 20.  It must be

23  last resort.  That means that it has to be the last resort.

24  It's only in immediate defense of life.

25          Mr. Galipo mentioned the word "special rules."

1    That's typically the policy.  Every policy like in this

2    case, San Bernardino County Sheriff's Department or even

3    LAPD, the policies are about the same.

4         It's typically in immediate defense of life, your

5    life or someone else's life.  Great bodily injury or death

6    is typically the parameters.  Must be the direst of

7    circumstances; that being that it's got to be, once again,

8    going back to the last resort.

9         It's also predicated on the reverence for human

10   life.  I mean, it's -- though I've been involved in three

11   lethal use of force situations, and we always have to

12   consider the reverence for another person's life, and we

13   have to take that into consideration before we use deadly

14   force.

15        Subjective fear is insufficient.  And why that is

16   important is that the fear that an officer feels -- and

17   those of us in law enforcement has obviously felt fear.  But

18   that fear has to be reasonable based on the circumstances.

19        They can't be -- it has to be correlated in one's

20   mind that's reasonable.  Because, for instance, all traffic

21   stops are dangerous.

22        Pulling someone over at night, they're dangerous,

23   but you can't come up and use force because you're afraid

24   that someone in the car may have a weapon.  Right?  It's

25   based on the totality of the circumstances.

1          So when it comes down to fear, the fear has to be

2     objectively reasonable based on the circumstances that are

3     occurring at that time, not at a later time but at that

4     time.  And that's basically based on what the facts that the

5     officer knows at that time.

6          And, lastly, all other reasonable measures have

7     been exhausted where you've tried other things, they've not

8     worked.  Once again, it all falls back to immediate defense

9     of life and, if you don't use lethal force, there's a

10    likelihood that your life or someone else's life would be in

11    danger.

12    Q    Okay.  So just to follow up on some of those POST

13    standards and the facts of this case, do you have an opinion

14    as to whether shooting Nate was a last resort of the

15    officer?

16    A    No.

17    Q    Well, what is your opinion in that regards?

18    A    That, for one, the threatening to shoot him was -- I

19    believe was inappropriate because, once again, you can only

20    shoot when it's immediate defense of life.

21         So using those words "I'm going to shoot you" at

22    that point is obviously going to create some fear to that

23    person that you've threatened that you're going to shoot

24    that's run from you that's -- from this entire event is

25    trying to figure out what they've done wrong.

```
 1              You've heard it on the belt recordings:  What for?
 2    Why are you stopping me?  Now you're telling me you're going
 3    to shoot me.  And the question is -- prior to that, you're
 4    telling me you're going tase me.
 5              And even though you fell down and you're injured,
 6    you're still asking those questions as to why you're going
 7    to do these things.
 8    Q    Okay.
 9              MR. EWING:  I'm going to object and move to strike
10    the witness's testimony about Nate being injured from the
11    fall.  That's a medical expert opinion, and I would move to
12    strike that testimony just now.
13              THE COURT:  Overruled.
14              MR. GALIPO:  Okay.
15    Q    And do you have an opinion or was this the direst of
16    circumstances?
17    A    No.
18    Q    Was it an immediate defense of life?
19    A    No.
20    Q    Were there other reasonable options other than shooting
21    and killing him?
22    A    Yes.
23    Q    So I want to ask you about this subjective fear.  Is it
24    enough in looking at a shooting case and deciding if the use
25    of force was excessive or not, if the officer just says:  I
```

```
1    was afraid for my life.  I thought I was going to be knocked

2    out.  I thought maybe he could grab my gun.  I was afraid

3    for my life.  Is that enough?

4    A     No.

5    Q     Why not?

6    A     It has to be reasonable.  Has -- based on the

7    circumstances, that fear would have to be considered a

8    reasonable person would believe that their life or someone

9    else's life is in danger.

10   Q     Have you reviewed -- I take it you have reviewed other

11   shooting cases.

12   A     Yes.

13   Q     And by the way, you mentioned, Mr. DeFoe, that you had

14   been involved in various assignments including a SWAT

15   officer; is that correct?

16   A     A SWAT supervisor.

17   Q     And if I understood your testimony, you mentioned that

18   there were three use of force incidents that you were

19   involved in?

20   A     Yes.

21   Q     In each of those incidents was someone either shooting

22   at you or have a gun pointed at you?

23   A     Yes.

24   Q     In your opinion, based on your review of the facts of

25   this case, are those incidents factually a little different
```

1   than this case?

2   A     Yes.

3   Q     Okay.  Now, have you reviewed cases where you believe

4   the officer overreacted and shot?

5   A     Yes.

6   Q     And if an officer overreacts, based on police officer

7   training, is that an example of excessive force?

8   A     Yes.

9   Q     In other words, the officer doesn't necessarily have to

10  have a criminal intent to kill someone or anything like

11  that?

12  A     That's correct.

13  Q     Are officers trained that they need to control their

14  fear?

15  A     Yes.

16  Q     Can you explain to the jury what the training is on

17  that?

18  A     Well, it comes -- it comes down to training.  It comes

19  down to being in situations where, if you reasonably believe

20  you need a backup, you call for a backup.  You don't engage

21  people when you shouldn't engage them.

22          If you need to be conversant with your weapon

23  systems.  That could be, obviously, your fighting skills,

24  your less-than-lethal force options.

25          You need to know that you can use a Taser to the

1    front of someone's body if that's going to be a tactical

2    option that you're going to use at that time.

3            You need to know that pepper spray works in the

4    event you're going to deploy pepper spray in an incident.

5            Because, once again, there's an expectation, as I

6    mentioned earlier, there's a reverence for human life; and

7    that's the last resort is to, obviously, use your firearm.

8    That only can be done in immediate defense of life.

9    Q    Are officers trained that, if they use unreasonable

10   force against a citizen such as punching the citizen in the

11   face or head, that the citizen has a right to defend

12   themselves?

13   A    Yes.

14   Q    I want to ask you a few more questions.

15           Gun retention.  Is there a specific training about

16   gun retention?

17   A    First, if you're ground fighting with someone or you're

18   involved in an altercation, the last thing you want to do is

19   take a pistol out of your holster and introduce it into an

20   environment where you're fighting with someone with hands

21   and feet because the concern is that the person can grab at

22   it.  There's a concern that you could have a negligent

23   discharge, that being the gun going off.  You don't want to

24   introduce a firearm.

25           That's why, you know, today prior to -- dating

```
 1   myself here -- when I came on, you had single-snap holsters

 2   where you'd put the weapon in the holster and you'd snap it

 3   down.

 4            Now they have great holsters that are weapon

 5   retention holsters that allow a significant amount of force

 6   to take that weapon out of your holster.

 7            So officers are trained to keep that gun in the

 8   holster, once again, until there's a likelihood that you're

 9   going to need to use it.

10            The last thing you would want to do in close

11   quarters and fighting someone on the ground is to take a

12   weapon out.  Now you really can't even defend yourself

13   because you're really concerned about that weapon, and it

14   limits your abilities as well because now, if you're

15   right-hand dominant, you have a weapon in your right hand

16   and most of us can't fight with one hand or even detract

17   someone's attack.

18            So in the event that you do have your weapon out

19   and someone tries to take a weapon, we're taught weapon

20   retention techniques.

21            And there's a series that we've taught in the

22   POST-certified academy that all of us have gone through,

23   which is about 8- or 900 hours of total training, that in

24   the event someone is trying to grab at your weapon, is that

25   you bring that weapon system in close to your body and try
```

1    to maintain control at the same time yelling out that "He's

2    going to my gun" or trying to alert someone that that person

3    is going for their gun.

4            In this case, based on my review of the testimony,

5    that was never stated.  Mr. Kelsey who was in close

6    proximity never heard that Deputy Woods yelled that he's

7    going to my gun.

8            When I reviewed the belt recording, the last thing

9    that was asked in the belt recording -- on page 7 of the

10   belt recording on the document stated:  When asked, was he

11   going for your gun?  He stated:  I don't know at that time.

12           MR. EWING:  Objection.  That misstates the

13   testimony.  That's based on a transcript in a prior

14   objection.

15           THE COURT:  Overruled.

16   BY MR. GALIPO:

17   Q    Was what it said -- and I know you're paraphrasing.

18   Was the question specifically:  Did he grab your gun or

19   something to that effect and he said:  I don't know?

20   A    I'll read it.  It states:  Officer 2:  He grabbed your

21   gun?  Woods:  I don't know.

22           MR. EWING:  Again, the same objection.  It

23   mischaracterizes what the audio recording says.

24           THE COURT:  All right.  Overruled.

25

```
 1    BY MR. GALIPO:
 2    Q    Okay.  So with respect to -- you've already told us
 3    about taking out the gun during a struggle.  But if someone
 4    thought someone was reaching for their gun -- so one thing
 5    they're trained to yell out:  He's going for my gun or
 6    something to that effect?
 7    A    If time affords, if you can do that.  I mean, obviously
 8    it's going to be depending on the time.  But the first thing
 9    I would do if I believed someone was going for my gun is I'd
10    bring that weapon in tight to my body.
11         I would protect that weapon with both of my hands
12    even if you're being attacked because the last thing you
13    want to do is have that person get control of that firearm.
14    That would be concerning.
15    Q    Okay.  And in this case, is it your understanding from
16    reviewing the materials that the barrel of the gun was close
17    to or in contact with Mr. Pickett's chest at the time of
18    discharge?
19    A    Yes.
20    Q    Medical assistance, is there any training on officers
21    calling for medical assistance if someone that's been
22    seriously injured or shot?
23    A    Officers are trained that you should summon medical
24    assistance as soon as possible.  And then, in conjunction
25    with that, you should perform any lifesaving techniques that
```

1    you can in the interim until medical arrives.

2          That could be chest compressions, direct pressure

3    on wounds, whatever it may be until medical arrives.

4    Q    Okay.  And lastly, Mr. DeFoe, just kind of in summary,

5    can you tell the ladies and gentlemen of the jury -- I take

6    it your opinion is the use of deadly force was excessive and

7    unreasonable in this case.

8    A    Yes.

9    Q    Can you, just in summary, explain the reasons to the

10   ladies and gentlemen of the jury as to why it's your opinion

11   that the use of deadly force was excessive and unreasonable.

12   A    As I mentioned from the start, I believe that the

13   consensual encounter was elevated to a detention.

14   Mr. Pickett had a right to leave, and he ran.

15         As I mentioned, running in itself -- flight does

16   not -- you cannot establish reasonable suspicion based on

17   flight.

18         He fell to the ground obviously.  He was then

19   threatened he was going to be tased for no reason because

20   the tasing in that time would have still been unreasonable

21   and excessive.

22         At that point he was threatened he was going to be

23   shot while he was on the ground.  Once again, asking:  What

24   for, what did I do, throughout this entire incident while

25   being professional, polite, using the word "sir" during the

```
 1    interaction, complying with the officer's -- or deputy's
 2    commands and removing his hands and giving the information
 3    he asked for.
 4            And then the big thing for me when I decided to
 5    take the case -- because I screen away a lot of the cases
 6    that I'm asked to take if I believe the officer's actions
 7    were reasonable or if an officer was injured.
 8            Because when I looked at the photos of
 9    Deputy Woods, that in itself was not consistent with what
10    was testified to that:  I was struck in the face 10 to 15
11    times or 10 to 20 times in the face and mouth area.
12            I just didn't see the photos that were taken an
13    hour later without making credibility determinations on
14    Deputy Woods.  It was not consistent with what I reviewed
15    the facts in the matter.
16    Q    You said you have reviewed other officer-involved
17    shootings?
18    A    Yes.
19    Q    And in terms of your opinion that the use of deadly
20    force was excessive and unreasonable, how strongly do you
21    feel about that opinion in this case as opposed to other
22    cases you've looked at?
23    A    This is troubling in the sense that there was no crime,
24    wasn't under the influence, was mentally ill, elevated
25    detention, and then the force, I believe, was unnecessary
```

1  unreasonable.

2        He resided at the location.  There wasn't a crime.

3  There wasn't trespassing.  He was simply trying to get to

4  his house and then everything that happened after the fact,

5  I believe, was unnecessary and unreasonable.

6  Q    And where would you rank this in terms of cases you

7  reviewed as to how excessive this is?

8  A    Well, I typically only take cases where the person is

9  unarmed.  I don't take a case where a person, an assailant,

10  has a gun or a knife or an officer was shot or stabbed.

11        I turn down those cases throughout the week and,

12  in fact, even to Mr. Galipo's office on occasion; and this

13  is probably one of the worst cases I have looked at because

14  of the mental health component to this matter.

15  Q    You when you say it's one of the worst cases, in what

16  way?

17  A    Because as I mentioned, there was no crime.  He wasn't

18  under the influence.  He was not combative.  He was

19  respectful.  He ran as he has a lawful right to do.

20        He asked why was he was being stopped.  He was

21  threatened to be tased, threatened to be shot, ultimately

22  shot.

23        As we mentioned, people have a right to defend

24  themselves.  No one is going to lay on the ground and be

25  struck as we saw in the video and not defend themselves, put

```
 1   their hands up, fight back.
 2            They're not -- a normal person is going to do that
 3   especially after they've been told that they're going to be
 4   shot.  I think the reactions to that, even if the fact that
 5   there's -- obviously, there's questions as to grabbing of
 6   the gun.
 7            If I was told that I was -- if I was being struck,
 8   punched after falling down to the ground, a gun was taken
 9   and pointed at me, what I would do, I would -- take away
10   from the law enforcement side of it, I would try to get that
11   gun away from me.
12            I would try to push that gun out of the way
13   because I would not want to be shot because I haven't quite
14   figured out why this is all happening; and that's not --
15   take away the mental health component.
16            MR. GALIPO:  Thank you.  That's all I have.
17            No further questions at this time.
18            THE COURT:  All right.  Why don't we take a
19   ten-minute recess, ladies and gentlemen of the jury.
20            Please do not form an opinion about the case until
21   the matter is finally submitted to you.  Don't talk with
22   anyone about the case.  Do allow anyone to talk to you about
23   the case and do not conduct any research of any kind on any
24   subject matter connected with this case.
25            We'll take a ten-minute recess.  All right?
```

```
 1                  Thank you.
 2             THE CLERK:  All rise for the jury.
 3             Please be seated.
 4        (The following was heard in open court outside the
 5         presence of the jury:)
 6             THE COURT:  You may step down.
 7             All right.  Let's just take ten minutes and come
 8   back.
 9             Mr. Ewing, you'll be ready for cross-examination;
10   correct?
11             MR. EWING:  Yes.
12             THE COURT:  Thank you.
13             THE CLERK:  All rise.  This Court is in recess.
14        (Recess taken 11:54 to 12:10 P.M.)
15        (The following was heard in open court in the presence
16         of the jury:)
17             THE COURT:  All right.  Cross-examination, please
18   Mr. Ewing.
19             MR. EWING:  Thank you, Your Honor.
20                         CROSS-EXAMINATION
21   BY MR. EWING:
22   Q    Good afternoon, Mr. DeFoe.
23   A    Good afternoon, Mr. Ewing.
24   Q    You testified that you did not go out to the scene of
25   the shooting?
```

```
 1   A    That's correct.

 2   Q    Are you familiar with the El Rancho Motel based upon

 3   your research of documents and materials in this case?

 4   A    Familiar as to the layout of the motel?

 5   Q    The location of the motel, the area of Barstow.  You

 6   testified, I believe, that Nate lived there.  So are you

 7   familiar with the El Rancho Motel, Main and 2nd Street?

 8   A    Yes.

 9              MR. CONAWAY:  Compound.

10              THE COURT:  I'm sorry.  Was there an objection?

11              MR. CONAWAY:  It was compound.

12              THE COURT:  I can't hear you.  Can you stand up,

13   please.

14              MR. CONAWAY:  Objection.  It was compound.

15              THE COURT:  Overruled.

16   BY MR. EWING:

17   Q    Is the El Rancho Motel located in a high-crime area of

18   Barstow?

19   A    I wouldn't know.  I didn't look at the crime

20   statistics.

21   Q    You reviewed materials to prepare you for this trial?

22   A    I did.

23   Q    Did you review reports regarding this incident?

24   A    I did.

25   Q    Did you review Kyle Woods's deposition?
```

```
 1   A     Yes.

 2   Q     That was part of your expert review so you could

 3   testify to this jury and for the attorney who hired you as

 4   to your opinion on this case?

 5   A     That's correct.

 6   Q     And in Kyle Woods's deposition testimony, do you recall

 7   him indicating that that area of Barstow is a high-crime

 8   area?

 9   A     Yeah, I recall him indicating that.

10   Q     Do you recall him indicating what types of crime?

11   A     I believe there's narcotic-related crimes.

12   Q     You obtained your undergraduate degree from, I think

13   you said, Northeastern on the East Coast?

14   A     Yes.

15   Q     And an advanced degree from Cal State Long Beach --

16   A     Yes.

17   Q     -- in public administration?

18   A     That's correct.

19   Q     In any of your studies, did you study psychiatry,

20   psychology, diagnoses of persons with mental illness?

21   A     Obviously, psychology both undergrad and grad courses

22   but primarily my training came when I was the officer in

23   charge of SWAT's Crisis Negotiation Team.

24         I had 24 negotiators under my supervision, and

25   with that we attend significant mental health training
```

1    classes with LAPD Mental Evaluation Unit.

2            I have attended the FBI's negotiation course.

3    Within that, there was a great deal of training as relates

4    to mental illness.

5            I supervised and volunteered at Didi Hirsch

6    Suicide Prevention Hotline where all day you take incoming

7    calls from people all over the country that are either

8    suicidal or expressing ideations of being suicidal.

9            In addition to that, as I mentioned, I'm a drug

10   recognition expert, Court qualified and certified, and

11   attended various -- and, lastly, I assisted West Point

12   Military Academy with their implementation of their

13   Negotiation Cadre which are used, obviously, over in theater

14   over in foreign countries to help people negotiate.

15           Within that learning domains, we learned a lot

16   about mental illness and mental health-related situations.

17   Though we're not doctors, we understand within our component

18   within the LAPD we had a mental health personnel or

19   clinician that would attach themselves to barricaded subject

20   incidents.

21           But most departments have an opportunity, if you

22   believe someone is mentally ill or having experiencing a

23   mental crisis, that you can call a mental evaluation team or

24   crisis team that will come out and assist you in that

25   situation.

```
1    Q    In all the experience that you've just described,

2    taking that into account, when did this incident occur?

3    A    It occurred November 19th of 2015.

4    Q    On November 19th of 2015, were you contacted about Nate

5    Pickett?

6    A    On November -- no, I was not.

7    Q    On November 20th of 2015, were you contacted about Nate

8    Pickett?

9    A    No.

10   Q    So would it be fair to say you had no idea of what

11   Kyle Woods experienced that night on November 19th, 2015,

12   with respect to Nate Pickett and his mental illness?

13            MR. GALIPO:  Objection.  Vague as phrased.

14            THE COURT:  Overruled.

15            THE WITNESS:  That's correct, sir.

16   BY MR. EWING:

17   Q    You never examined Nate Pickett, I presume; is that

18   correct?

19   A    That's correct.

20   Q    So in the process of doing or interacting with subjects

21   in your experience, did you interact with persons with

22   mental illness?

23   A    Yes.

24   Q    But you never interacted with Nate Pickett, did you?

25   A    No.
```

1   Q    With respect to your opinion about Nate being unable to

2   spell his last name, where did that come from?

3   A    From his testimony.

4   Q    From Nate's testimony?

5   A    On the belt recording.

6   Q    Okay.  So you presumed that the fact that Nate was

7   confirming the misspelling of his name, that he did not know

8   how to spell his name?

9   A    He stated -- Nate stated:  I don't know how that's

10  spelled.  That's your job which made me believe that he

11  didn't know how to spell his name.

12  Q    Is it also possible or plausible that Nate didn't want

13  to provide the correct name to Kyle Woods?

14  A    I don't believe there's anything outstanding for him at

15  the time, that being warrants or anything else that I knew

16  about that would cause him to want not to give the correct

17  information.

18        Based on the belt recording that I listened to and

19  obviously I have a transcript of, he said his name is Nate

20  Pickett.  And then -- excuse me -- and then Deputy Woods

21  discerned that it was Pigget.  And I don't know if -- once

22  again, I wasn't there and not making credibility

23  determinations.

24        But I don't know if Nate had heard when he recited

25  back the P-i-g-g or that he doesn't know how to spell his

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   name.  But I just assume when he said that that he couldn't
 2   spell his own name.
 3   Q    You never have an opportunity to talk to Nate; correct?
 4   A    Obviously not, sir.
 5   Q    Did you have an opportunity to talk to members of his
 6   family?
 7   A    I met his mom, I believe, in the hallway today briefly
 8   on her way to the restroom.
 9   Q    Were you ever told by anybody that Nate had problems
10   spelling his name?
11   A    No.
12   Q    In your law enforcement experience, did you ever
13   encounter people who might not be providing truthful
14   information --
15   A    Yes.
16   Q    -- to evade detection?
17   A    Yes, sir.
18   Q    You testified that you reviewed Deputy Kyle Woods --
19   I'm going to dispense with the long -- you reviewed
20   Kyle Woods's transcript of his testimony and deposition?
21   A    Yes.
22   Q    Do you recall that Kyle Woods testified that he
23   attempted to look into Nate's pupils?
24   A    I believe he did.
25   Q    And what did Kyle testify as to attempting to look into
```

1    Nate's pupils?

2    A    He couldn't tell, I guess.

3    Q    Did Kyle testify that he had kept attempting to look

4    into Nate's pupils but Nate kept diverting his eyes and

5    would not allow him to do that?

6    A    I don't recall if I testified to that.

7             MR. EWING:  May have a moment.

8             THE COURT:  Yes.

9                  (Pause in the proceedings.)

10   BY MR. EWING:

11   Q    Again, you had an opportunity to review Kyle Woods's

12   deposition testimony and the transcript?

13   A    Yes.

14   Q    Do you recall Kyle testifying that, in response to this

15   question:  And you make reference in your statement about

16   trying to see if his pupils were dilated.  Remember that?

17           And Kyle's response was yes.

18           But you never specifically saw his pupils dilated;

19   isn't that true?

20           Yes, that's true.  He kept looking way from me

21   every time I tried to look in his eyes.

22           Do you recall that?

23   A    Yes.

24   Q    With respect to your testimony about determining

25   whether or not a person -- when you're in the field, you

```
 1   encounter a subject and, as an officer, you're determining

 2   whether or not they're under the influence of drugs but they

 3   also may under the influence -- or they may be mentally ill.

 4           Do you recall your testimony along those lines?

 5   A    Yes.

 6   Q    And in this case, having reviewed Kyle's deposition

 7   transcript and having reviewed the records in this matter,

 8   is it your understanding that Kyle has stated several times

 9   that he believed that Nate was under the influence of a

10   drug?

11   A    Yes.

12   Q    So query this.  If you have a subject that you believe

13   is under the influence of a drug -- and in Kyle's case I

14   believe it was methamphetamines; is that correct?

15   A    That's what he stated, yes.

16   Q    And you have a subject that you may believe is mentally

17   ill and you have these two competing or signs and

18   symptomatologies that may be similar, as a police officer

19   who's engaged in a consensual encounter, what do you do with

20   the person?

21           You just let them go because you say:  Well, I

22   think he might be under the influence of drugs but he could

23   be mentally ill; so I'm just going to let him go.

24   A    Sir, you can't walk up to someone on the street -- an

25   officer can't do that, walk up arbitrarily to call someone
```

1    over and ask to look at their pupils and then detain them

2    because they're looking away at that time.

3           For one, you ask.  And he never asked during this

4    event.  He never asked:  Are you -- have you taken any

5    methamphetamine?  As we know, the analysis was that

6    Mr. Pickett was not under the influence of methamphetamine.

7           As we also know, drugs like Ritalin, as I

8    mentioned, cause pupils to expand.  As it relates to

9    doing it -- looking at pupils in the field, once again,

10   that's preliminarily what officers will do if they're a

11   certified drug recognition expert.

12          There was also discussions about a white tongue

13   that came up and which I thought was kind of unique because

14   there's a number of factors that can cause someone to have a

15   white tongue.

16          That can be antihistamines.  That can be

17   antidepressants.  That can be lack of hydration.  There's a

18   number of reasons.  But that was part of the information

19   that Deputy Woods had conveyed as the reason for the stop

20   though that was never mentioned in the autopsy that

21   Mr. Pickett had a white tongue.

22          And even if he did, there are also other medical

23   issues associated -- and I can't pronounce those two.  I

24   can't pronounce either one of them.  But there are two

25   associated with having a white tongue.

1    Q    Mr. DeFoe, I believe the question was -- because I

2    don't believe that that was responsive to it, but I'm going

3    to try to rephrase it to help you out.

4         You have an encounter with a subject.  In this

5    case Kyle Woods has testified that I believe that Nate

6    Pickett was under the influence of a drug.

7         And you've testified that it's also very likely

8    that Nate was mentally ill, schizophrenic, or bipolar.

9         And you have Kyle Woods facing that instance.  He

10   doesn't know anything about Nate's mental condition and he

11   doesn't know anything about his drug ingestion.  He's just

12   observing the symptomatologies or the symptoms of the person

13   that he's encountering.

14        So my question to you -- it's a hypothetical --

15   you encounter someone in that scenario and you have to make

16   a decision.  The person, if you decide they're mentally ill

17   but they're potentially under the influence of a drug, do

18   you let the person who is mentally ill go, or do you

19   continue to investigate to determine whether or not they're

20   under the influence of a drug?

21   A    The first thing you do in that process is you ask them

22   questions.  The first stage of doing an evaluation is you

23   ask that person open-ended questions.

24   Q    Mr. DeFoe, did Kyle Pickett ask Nate -- did Kyle Woods

25   ask Nate Pickett questions?

```
 1   A     I'm talking.  I'd like to complete my thought.

 2            If he asked him questions specifically about:  Are

 3   you under the influence of a medication?  Have you taken any

 4   psychotropic medications?  Are you under the care of a

 5   doctor?  Have you used any controlled substances?  That's

 6   the best information that we in law enforcement find out

 7   from the onset.

 8            Because, once again, you can't guess.  As I

 9   mentioned, there's a number of things people could be

10   exhibiting that you may think you're going down the right

11   path that you're not, and we find out later that you're not.

12            So the best process that we're all taught is that

13   you ask those open-ended questions as to:  Are you taking

14   medication?  Have you used any meth today?  Have you used

15   any cocaine today?  Something that may cause the pupils to

16   dilate.

17   Q    So, again, you heard the audio, you watched the video,

18   you've reviewed the transcript prepared by the plaintiffs in

19   this case of the audio.  Did Kyle Woods ask Nate questions?

20   A     He sure did.

21   Q     He asked him several questions; correct?

22   A     Yes.

23   Q     And based on your background, training, and experience,

24   do you have to ask these specific questions about what you

25   suspect at that moment?
```

```
 1    A    You should.

 2    Q    So if Kyle asked Nate, have you taken meth or have you

 3    used meth within the last hour and the response was no, does

 4    the investigation end?

 5    A    It may or may not.  It depends if there are more

 6    factors.  Once again, if he says no and you still see me

 7    exhibiting signs of being under the influence of a central

 8    nervous stimulant or there are calls or you're looking at

 9    behavioral-related issues.

10          None of those apply to the facts in this case.

11    There was not a call for service.  There was not a crime

12    that was committed.

13          No one called and said that Nate was acting, you

14    know, outrageous or doing things that would cause the police

15    or summon a response by the police --

16    Q    Mr. DeFoe, we were talking about questions.  So your

17    response, I believe, was to my question about whether Kyle

18    had asked Nate questions.  Your answer was yes.

19          And then the next question pertained to asking the

20    specific question about whether Nate had used meth, and you

21    said that that was something that you should do based on

22    your opinion?

23    A    Yes.

24    Q    And if the answer is no, my question was:  Do you

25    discontinue the investigation?  I believe your testimony was
```

```
 1   no.
 2   A     It depends, was the testimony.
 3   Q     Right.  And so in this case, Kyle has testified that he
 4   observed white coating on the tongue, that Nate was pacing
 5   back and forth.  I think that's visible in the video; that
 6   Nate continued to put his hands in and out of his pockets;
 7   that his hands were twitching and that he had eye tremors
 8   and that he seemed nervous.
 9          That's what you reviewed in the records of this
10   case, and that's been Kyle's testimony.  Does that sound
11   familiar to you?
12          MR. GALIPO:  I hesitate to object because it's
13   such a long question, but I'm not so sure all of that has
14   been the testimony with respect to eye tremors and stuff
15   like that.
16          THE COURT:  The objection is overruled.  He can
17   answer to the extent he understands the question.
18          THE WITNESS:  I remember reading the testimony,
19   yes.
20   BY MR. EWING:
21   Q     And you reviewed Kyle's deposition transcript?
22   A     Yes.
23   Q     And in that deposition he was examined by Mr. Galipo
24   extensively; is that accurate?
25   A     He was examined by him.  I don't know how extensive it
```

```
 1   was.
 2   Q     Do you see the deposition transcript?
 3   A     The one you're holding?
 4   Q     Yes.
 5   A     I can see that.
 6   Q     Have you seen this before?
 7   A     I have.
 8   Q     Have you held it before?
 9   A     No.  I get them electronically.  I don't hold them,
10   save the paper.
11   Q     Holding this, does this look like an extensive
12   examination of Kyle Woods?
13   A     It's an examination.  Once again, I get some
14   depositions that are seven hours long that come in volumes;
15   so I don't know if that would be extensive or not.
16   Q     Okay.  So fair to say relatively speaking.
17   Particularly with the subject of the eye tremors, the
18   twitching fingers, the pacing back and forth, the putting
19   the hands in and out of the pockets, the inability for him
20   to look into Mr. Pickett's eyes to observe whether or not
21   his pupils were dilated, the white coating on his tongue --
22   are you familiar with that testimony of Kyle Woods?
23   A     I am.
24   Q     You also understand from reviewing the records in this
25   case that Kyle Woods had no prior contacts or history with
```

1   Nate Pickett.  Is that right?

2   A    I believe so, yes.

3   Q    So based on your background when you encounter somebody

4   and you don't know anything about them and you observe the

5   signs that I just recited -- the twitching fingers, the eye

6   tremors, the pacing back and forth, the nervousness,

7   continually putting the hands in and out of the pockets, and

8   the suspicion -- that you're in a high-crime area known for

9   narcotics, would it be reasonable to conclude that Nate

10  Pickett possibly could be under the influence of a drug?

11  A    I don't think you can conclude it, no.  But once again,

12  it would bode him to ask questions at that time.

13        And in addition, as we know in POST Learning

14  Domain No. 37, there are mental illnesses such as bipolar

15  and schizophrenia where the person exhibits certain symptoms

16  and signs of being -- similar to that being under the

17  influence of a CNS stimulant such as methamphetamine.

18  Q    So your testimony is that you would ask more questions

19  or you would continue the investigation; correct?

20  A    Reasonable until that person wanted to leave, and then

21  they could obviously leave.

22  Q    Based upon your understanding of the facts in this

23  case, did Kyle continue his investigation?  Did he ask Nate

24  more questions?

25  A    He did, yes.

1  Q    And based on your experience when you're asking

2  subjects -- subject questions, you're using all of your

3  senses to perceive what they're telling you and what you're

4  hearing, what you're smelling, and so forth; correct?

5  A    Yes.  But, once again, when you're asking questions, we

6  want to ask those questions that are relative to the answers

7  that we're looking to get.

8        Like if -- to minimize, if you ask the questions:

9  Are you under the care of a doctor?  Have you taken any

10 psychotropic medications?  And he says:  Yes, by the way, I

11 am.  I'm paranoid schizophrenic and I'm off my medications,

12 or he says:  I'm bipolar and I'm taking certain, you know,

13 medication, then that's information an officer has.

14       Or, conversely, he says:  No, I'm not mentally

15 ill.  I'm not on psychotropic medication though I take

16 Ritalin.  I take Ritalin for ADHD or he says something to

17 the effect of:  I've used methamphetamine an hour ago.

18       The reason why those questions are important from

19 the front is because we can't guess.

20 Q    So if you ask the question:  Did you use meth and the

21 answer is no, you follow up with further questions; correct?

22 A    Sure.

23 Q    You don't ask the same question multiple times.  Did

24 you use meth?  Did you use meth?  Did you use meth?

25 Correct?

1    A     Unless, once again, during the course of the

2    information maybe you get back a criminal check from

3    Dispatch that says he was recently arrested for 11550 which

4    is under the influence of a narcotic, then that would change

5    maybe the dynamic of the conversation a little bit.

6             But I would then ask:  Well, okay.  You said no,

7    but are you under the care of a doctor?  Are you taking

8    psychotropic medication?

9             And, once again, to limit some of these things,

10   rather than just make this assumption, because an

11   evaluation, once again, it's a 12-step process that is not

12   done at the field at a motel other than you looking at

13   someone's eyes and saying:  Okay.  The pupils are a little

14   bit larger than what they should be in that lighting

15   condition; and there might be some other factors that you've

16   mention that may be reasonable based on the circumstances

17   but it's all situation driven.

18   Q    So your testimony is that a reasonable officer in these

19   circumstances on November 19th, 2015, when Kyle encountered

20   Nate, should have perceived that Nate was showing signs of

21   mental illness?

22   A     Should have considered.

23   Q    And the same set of circumstances, November 19th, 2015,

24   Kyle is encountering Nate, it's your testimony that a

25   reasonable officer should have considered that Nate might be

```
 1  under the influence of a drug?

 2  A    Yes.

 3  Q    You've also talked about the totality of the

 4  circumstances.  Is that a phrase of art?

 5  A    It is.

 6  Q    And in doing your job as a deputy sheriff or as a

 7  police officer, you're trained to consider the totality of

 8  the circumstances.  Is that accurate?

 9  A    Yes.

10  Q    So those circumstances would include the location?

11  A    It may.

12  Q    Responses to your questions?

13  A    It may.

14  Q    Time of night?

15  A    It may.

16  Q    Behaviors of the subject?

17  A    It may.

18  Q    So we talked a little while ago about the environment.

19  So now I've talked to you about what Kyle perceived with

20  respect to Nate personally:  the eye tremors, the twitching

21  fingers, and so forth.

22          And then we talked about the environment being a

23  high-crime area and known for the use of narcotics, sales

24  and use; correct?

25  A    Correct.
```

1    Q     So would that factor, the environment, be part of the

2    totality of the circumstances?

3    A     Not in this case.  I mean, I've worked in areas where

4    there's 170 murders in six-square-mile divisions but 99

5    percent of the people you interact with are good people.

6    They just live in a bad area.

7          But the factor someone living, working, or

8    visiting in a bad area, that in itself doesn't increase an

9    officer's ability to reasonably detain someone based on a

10   set of circumstances.

11         You consider high-crime area, and what's unique

12   about that question is that, if he reasonably believed that

13   this area was so fraught with crime, he had a citizen on

14   patrol with him in the car; that he got out of the car,

15   didn't tell him where he was going, left him by himself

16   unarmed in this apparently very high-crime area and then

17   walked by himself through the fence to interact with

18   Mr. Pickett, never once telling Mr. Kelsey he's wanted for

19   this or anything at all, to let that person know, by the

20   way, I'm going to stop him for A, B, or C -- so it doesn't

21   really coincide with the facts in this case because, if I

22   have a ride-along, which I've had on a couple hundred

23   occasions, and I'm working in a high-crime area, I'm

24   probably not going to get out of the car for one and leave

25   that person alone, especially if I'm going to put that

```
 1    person in some type of jeopardy where I may not be able to

 2    protect them, I'm not just going to arbitrarily get out of

 3    the car, walk, leave my car, walk through a fence, not tell

 4    that person anything if I'm very concerned about the area

 5    that I'm working in.

 6    Q    So the high-crime area is something to consider as part

 7    of the totality of the circumstances; is that correct?

 8    A    In some cases.  But it doesn't apply to the facts in

 9    this matter based on the fact that Mr. Kelsey was left by

10    himself in a car to wander around in a parking lot by

11    himself.

12    Q    So the high-crime area in this case is something that

13    you do not count as part of the totality of the

14    circumstances?

15    A    I wouldn't take a ride-along through a --

16    Q    That's not the question.

17    A    -- a motel.

18    Q    I'm not asking you about the ride-along.

19         I'm asking you about the totality of the

20    circumstances and whether you would consider the high-crime

21    area as part of those circumstances.  It had nothing to do

22    with Kelsey.

23    A    It does, sir.  Because the reason why it has to do with

24    him because if I was riding along with someone desirous to

25    get into law enforcement and explore like citizen on --
```

```
1    Q    Mr. DeFoe, I'm not asking for context.  I'm asking for

2    an answer to that question.

3    A    Well, it does matter.  It does fall into the totality

4    of the circumstances because, once again, if I was driving

5    around your child as a ride-along, I wouldn't drive them to

6    a motel --

7    Q    Thank you.

8    A    -- and get out of that car.

9    Q    Thank you.

10        So just to be clear, without the context -- and I

11   appreciate what you're doing.  But without the context, the

12   high-crime area is something to consider as part of the

13   totality of the circumstances on November 19th, 2015, by

14   Deputy Woods?

15   A    I'm going to disagree with that.

16   Q    Thank you.

17        Now, did Deputy Kyle Woods, based on your

18   understanding of the facts in this case, make a radio call

19   before he contacted Nate Pickett?

20   A    He -- that he was out with a ped is what I think he

21   advised, that he was with a ped or doing a pedestrian stop.

22   Q    Ped check; is that about right?

23   A    That's right.

24   Q    In law enforcement parlance, what does that mean?

25   A    Means you're stopping someone who's on foot.
```

```
 1    Q     So Kyle Woods did notify Dispatch of what he was doing

 2    in the area where he was on November 19th, 2015, at the

 3    El Rancho Motel?

 4    A     He did.

 5    Q     Back to the totality of the circumstances, based on

 6    your training and experience, is compliance a factor that

 7    you consider as part of the totality of the circumstances?

 8    A     Yes.

 9    Q     And the opposite of that, noncompliance is something

10    you consider as well?

11    A     That's correct.

12    Q     And in this case, you heard the audio, you watched the

13    audio synched with the video.  Did you hear Nate comply?

14    A     Yes.

15    Q     Approximately how many times did he comply?

16    A     Nate responded.  He asked if he wanted to talk to him

17    so he said:  I'm all right.

18              Can I get your name?

19              Nate.

20              Nate what?

21              Pickett.  Then he comes back with Pigget.

22              Nate says yes.

23              Nate gave him his date of birth on the same page

24    of 7/3/86 which was, in fact, the correct date of birth.  So

25    he did comply throughout that.
```

```
 1              Even further in the conversation, he was still

 2    agreeable to some of the questioning even though he was at

 3    the point where he was about to walk away.

 4    Q     Did you have an opportunity to have the transcript in

 5    front of you when you were watching the audio and video

 6    sync?

 7    A     I just watched the audio and video sync today.

 8    Q     Did you have the transcript in front of you when you

 9    watched it?

10    A     Yes.

11    Q     Did you see in that transcript the number of times that

12    Nate said yeah?

13    A     Yes.

14    Q     Approximately how many times?  Once?  Twice?  Five?

15    Ten?

16    A     I count six.

17    Q     And this is during the consensual encounter?

18    A     Yes.  This is in the initial part of the -- yes.

19    Q     Would that be, to use a different term, the yeahs,

20    would you characterize that or would you interpret those

21    yeahs as consent?

22    A     I consider it as yes.  They were questions he was being

23    asked.

24    Q     And Nate was complying?

25    A     Yes.
```

1  Q   And do you recall when you reviewed the records in this

2  case and the deposition transcript of Kyle Woods that he had

3  asked to pat down Nate?

4  A   Yes.

5  Q   And what did Nate say?

6  A   No.

7  Q   And did Kyle try to pat him down?

8  A   No.

9  Q   You heard the audio.

10      Did, in your opinion, Kyle's voice seem to be

11 elevated?

12 A   No.  He was professional.

13 Q   Took a -- and consistent with your earlier testimony

14 about the Learning Domain -- was it 37 on mental illness?

15 A   Well, people with disabilities, yes, 37.

16 Q   People with disabilities.

17      What are some of the factors that you are to

18 consider when you're encountering a person that potentially

19 could have mental disabilities or disabilities?

20 A   Well, the same officer safety concerns you would if

21 they didn't have a mental illness.

22 Q   So is there anything that you perceived in the tone of

23 Kyle's voice that was unprofessional?

24 A   Up to which point?

25 Q   When he's just asking to talk to Nate.

```
 1   A    No.  I believe he was professional.

 2   Q    Didn't elevate his voice, did he?

 3   A    Not at all.

 4   Q    You watched the video.  Was he aggressive?

 5   A    Not until he tried to grab his arm.

 6   Q    And you testified earlier that in a consensual

 7   encounter a person has the right to run away and that, based

 8   on your opinion and training, that it's okay for the officer

 9   to run alongside of him until you might get some more

10   information that indicates that you may want to detain them.

11   I think the scenario you used was a description of a

12   subject.  I think it was white shirt, black hat, or

13   vice versa, something along those lines.

14            Do you recall that testimony?

15   A    Yes.

16   Q    When you watched the audio and video sync, watched and

17   listened to of Kyle, did you see him walking alongside of

18   Nate while he was talking to him?  Did you see that?  Nate

19   is walking up the breezeway and Kyle is walking alongside

20   him?

21   A    Yes.

22   Q    Is that consistent with the type of -- if a subject

23   decides they want to walk away or they want to run away, you

24   can go alongside of them but you cannot detain them at that

25   point?
```

```
 1   A    That's correct.

 2   Q    Until you get more information?

 3   A    Until you have reasonable suspicion.

 4   Q    That's right.

 5        MR. EWING:  May have a moment, Your Honor.

 6        THE COURT:  Absolutely.

 7             (Pause in the proceedings.)

 8   BY MR. EWING:

 9   Q    So Kyle is attempting to confirm the spelling of Nate's

10   name and the name -- and the first name; and Nate gives Kyle

11   the correct date of birth; correct?

12   A    Yes.

13   Q    And there's a misspelling of the name.  Kyle attempts

14   to confirm it.  Would it be fair to say that Nate didn't

15   facilitate that process?

16   A    I don't understand your question.

17   Q    He didn't help him spell his name?

18   A    As I mentioned, I don't think he can spell his name.

19   Q    Let me go back to that first question.

20        You didn't understand my question about Nate did

21   not help Kyle facilitate the process of Kyle confirming the

22   spelling of his name?  You didn't understand that question?

23   A    I didn't.

24   Q    And I followed it up with Kyle was attempting to

25   confirm the spelling of Nate's name, the last name in
```

```
 1   particular, and you heard that exchange on the audio?

 2   A    Was that a question?

 3   Q    I'm getting there.  Thank you, though.

 4   A    Sorry.

 5   Q    And at some point, actually multiple times, not more

 6   than -- not once, not twice, not three times -- multiple

 7   times, Kyle attempts to confirm the spelling of Nate's last

 8   name.  Did you hear that in the audio?

 9   A    I think there was two or three times.  I don't think

10   there was any more than that.

11   Q    Are you certain?

12   A    Just from looking at the transcript.

13            MR. EWING:  May I have a moment, Your Honor.

14            THE COURT:  Absolutely.

15                  (Pause in the proceedings.)

16   BY MR. EWING:

17   Q    Do you have the transcript provided by plaintiff,

18   Plaintiffs' Exhibit 3, in front of you?

19   A    I just have my copy.  It's not an exhibit.

20                  (Counsel conferred.)

21   BY MR. EWING:

22   Q    If you could -- it's in your book.  Exhibit 3 in the

23   Plaintiffs' Exhibit book, please.

24   A    3 is the -- okay.  I'm here.

25   Q    I'm at page 2 of 17, Plaintiffs' Exhibit 3, line
```

```
 1   Number 9.  This is the beginning of Kyle's consensual

 2   encounter with Nate.  Do you see Number 9, Nate's response?

 3   A    Yeah.

 4   Q    Can you read it to the jury.

 5   A    It states "Yeah."

 6   Q    So he's responding to Kyle asking to talk to him; is

 7   that right?

 8   A    That's correct.

 9   Q    Do you see line Number 16 on the same page?

10   A    Yes.

11   Q    And what does it say?

12   A    "Yeah."

13   Q    And that's in response to Kyle saying:  I want to talk

14   to you, essentially?

15   A    That's correct.

16   Q    Do you see page 3 of 17, Plaintiffs' Exhibit Number 3,

17   line 3?

18   A    I see it.

19   Q    Kyle Woods says:  Nothing, dude.  Like I said, I just

20   stopped to talk to you.  That's it.

21        And what does Nate say on line 3?

22   A    All right.  Well, I'm all right.

23   Q    Is that consent?

24   A    Yeah.  He's giving him consent at that point.

25   Q    You do you see Number 9, line 9, page 3,
```

1    Plaintiffs' Exhibit 3?

2    A    Yes.

3    Q    And at line 7, Kyle attempts to obtain Nate's last

4    name.  At line 6 I should say.

5    A    That's correct.

6    Q    Kyle asks Nate:  What?  And Nate responds at line 7.

7    What does he say?

8    A    Pickett.

9    Q    And he doesn't spell it; correct?

10   A    That's correct.

11   Q    And then on the next line, line 8, Kyle spells it;

12   correct?

13   A    That's correct.

14   Q    What does he spell?

15        MR. GALIPO:  I object, Your Honor.  I'm not sure

16   if it was spelled at that point.  I think it was just

17   stated.

18        MR. EWING:  I'm going off of --

19        THE COURT:  Hold on.  Hold on.

20        The objection is overruled.

21        THE WITNESS:  It's not spelled.  He just says

22   "Pigget."

23   BY MR. EWING:

24   Q    Understand.  And Kyle states Pigget.  The transcript at

25   line 8, page 3 of 17, Plaintiffs' Exhibit 3, has what

```
 1   spelling of the name?  Line 8.
 2   A    Line 8, page 3, just says "Pigget" with a question
 3   mark.
 4   Q    Can you spell that, please.
 5   A    P-i-g-g-e-t.
 6   Q    And in the next line, line Number 9, what does Nate say
 7   to that?
 8   A    "Yeah."
 9   Q    And in the next line, line Number 10, what does Kyle
10   say to Nate?
11   A    "How do you spell your last name?"
12   Q    And then at line 16, page 3 of 17, Plaintiffs' Exhibit
13   3, what does Nate say?
14   A    Before that, Deputy Woods says Pickett --
15   Q    I'm not asking for the context.
16   A    That's important.
17   Q    Mr. DeFoe, I appreciate your attempting to help your
18   client.  I'm not asking for the context.  I asked a specific
19   question, and I'm asking for a specific answer.  I can
20   provide the context with another question.
21   A    Okay.  It says "Yes" or "Yeah."
22   Q    And that -- you would construe that as consent or as
23   something else?
24   A    What it was was Pickett, first name of Nate, and he
25   says "Yeah."  So he's giving him his name.
```

1   Q    Confirming the spelling of the name or confirming his

2   name and the date of birth; right?

3   A    That's correct.

4   Q    Now, at line 21, same exhibit, same page,

5   Plaintiffs' 3, page 3 of 17, Deputy Woods says what to Nate?

6   A    "And your last name spelled P-i-g-g-e-t?"

7   Q    And at line 23, what does Nate say?

8   A    "Yeah."

9   Q    So up to this point, would it be fair to say that Nate

10  is cooperating?

11  A    Yes.

12  Q    You've heard the audio.  The conversation was -- the

13  tones were low.  There wasn't any elevated tones.  No

14  yelling, no screaming, no barking commands.  This was just a

15  back-and-forth consensual conversation?

16  A    Yes, other than on page 3 --

17  Q    I didn't ask for that.  Thank you, though.  I

18  appreciate what you're doing.

19          Can you go to Plaintiffs' Exhibit 3, page 4 of 17,

20  line 19.  Can you read what line 19 says.

21  A    "Eight Paul 12, that's a negative.  Have you ever been

22  arrested before?"

23  Q    And in law enforcement parlance, what does "8 Paul 12,

24  that's a negative" mean?

25  A    He is responding to Dispatch from a question.

1    Q    What do the 8 and the Paul and the 12 mean?

2    A    I'm assuming that's his unit number.

3    Q    Do police officers or deputy sheriffs, based on your

4    experience, have call names?

5    A    They have the unit they're working that day.

6    Q    And that's it?  No other names are associated with that

7    particular officer?

8    A    Typically, that -- whatever that assignment is for that

9    day is what they typically will use when they're speaking on

10   the radio unless they're in a simplex mode, then they can

11   speak more freely.

12   Q    And your understanding of 8 Paul 12 is that that's

13   related to the unit number that -- the patrol unit that

14   Kyle Woods was driving that night?

15   A    It could be.

16   Q    Could it be something else?

17   A    Well, could have been a question from 8 Paul 12 who

18   then said:  8 Paul 12 that's a negative.  Where he could

19   have been -- 8 Paul 12 could have been asking his unit a

20   question and he was responding back to 8 Paul 12.

21   Q    Thank you.

22        And Kyle asks Nate:  "Have you ever been arrested

23   before?"  And what does Nate say?

24   A    "Yeah."

25   Q    So at this point, consensual encounter.  The tones are

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   low.  There's no escalation, no yelling, no screaming,

 2   Nate's cooperating; correct?

 3   A    Yes.

 4   Q    And that "Yeah" would be consent?  The "Yeah" that I

 5   just referenced and questioned about on line 21 at

 6   Plaintiffs' 3, page 4 of 17, "Yeah," that's consent to this

 7   encounter.  Is that accurate?

 8   A    I believe that's accurate.

 9   Q    Thank you.

10        Plaintiffs' Exhibit 3, page 5 of 17, line 4, Kyle

11   says, "Like I said, I just stopped to talk to you.  That's

12   it."  And at line 6, what does Nate say?

13   A    "All right."

14   Q    Is that "All right" consent?

15   A    Appears to be, yes.

16   Q    That consistent with the consensual encounter?

17   A    At that point, yes.

18   Q    And at this point of the questions, do you recall where

19   Nate was in the audio and the video in the sync that you

20   just watched?

21   A    I don't recall.

22   Q    Plaintiffs' Exhibit 3, page 5 of 17, Kyle continues at

23   line 7.  "So I don't see that many people walking around; so

24   I like to stop and talk to them."

25        And at line 10, what does Nate say?
```

```
1    A    "All right."
2    Q    At line 23, Plaintiffs' Exhibit 3, page 5 of 17, Kyle
3    asks Nate "Where do you live?" and what does Nate say at
4    line 24?
5    A    "I don't know.  I got to go.  Man, I got to go."
6    Q    Now, based upon your prior testimony, Nate didn't have
7    to tell Kyle where he lived; right?
8    A    That's correct.
9    Q    At Plaintiffs' Exhibit 3, page 6 of 17, line 8, Kyle
10   says, "Like I said, Nate, there's no problem.  I just
11   stopped to talk to you.  That's it.  There is no problem
12   because I was trying to figure out right now how you got
13   over that fence.  Did you jump over that fence?"
14        And do you recall the audio at this juncture of
15   Kyle's encounter with Nate?
16   A    Do I recall it?  Yes.
17   Q    Do you recall the long pause that -- the long pause
18   before Nate responded to that question?
19   A    Yes.
20   Q    Based upon your background, training, and experience
21   and this transcript, what does the long pause potentially
22   tell Kyle, the reasonable officer in those circumstances?
23        MR. CONAWAY:  Objection.  Foundation.
24        THE COURT:  I can't hear you.  Counsel?
25        MR. CONAWAY:  Objection.  Foundation.
```

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  I don't know what it tells him.  I
 3    know he told him earlier he needed to go.  I don't know what
 4    that tells him other than he thought about the question and,
 5    once again, I'm harking back to the mental illness issue.
 6    BY MR. EWING:
 7    Q    Okay.  So you read Kyle's deposition transcript when he
 8    was examined by Mr. Galipo; correct?
 9    A    Yes.
10    Q    Do you recall Kyle's -- what Kyle explained to
11    Mr. Galipo when he was being deposed about this juncture of
12    his encounter -- this point in time of his encounter with
13    Nate Pickett?
14    A    I don't recall.
15              MR. EWING:  May have a moment, Your Honor.
16              THE COURT:  Yes.
17              (Pause in the proceedings.)
18    BY MR. EWING:
19    Q    Do you recall Kyle explaining to Mr. Galipo in his
20    deposition that, in response to all of his prior questions
21    to Nate, Nate answered pretty quickly?
22              And then in response to this question about
23    where he lived or how he got over the fence or whether he
24    hopped the fence, Nate took a long time to pause and that
25    Kyle thought that Nate might be thinking about the answer
```

```
 1    and that he may not be telling the truth.

 2              Do you recall that deposition testimony?

 3    A    I recall he stated that, yes.

 4    Q    At Plaintiffs' Exhibit 3, page 6 of 17, after the

 5    pause, Kyle says at line 17, "Oh, it opens."  And Nate

 6    confirms in line 18 what?

 7    A    "Yeah."

 8    Q    At line 21, Kyle asks Nate, "Are you staying here at

 9    the hotel?"  And at line 22, what does Nate say?

10    A    "I don't know."

11    Q    Again, going back to your prior testimony, during a

12    consensual encounter, Nate didn't have to provide

13    information about where he lived; is that correct?

14    A    That's correct.

15    Q    And at this point in Kyle's encounter with Nate where

16    he's asking him about where he lives, is this still a

17    consensual encounter at this point?

18    A    You know, I don't know.  He earlier on, as I tried to

19    testify to, he questioned it -- I think it was on page 4 --

20    the reason for the stop.

21    Q    So is your training that, if a person that you're

22    engaging with in a consensual encounter asks about the

23    reason for the stop, that the encounter has to stop at that

24    moment?

25    A    It doesn't.  But they should -- a reasonable person
```

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    should feel free that they can leave at any time.

2    Q    I'm referring to the officer training and the POST

3    training and, you know, your years of experience as an

4    officer.

5         If someone asks you:  Why are you stopping me, you

6    know, so on and so forth as Nate did ask -- he asked Kyle

7    that many times -- does that mean that Kyle has to stop?

8    A    He doesn't but also Mr. Woods can walk away -- excuse

9    me -- Mr. Pickett can walk away.

10   Q    And he did in this case; correct?

11   A    He did.

12   Q    He walked up the breezeway; correct?

13   A    That's correct.

14   Q    And in your prior testimony you talked about if someone

15   runs away, that you can run along with him until you find

16   some reason to -- reasonable suspicion to detain him; is

17   that accurate?

18   A    That's correct.

19   Q    And so in this case Kyle is walking along with Nate

20   talking to him and Nate is talking back.  Isn't that what

21   the audio reflects?  It shows him talking back in the audio

22   and video?

23   A    It does.

24   Q    Okay.  So at this point, as Kyle is walking along with

25   Nate and talking or walking along and he's talking, it's

```
 1   still a consensual encounter?

 2   A    Yes.

 3   Q    Just to clarify, the consent comes from who?

 4   A    The consent comes from the person that you're

 5   detaining.

 6   Q    From Nate?

 7   A    That would be correct.

 8   Q    At line 7 of 17, Plaintiffs' Exhibit 3 -- I'm sorry --

 9   page 7 of 17, Plaintiffs' Exhibit 3, Kyle says to Nate at

10   line 3, "Like I said, Nate, there's no problem.  I just

11   stopped to talk to you.  That's it.  You gave me your name;

12   so I'm verifying for who you are.  That's it."

13           And at line 7, what does Nate say?

14   A    "All right."

15   Q    Is that "All right" consent?

16   A    Yes.

17   Q    At line 8, Kyle says, "I'm checking to make sure you

18   have no warrants or anything, and then that's it."

19           And at line 10, Nate says --

20   A    "All right."

21   Q    Is that consent?

22   A    It can be.  Once again, though, the fact that he

23   responded to that doesn't mean that he felt he could freely

24   just walk away.  It just depends on his feeling at that

25   time.
```

```
 1  Q    But you don't know how he was feeling at the time, do
 2  you?
 3  A    I do not.
 4  Q    So back to my question, is that -- are you construing
 5  the "All right" at line 10, based upon your background, your
 6  training, your experience, as consent?
 7  A    My background, education, and training doesn't have
 8  anything to do with it.  It has to do with the fact of what
 9  Nate was feeling at that time of that encounter.  If he felt
10  he could reasonably leave is what matters.
11  Q    Hold on.  You said your background, training, and
12  experience doesn't have anything to do with it?
13  A    With this piece of the dialogue only here.
14  Q    Okay.  That specific question?
15  A    Yes.
16  Q    Because you're here as an expert witness; right?
17  A    But you're asking me specifically how he was feeling at
18  the time.
19  Q    Okay.
20  A    My background, education, and training has no relevance
21  to how he was feeling.
22  Q    Well, that's you're -- okay.  Just making sure.
23  A    Okay.
24  Q    You're qualified as an expert?
25  A    I am.
```

1    Q    Okay.  So now with this question and construing the

2    "All right," my question to you is, is that consent at this

3    point in the encounter?  Line 10, page 7 of 17, Plaintiffs'

4    Exhibit 3, Nate's response, "All right," is that consent?

5    A    Appears to be, yes.

6    Q    Now earlier in your testimony when you were being

7    examined by Mr. Galipo, you testified about -- you didn't

8    know whether or not Nate had any warrants or anything of

9    that nature; is that correct?

10   A    That's correct.

11   Q    So you don't know if he did or if he didn't?

12   A    Don't know.

13   Q    And do you recall the part of the audio recording where

14   Kyle says, "Hey, Nate.  Look, man.  If you have any

15   misdemeanor warrants, it's not a big deal.  I'm just trying

16   to confirm" -- I'm paraphrasing -- "essentially who you

17   are."

18   A    Yes.

19   Q    Do you recall that?

20   A    I do.

21   Q    And at page 19 -- line 19, page 7 of 17, Plaintiffs'

22   Exhibit 3, at line 18, Kyle's explaining to Nate, "That's my

23   job"; and Nate says at line 19 what, Mr. DeFoe?

24   A    "I ain't got no warrants though."

25              MR. EWING:  Your Honor, would this be a good time?

1    THE COURT:  Can we approach, please.

2        (The following proceedings were held at sidebar.)

3    THE COURT:  I just want to confirm.  Was there a

4    scheduling issue with Mr. DeFoe tomorrow or not?  I just

5    can't remember.

6    MR. GALIPO:  I can double-check.  I was thinking

7    we were going to be able to finish him, but it sounds like

8    counsel has some more time.

9    THE COURT:  And that led to my next question,

10   Mr. Ewing.  How much more time do you think you need with

11   this witness?  It's not set in stone.  I am just curious.

12   MR. EWING:  Forty-five minutes.

13   THE COURT:  All right.  So we'll recess for today.

14   You will need to have him come back tomorrow.

15   MR. GALIPO:  That's not a problem.  We'll figure

16   it out.  If there is any problem with him coming back -- I

17   don't think there is a problem.  Can you inquire of the

18   witness?

19       I don't mind if you inquire in front of the jury

20   are you able to come back first thing?  I don't have any

21   information he's not available tomorrow morning, just that

22   he was hoping to finish it today.

23   THE COURT:  All right.  I don't need to inquire.

24   MR. GALIPO:  I think we're good.

25   THE COURT:  Let's all recess today and resume at

```
 1   9:00.

 2            MR. GALIPO:  We'll work it out.

 3            THE COURT:  All right.

 4        (The following was heard in open court in the presence

 5         of the jury:)

 6            THE COURT:  Ladies and gentlemen, we are going to

 7   recess for the day to day.  As I indicated, I have another

 8   matter that I need to deal with this afternoon.  So we'll

 9   resume promptly at 9:00 A.M. tomorrow.

10            As I say to you always please do not form or

11   express an opinion about this case until the matter is

12   finally submitted to you.  Don't talk to anyone about the

13   case.  Don't allow anyone to talk to you about the case and

14   do not conduct any research of any kind on any subject

15   matter connected with this case.  We'll see you all tomorrow

16   at 9:00 A.M.  All right.  Thank you.

17            THE CLERK:  All rise for the jury.

18        (The following was heard in open court outside the

19         presence of the jury:)

20            THE CLERK:  Please be seated.

21            THE COURT:  Mr. DeFoe, you can step down.  We'll

22   see you tomorrow at 9:00 A.M., please.

23            All right.  Counsel, are there any other issues

24   that we need to discuss before we adjourn for today?

25            Mr. Ewing?
```

```
 1              MR. EWING:  None for the defense, Your Honor.
 2    Thank you.
 3              THE COURT:  Mr. Galipo?
 4              MR. GALIPO:  Not that I can think of.
 5              THE COURT:  All right.  Can I get a sense of
 6    what's the run of show tomorrow that you anticipate?
 7              MR. GALIPO:  Well, I know we have the medical
 8    examiner coming in the morning.  I guess we can -- I'd like
 9    to finish with Mr. DeFoe because I am sure --
10              THE COURT:  Sir, you can leave.
11              MR. GALIPO:  So we'll finish with Mr. DeFoe, have
12    the medical examiner, and I am contemplating putting on
13    Dominic Archibald briefly as it relates to some of the
14    issues in this phase.  And I am hoping by noon or close to
15    it or early afternoon, I am going to rest my case in this
16    phase.
17              THE COURT:  All right.
18              So, Mr. Ewing, I assume you will have your
19    witnesses available and ready to go.  I think, in fairness
20    to you, be conservative, I would say tomorrow afternoon.
21              MR. EWING:  Yes.
22              THE COURT:  All right.  Perfect.
23              MR. GALIPO:  Could I inquire or the Court please
24    inquire -- he will tell me -- I am sure -- who those
25    witnesses may be.
```

```
 1              THE COURT:  Mr. Ewing, why don't you give us a
 2    preview, if you wouldn't mind.
 3              MR. EWING:  Certainly.  So I anticipate calling
 4    Kyle Woods.
 5              THE COURT:  As your witness; so you will do a
 6    direct exam on him.
 7              MR. EWING:  That's correct.  Bill Kelsey,
 8    Tommy Dickey.
 9              THE COURT:  He was a responding officer, I
10    believe?
11              MR. EWING:  First.
12              THE COURT:  Okay.  All right.
13              MR. EWING:  The two medical professionals from the
14    Barstow Community Hospital -- that is, Nurse MaryAnn Savory.
15              THE COURT:  I don't need the names but the -- I am
16    just curious.  What's your proffer as it relates to their
17    testimony, the nurses?
18              MR. EWING:  That they were the first medical
19    professionals to treat Kyle when he presented himself to the
20    hospital.
21              THE COURT:  Are they going to testify about any
22    injuries the deputy's suffered.
23              MR. EWING:  Yes.
24              THE COURT:  After the nurses?
25              MR. EWING:  The radiologist who will testify about
```

 1   his fractured nose.

 2        THE COURT:  I would hope that will fill up the

 3   day.

 4        MR. EWING:  I am thinking it will.

 5        THE COURT:  And then I am just trying to walk

 6   through this.  Tomorrow is Thursday.  So we resume, again,

 7   the following week.  How many more witnesses do you

 8   anticipate calling?

 9        MR. EWING:  Monday after the medical

10   professionals, and I believe both of you -- after examining

11   McCormick, the medical professionals, those two, then we

12   will call -- I believe we're going to work out the experts

13   audio video issue.  Sounds like we're really close.  That

14   would be Parris Ward otherwise.  I will reserve in case we

15   don't work that out and then Clarence Chapman.

16        THE COURT:  Who is that?

17        MR. EWING:  Expert witness, police practices.

18        THE COURT:  Okay.

19        MR. EWING:  And that's potentially Detective Rios.

20        THE COURT:  Who did the interview?

21        MR. EWING:  Yes.

22        THE COURT:  For what?  Prior consistent

23   statements?  What would his purpose be?

24        MR. EWING:  Prior consistent statements based on

25   the inconsistent transcript of the audio.  That's who is

1    talking to Kyle about -- plaintiffs' proffer is that this

2    detective said one thing.  The detective will come in and

3    say that's not what I said.

4         THE COURT:  That's an interesting issue, and I

5    guess we'll cross that bridge when we need to deal with it.

6    Maybe I didn't make this clear, but the transcripts are not

7    going into evidence.

8         MR. EWING:  I am aware.

9         THE COURT:  I just want to make sure we're clear

10   on it.

11        MR. EWING:  I am aware.  However, the jury did

12   have it.  They read through it.

13        THE COURT:  But they get an instruction they are

14   to listen to it and if their hearing is different from the

15   transcript, their memory or their listening controls.  But I

16   understand why you are calling Rios.  But in the event that

17   wasn't clear, I think we're all on the same page with

18   respect to the transcript.

19        MR. EWING:  Right.  Lastly, potentially,

20   Detective Libby.

21        THE COURT:  Refresh my memory.

22        MR. EWING:  As to the statement, the recorded

23   audio statement, of Kyle Woods on December 17, 2015.  That

24   was part of the district attorney's investigation for the

25   crime.

```
 1            THE COURT:  What's the proffer as it relates to

 2   that testimony.

 3            MR. EWING:  The testimony that Mr. Galipo elicited

 4   from Mr. Woods was that you told the investigator that you

 5   saw Nate hop the fence.

 6            THE COURT:  Okay.

 7            MR. EWING:  And we have different evidence.

 8            THE COURT:  Detective Woods will say that's not

 9   what he said.

10            MR. EWING:  Right.

11            THE COURT:  There is a possibility that we could

12   get this matter to the jury maybe Tuesday.

13            MR. EWING:  Yes.

14            THE COURT:  I think some of the jurors will

15   greatly appreciate that.  All right.  If there is nothing

16   further, let's have you here at a quarter till 9:00 just in

17   case there are any issues the parties need to discuss.

18            If there is nothing further, have a good evening.

19   Thank you for this indulgence.  I made this commitment to

20   give this speech this afternoon about six months ago and

21   couldn't pull out of it.  So thank you.

22            THE CLERK:  All rise.  This Court is adjourned.

23        (Proceedings concluded at 1:14 P.M.)

24                          --oOo--

25
```

CERTIFICATE

     I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 8, 2018.

                    ___/S/ CHIA MEI JUI _____

                    Chia Mei Jui, CSR No. 3287

**MR. CONAWAY: [12]**
235/14 235/24 237/6
237/10 270/22 277/15
277/17 327/8 327/10
327/13 360/22 360/24
**MR. EWING: [56]**
235/17 238/21 239/4
240/2 249/19 254/1
261/2 261/13 261/16
261/20 262/6 263/14
266/10 266/25 268/8
268/12 268/19 270/11
272/8 277/13 297/19
315/8 320/11 320/21
326/10 326/18 333/6
352/4 353/12 355/17
361/14 366/24 367/11
368/25 369/20 370/2
370/6 370/10 370/12
370/17 370/22 370/24
371/3 371/8 371/16
371/18 371/20 371/23
372/7 372/10 372/18
372/21 373/2 373/6
373/9 373/12
**MR. GALIPO: [79]**
235/10 237/16 238/2
238/18 238/22 239/21
240/7 241/6 244/4
244/6 244/10 249/10
249/16 249/22 249/25
253/21 253/23 260/1
261/11 262/2 262/8
262/13 262/17 263/7
263/22 264/4 264/15
264/18 264/25 265/3
265/13 265/17 265/20
265/24 267/13 267/16
268/4 268/15 269/11
269/16 269/23 270/9
270/19 270/25 271/2
271/11 271/19 271/24
272/4 272/12 272/14
275/6 277/20 277/23
278/14 297/12 297/20
297/22 298/20 299/14
299/21 300/12 301/7
305/4 308/1 310/24
315/13 325/15 330/12
339/11 355/14 367/5
367/14 367/23 368/1
369/3 369/6 369/10
369/22
**MS. LE: [1]** 265/2
**THE CLERK: [10]**
235/5 269/5 269/12
278/4 278/9 326/1
326/12 368/16 368/19
373/21
**THE COURT: [128]**
235/13 235/16 235/20
236/9 237/8 237/13
237/22 238/15 239/2
239/17 239/24 240/5
240/9 240/14 244/5
244/8 244/11 249/9
249/15 249/17 249/20

253/22 253/25 254/2
260/2 261/4 261/12
261/14 261/17 262/7
262/10 262/16 262/21
263/17 263/25 264/17
264/20 265/5 265/15
265/18 265/23 266/5
266/11 267/1 267/15
268/6 268/9 268/11
268/17 268/22 269/8
269/14 269/22 270/5
270/18 271/1 271/9
271/12 271/22 272/3
272/6 272/9 272/13
275/11 277/10 277/14
277/16 277/18 277/22
277/25 278/13 297/21
297/23 315/12 320/14
320/23 325/17 326/5
326/11 326/16 327/9
327/11 327/14 330/13
333/7 339/15 352/5
353/13 355/18 360/23
360/25 361/15 366/25
367/2 367/8 367/12
367/22 367/24 368/2
368/5 368/20 369/2
369/4 369/9 369/16
369/21 369/25 370/4
370/8 370/11 370/14
370/20 370/23 371/1
371/4 371/15 371/17
371/19 371/21 372/3
372/8 372/12 372/20
372/25 373/5 373/7
373/10 373/13
**THE WITNESS: [7]**
261/5 278/8 278/11
330/14 339/17 355/20
361/1

**-**
**--oOo [1]** 373/24
**-13 [1]** 249/21
**-2 [1]** 249/21
**-26 [1]** 272/7
**-38 [1]** 272/7
**-50 [1]** 272/7
**-55 [1]** 272/8
**-58 [1]** 272/8

**.**
**.45 [1]** 254/10
**.45 caliber [1]** 254/10

**1**
**10 [14]** 245/15 250/25
274/2 274/4 306/13
306/15 307/16 323/10
323/11 356/9 359/25
364/19 365/5 366/3
**10:22 [1]** 269/14
**10:36 [1]** 269/14
**11 [1]** 299/19
**114 [2]** 297/23 297/24
**11550 [1]** 343/3
**11:54 [1]** 326/14
**12 [13]** 249/17 249/21

249/24 250/3 309/17
357/21 357/23 358/1
358/12 358/17 358/18
358/19 358/20
**12 feet [1]** 312/3
**12-step [1]** 343/11
**12:10 [1]** 326/14
**13 [4]** 249/17 249/21
249/24 250/12
**13-7 [2]** 244/9 244/10
**13-inch [1]** 309/17
**13181 [1]** 233/14
**14 [1]** 303/24
**148 [1]** 303/6
**15 [5]** 251/17 298/20
305/17 306/13 323/10
**15-12 [4]** 249/17
249/21 249/24 250/3
**15-13 [2]** 249/17
249/24
**16 [2]** 354/9 356/12
**16-1128-AB [2]** 232/9
235/6
**16-officer [1]** 280/19
**17 [18]** 353/25 354/16
355/25 356/12 357/5
357/19 359/6 359/10
359/22 360/2 360/9
362/4 362/5 364/8
364/9 366/3 366/21
372/23
**170 [1]** 345/4
**18 [2]** 362/6 366/22
**19 [5]** 357/20 357/20
366/21 366/21 366/23
**1989 [2]** 279/5 279/9
**1997 [1]** 281/3
**1998 [1]** 281/3
**19th [6]** 330/3 330/4
330/11 343/19 343/23
347/13
**1:00 o'clock [1]**
240/20
**1:14 [1]** 373/23

**2**
**2-1 [1]** 262/20
**20 [23]** 245/15 250/25
251/8 251/9 251/17
260/10 260/15 260/21
260/25 272/5 272/7
272/11 272/18 272/19
274/2 274/4 275/15
305/17 306/15 307/10
307/17 312/22 323/11
**2010 [2]** 279/9 279/11
**2013 [1]** 279/14
**2014 [1]** 279/14
**2015 [9]** 330/3 330/4
330/7 330/11 343/19
343/23 347/13 348/2
372/23
**2016 [1]** 279/11
**2018 [4]** 232/16 234/2
235/1 374/10
**21 [5]** 254/9 309/11
357/4 359/5 362/8
**21800 [1]** 233/5

**22 [1]** 362/9
**23 [2]** 357/7 360/2
**232 [1]** 232/20
**24 [3]** 283/22 328/24
360/4
**25 feet [1]** 309/11
**26 [4]** 272/5 272/7
272/11 275/23
**2655 [1]** 233/9
**27-1 [2]** 254/3 254/4
**28 [2]** 267/25 374/4
**28-1 [4]** 249/17 249/21
249/24 250/19
**28-2 [4]** 249/17 249/24
250/22 307/18
**29-20 [4]** 272/5 272/7
272/11 275/15
**29-26 [3]** 272/5 272/11
275/23
**29-38 [3]** 272/5 272/11
276/2
**29-50 [3]** 272/5 272/11
276/11
**29-55 [3]** 272/5 272/11
276/11
**29-58 [3]** 272/6 272/12
276/22
**29-60 [3]** 272/6 272/12
277/4
**290 pounds [1]**
276/20
**2nd [3]** 245/13 246/4
327/7

**3**
**310 [1]** 233/5
**3287 [2]** 232/23
374/15
**33 [1]** 255/10
**3333 [1]** 233/6
**347-3333 [1]** 233/6
**350 [1]** 232/24
**37 [5]** 287/19 300/7
341/14 350/14 350/15
**374 [1]** 232/20
**38 [4]** 272/5 272/7
272/11 276/2

**4**
**400 [1]** 233/14
**43 [2]** 283/17 287/19
**4311 [1]** 232/24
**45 [4]** 286/15 304/24
304/24 305/1
**465 [1]** 281/14
**465 square [1]** 281/6
**47 [1]** 287/23

**5**
**50 [4]** 272/5 272/7
272/11 276/11
**503-9010 [1]** 233/10
**55 [4]** 272/5 272/8
272/11 276/17
**5500 [1]** 233/15
**562 [1]** 233/5
**58 [4]** 272/6 272/8
272/12 276/22

**6**
**60 [4]** 272/6 272/8
272/12 277/4
**699-5500 [1]** 233/15

**7**
**7/3/86 [1]** 348/24
**753 [1]** 374/3
**760 [1]** 233/10
**77th Division [1]**
279/18

**8**
**818 [1]** 233/6
**86 [1]** 348/24

**9**
**900 [1]** 319/23
**90012 [1]** 232/24
**9010 [1]** 233/10
**91367 [1]** 233/5
**91746 [1]** 233/14
**92307 [1]** 233/10
**99 [1]** 345/4
**9:00 [1]** 368/1
**9:00 A.M [3]** 368/9
368/16 368/22
**9:00 just [1]** 373/16
**9:14 [2]** 232/17 235/2

**A**
**AB [2]** 232/9 235/6
**abilities [1]** 319/14
**ability [2]** 286/20
345/9
**able [9]** 239/2 239/15
240/17 290/7 305/10
310/3 346/1 367/7
367/20
**absolutely [4]** 260/3
277/17 352/6 353/14
**academy [4]** 280/10
283/11 319/22 329/12
**accent [1]** 237/4
**according [5]** 256/8
256/19 257/10 267/8
286/7
**account [1]** 330/2
**accurate [5]** 339/24
344/8 359/7 359/8
363/17
**accurately [1]** 239/10
**achievable [1]** 310/22
**achieve [2]** 309/18
310/10
**across [1]** 288/16
**acting [1]** 338/13
**actions [1]** 323/6
**activate [2]** 243/16
243/18
**active [2]** 288/13
296/19
**acts [2]** 299/1 301/12
**actual [1]** 296/20
**addition [9]** 279/9
279/12 279/23 281/18
286/11 301/18 306/5
329/9 341/13

**A**

additional [4] 249/12
301/23 301/24 304/7
address [1] 237/15
ADHD [1] 342/16
adjourn [1] 368/24
adjourned [1] 373/22
administration [1]
280/22 328/17
admissibility [2]
269/25 270/1
ADMIT [1] 234/13
admitted [11] 234/13
244/9 244/10 249/22
249/24 254/3 254/4
271/5 272/8 272/10
272/12
advanced [1] 328/15
advise [1] 269/17
advised [3] 286/5
301/19 347/21
affects [1] 292/1
affords [1] 321/7
afraid [3] 313/23
316/1 316/2
Africa [1] 281/25
after [32] 250/20
250/21 250/23 250/24
251/15 251/20 252/20
253/6 258/25 258/25
259/6 260/17 273/21
275/21 277/4 278/23
279/20 280/21 281/19
293/11 293/18 294/23
304/25 306/19 306/20
324/4 325/3 325/8
362/4 370/24 371/9
371/10
afternoon [6] 326/22
326/23 368/8 369/15
369/20 373/20
again [31] 246/6
250/15 263/9 280/7
288/5 305/6 306/11
313/7 314/8 314/19
318/5 319/8 320/22
322/23 331/22 333/11
335/9 337/8 337/17
338/6 340/13 341/11
342/5 343/1 343/9
343/11 347/4 361/5
362/11 364/22 371/6
against [8] 242/5
254/20 255/1 257/4
276/5 276/6 292/24
318/10
agencies [1] 283/14
agency [5] 278/22
283/13 283/18 283/24
284/3
agent [1] 278/25
aggressive [2] 301/11
351/4
ago [4] 251/12 342/17
344/18 373/20
agree [17] 248/14
249/3 249/6 249/7
250/9 250/15 251/13

252/5 252/25 255/14
256/1 258/7 260/25
269/24 270/17 272/20
272/23
agreeable [1] 349/2
agreed [2] 270/20
271/3
agreeing [2] 238/7
238/9
agreement [6] 244/7
253/24 269/18 270/9
270/14 272/1
agrees [2] 270/1
270/11
ahead [2] 287/9
293/23
ain't [1] 366/24
air [1] 312/9
al [2] 232/10 235/7
alert [1] 320/2
allow [5] 269/2 319/5
325/22 333/5 368/13
allowed [1] 287/24
almost [1] 309/4
alone [1] 345/25
along [13] 304/1
307/8 334/4 345/22
346/15 346/18 346/24
347/5 351/13 363/15
363/19 363/24 363/25
alongs [1] 303/25
alongside [6] 293/12
293/25 351/9 351/17
351/19 351/24
already [7] 256/7
264/11 269/22 284/18
305/12 311/17 321/2
altercation [1] 318/18
although [1] 269/21
ALVAREZ [1] 233/13
ALVAREZ-GLASMAN
[1] 233/13
always [2] 313/11
368/10
Alzheimer's [1]
281/10
ambulance [1] 295/14
amount [3] 240/21
285/12 319/5
analysis [1] 335/5
and we [1] 285/11
ANDRÉ [1] 232/3
ANGELES [6] 232/18
232/24 235/1 279/4
279/16 279/19
angles [1] 237/25
another [8] 246/5
280/7 303/23 304/20
307/16 313/12 356/20
368/7
answer [11] 258/11
284/23 295/9 312/14
338/18 338/24 339/17
342/21 347/2 356/19
361/25
answered [1] 361/21
answers [1] 342/6
anticipate [3] 369/6

376/3 425/8
antidepressants [1]
335/17
antihistamines [1]
335/16
anymore [1] 293/23
apart [1] 311/4
apologies [1] 239/6
apologize [2] 237/3
239/7
apparently [1] 345/16
appear [1] 307/21
appearances [2]
233/1 235/10
Appears [2] 359/15
366/5
APPLE [1] 233/10
applies [1] 248/25
apply [3] 287/10
338/10 346/8
appreciate [4] 347/11
356/17 357/18 373/15
approach [10] 236/2
244/5 253/22 261/14
265/14 265/19 268/9
304/8 308/11 367/1
approached [1]
246/22
approaches [1]
298/15
appropriate [4]
295/18 303/1 303/19
308/9
approximately [16]
241/17 242/13 245/25
246/7 251/8 251/12
251/18 254/25 256/13
257/14 260/15 272/18
274/10 306/20 348/15
349/14
arbitrarily [3] 304/14
334/25 346/2
ARCHIBALD [5]
232/5 233/2 235/7
235/13 369/13
area [27] 244/14
245/25 248/19 255/15
280/4 280/4 280/15
286/23 323/11 327/5
327/17 328/7 328/8
341/8 344/23 345/6
345/8 345/11 345/13
345/16 345/23 346/4
346/6 346/12 346/21
347/12 348/2
areas [1] 345/3
aren't [2] 277/1 304/5
arguing [1] 236/24
arm [6] 258/19 258/21
276/9 276/13 276/15
351/5
armed [1] 304/3
around [16] 246/11
253/20 266/22 266/25
267/5 275/5 276/9
276/10 276/13 276/16
281/2 302/23 304/3
346/10 347/5 359/23

arrest [6] 285/15
285/17 287/6 287/9
287/9 295/5
arrested [4] 303/6
343/3 357/22 358/22
arrive [1] 270/16
arrived [1] 260/17
arrives [2] 322/1
322/3
art [1] 344/4
arts [1] 306/25
ascertain [1] 264/4
ask Nate [1] 336/24
asked [27] 252/18
260/19 261/1 261/7
267/22 285/11 286/4
286/4 299/2 302/6
308/22 320/9 320/10
323/3 323/6 324/20
335/3 335/4 337/2
337/21 338/2 338/18
348/16 349/23 350/3
356/18 363/6
asking [22] 252/2
262/4 294/20 298/8
299/9 315/6 322/23
338/19 342/1 342/5
346/18 346/19 347/1
347/1 350/25 354/6
356/15 356/18 356/19
358/19 362/16 365/17
asks [6] 355/6 358/22
360/3 362/8 362/22
363/5
assailant [1] 324/9
assault [2] 306/6
306/22
assaultive [4] 296/11
296/14 296/19 311/18
assigned [2] 279/1
280/25
assignment [3] 280/4
280/8 358/8
assignments [3]
279/16 305/25 316/14
assist [2] 312/10
329/24
assistance [7] 295/1
295/15 308/17 308/23
321/20 321/21 321/24
assisted [1] 329/11
assisting [2] 274/24
275/1
associated [3] 335/23
335/25 358/6
assume [7] 240/1
240/1 265/16 273/24
291/17 332/1 369/18
assuming [4] 236/23
291/1 292/20 358/2
assumption [1]
343/10
atop [1] 275/23
attach [1] 329/19
attached [2] 309/9
309/9
attack [2] 281/19
319/17

attacked [1] 321/12
attempted [2] 256/3
332/23
attempting [7] 247/23
253/17 332/25 333/3
352/9 352/24 356/17
attempts [3] 352/13
353/7 355/3
attend [1] 328/25
attended [3] 260/14
329/2 329/11
attention [1] 259/18
audio [35] 237/25
238/4 238/14 238/25
257/24 262/16 263/16
264/17 264/24 269/10
269/21 283/6 294/19
297/16 297/17 320/23
337/17 337/19 348/12
348/13 349/5 349/7
350/9 351/16 353/1
353/8 357/12 359/19
360/14 363/21 363/21
366/13 371/13 371/25
372/23
August [1] 281/25
automatic [1] 254/15
autopsy [1] 335/20
available [5] 263/20
271/18 311/21 367/21
369/19
average [1] 298/14
avoid [3] 240/7 248/20
248/21
aware [10] 243/25
253/3 256/24 258/18
258/21 275/5 305/16
306/14 372/8 372/11
awareness [1] 275/4
away [33] 253/6
253/13 255/18 255/18
256/1 274/10 274/11
277/5 284/22 292/18
296/7 298/16 298/19
300/16 300/20 300/21
300/22 302/19 304/22
312/3 323/5 325/9
325/11 325/15 335/2
349/3 351/7 351/12
351/23 363/8 363/9
363/15 364/24

**B**

back [60] 247/13
248/22 248/24 248/24
250/4 250/5 250/7
250/10 250/13 255/10
255/21 256/1 256/3
256/5 257/10 257/12
257/14 269/11 269/16
273/16 273/17 276/7
279/13 279/22 288/3
288/7 294/17 296/8
302/8 303/13 305/1
305/6 309/25 309/25
310/4 310/7 310/18
310/23 313/8 314/8
325/1 326/8 331/25

**B**

back... [17] 339/5
340/18 341/6 343/2
348/5 348/21 352/19
357/15 358/20 361/5
362/11 363/20 363/21
365/4 367/14 367/16
367/20
back-and-forth [1]
357/15
backed [1] 253/21
background [8]
278/20 337/23 341/3
360/20 365/5 365/7
365/11 365/20
backup [9] 259/12
274/12 274/20 303/21
303/23 304/6 304/18
317/20 317/20
bad [2] 345/6 345/8
barking [1] 357/14
barrel [5] 254/20
256/11 256/15 259/21
321/16
barricaded [2] 281/15
329/19
Barring [1] 285/17
Barstow [4] 327/5
327/18 328/7 370/14
based [53] 242/22
248/14 249/3 261/21
284/4 285/18 286/9
286/9 291/5 292/21
293/20 294/7 294/15
294/25 295/8 298/13
299/11 300/4 300/19
302/4 302/18 305/23
306/21 308/5 308/19
313/18 313/25 314/2
314/4 316/6 316/24
317/6 320/4 320/13
322/16 327/2 331/18
337/23 338/21 341/3
341/22 342/1 343/16
345/9 346/9 347/17
348/5 351/7 358/3
360/6 360/20 365/5
371/24
basically [9] 269/19
281/2 281/14 283/13
284/19 285/2 298/8
309/8 314/4
basis [2] 270/13
288/12
baton [3] 243/4 243/6
294/5
battery [1] 306/6
Beach [2] 280/23
328/15
beam [1] 295/19
becomes [1] 288/8
before [21] 235/23
241/13 241/16 242/8
252/18 256/8 260/5
266/24 269/16 278/6
309/4 312/11 313/13
340/6 340/8 347/19
356/14 357/22 358/23

beginning [3] 264/18
298/2 354/1
begins [1] 236/5
behalf [2] 235/12
235/15
behavior [3] 296/10
296/11 296/14
behavioral [1] 338/9
behavioral-related [1]
338/9
behaviors [2] 288/24
344/16
behind [2] 276/11
308/6
behold [1] 293/17
believe [56] 237/11
238/7 238/19 239/15
245/11 247/24 248/9
249/13 249/14 252/2
254/19 255/10 257/15
265/1 284/21 285/2
285/14 286/1 286/1
286/11 287/1 291/5
291/22 292/12 301/22
302/3 304/17 314/19
316/8 317/3 317/19
322/12 323/6 323/25
324/5 327/6 328/11
329/22 331/10 331/14
332/7 332/24 334/12
334/14 334/16 336/1
336/2 336/5 338/17
338/25 341/2 351/1
359/8 370/10 371/10
371/12
believed [6] 252/21
258/13 301/6 321/9
334/9 345/12
believes [1] 289/14
below [1] 310/16
belt [13] 238/8 243/15
260/5 262/16 286/3
310/14 310/16 315/1
320/8 320/9 320/10
331/5 331/18
BERNARDINO [4]
232/10 235/7 235/19
313/2
best [8] 237/12 261/3
265/13 284/4 286/6
309/24 337/6 337/12
better [1] 310/23
between [2] 290/7
291/11
beyond [1] 291/8
big [2] 323/4 366/15
bill [2] 287/3 370/7
bipolar [5] 290/8
290/9 336/8 341/14
342/12
BIROTTE [1] 232/3
birth [9] 286/4 293/8
299/10 299/13 302/2
348/23 348/24 352/11
357/2
bit [4] 257/14 305/6
343/5 343/14

black [2] 293/16
351/12
blacking [2] 259/8
259/10
blocks [2] 274/10
274/11
blood [2] 259/14
307/13
bloodied [1] 252/6
bloody [1] 251/24
bode [1] 341/12
bodily [2] 311/15
313/5
body [11] 255/2
255/18 276/6 295/16
307/6 309/19 309/23
310/24 318/1 319/25
321/10
body-forward [1]
295/16
bones [1] 307/14
book [2] 353/22
353/23
bookmaking [1] 280/6
booth [1] 312/7
Boston [1] 278/24
both [12] 235/21
238/6 239/1 242/23
262/6 276/22 276/23
276/23 282/9 321/11
328/21 371/10
bottom [2] 254/13
299/19
BOULEVARD [1]
233/5
box [2] 233/9 236/17
boxing [1] 307/7
bracing [1] 296/6
break [3] 239/16
268/15 268/17
breaking [1] 285/6
breaks [1] 240/20
breezeway [2] 351/19
363/12
bridge [1] 372/5
brief [2] 269/4 269/9
briefly [3] 268/9 332/7
369/13
bring [7] 235/24
240/11 271/10 271/13
288/18 319/25 321/10
broad [1] 284/3
broad-ranged [1]
284/3
broken [1] 307/14
brought [2] 269/16
294/5
building [1] 271/18
bullets [1] 254/12
BURBANK [1] 233/5
burglaries [1] 279/25
business [3] 286/20
286/22 286/24
button [1] 243/17
buys [1] 280/15

**C**

Cadre [1] 329/13

Cal [1] 328/15
Cal State [1] 328/15
caliber [1] 254/10
CALIFORNIA [9]
232/2 232/18 232/24
233/5 233/10 233/14
235/1 280/22 283/10
call [23] 259/2 259/17
262/20 269/18 271/8
277/19 277/24 280/7
285/6 286/16 287/7
293/4 303/6 303/11
303/23 304/18 317/20
329/23 334/25 338/11
347/18 358/4 371/12
called [6] 243/7
279/22 286/13 287/18
300/23 338/13
calling [5] 235/6
321/21 370/3 371/8
372/16
calls [2] 329/7 338/8
came [5] 294/17 302/7
319/1 328/22 335/13
Camera [1] 299/19
Camera 11 [1] 299/19
car [12] 245/12
246/19 285/6 304/14
313/24 345/14 345/14
345/24 346/3 346/3
346/10 347/8
care [3] 337/4 342/9
343/7
career [1] 283/18
carefully [1] 262/24
caring [2] 288/19
290/3
cartridge [2] 309/7
309/9
cases [14] 236/19
282/5 306/6 306/6
316/11 317/3 323/5
323/22 324/6 324/8
324/11 324/13 324/15
346/8
categories [1] 296/18
cause [12] 252/3
278/6 285/13 295/5
307/12 308/20 311/14
331/16 335/8 335/14
337/15 338/14
causes [1] 271/16
cautiously [1] 267/15
caveat [1] 270/2
CCRR [1] 232/23
cement [2] 273/17
307/5
center [1] 259/22
central [4] 232/2
279/18 290/11 338/7
certain [10] 284/6
287/24 288/18 288/24
295/21 296/3 304/2
341/15 342/12 353/11
certainly [2] 253/1
370/3
CERTIFICATE [1]
374/1

certified [4] 283/11
319/22 329/10 335/11
certify [1] 374/3
change [1] 343/4
changed [1] 258/11
Chapman [1] 371/15
chapter [1] 311/9
characterization [1]
263/16
characterize [2]
294/14 349/20
characterized [1]
239/10
charge [1] 328/23
check [5] 246/19
270/2 343/2 347/22
367/6
checked [1] 291/10
checking [1] 364/17
chest [14] 254/11
254/24 256/1 256/8
256/12 256/16 257/3
257/5 257/9 257/12
259/22 295/18 321/17
322/2
CHIA [3] 232/23
374/14 374/15
chief's [1] 280/23
child [2] 281/9 347/5
circumstances [26]
284/6 303/19 308/14
313/7 313/18 313/25
314/2 315/16 316/7
343/16 343/19 343/23
344/4 344/8 344/10
345/2 345/10 346/7
346/14 346/20 346/21
347/4 347/13 348/5
348/7 360/22
citizen [10] 246/18
274/24 276/17 282/19
304/9 318/10 318/10
318/11 345/13 346/25
citizen's [1] 287/8
city [3] 233/14 281/6
281/15
civil [4] 235/6 236/6
236/15 280/14
civilian [2] 304/3
304/9
claim [2] 247/10
273/16
Clarence [1] 371/15
clarify [1] 364/3
classes [1] 329/1
clear [5] 299/18
347/10 372/6 372/9
372/17
clerk [2] 265/14
265/20
client [2] 236/3
356/18
clinician [1] 329/19
clip [2] 262/19 262/21
close [15] 238/8 247/1
247/2 250/13 258/22
274/9 289/10 310/13
310/17 319/10 319/25

**C**

close... [4] 320/5
321/16 369/14 371/13
close-up [1] 250/13
closed [1] 286/25
closer [1] 257/3
clothing [4] 310/1
310/2 310/3 310/5
cmjui.csr [1] 232/25
CNS [1] 341/17
Coast [1] 328/13
coating [3] 247/13
339/4 340/21
cocaine [3] 290/12
292/2 337/15
Code [4] 301/19 303/6
303/20 374/4
Code 4 [1] 301/19
coincide [1] 345/21
COLVIN [1] 233/13
combative [1] 324/18
comes [9] 304/25
305/1 314/1 317/18
317/18 317/18 348/21
364/3 364/4
comfortable [3] 237/6
245/3 298/16
coming [8] 259/14
280/10 287/22 288/3
294/18 304/12 367/16
369/8
commands [3] 296/1
323/2 357/14
comment [2] 247/10
247/14 270/22
commitment [1]
373/19
committed [4] 286/6
293/4 308/17 338/12
communicate [2]
270/15 304/4
communities [1]
287/21
community [3] 288/1
288/7 370/14
compassionate [2]
288/20 290/3
competing [1] 334/17
complete [3] 283/23
295/4 337/1
completion [1] 261/22
compliance [3] 299/1
310/11 348/6
compliant [3] 298/11
299/7 299/12
complied [1] 293/6
comply [4] 283/14
348/13 348/15 348/25
complying [3] 295/25
323/1 349/24
component [3] 324/14
325/15 329/17
compound [3] 327/9
327/11 327/14
compressions [1]
322/2
computer [1] 264/25
CONAWAY [5] 233/8

233/9 235/15 236/8
261/18
concept [1] 287/16
concern [2] 318/21
318/22
concerned [7] 236/1
236/5 237/9 269/4
312/5 319/13 346/4
concerning [1] 321/14
concerns [1] 350/20
conclude [2] 341/9
341/11
concluded [1] 373/23
condition [3] 269/25
336/10 343/15
conduct [4] 269/3
306/1 325/23 368/14
conducting [1] 280/19
Conference [1] 374/8
conferred [1] 353/20
confident [1] 238/13
confirm [7] 240/23
352/9 352/14 352/25
353/7 366/16 367/3
confirming [4] 331/7
352/21 357/1 357/1
confirms [1] 362/6
conformance [1]
374/7
conjunction [6]
279/24 281/8 283/24
310/5 312/1 321/24
connected [4] 264/23
285/4 325/24 368/15
connection [1] 243/18
connotation [1]
289/25
consensual [20]
253/9 253/10 284/17
286/2 295/7 298/8
301/1 302/12 322/13
334/19 349/17 351/6
354/1 357/15 358/25
359/16 362/12 362/17
362/22 364/1
consent [14] 349/21
354/23 354/24 356/22
359/4 359/6 359/14
364/3 364/4 364/15
364/21 365/6 366/2
366/4
conservative [1]
369/20
consider [12] 290/14
290/16 313/12 344/7
345/11 346/6 346/20
347/12 348/7 348/10
349/22 350/18
consideration [1]
313/13
considered [4] 299/4
316/7 343/22 343/25
consistent [11]
258/19 258/22 305/24
306/3 323/9 323/14
350/13 351/22 359/16
371/22 371/24
construe [1] 356/22

consisting [2] 365/4
366/1
consult [1] 282/5
consulting [1] 282/9
contact [5] 237/21
243/19 243/22 302/24
321/17
contacted [3] 330/4
330/7 347/19
contacting [1] 273/1
contacts [1] 340/25
contamination [1]
312/6
contemplating [1]
369/12
contends [1] 306/14
context [6] 347/1
347/10 347/11 356/15
356/18 356/20
continually [1] 341/7
continue [11] 271/24
298/21 299/15 299/22
300/13 301/8 308/2
310/25 336/19 341/19
341/23
continued [2] 298/10
339/6
continues [1] 359/22
control [5] 309/3
311/25 317/13 320/1
321/13
controlled [5] 286/14
291/1 292/13 300/6
337/5
controls [1] 372/15
conversant [1] 317/22
conversation [9]
246/23 247/1 284/20
289/20 304/21 343/5
349/1 357/12 357/15
conversations [1]
239/11
conversely [1] 342/14
conversing [1] 304/19
conveyed [1] 335/19
Conway [2] 236/8
237/8
cooperate [2] 295/22
303/18
cooperating [2]
357/10 359/2
cooperative [2]
295/22 299/12
copies [2] 263/23
264/21
copy [2] 265/17
353/19
corporal [1] 280/11
correctly [2] 237/13
238/21
correlated [1] 313/19
corruption [2] 281/1
281/1
counsel [20] 233/1
235/9 237/18 238/11
239/6 239/10 239/14
240/3 244/5 253/22
261/22 265/17 268/12

269/15 270/11 278/14
353/20 360/24 367/8
368/23
counsel's [1] 263/15
count [2] 346/13
349/16
count six [1] 349/16
countries [1] 329/14
country [2] 281/24
329/7
COUNTY [5] 232/10
235/7 235/19 279/12
313/2
couple [6] 235/23
259/18 263/18 286/25
298/25 345/22
course [4] 290/23
303/8 329/2 343/1
courses [1] 328/21
Court's [4] 264/16
264/23 268/5 297/14
courthouse [1] 265/8
covered [2] 252/24
281/5
covers [1] 281/14
CRASH [1] 279/22
create [2] 307/5
314/22
credibility [2] 323/13
331/22
crime [33] 279/1
280/19 285/4 285/8
285/16 286/6 293/4
301/21 303/5 303/10
303/11 303/15 304/7
308/17 323/23 324/2
324/17 327/17 327/19
328/7 328/10 338/11
341/8 344/23 345/11
345/13 345/16 345/23
346/6 346/12 346/20
347/12 372/25
crimes [2] 279/25
328/11
criminal [4] 236/6
236/19 317/10 343/2
crisis [5] 281/16
288/17 328/23 329/23
329/24
critical [2] 281/19
288/11
cross [6] 234/8 312/6
326/9 326/17 326/20
372/5
cross-contamination
[1] 312/6
cross-examination [4]
234/8 326/9 326/17
326/20
crossing [3] 244/21
245/4 245/8
CROSSROADS [1]
233/14
crosswalk [1] 286/8
crying [1] 268/14
CSR [2] 232/23
374/15
cued [1] 263/9

cues [3] 290/10 300/4
300/8
curious [2] 367/11
370/16
custody [4] 252/17
252/19 295/12 295/13
Customs [1] 278/25
CV [2] 232/9 235/6

**D**

D-e-F-o-e [1] 278/13
DALE [3] 233/3 233/3
235/12
Dale Galipo [1]
235/12
damage [1] 307/5
danger [2] 314/11
316/9
dangerous [2] 313/21
313/22
darts [4] 309/7 309/14
309/15 310/3
data [1] 270/24
date [10] 286/4 293/7
299/9 299/12 302/2
348/23 348/24 352/11
357/2 374/10
dating [1] 318/25
day [17] 232/20 235/8
240/16 240/18 241/12
241/16 242/8 249/13
259/1 287/4 289/3
329/6 358/5 358/9
368/7 368/7 371/3
days [1] 267/25
de [1] 288/14
de-escalation [1]
288/14
deadly [13] 248/25
249/5 296/21 297/14
306/6 311/8 311/11
311/13 312/21 313/13
322/6 322/11 323/19
deal [7] 236/11 238/4
281/21 329/3 366/15
368/8 372/5
dealing [2] 236/1
284/5
deals [1] 236/7
death [4] 248/21
248/24 311/14 313/5
DECEASED [1] 232/7
December [1] 372/23
December 17 [1]
372/23
decide [2] 287/4
336/16
decided [3] 279/6
279/13 323/4
decides [1] 351/23
deciding [1] 315/24
decision [1] 336/16
defend [4] 318/11
319/12 324/23 324/25
defendant [2] 235/19
235/20
DEFENDANTS [2]
232/11 233/12

**D**

**defense [14]** 237/18 238/17 239/4 269/19 269/25 270/2 296/17 312/24 313/4 314/8 314/20 315/18 318/8 369/1
**defensive [2]** 294/17 294/18
**DeFoe [22]** 238/24 271/6 271/8 277/25 278/2 278/13 278/18 294/9 297/18 316/13 322/4 326/22 336/1 336/24 338/16 347/1 356/17 366/23 367/4 368/21 369/9 369/11
**degree [3]** 280/22 328/12 328/15
**degrees [1]** 309/8
**delaying [1]** 303/7
**delays [1]** 271/16
**delirium [1]** 309/22
**delivering [1]** 242/6
**demonstrator [1]** 295/24
**department [6]** 279/5 279/13 279/16 281/2 281/23 313/2
**departments [1]** 329/21
**depending [1]** 321/8
**depends [4]** 274/16 338/5 339/2 364/24
**depicting [1]** 305/20
**deploy [2]** 310/19 318/4
**deployed [1]** 310/20
**deposed [1]** 361/11
**deposition [20]** 241/19 248/15 251/22 252/14 258/8 258/13 302/3 305/16 327/25 328/6 332/20 333/12 334/6 339/21 339/23 340/2 350/2 361/7 361/20 362/2
**depositions [2]** 282/21 340/14
**Deputies [1]** 280/11
**deputy [31]** 241/2 255/1 262/24 271/7 298/7 299/8 301/19 301/24 304/11 305/16 305/17 306/14 307/24 308/6 308/9 308/15 308/20 320/6 323/9 323/14 331/20 332/18 335/19 344/6 347/14 347/17 356/14 357/15 358/3
**Deputy Kyle [1]** 332/18
**Deputy Kyle Woods [1]** 347/17
**Deputy Woods [20]** 241/2 255/1 262/24 298/7 299/8 301/19

304/11 305/16 305/17 306/14 307/21 307/24 320/6 323/9 323/14 331/20 335/19 347/14 356/14 357/5
**Deputy Woods's [1]** 306/18
**deputy's [4]** 286/7 293/6 323/1 370/22
**describe [1]** 305/9
**described [1]** 330/1
**description [2]** 285/7 351/11
**desired [1]** 310/23
**desirous [1]** 346/24
**detail [1]** 280/19
**detain [21]** 253/11 253/17 253/18 284/12 285/3 285/11 286/12 291/5 291/7 292/16 292/21 295/6 298/6 302/11 302/15 304/12 335/1 345/9 351/10 351/24 363/16
**detained [7]** 266/3 266/9 266/20 266/21 266/23 267/9 300/25
**detaining [1]** 364/5
**detection [1]** 332/16
**detective [15]** 260/16 261/1 262/25 263/10 264/6 264/12 267/22 280/13 285/9 306/5 371/19 372/2 372/2 372/20 373/8
**Detective Libby [1]** 372/20
**Detective Rios [7]** 260/16 261/1 262/25 263/10 264/6 267/22 371/19
**detectives [2]** 279/24 279/25
**detention [11]** 284/9 284/13 285/20 285/25 286/1 301/1 301/17 302/15 302/19 322/13 323/25
**determinations [2]** 323/13 331/23
**determine [1]** 336/19
**determining [3]** 290/25 333/24 334/1
**detract [1]** 319/16
**develop [1]** 292/11
**device [5]** 243/12 243/14 246/23 294/4 309/3
**diagnose [1]** 290/6
**diagnoses [1]** 328/20
**dialogue [1]** 365/13
**Dickey [1]** 370/8
**Didi [1]** 329/5
**Didi Hirsch [1]** 329/5
**DIEU [2]** 233/4 235/12
**difference [1]** 236/20
**different [10]** 237/25 238/18 288/6 289/22

296/8 330/10 316/25 349/19 372/14 373/7
**differentiate [1]** 290/7
**diffusing [1]** 288/15
**dilate [1]** 337/16
**dilated [4]** 290/20 333/16 333/18 340/21
**dire [1]** 236/17
**direct [6]** 234/6 234/8 241/8 278/16 322/2 370/6
**direction [1]** 245/9
**directly [2]** 287/22 308/20
**direst [2]** 313/6 315/15
**disabilities [7]** 283/16 287/18 288/10 350/15 350/16 350/19 350/19
**disagree [1]** 347/15
**discerned [1]** 331/21
**discharge [2]** 318/23 321/18
**discontinue [1]** 338/25
**discuss [2]** 368/24 373/17
**discussed [4]** 239/19 239/23 240/6 251/22
**discussions [1]** 335/12
**disorder [2]** 288/4 290/9
**dispatch [10]** 247/23 248/1 248/5 259/11 301/19 303/13 304/20 343/3 348/1 357/25
**dispense [2]** 239/16 332/19
**disrespect [1]** 239/6
**disrespectful [1]** 300/24
**distance [3]** 242/11 309/12 312/3
**distractions [2]** 289/19 290/3
**distribute [1]** 265/20
**district [4]** 232/1 232/2 232/3 372/24
**diverting [1]** 333/4
**DIVISION [3]** 232/2 279/18 281/5
**divisions [1]** 345/4
**doctor [3]** 337/5 342/9 343/7
**doctors [1]** 329/17
**document [1]** 320/10
**documents [1]** 327/3
**Dodger [1]** 279/21
**Dodger Stadium [1]** 279/21
**doing it [1]** 335/9
**domain [12]** 255/7 255/10 255/11 287/16 287/19 288/10 298/20 300/7 311/9 312/22 341/14 350/14
**Domain 37 [2]** 287/19

300/7
**domains [4]** 283/9 283/17 288/11 329/15
**dominant [1]** 319/15
**DOMINIC [5]** 232/5 233/2 235/7 235/13 369/13
**Dominic Archibald [2]** 235/13 369/13
**door [1]** 285/10
**double [1]** 367/6
**double-check [1]** 367/6
**down [29]** 239/13 252/12 252/20 256/5 270/4 270/9 271/14 275/21 277/15 279/18 289/18 292/18 294/12 294/16 295/16 307/9 308/15 314/1 315/5 317/18 317/19 319/3 324/11 325/8 326/6 337/10 350/3 350/7 368/21
**downward [1]** 307/3
**downwards [1]** 276/16
**drive [4]** 241/13 241/16 242/4 347/5
**driven [1]** 343/17
**driving [3]** 304/3 347/4 358/14
**drug [16]** 279/1 279/2 290/15 290/22 291/15 292/4 329/9 334/10 334/13 335/11 336/6 336/11 336/17 336/20 341/10 344/1
**drugs [4]** 248/6 334/2 334/22 335/7
**dude [1]** 354/19
**due [2]** 272/25 273/7
**duly [3]** 237/14 241/5 278/3
**duration [1]** 285/11
**during [16]** 236/17 237/21 239/16 241/18 243/21 245/18 258/13 274/5 280/25 294/11 321/3 322/25 335/3 343/1 349/17 362/11
**duties [1]** 303/8
**dynamic [1]** 343/5

**E**

**e-mailing [1]** 239/14
**each [4]** 238/3 254/17 274/4 316/21
**earlier [8]** 292/1 300/4 318/6 350/13 351/6 361/3 362/18 366/6
**early [2]** 287/24 369/15
**East [2]** 280/18 328/13
**East Coast [1]** 328/13
**East L.A [1]** 280/18
**edge [1]** 290/4

**education [2]** 365/7 365/20
**effect [6]** 246/20 257/18 258/1 320/19 321/6 342/17
**effective [1]** 241/22
**effort [2]** 237/5 237/12
**eight [3]** 291/14 309/8 357/21
**eight degrees [1]** 309/8
**either [12]** 263/21 268/14 273/18 273/24 288/5 289/9 289/25 290/6 291/17 316/21 329/7 335/24
**El [7]** 237/22 244/17 247/3 327/2 327/7 327/17 348/3
**El Rancho [1]** 247/3
**El Rancho Motel [6]** 237/22 244/17 327/2 327/7 327/17 348/3
**electronic [1]** 309/3
**electronically [1]** 340/9
**elevate [1]** 351/2
**elevated [6]** 295/7 301/1 322/13 323/24 350/11 357/13
**elicited [1]** 373/3
**eliminate [1]** 291/17
**else's [3]** 313/5 314/10 316/9
**encounter [33]** 253/9 253/10 284/17 284/19 286/2 295/7 298/8 301/1 302/12 322/13 332/13 334/1 334/19 336/4 336/15 341/3 349/17 351/7 354/2 358/25 359/7 359/16 360/15 361/12 361/12 362/12 362/15 362/17 362/22 362/23 364/1 365/9 366/3
**encountered [1]** 343/19
**encountering [3]** 336/13 343/24 350/18 260/22 264/18 267/23 271/17 292/11 309/7 338/4
**ended [2]** 336/23 337/13
**energy [1]** 240/17
**enforcement [16]** 278/20 279/14 281/21 282/7 288/8 305/23 306/21 307/2 309/10 313/17 325/10 332/12 337/6 346/25 347/24 357/23
**enforcement-related [1]** 288/8
**engage [2]** 317/20 317/21

**E**

engaged [1] 334/19
engaging [1] 362/22
enough [4] 255/13
262/11 315/24 316/3
ensures [1] 283/14
enter [1] 287/1
entire [9] 250/5
261/24 262/2 263/25
264/2 264/3 273/1
314/24 322/24
entirety [1] 262/19
entitled [2] 262/2
374/6
environment [5]
291/14 318/20 344/18
344/22 345/1
environmental [1]
289/17
equally [1] 290/16
escalation [2] 288/14
359/1
especially [6] 289/4
303/24 307/4 307/12
325/3 345/25
essence [1] 267/20
essentially [4] 259/6
270/15 354/14 366/16
establish [4] 284/25
285/13 285/14 322/16
estimate [4] 251/6
251/17 260/8 260/13
estimating [1] 256/11
eternal [1] 267/16
evade [1] 332/16
evaluation [4] 329/1
329/23 336/22 343/11
even [17] 236/10
273/10 273/20 274/17
303/14 303/17 310/9
313/2 315/5 319/12
319/16 321/12 324/12
325/4 335/22 349/1
349/2
evening [1] 373/18
event [6] 314/24 318/4
319/18 319/24 335/4
372/16
Eventually [1] 280/2
evidence [11] 236/21
244/10 249/25 254/4
261/3 265/13 272/8
272/12 306/8 372/7
373/7
EWING [20] 233/13
234/8 235/19 236/22
236/23 236/23 237/7
239/4 240/1 249/19
261/20 272/8 277/12
326/9 326/18 366/23
367/10 368/25 369/18
370/1
exactly [1] 255/11
exam [1] 370/6
examination [10]
234/6 234/8 234/8
241/8 278/16 326/9
326/17 326/20 340/12

340/13
examine [1] 277/12
examined [5] 330/17
339/23 339/25 361/8
366/7
examiner [2] 369/8
369/12
examining [1] 371/10
example [4] 284/8
291/20 303/21 317/7
excerpt [1] 261/25
excessive [7] 315/25
317/7 322/6 322/11
322/21 323/20 324/7
exchange [1] 353/1
excited [1] 309/21
exclusion [1] 239/20
excuse [2] 331/20
363/8
excused [1] 240/5
exhausted [1] 314/7
Exhibit 1 [1] 268/6
Exhibit 13-7 [1] 244/8
Exhibit 15-13 [1]
250/12
Exhibit 2 [1] 267/17
Exhibit 27-1 [1]
253/24
Exhibit 3 [10] 265/18
353/22 355/25 359/10
360/2 362/4 364/8
364/9 366/4 366/22
exhibiting [2] 337/10
338/7
exhibits [6] 234/12
234/13 249/18 249/24
272/11 341/15
exiting [1] 243/20
expand [1] 335/8
expect [1] 294/22
expectation [1] 318/5
experience [16]
247/22 282/2 300/10
305/23 306/21 330/1
330/21 332/12 337/23
342/1 348/6 358/4
360/20 363/3 365/6
365/12
experienced [1]
330/11
experiencing [2]
288/17 329/22
expert [13] 238/4
269/20 270/3 270/24
282/6 290/22 315/11
328/2 329/10 335/11
365/16 365/24 371/17
experts [6] 238/15
239/16 269/19 270/15
291/15 371/12
explain [4] 279/15
284/15 317/16 322/9
explained [1] 361/10
explaining [2] 361/19
366/22
explore [1] 346/25
explore like [1]
346/25

express [2] 268/25
368/11
expressing [1] 329/8
extensive [3] 339/25
340/11 340/15
extensively [1] 339/24
extent [2] 237/1
339/17
extra [1] 290/2
eye [6] 305/2 339/7
339/14 340/17 341/5
344/20
eyes [5] 289/19 333/4
333/21 340/20 343/13

**F**

face [32] 251/1 251/14
251/20 251/24 252/5
252/5 252/8 272/21
272/24 273/2 273/5
273/9 273/10 273/11
273/13 273/21 274/2
274/3 284/19 284/19
295/16 305/18 305/21
306/11 306/15 306/18
307/11 307/22 308/10
318/11 323/10 323/11
face-forward [1]
295/16
face-to-face [1]
284/19
facilitate [2] 352/15
352/21
facing [2] 310/17
336/9
fact [17] 236/6 252/8
253/10 267/11 300/12
301/6 304/25 305/4
305/4 324/4 324/12
325/4 331/6 346/9
348/24 364/22 365/8
factor [4] 299/3 345/1
345/7 348/6
factors [4] 335/14
338/6 343/15 350/17
facts [18] 285/19
286/10 287/10 291/6
294/7 295/17 297/12
300/5 308/13 314/4
314/13 316/24 323/15
338/10 341/22 345/21
346/8 347/18
factually [1] 316/25
fair [11] 243/25 244/2
251/24 255/13 262/11
311/5 311/13 330/10
340/16 352/14 357/9
fairness [1] 369/19
fall [5] 252/20 294/14
294/16 294/25 305/6
305/9 315/11 347/3
falling [2] 292/18
325/8
falls [1] 314/8
familiar [5] 327/2
327/4 327/7 339/11
340/22
family [2] 289/9 332/6

far [3] 252/24 256/11
304/23
fast [1] 237/4
fast-talking [1] 237/4
FBI's [1] 329/2
FCRR [1] 232/23
fear [11] 304/18
313/15 313/16 313/17
313/18 314/1 314/1
314/22 315/23 316/7
317/14
feasible [1] 255/20
federal [2] 232/23
279/6
feel [8] 237/5 242/16
242/20 282/25 298/16
300/3 323/21 363/1
feeling [5] 364/24
365/1 365/9 365/17
365/21
feels [1] 313/16
feet [8] 242/13 294/6
309/11 309/13 309/16
310/9 312/3 318/21
fell [10] 252/1 252/12
275/21 294/12 294/16
294/23 295/16 308/14
315/5 322/18
felt [4] 236/9 313/17
364/23 365/9
fence [9] 252/25
304/15 345/17 346/3
360/13 360/13 361/23
361/24 373/5
few [7] 249/12 264/19
264/20 274/21 294/9
297/18 318/14
field [6] 280/9 291/16
310/20 333/25 335/9
343/12
fight [9] 248/16
296/12 296/12 296/20
296/24 297/6 312/17
319/16 325/1
fighting [8] 307/1
307/1 311/18 312/15
317/23 318/17 318/20
319/11
figure [5] 250/1
265/22 314/25 360/12
367/15
figured [1] 325/14
figuring [1] 249/8
fill [1] 371/2
final [1] 235/25
finally [2] 325/21
368/12
find [5] 236/3 262/9
337/6 337/11 363/15
fine [3] 264/5 270/20
304/22
fingers [3] 340/18
341/5 344/21
finish [4] 367/7
367/22 369/9 369/11
fire [3] 309/6 310/7
310/8
firearm [3] 318/7

318/24 321/13
fired [8] 257/4 257/6
258/6 258/9 258/15
258/16 259/12 259/22
fires [1] 309/7
first [24] 232/24
235/25 236/11 236/11
254/23 255/2 257/6
257/10 258/16 278/3
290/21 296/18 301/16
306/8 318/17 321/8
336/21 336/22 352/10
352/19 356/24 367/20
370/11 370/18
fists [1] 294/1
five [10] 241/17
242/13 268/16 268/19
268/24 271/7 281/13
295/8 349/14 367/12
five feet [1] 242/13
five-minute [3] 268/16
268/19 268/24
flashing [1] 289/19
fled [1] 281/7
flight [4] 284/25 293/9
322/15 322/17
focus [1] 281/20
focuses [2] 280/6
281/16
focusing [4] 280/3
280/15 280/19 281/15
follow [4] 285/9
297/19 314/12 342/21
follow-up [2] 285/9
297/19
followed [1] 352/24
following [15] 235/4
240/13 261/16 262/12
268/11 268/21 269/7
271/21 279/25 326/4
326/15 367/2 368/4
368/18 371/7
follows [2] 241/6
278/4
foot [2] 293/14 347/25
force [49] 248/25
249/5 251/1 274/3
279/2 281/1 283/15
283/21 288/19 292/22
293/1 293/12 294/1
294/1 294/2 295/20
296/3 296/9 296/11
296/16 296/22 297/14
306/1 306/2 306/3
306/15 306/22 307/8
308/12 311/8 311/11
311/11 311/13 312/11
312/21 313/11 313/14
313/23 314/9 315/25
316/18 317/7 317/24
318/10 319/5 322/6
322/11 323/20 323/25
forcefully [3] 273/10
273/11 307/22
foregoing [1] 374/4
foreign [1] 329/14
Forget [1] 260/24
form [4] 268/24 286/8

**F**

**form... [2]** 325/20
368/10
**format [1]** 374/7
**formed [1]** 285/23
**former [1]** 310/19
**formulate [1]** 293/20
**forth [7]** 339/5 340/18
341/6 342/4 344/21
357/15 363/6
**Forty [1]** 367/12
**Forty-five [1]** 367/12
**forward [5]** 235/9
278/1 292/12 295/16
295/16
**foundation [4]** 238/7
238/9 360/23 360/25
**four [8]** 236/18 237/24
237/24 254/24 257/11
269/21 291/11 299/18
**four inches [2]** 254/24
257/11
**four millimeters [1]**
291/11
**fractured [1]** 371/1
**frame [1]** 276/2
**frames [1]** 270/4
**Francisco [1]** 279/2
**fraught [1]** 345/13
**free [6]** 266/16 266/24
267/4 287/1 300/3
363/1
**freely [2]** 358/11
364/23
**friends [1]** 289/9
**from 2013 [1]** 279/14
**front [12]** 245/8
286/21 292/10 310/2
310/9 310/21 318/1
342/19 349/5 349/8
353/18 367/19
**full [5]** 251/1 274/3
279/8 279/10 306/15
**full-force [2]** 251/1
306/15
**full-time [1]** 279/10
**function [1]** 256/25
**further [8]** 239/3
240/11 241/6 325/17
342/21 349/1 373/16
373/18

**G**

**GALIPO [17]** 233/3
233/3 234/6 234/8
235/12 237/16 241/1
271/23 277/19 312/25
339/23 361/8 361/11
361/19 366/7 369/3
373/3
**Galipo's [2]** 312/14
324/12
**gambling [1]** 280/7
**gang [5]** 279/22 280/2
280/3 280/19 280/19
**gate [4]** 246/8 246/10
246/11 246/12
**gave [6]** 267/25 286/4

293/7 302/1 348/23
364/11
**general [1]** 244/14
**generally [2]** 248/18
270/13
**gentlemen [8]** 265/6
268/23 283/8 312/19
322/5 322/10 325/19
368/6
**gets [2]** 248/24
304/14
**getting [9]** 248/16
248/24 266/21 267/14
280/21 293/21 303/13
311/24 353/3
**give [11]** 236/22 264/2
264/22 268/15 278/6
290/10 292/1 297/3
331/16 370/1 373/20
**given [4]** 271/4 287/25
288/5 308/13
**gives [1]** 352/10
**giving [5]** 299/12
306/11 323/2 354/24
356/25
**glanced [1]** 286/7
**GLASMAN [1]** 233/13
**Glock [1]** 254/9
**gmail.com [1]** 232/25
**God [1]** 278/8
**goes [3]** 290/23
293/23 312/17
**gone [1]** 319/22
**good [19]** 235/11
235/14 235/17 235/18
235/21 240/15 241/10
241/11 270/10 271/10
278/18 278/19 301/23
326/22 326/23 345/5
366/25 367/24 373/18
**government [1]** 279/6
**grab [17]** 253/7
253/16 256/4 256/21
260/17 261/2 263/4
263/11 264/7 264/13
267/22 303/2 316/2
318/21 319/24 320/18
351/5
**grabbed [5]** 248/20
255/16 256/22 256/24
320/20
**grabbing [2]** 293/2
325/5
**grad [1]** 328/21
**graduated [1]** 278/23
**grappling [1]** 311/24
**graveyard [1]** 274/19
**great [5]** 240/24 312/2
313/5 319/4 329/3
**greater [1]** 237/5
**greatly [1]** 373/15
**ground [15]** 276/22
306/13 307/1 307/4
307/9 307/16 308/12
312/15 312/18 318/17
319/11 322/18 322/23
324/24 325/8
**ground-fighting [1]**

**grounds [1]** 236/2
**group [3]** 280/14
310/6 310/8
**grown [2]** 307/15
307/16
**guess [9]** 237/24
239/18 250/5 282/2
333/2 337/8 342/19
369/8 372/5
**guilty [4]** 236/4
236/12 239/7 285/15
**gun [64]** 248/11
248/18 248/19 248/23
254/6 254/7 254/8
254/20 255/6 255/7
255/15 255/17 255/18
255/21 256/4 256/8
256/9 256/11 256/15
256/20 256/21 256/24
257/2 257/10 257/11
257/16 257/17 257/25
258/4 258/5 258/8
258/15 258/17 259/22
260/18 261/2 261/7
263/4 263/11 264/7
264/13 267/23 316/2
316/22 318/15 318/16
318/23 319/7 320/2
320/3 320/7 320/11
320/18 320/21 321/3
321/4 321/5 321/9
321/16 324/10 325/6
325/8 325/11 325/12
**gunshot [1]** 258/23
**gunshots [1]** 258/19
**guy [1]** 246/19

**H**

**half [2]** 265/9 280/24
**hall [1]** 271/15
**hallway [1]** 332/7
**hand [14]** 246/3 256/9
256/12 256/19 257/9
258/3 258/5 258/8
258/16 258/18 258/21
319/15 319/15 319/16
**handcuff [3]** 253/19
303/2 309/1
**handle [1]** 289/15
**hands [13]** 293/7
294/5 294/18 299/3
308/25 318/20 321/11
323/2 325/1 339/6
339/7 340/19 341/7
**hands-on [1]** 308/25
**HANG [2]** 233/4
235/12
**Hang Dieu Le [1]**
235/12
**happen [1]** 247/1
**happened [4]** 238/3
274/9 281/21 324/4
**happening [4]** 276/2
276/4 294/21 325/14
**happens [4]** 274/1
274/4 293/10 295/1
**hard [1]** 309/5

**harking [1]** 361/5
**hat [2]** 293/16 351/12
**hats [1]** 239/8
**having [7]** 241/5
278/3 288/19 329/22
334/6 334/7 335/25
**he's [23]** 257/17
257/25 294/25 295/21
301/25 304/22 304/23
304/23 305/1 305/12
320/1 320/6 321/5
336/11 336/13 345/18
350/25 354/6 354/24
356/25 362/16 363/25
367/21
**head [10]** 250/5 250/7
250/10 250/13 251/14
273/16 273/18 305/18
308/10 318/11
**health [5]** 324/14
325/15 328/25 329/16
329/18
**health-related [1]**
329/16
**hear [14]** 237/4
257/25 261/9 262/2
262/25 263/6 263/10
264/6 264/10 265/12
327/12 348/13 353/8
360/24
**heard [23]** 235/4
240/13 248/8 262/12
268/7 269/7 271/21
284/18 286/2 293/13
301/18 315/1 320/6
326/4 326/15 331/24
337/17 348/12 350/9
353/1 357/12 368/4
368/18
**hearing [3]** 293/15
342/4 372/14
**held [5]** 261/16 268/11
340/8 367/2 374/6
**help [9]** 249/8 252/16
278/8 293/19 329/24
336/3 352/17 352/21
356/17
**helping [1]** 276/18
**helps [1]** 292/11
**hereby [1]** 374/3
**hesitate [1]** 339/12
**hey [2]** 246/19 366/14
**high [12]** 291/18
327/17 328/7 341/8
344/23 345/11 345/16
345/23 346/6 346/12
346/20 347/12
**high-crime [11]**
327/17 328/7 341/8
344/23 345/11 345/16
345/23 346/6 346/12
346/20 347/12
**higher [3]** 236/25
291/13 291/13
**highest [1]** 311/14
**HILLS [1]** 233/5
**himself [2]** 252/12
345/15 345/17 346/10

346/11 370/19
**hired [3]** 278/24 280/5
328/3
**Hirsch [1]** 329/5
**history [1]** 340/25
**hit [2]** 257/22 306/7
273/20 296/7
**hitting [3]** 273/15
273/20 296/7
**hold [5]** 301/4 340/9
355/19 355/19 365/11
**holding [3]** 307/19
340/3 340/11
**holds [1]** 311/25
**hollow [1]** 254/12
**holster [4]** 318/19
319/2 319/6 319/8
**holsters [1]** 319/1
319/4 319/5
**homeless [2]** 287/22
289/5
**HONORABLE [1]**
232/3
**hooked [2]** 265/12
268/17
**hop [2]** 252/25 373/5
**hope [4]** 267/16
297/20 297/21 371/2
**hopefully [1]** 240/16
288/18
**hoping [2]** 367/22
369/14
**hopped [3]** 246/8
246/10 361/24
**hospital [2]** 370/14
370/20
**hostage [1]** 281/17
**hotel [3]** 238/1 287/3
362/9
**Hotline [1]** 329/6
**hour [6]** 250/20
250/22 306/20 323/13
338/3 342/17
**hours [3]** 283/22
319/23 340/14
**house [4]** 300/1 324/4
**However [1]** 372/11
**huge [1]** 236/23
**human [2]** 313/9
318/6
**hunch [1]** 286/9
**hundred [3]** 258/14
306/1 345/22
**hurt [1]** 252/15
**hurts [2]** 242/17
242/21
**hydration [1]** 335/17
**hypothetical [1]**
336/14
**hypothetically [2]**
290/17 291/21

**I**

**I'd [3]** 321/9 337/1
369/8
**idea [2]** 310/18 330/10
**ideations [1]** 329/8
**identify [1]** 302/1
**idiots [1]** 236/14

**I**

**II [2]** 232/7 281/4
**ill [15]** 288/17 288/24 290/16 292/9 300/9 300/12 323/24 329/22 334/3 334/17 334/23 336/8 336/16 336/18 342/15
**illegal [1]** 292/8
**illness [12]** 289/5 289/25 302/4 328/20 329/4 329/16 330/12 330/22 343/21 350/14 350/21 361/5
**illnesses [1]** 341/14
**immediate [7]** 296/17 312/24 313/4 314/8 314/20 315/18 318/8
**immediately [2]** 253/21 294/23
**impact [3]** 294/5 310/2 312/12
**impacted [2]** 289/11 312/8
**impairment [2]** 287/17 289/15
**impairments [1]** 289/8
**impeding [1]** 286/22
**implementation [1]** 329/12
**important [7]** 289/12 292/3 304/16 309/13 313/16 342/18 356/16
**impression [1]** 267/11
**inability [1]** 340/19
**inaccurate [1]** 263/17
**inadvertently [1]** 255/17
**inappropriate [3]** 248/4 305/13 314/19
**incapacitation [2]** 309/19 310/10
**inch [2]** 257/13 309/17
**inches [6]** 254/24 256/13 256/14 256/16 257/8 257/11
**incident [27]** 237/20 241/12 241/16 241/25 242/9 243/2 249/13 250/20 250/21 250/23 250/24 251/4 251/7 251/20 258/25 262/16 264/17 267/20 268/2 283/2 306/19 306/20 312/17 318/4 322/24 327/23 330/2
**incidents [7]** 281/16 306/22 306/22 316/18 316/21 316/25 329/20
**include [5]** 239/24 270/5 282/16 284/8 344/10
**including [2]** 292/17 316/14
**inclusive [1]** 232/20
**incoming [1]** 329/6
**inconsistent [2]**

**increase [1]** 345/8
**incredibly [1]** 291/13
**India [1]** 281/18
**indicate [3]** 247/16 247/19 272/2
**indicated [9]** 240/19 244/21 245/14 245/18 246/8 251/16 258/8 303/20 368/7
**indicates [1]** 351/10
**indicating [4]** 241/21 328/7 328/9 328/10
**indication [1]** 289/14
**indirectly [1]** 308/21
**individual's [1]** 296/14
**INDIVIDUALS [1]** 232/6
**indulgence [1]** 373/19
**INDUSTRY [1]** 233/14
**inflicted [2]** 288/20 289/5
**influence [36]** 247/7 247/21 248/3 248/6 248/9 252/21 286/13 290/11 290/15 290/18 290/25 291/1 291/12 291/19 291/22 292/13 300/6 303/22 309/22 323/24 324/18 334/2 334/3 334/9 334/13 334/22 335/6 336/6 336/17 336/20 337/3 338/7 341/10 341/17 343/4 344/1
**information [19]** 292/11 293/15 293/19 293/20 299/9 303/12 303/13 305/3 323/2 331/17 332/14 335/18 337/6 342/13 343/2 351/10 352/2 362/13 367/21
**informed [1]** 235/22
**infrastructure [1]** 281/20
**ingested [1]** 292/7
**ingestion [1]** 336/11
**initial [6]** 239/5 246/23 247/1 293/6 298/12 349/18
**initially [3]** 244/22 303/17 309/2
**initiate [2]** 278/23 302/23
**injured [9]** 251/25 252/6 252/11 292/9 295/3 315/5 315/10 321/22 323/7
**injuries [12]** 250/11 250/16 250/17 258/18 273/9 273/12 305/20 306/10 307/15 308/19 308/20 370/22
**injury [8]** 250/9 258/21 273/17 273/19 295/4 307/12 311/15

31#:3491

**inquire [6]** 265/4 367/17 367/19 367/23 369/23 369/24
**installation [1]** 286/24
**instance [3]** 291/9 313/20 336/9
**instinct [1]** 286/9
**instruction [1]** 372/13
**instructor [1]** 310/20
**insufficient [1]** 313/15
**intending [1]** 236/24
**intensity [1]** 285/12
**intensive [1]** 290/23
**intent [1]** 317/10
**intentionally [1]** 255/17
**interact [3]** 330/21 345/5 345/17
**interacted [1]** 330/24
**interacting [3]** 289/3 295/2 330/20
**interaction [1]** 323/1
**INTEREST [1]** 232/6
**interesting [1]** 372/4
**interfering [1]** 286/19 303/7
**interim [1]** 322/1
**intermediate [1]** 295/20
**interpret [1]** 349/20
**intersection [4]** 244/22 246/2 246/3 246/15
**interview [1]** 371/20
**introduce [5]** 238/17 238/20 270/21 318/19 318/24
**intrusive [1]** 312/11
**investigate [2]** 247/23 336/19
**investigating [1]** 306/22
**investigation [5]** 338/4 338/25 341/19 341/23 372/24
**investigations [3]** 379/3 280/3 306/1
**investigator [1]** 373/4
**involved [11]** 282/17 285/8 290/24 298/8 304/5 306/25 313/10 316/14 316/19 318/18 323/16
**involving [1]** 282/6
**irrespective [1]** 283/18
**issue [13]** 236/11 240/7 269/16 270/22 288/9 288/21 289/23 299/8 302/5 361/5 367/4 371/13 372/4
**issues [14]** 235/23 237/18 238/5 239/6 284/7 289/6 289/17 297/14 312/4 335/23 338/9 368/23 369/14 373/17

**items [1]** 272/10
**itself [5]** 284/25 312/9 322/15 323/9 345/8

**J**

**jacket [1]** 293/16
**jeopardy [1]** 346/1
**Jersey [1]** 237/4
**job [4]** 302/9 331/10 344/6 366/23
**Joint [1]** 254/4
**JR [1]** 232/3
**JUDGE [2]** 232/3 249/11
**Judicial [1]** 374/8
**JUI [3]** 232/23 374/14 374/15
**jump [1]** 360/13
**jumps [1]** 304/15
**juncture [5]** 300/10 301/2 303/15 360/14 361/11
**June [2]** 279/9 279/10
**jurors [7]** 236/17 237/9 264/4 264/22 265/20 271/14 373/14
**justify [1]** 285/20

**K**

**K-9 [3]** 281/5 281/6 281/6
**keep [3]** 255/18 305/2 319/7
**Kelsey [12]** 239/24 240/5 274/23 276/17 276/20 304/10 304/11 320/5 345/18 346/9 346/22 370/7
**kept [3]** 333/3 333/4 333/20
**kicked [1]** 306/7
**kicks [2]** 296/12 296/20
**kill [2]** 307/11 317/10
**killing [1]** 315/21
**kind [9]** 243/9 245/7 269/3 302/9 304/1 322/4 325/23 335/13 368/14
**knees [1]** 294/18
**knew [2]** 274/12 331/15
**knife [1]** 324/10
**knocked [2]** 273/16 316/1
**knocking [1]** 285/10
**known [8]** 266/3 266/9 266/18 266/20 267/7 267/9 341/8 344/23
**knows [1]** 314/5
**Kyle [74]** 235/20 241/4 327/25 328/6 330/11 331/13 332/18 332/20 332/22 332/25 333/3 333/11 333/14 334/8 336/5 336/9 336/24 336/24 337/19

**items [1]** 272/10
338/2 338/17 339/3 340/12 340/22 340/25 341/23 343/19 343/24 344/19 347/17 348/1 350/2 350/7 351/17 351/19 352/9 352/10 352/13 352/21 352/21 352/24 353/7 354/6 354/13 354/19 355/3 355/6 355/11 355/24 356/9 358/14 358/22 359/10 359/22 360/2 360/7 360/9 360/22 361/10 361/19 361/25 362/5 362/8 363/6 363/7 363/19 363/24 364/9 364/17 366/14 370/4 370/19 372/1 372/23
**Kyle Woods [15]** 330/11 331/13 332/22 336/5 336/9 336/24 337/19 340/12 340/22 340/25 348/1 350/2 358/14 370/4 372/23
**Kyle Woods's [3]** 327/25 332/20 333/11
**Kyle's [13]** 333/17 334/6 334/13 339/10 339/21 350/10 350/23 354/1 360/5 361/7 361/10 362/15 366/22

**L**

**L.A [1]** 280/18
**lack [1]** 335/17
**ladies [8]** 265/6 268/23 283/8 312/19 322/5 322/10 325/19 368/6
**landed [1]** 294/16
**landing [1]** 272/24
**LAPD [6]** 279/7 279/8 280/11 313/3 329/1 329/18
**large [2]** 289/4 310/7
**larger [1]** 343/14
**largest [1]** 310/6
**laser [1]** 295/19
**last [25]** 237/3 251/10 260/11 260/12 263/9 271/3 278/12 281/13 303/24 312/23 312/23 313/8 314/14 318/7 318/18 319/10 320/8 321/12 331/2 338/3 352/25 353/7 355/3 356/11 357/6
**lastly [6]** 287/2 296/15 314/6 322/4 329/11 372/19
**later [4]** 267/25 314/3 323/13 337/11
**lateral [1]** 281/11
**laundering [1]** 279/3
**law [23]** 233/3 233/3 233/4 233/4 233/8 233/9 233/13 233/13 278/20

**L**

law... **[15]** 279/14 281/20 282/7 288/8 305/23 306/21 307/2 309/10 313/17 325/10 332/12 337/6 346/25 347/24 357/23
lawful **[5]** 284/23 286/20 303/8 308/18 324/19
lay **[1]** 324/24
laying **[4]** 259/5 259/5 259/15 273/14
layout **[1]** 327/4
LE **[1]** 233/4 235/12 265/4
learn **[2]** 285/19 288/21
learned **[2]** 286/10 329/15
learning **[16]** 255/7 255/10 255/11 283/9 283/17 287/16 287/19 288/10 288/11 298/20 300/7 311/9 312/22 329/15 341/13 350/14
Learning Domain **[2]** 255/10 255/11
least **[4]** 236/18 241/21 258/7 312/10
leave **[13]** 284/22 284/22 286/5 300/3 301/6 322/14 341/20 341/21 345/24 346/3 363/1 365/10 369/10
led **[1]** 367/9
left **[6]** 246/2 246/3 246/14 246/16 345/15 346/9
left-hand **[1]** 246/3
length **[1]** 236/15
less **[5]** 242/23 293/1 294/2 311/21 317/24
less-than-lethal **[3]** 294/2 311/21 317/24
let **[15]** 237/19 237/19 247/23 247/25 248/4 265/25 275/9 287/15 287/25 302/10 334/21 334/23 336/18 345/19 352/19
lethal **[8]** 242/23 293/1 294/2 296/16 311/21 313/11 314/9 317/24
level **[7]** 280/2 280/3 280/16 285/14 289/18 308/12 311/14
levels **[1]** 295/21
Libby **[1]** 372/20
lie **[2]** 303/16 303/17
life **[24]** 248/21 248/24 249/1 249/4 289/8 296/15 296/17 312/24 313/4 313/5 313/5 313/10 313/12 314/9 314/10 314/10 314/20 315/18 316/1 316/3

316/8 316/9 318/6 318/8
lifesaving **[1]** 321/25
light **[1]** 265/13
lighting **[1]** 343/14
lights **[1]** 289/19
like **[48]** 239/13 245/16 247/12 253/19 254/7 255/25 262/3 264/17 264/20 268/6 275/4 276/19 277/2 277/24 279/17 280/11 281/21 286/23 289/17 290/11 290/12 291/9 291/12 293/10 294/6 295/23 297/17 304/7 304/25 307/6 309/4 311/4 313/1 317/10 335/7 337/1 339/15 340/11 342/8 346/25 354/19 359/11 359/24 360/10 364/10 367/7 369/8 371/13
likelihood **[3]** 291/18 314/10 319/8
likely **[5]** 244/2 304/23 311/14 312/8 336/7
limit **[1]** 343/9
limits **[1]** 319/14
line **[49]** 245/7 298/12 303/14 310/14 310/16 353/25 354/9 354/17 354/21 354/25 355/3 355/4 355/6 355/11 355/11 355/25 356/1 356/2 356/6 356/6 356/9 356/9 356/12 357/4 357/7 357/20 357/20 359/5 359/10 359/12 359/23 359/25 362/5 362/6 362/8 362/9 364/8 364/10 364/13 364/17 364/19 365/5 366/3 366/21 366/22 366/23
line 10 **[3]** 359/25 364/19 365/5
line 16 **[1]** 356/12
line 17 **[1]** 362/5
line 18 **[2]** 362/6 366/22
line 19 **[1]** 357/20 366/21 366/23
line 21 **[1]** 362/8
line 22 **[1]** 362/9
line 23 **[2]** 357/7 360/2
line 24 **[1]** 360/4
line 3 **[3]** 354/17 354/21 364/10
line 4 **[1]** 359/10
line 6 **[2]** 355/4 359/12
line 7 **[4]** 355/3 355/6 359/23 364/13
line 8 **[6]** 355/11 355/25 356/1 356/2 360/9 364/17
lines **[2]** 334/4 351/13

listen **[1]** 257/24 262/24 263/1 372/14
listened **[5]** 260/5 260/21 283/6 331/18 351/17
listening **[5]** 260/24 264/6 288/13 294/19 372/15
literally **[1]** 271/17
little **[7]** 257/14 276/5 305/6 316/25 343/5 343/13 344/18
live **[2]** 345/6 360/3
lived **[5]** 253/1 327/6 360/7 361/23 362/13
lives **[2]** 306/25 362/16
living **[1]** 345/7
lo **[1]** 293/17
located **[1]** 327/17
location **[5]** 286/21 301/24 324/2 327/5 344/10
lock **[2]** 309/20 309/23
lodging **[1]** 327/1
long **[10]** 274/20 280/23 328/15 332/19 339/13 340/14 360/17 360/17 360/21 361/24
Long Beach **[2]** 280/23 328/15
look **[23]** 239/13 275/7 281/19 282/11 286/16 286/18 291/8 294/8 306/2 306/2 306/3 306/8 306/18 309/4 327/19 332/23 332/25 333/3 333/21 335/1 340/11 340/20 366/14
looked **[9]** 251/10 281/1 284/7 284/11 306/10 306/23 323/8 323/22 324/13
looking **[20]** 281/6 284/11 289/13 291/23 293/16 301/25 306/5 306/23 309/14 309/17 309/18 310/13 315/24 333/20 335/2 335/9 338/8 342/7 343/12 353/12
looks **[2]** 254/7 277/2
LOS **[6]** 232/18 232/24 235/1 279/4 279/16 279/19
Los Angeles **[1]** 279/19
losing **[1]** 290/4
lost **[1]** 281/9
lot **[5]** 289/24 303/5 323/5 329/15 346/10
low **[2]** 357/13 359/1
lying **[1]** 307/10

**M**

Ma'am **[1]** 296/1
made **[5]** 243/8

245/19 246/3 331/10 373/19
mailing **[1]** 239/14
Main **[1]** 327/7
maintain **[2]** 279/9 320/1
major **[2]** 279/2 280/3
make **[18]** 237/5 237/5 237/12 240/1 245/21 245/22 246/5 265/10 265/11 270/11 287/8 333/15 336/15 343/10 347/18 364/17 372/6 372/9
making **[4]** 237/8 323/13 331/22 365/22
man **[4]** 307/16 307/16 360/5 366/14
manageable **[1]** 289/18
manner **[3]** 284/13 294/24 312/11
many **[12]** 236/17 241/15 251/6 260/8 260/13 270/4 272/17 348/15 349/14 359/23 363/7 371/7
MARCEL **[2]** 233/4 235/12
Marcel Sincich **[1]** 235/12
MARCH **[5]** 232/16 234/2 235/1 279/11 374/10
mark **[2]** 245/2 356/3
MARKED **[1]** 234/13
marks **[1]** 249/9
martial **[1]** 306/25
MaryAnn **[1]** 370/14
master's **[1]** 280/21
materials **[7]** 282/14 282/16 285/24 292/17 321/16 327/3 327/21
math **[1]** 270/16
matter **[19]** 236/7 237/12 239/18 268/25 269/3 291/6 307/4 323/15 324/14 325/21 325/24 334/7 346/9 347/3 368/8 368/11 368/15 373/12 374/6
matters **[4]** 282/9 282/10 283/20 365/10
maximum **[2]** 240/21 312/3
maybe **[24]** 236/10 245/3 279/25 281/9 285/5 285/6 285/9 286/22 286/23 286/24 287/3 289/19 291/14 293/14 296/8 296/8 304/25 308/20 309/22 316/2 343/2 343/5 372/6 373/12
McCormick **[1]** 371/11
mean **[16]** 236/16 252/1 258/20 276/23

245/19 246/3 331/10 373/19
mailing **[1]** 239/14
Main **[1]** 327/7
maintain **[2]** 279/9 320/1
major **[2]** 279/2 280/3
make **[18]** 237/5 237/5 237/12 240/1 245/21 245/22 246/5 265/10 265/11 270/11 287/8 333/15 336/15 343/10 347/18 364/17 372/6 372/9

291/24 291/25 303/24 306/24 313/10 321/7 345/3 347/24 357/24 358/1 363/7 364/23
meaning **[1]** 253/10
means **[7]** 296/6 296/7 301/20 309/19 310/14 312/23 347/25
meant **[1]** 239/6
measures **[1]** 314/6
medical **[21]** 259/2 259/18 289/23 295/1 295/15 306/11 308/16 308/23 315/11 321/20 321/21 321/23 322/1 322/3 335/22 369/7 369/12 370/13 370/18 371/9 371/11
medication **[11]** 247/5 287/25 288/6 289/21 290/1 292/9 337/3 337/14 342/13 342/15 343/8
medications **[4]** 288/7 337/4 342/10 342/11
meetings **[1]** 260/13
MEI **[3]** 232/23 374/14 374/15
members **[2]** 289/10 332/5
memory **[3]** 239/7 372/15 372/21
mental **[28]** 287/17 288/17 288/20 289/5 289/8 289/15 289/25 302/4 324/14 325/15 328/20 328/25 329/1 329/4 329/16 329/16 329/18 329/23 329/23 330/12 330/22 336/10 341/14 343/21 350/14 350/19 350/21 361/5
mentally **[14]** 288/17 288/24 290/16 300/8 300/12 323/24 329/22 334/3 334/16 334/23 336/8 336/16 338/16 342/14
mention **[1]** 343/16
mentioned **[27]** 265/7 283/20 286/12 289/2 292/1 293/4 293/9 294/7 297/12 298/25 300/4 302/3 308/16 312/1 312/25 316/13 316/17 318/6 322/12 322/15 324/17 324/23 329/9 335/8 335/20 337/9 352/18
mere **[1]** 293/9
merged **[1]** 237/25
met **[1]** 332/7
metal **[1]** 243/9
meth **[8]** 337/14 338/2 338/3 338/20 342/20 342/24 342/24 342/24
methamphetamine **[10]** 253/4 290/12

**M**

**methamphetamine... [8]** 291/13 292/2 292/5 309/22 335/5 335/6 341/17 342/17
**methamphetamines [1]** 334/14
**Metropolitan [1]** 281/5
**microphone [1]** 264/25
**mid [3]** 280/2 280/3 280/16
**mid-level [3]** 280/2 280/3 280/16
**might [11]** 249/8 261/9 287/17 291/13 298/15 332/13 334/22 343/15 343/25 351/9 361/25
**mile [1]** 345/4
**miles [2]** 281/6 281/15
**military [2]** 286/24 329/12
**millimeters [2]** 291/11 291/14
**mind [4]** 266/16 313/20 367/19 370/2
**minimize [1]** 342/8
**minute [6]** 268/16 268/19 268/24 295/8 325/19 325/25
**minutes [5]** 259/18 271/7 274/21 326/7 367/12
**mischaracterizes [1]** 320/23
**misdemeanor [1]** 366/15
**mispronunciation [1]** 236/8
**Miss [1]** 265/4
**Miss Le [1]** 265/4
**missed [1]** 259/22
**missing [1]** 281/9
**misspelling [2]** 331/7 352/13
**misstates [1]** 320/12
**mistrial [1]** 236/2
**mode [4]** 241/13 241/16 242/5 358/10
**model [1]** 309/5
**mom [1]** 332/7
**moment [16]** 260/2 261/12 262/14 262/19 266/5 275/7 285/22 294/9 297/14 311/17 333/7 337/25 352/5 353/13 361/15 362/24
**Monday [1]** 371/9
**money [1]** 279/3
**month [1]** 281/25
**months [2]** 287/5 373/20
**more [21]** 237/6 250/12 252/23 262/14 263/13 271/7 284/3 300/11 307/5 318/14

338/5 341/18 341/24 351/9 352/2 353/5 353/10 358/11 367/8 367/10 371/7
**morning [14]** 235/11 235/14 235/17 235/18 235/21 237/15 238/11 240/15 241/10 241/11 278/18 278/19 367/21 369/8
**most [8]** 244/2 302/11 304/23 306/25 310/22 312/8 319/16 329/21
**motel [12]** 237/22 244/17 287/2 327/2 327/4 327/5 327/7 327/17 343/12 346/17 347/6 348/3
**motion [6]** 238/10 238/18 239/20 240/2 240/4 270/1
**mouth [4]** 247/11 307/11 307/13 323/11
**move [6]** 292/11 296/4 296/5 307/6 315/9 315/11
**moved [1]** 277/4
**movement [1]** 305/3
**Mr. Conaway [1]** 261/18
**Mr. DeFoe [19]** 238/24 271/6 271/8 278/18 294/9 297/18 316/13 322/4 326/22 336/1 336/24 338/16 347/1 356/17 366/23 367/4 368/21 369/9 369/11
**Mr. Ewing [17]** 236/22 236/23 236/23 237/7 239/4 240/1 249/19 261/20 272/8 277/12 326/9 326/18 326/23 367/10 368/25 369/18 370/1
**Mr. Galipo [12]** 237/16 241/1 271/23 277/19 312/25 339/23 361/8 361/11 361/19 366/7 369/3 373/3
**Mr. Galipo's [2]** 312/14 324/12
**Mr. Kelsey [10]** 239/24 240/5 274/23 276/17 276/20 304/10 304/11 320/5 345/18 346/9
**Mr. Pickett [36]** 235/16 243/19 243/22 244/2 244/21 245/4 245/8 245/10 245/15 246/5 246/6 246/15 246/22 264/13 284/9 285/25 286/3 286/6 286/13 291/7 292/16 292/18 292/24 293/3 295/10 298/9 300/5 300/12 302/1 304/15

308/14 335/6 335/21 345/18 363/5
**Mr. Pickett's [4]** 254/21 306/10 321/17 340/20
**Mr. Sincich [2]** 265/5 305/5
**Mr. Woods [2]** 363/8 373/4
**much [3]** 288/25 307/5 367/10
**muddy [1]** 236/5
**multiple [5]** 251/14 272/21 342/23 353/5 353/6
**Mumbai [3]** 281/18 281/19 281/22
**murders [1]** 345/4
**muscle [3]** 239/7 310/6 310/8
**must [3]** 283/23 312/22 313/6
**myriad [2]** 288/6 291/3
**myself [3]** 273/15 277/3 319/1

**N**

**name [41]** 236/8 237/3 237/8 278/11 278/12 278/12 286/4 293/7 299/9 299/12 302/2 302/4 331/2 331/7 331/8 331/11 331/13 331/19 332/1 332/2 332/10 348/18 352/10 352/10 352/12 352/13 352/17 352/18 352/22 352/25 352/25 353/8 355/4 356/1 356/11 356/24 356/25 357/1 357/2 357/6 364/11
**names [4]** 237/13 358/4 358/6 370/15
**narcotic [4]** 280/16 300/6 328/11 343/4
**narcotic-related [1]** 328/11
**narcotics [4]** 280/14 280/15 341/9 344/23
**Nate [141]** 251/14 251/17 258/21 259/2 259/14 266/2 266/8 266/16 267/4 267/11 272/21 272/23 273/20 274/2 274/3 275/19 275/23 276/5 276/11 276/24 277/3 277/5 294/12 294/23 299/2 299/11 299/12 299/20 299/25 300/16 301/12 302/23 303/2 305/17 306/15 307/25 308/6 308/6 308/10 308/14 314/14 315/10 327/6 330/4 330/7 330/12 330/17 330/24 331/1

331/6 331/9 331/12 331/19 331/24 332/3 332/9 333/4 334/9 336/5 336/8 336/24 336/25 337/19 338/2 338/13 338/18 338/20 339/4 339/6 341/1 341/9 341/23 343/20 343/20 343/24 343/25 344/20 347/19 348/13 348/16 348/19 348/20 348/22 348/23 349/12 349/24 350/3 350/5 350/25 351/18 351/18 352/10 352/14 352/20 354/2 354/21 355/6 355/6 356/6 356/10 356/13 356/24 357/5 357/7 357/9 358/22 358/23 359/12 359/19 359/25 360/3 360/3 360/6 360/10 360/15 360/18 361/13 361/21 361/21 361/24 361/25 362/5 362/8 362/9 362/12 362/15 363/6 363/19 363/20 363/25 364/6 364/9 364/10 364/13 364/19 365/9 366/8 366/14 366/22 366/23 373/5
**Nate Pickett [1]** 361/13
**Nate's [17]** 251/19 273/2 273/5 276/7 305/21 331/4 332/23 333/1 333/4 336/10 352/9 352/25 353/7 354/2 355/3 359/2 366/4
**NATHANAEL [3]** 232/5 232/6 233/7
**nature [3]** 294/14 311/25 366/9
**necessarily [1]** 317/9
**necessary [2]** 274/17 282/25
**necessity [2]** 238/6 304/18
**neck [3]** 276/9 276/10 276/13
**need [34]** 237/15 238/15 243/16 246/19 249/8 253/19 262/14 263/3 269/18 285/13 289/22 290/15 290/21 291/3 291/16 292/6 293/8 296/1 303/18 310/8 317/13 317/20 317/22 317/25 318/3 319/9 367/10 367/14 367/23 368/8 368/24 370/15 372/5 373/17
**needed [8]** 252/16 270/25 286/5 295/1 301/3 301/4 308/23 361/3
**needs [1]** 295/15

**negative [4]** 289/24 357/21 357/24 358/18
**negligent [1]** 318/22
**negotiate [1]** 329/14
**negotiating [1]** 281/17
**negotiation [5]** 281/16 281/17 328/23 329/2 329/13
**negotiators [1]** 328/24
**nervous [3]** 290/11 338/8 339/8
**nervousness [1]** 341/6
**neuromuscular [2]** 309/18 310/10
**never [17]** 248/7 253/15 264/11 266/14 273/9 304/11 304/11 320/5 320/6 330/17 330/24 332/3 333/18 335/3 335/4 335/20 345/18
**new [5]** 237/4 265/9 265/10 279/17 280/10
**New Jersey [1]** 237/4
**next [7]** 267/16 275/10 277/20 296/5 338/19 355/11 356/6 356/9 367/9
**night [7]** 246/13 260/12 304/1 313/22 330/11 344/14 358/14
**No. [4]** 286/15 298/20 304/24 304/24
**No. 15 [1]** 298/20
**non [1]** 238/25
**non-synchronized [1]** 238/25
**noncompliance [1]** 348/9
**None [3]** 287/10 338/10 369/1
**nonetheless [2]** 293/11 303/14
**nonresistance [1]** 295/23
**noon [1]** 369/14
**normal [1]** 325/2
**normally [1]** 291/9
**NORTH [2]** 233/14 281/24
**Northeast [2]** 279/21 280/4
**Northeastern [2]** 278/24 328/13
**Northeastern University [1]** 278/24
**nose [2]** 307/13 371/1
**notebooks [1]** 240/24
**noted [4]** 236/9 236/13 237/2 237/14
**notes [1]** 275/8
**nothing [7]** 240/11 278/7 293/5 346/21 354/19 373/15 373/18
**notice [1]** 259/14
**notify [1]** 348/1

**N**

November [10] 279/8
330/3 330/4 330/6
330/7 330/11 343/19
343/23 347/13 348/2
November 19th, 2015
[1] 348/2
November 20th of [1]
330/7
number [23] 255/11
264/22 264/23 270/16
292/10 297/22 306/24
309/25 312/16 312/22
335/14 335/18 337/9
349/11 354/1 354/2
354/9 354/16 354/25
356/6 356/9 358/2
358/13
Number 10 [1] 356/9
Number 16 [1] 354/9
Number 20 [1] 312/22
Number 9 [4] 354/1
354/2 354/25 356/6
number one [1]
264/22
number two [1]
264/23
numbers [2] 249/15
272/3
numerous [2] 286/3
310/20
Nurse [1] 370/14
Nurse MaryAnn [1]
370/14
nurses [2] 370/17
370/24
nutritious [1] 240/16

**O**

o'clock [1] 240/20
oath [1] 241/3
object [3] 315/9
339/12 355/15
objected [1] 236/13
objection [28] 237/1
249/14 249/18 254/1
254/2 261/3 261/21
261/24 261/25 262/7
263/15 264/1 266/11
267/1 268/8 268/13
272/7 272/9 320/12
320/14 320/22 327/10
327/14 330/13 339/16
355/20 360/23 360/25
objectively [1] 314/2
observation [1] 285/5
observe [2] 340/20
341/4
observed [2] 294/15
339/4
observing [1] 336/12
obtain [1] 355/3
obtained [1] 328/12
obviate [2] 238/6
269/18
obviously [23] 253/3
282/2 284/5 288/8
289/18 294/19 296/4

296/13 310/22 312/15
312/17 313/17 314/22
317/23 318/7 321/7
322/18 325/5 328/21
329/13 331/19 332/4
341/21
OC [4] 312/2 312/2
312/4 312/10
occasion [1] 324/12
occasions [4] 241/15
286/3 310/21 345/23
occur [1] 330/2
occurred [4] 295/9
303/11 308/19 330/3
occurring [2] 306/9
314/3
off [8] 246/3 249/9
266/22 290/10 292/1
318/23 342/11 355/18
off of [1] 355/18
offenders [1] 287/24
offer [1] 268/14
offering [1] 295/24
office [4] 247/2
280/23 282/11 324/12
officer [55] 237/21
238/24 259/24 279/10
280/5 280/9 280/19
282/17 283/11 283/24
284/19 285/2 286/5
289/12 290/17 292/21
294/23 297/7 298/14
299/20 300/9 302/22
303/2 303/9 303/23
305/24 311/19 313/16
316/15 317/4 317/6
317/6 317/9 320/20
323/7 323/16 324/10
328/22 334/1 334/18
343/25 344/7 350/20
351/8 358/7 360/22
363/2 363/4 370/10
Officer 2 [1] 320/20
Officer Rios [1]
259/24
officer's [3] 323/1
323/6 345/9
officer-involved [1]
323/16
officers [28] 248/1
248/5 279/17 282/3
283/10 284/4 287/15
288/11 289/1 289/7
289/15 290/6 291/15
291/21 293/10 296/21
296/24 298/18 311/23
312/2 312/14 317/13
318/9 319/7 321/20
321/23 335/10 358/3
officers have [1]
311/23
OFFICES [2] 233/3
233/8
official [2] 232/23
268/1
oh [3] 275/8 289/9

362/3494

once [26] 280/7 288/5
306/11 308/14 313/7
314/8 314/19 318/5
319/8 322/23 331/21
335/9 337/8 338/6
340/13 341/11 342/5
343/1 343/9 343/11
345/18 347/4 349/14
353/6 361/5 364/22
one [43] 236/13
239/12 252/23 255/12
256/20 257/13 257/16
260/2 261/12 262/4
262/10 262/14 262/19
262/21 263/13 264/22
266/5 273/10 274/4
286/12 287/4 287/19
288/11 290/18 291/25
303/22 307/18 309/4
310/14 310/15 310/16
314/18 319/16 321/4
324/13 324/15 324/24
335/3 335/24 338/13
340/3 345/24 372/2
one inch [1] 257/13
one's [1] 313/19
ongoing [1] 283/19
only [17] 237/17 240/8
248/1 256/3 257/11
257/12 270/2 270/6
271/14 274/19 287/2
296/16 312/24 314/19
318/8 324/8 365/13
onset [1] 337/7
oOo [1] 373/24
open [12] 235/4
240/13 262/12 268/21
269/7 271/21 326/4
326/15 336/23 337/13
368/4 368/18
open-ended [2]
336/23 337/13
opened [1] 265/8
opening [3] 236/1
236/13 236/21
opens [1] 362/5
operations [1] 283/16
opinion [25] 268/25
285/23 292/15 295/17
298/5 301/16 302/14
303/1 308/9 314/13
314/17 315/11 315/15
316/24 322/6 322/10
323/19 323/21 325/20
328/4 331/1 338/22
350/10 351/8 368/11
opinions [2] 285/22
306/11
opportunity [8] 264/2
279/4 284/5 329/21
332/3 332/5 333/11
349/4
opposed [4] 264/24
308/25 311/11 323/21
opposing [1] 265/16
opposite [1] 348/9
optimal [3] 309/12

309/14 310/7
optimistic [1] 267/15
option [2] 294/3 318/2
options [8] 242/24
296/3 296/9 296/14
303/22 311/21 315/20
317/24
organized [1] 279/1
otherwise [2] 262/10
371/14
out [67] 239/9 239/15
240/4 243/8 245/15
246/19 247/17 247/20
248/5 248/8 248/9
248/10 249/8 250/1
257/17 257/20 257/21
259/9 259/10 259/14
262/9 263/24 265/22
269/18 270/16 271/1
271/2 276/18 277/3
280/10 285/10 287/23
293/7 296/1 299/3
304/14 309/8 314/25
316/2 318/19 319/6
319/12 319/18 320/1
321/3 321/5 325/12
325/14 326/24 329/24
336/3 337/6 337/11
339/6 340/19 341/7
345/14 345/24 346/2
347/8 347/20 360/12
367/16 368/2 371/12
371/15 373/21
Outdoors [1] 312/9
outrageous [1]
338/14
outside [7] 235/4
269/7 281/24 306/12
312/5 326/4 368/18
outstanding [1]
331/14
over [30] 239/15
247/16 247/19 248/8
251/8 251/9 252/23
260/10 260/15 260/21
260/25 271/5 271/8
272/18 272/19 279/7
279/20 279/20 279/21
282/8 304/12 306/1
313/22 329/7 329/13
329/14 335/1 360/13
360/13 361/23
overarching [1]
283/13
overly [1] 310/15
overreacted [1] 317/4
overreacts [1] 317/6
overruled [10] 237/2
261/5 315/13 320/15
320/24 327/15 330/14
339/16 355/20 361/1
own [3] 283/25 286/7
332/2

**P**

P-i-g-g [1] 331/25
P-i-g-g-e-t [2] 356/5
357/6

309/14 310/7
P.O [1] 233/9
pacing [3] 339/4
340/18 341/6
page [29] 232/20
234/5 270/11 320/9
348/23 353/25 354/9
354/16 354/25 355/25
356/2 356/12 357/4
357/5 357/16 357/19
359/6 359/10 359/22
360/2 360/9 362/4
362/19 364/9 366/3
366/21 366/21 372/17
374/7
page 19 [1] 366/21
page 2 [1] 353/25
page 3 [7] 354/16
354/25 355/25 356/2
356/12 357/5 357/16
page 4 [2] 359/6
362/19
page 5 [3] 359/10
359/22 360/2
page 6 [2] 360/9
362/4
page 7 [4] 320/9
364/9 366/3 366/21
paid [1] 279/6
pain [1] 310/11
paper [1] 340/10
parameters [2]
286/18 313/6
paranoid [2] 290/8
342/11
paraphrasing [2]
320/17 366/16
parent [1] 281/10
parked [1] 245/12
parking [1] 346/10
PARKWAY [1] 233/14
parlance [2] 347/24
357/23
Parris [1] 371/14
Parris Ward [1]
371/14
part [20] 247/25
261/10 262/4 262/10
262/21 263/9 279/19
290/5 310/4 328/2
335/18 345/1 346/6
346/13 346/21 347/12
348/7 349/18 366/13
372/24
particular [5] 239/17
282/12 311/9 353/1
358/7
Particularly [1]
340/17
parties [5] 235/23
240/9 240/10 270/7
373/17
partners [2] 248/8
274/16
pass [1] 263/24
passive [2] 295/23
296/19
past [1] 282/8
pat [2] 350/3 350/7

**P**

path [1] 337/11
patrol [13] 243/20
 244/25 245/4 246/18
 274/24 276/17 279/17
 279/20 282/3 282/3
 282/19 345/14 358/13
Paul [8] 357/21
 357/23 358/1 358/12
 358/17 358/18 358/19
 358/20
pause [9] 333/9 352/7
 353/15 360/17 360/17
 360/21 361/17 361/24
 362/5
pay [2] 287/3 287/4
peace [3] 283/11
 283/24 303/9
ped [3] 347/20 347/21
 347/22
pedestrian [1] 347/21
Penal [2] 303/6
Penal Code [1] 303/6
pencils [1] 240/25
pens [1] 240/24
people [24] 236/18
 274/17 281/7 283/15
 287/18 288/10 288/23
 289/4 289/7 289/25
 290/6 300/8 303/5
 317/21 324/23 329/7
 329/14 332/13 337/9
 345/5 345/5 350/15
 350/16 359/23
people's [3] 237/13
 289/19 291/8
pepper [9] 242/8
 242/12 242/18 242/23
 243/1 294/3 312/4
 318/3 318/4
per [1] 270/4
perceive [1] 342/3
perceived [3] 343/20
 344/19 350/22
percent [2] 258/14
 345/5
Perfect [3] 240/10
 240/25 369/22
perform [1] 321/25
period [3] 259/6 259/8
 259/13
perishable [2] 283/19
 283/22
permission [3] 264/16
 268/5 297/15
permitted [2] 292/21
 300/1
person [61] 242/5
 243/14 253/12 255/19
 284/21 285/3 285/7
 285/15 286/25 287/3
 287/9 288/22 289/14
 289/23 290/15 290/16
 291/17 292/12 293/11
 293/12 293/15 293/17
 293/22 295/15 295/24
 296/4 296/6 297/7
 298/14 298/18 300/3

301/5 302/19 304/8
 306/3 310/17 314/23
 316/8 318/21 320/2
 321/13 324/8 324/9
 325/2 333/25 334/20
 336/12 336/16 336/18
 336/23 341/15 341/20
 345/19 345/25 346/1
 346/4 350/18 351/7
 362/21 362/25 364/4
person's [3] 290/19
 310/18 313/12
personally [2] 248/7
 344/20
personnel [1] 329/18
persons [2] 328/20
 330/21
pertained [1] 338/19
phase [2] 369/14
 369/16
photograph [4] 250/4
 250/19 250/22 252/13
photographs [2]
 251/19 305/20
photos [6] 272/2
 282/23 283/1 307/18
 323/8 323/12
phrase [1] 344/4
phrased [1] 330/13
physical [3] 295/25
 302/23 306/8
pick [1] 300/7
PICKETT [55] 232/7
 233/7 235/16 243/19
 243/22 244/2 244/21
 245/4 245/8 245/10
 245/15 246/5 246/6
 246/15 246/22 264/13
 284/9 285/25 286/3
 286/6 286/13 291/7
 292/16 292/18 292/24
 293/3 295/10 298/9
 300/5 300/12 302/1
 304/15 308/11 322/14
 330/5 330/8 330/12
 330/17 330/24 331/20
 335/6 335/21 336/6
 336/24 336/25 341/1
 341/10 345/18 347/19
 348/21 355/8 356/14
 356/24 361/13 363/9
Pickett's [4] 254/21
 306/10 321/17 340/20
PICKETT,I [1] 232/5
picture [6] 246/12
 254/6 254/7 254/13
 276/19 306/23
pictures [4] 249/12
 252/4 252/5 306/18
piece [2] 239/12
 365/13
Pigget [5] 331/21
 348/21 355/22 355/24
 356/2
pistol [2] 309/4
 318/19
place [1] 310/25
plainclothes [2] 280/4

28/73495

plaintiff [4] 233/2
 233/7 277/24 353/17
plaintiffs [2] 232/8
 337/18
plaintiffs' [21] 234/4
 353/18 353/23 353/25
 354/16 355/1 355/25
 356/12 357/5 357/19
 359/6 359/10 359/22
 360/2 360/9 362/4
 364/8 364/9 366/3
 366/21 372/1
Plaintiffs' 3 [1] 357/5
Plaintiffs' Exhibit 1 [1]
 353/23
Plaintiffs' Exhibit 3 [6]
 353/18 353/25 355/1
 357/19 359/22 360/9
Plaintiffs' Exhibit
 Number 3 [1] 354/16
plastic [1] 309/5
Platoon [1] 281/5
plausible [1] 331/12
play [16] 238/23 262/3
 262/5 262/9 262/10
 262/18 262/19 263/9
 263/13 263/25 264/2
 264/17 268/6 275/10
 294/10 297/17
played [14] 263/7
 263/14 263/20 263/21
 267/18 297/25 299/16
 299/23 300/14 301/9
 301/14 305/7 308/3
 311/2
playing [3] 261/24
 261/25 298/23
please [27] 235/9
 240/12 249/16 263/8
 263/13 266/5 268/24
 271/13 272/4 277/25
 278/10 278/11 298/22
 299/15 299/22 300/13
 325/20 326/3 326/17
 327/13 353/23 356/4
 367/1 368/10 368/20
 368/22 369/23
pocket [1] 293/7
pockets [4] 299/3
 339/6 340/19 341/7
point [6] 246/8
 254/12 259/25 261/1
 271/3 275/19 275/23
 276/7 276/11 277/7
 282/11 284/18 285/13
 292/16 292/20 295/11
 295/18 295/19 298/6
 299/7 299/19 300/25
 300/2 300/16 300/25
 301/1 301/4 301/5
 301/17 301/11 301/20
 301/21 302/13 302/22
 303/1 304/17 308/5
 308/15 314/22 322/22
 329/11 349/3 350/24
 351/25 353/5 354/24
 355/16 357/9 358/25

359/17 359/18 361/12
 362/15 362/17 363/24
 366/3
pointed [2] 316/22
 325/9
pointing [4] 254/20
 256/8 275/19 275/25
points [2] 252/23
police [26] 243/4
 243/10 247/16 247/19
 279/5 279/16 281/2
 281/6 281/7 282/6
 282/10 283/10 286/13
 287/7 287/8 287/8
 298/14 298/18 311/18
 317/6 334/18 338/14
 338/15 344/7 358/3
 371/17
police-related [1]
 282/10
policies [3] 284/1
 284/2 313/3
policy [2] 313/1 313/1
polite [1] 322/25
pony [1] 276/5
poorly [1] 279/5
population [2] 287/22
 289/5
portion [3] 270/1
 294/12 298/2
portions [2] 238/24
 297/18
position [4] 294/17
 294/18 307/10 308/7
positive [2] 255/4
 258/14
possibility [1] 373/11
possible [6] 240/22
 265/13 273/8 305/5
 321/24 331/12
possibly [4] 252/21
 289/14 291/17 341/10
POST [23] 249/4
 255/7 283/9 283/11
 283/11 283/13 284/2
 284/16 292/21 295/20
 296/21 298/13 298/17
 298/20 300/19 302/18
 311/7 311/10 312/20
 314/12 319/22 341/13
 363/2
POST-certified [2]
 283/11 319/22
posttraumatic [1]
 288/3
potential [1] 285/8
potentially [7] 248/19
 300/11 336/17 350/18
 360/21 371/19 372/19
pounds [1] 276/20
practices [2] 284/4
 371/17
precautions [1] 304/2
predicated [1] 313/9
preliminarily [1]
 335/10
prepare [2] 270/7
 327/21

prepared [2] 269/20
 337/18
prescribed [1] 292/4
prescription [2]
 289/2 292/8
presence [10] 235/5
 240/13 262/12 268/21
 269/8 271/21 326/5
 326/15 368/4 368/19
presented [1] 370/19
Presently [1] 281/23
press [2] 242/5
 254/17
pressed [2] 254/20
 259/21
pressing [1] 255/1
pressure [1] 322/2
presumably [1]
 237/25
presume [1] 330/17
presumed [1] 331/6
pretrial [2] 239/23
 240/7
pretty [4] 238/13
 288/25 294/16 361/21
prevent [1] 248/23
Prevention [1] 329/6
preview [1] 370/2
previously [2] 241/5
 289/2
primarily [2] 282/8
 328/22
prior [16] 240/5
 241/12 243/20 295/9
 300/21 300/22 315/3
 318/25 320/13 340/25
 360/6 361/20 362/11
 363/14 371/22 371/24
probability [1] 291/18
probable [2] 285/13
 295/5
probably [4] 240/20
 306/1 324/13 345/24
probes [2] 310/15
 310/16
problem [7] 288/3
 360/10 360/11 364/10
 367/15 367/16 367/17
problems [2] 279/23
 332/9
proceed [2] 272/14
 278/14
proceedings [10]
 232/15 261/16 268/11
 333/9 352/7 353/15
 361/17 367/2 373/23
 374/6
process [6] 330/20
 336/21 337/12 343/11
 352/15 352/21
professional [3]
 322/25 350/12 351/1
professionals [4]
 370/13 370/19 371/10
 371/11
proffer [3] 370/16
 372/1 373/1
progress [2] 239/10

**P**

progress... [1] 304/8
promoted [5] 280/2
280/13 280/17 281/4
281/11
promotion [2] 280/6
280/14
promptly [1] 368/9
prone [1] 307/10
pronounce [3] 237/12
335/23 335/24
proof [1] 236/21
properly [1] 244/19
proposed [1] 239/11
proposition [2]
287/23 287/23
Proposition 47 [1]
287/23
prostitution [1] 280/6
protect [3] 273/14
321/11 346/2
provide [4] 284/2
331/13 356/20 362/12
provided [2] 303/11
353/17
providing [1] 332/13
proximity [2] 258/22
320/6
psychiatry [1] 328/19
psychology [2]
328/20 328/21
psychotropic [5]
287/25 337/4 342/10
342/15 343/8
public [4] 280/22
289/3 289/4 328/17
publish [1] 244/11
pull [5] 255/18 255/21
256/3 256/5 373/21
pulled [3] 257/9
257/12 257/14
pulling [4] 256/1
264/25 296/8 313/22
punch [1] 272/24
punched [11] 251/17
273/10 273/11 274/3
305/17 305/24 306/7
306/13 306/15 307/22
325/8
punches [12] 251/1
273/2 273/5 274/2
274/6 274/7 296/12
296/20 296/25 306/16
307/16 307/25
punching [5] 251/13
252/8 272/21 308/10
318/10
pupils [16] 290/20
291/8 291/10 291/23
292/2 332/23 333/1
333/4 333/16 333/18
335/1 335/8 335/9
337/15 340/21 343/13
purpose [2] 247/25
371/23
purposes [1] 262/20
pursuant [2] 296/21
374/3

pursuit [1] 293/14
pursuits [1] 283/20
push [3] 240/20
243/17 325/12
pushed [2] 257/2
276/5
pushing [2] 276/6
277/2
putting [5] 255/15
255/25 340/18 341/7
369/12

**Q**

qualified [2] 329/10
365/24
quality [2] 272/25
273/7
quarter [1] 373/16
quarters [1] 319/11
query [1] 334/12
question [42] 258/20
262/4 266/4 267/7
291/24 295/9 312/14
315/3 320/18 333/15
336/1 336/14 338/17
338/19 338/20 338/24
339/13 339/17 342/20
342/23 345/12 346/16
347/2 352/16 352/19
352/20 352/22 353/2
356/2 356/19 356/20
357/25 358/17 358/20
360/18 361/4 361/22
365/4 365/14 366/1
366/2 367/9
question-and-answer
[1] 295/9
questioned [2] 359/5
362/19
questioning [4] 271/8
294/21 298/12 349/2
questions [32] 264/20
265/22 284/21 284/23
294/10 315/6 318/14
325/5 325/17 336/22
336/23 336/25 337/2
337/13 337/19 337/21
337/24 338/16 338/18
341/12 341/18 341/24
342/2 342/5 342/6
342/8 342/18 342/21
344/12 349/22 359/18
361/20
quick [1] 275/9
quickly [1] 361/21
quite [1] 325/13

**R**

radio [10] 243/10
247/16 247/19 247/25
248/8 289/18 293/15
304/19 347/18 358/10
radiologist [1] 370/25
raise [2] 235/23
269/16
Rampart [2] 280/4
281/1
ran [7] 252/22 253/15

287/8 308/16 308/17
322/14 324/19
Rancho [7] 237/22
244/17 247/3 327/2
327/7 327/17 348/3
ranged [1] 284/3
rank [1] 324/6
rather [1] 343/10
RCB [1] 243/7
reach [2] 238/13
239/1
reaching [3] 255/16
257/16 321/4
reactions [1] 325/4
read [7] 270/8 270/18
320/20 354/4 357/20
361/7 372/12
reading [1] 339/18
ready [4] 266/1
266/21 326/9 369/19
real [2] 263/20 275/9
realize [2] 259/2
259/19
realized [1] 279/5
really [6] 240/4
295/12 319/12 319/13
345/21 371/13
reason [14] 237/8
258/11 259/17 273/6
273/8 301/22 308/11
322/19 335/19 342/18
346/23 362/20 362/23
363/16
reasonable [47]
253/11 284/9 284/12
284/21 285/1 285/1
285/2 285/12 285/18
285/25 286/8 286/12
286/25 291/4 291/7
293/20 294/6 295/6
295/8 295/14 296/4
297/11 298/5 299/10
300/2 300/9 301/5
302/11 302/14 313/18
313/20 314/2 314/6
315/20 316/6 316/8
322/16 323/7 341/9
341/20 343/16 343/18
343/25 352/3 360/22
362/25 363/16
reasonableness [1]
306/2
reasonably [8] 285/14
292/12 294/22 304/17
317/19 345/9 345/12
365/10
reasons [4] 285/22
309/25 322/9 335/18
recall [3] 241/18
241/21 242/3 251/1
258/5 258/10 258/13
260/19 260/22 261/6
277/16 328/6 328/9
328/10 332/22 333/6
333/14 333/22 334/4
350/1 351/14 359/18
359/21 360/14 360/16
360/17 361/10 361/14

361/19 362/2 362/3
366/13 366/19
received [2] 239/12
250/25
recently [1] 343/3
recess [14] 268/18
268/19 268/24 269/4
269/9 269/13 269/14
325/19 325/25 326/13
326/14 367/13 367/25
368/7
recited [2] 331/24
341/5
recognition [4]
290/22 291/15 329/10
335/11
recognize [2] 244/14
288/25 289/1
recognized [1] 300/10
recognizing [1]
287/16
recollection [2] 256/6
261/9
record [4] 238/12
270/8 272/3 278/11
record's [1] 236/9
recorded [3] 243/23
244/3 372/22
recording [33] 237/20
237/21 238/8 243/12
243/14 246/23 260/5
260/17 260/20 260/22
260/25 261/1 261/4
261/10 261/24 262/2
262/6 262/16 262/18
263/16 263/19 263/25
267/20 267/23 286/3
297/16 320/8 320/9
320/10 320/23 331/5
331/18 366/13
recordings [1] 315/1
records [4] 334/7
339/9 340/24 350/1
recruits [1] 280/10
red [1] 293/16
reduce [2] 289/17
289/18
reducing [1] 290/3
reference [5] 236/3
236/12 237/7 239/7
333/15
referenced [1] 359/5
referred [1] 262/21
referring [2] 237/10
363/2
reflects [1] 363/21
refresh [2] 261/9
372/21
refuse [1] 284/23
refused [1] 303/17
regard [2] 237/6
258/12
regarding [6] 237/18
247/10 248/18 255/6
260/14 327/23
regardless [2] 283/18
309/21
regards [1] 314/17

regular [1] 288/12
regulations [1] 374/8
relate [3] 311/8
311/10 312/21
related [2] 282/10
288/8 328/11 329/16
338/9 358/13
relates [7] 270/8
285/18 329/3 335/8
369/13 370/16 373/1
relative [1] 342/6
relatively [1] 340/16
release [1] 287/24
relevance [1] 365/20
remember [5] 239/23
240/6 333/16 339/18
367/5
remind [1] 241/2
removing [1] 323/2
repeated [1] 236/7
rephrase [2] 266/4
336/3
reported [1] 374/5
REPORTER [1]
232/23
REPORTER'S [1]
232/15
reports [1] 327/23
request [7] 270/6
293/6 295/1 301/23
303/20 304/6 304/7
requested [1] 282/5
required [1] 283/22
research [4] 269/3
325/23 327/3 368/14
reserve [3] 279/10
279/10 371/14
resided [1] 324/2
resistance [3] 295/21
295/25 296/19
resisting [1] 303/7
resistive [1] 296/5
resort [5] 312/23
312/23 313/8 314/14
318/7
respect [13] 236/12
237/3 237/12 239/9
239/20 311/23 321/2
330/12 331/1 333/24
339/14 344/20 372/18
respectful [2] 300/23
324/19
respective [2] 240/24
284/3
respond [2] 296/13
301/24
responded [4] 259/24
348/16 360/18 364/23
responding [4] 354/6
357/25 358/20 370/9
responds [1] 355/6
response [10] 333/14
333/17 338/3 338/15
338/17 354/2 354/13
361/20 361/22 366/4
Responses [1] 344/12
responsive [1] 336/2
rest [1] 369/15

**R**

**restrict** [1] 305/3
**restricted** [1] 286/23
**restroom** [1] 332/8
**result** [2] 288/19
295/13
**resume** [6] 240/12
241/1 269/11 367/25
368/9 371/6
**RESUMED** [2] 234/6
241/8
**retained** [1] 238/4
**retention** [10] 248/11
248/18 248/23 255/6
255/7 312/16 318/15
318/16 319/5 319/20
**retirement** [1] 282/7
**reverence** [3] 313/9
313/12 318/6
**revert** [1] 248/22
**review** [9] 284/5 291/6
299/11 316/24 320/4
327/23 327/25 328/2
333/11
**reviewed** [19] 237/13
237/24 282/14 316/10
316/10 317/3 320/8
323/14 323/16 324/7
327/21 332/18 332/19
334/6 334/7 337/18
339/9 339/21 350/1
**reviewing** [5] 285/23
299/2 305/15 321/16
340/24
**ride** [6] 303/25 304/1
345/22 346/15 346/18
347/5
**ride-along** [5] 304/1
345/22 346/15 346/18
347/5
**ride-alongs** [1] 303/25
**riding** [1] 346/24
**right** [96] 237/14
238/16 239/3 239/18
240/24 240/25 244/9
246/11 248/25 250/18
252/2 253/12 254/1
260/24 261/15 261/20
262/8 262/17 262/22
265/19 265/24 266/6
266/12 268/7 268/10
268/18 269/9 269/11
269/15 269/23 270/6
270/19 271/23 273/20
273/22 275/12 277/2
277/11 277/17 284/23
291/10 297/20 299/19
300/19 301/25 305/15
308/18 312/7 313/24
318/11 319/15 319/15
320/24 322/14 324/19
324/23 325/18 325/25
326/7 326/17 337/10
339/3 341/1 347/22
347/23 348/17 351/7
352/4 354/7 354/22
354/22 357/2 359/13
359/14 360/1 360/7

360/12 364/14 364/15
364/20 365/5 365/16
366/2 366/4 367/13
367/23 368/3 368/16
368/23 369/5 369/17
369/22 370/12 372/19
373/10 373/15
**right-hand** [1] 319/15
**Rios** [10] 259/24
260/16 261/1 262/25
263/10 264/6 264/12
267/22 371/19 372/16
**Rios or** [1] 264/12
**rise** [6] 269/6 269/13
326/2 326/13 368/17
373/22
**Ritalin** [6] 290/13
292/1 292/4 335/7
342/16 342/16
**Riverside** [1] 279/12
**robberies** [1] 280/1
**ROBERT** [3] 233/8
233/9 235/15
**Robert Conaway** [1]
235/15
**room** [9] 232/24
271/18 277/22 286/15
291/10 298/10 304/24
304/24 305/1
**Room No** [1] 305/1
**Room No. 45** [3]
286/15 304/24 304/24
**round** [2] 258/15
258/16
**rule** [2] 261/22 262/1
**rules** [2] 311/15
312/25
**run** [13] 253/13
284/25 293/11 293/11
293/25 301/4 308/18
314/24 351/7 351/9
351/23 363/15 369/6
**running** [10] 253/6
253/21 266/22 292/18
293/17 295/10 296/6
296/8 308/14 322/15
**runs** [4] 293/10
293/23 295/13 363/15

**S**

**safety** [1] 350/20
**sales** [1] 344/23
**same** [15] 240/1
270/11 290/10 292/1
313/3 320/1 320/22
342/23 343/23 348/23
350/20 354/9 357/4
357/4 372/17
**SAN** [5] 232/10 235/7
235/19 279/2 313/2
**San Bernardino** [1]
235/19
**San Francisco** [1]
279/2
**save** [1] 340/10
**Savory** [1] 370/14
**saying** [19] 246/1
246/14 248/4 252/11

254/24 256/22 257/2
257/8 257/12 257/25
262/25 266/24 267/4
273/5 273/20 274/1
298/17 343/13 354/13
**says Pickett** [1]
356/14
**scenario** [2] 336/15
351/11
**scene** [6] 259/25
260/17 264/13 282/23
283/1 326/24
**scheduled** [1] 281/24
**scheduling** [1] 367/4
**schizophrenia** [1]
341/15
**schizophrenic** [3]
290/8 336/8 342/11
**scones** [1] 240/16
**scope** [4] 284/13
285/11 303/8 306/12
**Scott** [3] 277/24 278/2
278/12
**screaming** [2] 357/14
359/1
**screen** [7] 237/24
244/20 245/2 245/23
247/2 299/19 323/5
**screens** [2] 269/21
299/18
**search** [1] 280/20
**seated** [4] 278/10
308/6 326/3 368/20
**second** [3] 236/7
252/3 254/19 256/4
257/4 258/4 258/6
258/9 258/15 270/4
272/16 273/21 311/4
**Secondly** [2] 263/20
286/23
**seconds** [3] 245/15
256/20 274/13
**section** [2] 255/7
374/3
**security** [1] 282/9
**see** [51] 238/11
244/17 246/15 247/2
251/13 254/12 256/19
257/23 262/24 263/6
263/10 265/12 270/3
271/9 272/20 272/23
273/2 273/6 273/24
274/7 274/23 284/11
285/5 288/23 288/24
290/19 291/8 292/17
295/15 299/20 300/16
301/25 305/6 305/10
307/24 323/12 333/16
338/6 340/2 340/5
349/11 351/17 351/18
354/2 354/9 354/16
354/18 354/25 359/23
368/15 368/22
**seeing** [1] 252/13
**seeking** [1] 238/17
**seem** [1] 350/10
**seemed** [1] 339/8
**seems** [2] 255/25

254/4 256/6
276/19
**seen** [12] 251/4 251/6
251/19 268/2 269/22
282/23 283/4 287/12
305/20 307/18 309/4
340/6
**sees** [1] 289/13
**semi** [1] 254/15
**semi-automatic** [1]
254/15
**send** [2] 238/10
304/20
**sense** [4] 238/4
255/16 323/23 369/5
**senses** [1] 342/3
**separation** [1] 236/6
**sergeant** [5] 280/17
280/18 281/4 281/13
303/24
**series** [3] 290/24
291/16 319/21
**serious** [1] 311/14
**seriously** [1] 321/22
**served** [1] 236/18
**service** [6] 278/25
280/14 285/7 293/5
303/11 338/11
**session** [1] 295/9
**set** [10] 246/12 285/19
286/10 294/7 295/17
296/13 297/11 343/23
345/10 367/11
**seven** [5] 295/8
309/13 309/16 310/9
340/14
**seven feet** [2] 309/16
310/9
**seven-minute** [1]
295/8
**several** [2] 334/8
337/21
**shall** [2] 278/6 278/7
**sheriff** [1] 344/6
**Sheriff's** [2] 279/13
313/2
**Sheriff's Department**
[1] 279/13
**sheriffs** [1] 358/3
**shift** [1] 279/7
**shirt** [1] 351/12
**shock** [1] 242/6
**shoes** [1] 293/17
**shoot** [12] 248/15
256/7 256/17 296/25
297/4 297/8 311/17
314/18 314/20 314/21
314/23 315/3
**shooting** [7] 258/25
314/14 315/20 315/24
316/11 316/21 326/25
**shootings** [1] 323/17
**short** [2] 259/8 259/13
**shot** [25] 254/17
254/19 254/23 255/2
257/4 257/6 257/10
257/10 258/4 258/6
258/9 259/3 259/6
259/19 273/21 275/14

277/8 317/4 321/22
322/23 324/10 324/21
324/22 325/4 325/13
**shots** [3] 259/11
277/4 311/4
**shoulder** [1] 276/16
**show** [7] 245/3 245/23
246/10 249/12 250/7
275/9 369/6
**showed** [1] 252/13
**showing** [5] 245/7
250/12 250/19 275/23
343/20
**shown** [2] 244/14
265/16
**shows** [1] 363/21
**sick** [1] 292/9
**side** [9] 238/3 255/21
256/5 263/22 271/15
271/19 277/1 277/1
325/10
**sidebar** [3] 261/16
268/11 367/2
**sides** [2] 238/6 239/2
**sidewalk** [1] 296/1
**sight** [1] 245/15
**significant** [4] 305/9
307/12 319/5 328/25
**signs** [7] 286/25
289/13 334/17 338/7
341/5 341/16 343/20
**similar** [2] 334/18
341/16
**simple** [1] 291/24
**simplex** [1] 358/10
**simply** [3] 286/15
304/19 324/3
**since** [2] 255/25 282/6
**SINCICH** [2] 233/4
235/12 265/5 305/5
**single** [1] 319/1
**single-snap** [1] 319/1
**sir** [26] 235/17 252/11
252/19 253/15 256/24
257/2 257/20 258/7
258/18 259/21 260/20
260/25 273/12 274/1
276/13 277/15 278/1
282/4 300/23 322/25
330/15 332/4 332/17
334/24 346/23 369/10
**sit** [1] 271/14
**sitting** [1] 291/10
**situation** [7] 281/21
288/18 289/16 298/18
300/11 329/25 343/17
**situational** [1] 275/4
**situations** [4] 284/6
313/11 317/19 329/16
373/20
**six** [3] 345/4 349/16
373/20
**six-square-mile** [1]
345/4
**skills** [4] 283/19
283/23 288/13 317/23
**skip** [2] 274/1 274/4
**skips** [3] 272/25
273/25 274/5

**S**

**slide [2]** 256/22
256/24
**slip [1]** 236/23
**slow [4]** 238/10
238/18 270/1 270/4
**slowed [2]** 239/13
270/9
**slowed-down [1]**
239/13
**smelling [1]** 342/4
**smuggling [1]** 279/3
**snap [2]** 319/1 319/2
**software [1]** 270/23
**solemnly [1]** 278/5
**solving [1]** 279/24
**somebody [1]** 341/3
**somehow [2]** 285/3
289/11
**someone [71]** 247/17
247/20 248/3 248/5
248/9 248/15 253/11
255/16 257/15 257/16
281/9 285/6 285/10
286/10 287/16 288/16
288/20 289/10 289/16
290/7 290/8 290/10
290/18 290/25 291/1
291/22 292/3 293/9
293/14 295/2 295/11
296/25 301/22 303/7
303/21 306/7 306/13
307/3 307/9 309/12
311/18 311/24 312/6
313/5 313/22 313/24
314/10 316/8 316/21
317/10 318/17 318/20
319/11 319/19 319/24
320/2 321/3 321/4
321/9 321/21 329/22
334/24 334/25 335/14
336/15 345/7 345/9
346/24 347/25 363/5
363/14
**someone's [5]** 249/8
286/19 318/1 319/17
343/13
**something [26]**
245/16 246/20 247/11
247/12 270/7 270/17
289/22 290/11 291/19
293/13 295/22 301/22
304/25 310/2 320/19
321/6 337/15 338/21
342/16 346/6 346/12
347/12 348/9 351/13
356/23 358/16
**sometime [1]** 288/8
**Sometimes [2]** 303/25
303/25
**somewhat [1]** 294/17
**somewhere [1]** 301/3
**soon [3]** 239/1 262/5
321/24
**sorry [5]** 258/20 266/4
327/10 353/4 364/8
**sound [1]** 339/10
**sounded [1]** 311/4

**sounds [3]** 271/10
367/7 371/13
**source [1]** 240/17
**South [1]** 279/18
**South Central [1]**
279/18
**speak [1]** 358/11
**speakers [1]** 264/24
**speaking [2]** 340/16
358/9
**special [5]** 278/24
279/23 281/12 311/15
312/25
**specific [8]** 283/14
284/1 318/15 337/24
338/20 356/18 356/19
365/14
**specifically [6]** 261/7
289/1 320/18 333/18
337/2 365/17
**specifics [1]** 285/21
**sped [1]** 270/9
**speech [1]** 373/20
**spell [15]** 278/11
302/4 302/6 302/7
331/2 331/8 331/11
331/25 332/2 352/17
352/18 355/9 355/14
356/4 356/11
**spelled [5]** 302/8
331/10 355/16 355/21
357/6
**spelling [7]** 332/10
352/9 352/22 352/25
353/7 356/1 357/1
**spells [1]** 355/11
**split [2]** 256/4 310/14
**spoke [1]** 287/20
**spray [13]** 242/8
242/12 242/23 243/1
294/3 312/2 312/2
312/4 312/6 312/9
312/10 318/3 318/4
**sprayed [1]** 242/18
**spraying [1]** 312/4
**spread [3]** 309/14
309/15 309/17
**springs [1]** 267/16
**square [3]** 281/6
281/14 345/4
**stabbed [1]** 324/10
**Stadium [1]** 279/21
**stage [1]** 336/22
**stairs [2]** 294/16
295/16
**stand [2]** 237/19
327/12
**standard [3]** 236/21
236/25 248/25
**standards [13]** 249/4
283/9 283/12 292/22
296/21 298/13 298/17
300/19 302/18 311/7
311/10 312/20 314/13
**standing [2]** 275/17
307/7
**stands [1]** 283/11
**start [3]** 244/20

308/9 348/22 352/12
**started [2]** 253/21
308/14
**starting [1]** 300/16
**starts [1]** 304/15
**state [8]** 235/9 249/15
278/11 280/22 281/23
283/10 287/23 328/15
**State Department [1]**
281/23
**stated [9]** 320/5
320/10 320/11 331/9
331/9 334/8 334/15
355/17 362/3
**statement [11]** 236/1
236/21 263/16 267/25
268/1 282/16 286/7
305/16 333/15 372/22
372/23
**statements [2]** 371/23
371/24
**states [8]** 232/1
278/25 306/7 320/20
354/5 355/24 374/4
374/8
**station [2]** 274/9
274/17
**statistics [1]** 327/20
**status [1]** 279/10
**stay [1]** 287/5
**staying [3]** 286/15
304/23 362/8
**stenographically [1]**
374/5
**step [6]** 235/9 277/15
278/1 326/6 343/11
368/21
**steps [3]** 275/21
290/24 292/18
**stills [2]** 270/21 271/4
**stimulant [5]** 290/12
290/18 291/22 338/8
341/17
**stip [1]** 270/13
**stipulation [8]** 238/5
238/12 238/14 239/1
239/10 239/11 239/16
270/5
**stone [1]** 367/11
**stop [15]** 263/8
264/19 294/1 297/7
297/7 297/18 304/4
335/19 345/20 347/21
359/24 362/20 362/23
362/23 363/7
**stopped [9]** 244/24
245/4 286/5 298/11
324/20 354/20 359/11
360/11 364/11
**stopping [4]** 304/12
315/2 347/25 363/5
**stops [1]** 313/21
**strategies [1]** 288/18
**street [9]** 232/24
245/5 245/8 245/12
246/4 280/15 280/15
327/7 334/24
**stress [1]** 288/3

**strike [4]** 248/10
274/22 315/9 315/12
**strikes [1]** 312/12
**striking [3]** 251/15
296/7 307/3
**stripe [1]** 280/12
**strongly [1]** 323/20
**struck [4]** 307/10
323/10 324/25 325/7
**struggle [2]** 297/6
321/3
**struggling [1]** 297/8
**stuck [1]** 304/1
**studies [1]** 328/19
**study [1]** 328/19
**stuff [1]** 339/14
**stun [3]** 241/13
241/16 242/5
**subject [18]** 239/17
269/3 277/16 281/15
283/20 292/13 325/24
329/19 334/1 334/12
334/16 336/4 340/17
342/2 344/16 351/12
351/22 368/14
**subjective [2]** 313/15
315/23
**subjects [2]** 330/20
342/2
**submitted [3]** 269/1
325/21 368/12
**substance [4]** 286/14
291/2 292/14 300/6
**substances [2]** 292/8
337/5
**successful [1]** 288/19
**SUCCESSOR [1]**
232/6
**such [20]** 237/4 280/1
280/20 281/10 283/16
283/20 286/20 289/24
290/9 294/3 294/5
299/9 300/11 307/14
307/14 312/13 318/10
339/13 341/14 341/17
**suffered [1]** 370/22
**suicidal [2]** 329/8
329/8
**Suicide [1]** 329/6
**SUITE [2]** 233/5
233/14
**summary [2]** 322/4
322/9
**summon [3]** 295/14
321/23 338/15
**summoned [1]** 308/16
**supervised [1]** 329/5
**supervising [1]** 282/3
**supervision [1]**
328/24
**supervisor [1]** 316/16
**supposed [3]** 249/5
275/5 289/13
**sure [17]** 236/10
245/24 255/11 259/23
265/10 265/11 270/11
279/17 337/20 339/13
342/22 355/15 364/17

365/22 369/9 369/24
372/9
**suspect [1]** 337/25
**suspicion [19]** 253/11
284/12 285/1 285/1
285/18 286/8 286/12
291/5 291/7 293/20
295/6 295/8 298/5
302/11 302/15 322/16
341/8 352/3 363/16
**sustained [2]** 264/1
267/2
**SWAT [3]** 281/14
316/14 316/16
**SWAT's [1]** 328/23
**swear [1]** 278/5
**sweatshirt [1]** 310/1
**sworn [3]** 241/5 278/3
279/8
**symptomatologies [2]**
334/18 336/12
**symptoms [2]** 336/12
341/15
**sync [4]** 349/6 349/7
351/16 359/19
**synched [1]** 348/13
**synchronization [3]**
238/20 269/20 271/4
**synchronized [2]**
238/25 239/2
**syncing [1]** 238/9
**syncs [1]** 297/15
**system [4]** 253/4
290/11 302/1 319/25
**systems [1]** 317/23

**T**

**tackling [1]** 294/2
**tactical [2]** 290/4
318/1
**tactics [2]** 281/12
281/20
**take [39]** 239/13
240/20 249/9 255/6
268/16 268/18 268/19
268/24 269/4 269/9
274/20 282/11 290/1
290/2 293/7 299/2
302/10 304/2 307/7
313/13 316/10 318/19
319/6 319/11 319/19
322/5 323/5 323/6
324/8 324/9 325/9
325/15 325/18 325/25
326/7 329/6 342/15
342/16 346/15
**taken [15]** 249/13
250/4 250/19 250/21
250/22 269/14 289/21
306/19 323/12 325/8
326/14 335/4 337/3
338/2 342/9
**takes [1]** 271/15
**taking [8]** 291/25
292/7 292/8 321/3
330/2 337/13 342/12
343/7
**talk [24]** 255/14 269/1

**T**

**talk... [22]** 269/2
285/10 293/22 298/7
298/19 303/18 311/7
325/21 325/22 332/3
332/5 348/16 350/25
354/6 354/13 354/20
359/11 359/24 360/11
364/11 368/12 368/13

**talked [13]** 236/15
236/20 242/4 248/13
253/12 258/25 261/22
300/7 344/3 344/18
344/19 344/22 363/14

**talking [20]** 237/4
238/1 241/18 266/2
266/8 266/19 267/9
288/22 293/1 299/1
307/13 337/1 338/16
351/18 363/20 363/20
363/21 363/25 363/25
372/1

**talks [1]** 311/10

**tase [5]** 295/19 305/12
309/2 309/12 315/4

**tased [3]** 242/14
322/19 324/21

**Taser [21]** 241/13
241/15 241/24 242/2
242/23 275/19 294/4
294/4 295/18 295/20
309/3 309/7 309/9
309/13 309/15 309/18
310/19 310/19 310/20
312/12 317/25

**tasing [2]** 293/2
322/20

**task [2]** 279/1 281/1

**tasked [2]** 281/18
290/2

**taught [16]** 275/4
284/15 288/12 288/13
288/14 288/14 288/17
290/6 290/12 290/14
291/16 295/4 307/2
319/19 319/21 337/12

**teach [4]** 255/17
281/23 281/25 298/17

**teaches [1]** 295/20

**teachings [1]** 312/20

**team [4]** 281/16
328/23 329/23 329/24

**technical [2]** 270/24
310/15

**techniques [5]** 288/14
288/15 312/16 319/20
321/25

**technology [1]** 265/10

**telling [8]** 256/16
259/12 301/4 315/2
315/4 342/3 345/18
362/1

**tells [3]** 302/23 361/2
361/4

**ten [7]** 271/7 291/14
309/13 325/19 325/25
326/7 349/15

**ten feet [1]** 309/13

**ten millimeters [1]**
291/14

**ten-minute [2]** 325/19
325/25

**tensing [1]** 296/6

**tentative [1]** 270/13

**term [1]** 349/19

**terminology [1]** 270/3

**terms [3]** 284/15
323/19 324/6

**terrorist [1]** 281/19

**testified [13]** 241/6
278/4 323/10 326/24
327/6 332/18 332/22
333/6 336/5 336/7
339/3 351/6 366/7

**testify [7]** 238/15
328/3 332/25 333/3
362/19 370/21 370/25

**testifying [1]** 333/14

**testimony [43]** 240/5
240/21 251/2 258/3
259/17 269/11 273/21
274/22 275/1 277/7
278/6 298/25 315/10
315/12 316/17 320/4
320/13 328/6 331/3
331/4 332/20 333/12
333/24 334/4 338/25
339/2 339/10 339/14
339/18 340/22 341/18
343/18 343/24 350/13
351/14 360/6 362/2
362/11 363/14 366/6
370/17 373/2 373/3

**thank [34]** 239/5
241/7 249/11 249/23
268/20 269/4 269/12
270/12 271/20 271/25
272/13 277/10 277/14
277/18 278/10 278/15
282/1 297/24 298/21
325/16 326/1 326/12
326/19 347/7 347/9
347/16 353/3 357/17
358/21 359/9 368/16
369/2 373/19 373/21

**that I [1]** 325/7

**the long [1]** 332/19

**theater [1]** 329/13

**them [38]** 236/15
236/20 238/6 248/16
263/24 271/16 274/8
285/17 287/6 287/6
289/20 289/21 291/24
292/6 294/1 294/2
297/1 297/3 297/4
297/8 298/15 298/19
300/3 307/11 317/21
334/21 335/1 335/24
336/21 340/9 340/9
341/4 346/2 347/5
351/10 351/24 351/24
359/24

**themselves [4]**
318/12 324/24 324/25
329/19

**there's [39]** 283/22

285/3 285/17 288/2
288/11 289/3 290/24
291/3 291/16 291/18
292/10 296/25 297/6
301/21 303/5 303/15
304/18 306/24 307/5
309/6 312/4 314/9
318/5 318/6 318/22
319/8 319/21 325/5
325/5 328/11 331/14
335/14 335/17 337/9
345/4 352/13 359/1
360/10 364/10

**they should [1]**
362/25

**thing [12]** 262/10
306/8 318/18 319/10
320/8 321/4 321/8
321/12 323/4 336/21
367/20 372/2

**things [23]** 257/16
263/19 280/1 280/20
281/10 283/16 290/19
291/3 291/16 291/20
292/10 298/25 299/8
304/5 306/24 307/14
311/25 312/17 314/7
315/7 337/9 338/14
343/9

**think [59]** 236/14
236/16 236/22 236/24
242/4 244/19 245/14
245/18 248/6 248/13
248/14 251/16 251/16
252/24 253/11 254/10
254/24 259/21 261/9
263/8 264/11 265/7
266/2 266/8 269/21
271/6 273/8 275/10
281/2 289/9 297/15
298/14 300/2 300/9
302/5 303/21 304/16
305/13 325/4 328/12
334/22 337/10 339/5
341/11 347/20 351/11
351/12 352/18 353/9
353/9 355/16 362/19
367/10 367/17 367/24
369/4 369/19 372/17
373/14

**thinking [3]** 361/25
367/6 371/4

**though [13]** 290/9
290/14 293/10 313/10
315/5 329/17 335/20
342/15 349/2 353/3
357/17 364/22 366/24

**thought [15]** 239/22
240/4 247/17 247/20
248/3 252/11 290/17
302/9 316/1 316/2
321/4 335/13 337/1
361/4 361/25

**threatened [6]** 309/2
314/23 322/19 322/22
324/21 324/21

**threatening [6]** 249/1
249/5 295/19 296/15

285/8 288/17 288/2
288/11 289/3 290/24
291/3 291/16 291/18
292/10 296/25 297/6

**three [16]** 236/18
256/13 256/14 256/16
257/8 274/10 274/11
274/19 282/8 286/17
287/5 287/10 313/10
316/18 353/6 353/9

**three inches [4]**
256/13 256/14 256/16
257/8

**through a [1]** 346/15

**throughout [6]** 240/17
273/1 283/17 322/24
324/11 348/25

**throwing [2]** 274/6
307/24

**thrown [2]** 296/20
296/25

**thumbs [1]** 267/14

**Thursday [1]** 371/6

**tight [1]** 321/10

**tighter [1]** 310/1

**tighter-wearing [1]**
310/1

**tightest [1]** 310/4

**till [1]** 373/16

**tissue [1]** 268/15

**Title [1]** 374/4

**to 2014 [1]** 279/14

**to stop [1]** 304/4

**today [10]** 240/18
318/25 332/7 337/14
337/15 349/7 367/13
367/22 367/25 368/24

**together [2]** 262/15
269/10

**told [20]** 248/15
250/25 254/10 256/7
264/11 264/11 266/14
266/22 266/24 267/5
301/3 304/11 305/13
311/17 321/2 325/3
325/7 332/9 361/3
373/4

**Tommy [1]** 370/8

**Tommy Dickey [1]**
370/8

**tomorrow [9]** 367/4
367/14 367/21 368/9
368/15 368/22 369/6
369/20 371/6

**tone [1]** 350/22

**tones [3]** 357/13
357/13 358/25

**tongue [9]** 236/24
247/11 247/13 335/12
335/15 335/21 335/25
339/4 340/21

**took [3]** 266/22
350/13 361/24

**tool [1]** 310/11

**top [3]** 256/4 256/21
276/16

**torso [1]** 310/9

**total [1]** 319/23

**totality [11]** 313/25
344/3 344/7 345/2
346/7 346/13 346/19

**305/12 314/18**

**347/3 347/13 348/5
348/7**

**touch [2]** 244/19
256/19

**towards [5]** 255/18
256/5 260/16 267/23
304/15

**tracking [1]** 281/8

**traffic [1]** 313/20

**trailing [1]** 297/24

**trained [20]** 248/18
257/15 280/10 287/15
289/1 289/7 289/15
290/21 291/21 294/22
296/24 312/15 312/15
312/16 317/13 318/9
319/7 321/5 321/23
344/7

**training [41]** 242/14
242/18 242/22 247/22
248/7 248/11 248/14
248/22 249/3 253/9
280/9 283/12 283/15
283/19 283/23 283/25
284/4 290/22 298/13
300/9 311/23 317/7
317/16 317/18 318/15
319/23 321/20 328/22
328/25 329/3 337/23
348/6 351/8 360/20
362/21 363/2 363/3
365/6 365/7 365/11
365/20

**trajectory [1]** 307/3

**transactions [1]**
280/16

**transcript [29]** 232/15
263/18 263/19 263/23
264/3 264/3 265/15
320/13 331/19 332/20
333/12 334/7 337/18
339/21 340/2 349/4
349/8 349/11 350/2
353/12 353/17 355/24
360/21 361/7 371/25
372/15 372/18 374/5
374/7

**transcripts [4]** 264/21
265/1 265/17 372/6

**transfer [1]** 281/12

**transient [1]** 286/21

**treat [1]** 370/19

**treatment [1]** 288/2

**tremors [5]** 339/7
339/14 340/17 341/6
344/20

**trespassing [11]**
247/17 252/22 252/24
253/1 286/16 286/16
286/18 287/7 287/9
303/22 324/3

**trial [9]** 232/20 234/13
235/8 240/12 240/16
244/10 249/24 272/11
327/21

**tried [7]** 253/6 253/15
264/13 314/7 333/21
351/5 362/18

**T**

**tries [2]** 302/23
319/19
**trigger [1]** 254/17
**tripping [1]** 308/19
**troubling [1]** 323/23
**true [8]** 253/16 253/17
264/9 267/12 273/18
333/19 333/20 374/4
**truth [4]** 278/7 278/7
278/8 362/1
**truthful [1]** 332/13
**try [10]** 248/22 256/3
256/5 289/17 303/2
319/25 325/10 325/12
336/3 350/7
**trying [15]** 238/5
252/17 252/19 262/15
265/22 273/14 308/25
314/25 319/24 320/2
324/3 333/16 360/12
366/15 371/5
**Tuesday [1]** 373/12
**turn [12]** 245/19
245/21 245/22 246/2
246/3 253/20 266/22
266/25 267/5 289/17
302/23 324/11
**turned [4]** 246/1 246/1
246/14 246/24
**turning [1]** 300/2
**turns [1]** 243/17
**twelve [1]** 290/24
**twice [3]** 271/9 349/14
353/6
**twitching [4]** 339/7
340/18 341/5 344/20
**two [24]** 239/8 240/20
241/17 254/24 256/13
256/14 256/15 256/20
257/8 257/11 264/23
274/10 274/11 274/19
280/11 283/23 291/11
309/7 334/17 335/23
335/24 353/9 370/13
371/11
**type [12]** 243/6
243/12 254/8 285/16
288/5 289/16 291/14
294/1 296/10 298/18
346/1 351/22
**types [2]** 283/14
288/6 311/11 328/10
**typically [17]** 284/17
286/17 291/11 295/21
295/23 296/12 304/4
304/6 309/10 309/25
310/4 313/1 313/4
313/6 324/8 358/8
358/9

**U**

**U-turn [3]** 245/19
245/21 245/22
**ultimately [1]** 324/21
**unable [1]** 331/1
**unarmed [3]** 304/10
324/9 345/16

**unaware [1]** 244/3
**under [46]** 241/3
247/5 247/7 247/20
248/3 248/6 248/9
252/21 286/13 290/10
290/15 290/18 290/25
291/1 291/12 291/19
291/22 292/13 295/17
297/11 300/5 303/19
303/22 309/22 312/22
323/24 324/18 328/24
334/2 334/3 334/9
334/13 334/22 335/6
336/6 336/17 336/20
337/3 337/4 338/7
341/10 341/16 342/9
343/4 343/7 344/1
**undercover [1]** 280/7
**undergrad [1]** 328/21
**undergraduate [1]**
328/12
**underneath [1]** 277/3
**understand [10]**
235/22 256/6 290/5
329/17 340/24 352/16
352/20 352/22 355/24
372/16
**understanding [13]**
238/21 239/14 242/11
243/21 249/4 261/23
282/25 292/15 321/15
334/8 341/22 347/18
358/12
**understands [1]**
339/17
**understood [1]**
316/17
**unfortunately [1]**
289/2
**uniform [1]** 280/12
**unique [5]** 293/3
302/9 312/9 335/13
345/11
**unit [13]** 279/22
279/23 280/3 301/23
303/23 304/7 304/20
329/1 358/2 358/5
358/13 358/13 358/19
**UNITED [4]** 232/1
278/25 374/4 374/8
**units [1]** 259/12
**universe [1]** 238/1
**University [1]** 278/24
**unless [3]** 293/12
343/1 358/10
**unnecessary [2]**
323/25 324/5
**unprofessional [1]**
350/23
**unreasonable [14]**
286/1 292/16 292/20
301/17 302/16 302/19
305/14 318/9 322/7
322/11 322/20 323/20
324/1 324/5
**until [16]** 240/19
253/15 268/25 305/2
305/3 319/8 322/1

322/3 329/20 341/20
351/5 351/9 352/2
352/3 363/15 368/11
**up [51]** 246/12 250/13
253/21 255/25 257/4
263/9 265/12 267/4
267/14 268/17 270/9
275/17 276/5 276/6
279/25 284/2 284/18
284/20 285/9 286/17
294/5 294/17 294/18
297/19 299/7 299/10
300/8 301/11 301/18
302/22 303/14 304/25
307/7 307/19 309/20
309/23 310/13 313/23
314/12 325/1 327/12
334/24 334/25 335/13
342/21 350/24 351/19
352/24 357/9 363/12
371/2
**upon [6]** 302/18 327/2
341/22 360/6 360/20
365/5
**upset [1]** 294/20
**urgent [1]** 304/5
**us [19]** 246/10 250/25
254/10 264/11 270/15
270/24 274/19 289/9
289/10 290/21 295/21
305/13 306/24 311/17
313/17 319/16 319/22
321/2 370/1
**use [45]** 239/2 240/17
248/25 249/5 283/15
283/21 287/8 288/19
292/22 293/12 293/25
295/20 296/3 296/9
296/16 296/21 310/23
310/22 310/23 311/25
312/11 312/12 312/21
313/11 313/13 313/23
314/9 315/24 316/18
317/25 318/2 318/7
318/9 319/9 322/6
322/11 323/19 342/20
342/24 342/24 342/24
344/23 344/24 349/19
358/9
**used [15]** 241/12
241/15 241/22 242/8
270/23 296/16 310/11
329/13 337/5 337/14
337/14 338/3 338/20
342/17 351/11
**using [6]** 242/12
265/11 294/2 314/21
322/25 342/2

**V**

**vagrant [1]** 286/21
**Vague [2]** 267/1
330/13
**VALLEY [1]** 233/10
**various [3]** 282/14
316/14 329/11
**vehicle [4]** 243/20
244/25 245/4 283/16

**ventilation [1]** 312/10
**verbal [1]** 295/25
**verifying [1]** 364/12
**versa [1]** 351/13
**version [3]** 238/16
239/2 239/13
**versus [2]** 235/7
236/6
**vets [1]** 288/3
**vice [2]** 280/5 351/13
**vice versa [1]** 351/13
**video [64]** 237/18
237/22 237/23 238/1
238/4 238/8 238/10
238/14 238/17 238/18
238/25 238/25 251/4
251/7 251/13 263/21
264/3 268/2 268/6
268/17 269/9 269/20
270/2 270/9 272/2
272/17 272/20 272/23
272/25 273/3 273/6
273/7 273/24 274/4
274/5 274/7 274/23
275/10 275/14 275/25
283/2 283/4 287/12
292/17 294/8 294/11
297/16 305/10 305/15
307/24 308/2 308/6
311/1 324/25 337/17
339/5 348/13 349/5
349/7 351/4 351/16
359/19 363/22 371/13
**viewing [3]** 292/17
294/11 308/5
**VINCENT [2]** 233/13
235/19
**Vincent Ewing [1]**
235/19
**violative [1]** 262/1
**violent [2]** 294/16
309/23
**visible [10]** 250/9
250/11 250/15 250/17
273/9 273/12 273/19
307/12 307/15 339/5
**visiting [1]** 345/8
**voice [3]** 350/10
350/23 351/2
**voir [1]** 236/17
**voir dire [1]** 236/17
**volume [1]** 289/4
**volumes [1]** 340/14
**volunteered [1]** 329/5

**W**

**wait [1]** 261/18
**walk [18]** 253/13
284/22 298/10 298/16
298/19 300/16 300/20
302/19 334/24 334/25
346/3 346/3 349/3
351/23 363/8 363/9
364/24 371/5
**walked [5]** 261/22
300/21 300/22 345/17
363/12
**walking [11]** 245/10

246/16 271/17 304/15
351/17 351/19 351/19
359/23 363/19 363/24
363/25
**walks [1]** 284/20
289/8 304/22
**wall [1]** 276/5
**wander [1]** 346/10
**wanted [7]** 238/20
267/12 269/16 269/17
341/20 345/18 348/16
**wants [2]** 270/2
299/25
**Ward [1]** 371/14
**warn [1]** 287/6
**warnings [1]** 297/3
**warrant [2]** 305/1
305/4
**warrants [7]** 280/20
301/5 331/15 364/18
366/8 366/15 366/24
**watched [9]** 272/17
337/17 348/12 349/7
349/9 351/4 351/16
351/16 359/20
**watching [2]** 305/15
349/5
**waters [1]** 236/6
**weapon [20]** 254/15
294/5 306/6 312/12
312/16 313/24 317/22
319/2 319/4 319/6
319/12 319/13 319/15
319/18 319/19 319/19
319/24 319/25 321/10
321/11
**Weapons [1]** 281/12
**wear [1]** 239/8
**wearing [3]** 293/16
310/1 310/1
**WEDNESDAY [2]**
232/16 235/1
**week [1]** 251/12
324/11 371/7
**weighs [1]** 276/20
**Welcome [1]** 240/15
**welcomed [1]** 303/25
**went [6]** 253/20 261/7
279/20 280/17 290/22
304/24
**west [3]** 232/24
245/11 329/11
**West Point [1]** 329/11
**WESTERN [1]** 232/2
**where he [1]** 361/23
**white [11]** 247/11
247/11 247/13 293/16
335/12 335/15 335/21
335/25 339/4 340/21
351/12
**whole [3]** 262/5
262/10 278/7
**why [26]** 244/20
258/11 268/16 273/8
286/4 294/20 297/10
299/6 303/4 304/11
304/12 309/13 313/15
315/2 315/6 316/5

## W

**why... [10]** 318/25
322/10 324/20 325/14
325/18 342/18 346/23
363/5 370/1 372/16
**Wilshire [1]** 280/15
**wire [2]** 309/10 309/10
**wish [2]** 235/23
277/12
**without [6]** 240/4
288/19 290/4 323/13
347/10 347/11
**witness [12]** 268/14
271/6 275/11 277/12
277/20 277/21 282/6
365/16 367/11 367/18
370/5 371/17
**witness's [1]** 315/10
**witnesses [7]** 234/5
239/20 239/25 240/8
369/19 369/25 371/7
**wondering [1]** 252/4
**WOODLAND [1]**
233/5
**Woods [44]** 235/20
241/2 241/4 255/1
262/24 298/7 299/8
301/19 304/11 305/16
305/17 306/14 307/21
307/24 320/6 320/21
323/9 323/14 330/11
331/13 331/20 332/18
332/22 335/19 336/5
336/9 336/24 337/19
340/12 340/22 340/25
347/14 347/17 348/1
350/2 354/19 356/14
357/5 358/14 363/8
370/4 372/23 373/4
373/8
**Woods's [5]** 306/18
327/25 328/6 332/20
333/11
**word [3]** 294/4 312/25
322/25
**words [5]** 235/25
257/17 257/25 314/21
317/9
**work [15]** 239/8
239/15 270/15 271/1
271/2 278/22 279/4
280/18 283/19 283/25
310/12 310/21 368/2
371/12 371/15
**workbooks [1]** 287/19
**worked [20]** 240/3
269/18 279/2 279/8
279/12 279/17 279/18
279/20 279/21 279/23
279/24 280/9 280/14
280/21 280/23 281/8
289/10 305/25 314/8
345/3
**working [8]** 237/18
239/9 244/19 274/19
345/7 345/23 346/5
358/5
**works [2]** 297/20

318/3
**worst [2]** 324/13
324/15
**wounds [1]** 322/3
**wrestling [1]** 311/24
**writing [1]** 270/17
**wrong [3]** 288/5
301/22 314/25

## X

**X2 [1]** 242/3
**X26 [3]** 242/2 242/3
309/5

## Y

**yeahs [2]** 349/19
349/21
**year [3]** 265/8 280/23
290/23
**years [5]** 281/13
282/8 283/23 303/24
363/3
**yell [5]** 248/10 257/17
257/20 257/21 321/5
**yelled [1]** 320/6
**yelling [3]** 320/1
357/14 359/1
**yesterday [8]** 242/4
248/13 250/25 251/16
252/25 253/12 254/10
259/1
**Your Honor [29]**
235/11 235/18 237/17
238/22 239/22 244/5
244/7 244/11 249/14
249/20 253/22 253/25
254/2 260/2 261/3
261/12 261/14 262/15
268/9 268/13 269/17
272/1 275/11 277/10
277/16 353/13 361/15
366/25 369/1
**your training [1]**
348/6

## Z

**zero [1]** 310/9