1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5   DOMINIC ARCHIBALD AND          )
    NATHANAEL PICKETT,I, AS         )
6   INDIVIDUALS AND AS SUCCESSOR    )
    IN INTEREST TO NATHANAEL H.     )
7   PICKETT, II, DECEASED,          )
                                    )
8                  PLAINTIFFS,      )
                                    )
9           vs.                     ) No. CV 16-1128-AB
                                    )
10  COUNTY OF SAN BERNARDINO, ET    )
    AL.,                            )
11                                  )
                   DEFENDANTS.      )
12  _____)

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 MONDAY, MARCH 12, 2018

17                      9:31 A.M.

18                 LOS ANGELES, CALIFORNIA

19

20    Day 4 of Jury Trial, Page 629 through 721, inclusive

21

22  _____

23            **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST FIRST STREET, ROOM 4311
              LOS ANGELES, CALIFORNIA 90012
25                 cmjui.csr@gmail.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF DOMINIC ARCHIBALD:

 3         LAW OFFICES OF DALE K. GALIPO
           BY:  DALE K. GALIPO, ATTORNEY AT LAW
 4              HANG DIEU LE, ATTORNEY AT LAW
                MARCEL SINCICH, ATTORNEY AT LAW
 5         21800 BURBANK BOULEVARD, SUITE 310
           WOODLAND HILLS, CALIFORNIA 91367
 6         (818) 347-3333

 7
     FOR THE PLAINTIFF NATHANAEL PICKETT, I:
 8
           LAW OFFICES OF ROBERT D. CONAWAY
 9         BY:  ROBERT D. CONAWAY, ATTORNEY AT LAW
           P.O. BOX 2655
10         APPLE VALLEY, CALIFORNIA 92307
           (760) 503-9010
11

12   FOR THE DEFENDANTS:

13         ALVAREZ-GLASMAN & COLVIN
           BY:  VINCENT C. EWING, ATTORNEY AT LAW
14         13181 CROSSROADS PARKWAY NORTH, SUITE 400
           CITY OF INDUSTRY, CALIFORNIA 91746
15         (562) 699-5500

16

17

18

19

20

21

22

23

24

25
```

1          I N D E X

2        MARCH 3rd, 2018

3

4

5  DEFENDANTS'
   WITNESSES                                           PAGE

6
   PARRIS WARD
7      DIRECT EXAMINATION BY MR. EWING               639
       CROSS-EXAMINATION BY MR. GALIPO               649
8      REDIRECT EXAMINATION BY MR. EWING             657

9  CLARENCE ROBERT CHAPMAN
       DIRECT EXAMINATION BY MR. EWING               659
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, MARCH 12, 2018

 2                            9:31 A.M.

 3                              -  -  -

 4        (The following was heard in open court outside the

 5         presence of the jury:)

 6              THE CLERK:  Calling civil case CV 16-1128-AB,

 7   Dominic Archibald versus County of San Bernardino, et al.

 8              Counsel, please step forward and state your

 9   appearances.

10              MR. GALIPO:  Good morning, Your Honor.

11   Dale Galipo with Hang Le and Marcel Sincich from my office

12   on behalf of Dominic Archibald.

13              THE COURT:  All right.  Good morning to you all.

14              MR. SINCICH:  Good morning.

15              MR. EWING:  Good morning, Your Honor.  Vince Ewing

16   on behalf of the County of San Bernardino and Deputy

17   Kyle Woods, defendants.

18              THE COURT:  I was going to say, Mr. Conaway, are

19   you not joining us today?

20              MR. CONAWAY:  Robert Conaway on behalf of

21   Mr. Pickett.

22              THE COURT:  Good morning to you all.  Hopefully,

23   everyone is adjusting to Daylight Saving, and I don't think

24   any of you have young children, but, hopefully, you will not

25   have had to have gone through trying to wake up young kids
```

```
 1   like I did this morning.
 2           All right.  I think the jurors have just -- we
 3   just gotten all of them, but what I wanted to do briefly is
 4   just give you at least some preliminary thoughts that I had
 5   with respect to the disputed jury instructions with the hope
 6   that perhaps during the lunch hour we'll have more time to
 7   go through them.
 8           I will just run through the list of what I believe
 9   are all the joint -- the disputed instructions, and I will
10   give you preliminary thoughts, and then we can resume with
11   testimony.
12           Starting -- I think the first disputed jury
13   instruction is Number 18 with respect to causation.  My
14   inclination is to not give this instruction.  This is really
15   more just commentary; so I am not inclined to give that.
16           With respect to Jury Instruction Number 20, I
17   don't believe that we need any definition of
18   "intentionally."  I am inclined to include the initial edit
19   with respect to unreasonably detaining and arresting without
20   probable cause, but I don't think we need that paragraph in
21   lines 13 through 19.
22           With respect to Jury Instruction Number 21, the
23   unreasonable seizure, Terry stop, I guess there is some
24   additional things in the proposed instruction, specifically
25   lines 9 through 16, that the Court thinks is just simply too
```

```
 1    argumentive.  But the other minor edits, I think, are
 2    reasonable.
 3            With respect to Jury Instruction Number 22, this
 4    is one I think we need to have a little more discussion on.
 5    I have a proposal that it seems, I think, in line with
 6    plaintiffs' argument that, if we include some of defense's
 7    language, defendant's language about knowingly resist by the
 8    use of force and violence, then I think other language needs
 9    to be incorporated that talks about if a police officer uses
10    unreasonable force, then the arrestee may use reasonable
11    force to defend him or herself.  So that's my inclination as
12    it relates to 22.
13            23, there was a minor -- I'm not inclined to
14    include lines 10 and 11 with regard to the infliction of --
15    or threatened infliction of serious physical harm.  I don't
16    think that's necessary.
17            Number 25, my leaning is to go with the
18    plaintiffs' proposed instruction.
19            Number 28, qualified immunity, I don't think it's
20    appropriate to instruct the jury as it relates to qualified
21    immunity.
22            Number 29, I think we need to have a discussion as
23    to what the language should be.  I think defense's proposal
24    is to arrest him and to prevent his escape to overcome his
25    resistance.  I think we might want to simplify it to say
```

1    simply to detain him, but we'll have more discussion on 29.

2              32, I think we need to have a little discussion on

3    this because I'm not sure what plaintiffs are asking for

4    exactly here.  It seems like defense's proposal is

5    consistent with the elements, but I want to -- I'll get some

6    clarification.

7              34, I do not intend to give this instruction -- I

8    should say the modification in the last paragraph.  So I

9    tend to agree with plaintiffs' objection on that.

10             36, I don't think assumption of the risk is

11   applicable; so I don't intend to include that.

12             Then 37, I have some questions about that

13   specifically is if -- whether there is any testimony

14   throughout this trial that would make this instruction

15   applicable.

16             38, I have a proposal that talks about

17   specifically what I believe the defendant would have to

18   prove relative to that affirmative defense.  And it's broken

19   up into three specific items based on what I recall the

20   testimony, specifically, whether Deputy Woods reasonably

21   believed that Nathanael Pickett was, A, under the influence;

22   B, trespassing; and/or, C, had given a false name.  Again, I

23   just wanted to tee that up for discussion later.

24             Number 41, I don't believe is appropriate.

25             Number 42, I don't see how that is appropriate nor

```
 1    do I believe 43 is appropriate, an appropriate instruction
 2    for this case.  I didn't deal with the damages.  We'll deal
 3    with that if and when we get there.
 4           I was going through them quickly, but does anyone
 5    want me to go through them again?  Or do you think you got
 6    at least some preliminary notes to give some food for
 7    thought as we have this discussion later on today?
 8           Mr. Galipo?
 9           MR. GALIPO:  I think -- I was able to take notes;
10    so I appreciate you letting us know your thoughts, and we
11    could follow up later today.
12           THE COURT:  Mr. Ewing.
13           MR. EWING:  As well, Your Honor.  I took notes,
14    and you have covered enough for us to have a later
15    discussion.
16           THE COURT:  All right.  Great.
17           What's the run of the show today, Mr. Ewing?
18           MR. EWING:  I will -- the defense will call expert
19    Parris Ward.  The defense will cue up the video, both the
20    plaintiffs' and the defendants'.  I have discussed this with
21    counsel.
22           THE COURT:  All right.
23           MR. EWING:  I will examine Mr. Ward on the work
24    that he did with respect to synchronizing the audio and the
25    video.
```

```
1              THE COURT:  Okay.
2              MR. EWING:  And I will finish with Mr. Ward.
3   Mr. Galipo will do what he does, and then I will call expert
4   Clarence Chapman, and I will examine Clarence Chapman at
5   length for approximately 45 minutes to an hour.
6              THE COURT:  Okay.
7              MR. EWING:  After I finish with Clarence Chapman,
8   Mr. Galipo will do his cross, I maybe some redirect, and we
9   should be done with -- the defense should be done with
10  Mr. Chapman, and then the defense will make a couple motions
11  and -- which I am sure the Court and counsel anticipate, and
12  then we'll make -- we'll be ready to rest and give the case
13  to the jury after argument.
14             THE COURT:  All right.
15             Mr. Galipo, I am not holding you to this -- I am
16  just inquiring -- do you anticipate putting any rebuttal
17  case on?
18             MR. GALIPO:  As of right now, no.
19             THE COURT:  Okay.  All right.
20             So let's bring in the jury, then.
21             Is Dr. Ward or Mr. Ward --
22             MR. EWING:  They're both here.
23             THE COURT:  Mr. Ewing, you know your screen is up
24  on the monitors right now?
25             MR. EWING:  Yes.
```

```
 1              THE COURT:  So the jury will be able to see it.  I
 2   just want to make sure you don't have anything you don't
 3   want them to see on there.
 4              MR. EWING:  I am aware.  Thank you.
 5         (The following was heard in open court in the presence
 6          of the jury:)
 7              THE CLERK:  All rise for the jury.
 8              THE COURT:  Good morning, ladies and gentlemen of
 9   the jury.  I hope you had a wonderful weekend and were able
10   to adjust to the Daylight Savings Time.  I was joking with
11   the lawyer earlier.  Hopefully, you did not have the
12   experience I had this morning trying to get three young kids
13   up with the shortened amount of sleep.  So with that, why
14   don't we resume our trial.
15              Mr. Ewing, you may call your next witness.
16              MR. EWING:  Thank you, Your Honor.  At this time
17   the defense calls Parris Ward.  May I retrieve him?
18              THE COURT:  Yes, please.
19              MR. EWING:  Thank you.
20                        PARRIS WARD,
21               having been first duly sworn,
22                 testified as follows:
23              THE CLERK:  Do you solemnly swear that the
24   testimony you shall give in the cause now before this Court
25   shall be the truth, the whole truth, and nothing but the
```

```
 1   truth, so help you God?

 2            THE WITNESS:  I do.

 3            THE CLERK:  Thank you.  Please be seated.

 4            Please state and spell your name for the record.

 5            THE WITNESS:  My name is Parris Ward.  First name

 6   is P-a-r-r-i-s.  Last name is Ward, W-a-r-d.

 7            THE COURT:  Mr. Ewing, you may proceed.

 8            MR. EWING:  Thank you, Your Honor.

 9                     DIRECT EXAMINATION

10   BY MR. EWING:

11   Q    Good morning, Mr. Ward.

12   A    Good morning.

13   Q    What do you do?

14   A    I work for a company called Biodynamics Engineering,

15   and I do all kinds of things relating to computer graphics,

16   computer animation, as well as video analysis and video

17   enhancements, high-speed imaging, all kinds of things

18   related to video, audio, and computer imaging.

19   Q    Were you retained for this case to do such things?

20   A    Yes.

21   Q    And can you tell the jury your background, your

22   training, and your experience.

23   A    Okay.  I have a law degree, but I don't practice as an

24   attorney.  I went to Pepperdine University and got a law

25   degree there.  I also have taken classes through UCLA and
```

```
 1   MIT in video high-speed imaging, video systems, computer
 2   graphics, and computer imaging.
 3           I have testified in a number of cases.  I have
 4   been doing video enhancements since the early 1990s.  I have
 5   done many high-profile cases.  I have been certified as a
 6   forensic video technician through LEVA, which is the law
 7   enforcement and emergency services video association.
 8           I have -- that's pretty good summary, I guess.
 9   Q    So have you qualified as an expert witness in civil
10   jury cases before?
11   A    Yes.
12   Q    Approximately how many times?
13   A    Probably testified around a dozen times.
14   Q    Have you prepared demonstrative evidence for any of
15   those cases?
16   A    Yes.
17   Q    Approximately how many times?
18   A    In all of those cases I have prepared some sort of
19   demonstrative evidence.  I have prepared demonstrative
20   evidence in a lot more cases in which I was not called to
21   testify or the evidence was stipulated to or whatever.  So
22   in that case, hundreds of cases that I have actually worked
23   on.
24   Q    In this case, did you prepare a Rule 26 report?
25   A    I did.
```

1    Q     And in that report, do you -- can you tell the jury the

2    scope of your analysis of the evidence in this case.

3    A     Yes.  I was originally contacted by the defense in this

4    case to see if we could take the video, surveillance video

5    footage, and match it to the belt recordings which are the

6    little recorders that officers wear on their belts that

7    record the dialogue of what's going on when they go to a

8    scene.

9          And so I was able to take the audio recording and

10   match it to the video so that now you have a complete

11   narrative of what happened.

12         Subsequent to that, I was asked the question about

13   whether there were, apparently, two versions of the video,

14   the surveillance video, one that the defense had and one

15   that the plaintiffs had.  And I was asked to compare the two

16   and see if those were, in fact, the same or if one was

17   different than the other.

18         And so I did that and established that, although

19   they had different camera views, one video had six camera

20   views and the other had four, the primary camera views.  The

21   Camera 10 and 11 which are the most important to this case

22   were identical as far as the problems with those videos.

23   And so there was no difference between those.

24         Then subsequent to my doing my report, I was asked

25   to evaluate the video evidence that the defense was

1   planning -- the prosecution -- the plaintiff was going to

2   put on in this case.

3   Q    And did you have an opportunity to discover the source

4   of the videos?

5   A    Yes.  The videos come from a surveillance system that

6   was in the motel.  This particular surveillance system that,

7   when you want to take video off of that surveillance system,

8   you can't export it as a playable file that you can just

9   play on your computer.

10          It exports it as a kind of a combination program,

11  a player executable file with the video frames inside that

12  file.  And so the only way that you can really get to it

13  practically is to take that whole executable file, put it on

14  your computer, and play it back using that program.

15          So the -- there were two separate files, but they

16  were both generated from the same DVR, which is the recorder

17  on the surveillance system.  They were just made at

18  different times.  So they have the same video source, but

19  they're technically different files.

20  Q    Describe the quality of the equipment or the video that

21  you analyzed.

22  A    I didn't look at the actual equipment, but you can tell

23  from the quality of the video that it's low resolution.  As

24  I say in my report, this video only has the images that are,

25  in this particular camera view, 10 and 11, there were only

1   352 pixels across by 240 pixels vertically.

2              So if you are used to a big screen TV at home, you

3   are talking about a lot more pixels than that.  You are

4   talking about 1,920 pixels across by 1,080 vertically in a

5   1080P or 1080I video.

6              So this -- and even the old TVs that we used to

7   have before HDTV came along, this is about a quarter of that

8   resolution.  It's a very small picture.

9              So even when you blow it up -- and I'm sure people

10  have already seen the video -- but when you blow it up, it's

11  very difficult to see details in that video.

12  Q    Did you observe any deficiencies in the video?

13  A    Yes.  The video system has variable frame rate.

14  Normally, the video we're used to seeing on TV runs at 30

15  frames per second.  This tries to do that.  It gets to about

16  28 frames per second, but it can't keep pace with the amount

17  of information it's trying to record.

18             So what it does is it drops frames occasionally.

19  So you will notice, as you watch the video, all through the

20  video there are points where people are moving and then they

21  hesitate and then they move a lot.  That's because it's

22  dropped intermediate frames.

23             We're used to seeing video as a series of images

24  that are projected one after the other, and we see this

25  motion kind of like animation, and we see this happen.

```
 1            But when some of those images are missing and it
 2   repeats the same image multiple times, it looks like a
 3   person hesitates and then they suddenly move faster.
 4            So that's a problem, but also whatever was in that
 5   interim is missing from the video.  So we may not see
 6   everything that happened if it happened really quickly.
 7            MR. EWING:  Your Honor, permission to publish
 8   Defense Exhibit 114, the expert's video synchronization.
 9            THE COURT:  Any objection?
10            MR. GALIPO:  No objection.
11            THE COURT:  You may publish it.
12            (Exhibit played.)
13   BY MR. EWING:
14   Q    Mr. Ward, at this point in the video, is there any of
15   the skipping or frame jumping that you talked about?
16   A    Well, what you can look at is in the one view in the
17   upper right-hand corner.  If you watch headlights of cars
18   moving, for example, you will see even those hesitate and
19   move quickly.  So the skipping isn't happening just at our
20   critical juncture where this incident occurs.  It's
21   happening throughout the video.
22   Q    Thank you.
23            (Exhibit played.)
24   BY MR. EWING:
25   Q    As you have watched this video so far, Mr. Ward, have
```

```
 1   you been able to identify parts where it skips, the frame
 2   skipping that you testified about?
 3   A    Yes.  There are different spots where you can see
 4   slight hesitations that occur, and some of those hesitations
 5   occur maybe for a fraction of a second, some up to a whole
 6   second, but you will see them just periodically; and it's
 7   not, like I said, just a one-camera view.  It's the
 8   different cameras of views also.
 9   Q    Thank you.
10           (Exhibit played.)
11   BY MR. EWING:
12   Q    Again, are you able to see the skipping that you
13   testified about in this video?
14   A    Yes.
15           (Exhibit played.)
16   BY MR. EWING:
17   Q    At this point, are you able to see the skipping that
18   you testified about in this video?
19   A    There is -- it's throughout the whole video.  I didn't
20   notice in that particular segment right there that there was
21   a particular skip, but yes.
22   Q    But, particularly with respect to the images that were
23   set forth on Camera 11 -- I will play this and let me know
24   if you see the skipping that you testified about.
25   A    Okay.
```

```
 1   Q     Thank you.

 2               (Exhibit played.)

 3               THE WITNESS:  A little bit right there.  Right

 4   there there was a major skip of about half a second there.

 5   BY MR. EWING:

 6   Q     In the frames that you just saw on Camera 11?

 7   A     Yes.

 8               (Exhibit played.)

 9               THE WITNESS:  There was actually -- when the

10   person in the dark jacket moved away, you could see that he

11   moved dramatically.  He was standing still, and then he

12   moved quite a distance; so that was about a whole second of

13   lost data.

14               MR. EWING:  I will play that again.

15               (Exhibit played.)

16   BY MR. EWING:

17   Q     This is --

18   A     When he moves into the parking lot.

19   Q     On the parking lot into the breezeway?

20   A     Well, no, where he is --

21   Q     "He" being who?

22   A     As --

23   Q     Person in the dark jacket?

24   A     Yes.

25   Q     Okay.
```

```
 1   A     He is standing in the pathway there.  And then he will
 2   move out to the parking lot, and we focus on him.  It looks
 3   like he moves suddenly a lot, a great distance, which,
 4   obviously, is not possible.
 5           That's because the information is lost, and then
 6   it just holds that frame and keeps showing the same frame,
 7   and then it jumps ahead.
 8   Q     And you are referring to the information being lost by
 9   the camera?
10   A     Or the recording system, yes.
11   Q     Thank you.
12           (Exhibit played.)
13   BY MR. EWING:
14   Q     And what you just saw is what you are referring to, the
15   skipping?
16   A     Yes.
17           MR. EWING:  At this point, permission to publish
18   Plaintiffs' Exhibit 1A, the slow motion of the video,
19   Your Honor.
20           THE COURT:  Any objection?
21           MR. GALIPO:  No objection.
22           THE COURT:  Exhibit 1A will be played.
23           (Exhibit played.)
24   BY MR. EWING:
25   Q     Mr. Ward, have you seen the video that's on your screen
```

1  now?

2  A    Yes.   I created the original of this, which is the

3  video comparison showing defense versus plaintiffs' videos.

4  Q    So what is this?   Essentially, a slowed down version of

5  what you created?

6  A    I didn't slow it down; so maybe somebody else did.   I

7  have -- my original version played in real time.

8  Q    And this -- the video that you have before you is not

9  in real time?

10  A    I don't know.   I was just watching it for the first

11  time here; so I haven't seen it.

12  Q    Okay.

13          (Exhibit played.)

14  BY MR. EWING:

15  Q    Were you able to see any skipping in the slow motion

16  version of the real-time video that you had prepared?

17  A    Yes.

18  Q    And can you describe where the skipping occurred that

19  you just observed in this video.

20  A    It looked like the man in the dark jacket suddenly

21  moved forward, but that was because frames were lost.

22          (Exhibit played.)

23  BY MR. EWING:

24  Q    Did you see any skipping in the video that you have on

25  your screen?

```
 1   A    Yes.
 2   Q    And can you describe the skipping that you just
 3   observed?
 4   A    That was, again, the person in the dark jacket suddenly
 5   moved from a position in the walkway out into the parking
 6   lot.
 7   Q    And did you, based on your analysis of this video, have
 8   an opinion as to how many frames are lost during that
 9   skipping?
10   A    Well, it changes from -- in different skips, and the
11   one -- first one that you showed me, it's about half a
12   second in real time is lost.  And in the second one, it is,
13   like, 34 frames that are lost.
14           So if it's running normally at close to 30 frames
15   per second, it's something on the order of 1 1/4 second,
16   something like that.
17   Q    Thank you.  I have nothing further.
18           THE COURT:  All right.  Cross-examination.
19                      CROSS-EXAMINATION
20   BY MR. GALIPO:
21   Q    Good morning, Mr. Ward.
22   A    Good morning.
23   Q    So how many hours would you estimate you have worked on
24   this case?
25   A    I don't know without my billing, but probably somewhere
```

1    in the order of 20 hours maybe, something like that.

2    Q    And what do you charge per hour?

3    A    $180 per hour.

4    Q    And what do you charge for trial testimony?

5    A    $230 an hour.

6    Q    And who is paying you?

7    A    The attorney that hired me.  I assume they're getting

8    reimbursed by the County.

9    Q    Now, you indicated that -- I will take another sip of

10   water here.

11          THE COURT:  Take your time.  Are you going to be

12   utilizing the screen, Mr. Galipo?  I should say the videos?

13          MR. GALIPO:  I don't think so.

14          THE COURT:  All right.  So why don't we -- we

15   could take them down if that's okay.  Thank you.

16          MR. GALIPO:  If I can get this frog out of my

17   throat.

18          THE COURT:  Take your time.

19   BY MR. GALIPO:

20   Q    You indicated that you worked on several hundred cases,

21   I think, you said?

22   A    I have, yes, over the years.

23   Q    And many of those have been police shooting cases?

24   A    I have done a number of police shootings, yes.

25   Q    Would it be fair to say that you are normally retained

1   on behalf of the agency in those cases?

2   A    The "agency" being --

3   Q    The police agency or the defendants, normally.

4   A    In civil cases, yes.  In criminal cases, I do also

5   defense work for -- even for public defenders.

6   Q    Okay.  So in criminal cases, you are retained on behalf

7   of the person accused of the crime.

8   A    Sometimes.  Sometimes by the district attorney also.

9   Q    Okay.  You indicated that you do enhancements

10  sometimes?

11  A    Yes.

12  Q    Did you do any enhancement in this case?

13  A    Well, enhancement is when you do pretty much anything

14  to the video other than having it in its native format.

15         So you could consider what I did in that quad

16  image that you saw, which is the four images, I rotated

17  camera that was in the upper right-hand corner.

18         When it was recorded, it was recorded sideways.  I

19  flipped it vertically, and I enhanced the contrast to

20  brightness in that so we could see it better.  So those

21  types of changes would be considered enhancements.

22  Q    Okay.  Now, did you look at the frames frame by frame

23  in your analysis?

24  A    I did in the comparison after I did my report, and I

25  compared plaintiff and defense videos.

```
 1   Q    And is the standard 29.97 frames per second?

 2   A    Well, it depends on what standard you are referring to.

     In broadcast television in the United States, 29.97 frames

 4   per second has been the standard for a long time.

 5        When we have surveillance systems, they run

 6   anywhere from 1 frame per second to 8 frames to 15.  They're

 7   all over the map.

 8   Q    Right.  But this one was about 28.7 frames per second;

 9   is that true?

10   A    That's what it worked out to, but that's also part of

11   the problem with the dropping frames, yes.

12   Q    But if you dropped a frame, for example, just to be

13   clear, one frame would be about 1/30th of a second; is that

14   true?

15   A    Yes.

16   Q    Now, would you agree in watching the video even in real

17   time you can see Deputy Woods punching Mr. Pickett?

18   A    Yes.

19   Q    And would you agree, when you watch it in real time,

20   you do not see Mr. Pickett landing punches on Deputy Woods's

21   face?  Would you agree with that?

22   A    I did not see that in the video.

23   Q    You don't see it in the slow motion either, do you?

24   A    I did not.

25   Q    Okay.  Now, just so I can understand your testimony,
```

```
 1   part of the skipping that you are referring to is fractions
 2   of a second.  Is that fair?
 3   A     The one skip was longer than a second, but typically
 4   the skips are in the order of a fraction of a second, yes.
 5   Q     Right.  And the two that you refer to, I think you said
 6   one was about a half a second and one was about 34 frames.
 7   A     Yes.
 8   Q     And if I am doing my math right, 28, 29 frames per
 9   second -- 34 frames would be slightly over a second?
10   A     Yes.
11   Q     Now, you wrote in your report -- you did write a
12   report; correct?
13   A     Yes.
14   Q     And you do have a copy of your report handy?
15   A     Yes.
16   Q     Can you turn to page 6 of your report, please.
17   A     Yes.
18   Q     You have a sentence that starts, "While it may seem
19   highly coincidental that these two significant glitches
20   happened at a critical point in the video" -- do you see
21   that?
22   A     Yes.
23   Q     What were you referring to?
24   A     Well, there was the possibility that there had been
25   something cut out of the video.  That was kind of a question
```

 1    in my mind, if there was any deficiencies in the video.

 2               So if you just focus on that one incident and you

 3    see that skip, you might think, oh, hey.  Something is

 4    missing from this particular thing right at the most

 5    important part of the video.

 6               But when you look at the entire video, you see

 7    that the skips are happening all over the place.  So it's --

 8    while it may seem coincidental we notice a skip there, it's,

 9    in fact, not coincidental.  It just happened there.

10    Q    Let me ask you this:  Hypothetically, if somebody got

11    ahold of the video from the hotel or motel and they wanted

12    to modify it -- let's just say, hypothetically, someone had

13    that intent and they wanted to create half a second or

14    second missing during that critical time, what would they

15    have to do to the video to make that happen?

16    A    Well, it would be extremely difficult because the only

17    evidence we have at this point -- we don't have the hard

18    drive out of the DVR.  I mean, if it was on the hard drive,

19    you would have to go in and go into the hexadecimal encoding

20    of those frames and you would then have to cut out those

21    hexadecimal numbers for those particular frames.

22               In the case of these executable files, the reason

23    that we can't just go into the executable file and pull out

24    the video is because these executable files have multiple

25    camera views, and they're doing a frame from Camera 1, a

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  frame from Camera 2, a frame from Camera 3, and they're

2  sequencing them that way in the file.

3         So it would be extremely difficult to go in and

4  try to cut out those particular images because they're

5  inside an executable file.  So I don't think that it could

6  be done, certainly not easily.  It would be extremely

7  difficult to do.

8  Q    Okay.  And more likely to be done when it was in the

9  system?

10  A    Possibly if that was possible, yes.

11  Q    Okay.  And is it your understanding that an

12  investigating police department was the one that retrieved

13  this video from the system?

14  A    I don't know.  There are two files that were recovered

15  on two different days from the same system.  So I don't know

16  who had control of the system in that period.

17  Q    Okay.  Would you agree that you don't see a gap of a

18  second anywhere else on the video other than during the time

19  just about the time of the shooting?

20  A    I can't say that.  I think there is probably other

21  instances where there is at least a second.  But we would

22  have to go look at the whole video, you know.

23         Of course, we've only focused on the critical

24  frames.  So you can see regular glitches happening

25  throughout the video.

1    Q    I take it, since you synchronized the sound with the

2    video, then you were able to do that.  In other words, you

3    had enough continuous video to synchronize the two.

4    A    Yes.  But I had to break the video down into segments

5    to correct for the speed of the video because if the speed

6    of the video wasn't precise, it would not match the audio,

7    which is recorded at a very precise rate.

8              So I had to go in and fix little bits of the video

9    by breaking it down and correcting the speed so that it

10   would match real time.

11   Q    Okay.  In any event, in all your work on the case,

12   including examining the frames, examining the video, looking

13   at it in real time, looking at in court in slow motion, you

14   would agree you did not see in any of the frames or video

15   that you analyzed Mr. Pickett punching Deputy Woods in the

16   face.  Would you agree with that?

17   A    I did not see that.

18              MR. GALIPO:  May I have one moment, Your Honor.

19              THE COURT:  Absolutely.

20   BY MR. GALIPO:

21   Q    Did you -- as part of the software you used in your

22   work on this case, did that include PhotoShop?

23   A    Yes.

24              MR. GALIPO:  Thank you.  That's all I have,

25   Your Honor.

```
 1              THE COURT:  Mr. Ewing.

 2              MR. EWING:  Thank you, Your Honor.

 3                      REDIRECT EXAMINATION

 4   BY MR. EWING:

 5   Q    Mr. Ward, counsel just asked you about the custody and

 6   control of the video and portions that were missed, and you

 7   offered an opinion as to the difficulty of manipulating the

 8   video.  Do you recall that?

 9   A    Yes.

10   Q    And based on your opinion, have you encountered anybody

11   in the San Bernardino County Sheriff's Office or the

12   San Bernardino Police Department that has the same expertise

13   as you with respect to videos?

14   A    I have not met anybody.

15   Q    Have you reviewed any documents in preparation for your

16   testimony today that would cause you to believe that there

17   was somebody in either one of those agencies that possessed

18   that expertise?

19   A    No.

20   Q    Did you see any sort of breakdown or analysis or

21   manipulation of the video from any law enforcement agency

22   involved in this case?

23   A    No.

24   Q    To your knowledge, are you and the plaintiffs' experts

25   the only ones that provided any sort of analysis on this
```

```
 1  video?
 2  A     Yes.
 3          MR. EWING:  I have nothing further.  Thank you.
 4          THE COURT:  All right.  Mr. Galipo.
 5          MR. GALIPO:  No further questions.
 6          THE COURT:  May this witness be excused?
 7          MR. EWING:  Yes, Your Honor.
 8          THE COURT:  Thank you, sir.  You may step down.
 9          Please call your next witness.
10          MR. EWING:  Thank you, Your Honor.  At this time
11  the defense calls Chief Clarence Chapman.
12                  CLARENCE ROBERT CHAPMAN,
13               having been first duly sworn,
14                  testified as follows:
15          THE CLERK:  Do you solemnly swear that the
16  testimony you shall give in the cause now before this Court
17  shall be the truth, the whole truth, and nothing but the
18  truth, so help you God?
19          THE WITNESS:  I do.
20          THE CLERK:  Thank you.  Please be seated.
21          THE COURT:  Counsel, the screen is on.
22          THE CLERK:  Please state and spell your name for
23  the record.
24          THE WITNESS:  Clarence Robert Chapman;
25  C-l-a-r-e-n-c-e C-h-a-p-m-a-n.
```

```
 1              THE COURT:  Mr. Ewing, you may proceed.
 2                     DIRECT EXAMINATION
 3   BY MR. EWING:
 4   Q     Good morning, Mr. Chapman.
 5   A     Good morning, Counsel.
 6   Q     What do you do for a living?
 7   A     Currently I am a forensics expert in the area of police
 8   practices, training tactics, and management administration.
 9   Q     And were you retained by my law firm to provide
10   testimony in this case?
11   A     Yes, sir, I was.
12   Q     And can you describe to the jury your background, your
13   training, your experience that qualify you to testify as an
14   expert in this case.
15   A     Yes.  Over all I have 41 years of active police
16   service.  Those 41 years encompassed 30 years with the Los
17   Angeles County Sheriff's Department where I was employed
18   beginning in 1995 holding the rank of deputy, obviously,
19   sergeant, lieutenant, and, finally, retiring at the rank of
20   Captain Station Commander.
21              During my 30-year tenure with the
22   Los Angeles County Sheriff's Department, I took a leave of
23   absence and graduated from the FBI Academy, Quantico,
24   Virginia, and was a deputy, United States Marshal for
25   approximately six years, working on domestic and
```

1    international drug interdiction, Pablo Escobar.

2             While I was at the Sheriff's Department, I also

3    took a leave of absence and worked for -- for three years

4    for then first term Governor Jerry Brown, worked in the

5    Capital as a legislative analyst, writing legislation for

6    police-related matters and community safety grant programs.

7             I was also court-appointed federal monitor for the

8    federal bench in the state of New Mexico on a class action

9    consent decree case involving racial discrimination civil

10   rights violations and racial animus towards the black

11   community in a city in the state of New Mexico.

12            I served the federal bench in that capacity for

13   approximately 4 1/2 years.

14            In 1994, I retired from the Sheriff's Department

15   after approximately 30 years and was appointed Chief of

16   Police at the UCLA Police Department.

17            While at UCLA as Chief of Police, I re-entered the

18   FBI Academy in the executive development program and

19   graduated again from the Department of Justice training

20   center.

21            Also, while I was Chief of Police at UCLA, I was

22   appointed by the State of California to be a staff

23   instructor for what we call POST, Peace Officer Standards

24   and Training, out of Sacramento, California.  And I served

25   as a senior POST instructor for 6 1/2 years while I was

```
 1   chief at UCLA.
 2           In addition to that, I -- my formal education, I'm
 3   a graduate of Pepperdine University, master's work -- in
 4   public administration, master's work at
 5   University of Southern California, USC.
 6           I hold a master's degree from UCLA,
 7   Anderson School of Management, MBA degree.
 8           I also have a certificate of completion from the
 9   University of Virginia in constitutional law specializing in
10   civil rights violations.
11   Q    Thank you, Mr. Chapman.
12           Did you review documents and materials related to
13   this case and prepare a report?
14   A    Yes, sir, I did.
15   Q    And did you go out to the scene of the incident?
16   A    Yes.  I availed myself the opportunity to go out to the
17   scene to reconcile what I had read in the documentation in
18   this case to get a firsthand, sort of, real world
19   perspective on what the distances, approximate timing,
20   location, geography of where this particular incident
21   occurred.
22   Q    And going back to your career as a deputy sheriff and
23   then as a -- let's start as a deputy sheriff.
24           Did you have the opportunity to effectuate arrests
25   at that time?
```

```
 1   A     Quite a few, yes, sir.

 2   Q     Did you work patrol at that time?

 3   A     Yes.  I worked patrol for approximately, as a deputy,

 4   approximately five years; as a sergeant for approximately

 5   nine years; and as a lieutenant for another four years.

 6   Q     Did you have the occasion to use force?

 7   A     Many times, yes.

 8   Q     Did you have the occasion to use tools that are

 9   commonly associated with a law enforcement official's belt?

10   A     Yes, sir.

11   Q     Did you have the occasion to learn about and use the

12   Taser?

13   A     At UCLA, yes, sir.

14   Q     Did you have the opportunity to learn about and use a

15   pistol or a handgun?

16   A     Yes, throughout my career.

17   Q     Did you have an opportunity to learn about and use

18   pepper spray?

19   A     Yes.

20   Q     Did you have an opportunity to learn about and use a

21   baton?

22   A     Yes, I did.

23   Q     You had an opportunity to review the incident in this

24   case.

25         Can you tell me what you know about the incident
```

1  that occurred on November 19th, 2015, at approximately

2  9:00 P.M. involving Deputy Kyle Woods.

3  A    Yes.  Basically, my knowledge with this particular case

4  is through reading documentation that was forwarded to me

5  that pretty much included the police reports, the

6  investigation report from the San Bernardino County

7  Sheriff's Department, obviously, the Complaints, but, more

8  importantly the videotape, the location, and certain

9  segments of the confrontation and the incident.

10       I also reviewed statements that were included in

11  the investigative report and sworn depositions from

12  Deputy Woods and other witnesses associated with the case.

13       I reviewed the autopsy report and also reports of

14  the plaintiffs' experts, in this particular case, Mr. Roger

15  Clark, Mr. Scott DeFoe, Dr. McCormick, and Mr. Mattern.

16  Also reviewed the deposition of Deputy -- Detective Keith

17  Libby.

18       So in reviewing all that documentation and

19  availing myself the opportunity to actually visit the scene

20  and do a walk-through, I formed certain opinions regarding

21  that.  And those opinions are based on my training,

22  education, experience as I have explained to you based on my

23  knowledge of what proper police procedures and practices and

24  policies are relating to how police officers react to

25  similar situations as we are here today in this case.

1   Q    Let's start with Deputy Woods's first observation of

2   Mr. Pickett.

3   A    Okay.

4   Q    Can you tell the jury, based on your background,

5   training, and experience, your review of the materials and

6   deputy -- about the first observation of Mr. Pickett.

7   A    From my understanding, the first observation of

8   Mr. Pickett by Deputy Woods was -- occurred at the

9   intersection of Main Street and 2nd Street downtown -- well,

10  in the city of Barstow, California.

11  Q    Did you go there?

12  A    Yes, sir, I went there.  And I actually drove the route

13  that I am about to describe.

14  Q    Please.

15  A    Deputy Woods was stopped at a red light northbound on

16  2nd Street at the intersection of Main.  At that particular

17  point in time, he observed Mr. Pickett walking westbound on

18  the -- would be the south sidewalk just closest to the front

19  of his car, walking east to west across his car.  So it

20  would be from the passenger side over to the driver's side

21  into the next curb over, which would be the west curb and at

22  that point in time disappear behind a building that

23  obstructed his view.  The building was the Uptown Barber

24  Shop that sat right there on the southwest corner.

25            At that particular time, according to

 1  Deputy Woods, he observed Mr. Pickett looking at him in a

 2  nervous kind of way, looking back over his shoulder, kind of

 3  getting the perspective of where the police car was located.

 4         Very important, it was my observation at that time

 5  by reading material that Deputy Woods was in full uniform,

 6  that he was driving a black and white car with the red and

 7  blue light bar on top.  So he was undisputedly identified as

 8  a police officer.

 9         We would all see that kind of markings and uniform

10  identification that we would relate to a police officer.

11  That becomes very important.

12         It becomes important because, in view of

13  Deputy Woods, according to him, that the behavior of

14  Mr. Pickett was somewhat suspicious.

15  Q    I am going to pause you there for a second, and I want

16  you to talk to the jury a moment about community policing

17  and that theory of policing.

18         Please tell them what community policing means.

19  A    The cornerstone of community policing is what we call

20  uncommitted patrol time.  As a police captain commander and

21  a chief of police, uncommitted patrol time is the most

22  important time that a police officer can spend on his or her

23  shift.

24         And what that means is they're not answering

25  calls, they're not responding to details.  They are out in

```
 1   the community, and they're looking for any kind of
 2   suspicious behavior that could be characterized, based on
 3   their training and understanding and experience, what the
 4   community, that could pose a threat, not a great threat all
 5   the time, not always a direct threat to the community, but
 6   anything that would be out of place that could develop into
 7   a situation that would endanger community safety as a whole.
 8   Q    Mr. Chapman, in line with what you are talking about,
 9   what is the core mission of law enforcement based on your
10   training and experience?  What are you out there doing?
11   A    We are out there to keep the community safe.  We are
12   out there to be proactive, to prevent crime as best we can
13   without a crystal ball and the ability to look into the
14   future but based on really good training and really good
15   experience to decipher, identify, and ferret out those kinds
16   of situations based on observable behavior on the foundation
17   of experience that could develop into any risk to the
18   community no matter how small or how great.
19         And that is the core of police work -- not
20   answering calls, not answering 911 calls, but doing that
21   kind of work in the community that prevents those kinds of
22   things from happening and allows our citizens to live and
23   sleep and enjoy in a safe community and neighborhood.
24   Q    Going back to what you were testifying about,
25   Deputy Woods's observation of Mr. Pickett and the behavior
```

 1   of Mr. Pickett, please continue that testimony.

 2   A    At that point in time, Deputy Woods decided we would do

 3   what is called a consensual stop, in other words, a police

 4   officer can stop and talk to anybody.

 5        You don't have to be a police officer to talk to

 6   anybody.  Police officer has the same right as a private

 7   citizen.  I can walk up to any citizen and start a

 8   conversation.  There is absolutely no force of law at that

 9   point in time.

10        But because it's a police officer, the police

11   officer can engage in conversation voluntarily that would

12   perhaps gain information, gain an understanding of what the

13   person's purpose and mission is in that particular --

14   activity, not mission, activity is at that particular point

15   in time.

16        And that's what Deputy Woods did, according to his

17   statements and his reports.

18   Q    Mr. Chapman, I am going to interrupt you for a second.

19        Do you have at your disposal a binder that says

20   "Defendants' Trial Exhibits"?  And if so, could you please

21   locate Binder 1 of 2.

22   A    Got it.

23   Q    Thank you.

24        You talked about your training and experience with

25   POST in Sacramento.  I don't recall if I heard you tell the

1    jury what the acronym means.  Could you please tell us what

2    that means.

3    A    I did tell them.  It's Peace Officer Standards and

4    Training.  Basically what POST is, it's the certification

5    board for all police officers in the state of California.

6         You have to -- a police officer has to satisfy the

7    requirements -- and we're talking about academic achievement

8    requirements of certain acceptable scores -- to become a

9    police officer in the state of California.

10         It's like the American Medical Association has an

11    examination for doctors, California State Bar has

12    certification, State Bar for all judicial officers.

13         Law enforcement is no exception.  We have a

14    certification board for all police officers.  And,

15    basically, what it is, it is a requisite amount of

16    information and learning that qualifies an individual to be

17    a police officer in the state of California.  It's requisite

18    bottom line for proficiency.

19         Now, that can increase, and it can actually go to

20    higher standards, but that's the basic line.  That's what

21    POST does.

22    Q    Are you familiar with Learning Domain 15 of POST?

23    A    Yes, I am.

24    Q    What are learning domains as they relate to POST?

25    A    I think at last count there was about 63

1    learning domains.  Basically, it's like going to school and

2    you take social studies and you take physics and you take

3    math and you take sociology.  The learning domain is the

4    same thing.  We just call them learning domains, but

5    they're, basically, classes in a curriculum.

6            They go all the way from ethics, professionalism,

7    and all the way to every conceivable situation and

8    combination of occurrences that will more than likely

9    confront a police officer.

10           It's kind of hard to do because we are kind of

11   guessing what's going to happen.  But, basically, we marry

12   legislation and the law and the experience of police

13   officers.  You talk about Learning Domain 15, those are laws

14   of arrest.

15           We know that police officers are going to make an

16   arrest.  So we built a curriculum for every police officer

17   to learn, to study, and to competently pass so that that

18   police officer, he and she, can make an arrest consistent

19   with the laws of the State of California and case law

20   constitutional rights of the United States constitution, and

21   also consistent with policies and procedures to conform with

22   the agency guidelines based on proper conduct and, most

23   important, officer safety.

24   Q    And is a police officer able to be on patrol without

25   being POST certified?

```
 1   A    No.  No.  No.  It -- no.  Not a full-time police
 2   officer, no.
 3   Q    With respect to -- can you turn to defendant's
 4   Exhibit 105.
 5   A    I have.
 6   Q    And what is Defendant's 105?
 7   A    Like I stated, it's laws of arrest.
 8   Q    Can you turn to page 2-4.
 9   A    Got it.
10   Q    And what does Learning Domain 15-2-4 talk about?
11   A    Talks about consensual encounter.  That's kind of the
12   cornerstone of this particular case as I reviewed it.  Talks
13   about the ability and the responsibility, the rights and the
14   limitations of every police officer in conducting an
15   encounter with a citizen who at that particular point in
16   time had not committed any crime.
17   Q    Now, on 2-4, the domain talks about elevating actions.
18   Are you familiar with that?
19   A    Yes.
20   Q    And as it relates to this case and the documents that
21   you reviewed and the video that you watched, the audio that
22   you listened to, do you see the column or the table that
23   shows possible elevating actions and alternate actions?
24   A    Yes.
25   Q    Are you aware that -- are you aware of whether or not
```

```
 1    Deputy Woods used his emergency lights?

 2    A      He did not.

 3    Q      Why is that important?

 4    A      Well, we can cut to the chase.  If you are going to

 5    have a consensual encounter, it's exactly that.  If you are

 6    going to be a police officer and you are in uniform, that's

 7    a lot to begin with.

 8            And we all know that, anytime a police officer

 9    walks up and talks to you, you are going to have -- he is

10    going to have your undivided attention because a peace

11    officer is the only person in a free society who can deprive

12    you of your freedom.

13            However, it's very important in a consensual

14    encounter that the officer maintain a low tone, that the

15    officer not present himself in an enforcement manner, no red

16    lights, no running up, no shouting, no grabbing of batons

17    and weapons.  It's a consensual encounter.  The purpose and

18    the goal of a consensual encounter is to gain information

19    through conversation.  That's it.

20    Q    Did you -- did you listen to the audio and watch the

21    video in this case?

22    A      Yes, I did.

23    Q    Can you describe to the jury your opinion of how

24    Deputy Woods conducted himself as he initiated this

25    consensual encounter.
```

1  A    He conducted himself according to policy of the

2  San Bernardino County Sheriff's Department but also

3  consistent with training, the way we train police officers

4  to be.

5        I can tell you as a sergeant supervisor, as a

6  lieutenant, as a captain, as a station commander, and as a

7  chief of police, and a trained federal agent, this is the

8  way I would want all my police officers to conduct

9  consensual encounters:  Conversationally, cajoling, actually

10 being inquisitive in a nonthreatening manner.

11       You can listen to the audio tape.  I saw nothing

12 that would be characterized as overbearing, officious, or

13 threatening in the tone or the approach of Deputy Woods,

14 consistent with training.

15       We're talking about training, not my opinion.

16 This is what is expected out of a police officer according

17 to this training, and it was consistent with the actions of

18 Deputy Woods.

19 Q    Did you hear Deputy Woods during the consensual

20 encounter yell at Mr. Pickett?

21 A    No.  That's what I am talking about.  There is -- there

22 was no yelling.  There was no, sort of, excited commands.

23 There was no purposeful agitation.  And most importantly,

24 there was no tone or words that conveyed, well, I am a

25 police officer, now you are just a citizen, and I am going

```
 1    to tell you what to do.  It was a conversation that a person
 2    would have with another person regardless of being in
 3    uniform.
 4    Q    Please talk about the time and distance and
 5    Deputy Woods's testimony that he concluded that Mr. Pickett
 6    ran and hopped the fence based on your observations of
 7    having been out at the scene and listening to the -- or
 8    reviewing the records in this case and -- in light of
 9    Deputy Woods's conclusion and his testimony in this case.
10    A    Yeah.  It was a summation on the part of Deputy Woods
11    that Mr. Pickett actually ran down the sidewalk once he lost
12    view of him around the barber shop.
13          But as I drove that location, it's quite a
14    distance between the gate of the entry to the motel, the
15    El Rancho Motel, and where the intersection was.
16          Now, what we don't know is the phasing of the
17    light, the light at 2nd and Main Street.  Deputy Woods was
18    stopped at the red.  We don't know what that phasing was
19    until that light turned green.  But according to
20    Deputy Woods, it was sufficient enough for him to turn left.
21          If you go westbound, go up to 1st Street and to
22    make a U-turn and come back to the driveway into the motel,
23    that it was his summation at that point that the only way
24    that he could have observed Mr. Pickett 25 yards into the
25    parking lot was that Mr. Pickett would have to have run to
```

 1    get to that position from where Deputy Woods last saw him at

 2    the southwest corner of 2nd and Main Street.

 3    Q    And based upon your background, training, and

 4    experience, what's your opinion about that summation or that

 5    conclusion?

 6    A    I think that's a reasonable summation.  I mean I drove

 7    it.  I saw it, and I knew that if -- I -- if that red light

 8    had phased into a minute or two minutes, that by the time I

 9    got out to Main Street and turned around and for an

10    individual to go that far down to get to that parking lot

11    and -- I mean, to the gate and into the parking lot, they

12    would have to be moving at a pretty good clip.

13           It was just an estimation.  Obviously,

14    Deputy Woods didn't see him running, but it would be -- in

15    my opinion, it would be a very good estimation that an

16    individual would have to run.  It was a long way.

17    Q    So now let's talk about, again, the consensual

18    encounter and what you observed in watching the video and

19    listening to the audio, and let's talk about Deputy Woods's

20    first contact with Mr. Pickett.

21    A    The first contact with Mr. Pickett, I think we can all

22    pick up on the audio tape and some form or fashion on the

23    video where Deputy Woods actually goes up to Mr. Pickett and

24    says, "Hey, I want to talk to you."

25           We're not losing a fact that he is a police

1   officer and in uniform.  We're not going to candy coat that.

2   We know Mr. Pickett knew that he was dealing with a police

3   officer.

4        But at that point in time, Mr. Pickett was free to

5   go.  He was free not to talk to Deputy Woods.  Deputy Woods

6   didn't say that he had to talk to him.  Deputy Woods was

7   just asking him some questions.  And it becomes very

8   important at this point.

9        Every citizen confronted with a police officer can

10  turn around and walk away.  You don't have to talk to a

11  police officer.  You don't have to say a word to him, just

12  leave.

13       But when you answer a question that you are asked,

14  the police officer has a right to ask another question.  And

15  if you answer that question, he is going to ask you another

16  question.  He is going to keep asking you questions as long

17  as you are giving him answers, regardless of the legality or

18  any criminal acts that are occurring.

19       And in my listening to the audio tape, that's what

20  I decipher.  That's what I interpret it, a continuous Q and

21  A -- ask the question, get an answer, and continuing and

22  continuing so forth, and Mr. Pickett cooperating with the

23  officer in regards to satisfying those inquiries.

24  Q    So your view of the materials -- and you listened to

25  the audio, you watched the video.  Deputy Woods had -- has

1    testified that he observed Mr. Pickett had eye tremors, that

2    he was nervous, that his fingers were fidgety, that he was

3    pacing back and forth, that he continued to put his hands in

4    and out of the his pockets although Deputy Woods asked him

5    not to, Deputy Woods asked him to -- ask if he could pat him

6    down and Mr. Pickett said, "No."

7         And Mr. Pickett continued to engage him, and then

8    Deputy Woods asked him whether or not he had any -- whether

9    he was on probation or parole, Mr. Pickett said, "No."  He

10   asked him if he had been arrested, Mr. Pickett said, "Yes."

11   And he asked him if he had any warrants, and Mr. Pickett

12   said, "No."  And Deputy Woods continued to engage him and

13   ask him further questions.

14        After that series of questions -- you heard them

15   on the audio tape.  What is your opinion about the nature of

16   this consensual encounter and whether there was one?

17   A    Well, it's -- there is two things going on here.

18        There was nothing wrong, there is nothing illegal

19   in the law as far as police officers is concerned.  There is

20   nothing untoward as far as POST training, and there is

21   nothing procedurally incorrect with what Deputy Woods was

22   doing in asking him, Mr. Pickett, questions.

23        Mr. Pickett didn't have to answer any of those

24   questions, but he did.  And so as a police practices expert

25   and, sort of, the trier of these facts, based on my training

1    and experience, I didn't see anything wrong with that.  It

2    was consensual.  It was an exchange back and forth of

3    communication.

4           However, when you talk to a police officer, they

5    can look at you.  And based on their training and

6    experience, they can make a determination on your behavior,

7    your physical state, your gestures, or anything that may be

8    suspicious about you based on that encounter.

9           We're not talking about any criminal acts.  We're

10   talking about every police officer that you encounter.  They

11   look at you differently than another citizen would look at

12   you.

13          And based on that, the police officers can form

14   opinions, and that's what was happening.  Two things were

15   going on at one time.  Deputy Woods was accumulating and

16   obtaining information verbally.

17          The second thing he was doing was evaluating

18   Mr. Pickett based on his training and his education, and he

19   was combining both of those things at the same time.

20          And that's happens when you talk to a police

21   officer.  They're going to look at you because the

22   consensual encounter was because of suspicious behavior.

23   And the officer is going to try to ferret out and determine,

24   analyze, does that suspicious behavior rise to the level of

25   a criminal violation.

```
 1              And that's what was going on here.  But it was all
 2  voluntary.  It was all consensual at the initial outset.
 3  Q    Now, you listened to the audio.
 4              Did you hear Mr. Pickett consenting or complying
 5  or cooperating with Deputy Woods?
 6  A    I did.  I mean, Mr. Pickett gave his name.
 7  Q    Was that cooperation?
 8  A    It's cooperation.  But it's voluntary cooperation.  He
 9  didn't have to tell him his name.
10  Q    Did he -- did Mr. Pickett give any other information?
11  A    He gave his birthday.
12  Q    Is that cooperation?
13  A    Cooperation, but it's not obligation.  He didn't have
14  to give his birthday.
15  Q    And did you hear Mr. Pickett say, "Yes," and provide
16  other information in response to Deputy Woods's questions?
17  A    Well, I think the most significant thing was that
18  Mr. Pickett advised or responded to the question, "Have you
19  been arrested?"  He said, "Yes."
20              Now, that's pretty significant when you tell that
21  to a police officer because we have data collection systems
22  in the state of California.  And if you have been arrested,
23  regardless of whether you are convicted or not, you are in
24  the system.
25  Q    And Mr. Pickett confirmed Deputy Woods's misspelling of
```

```
 1   his last name.  Are you aware of that?
 2   A    More than once.
 3            MR. GALIPO:  Object as calls for speculation and
 4   lacks foundation as phrased.
 5            THE COURT:  Overruled.
 6            THE WITNESS:  More than once.
 7   BY MR. EWING:
 8   Q    And what information -- what does -- what did that, in
 9   your opinion, tell Deputy Woods in light of the fact that
10   Mr. Pickett had said to Deputy Woods that he had been
11   arrested?
12   A    Well, to be in the system as I talked about, there are
13   certain identifiers, and those identifiers start with your
14   name.
15            If you tell me what your name is after you
16   informed me that you have been arrested, you are going to be
17   in the system.  There is no doubt about that.
18            You give me a birth date in addition to a name,
19   and now we get even closer coordinates to identifying you in
20   the system and why you were in the system.
21            And at that point in time, the encounter had
22   transitioned into an inquiry into a California state data
23   system.  We call it CLETS, C-L-E-T-S, California Law
24   Enforcement Telecommunication System.
25   Q    So, Deputy Woods, during his encounter, observed and
```

1   has testified that he observed that Mr. Pickett's fingers

2   were twitching, that he was pacing back and forth, that he

3   had difficulty controlling his small motor functions, that

4   he wouldn't let Deputy Woods look into his eyes, that he

5   seemed nervous and was evasive.

6          What, based on your training and experience, does

7   that tell you with respect to Deputy Woods's encounter with

8   Mr. Pickett?

9   A    Consistent with POST training and POST Training

10  Domain 12, substance abuse, those are the baseline objective

11  symptoms of narcotic intoxication.

12  Q    And Deputy Woods testified that he was under the

13  suspicion that Mr. Pickett was under the influence of a

14  narcotic and at that point he also could not confirm or find

15  Mr. Pickett in the database system that you referred to.

16  And this is during the consensual.

17         You listened to the audio, you watched the video.

18  Based on your training and experience, please tell the jury

19  about Deputy Kyle Woods's behavior at that point.

20  A    At that point, the consensual encounter was progressing

21  into the area of a physical detention.

22         It's very important to understand the difference

23  of what we have here.  We have a continuum.  You have a

24  series of events that occur along a linear line.  The first

25  event is a consensual encounter.

```
 1          Once information is gathered, then the level of
 2   suspicious based on that information can result in the
 3   police officer at that point in time forming what we call
 4   reasonable suspicion to detain the individual until
 5   additional information can be confirmed or gathered to
 6   exonerate the individual from any sort of wrongdoing.
 7          And we are traveling along that continuum.  The
 8   continuum goes on to what we call -- and we'll get to that
 9   later -- but it gets to probable cause.  And at that point
10   in time probable cause justifies an arrest, but let's go
11   back where we are.
12   Q    Right now I would also like you to tell the jury about
13   the concept and the theory of the totality of the
14   circumstances.
15          What does that mean based on your training and
16   experience, and what does that mean to Deputy Kyle Woods, if
17   you know?
18   A    Very simply without being technical, totality of the
19   circumstances are just the building blocks.  You are
20   actually building, say, a wall or you are building a
21   structure, and you do it block by block.
22          If you get information that is not verifiable
23   through your data system, that's one brick in the wall.
24          If you get information relative to a name that is
25   not evident in your data system, that's another brick.
```

1           If you get information gathered visually or

2    through your senses that an individual may be under the

3    influence of narcotics, that's another brick.

4           If you have information that there is a no

5    trespassing sign on the property that you are actually

6    engaging the individual in, that's another brick.

7           If you don't have identification for that

8    individual or purpose for being present, that's another

9    brick.

10          And so it goes step by step.

11          If you listen to the audio in this case, it wasn't

12   a scatter gram, it wasn't a blast out.  Deputy Woods went

13   step by step by step.

14          For every brick I was telling you about, he

15   extracted it from his communication and his observation

16   abilities, and he laid it down.  He got the next one, and he

17   laid that down.  He got the next one, and he laid that down.

18          That's a proper continuum.  That's the way I

19   expect all my police officers to conduct themselves.  That's

20   the way any competent police chief would expect an officer

21   to do it, not to be accusatory and not to be overbearing and

22   not to be officious.  And this is what was going on at the

23   time.

24   Q    So at the point that -- you recall the point in the

25   audio tape where Deputy Woods utters "Code 4 for now"?  Do

1    you recall that point?

2    A    Yes.

3    Q    And please tell the jury, based upon the bricks you

4    talked about, where Deputy Woods was at that point, in your

5    opinion, and what "Code 4 for now" means.

6    A    Well, we talked about that, that transition from a

7    consensual encounter to maybe getting into what would be

8    reasonable cause to actually make a detention.  Now, let's

9    be very clear about that.

10          I was a professor of this for six years.  I taught

11   this class.  And, basically, what we teach police officers

12   and what I taught my students was, once you cross that

13   threshold of detention, you get into the area where the

14   person is really not free to leave.

15          And so you have to be pretty sure -- the officer

16   has to be pretty sure that he has sufficient amount of

17   information in order to proceed with the person being there

18   at the time and not being free to walk away, not being under

19   arrest and not being consensual at the time but sort of in

20   that middle ground.

21          And at this point in time when an officer keys his

22   or her mic and goes, "Code 4," it means no more assistance

23   is necessary at that point in time.  So there has been, sort

24   of, a determination that the officer is going to somehow

25   restrain or somehow contain the situation.

```
 1   Q    In your opinion, did Deputy Woods have enough
 2   information at the point when he says, "Code 4 for now," to
 3   detain Mr. Pickett?
 4   A    I think we had crossed that threshold.  I think there
 5   was enough information at that time based on the objective
 6   systems of intoxication, based on the no trespassing sign
 7   and Mr. Pickett and Deputy Woods having the encounter in the
 8   restricted area, if you will.
 9        The fact that there was information volunteered
10   about an arrest and there was the inability of the officer
11   to ferret that information out from the data collection
12   system was sufficient enough to hold Mr. Pickett there until
13   he could either be exonerated or the reason for the
14   inability to pull up his records could be rectified with
15   corrected material, the further information that could be
16   inputted.
17        So at that point in time, Mr. Pickett was not free
18   to leave.  We had transitioned to a physical detention.
19   Q    And is there a difference between a detention and
20   arrest?
21   A    Oh, very much so, yeah.  When -- it's a lower level.
22   When you talk about a detention, you are talking about
23   reasonable suspicion, kind of a legal term of art, if you
24   will.
25        But, basically, is it reasonable for you to
```

1  suspect that this is going on?  Let's just break it down.

2  Is it reasonable, not just for a police officer, but is it

3  reasonable for a similarly situated individual of like mind

4  and circumstance and experience and education to assume that

5  what he or she is confronting is suspicious in nature enough

6  to rise to the level of needing additional information.

7  Q    So what do you do when you detain someone?  You gather

8  that additional information?

9  A    That's why you detain them.  If you cross that

10 transitional line to a physical detention, then you have

11 opened up the door that there is a possibility there could

12 be criminal activity.

13      If there is criminal activity, then you don't want

14 to go chase the person who is three or four blocks down the

15 street after you let them go.  You keep them there until you

16 decide whether or not it's sufficient enough to effect an

17 arrest.

18 Q    When an officer detains someone, what does that officer

19 typically do after they detain them?  Gather more

20 information?

21 A    I just said that, yes.  But the officer has a few

22 things to do.  The officer can just have the person stand

23 there.  The officer can handcuff and restrain the person if

24 he or she elects to do so.

25      But I think the salient point here -- the most

```
 1   important point here is the person at that point in time is
 2   not under arrest but not free to leave.
 3   Q    Have you arrested people before?
 4   A    Yes, I have.
 5   Q    Have you detained people before?
 6   A    Yes, I have.
 7   Q    In the audio you hear Deputy Woods say, "Turn around."
 8   Do you recall hearing that?
 9   A    Yes.
10   Q    What does that mean to you based on your training and
11   experience?
12   A    Most definitely Deputy Woods was about to place
13   handcuffs on Mr. Pickett.
14   Q    And tell the jury your opinion about what transpires
15   right after Deputy Woods says to Mr. Pickett, "Turn around."
16              MR. GALIPO:  I am going to object as this calls
17   for speculation and vague as phrased.
18              THE COURT:  Overruled.
19   BY MR. EWING:
20   Q    You have watched the video, you have listened to the
21   audio.  What happened?
22   A    It's my understanding that Mr. Pickett recoiled, moved
23   away, obviously not wanting to be handcuffed or restrained
24   or to turn around and comply, what we call a lawful order at
25   that point in time.  And --
```

1  Q    I am going to pause you right there.

2  A    Yeah, I think I should.

3  Q    Not complying with a lawful order?  What does that

4  mean?

5  A    At that point in time -- and this is a good point.  I

6  start this out you don't have to comply with anything a

7  police officer says, but it's pretty intimidating to sit

8  there and look at somebody with a badge and gun and uniform

9  just getting out of a police car.  But really you don't have

10 to comply.

11        But at that point in time, when a police officer

12 gives you a command and tells you you have to do something,

13 now that badge and that symbol of authority, now that

14 uniform becomes the authority, and you have an obligation to

15 comply.

16        It's not consensual anymore.  You have a uniformed

17 police officer telling you you have to do something.  "Turn

18 around."  If you don't turn around, then it becomes a

19 consequence of that detention moving forward.

20 Q    Is not complying with a lawful order a crime?

21        MR. GALIPO:  I am going to object as calls for a

22 legal conclusion.

23        THE COURT:  Sustained.

24 BY MR. EWING:

25 Q    What happened next after Mr. Pickett didn't comply?

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A    Deputy Woods reached out and what we term "attempted"

 2   to apply -- apply a firm grip to bring Mr. Pickett back into

 3   a position where Deputy Woods could apply handcuffs.

 4   Q    Based on the audio and the video, what did you observe

 5   next?

 6   A    That Mr. Pickett pulled away and ran through the

 7   breezeway away from Deputy Woods.

 8   Q    And pretty obvious, but I will say it.  Was he

 9   complying?

10   A    No.  At that point, and this is an importance point.

11   We were all already into the physical detention.

12        When Mr. Pickett pulled away and he ran, we

13   transitioned to the next level, and that was probable cause

14   for arrest based on the disobedience to a lawful order which

15   constitutes resisting, obstructing arrest, 148(a) of the

16   Penal Code.

17        You can see it in the videotape where Mr. Pickett

18   is actually running away.  That's obstructing and resisting

19   arrest.

20        So now we have gone all three levels:  Consensual

21   encounter, physical detention based on a reasonable

22   suspicion, and then probable cause to arrest for misdemeanor

23   violation.

24        MR. EWING:  May I have a moment, Your Honor.

25        THE COURT:  Absolutely.
```

```
 1   BY MR. EWING:
 2   Q    Drawing your attention to Defense 105, Mr. Chapman,
 3   could you turn to page 4-5.
 4   A    Got it.
 5   Q    Do you see the table in front of you?
 6   A    Yes.
 7   Q    Can you read for the jury what that table says.
 8   A    Is --
 9   Q    Both sides.
10   A    Wrong page.
11   Q    4-5 --
12   A    I apologize.
13            THE COURT:  I didn't hear the objection.
14            MR. GALIPO:  I didn't want to cut you off.  I
15   think it calls for hearsay if he is just reading from the
16   document.
17            THE COURT:  Sustained.
18   BY MR. EWING:
19   Q    Do you see "Learning Domain 15," page 4-5, "probable
20   cause for arrest"?
21   A    This is Learning Domain 20.  Under tab 0-5.
22            Got it.  Sorry.  Wrong tab.
23   Q    Okay.  So first I want to start with the -- without you
24   reading based on the sustained objection, what are the
25   factors in this case that you understand Deputy Woods
```

1    considered for -- to formulate reasonable suspicion?

2    A    Reasonable suspicion would be everything that we have

3    talked about.  It's the objective systems of intoxication,

4    being at a location that was posted no trespassing under

5    penalty of law, being -- giving information that was

6    inconsistent with what the data collection systems were

7    revealing or what they had maintained.

8         The -- I think at that point in time, that would

9    suffice to establish reasonable suspicion for physical

10   detention.

11   Q    What are the factors that Deputy Woods considered to

12   formulate probable cause to arrest?

13   A    And it's a continuum at that point in time.  Once there

14   was resistance to the physical detention, it transitioned

15   into probable cause for resisting.

16   Q    Mr. Chapman, do you, based on your training and

17   experience, do you throw out all of the other factors that

18   you considered to formulate your reasonable suspicion?

19   A    No.  That investigation is going to continue.

20   Q    That's part of the continuum?

21   A    It parallels the continuum because, once you get the

22   violation of the law, then the objective of the officer is

23   to make the arrest.

24        So the arrest is going to be made, but then we go

25   back.  We throw it in reverse and actually go back and

1  examine, ferret out, investigate all those reasonable

2  suspicions to see if there was actually a criminal violation

3  in that realm, in that context.  But the completed act of a

4  misdemeanor had already been committed in the 148(a) PC,

5  Penal Code section.

6  Q   Now that we're at the point in this encounter where

7  Deputy Woods has, in your opinion, formulated probable cause

8  to arrest, Mr. Pickett runs, is flight a factor to consider?

9  A   Well, yeah.  It's a very important fact to consider.

10  Q   Why?  Please tell the jury.

11  A   In this particular case, it's undeniable that

12  Mr. Pickett had not been searched.  During the consensual

13  encounter phase, Deputy Woods asked very politely, "Can I

14  search you," and Mr. Pickett said, "No."  And Deputy Woods

15  said, "Okay," didn't search him.  I found that commendable.

16       But once that occurred, the thing that we do know

17  is Deputy Woods has no idea what's in the pockets or on the

18  person of Mr. Pickett.  He hasn't been searched.  He hasn't

19  been cleared, he hasn't been screened.

20       Now you have Mr. Pickett, who may or may not live

21  in the location, running through an environment in a

22  vicinity in the area where he lives that Deputy Woods has no

23  knowledge of.

24       And so is Mr. Pickett going to retrieve a weapon?

25  Is he going to secret himself in someplace where he can

1   barricade himself and be a further threat not only to

2   Deputy Woods but to the community?  So flight at that point

3   becomes very important because the one thing that

4   Deputy Woods doesn't know -- and it's undisputed -- he

5   doesn't know where Mr. Pickett is going, and he doesn't know

6   why Mr. Pickett is going there.

7           And the assumption based on officer safety

8   protocol is to assume that the flight entail either arming

9   himself or somehow defending himself from a police officer

10  in addition to, obviously, evasion.

11  Q    Now, you have seen the video.  There is a point where

12  you see Mr. Pickett falling down the stairs and Deputy Woods

13  gives chase and catches up to him.  Do you recall seeing

14  that?

15  A    Yes.

16  Q    And at that point Deputy Woods unholsters and aims his

17  Taser at Mr. Pickett.  Do you recall that?

18  A    Yes.

19  Q    And can you offer an opinion to the jury as to the

20  aiming of the Taser at Mr. Pickett by Deputy Woods.

21  A    Yes.  It's -- in my opinion, it is to elicit

22  compliance.  I think most people know what a Taser is and

23  what a Taser can do.  I have been tased, and it's not a

24  pleasant experience.  It's terrible.

25           But if an officer points a Taser at you, it -- in

1   most cases it will compel compliance.  Nobody wants to be

2   tased.  And I think it was commendable on the part of

3   Deputy Woods at that point in time to maybe display a tool,

4   or a weapon, if you want, or a Taser, to say, "Either you do

5   what I tell you to do or I am going to pull the trigger and

6   I am going to shock you with this thing."  And trust me, it

7   does.

8          So I think that was appropriate as opposed to

9   doing anything physical at that time because the resolution

10  of physical conflict without physical contact is the goal of

11  every police officer and certainly the goal of every police

12  administrator.  I don't want my officers hitting anybody.  I

13  don't want them hurting anybody.

14         And if they can scare somebody or threaten

15  somebody with the use of a tool without having to go hands

16  on, without having to use any kind of force, that is what I

17  want to see, and that's what this deputy did in this

18  particular situation.

19  Q   Is Deputy Woods's use of the Taser, threatening to use

20  it, was that consistent with POST training?

21  A   Absolutely.  He didn't use it.  He threatened to use

22  it.  There is nothing out of policy about that.

23  Q   On the types of force that are taught in POST, can you

24  describe those to the jury.

25  A   Yeah.  There is force that can overcome what we call

```
 1   compliant behavior.  There is force that overcomes resistant
 2   behavior.  There is force that can be used to overcome
 3   assaultive behavior and, of course, there is force to
 4   overcome what we consider deadly behavior.
 5           So those are the four levels of force that are
 6   used not on a continuum but in a situational context.  You
 7   don't have to work your way up the force.  You can take the
 8   threat and then use the force appropriate to neutralize the
 9   threat.
10           At this particular point in time, there is no
11   direct threat to Deputy Woods.  Deputy Woods at that point
12   in time is not getting compliance; so we don't want to hit
13   anybody.  We don't want to hurt anybody.  It's just
14   compliance.
15           And the mere showing of or display of a weapon
16   that could cause physical discomfort was the appropriate
17   thing to do.
18   Q    On the levels of force that you have just described,
19   where does the use of the Taser and the threat to use it by
20   Deputy Woods fall?
21   A    That would be noncompliance at that point in time.
22   Q    Would that be one of the lower levels of force?
23   A    There is four quadrants, and that is -- passive
24   resistance is the lowest.  And then there is noncompliance.
25           That is sort of the second level because at that
```

1    point in time Mr. Pickett hadn't done anything to threaten

2    the officer.  So the officer didn't do anything to

3    physically hurt Mr. Pickett.

4    Q    And take the jury through what happens next.

5             At some point, Deputy Woods holsters his Taser.

6    And before we get down to what happened next -- I apologize.

7    I am going to ask you about the use of the Taser at that

8    location given the closeness of Mr. Pickett to Deputy Woods.

9    Please provide your opinion on that.

10   A    Well, there is training that is issued by Taser

11   International.  That's the manufacturer who actually makes

12   the device.  They change names now.  It's called Axon.

13            But anyway, the nomenclature -- has got to be a

14   better word than that -- the actual mechanics of a weapon

15   have certain limitations.

16            So there has to be a requisite amount of distance

17   between the Taser and the individual.  The Taser darts

18   travel out at approximately one inch for every foot of

19   travel.  When I say "travel out," they spread one inch.  So

20   if you go one foot, one inch; two-foot, two inches;

21   three-foot, three inches.

22            What we want to get is a seven-inch spread on

23   those darts.  The reason you want to get a seven-inch spread

24   is because we want to achieve a good electrical contact.

25            If the darts are too close together, it's just

1    going to tingle right here.  If they're this close together,

2    it's going to hurt your pecs a little bit.

3            If you get a diagonal from the shoulder to the hip

4    bone, you are going to the ground, and I mean right now,

5    because we have achieved neural muscular incapacitation.

6    That's what we want.

7            If you are closer than seven feet, it's not going

8    to work.  You are going to get those darts in too close,

9    and, basically, all you are going to do is agitate the

10   individual.  It's going to hurt like heck, but you are going

11   to make him mad.

12           And at that point in time, based on his training

13   and his understanding of his tool, he appropriately

14   holstered his tool because it would have been ineffective.

15   And, basically, it would have resorted to a torture device

16   because all it's going to do is hurt like heck.

17   Q    Now, we're at the point where Deputy Woods holsters his

18   Taser.  And you have seen the video, engages in another

19   technique.  Can you describe that to the jury.

20   A    At that point in time, Deputy Woods goes hands on.

21   Q    What does that enema?

22   A    Actually confronts and touches the individual.

23           We talked about the firm grip.  Firm grip is when

24   you grab a suspect and you, sort of, move him around.  It's

25   not even a reportable use of force.

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    You can take an individual that you have arrested

2    for drunk driving, open the door, take him by the bicep,

3    hold their head, put him in the car.  You are touching him,

4    you are making him do something that they wouldn't

5    voluntarily do.

6    But it's not a reportable use of force because you

7    are not doing that to make them comply through pain.  You

8    are doing it to direct their movements.  Very important

9    distinction.

10    The next level is what we call "Control holds."

11    It's when an officer grabs you by the wrist, takes your arm

12    behind you, sort of bends your wrist up a little bit, causes

13    some discomfort, takes the cuffs out, puts the cuffs on you.

14    That's what's called control holds.

15    And that's what Deputy Woods did at that point in

16    time.  He applied a control hold to overcome Mr. Pickett's

17    resistance because, obviously, Mr. Pickett wasn't very

18    impressed with the Taser presentation.

19    MR. GALIPO:  I apologize, Your Honor.  I am going

20    to object and move to strike the last part of his response

21    that Mr. Pickett was not impressed with the Taser

22    presentation as lacking foundation and calling for

23    speculation.

24    THE COURT:  Sustained and stricken.

25

```
 1   BY MR. EWING:

 2   Q    Did Mr. Pickett comply when Deputy Woods presented his

 3   Taser and threatened to use it?

 4   A    Not that I could see.

 5   Q    And when Deputy Woods went, as you described, hands on

 6   with Mr. Pickett, what happened next?

 7   A    It appeared that Deputy Woods tried to turn Mr. Pickett

 8   around and to control his hands behind his back.  I believe

 9   at the time Mr. Pickett was in a sitting position, and it

10   appeared to me from what I could see and what I have read is

11   that the goal of the deputy at that point in time was to

12   apply handcuffs.

13   Q    Can you describe the technique that Deputy Woods used

14   in attempting to apply the handcuffs.

15   A    Yes.  He bent over, tried to obtain the hands of

16   Mr. Pickett, and then there was a brief confrontation at

17   that point.

18   Q    Do you recall hearing in the audio Deputy Woods telling

19   Mr. Pickett to turn over?

20   A    Yes.  And the "turn over" would mean to lay on his

21   stomach and present his arms behind his back.

22   Q    And was that command consistent with POST training?

23   A    Yes.  We want all police officers to assume position of

24   advantage.  We want police officers --

25              MR. GALIPO:  I apologize, Your Honor.  I think
```

```
 1   he's responded to the question, that it was consistent with

 2   POST standards.

 3            THE COURT:  All right.  So what's the objection?

 4            MR. GALIPO:  "What we want all police officers to

 5   do," beyond that is beyond the scope of the question.

 6            THE COURT:  Objection sustained.

 7   BY MR. EWING:

 8   Q    What's the purpose of the verbal command to "turn

 9   over"?

10   A    To achieve a position where the -- based on leverage,

11   based on positions of the bodies that the officer is going

12   to have superior advantage to control any kind of restraint,

13   any kind of struggle that may occur at that point in time.

14   Q    At any point did you observe Mr. Pickett in the video

15   to turn over?

16   A    No.

17   Q    And after Deputy Woods commanded Mr. Pickett to turn

18   over, what did you observe next with respect to this

19   attempted arrest?

20            MR. GALIPO:  I apologize.  I am going to object as

21   this calls for a narrative and speculation as to what he

22   observed as opposed to his opinions or hypotheticals.

23            THE COURT:  I'll allow it.

24            THE WITNESS:  It transitioned at that point in

25   time to pretty much a physical altercation where there were
```

```
 1   blows exchanged between Deputy Woods and Mr. Pickett.
 2             MR. GALIPO:  I am going to object and move to
 3   strike that there were blows exchanged as lacking
 4   foundation, calls for speculation, and not seen in the
 5   video.
 6             THE COURT:  Overruled.
 7   BY MR. EWING:
 8   Q    You do understand from your review of the records in
 9   this case and you do understand from Deputy Woods's
10   testimony that he stated that Mr. Pickett struck him?
11   A    Yes.  I'm not basing my answers solely on the video.  I
12   am basing it also on sworn testimony that was provided in
13   this case through deposition.
14   Q    So you described a physical altercation taking place.
15   Based on your background, training, and experience, what is
16   happening at this point where there is a fight?  What tools
17   does Deputy Woods have available to him?
18   A    At this point in time the only tools he has is what we
19   call personal weapons.  That's kind of tactical training
20   jargon for just fists and elbows and knees and head strikes,
21   those kinds of things.
22             But from what I could see in the video, there were
23   punches being swung.
24             MR. GALIPO:  Again, Your Honor, I am going to
25   object as not seen in the video by their own expert, and
```

```
 1    it's vague as to what punches he is talking about.
 2              THE COURT:  Sustained as to vague.  And, counsel,
 3    let's focus on this expert's opinions.
 4              MR. EWING:  Certainly.
 5    Q    So, in your opinion, was Deputy Woods's use of his
 6    personal weapons consistent with POST training?
 7    A    Yes.
 8    Q    Why?
 9    A    Because personal weapons gets into -- we talked about
10    these four levels of use of force.  We're in assaulted at
11    that point in time.  When I say, "assaulted," the deputy,
12    Deputy Woods felt his safety was in jeopardy.  At that point
13    in time, a police officer can defend his or herself with the
14    available tools and devices, weapons that they happen to
15    have.
16              The lowest level at that point in time is the use
17    of fist.  Obviously if you hit somebody with your stick, you
18    are going to break a bone, it's going to hurt really bad.
19              If you shoot somebody with a Taser, they're going
20    to lose the ability to stand, they're going to fall down,
21    they're going to hit their head, they're going to hurt
22    themselves.
23              Fists are something that's more controlled.  It's
24    attached to our body.  We can start with succession.
25    Re-engagement is really easy because actually it's all right
```

1    here.  I thought that was the appropriate course of action

2    for self-defense and to overcome resistance and achieve

3    control for Deputy Woods to employ at that time.

4    Q    Deputy Woods has testified that he had his pepper spray

5    on his belt.  Is that a tool that you would recommend, in

6    your opinion, in the circumstances as you know them?

7    A    Not for ground fighting.

8    Q    Why?

9    A    Ground fighting is a whole different, sort of, segment

10   of police training.  It's called grappling.  And once you

11   have pepper spray somebody and you hit him with that spray,

12   pepper spray, the base element in pepper spray is oil.  And

13   if you ever put on suntan lotion and you got a little oil in

14   your eye, that hurts.  Try doing that with pepper spray.

15        Once you get in the ground fighting and you are

16   actually on somebody, if you spray them and you coat them

17   with that oil, everything you touch on them, everything you

18   get on your hands you are going to get on yourself.  And the

19   goal is incapacitation, and that just means to cause the

20   individual to cease.

21        You get pepper spray on yourself, you are a human

22   being.  You have the same sensory elements, same membranes,

23   same pain sensation that the other individual has, and that

24   would really be counter-productive because the use of pepper

25   spray could actually take the officer out of the fight.

1   Q     You testified earlier that you went to the scene.  Did

2   you observe the walkway where the ground fighting occurred?

3   A     Yes.   I walked the entire breezeway from the top to the

4   bottom.

5   Q     And what's your opinion as to Deputy Woods's decision

6   not to use his pepper spray while he was engaged in a fight

7   with Nate Pickett in that walkway?

8   A     Other than cross-contamination that I just talked

9   about, there are a lot of steps.  There are gradations, sort

10  of elevations, I didn't count them all but there are several

11  series of steps that go from the top of the El Rancho

12  establishment all the way down to Main Street.

13          And for an individual to have limited visibility

14  and perception of space in a darkened environment, because

15  of pepper spray, would have subjected anybody, and this

16  deputy in this particular situation, to trip down those

17  stairs.

18          And they're concrete steps.  Some were three

19  steps, some were four steps, but there were several steps,

20  series of steps, and so pepper spray would be totally

21  inappropriate in an environment such as that.

22  Q     Which -- Deputy Woods is not seen on the audio, there

23  is no record of him using his baton although it was

24  available to him.  What is your opinion on Deputy Woods's

25  decision not to use the baton?

```
 1   A     At that point in time baton probably wouldn't be that
 2   effective.  To use a baton you need distance.  You can't --
 3   if you are -- you can't swing at a baseball in a closet.  If
 4   you are too close to somebody and you can't get distance,
 5   then the police officer, according to self-defense training,
 6   can't get leverage.
 7         You have got to have leverage to have that baton
 8   be effective.  And if the officer at that point in time is
 9   not going to disengage from the suspect, there is not going
10   to be any achievement of any kind of leverage that would
11   cause that baton to be effective.
12         Batons only inflict pain.  All they do.  It's pain
13   compliance.  It's to make you do something that I want you
14   to do because that will make me stop hitting you.  And if
15   you are not going to stop and the officer continues to hit,
16   then every blow of that baton becomes a potential cause of
17   injury.
18   Q     Is pain compliance also associated with the use of your
19   personal weapons or your fists?
20   A     Yes.  Yes.  Yes, that's pain compliance, but the
21   transition into control holds is very easy.
22   Q     It's a different type of pain compliance?
23   A     It's a different type of pain compliance because it --
24   you are not using a tool.  When you are swinging a baton,
25   that's pain compliance and you hit somebody.  When you get
```

1  compliance, you have got to put that tool away, and you have

2  got to put it away in a manner that the suspect can't get

3  it.

4  That's different than a Taser which causes you to

5  pass out because you can't control your muscles.  That's

6  different pain compliance than pepper spray because it hurts

7  like heck, but it makes you not be able to see and you can't

8  breathe very well.

9  So now you have got an instrument in your hand

10  that can be used against you.  So the best possible tactic

11  at that point are your personal weapons because they can be

12  instantly controlled.  You can apply the hits, you can

13  transition into a control hold, pull out your handcuffs, and

14  apply your handcuffs, and that's the way police officers are

15  trained.

16  Q    Talk to -- can you tell the jury about the stun mode of

17  the Taser, and whether or not that was a viable option for

18  Deputy Woods at that point.

19  A    Stun mode of a Taser is pain compliance, and that's all

20  it does.  It's got -- you take the cartridge out of the --

21  there is a big cartridge like an ink cartridge in a printer.

22  You take that off the front of Taser, and it has

23  two little prongs that stick out.  And you take those, and

24  stick it on a person, and you pull the trigger, and it

25  burns, and it leaves burn marks like someone had put a lit

1    cigarette or hot match.

2          And basically what it is doing is burning you.

3    It's enough electricity in there to burn, and all you are

4    doing is hurting them.  You are not making them comply

5    unless they just don't want to be hurt anymore.

6    Q    And, in your opinion, was Deputy Woods's decision not

7    to use the stun mode of his Taser POST compliant?

8    A    Yeah.  I'm not a big fan of stun mode because it does

9    produce pain, but then again you have got something in your

10   hand.  So if the suspect says, "Okay, I am not going to

11   resist anymore," and stops resisting, you have got to put

12   that thing away.  And when you are putting it away, you are

13   disengaging.  When you are using personal weapons, the

14   transition is into a control hold.  So you never disengage.

15   You always engage.  It's the best physical tactic at the

16   time.

17         There again our objective is not to hurt people.

18   Our objective is to get people to comply with the lawful

19   commands and the efforts that we are exerting to bring them

20   under control and apply handcuffs and take them into

21   custody.

22         MR. CONAWAY:  Move to strike as not responsive.

23   He was asked about POST compliance.

24         THE COURT:  After the words, "yes," stricken.

25

```
 1   BY MR. EWING:
 2   Q    So now we are at the point where Kyle Woods,
 3   Deputy Woods has made certain decisions as to the use of
 4   tools available to him, and what's your opinion as to what
 5   Kyle Woods does next and while he is grappling with
 6   Mr. Pickett?
 7   A    Well, yeah.  He's using his personal weapons and fist
 8   strikes, and then at some point in time the situation
 9   transitions to where Mr. Pickett is on top of him.
10   Q    And when may a deputy is situated such as Deputy Woods
11   use deadly force?
12   A    I didn't catch your question.
13   Q    When may a deputy situated such as Deputy Woods use
14   deadly force?
15   A    Only when that officer feels that his or her life is in
16   danger.  Imminent danger.  And that's very important,
17   imminent danger.  Not danger down the road, not danger five
18   minutes from now, not, "Oh, maybe you are going to scare
19   me."
20        It has to be what we call a sufficiency of fear.
21   There has to be sufficient basis for the officer to believe
22   that his or her life is going to be taken immediately, and
23   at that point in time deadly force is justified.
24   Q    And what's your opinion as to Deputy Woods's use of
25   deadly force in this case and why?
```

1  A     According to his statements and his sworn statements,

2  Deputy Woods at that point in time thought that he was

3  losing consciousness, he was losing the fight, that he

4  deployed his gun -- when I say "deployed," he pulled his gun

5  out of his holster, and almost immediately looked down and

6  saw Mr. Pickett's hand -- well, he felt a tug, and then he

7  saw Mr. Pickett's hand on his gun.

8        And because of his weakened condition, his losing

9  consciousness, according to him because he had his head

10 banged on the sidewalk, he felt that his life was in

11 imminent danger because the suspect was on top of him, he

12 was actively fighting him, according to officer Woods he had

13 been struck eight times maybe more, and that if he lost

14 control of his gun that the suspect would take the gun and

15 use it against him, imminent threat, and he fired a round,

16 he fired a bullet out of his gun.

17 Q     And what's your opinion as to Deputy Woods firing that

18 first bullet out of his good?

19 A     As I stated all along, any application of force is

20 intended to cease that assault.  Incapacitation.  Police

21 officers don't shoot people to kill them.  They shoot people

22 to cause them to stop what they're doing.

23       MR. GALIPO:  I apologize.  At least so far the

24 answer is nonresponsive to the question.

25       THE COURT:  Sustained.

```
 1  BY MR. EWING:
 2  Q    What's your opinion as to Deputy Woods's use of deadly
 3  force or firing that first bullet at Mr. Pickett?
 4  A    It was appropriate.
 5  Q    And why?
 6  A    His life was in danger.
 7  Q    And what's your opinion as to Deputy Woods's firing
 8  his -- the second bullet at Mr. Pickett?
 9  A    Same.  That the struggle continued, and Deputy Woods
10  correctly, in my opinion, surmised that his life was in
11  danger, imminent danger.
12  Q    Let's talk briefly about your opinion on gun retention
13  issues with respect to the fight that was taking place at
14  the moment just before Deputy Woods withdrew or unholstered
15  his gun.
16          Talk to the jury about gun retention issues in the
17  moment of the fight and what Deputy Woods, in your opinion,
18  should have been considering.
19  A    Well, Deputy Woods should have been considering
20  retaining possession of his gun.  And according to POST,
21  under POST Learning Domain 33, Chapter 6, there is a whole
22  section that instructs police officers the importance of
23  retaining their guns, how to retain their guns, and the
24  consequences of losing control of their guns.
25          The consequence is death or great bodily injury,
```

```
 1    not only to the police officer but to anybody in the
 2    vicinity that the suspect may acquisition because he has
 3    taken the gun from the officer.
 4              THE COURT:  Counsel, can we approach, please.
 5         (The following proceedings were held at sidebar.)
 6              THE COURT:  I am just getting a sense of timing.
 7    How much further do you think you have on direct with the
 8    witness, Mr. Ewing?
 9              MR. EWING:  Ten minutes maybe.  I am at the end.
10    I am at the end.  I just have a couple of points I want to
11    cover.
12              THE COURT:  I am going to take a ten-minute
13    recess, have you come back, finish the direct, and then
14    we'll break for lunch, all right?
15              MR. EWING:  Sounds good.
16         (The following was heard in open court in the presence
17          of the jury:)
18              THE COURT:  Ladies and gentlemen, we're going to
19    take a ten-minute recess.
20              Do not form or express any opinion about the case
21    until the matter has been submitted to you, don't talk to
22    anyone about the case, don't allow anyone to talk to you
23    about the case, and don't conduct any research of any kind
24    on any subject matter connected with the case.
25              We'll see you back at five minutes to noon.  Thank
```

1    you.

2              THE CLERK:  All rise for the jury.

3              Please be seated.

4         (The following was heard in open court outside the

5          presence of the jury:)

6              THE COURT:  Mr. Chapman, you may step down.  We'll

7    come back in ten minutes.

8              Mr. Galipo, is there anything you want to discuss?

9              MR. GALIPO:  Only to make sure I understand.

10   After the ten-minute break, counsel will conclude his direct

11   exam, then we'll take lunch.

12             THE COURT:  We'll take a lunch break, and you will

13   begin cross -- we're going to take a longer lunch break so

14   we can discuss jury instructions during the lunch break,

15   come back, cross, redirect, presumably if that's the last

16   witness, if there is no rebuttal, my hope is we'll have all

17   the jury instructions ready and we'll go great through in

18   the afternoon.

19             MR. GALIPO:  That's fine.

20             THE COURT:  Mr. Ewing.

21             MR. EWING:  Nothing.  Thank you.

22             THE COURT:  Let's take ten minutes.  Thank you.

23             THE CLERK:  All rise.  This Court is in recess.

24        (Recess taken 11:46 a.m. to 11:59 a.m.)

25             THE COURT:  Mr. Ewing, you may proceed.

```
 1              MR. EWING:  Thank you, Your Honor.
 2   BY MR. EWING:
 3   Q    Mr. Chapman, when is -- when may a police officer use
 4   deadly force?
 5   A    When an officer's life is in imminent danger of death
 6   or great bodily harm.
 7   Q    Describe what "great bodily harm" means.
 8   A    "Great bodily harm" is an injury that can produce life
 9   threatening consequences that can either temporarily or
10   permanently disable an individual in a grave or significant,
11   severe manner.
12   Q    Would a concussion be considered great bodily harm?
13   A    Yes, a concussion can lead to death.
14   Q    Would a fractured nose be considered great bodily harm?
15   A    It would be considered a severe injury, yes.
16              MR. CONAWAY:  Move to strike as not responsive.
17              THE COURT:  Overruled.
18   BY MR. EWING:
19   Q    In the audio and video of this matter before
20   Deputy Woods fired his gun the first time, did you hear him
21   say something to Mr. Pickett?
22   A    Yes.
23   Q    What did he say?
24   A    "Stop or I will shoot."
25   Q    Based on your training and experience, what does that
```

```
 1  tell you about Deputy Woods's conduct in this case?
 2  A    Compliant with POST training, Learning Domain 20,
 3  Chapter 4.
 4  Q    What's the purpose of that warning?
 5  A    All police officers are to give a warning when feasible
 6  prior to the use of deadly force.  It's to allow an
 7  individual to know what is about to happen if the activity
 8  or the conduct, behavior continues.  It is an appropriate
 9  thing to do to alert the individual of the consequences of
10  his or her act.
11  Q    How many warnings did Deputy Woods give Mr. Pickett?
12  Do you know?
13  A    From what I can recall, I believe it was three.  "Stop
14  or I will shoot."  "I am going to shoot you."  "I am going
15  to shoot you."  That's three.
16  Q    Are you familiar with the concept of 20/20 hindsight?
17  A    Yes, I am.
18  Q    Can you describe to the jury how that concept applies
19  to this case.
20  A    Very similar.
21        MR. GALIPO:  Object to the question as vague as
22  phrased.
23        THE COURT:  Overruled.
24        THE WITNESS:  It generally means what a reasonable
25  officer would do.  20/20 hindsight means that an officer in
```

```
 1    a similar situation, similarly situated with the same set of
 2    facts, the same baseline training and experience, how that
 3    officer would react to what is occurring to him or her at
 4    the time.
 5            When you talk about 20/20 hindsight, we're Monday
 6    morning quarterbacking.  We're always 100 percent right.
 7            When we are in the throes of a dramatic,
 8    life-threatening, extreme and frightening situation, we
 9    don't have the ability to go back and to decipher, evaluate,
10    and come to a decision that may have been an option that the
11    reviewer may have taken.
12            It has to be from the perspective of the officer
13    at the time based on what seems to be reasonably necessary
14    and justified at the time.  It's called a reasonable officer
15    standard, and it's actually part of training.
16            It can't be what you figure out later on when
17    things are calm under the auspices of a controlled
18    situation.  This was anything but controlled.
19    BY MR. EWING:
20    Q    Please provide your opinion as to Deputy Woods's
21    initiation of the consensual encounter, the initiation of
22    the detention, and then ultimately the use of deadly force
23    in this case.
24    A    As I have stated, it's all in accordance and compliant
25    with training.  And that's what we looked at because
```

```
 1   training is the cornerstone of policy, and policy is what
 2   dictates the actions of an officer.  Particularly in this
 3   case, we're talking about a consensual encounter, a physical
 4   detention, and probable cause for arrest.
 5           Every one of those actions, as we progressed going
 6   forward from the initial contact or observation,
 7   visualization, was according to policy, was according to
 8   training, was according to procedures, and according to the
 9   expectations of a police department and as a chief of police
10   of the behavior, performance, and expectations of a
11   competent, well-trained police officer.
12   Q    You testified at the outset of your testimony that you
13   testified in the use of force cases before, police cases,
14   and so forth.
15           Plaintiffs' counsel asked Mr. DeFoe where he would
16   rank this particular case in the spectrum of cases where
17   he's provided testimony.  Would you provide such a ranking
18   to this jury.
19   A    I would rank it as an example of exemplary police
20   conduct in regards to following training.  I think this case
21   is exactly what would be expected of any well-trained police
22   officer under my command, given the circumstances that were
23   provided.  To rate it, I would say highly competent.
24   Q    Do you have an opportunity to review cases and decide
25   which ones you are going to take on and which ones you are
```

1    not?

2    A    No.  I don't advertise.

3    Q    No.

4          Do people come to you and say, "Hey, Mr. Chapman,

5    I would like for you to testify in this case," and then ask

6    you to review the facts and so forth?

7    A    That's how it works, yeah.

8    Q    Did you do that in this case?

9    A    Yes.

10         MR. EWING:  I have nothing further.

11         THE COURT:  All right.  Ladies and gentlemen of

12   the jury, what we're going to do now is we're going to take

13   a lunch break.  And there is a method to my madness, so if

14   you will indulge me.  We're going to take a lunch break

15   until 2:00 P.M. today.

16         The reason being is as follows:  I am cautiously

17   optimistic you will get the matter to deliberate this

18   afternoon.  My hope is that I can work with the lawyers to

19   work on some instructions and some other issues between now

20   and 2:00 P.M. so that, upon -- when you come back at 2:00

21   we'll resume with cross-examination -- and if there are any

22   further witnesses we'll deal with those.  But the hope is

23   that the case will wrap up this afternoon and I will give

24   instructions, we'll hear closing arguments, and you can

25   begin the process of deliberation.

```
 1            So as a result, we'll take a longer lunch break.

 2   That may mean we push into closer to the 5:00 P.M. hour.

 3   But, again, my objective is -- and I trust that you share

 4   the same objective -- is to ultimately get this matter to

 5   you so you can begin your deliberation.

 6            So with that let's have you come back at 2:00 P.M.

 7            Please do not form or express an opinion about

 8   this case until the matter is finally submitted to you.

 9   Don't talk to anyone about this case.  Don't allow anyone to

10   talk to you about this case, and do not conduct any research

11   of any kind on any subject matter connected with this case.

12            We'll see you back at 2:00 P.M.  Thank you.

13            THE CLERK:  All rise for the jury.

14       (The jurors exit the courtroom.)

15            THE CLERK:  Please be seated.

16       (The following was heard in open court outside the

17        presence of the jury:)

18            THE COURT:  Sir, you may step down.

19            Counsel, I am waiting for the printout of some of

20   the jury instructions so I can give them to you to review

21   with some notes consistent with what I mentioned earlier.

22            I will ask you all to come back at 1:15 so we can

23   go through those instructions and try to finalize those

24   instructions before the 2:00 P.M. hour.

25            So any questions, comments, issues?
```

```
1              Mr. Galipo?

2              MR. GALIPO:  No, not that I can think of.  I guess

3    the only thing -- well, no.

4              THE COURT:  Mr. Conaway.

5              MR. CONAWAY:  Just the fact that on some of the

6    instructions Mr. Pickett's name is misspelled

7    N-a-t-h-a-n-i-e-l.

8              THE COURT:  I noted that.  We need to change it

9    because I am going to refer to him as Nathanael Pickett, II,

10   whereas in some of the instructions we have him just as his

11   first name.  We are going to make those changes.

12             In fact, they are being copied as we speak; so I

13   ask for you to wait a few moments.  My law clerk will get

14   them out to you.  So we'll come back in an hour and try to

15   finalize those instructions.  Okay?

16             Mr. Galipo.

17             MR. GALIPO:  The only other thing that I can think

18   of, based on the length and scope of the questioning of

19   Mr. Chapman --

20             THE COURT:  So much for 40 minutes; right?

21             MR. GALIPO:  Right.  I think it was close to two

22   hours, but I'm not sure.

23             THE COURT:  I know exactly how much it was, but I

24   will leave it at that.  He's entitled to do it, and that's

25   his right.
```

```
 1            MR. GALIPO:  I understand.  But because of that,

 2   my cross-examination could take up to an hour.

 3            THE COURT:  I wouldn't be surprised.

 4            MR. GALIPO:  I am just thinking out loud.  If we

 5   started promptly at 2:00 -- sometimes we're a few minutes

 6   behind because we have the instructions and verdict form to

 7   deal with -- that will put us at about 3:00 to 3:15.

 8            And I guess we'll wait and see how it goes.  And

 9   certainly, if the Court wants us to close today, if that's

10   the goal, that will be done, but I don't think it would be

11   the end of the world if we did it first thing tomorrow

12   morning depending on where we are with the timing.  That's

13   my only --

14            THE COURT:  I am thinking about all those things,

15   but I want to push you all to move -- not quickly, but I

16   want to try to get to that point.

17            If we need to do it tomorrow, we'll do it

18   tomorrow.  But I would like to at least get the instructions

19   finalized and perhaps even instruct them in the afternoon

20   depending on how late it goes.

21            Look.  I am not going to keep them until 6:00 or

22   7:00 at night.  Let me rephrase it.  I don't anticipate

23   doing that.

24            But as you know, Mr. Galipo, I have had jurors

25   expressly ask to stay to the evening, and so we'll have to
```

```
 1   play a little bit by ear in that regard.
 2             MR. GALIPO:  That's fine, Your Honor.
 3             THE COURT:  Mr. Ewing.
 4             MR. EWING:  The only thing I noted -- and I am
 5   confident the Court and/or the court clerk caught this -- is
 6   Bill Kelsey is still in some of the instructions.
 7             THE COURT:  Yes.  I just want to get a rough out
 8   to you to at least start thinking about the big issues.
 9             I guess what I would also ask you to do in the
10   meantime is, to the extent you are going to use any exhibits
11   or diagrams, demonstratives during closings, to at least
12   discuss that amongst the parties to see if there are any
13   issues that we need to deal with before the matter is
14   submitted to the jury.
15             All right.  So we'll take a recess.  Again, I will
16   go back to chambers, and then we'll make sure I get those
17   instructions to you.  All right?  Thank you.
18             THE CLERK:  All rise.
19             Court is in recess.
20        (Lunch recess taken 12:14 P.M.)
21                      --oOo--
22
23
24
25
```

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:  April 3rd, 2018.

11

12

13

14                        ___/S/ CHIA MEI JUI _____

15                        Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```

**MR. CONAWAY: [4]** 632/19 706/21 712/15 718/4

**MR. EWING: [27]** 632/14 636/12 636/17 636/22 637/1 637/6 637/21 637/24 638/3 638/15 638/18 639/7 644/6 646/13 647/16 657/1 658/2 658/6 658/9 688/23 701/3 710/8 710/14 711/20 711/25 716/9 720/3

**MR. GALIPO: [30]** 632/9 636/8 637/17 644/9 647/20 650/12 650/15 656/17 656/23 658/4 679/2 686/15 687/20 689/13 697/18 698/24 699/3 699/19 700/1 700/23 708/22 711/8 711/18 713/20 718/1 718/16 718/20 718/25 719/3 720/1

**MR. SINCICH: [1]** 632/13

**THE CLERK: [12]** 632/5 638/6 638/22 639/2 658/14 658/19 658/21 711/1 711/22 717/12 717/14 720/17

**THE COURT: [65]** 632/12 632/17 632/21 636/11 636/15 636/21 636/25 637/5 637/13 637/18 637/22 637/25 638/7 638/17 639/6 644/8 644/10 647/19 647/21 649/17 650/10 650/13 650/17 656/18 656/25 658/3 658/5 658/7 658/20 658/25 679/4 686/17 687/22 688/24 689/12 689/16 697/23 699/2 699/5 699/22 700/5 701/1 706/23 708/24 710/3 710/5 710/11 710/17 711/5 711/11 711/19 711/21 711/24 712/16 713/22 716/10 717/17 718/3 718/7 718/19 718/22 719/2 719/13 720/2 720/6

**THE WITNESS: [9]** 639/1 639/4 646/2 646/8 658/18 658/23 679/5 699/23 713/23

**$**

**$180 [1]** 650/3
**$230 [1]** 650/5

**-**

**--oOo [1]** 720/21

**0**

**0-5 [1]** 689/21

**1**

**1 1/4 [1]** 649/15
**1,080 [1]** 643/4
**1,920 [1]** 643/4
**1/30th of [1]** 652/13
**10 [3]** 634/14 641/21 642/25
**100 percent [1]** 714/6
**105 [3]** 670/4 670/6 689/2
**1080l [1]** 643/5
**1080P [1]** 643/5
**11 [5]** 634/14 641/21 642/25 645/23 646/6
**114 [1]** 644/8
**11:46 [1]** 711/24
**11:59 [1]** 711/24
**12 [3]** 629/16 632/1 680/10
**12:14 [1]** 720/20
**13 [1]** 633/21
**13181 [1]** 630/14
**148 [2]** 688/15 691/4
**15 [4]** 652/6 668/22 669/13 689/19
**16 [1]** 633/25
**16-1128-AB [2]** 629/9 632/6
**18 [1]** 633/13
**19 [1]** 633/21
**1990s [1]** 640/4
**1994 [1]** 660/14
**1995 [1]** 659/18
**19th [1]** 663/1
**1:15 so [1]** 717/22
**1A [2]** 647/18 647/22
**1st Street [1]** 673/21

**2**

**2-4 [1]** 670/17
**20 [7]** 633/16 650/1 689/21 713/2 713/16 713/25 714/5
**20/20 [3]** 713/16 713/25 714/5
**2015 [1]** 663/1
**2018 [4]** 629/16 631/2 632/1 721/10
**21 [1]** 633/22
**21800 [1]** 630/5
**22 [2]** 634/3 634/12
**23 [1]** 634/13
**240 [1]** 643/1
**25 [1]** 634/17
**25 yards [1]** 673/24
**26 [1]** 640/24
**2655 [1]** 630/9
**28 [4]** 634/19 643/16 653/8 721/4
**28.7 [1]** 652/8
**29 [3]** 634/22 635/1 653/8
**29.97 [2]** 652/1 652/3
**2:00 [2]** 716/20 719/5
**2:00 P.M [5]** 716/15

**3**

**30 [4]** 643/14 649/14 659/16 660/15
**30-year [1]** 659/21
**310 [1]** 630/5
**32 [1]** 635/2
**3287 [2]** 629/23 721/15
**33 [1]** 709/21
**3333 [1]** 630/6
**34 [4]** 635/7 649/13 653/6 653/9
**347-3333 [1]** 630/6
**350 [1]** 629/24
**352 [1]** 643/1
**36 [1]** 635/10
**37 [1]** 635/12
**38 [1]** 635/16
**3:00 to [1]** 719/7
**3:15 [1]** 719/7
**3rd [2]** 631/2 721/10

**4**

**4 1/2 [1]** 660/13
**4-5 [1]** 689/11
**40 [1]** 718/20
**400 [1]** 630/14
**41 [3]** 635/24 659/15 659/16
**42 [1]** 635/25
**43 [1]** 636/1
**4311 [1]** 629/24
**45 [1]** 637/5

**5**

**503-9010 [1]** 630/10
**5500 [1]** 630/15
**562 [1]** 630/15
**5:00 P.M [1]** 717/2

**6**

**6 1/2 [1]** 660/25
**629 [1]** 629/20
**63 [1]** 668/25
**699-5500 [1]** 630/15
**6:00 or [1]** 719/21

**7**

**721 [1]** 629/20
**753 [1]** 721/3
**760 [1]** 630/10
**7:00 at [1]** 719/22

**8**

**818 [1]** 630/6

**9**

**90012 [1]** 629/24
**9010 [1]** 630/10
**911 [1]** 666/20
**91367 [1]** 630/5
**91746 [1]** 630/14
**92307 [1]** 630/10
**716/20 717/6 717/12 717/24
**2nd [3]** 664/16 673/17 674/2
**2nd Street [1]** 664/9

**9:00 P.M [1]** 663/2
**9:31 [2]** 629/17 632/2

**A**

**AB [2]** 629/9 632/6
**abilities [1]** 682/16
**ability [4]** 666/13 670/13 701/20 714/9
**able [11]** 636/9 638/1 638/9 641/9 645/1 645/12 645/17 648/15 656/2 669/24 705/7
**absence [2]** 659/23 660/3
**absolutely [4]** 656/19 667/8 688/25 693/21
**abuse [1]** 680/10
**academic [1]** 668/7
**Academy [2]** 659/23 660/18
**acceptable [1]** 668/8
**accordance [1]** 714/24
**according [15]** 664/25 665/13 667/16 672/1 672/16 673/19 704/5 708/1 708/9 708/12 709/20 715/7 715/7 715/8 715/8
**accumulating [1]** 677/15
**accusatory [1]** 682/21
**accused [1]** 651/7
**achieve [3]** 695/24 699/10 702/2
**achieved [1]** 696/5
**achievement [2]** 668/7 704/10
**acquisition [1]** 710/2
**acronym [1]** 668/1
**across [3]** 643/1 643/4 664/19
**act [2]** 691/3 713/10
**action [2]** 660/8 702/1
**actions [6]** 670/17 670/23 670/23 672/17 715/2 715/5
**active [1]** 659/15
**actively [1]** 708/12
**activity [5]** 667/14 667/14 685/12 685/13 713/7
**acts [2]** 675/18 677/9
**actual [2]** 642/22 695/14
**addition [3]** 661/2 679/18 692/10
**additional [4]** 633/24 681/5 685/6 685/8
**adjust [1]** 638/10
**adjusting [1]** 632/23
**administration [2]** 659/8 661/4
**administrator [1]** 693/12
**advantage [2]** 698/24 699/12
**advertise [1]** 716/2

**advised [1]** 678/18
**affirmative [1]** 635/18
**after [14]** 637/7 637/13 643/24 651/24 660/15 676/14 679/15 685/15 685/19 686/15 687/25 699/17 706/24 711/10
**afternoon [4]** 711/18 716/18 716/23 719/19
**again [12]** 635/22 636/5 645/12 646/14 649/4 660/19 674/17 700/24 706/9 706/17 717/3 720/15
**against [2]** 705/10 708/15
**agencies [1]** 657/17
**agency [5]** 651/1 651/2 651/3 657/21 669/22
**agent [1]** 672/7
**agitate [1]** 696/9
**agitation [1]** 672/23
**agree [7]** 635/9 652/16 652/19 652/21 655/17 656/14 656/16
**ahead [1]** 647/7
**ahold [1]** 654/11
**aiming [1]** 692/20
**aims [1]** 692/16
**al [2]** 629/10 632/7
**alert [1]** 713/9
**allow [4]** 699/23 710/22 713/6 717/9
**allows [1]** 666/22
**almost [1]** 708/5
**along [4]** 643/7 680/24 681/7 708/19
**already [3]** 643/10 688/11 691/4
**altercation [2]** 699/25 700/14
**alternate [1]** 670/23
**although [3]** 641/18 676/4 703/23
**ALVAREZ [1]** 630/13
**ALVAREZ-GLASMAN [1]** 630/13
**always [3]** 666/5 706/15 714/6
**American [1]** 668/10
**amongst [1]** 720/12
**amount [5]** 638/13 643/16 668/15 683/16 695/16
**analysis [6]** 639/16 641/2 649/7 651/23 657/20 657/25
**analyst [1]** 660/5
**analyze [1]** 677/24
**analyzed [2]** 642/21 656/15
**and -- I [1]** 674/11
**and/or [2]** 635/22 720/5
**Anderson [1]** 661/7
**Anderson School [1]**

**A**

Anderson School...
**[1]** 661/7
ANDRÉ **[1]** 629/3
ANGELES **[5]** 629/18
629/24 632/1 659/17
659/22
animation **[2]** 639/16
643/25
animus **[1]** 660/10
another **[11]** 650/9
662/5 673/2 675/14
675/15 677/11 681/25
682/3 682/6 682/8
696/18
answer **[5]** 675/13
675/15 675/21 676/23
708/24
answering **[3]** 665/24
666/20 666/20
answers **[2]** 675/17
700/11
anticipate **[3]** 637/11
637/16 719/22
anymore **[3]** 687/16
706/5 706/11
anytime **[1]** 671/8
anyway **[1]** 695/13
apologize **[6]** 689/12
695/6 697/19 698/25
699/20 708/23
apparently **[1]** 641/13
appearances **[2]**
630/4 632/9
appeared **[2]** 698/7
698/10
APPLE **[1]** 630/10
applicable **[2]** 635/11
635/15
application **[1]** 708/19
applied **[1]** 697/16
applies **[1]** 713/18
apply **[8]** 688/2 688/2
688/3 698/12 698/14
705/12 705/14 706/20
appointed **[3]** 660/7
660/15 660/22
appreciate **[1]** 636/10
approach **[2]** 672/13
710/4
appropriate **[11]**
634/20 635/24 635/25
636/1 636/1 693/8
694/8 694/16 702/1
709/4 713/8
appropriately **[1]**
696/13
approximate **[1]**
661/19
approximately **[11]**
637/5 640/12 640/17
659/25 660/13 660/15
662/3 662/4 662/4
663/1 695/18
April **[1]** 721/10
ARCHIBALD **[4]**
629/5 630/2 632/7
632/12

area **[5]** 659/7 680/21
683/13 684/8 691/22
argument **[2]** 634/6
637/13
argumentive **[1]** 634/1
arguments **[1]** 716/24
arm **[1]** 697/11
arming **[1]** 692/8
arms **[1]** 698/21
around **[11]** 640/13
673/12 674/9 675/10
686/7 686/15 686/24
687/18 687/18 696/24
698/8
arrest **[22]** 634/24
669/14 669/16 669/18
670/7 681/10 683/19
684/10 684/20 685/17
686/2 688/14 688/15
688/19 688/22 689/20
690/12 690/23 690/24
691/8 699/19 715/4
arrested **[7]** 676/10
678/19 678/22 679/11
679/16 686/3 697/1
arrestee **[1]** 634/10
arresting **[1]** 633/19
arrests **[1]** 661/24
art **[1]** 684/23
asked **[13]** 641/12
641/15 641/24 657/5
675/13 676/4 676/5
676/8 676/10 676/11
691/13 706/23 715/15
asking **[4]** 635/3
675/7 675/16 676/22
assault **[1]** 708/20
assaulted **[2]** 701/10
701/11
assaultive **[1]** 694/3
assistance **[1]** 683/22
associated **[3]** 662/9
663/12 704/18
association **[2]** 640/7
668/10
assume **[4]** 650/7
685/4 692/8 698/23
assumption **[2]**
635/10 692/7
attached **[1]** 701/24
attempted **[2]** 688/1
699/19
attempting **[1]** 698/14
attention **[2]** 671/10
689/2
audio **[22]** 636/24
639/18 641/9 656/6
670/21 671/20 672/11
674/19 674/22 675/19
675/25 676/15 678/3
680/17 682/11 682/25
686/7 686/21 688/4
698/18 703/22 712/19
auspices **[1]** 714/17
authority **[2]** 687/13
687/14
autopsy **[1]** 663/13
available **[4]** 700/17

701/14 703/24 707/4
availed **[1]** 661/16
availing **[1]** 663/19
aware **[4]** 638/4
670/25 670/25 679/1
away **[12]** 646/10
675/10 683/18 686/23
688/6 688/7 688/12
688/18 705/1 705/2
706/12 706/12
Axon **[1]** 695/12

**B**

back **[25]** 642/14
661/22 665/2 666/24
673/22 676/3 677/2
680/2 681/11 688/2
690/25 690/25 698/8
698/21 710/13 710/25
711/7 711/15 714/9
716/20 717/6 717/12
717/22 718/14 720/16
background **[5]**
639/21 659/12 664/4
674/3 700/15
bad **[1]** 701/18
badge **[2]** 687/8
687/13
ball **[1]** 666/13
banged **[1]** 708/10
bar **[3]** 665/7 668/11
668/12
barber **[2]** 664/23
673/12
barricade **[1]** 692/1
Barstow **[1]** 664/10
base **[1]** 702/12
baseball **[1]** 704/3
based **[39]** 635/19
649/7 657/10 663/21
663/22 664/4 666/2
666/9 666/14 666/16
669/22 673/6 674/3
676/25 677/5 677/8
677/13 677/18 680/6
680/18 681/2 681/15
683/3 684/5 684/6
686/10 688/4 688/14
688/21 689/24 690/16
692/7 696/12 699/10
699/11 700/15 712/25
714/13 718/18
baseline **[2]** 680/10
714/2
basic **[1]** 668/20
basically **[11]** 663/3
668/4 668/15 669/11
669/5 669/11 683/11
684/25 696/9 696/15
706/2
basing **[2]** 700/11
700/12
basis **[1]** 707/21
baton **[2]** 662/21
703/23 703/25 704/1
704/2 704/7 704/11
704/16 704/24
batons **[1]** 671/16

704/12
become **[1]** 668/8
becomes **[7]** 665/11
665/12 675/7 687/14
687/18 692/3 704/16
before **[13]** 638/24
640/10 643/7 648/8
658/16 686/3 686/5
695/6 709/14 712/19
715/13 717/24 720/13
begin **[4]** 671/7
711/13 716/25 717/5
beginning **[1]** 659/18
behalf **[5]** 632/12
632/16 632/20 651/1
651/6
behavior **[14]** 665/13
666/2 666/16 666/25
677/6 677/22 677/24
680/19 694/1 694/2
694/3 694/4 713/8
715/10
behind **[5]** 664/22
697/12 698/8 698/21
719/6
believe **[9]** 633/8
633/17 635/17 635/24
636/1 657/16 698/8
707/21 713/13
believed **[1]** 635/21
belt **[3]** 641/5 662/9
702/5
belts **[1]** 641/6
bench **[2]** 660/8
660/12
bends **[1]** 697/12
bent **[1]** 698/15
BERNARDINO **[7]**
629/10 632/7 632/16
657/11 657/12 663/6
672/2
best **[3]** 666/12
705/10 706/15
better **[2]** 651/20
695/14
between **[6]** 641/23
673/14 684/19 695/17
700/1 716/19
beyond **[2]** 699/5
699/5
bicep **[1]** 697/2
big **[4]** 643/2 705/21
706/8 720/8
Bill **[1]** 720/6
billing **[1]** 649/25
binder **[2]** 667/19
667/21
Biodynamics **[1]**
639/14
BIROTTE **[1]** 629/3
birth **[1]** 679/18
birthday **[1]** 678/11
678/14
bit **[4]** 646/3 696/2
697/12 720/1
bits **[1]** 656/8
black **[2]** 660/10 665/6
blast **[1]** 682/12

block **[2]** 681/21
681/21
blocks **[2]** 681/19
685/14
blow **[3]** 643/9 643/10
704/16
blows **[2]** 700/1 700/3
blue **[1]** 665/7
board **[2]** 668/5
668/14
bodies **[1]** 699/11
bodily **[6]** 709/25
712/6 712/7 712/8
712/12 712/14
body **[1]** 701/24
bone **[2]** 696/4 701/18
both **[5]** 636/19
637/22 642/16 677/19
689/9
bottom **[2]** 668/18
703/4
BOULEVARD **[1]**
630/5
BOX **[1]** 630/9
break **[11]** 656/4
685/1 701/18 710/14
711/10 711/12 711/13
711/14 716/13 716/14
717/1
breakdown **[1]** 657/20
breaking **[1]** 656/9
breathe **[1]** 705/8
breezeway **[3]** 646/19
688/7 703/3
brick **[6]** 681/23
681/25 682/3 682/6
682/9 682/14
bricks **[1]** 683/3
brief **[1]** 698/16
briefly **[2]** 633/3
709/12
brightness **[1]** 651/20
bring **[3]** 637/20 688/2
706/19
broadcast **[1]** 652/3
broken **[1]** 635/18
Brown **[1]** 660/4
building **[5]** 664/22
664/23 681/19 681/20
681/20
built **[1]** 669/16
bullet **[4]** 708/16
708/18 709/3 709/8
BURBANK **[1]** 630/5
burn **[2]** 705/25 706/3
burning **[1]** 706/2
burns **[1]** 705/25

**C**

C-h-a-p-m-a-n **[1]**
658/25
C-l-a-r-e-n-c-e **[1]**
658/25
C-L-E-T-S **[1]** 679/23
cajoling **[1]** 672/9
CALIFORNIA **[19]**
629/2 629/18 629/24
630/5 630/10 630/14

**C**

**CALIFORNIA... [13]**
632/1 660/22 660/24
661/5 664/10 668/5
668/9 668/11 668/17
669/19 678/22 679/22
679/23

**call [15]** 636/18 637/3
638/15 658/9 660/23
665/19 669/4 679/23
681/3 681/8 686/24
693/25 697/10 700/19
707/20

**called [7]** 639/14
640/20 667/3 695/12
697/14 702/10 714/14

**calling [2]** 632/6
697/22

**calls [11]** 638/17
658/11 665/25 666/20
666/20 679/3 686/16
687/21 689/15 699/21
700/4

**calm [1]** 714/17

**came [1]** 643/7

**camera [14]** 641/19
641/19 641/20 641/21
642/25 645/7 645/23
646/6 647/9 651/17
654/25 654/25 655/1
655/1

**Camera 11 [1]** 646/6

**Camera 3 [1]** 655/1

**cameras [1]** 645/8

**candy [1]** 675/1

**capacity [1]** 660/12

**Capital [1]** 660/5

**captain [3]** 659/20
665/20 672/6

**car [6]** 664/19 664/19
665/3 665/6 687/9
697/3

**career [2]** 661/22
662/16

**cars [1]** 644/17

**cartridge [3]** 705/20
705/21 705/21

**cases [18]** 640/3
640/5 640/10 640/15
640/18 640/20 640/22
650/20 650/23 651/1
651/4 651/4 651/6
693/1 715/13 715/13
715/16 715/24

**catch [1]** 707/12

**catches [1]** 692/13

**caught [1]** 720/5

**causation [1]** 633/13

**cause [19]** 633/20
638/24 657/16 658/16
681/9 681/10 683/8
688/13 688/22 689/20
690/12 690/15 691/7
694/16 702/19 704/11
704/16 708/22 715/4

**causes [2]** 697/12
705/4

**cautiously [1]** 716/16

**CCRR [1]** 629/23

**cease [2]** 702/20
708/20

**center [1]** 660/20

**CENTRAL [1]** 629/2

**certain [6]** 663/8
663/20 668/8 679/13
695/15 707/3

**certainly [4]** 655/6
693/11 701/4 719/9

**certificate [2]** 661/8
721/1

**certification [3]** 668/4
668/12 668/14

**certified [2]** 640/5
669/25

**certify [1]** 721/3

**chambers [1]** 720/16

**change [2]** 695/12
718/8

**changes [3]** 649/10
651/21 718/11

**Chapman [17]** 637/4
637/4 637/7 637/10
658/11 658/12 658/24
659/4 661/11 666/8
667/18 689/2 690/16
711/6 712/3 716/4
718/19

**Chapter [2]** 709/21
713/3

**Chapter 6 [1]** 709/21

**characterized [2]**
666/2 672/12

**charge [2]** 650/2
650/4

**chase [3]** 671/4
685/14 692/13

**CHIA [3]** 629/23
721/14 721/15

**chief [9]** 658/11
660/15 660/17 660/21
661/1 665/21 672/7
682/20 715/9

**children [1]** 632/24

**cigarette [1]** 706/1

**circumstance [1]**
685/4

**circumstances [4]**
681/14 681/19 702/6
715/22

**citizen [6]** 667/7 667/7
670/15 672/25 675/9
677/11

**citizens [1]** 666/22

**city [3]** 630/14 660/11
664/10

**civil [5]** 632/6 640/9
651/4 660/9 661/10

**Clarence [6]** 637/4
637/4 637/7 658/11
658/12 658/24

**Clarence Chapman
[2]** 637/7 658/11

**clarification [1]** 635/6

**Clark [1]** 663/15

**class [2]** 660/8 683/11

**classes [2]** 639/25

669/5

**clear [2]** 652/13 683/9

**cleared [1]** 691/19

**clerk [2]** 718/13 720/5

**CLETS [1]** 679/23

**clip [1]** 674/12

**close [2]** 649/14
695/25 696/1 696/8
704/4 718/21 719/9

**closeness [1]** 695/8

**closer [3]** 679/19
696/7 717/2

**closest [1]** 664/18

**closet [1]** 704/3

**closing [1]** 716/24

**closings [1]** 720/11

**cmjui.csr [1]** 629/25

**coat [2]** 675/1 702/16

**Code [7]** 682/25 683/5
683/22 684/2 688/16
691/5 721/4

**Code 4 [2]** 683/22
684/2

**coincidental [3]**
653/19 654/8 654/9

**collection [3]** 678/21
684/11 690/6

**column [1]** 670/22

**COLVIN [1]** 630/13

**combination [2]**
642/10 669/8

**combining [1]** 677/19

**command [1]** 687/12
698/22 699/8 715/22

**commanded [1]**
699/17

**commander [3]**
659/20 665/20 672/6

**commands [2]** 672/22
706/19

**commendable [2]**
691/15 693/2

**commentary [1]**
633/15

**comments [1]** 717/25

**committed [2]** 670/16
691/4

**commonly [1]** 662/9

**communication [2]**
677/3 682/15

**community [14]** 660/6
660/11 665/16 665/18
665/19 666/1 666/4
666/5 666/7 666/11
666/18 666/21 666/23
692/2

**company [1]** 639/14

**compare [1]** 641/15

**compared [1]** 651/25

**comparison [2]** 648/3
651/24

**compel [1]** 693/1

**competent [3]** 682/20
715/11 715/23

**competently [1]**
669/17

**Complaints [1]** 663/7

**complete [1]** 641/10

**completed [1]** 691/3

**completion [1]** 661/8

**compliance [14]**
692/22 693/1 694/12
694/14 704/13 704/18
704/20 704/22 704/23
704/25 705/1 705/6
705/19 706/23

**compliant [4]** 694/1
706/7 713/2 714/24

**comply [9]** 686/24
687/6 687/10 687/15
687/25 697/7 698/2
706/4 706/18

**complying [4]** 678/4
687/3 687/20 688/9

**computer [7]** 639/15
639/16 639/18 640/1
640/2 642/9 642/14

**CONAWAY [5]** 630/8
630/9 632/18 632/20
718/4

**conceivable [1]** 669/7

**concept [3]** 681/13
713/16 713/18

**concerned [1]** 676/19

**conclude [1]** 711/10

**concluded [1]** 673/5

**conclusion [3]** 673/9
674/5 687/22

**concrete [1]** 703/18

**concussion [2]**
712/12 712/13

**condition [1]** 708/8

**conduct [8]** 669/22
672/8 682/19 710/23
713/1 713/8 715/20
717/10

**conducted [2]** 671/24
672/1

**conducting [1]** 670/14

**Conference [1]** 721/8

**confident [1]** 720/5

**confirm [1]** 680/14

**confirmed [2]** 678/25
681/5

**conflict [1]** 693/10

**conform [1]** 669/21

**conformance [1]**
721/7

**confront [1]** 669/9

**confrontation [2]**
663/9 698/16

**confronted [1]** 675/9

**confronting [1]** 685/5

**confronts [1]** 696/22

**connected [2]** 710/24
717/11

**consciousness [2]**
708/3 708/9

**consensual [24]**
667/3 670/11 671/5
671/13 671/17 671/18
671/25 672/9 672/19
674/17 676/16 677/2
677/22 678/2 680/16
680/20 680/25 683/7
683/19 687/16 688/20

691/12 714/21 715/3

**consent [1]** 660/9

**consenting [1]** 678/4

**consequence [2]**
687/19 709/25

**consequences [3]**
709/24 712/9 713/9

**consider [4]** 651/15
691/8 691/9 694/4

**considered [7]** 651/21
690/1 690/11 690/18
712/12 712/14 712/15

**considering [2]**
709/18 709/19

**consistent [12]** 635/5
669/18 669/21 672/3
672/14 672/17 680/9
693/20 698/22 699/1
701/6 717/21

**constitutes [1]** 688/15

**constitution [1]**
669/20

**constitutional [2]**
661/9 669/20

**contact [5]** 674/20
674/21 693/10 695/24
715/6

**contacted [1]** 641/3

**contain [1]** 683/25

**contamination [1]**
703/8

**context [2]** 691/3
694/6

**continue [2]** 667/1
690/19

**continued [4]** 676/3
676/7 676/12 709/9

**continues [2]** 704/15
713/8

**continuing [2]** 675/21
675/22

**continuous [2]** 656/3
675/20

**continuum [8]** 680/23
681/7 681/8 682/18
690/13 690/20 690/21
694/6

**contrast [1]** 651/19

**control [15]** 655/16
657/6 697/10 697/14
697/16 698/8 699/12
702/3 704/21 705/5
705/13 706/14 706/20
708/14 709/24

**controlled [4]** 701/23
705/12 714/17 714/18

**controlling [1]** 680/3

**conversation [4]**
667/8 667/11 671/19
673/1

**Conversationally [1]**
672/9

**conveyed [1]** 672/24

**convicted [1]** 678/23

**cooperating [2]**
675/22 678/5

**cooperation [5]** 678/7
678/8 678/8 678/12

**C**

cooperation... [1] 678/13
coordinates [1] 679/19
copied [1] 718/12
copy [1] 653/14
core [2] 666/9 666/19
corner [4] 644/17 651/17 664/24 674/2
cornerstone [3] 665/19 670/12 715/1
corrected [1] 684/15
correcting [1] 656/9
correctly [1] 709/10
counsel [12] 630/1 632/8 636/21 637/11 657/5 658/21 659/5 701/2 710/4 711/10 715/15 717/19
count [2] 668/25 703/10
counter [1] 702/24
counter-productive [1] 702/24
COUNTY [9] 629/10 632/7 632/16 650/8 657/11 659/17 659/22 663/6 672/2
couple [2] 637/10 710/10
course [3] 655/23 694/3 702/1
court-appointed [1] 660/7
cover [1] 710/11
covered [1] 636/14
create [1] 654/13
created [2] 648/2 648/5
crime [4] 651/7 666/12 670/16 687/20
criminal [8] 651/4 651/6 675/18 677/9 677/25 685/12 685/13 691/2
critical [1] 644/20 653/20 654/14 655/23
cross [11] 631/7 637/8 649/18 649/19 683/12 685/9 703/8 711/13 711/15 716/21 719/2
cross-contamination [1] 703/8
cross-examination [5] 631/7 649/18 649/19 716/21 719/2
crossed [1] 684/4
CROSSROADS [1] 630/14
crystal [1] 666/13
CSR [2] 629/23 721/15
cue [1] 636/19
cuffs [2] 697/13 697/13
curb [2] 664/21

664/21
Currently [1] 659/7
curriculum [2] 669/5 669/16
custody [2] 657/5 706/21
cut [5] 653/25 654/20 655/4 671/4 689/14
CV [2] 629/9 632/6

**D**

DALE [3] 630/3 630/3 632/11
Dale Galipo [1] 632/11
damages [1] 636/2
danger [10] 707/16 707/16 707/17 707/17 707/17 708/11 709/6 709/11 709/11 712/5
dark [4] 646/10 646/23 648/20 649/4
darkened [1] 703/14
darts [4] 695/17 695/23 695/25 696/8
data [7] 646/13 678/21 679/22 681/23 681/25 684/11 690/6
database [1] 680/15
date [2] 679/18 721/10
Day [1] 629/20
Daylight [2] 632/23 638/10
days [1] 655/15
deadly [9] 694/4 707/11 707/14 707/23 707/25 709/2 712/4 713/6 714/22
deal [5] 636/2 636/2 716/22 719/7 720/13
dealing [1] 675/2
death [3] 709/25 712/5 712/13
DECEASED [1] 629/7
decide [2] 685/16 715/24
decided [1] 667/2
decipher [3] 666/15 675/20 714/9
decision [4] 703/5 703/25 706/6 714/10
decisions [1] 707/3
decree [1] 660/9
defend [2] 634/11 701/13
defendant [1] 635/17
defendant's [3] 634/7 670/3 670/6
defendants [4] 629/11 630/12 632/17 651/3
defendants' [3] 631/5 636/20 667/20
defenders [1] 651/5
defending [1] 692/9
defense [17] 635/18 636/18 636/19 637/9 637/10 638/17 641/3

641/14 641/25 644/8 648/3 651/5 651/25 658/11 689/2 702/2 704/5
Defense 105 [1] 689/2
Defense Exhibit 114 [1] 644/8
defense's [3] 634/6 634/23 635/4
deficiencies [2] 643/12 654/1
definitely [1] 686/12
definition [1] 633/17
DeFoe [2] 663/15 715/15
degree [4] 639/23 639/25 661/6 661/7
deliberate [1] 716/17
deliberation [2] 716/25 717/5
demonstrative [3] 640/14 640/19 640/19
demonstratives [1] 720/11
department [11] 655/12 657/12 659/17 659/22 660/2 660/14 660/16 660/19 663/7 672/2 715/9
Department of Justice [1] 660/19
depending [2] 719/12 719/20
depends [1] 652/2
deployed [2] 708/4 708/4
deposition [2] 663/16 700/13
depositions [1] 663/11
deprive [1] 671/11
deputy [131]
Deputy Woods [92] 635/20 652/17 656/15 663/12 664/8 664/15 665/1 665/5 665/13 667/2 667/16 671/1 671/24 672/13 672/18 672/19 673/10 673/17 673/20 674/1 674/14 674/23 675/5 675/5 675/6 675/25 676/4 676/5 676/8 676/21 677/15 678/5 679/9 679/10 679/25 680/4 680/12 682/12 682/25 683/4 684/1 684/7 686/7 686/12 686/15 688/1 688/3 688/7 689/25 690/11 691/7 691/13 691/14 691/17 691/22 692/2 692/4 692/12 692/16 692/20 693/3 694/11 694/11 694/20 695/5 695/8 696/17 696/20 697/15 698/5 698/7 698/13 698/18 699/17 700/1

700/17 701/12 702/3 702/4 703/22 705/18 707/3 707/10 707/13 708/2 708/17 709/9 709/14 709/17 709/19 712/20 713/11
Deputy Woods's [20] 652/20 664/1 666/25 673/5 673/9 674/19 678/16 678/25 680/7 693/19 700/9 701/5 703/5 703/24 706/6 707/24 709/2 709/7 713/1 714/20
describe [1] 642/20 648/18 649/2 659/12 664/13 671/23 693/24 696/19 698/13 712/7 713/18
described [3] 694/18 698/5 700/14
details [2] 643/11 665/25
detain [6] 635/1 681/4 684/3 685/7 685/9 685/19
detained [1] 686/5
detaining [1] 633/19
detains [1] 685/18
Detective [1] 663/16
detention [14] 680/21 683/8 683/13 684/18 684/19 684/22 685/10 687/19 688/11 688/21 690/10 690/14 714/22 715/4
determination [2] 677/6 683/24
determine [1] 677/23
develop [2] 666/6 666/17
development [1] 660/18
device [2] 695/12 696/15
devices [1] 701/14
diagonal [1] 696/3
diagrams [1] 720/11
dialogue [1] 641/7
dictates [1] 715/2
DIEU [1] 630/4
difference [3] 641/23 680/22 684/19
different [13] 641/17 641/19 642/18 642/19 645/3 645/8 649/10 655/15 702/9 704/22 704/23 705/4 705/6
differently [1] 677/11
difficult [4] 643/11 654/16 655/3 655/7
difficulty [2] 657/7 680/3
direct [10] 631/7 631/9 639/9 659/2 666/5 694/11 697/8 710/7 710/13 711/10
disable [1] 712/10

disappear [1] 664/22
discomfort [2] 694/16 697/13
discover [1] 642/3
discrimination [1] 660/9
discuss [3] 711/8 711/14 720/12
discussed [1] 636/20
discussion [7] 634/4 634/22 635/1 635/2 635/23 636/7 636/15
disengage [2] 704/9 706/14
disengaging [1] 706/13
disobedience [1] 688/14
display [2] 693/3 694/15
disposal [1] 667/19
disputed [3] 633/5 633/9 633/12
distance [7] 646/12 647/3 673/4 673/14 695/16 704/2 704/4
distances [1] 661/19
distinction [1] 697/9
district [4] 629/1 629/2 629/3 651/8
DIVISION [1] 629/2
doctors [1] 668/11
document [1] 689/16
documentation [3] 661/17 663/4 663/18
documents [3] 657/15 661/12 670/20
domain [10] 668/22 669/3 669/13 670/10 670/17 680/10 689/19 689/21 709/21 713/2
Domain 12 [1] 680/10
domains [3] 668/24 669/1 669/4
domestic [1] 659/25
DOMINIC [4] 629/5 630/2 632/7 632/12
Dominic Archibald [1] 632/12
door [2] 685/11 697/2
doubt [1] 679/17
down [23] 648/4 648/6 650/15 656/4 656/9 658/8 673/11 674/10 676/6 682/16 682/17 682/17 685/1 685/14 692/12 695/6 701/20 703/12 703/16 707/17 708/5 711/6 717/18
downtown [1] 664/9
dozen [1] 640/13
Dr. [2] 637/21 663/15
Dr. McCormick [1] 663/15
Dr. Ward [1] 637/21
dramatic [1] 714/7
dramatically [1]

**D**

dramatically... [1]
646/11
Drawing [1] 689/2
drive [2] 654/18
654/18
driver's [1] 664/20
driveway [1] 673/22
driving [2] 665/6
697/2
dropped [2] 643/22
652/12
dropping [1] 652/11
drops [1] 643/18
drove [3] 664/12
673/13 674/6
drug [1] 660/1
drunk [1] 697/2
duly [2] 638/21 658/13
during [11] 633/6
649/8 654/14 655/18
659/21 672/19 679/25
680/16 691/12 711/14
720/11
DVR [2] 642/16
654/18

**E**

ear [1] 720/1
earlier [3] 638/11
703/1 717/21
early [1] 640/4
easily [1] 655/6
east [1] 664/19
easy [2] 701/25
704/21
edit [1] 633/18
edits [1] 634/1
education [4] 661/2
663/22 677/18 685/4
effect [1] 685/16
effective [3] 704/2
704/8 704/11
effectuate [1] 661/24
efforts [1] 706/19
eight [1] 708/13
either [6] 652/23
657/17 684/13 692/8
693/4 712/9
El [2] 673/15 703/11
El Rancho Motel [1]
673/15
elbows [1] 700/20
electrical [1] 695/24
electricity [1] 706/3
elects [1] 685/24
element [1] 702/12
elements [2] 635/5
702/22
elevating [2] 670/17
670/23
elevations [1] 703/10
elicit [1] 692/21
emergency [2] 640/7
671/1
employ [1] 702/3
employed [1] 659/17
encoding [1] 654/19

encompassed [1]
659/16
encounter [25]
670/11 670/15 671/5
671/14 671/17 671/18
671/25 672/20 674/18
676/16 677/8 677/10
677/22 679/21 679/25
680/7 680/20 680/25
683/7 684/7 688/21
691/6 691/13 714/21
715/3
encountered [1]
657/10
encounters [1] 672/9
end [3] 710/9 710/10
719/11
endanger [1] 666/7
enema [1] 696/21
enforcement [7]
640/7 657/21 662/9
666/9 668/13 671/15
679/24
engage [4] 667/11
676/7 676/12 706/15
engaged [1] 703/6
engagement [1]
701/25
engages [1] 696/18
engaging [1] 682/6
Engineering [1]
639/14
enhanced [1] 651/19
enhancement [2]
651/12 651/13
enhancements [4]
639/17 640/4 651/9
651/21
enjoy [1] 666/23
enough [9] 636/14
656/3 673/20 684/1
684/5 684/12 685/5
685/16 706/3
entail [1] 692/8
entered [1] 660/17
entire [2] 654/6 703/3
entitled [2] 718/24
721/6
entry [1] 673/14
environment [3]
691/21 703/14 703/21
equipment [2] 642/20
642/22
escape [1] 634/24
Escobar [1] 660/1
Essentially [1] 648/4
establish [1] 690/9
established [1]
641/18
establishment [1]
703/12
estimate [1] 649/23
estimation [2] 674/13
674/15
ethics [1] 669/6
evaluate [2] 641/25
714/9
evaluating [1] 677/17

evasion [1] 692/10
evasive [1] 680/5
even [8] 643/6 643/9
644/18 651/5 652/16
679/19 696/25 719/19
evening [1] 719/25
event [2] 656/11
680/25
events [1] 680/24
evidence [7] 640/14
640/19 640/20 640/21
641/2 641/25 654/17
evident [1] 681/25
EWING [16] 630/13
631/7 631/8 631/9
632/15 636/12 636/17
637/23 638/15 639/7
657/1 659/1 710/8
711/20 711/25 720/3
exactly [4] 635/4
671/5 715/21 718/23
exam [1] 711/11
examination [12]
631/7 631/7 631/8
631/9 639/9 649/18
649/19 657/3 659/2
668/11 716/21 719/2
examine [3] 636/23
637/4 691/1
examining [2] 656/12
656/12
example [3] 644/18
652/12 715/19
exception [1] 668/13
exchange [1] 677/2
exchanged [2] 700/1
700/3
excited [1] 672/22
excused [1] 658/6
executable [6] 642/11
642/13 654/22 654/23
654/24 655/5
executive [1] 660/18
exemplary [1] 715/19
exerting [1] 706/19
Exhibit 105 [1] 670/4
Exhibit 1A [2] 647/18
647/22
exhibits [1] 667/20
720/10
exit [1] 717/14
exonerate [1] 681/6
exonerated [1] 684/13
expect [2] 682/19
682/20
expectations [2]
715/9 715/10
expected [2] 672/16
715/21
experience [24]
638/12 639/22 659/13
663/22 664/5 666/3
666/10 666/15 666/17
667/24 669/12 674/4
677/1 677/6 680/6
680/18 681/16 685/4
686/11 690/17 692/24
700/15 712/25 714/2

expert [7] 636/18
637/3 640/9 659/7
659/14 676/24 700/25
expert's [2] 644/8
701/3
expertise [2] 657/12
657/18
experts [2] 657/24
663/14
explained [1] 663/22
export [1] 642/8
exports [1] 642/10
express [2] 710/20
717/7
expressly [1] 719/25
extent [1] 720/10
extracted [1] 682/15
extreme [1] 714/8
extremely [3] 654/16
655/3 655/6
eye [2] 676/1 702/14
eyes [1] 680/4

**F**

face [2] 652/21 656/16
fact [8] 641/16 654/9
674/25 679/9 684/9
691/9 718/5 718/12
factor [1] 691/8
factors [3] 689/25
690/11 690/17
facts [3] 676/25 714/2
716/6
fair [2] 650/25 653/2
fall [2] 694/20 701/20
falling [1] 692/12
false [1] 635/22
familiar [3] 668/22
670/18 713/16
fan [1] 706/8
far [6] 641/22 644/25
674/10 676/19 676/20
708/23
fashion [1] 674/22
faster [1] 644/3
FBI [2] 659/23 660/18
FCRR [1] 629/23
fear [1] 707/20
feasible [1] 713/5
federal [5] 629/23
660/7 660/8 660/12
672/7
feels [1] 707/15
feet [1] 696/7
felt [3] 701/12 708/6
708/10
fence [1] 673/6
ferret [4] 666/15
677/23 684/11 691/1
few [4] 662/1 685/21
718/13 719/5
fidgety [1] 676/2
fight [6] 700/16
702/25 703/6 708/3
709/13 709/17
fighting [5] 702/7
702/9 702/15 703/2
708/12

figure [1] 714/16
files [5] 642/15 642/19
654/22 654/24 655/14
finalize [2] 717/23
718/15
finalized [1] 719/19
finally [2] 659/19
717/8
find [1] 680/14
fine [2] 711/19 720/2
fingers [2] 676/2
680/1
finish [3] 637/2 637/7
710/13
fired [3] 708/15
708/16 712/20
firing [1] 708/17 709/3
709/7
firm [4] 659/9 688/2
696/23 696/23
first [20] 629/24
633/12 638/21 639/5
648/10 649/11 658/13
660/4 664/1 664/6
664/7 674/20 674/21
680/24 689/23 708/18
709/3 712/20 718/11
719/11
firsthand [1] 661/18
fist [2] 701/17 707/7
fists [3] 700/20
701/23 704/19
five [2] 662/4 707/17
710/25
fix [1] 656/8
flight [3] 691/8 692/2
692/8
flipped [1] 651/19
focus [3] 647/2 654/2
701/3
focused [1] 655/23
follow [1] 636/11
following [1] 632/4
638/5 710/5 710/16
711/4 715/20 717/16
follows [3] 638/22
658/14 716/16
food [1] 636/6
foot [4] 695/18 695/20
695/20 695/21
footage [1] 641/5
force [29] 634/8
634/10 634/11 662/6
667/8 693/16 693/23
693/25 694/1 694/2
694/3 694/5 694/7
694/8 694/18 694/22
696/25 697/6 701/10
707/11 707/14 707/23
707/25 708/19 709/3
712/4 713/6 714/22
715/13
foregoing [1] 721/4
forensic [1] 640/6
forensics [1] 659/7
form [5] 674/22
677/13 710/20 717/7
719/6

**F**

formal [1] 661/2
format [2] 651/14
721/7
formed [1] 663/20
forming [1] 681/3
formulate [3] 690/1
690/12 690/18
formulated [1] 691/7
forth [7] 645/23
675/22 676/3 677/2
680/2 715/14 716/6
forward [4] 632/8
648/21 687/19 715/6
forwarded [1] 663/4
found [1] 691/15
foundation [4] 666/16
679/4 697/22 700/4
four [8] 641/20 651/16
662/5 685/14 694/5
694/23 701/10 703/19
fraction [2] 645/5
653/4
fractions [1] 653/1
fractured [1] 712/14
frame [13] 643/13
644/15 645/1 647/6
647/6 651/22 651/22
652/6 652/12 652/13
654/25 655/1 655/1
frames [24] 642/11
643/15 643/16 643/18
643/22 646/6 648/21
649/8 649/13 649/14
651/22 652/1 652/3
652/6 652/8 652/11
653/6 653/8 653/9
654/20 654/21 655/24
656/12 656/14
free [7] 671/11 675/4
675/5 683/14 683/18
684/17 686/2
freedom [1] 671/12
frightening [1] 714/8
frog [1] 650/16
front [3] 664/18 689/5
705/22
full [2] 665/5 670/1
full-time [1] 670/1
functions [1] 680/3
further [9] 649/17
658/3 658/5 676/13
684/15 692/1 710/7
716/10 716/22
future [1] 666/14

**G**

gain [3] 667/12 667/12
671/18
GALIPO [14] 630/3
630/3 631/7 632/11
636/8 637/3 637/8
637/15 650/12 658/4
711/8 718/1 718/16
719/24
gap [1] 655/17
gate [2] 673/14
674/11

gather [2] 685/7
685/19
gathered [3] 681/1
681/5 682/1
gave [2] 678/6 678/11
generally [1] 713/24
generated [1] 642/16
gentlemen [3] 638/8
710/18 716/11
geography [1] 661/20
gestures [1] 677/7
gets [3] 643/15 681/9
701/9
getting [6] 650/7
665/3 683/7 687/9
694/12 710/6
give [16] 633/4 633/10
633/14 633/15 635/7
636/6 637/12 638/24
658/16 678/10 678/14
679/18 713/5 713/11
716/23 717/20
given [3] 635/22 695/8
715/22
gives [2] 687/12
692/13
giving [2] 675/17
690/5
GLASMAN [1] 630/13
glitches [2] 653/19
655/24
gmail.com [1] 629/25
goal [6] 671/18 693/10
693/11 698/11 702/19
719/10
God [2] 639/1 658/18
goes [7] 674/23 681/8
682/10 683/22 696/20
719/8 719/20
gone [2] 632/25
688/20
good [21] 632/10
632/13 632/14 632/15
632/22 638/8 639/11
639/12 640/8 649/21
649/22 659/4 659/5
666/14 666/14 674/12
674/15 687/5 695/24
708/18 710/15
gotten [1] 633/3
Governor [1] 660/4
grab [1] 696/24
grabbing [1] 671/16
grabs [1] 697/11
gradations [1] 703/9
graduate [1] 661/3
graduated [2] 659/23
660/19
gram [1] 682/12
grant [1] 660/6
graphics [2] 639/15
640/2
grappling [2] 702/10
707/5
grave [1] 712/10
great [11] 636/16
647/3 666/4 666/18
709/25 711/17 712/6

712/7 712/8 712/12
712/14
green [1] 673/19
grip [3] 688/2 696/23
696/23
ground [6] 683/20
696/4 702/7 702/9
702/15 703/2
guess [5] 633/23
640/8 718/2 719/8
720/9
guessing [1] 669/11
guidelines [1] 669/22
gun [13] 687/8 708/4
708/4 708/7 708/14
708/14 708/16 709/12
709/15 709/16 709/20
710/3 712/20
guns [3] 709/23
709/23 709/24

**H**

half [4] 646/4 649/11
653/6 654/13
hand [6] 644/17
651/17 705/9 706/10
708/6 708/7
handcuff [1] 685/23
handcuffed [1] 686/23
handcuffs [1] 686/13
688/3 698/12 698/14
705/13 705/14 706/20
handgun [1] 662/15
hands [7] 676/3
693/15 696/20 698/5
698/8 698/15 702/18
handy [1] 653/14
HANG [2] 630/4
632/11
Hang Le [1] 632/11
happen [5] 643/25
654/15 669/11 701/14
713/7
happened [9] 641/11
644/6 644/6 653/20
654/9 686/21 687/25
695/6 698/6
happening [7] 644/19
644/21 654/7 655/24
666/22 677/14 700/16
happens [2] 677/20
695/4
hard [3] 654/17
654/18 669/10
harm [6] 634/15 712/6
712/7 712/8 712/12
712/14
having [7] 638/21
651/14 658/13 673/7
684/7 693/15 693/16
HDTV [1] 643/7
he's [4] 699/1 707/7
715/17 718/24
head [4] 697/3 700/20
701/21 708/9
headlights [1] 644/17
hear [3] 672/19 678/4
678/15 686/7 689/13

712/20 716/24
heard [7] 632/4 638/5
667/25 676/14 710/16
711/4 717/16
hearing [2] 686/8
698/18
hearsay [1] 689/15
heck [3] 696/10
696/16 705/7
held [2] 710/5 721/6
help [2] 639/1 658/18
hereby [1] 721/3
herself [2] 634/11
701/13
hesitate [2] 643/21
644/18
hesitates [1] 644/3
hesitations [2] 645/4
645/4
hexadecimal [2]
654/19 654/21
hey [3] 654/3 674/24
716/4
high [3] 639/17 640/1
640/5
high-profile [1] 640/5
high-speed [2] 639/17
640/1
higher [1] 668/20
highly [2] 653/19
715/23
HILLS [1] 630/5
himself [7] 671/15
671/24 672/1 691/25
692/1 692/9 692/9
hindsight [3] 713/16
713/25 714/5
hip [1] 696/3
hired [1] 650/7
hit [6] 694/12 701/17
701/21 702/11 704/15
704/25
hits [1] 705/12
hitting [2] 693/12
704/14
hold [6] 661/6 684/12
697/3 697/16 705/13
706/14
holding [2] 637/15
659/18
holds [4] 647/6
697/10 697/14 704/21
holster [1] 708/5
holstered [1] 696/14
holsters [2] 695/5
696/17
home [1] 643/2
HONORABLE [1]
629/3
hope [5] 633/5 638/9
711/16 716/18 716/22
hopefully [3] 632/22
632/24 638/11
hopped [1] 673/6
hot [1] 706/1
hotel [1] 654/11
hour [9] 633/6 637/5
650/2 650/3 650/5

717/2 717/24 718/14
719/2
hours [3] 649/23
650/1 718/22
However [2] 671/13
677/4
human [1] 702/21
hundred [1] 650/20
hundreds [1] 640/22
hurt [9] 694/13 695/3
696/2 696/10 696/16
701/18 701/21 706/5
706/17
hurting [2] 693/13
706/4
hurts [2] 702/14 705/6
hypothetically [2]
654/10 654/12
hypotheticals [1]
699/22

**I**

idea [1] 691/17
identical [1] 641/22
identification [2]
665/10 682/7
identified [1] 665/7
identifiers [2] 679/13
679/13
identify [2] 645/1
666/15
identifying [1] 679/19
if -- I [1] 674/7
II [2] 629/7 718/9
illegal [1] 676/18
image [2] 644/2
651/16
images [6] 642/24
643/23 644/1 645/22
651/16 655/4
imaging [4] 639/17
639/18 640/1 640/2
immediately [2]
707/22 708/5
imminent [6] 707/16
707/17 708/11 708/15
709/11 712/5
immunity [2] 634/19
634/21
importance [2]
688/10 709/22
important [16] 641/21
654/5 665/4 665/11
665/12 665/22 669/23
671/3 671/13 675/8
680/22 686/1 691/9
692/3 697/8 707/16
importantly [2] 663/8
672/23
impressed [2] 697/18
697/21
inability [2] 684/10
684/14
inappropriate [1]
703/21
incapacitation [1]
696/5 702/19 708/20
inch [5] 695/18 695/19

**I**

inch... **[3]** 695/20
695/22 695/23
**inches [2]** 695/20
695/21
**incident [7]** 644/20
654/2 661/15 661/20
662/23 662/25 663/9
**inclination [2]** 633/14
634/11
**inclined [3]** 633/15
633/18 634/13
**include [5]** 633/18
634/6 634/14 635/11
656/22
**included [2]** 663/5
663/10
**including [1]** 656/12
**inclusive [1]** 629/20
**inconsistent [1]** 690/6
**incorporated [1]**
634/9
**incorrect [1]** 676/21
**increase [1]** 668/19
**indicated [2]** 650/9
650/20 651/9
**individual [19]** 668/16
674/10 674/16 681/4
681/6 682/2 682/6
682/8 685/3 695/17
696/10 696/22 697/1
702/20 702/23 703/13
712/10 713/7 713/9
**INDIVIDUALS [1]**
629/6
**indulge [1]** 716/14
**INDUSTRY [1]** 630/14
**ineffective [1]** 696/14
**inflict [1]** 704/12
**infliction [2]** 634/14
634/15
**influence [1]** 635/21
680/13 682/3
**information [27]**
643/17 647/5 647/8
667/12 668/16 671/18
677/16 678/10 678/16
679/8 681/1 681/2
681/5 681/22 681/24
682/1 682/4 683/17
684/2 684/5 684/9
684/11 684/15 685/6
685/8 685/20 690/5
**informed [1]** 679/16
**initial [1]** 633/18 678/2
715/6
**initiated [1]** 671/24
**initiation [2]** 714/21
714/21
**injury [4]** 704/17
709/25 712/8 712/15
**ink [1]** 705/21
**inputted [1]** 684/16
**inquiries [1]** 675/23
**inquiring [1]** 637/16
**inquiry [2]** 679/22
**inquisitive [1]** 672/10
**inside [2]** 642/11

655/5
**instances [1]** 655/21
**instantly [1]** 705/12
**instruct [2]** 634/20
719/19
**instruction [10]**
633/13 633/14 633/16
633/22 633/24 634/3
634/18 635/7 635/14
636/1
**instructions [16]**
633/5 633/9 711/14
711/17 716/19 716/24
717/20 717/23 717/24
718/6 718/10 718/15
719/6 719/18 720/6
720/17
**instructor [2]** 660/23
660/25
**instructs [1]** 709/22
**instrument [1]** 705/9
**intend [2]** 635/7
635/11
**intended [1]** 708/20
**intent [1]** 654/13
**intentionally [1]**
633/18
**interdiction [1]** 660/1
**INTEREST [1]** 629/6
**interim [1]** 644/5
**intermediate [1]**
643/22
**international [2]**
660/1 695/11
**interpret [1]** 675/20
**interrupt [1]** 667/18
**intersection [3]** 664/9
664/16 673/15
**intimidating [1]** 687/7
**intoxication [3]**
680/11 684/6 690/3
**investigate [1]** 691/1
**investigating [1]**
655/12
**investigation [2]**
663/6 690/19
**investigative [1]**
663/11
**involved [1]** 657/22
**involving [2]** 660/9
663/2
**issued [1]** 695/10
**issues [6]** 709/13
709/16 716/19 717/25
720/8 720/13
**items [1]** 635/19

**J**

**jacket [4]** 646/10
646/23 648/20 649/4
**jargon [1]** 700/20
**jeopardy [2]** 701/12
**Jerry [1]** 660/4
**Jerry Brown [1]** 660/4
**joining [1]** 632/19
**joint [1]** 633/9
**joking [1]** 638/10
**JR [1]** 629/3

**JUDGE [4]** 629/3
**judicial [2]** 668/12
721/8
**JUI [3]** 629/23 721/14
721/15
**jumping [1]** 644/15
**jumps [1]** 647/7
**juncture [1]** 644/20
**jurors [3]** 633/2
717/14 719/24
**Justice [1]** 660/19
**justified [2]** 707/23
714/14
**justifies [1]** 681/10

**K**

**keep [5]** 643/16
666/11 675/16 685/15
719/21
**keeps [1]** 647/6
**Keith [1]** 663/16
**Kelsey [1]** 720/6
**keys [1]** 683/21
**kids [2]** 632/25 638/12
**kill [1]** 708/21
**kind [19]** 642/10
643/25 653/25 665/2
665/2 665/9 666/1
666/21 669/10 669/10
670/11 684/23 693/16
699/12 699/13 700/19
704/10 710/23 717/11
**kinds [5]** 639/15
639/17 666/15 666/21
700/21
**knees [1]** 700/20
**knew [2]** 674/7 675/2
**knowingly [1]** 634/7
**knowledge [4]** 657/24
663/3 663/23 691/23
**Kyle [6]** 632/17 663/2
680/19 681/16 707/2
707/5
**Kyle Woods [3]**
632/17 663/2 681/16
**Kyle Woods's [1]**
680/19

**L**

**lacking [2]** 697/22
700/3
**lacks [1]** 679/4
**ladies [3]** 638/8
710/18 716/11
**laid [3]** 682/16 682/17
682/17
**landing [1]** 652/20
**language [4]** 634/7
634/7 634/8 634/23
**last [7]** 635/8 639/6
668/25 674/1 679/1
697/20 711/15
**late [1]** 719/20
**later [6]** 635/23 636/7
636/11 636/14 681/9
714/16
**law [24]** 630/3 630/3
630/4 630/4 630/8

630/9 630/13 639/23
639/24 640/6 657/21
659/9 661/9 662/9
666/9 667/8 668/13
669/12 669/19 676/19
679/23 690/5 690/22
718/13
**lawful [5]** 686/24
687/3 687/20 688/14
706/18
**laws [3]** 669/13
669/19 670/7
**lawyer [1]** 638/11
**lawyers [1]** 716/18
**lay [1]** 698/20
**LE [2]** 630/4 632/11
**lead [1]** 712/13
**leaning [1]** 634/17
**learn [5]** 662/11
662/14 662/17 662/20
669/17
**learning [12]** 668/16
668/22 668/24 669/1
669/3 669/4 669/13
670/10 689/19 689/21
709/21 713/2
**Learning Domain 15
[3]** 668/22 669/13
689/19
**Learning Domain
15-2-4 [1]** 670/10
**Learning Domain 20
[2]** 689/21 713/2
**Learning Domain 33
[1]** 709/21
**learning domains [2]**
669/1 669/4
**least [7]** 633/4 636/6
655/21 708/23 719/18
720/8 720/11
**leave [7]** 659/22 660/3
675/12 683/14 684/18
686/2 718/24
**leaves [1]** 705/25
**left [1]** 673/20
**legal [2]** 684/23
687/22
**legality [1]** 675/17
**legislation [2]** 660/5
669/12
**legislative [1]** 660/5
**length [2]** 637/5
718/18
**let [5]** 645/23 654/10
680/4 685/15 719/22
**letting [1]** 636/10
**LEVA [1]** 640/6
**level [8]** 677/24 681/1
684/21 685/16 688/13
694/25 697/10 701/16
**levels [5]** 688/20
694/5 694/18 694/22
701/10
**leverage [4]** 699/10
704/6 704/7 704/10
**Libby [1]** 663/17
**lieutenant [3]** 659/19
662/5 672/6

**life [8]** 707/15 707/22
708/10 709/6 709/10
712/5 712/8 714/8
**life-threatening [1]**
714/8
**light [8]** 664/15 665/7
673/8 673/17 673/17
673/19 674/7 679/9
**lights [2]** 671/1
671/16
**like [22]** 633/1 635/4
643/25 644/2 645/7
647/3 648/20 649/13
649/16 650/1 668/10
669/1 670/7 681/12
685/3 696/10 696/16
705/7 705/21 705/25
716/5 719/18
**likely [2]** 655/8 669/8
**limitations [2]** 670/14
695/15
**limited [1]** 703/13
**line [6]** 634/5 666/8
668/18 668/20 680/24
685/10
**linear [1]** 680/24
**lines [3]** 633/21
633/25 634/14
**lines [1]** 634/14
**lines 13 [1]** 633/21
**lines 9 [1]** 633/25
**list [1]** 633/8
**listen [3]** 671/20
672/11 682/11
**listened [5]** 670/22
675/24 678/3 680/17
686/20
**listening [3]** 673/7
674/19 675/19
**lit [1]** 705/25
**little [10]** 634/4 635/2
641/6 646/3 656/8
696/2 697/12 702/13
705/23 720/1
**live [2]** 666/22 691/20
**lives [1]** 691/22
**living [1]** 659/6
**locate [1]** 667/21
**located [1]** 665/3
**location [6]** 661/20
663/8 673/13 690/4
691/21 695/8
**long [3]** 652/4 674/16
675/16
**longer [3]** 653/3
711/13 717/1
**look [13]** 642/22
644/16 651/22 654/6
655/22 666/13 677/5
677/11 677/11 677/21
680/4 687/8 719/21
**looked [3]** 648/20
708/5 714/25
**looking [5]** 656/12
656/13 665/1 665/2
666/1
**looks [2]** 644/2 647/2
**LOS [5]** 629/18 629/24

**L**

LOS... [3] 632/1
659/16 659/22
Los Angeles County
[1] 659/22
lose [1] 701/20
losing [5] 674/25
708/3 708/3 708/8
709/24
lost [9] 646/13 647/5
647/8 648/21 649/8
649/12 649/13 673/11
708/13
lot [13] 640/20 643/3
643/21 646/18 646/19
647/2 647/3 649/6
671/7 673/25 674/10
674/11 703/9
lotion [1] 702/13
loud [1] 719/4
low [2] 642/23 671/14
lower [2] 684/21
694/22
lowest [2] 694/24
701/16
lunch [10] 633/6
710/14 711/11 711/12
711/13 711/14 716/13
716/14 717/1 720/20

**M**

mad [1] 696/11
made [3] 642/17
690/24 707/3
madness [1] 716/13
Main [6] 664/9 664/16
673/17 674/2 674/9
703/12
maintain [1] 671/14
maintained [1] 690/7
major [1] 646/4
make [18] 635/14
637/10 637/12 638/2
654/15 669/15 669/18
673/22 677/6 683/8
690/23 696/11 697/7
704/13 704/14 711/9
718/11 720/16
makes [2] 695/11
705/7
making [2] 697/4
706/4
man [1] 648/20
management [2]
659/8 661/7
manipulating [1]
657/7
manipulation [1]
657/21
manner [4] 671/15
672/10 705/2 712/11
manufacturer [1]
695/11
many [8] 640/5
640/12 640/17 649/8
649/23 650/23 662/7
713/11
map [1] 652/7

MARCEL [2] 630/4
632/11
Marcel Sincich [1]
632/11
MARCH [3] 629/16
631/2 632/1
markings [1] 665/9
marks [1] 705/25
marry [1] 669/11
Marshal [1] 659/24
master's [3] 661/3
661/4 661/6
match [5] 641/5
641/10 656/6 656/10
706/1
material [2] 665/5
684/15
materials [3] 661/12
664/5 675/24
math [2] 653/8 669/3
matter [10] 666/18
710/21 710/24 712/19
716/17 717/4 717/8
717/11 720/13 721/6
Mattern [1] 663/15
matters [1] 660/6
maybe [9] 637/8
645/5 648/6 650/1
683/7 693/3 707/18
708/13 710/9
MBA [1] 661/7
McCormick [1]
663/15
mean [11] 654/18
674/6 674/11 678/6
681/15 681/16 686/10
687/4 696/4 698/20
717/2
means [10] 665/18
665/24 668/1 668/2
683/5 683/22 702/19
712/7 713/24 713/25
meantime [1] 720/10
mechanics [1] 695/14
Medical [1] 668/10
MEI [3] 629/23 721/14
721/15
membranes [1]
702/22
mentioned [1] 717/21
mere [1] 694/15
met [1] 657/14
method [1] 716/13
Mexico [2] 660/8
660/11
mic [1] 683/22
middle [1] 683/20
might [2] 634/25
654/3
mind [1] 654/1 685/3
minor [2] 634/1
634/13
minute [4] 674/8
710/12 710/19 711/10
minutes [1] 637/5
674/8 707/18 710/9
710/25 711/7 711/22
718/20 719/5

misdemeanor [2]
688/22 691/4
missed [1] 657/6
missing [4] 644/1
644/5 654/4 654/14
mission [3] 666/9
667/13 667/14
misspelled [1] 718/6
misspelling [1]
678/25
MIT [1] 640/1
mode [4] 705/16
705/19 706/7 706/8
modification [1] 635/8
modify [1] 654/12
moment [5] 656/18
665/16 688/24 709/14
709/17
moments [1] 718/13
MONDAY [3] 629/16
632/1 714/5
monitor [1] 660/7
monitors [1] 637/24
more [15] 633/6
633/15 634/4 635/1
640/20 643/3 655/8
663/7 669/8 679/2
679/6 683/22 685/19
701/23 708/13
morning [16] 632/10
632/13 632/14 632/15
632/22 633/1 638/8
638/12 639/11 639/12
649/21 649/22 659/4
659/5 714/6 719/12
most [10] 641/21
654/4 665/21 669/22
672/23 678/17 685/25
686/12 692/22 693/1
motel [5] 642/6
654/11 673/14 673/15
673/22
motion [5] 643/25
647/18 648/15 652/23
656/13
motions [1] 637/10
motor [1] 680/3
move [10] 643/21
644/3 644/19 647/2
696/24 697/20 700/2
706/22 712/16 719/15
moved [6] 646/10
646/11 646/12 648/21
649/5 686/22
movements [1] 697/8
moves [2] 646/18
647/3
moving [4] 643/20
644/18 674/12 687/19
Mr. Chapman [11]
637/10 659/4 661/11
669/8 667/18 689/2
690/16 711/6 712/3
716/4 718/19
Mr. Conaway [2]
632/18 718/4
Mr. DeFoe [1] 715/15
Mr. Ewing [11] 636/12

636/17 637/23 638/15
639/7 657/1 659/1
710/8 711/20 711/25
720/3
Mr. Galipo [9] 636/8
637/3 637/8 637/15
650/12 658/4 718/1
718/16 719/24
Mr. Mattern [1]
663/15
Mr. Pickett [86]
632/21 652/17 652/20
656/15 664/2 664/6
664/8 664/17 665/1
665/14 666/25 667/1
672/20 673/5 673/11
673/24 673/25 674/20
674/21 674/23 675/2
675/4 675/22 676/1
676/6 676/7 676/9
676/10 676/11 676/22
676/23 677/18 678/4
678/6 678/10 678/15
678/18 678/25 679/10
680/8 680/13 680/15
684/3 684/7 684/12
684/17 686/13 686/15
686/22 687/25 688/2
688/6 688/12 688/17
691/8 691/12 691/14
691/18 691/20 691/24
692/5 692/6 692/12
692/17 692/20 695/1
695/3 695/8 697/17
697/21 698/2 698/6
698/7 698/9 698/16
698/19 699/14 699/17
700/1 700/10 707/6
707/9 709/3 709/8
712/21 713/11
Mr. Pickett's [5] 680/1
697/16 708/6 708/7
718/6
Mr. Roger [1] 663/14
Mr. Scott [1] 663/15
Mr. Ward [9] 636/23
637/2 637/21 639/11
644/14 644/25 647/25
649/21 657/5
much [7] 651/13
663/5 684/21 699/25
710/7 718/20 718/23
multiple [2] 644/2
654/24
muscles [1] 705/5
muscular [1] 696/5
myself [2] 661/16
663/19

**N**

N-a-t-h-a-n-i-e-l [1]
718/7
name [15] 635/22
639/4 639/5 639/5
639/6 658/22 678/6
678/9 679/1 679/14
679/15 679/18 681/24
718/6 718/11

names [1] 695/12
narcotic [2] 680/11
680/14
narcotics [1] 682/3
narrative [2] 641/11
699/21
Nate [1] 703/7
Nate Pickett [1] 703/7
NATHANAEL [5]
629/5 629/6 630/7
635/21 718/9
Nathanael Pickett [1]
635/21
native [1] 651/14
nature [2] 676/15
685/5
necessary [3] 634/16
683/23 714/13
need [9] 633/17
633/20 634/4 634/22
635/2 704/2 718/8
719/17 720/13
needing [1] 685/6
needs [1] 634/8
neighborhood [1]
666/23
nervous [3] 665/2
676/2 680/5
neural [1] 696/5
neutralize [1] 694/8
never [2] 706/14
New [2] 660/8 660/11
New Mexico [2] 660/8
660/11
next [14] 638/15
658/9 664/21 682/16
682/17 687/25 688/5
688/13 695/4 695/6
697/10 698/6 699/18
707/5
night [1] 719/22
nine [1] 662/5
Nobody [1] 693/1
nomenclature [1]
695/13
noncompliance [2]
694/21 694/24
nonresponsive [1]
708/24
nonthreatening [1]
672/10
noon [1] 710/25
normally [4] 643/14
649/14 650/25 651/3
NORTH [1] 630/14
northbound [1]
664/15
nose [1] 712/14
noted [2] 718/8 720/4
notes [4] 636/6 636/9
636/13 717/21
nothing [12] 638/25
649/17 658/3 658/17
672/11 676/18 676/18
676/20 676/21 693/22
711/21 716/10
notice [3] 643/19
645/20 654/8

**N**

November [1] 663/1
number [11] 633/13
633/16 633/22 634/3
634/17 634/19 634/22
635/24 635/25 640/3
650/24
Number 18 [1] 633/13
Number 20 [1] 633/16
Number 21 [1] 633/22
Number 22 [1] 634/3
Number 25 [1] 634/17
Number 28 [1] 634/19
Number 29 [1] 634/22
Number 41 [1] 635/24
Number 42 [1] 635/25
numbers [1] 654/21

**O**

object [8] 679/3
686/16 687/21 697/20
699/20 700/2 700/25
713/21
objection [9] 635/9
644/9 644/10 647/20
647/21 689/13 689/24
699/3 699/6
objective [8] 680/10
684/5 690/3 690/22
706/17 706/18 717/3
717/4
obligation [2] 678/13
687/14
observable [1] 666/16
observation [7] 664/1
664/6 664/7 665/4
666/25 682/15 715/6
observations [1]
673/6
observe [5] 643/12
688/4 699/14 699/18
703/2
observed [10] 648/19
649/3 664/17 665/1
673/24 674/18 676/1
679/25 680/1 699/22
obstructed [1] 664/23
obstructing [2]
688/15 688/18
obtain [1] 698/15
obtaining [1] 677/16
obvious [1] 688/8
obviously [8] 647/4
659/18 663/7 674/13
686/23 692/10 697/17
701/17
occasion [3] 662/6
662/8 662/11
occasionally [1]
643/18
occur [4] 645/4 645/5
680/24 699/13
occurred [6] 648/18
661/21 663/1 664/8
691/16 703/2
occurrences [1]
669/8
occurring [2] 675/18

714/3
occurs [1] 644/20
off [3] 642/7 689/14
705/22
offer [1] 692/19
offered [1] 657/7
office [2] 632/11
657/11
officer [82] 634/9
660/23 665/8 665/10
665/22 667/4 667/5
667/6 667/10 667/11
668/3 668/6 668/9
668/17 669/9 669/16
669/18 669/23 669/24
670/2 670/14 671/6
671/8 671/11 671/14
671/15 672/16 672/25
675/1 675/3 675/9
675/11 675/14 675/23
677/4 677/10 677/21
677/23 678/21 681/3
682/20 683/15 683/21
683/24 684/10 685/2
685/18 685/18 685/21
685/22 685/23 687/7
687/11 687/17 690/22
692/7 692/9 692/25
693/11 695/2 695/2
697/11 699/11 701/13
702/25 704/5 704/8
704/15 707/15 707/21
708/12 710/1 710/3
712/3 713/25 713/25
714/3 714/12 714/14
715/2 715/11 715/22
officer's [1] 712/5
officers [21] 641/6
663/24 668/5 668/12
668/14 669/13 669/15
672/3 672/8 676/19
677/13 682/19 683/11
693/12 698/23 698/24
699/4 705/14 708/21
709/22 713/5
OFFICES [2] 630/3
630/8
OFFICIAL [1] 629/23
official's [1] 662/9
officious [2] 672/12
682/22
oh [3] 654/3 684/21
707/18
oil [3] 702/12 702/13
702/17
old [1] 643/6
once [10] 673/11
679/2 679/6 681/1
683/12 690/13 690/21
691/16 702/10 702/15
one [32] 634/4 641/14
641/14 641/16 641/19
643/24 644/16 645/7
649/11 649/11 649/12
652/8 652/13 653/3
653/6 653/6 654/2
655/12 656/18 657/17
676/16 677/15 681/23

682/3 687/22 692/3
694/22 695/18 695/19
695/20 695/20 715/5
one inch [2] 695/19
695/20
one-camera [1] 645/7
ones [3] 657/25
715/25 715/25
only [18] 642/12
642/24 642/25 654/16
655/23 657/25 671/11
673/23 692/1 700/18
704/12 707/15 710/1
711/9 718/3 718/17
719/13 720/4
oOo [1] 720/21
open [6] 632/4 638/5
697/2 710/16 711/4
717/16
opened [1] 685/11
opinion [32] 649/8
657/7 657/10 671/23
672/15 674/4 674/15
676/15 679/9 683/5
684/1 686/14 691/7
692/19 692/21 695/9
701/5 702/6 703/5
703/24 706/6 707/4
707/24 708/17 709/2
709/7 709/10 709/12
709/17 710/20 714/20
717/7
opinions [5] 663/20
663/21 677/14 699/22
701/3
opportunity [9] 642/3
661/16 661/24 662/14
662/17 662/20 662/23
663/19 715/24
opposed [2] 693/8
699/22
optimistic [1] 716/17
option [2] 705/17
714/10
order [8] 649/15 650/1
653/4 683/17 686/24
687/3 687/20 688/14
original [2] 648/2
648/7
originally [1] 641/3
out [46] 647/2 649/5
650/16 652/10 653/25
654/18 654/20 654/23
655/4 660/24 661/15
661/16 665/25 666/6
666/10 666/11 666/12
666/15 672/16 673/7
674/9 676/4 677/23
682/12 684/11 687/6
687/9 688/1 690/17
691/1 693/22 695/18
695/19 697/13 702/25
705/5 705/13 705/20
705/23 708/5 708/16
708/18 714/16 718/14
719/4 720/7
outset [2] 678/2
715/12

682/2 692/17 692/3
694/22 695/18 695/19
695/20 695/20 715/5
outside [3] 632/4
711/4 717/16
over [14] 650/22
652/7 653/9 654/7
659/15 664/20 664/21
665/2 698/15 698/19
698/20 699/9 699/15
699/18
overbearing [2]
672/12 682/21
overcome [6] 634/24
693/25 694/2 694/4
697/16 702/2
overcomes [1] 694/1
Overruled [5] 679/5
686/18 700/6 712/17
713/23
own [1] 700/25

**P**

P-a-r-r-i-s [1] 639/6
P.O [1] 630/9
Pablo [1] 660/1
pace [1] 643/16
pacing [1] 676/3
680/2
page [8] 629/20 631/5
653/16 670/8 689/3
689/10 689/19 721/7
page 2-4 [1] 670/8
page 4-5 [2] 689/3
689/19
page 6 [1] 653/16
pain [12] 697/7
702/23 704/12 704/12
704/18 704/20 704/22
704/23 704/25 705/6
705/19 706/9
paragraph [2] 633/20
635/8
parallels [1] 690/21
parking [7] 646/18
646/19 647/2 649/5
673/25 674/10 674/11
PARKWAY [1] 630/14
parole [1] 676/9
Parris [4] 636/19
638/17 638/20 639/5
Parris Ward [3]
636/19 638/17 639/5
part [9] 652/10 653/1
654/5 656/21 673/10
690/20 693/2 697/20
714/15
particular [21] 642/6
642/25 645/20 645/21
654/4 654/21 655/4
661/20 663/3 663/14
664/16 664/25 667/13
667/14 670/12 670/15
691/11 693/18 694/10
703/16 715/16
particularly [2] 645/22
715/2
parties [1] 720/12
parts [1] 645/1
pass [2] 669/17 705/5
passenger [1] 664/20

passive [1] 694/23
pat [1] 676/5
pathway [1] 647/1
patrol [5] 662/2 662/3
665/20 665/21 669/24
pause [2] 665/15
687/1
paying [1] 650/6
PC [1] 691/4
peace [3] 660/23
668/3 671/10
pecs [1] 696/2
Penal [2] 688/16
691/5
Penal Code [1]
688/16
penalty [1] 690/5
people [10] 643/9
643/20 686/3 686/5
692/22 706/17 706/18
708/21 708/21 716/4
pepper [12] 662/18
702/4 702/11 702/12
702/12 702/14 702/21
702/24 703/6 703/15
703/20 705/6
Pepperdine [2]
639/24 661/3
Pepperdine
University [2] 639/24
661/3
per [10] 643/15
643/16 649/15 650/2
650/3 652/1 652/4
652/6 652/8 653/8
percent [1] 714/6
perception [1] 703/14
performance [1]
715/10
perhaps [3] 633/6
667/12 719/19
period [1] 655/16
periodically [1] 645/6
permanently [1]
712/10
permission [2] 644/7
647/17
person [16] 644/3
646/10 646/23 649/4
651/7 671/11 673/1
673/2 683/14 683/17
685/14 685/22 685/23
686/1 691/18 705/24
person's [1] 667/13
personal [7] 700/19
701/6 701/9 704/19
705/11 706/13 707/7
perspective [3]
661/19 665/3 714/12
phase [1] 691/13
phased [1] 674/8
phasing [2] 673/16
673/18
PhotoShop [1] 656/22
phrased [3] 679/4
686/17 713/22
physical [1] 634/15
677/7 680/21 684/18

**P**

**physical...** [13] 685/10
688/11 688/21 690/9
690/14 693/9 693/10
693/10 694/16 699/25
700/14 706/15 715/3
**physically** [1] 695/3
**physics** [1] 669/2
**pick** [1] 674/22
**PICKETT** [91] 629/7
630/7 632/21 635/21
652/17 652/20 656/15
664/2 664/6 664/8
664/17 665/1 665/14
666/25 667/1 672/20
673/5 673/11 673/24
673/25 674/20 674/21
674/23 675/2 675/4
675/22 676/1 676/6
676/7 676/9 676/10
676/11 676/22 676/23
677/18 678/4 678/6
678/10 678/15 678/18
678/25 679/10 680/8
680/13 680/15 684/3
684/7 684/12 684/17
686/13 686/15 686/22
687/25 688/2 688/6
688/12 688/17 691/8
691/12 691/14 691/18
691/20 691/24 692/5
692/6 692/12 692/17
692/20 695/1 695/3
695/8 697/17 697/21
698/2 698/6 698/7
698/9 698/16 698/19
699/14 699/17 700/1
700/10 703/7 707/6
707/9 709/3 709/8
712/21 713/11 718/9
**Pickett's** [5] 680/1
697/16 708/6 708/7
718/6
**PICKETT,I** [1] 629/5
**picture** [1] 643/8
**pistol** [1] 662/15
**pixels** [4] 643/1 643/1
643/3 643/4
**place** [5] 654/7 666/6
686/12 700/14 709/13
**plaintiff** [4] 630/2
630/7 642/1 651/25
**plaintiffs** [3] 629/8
635/3 641/15
**plaintiffs'** [9] 634/6
634/18 635/9 636/20
647/18 648/3 657/24
663/14 715/15
**planning** [1] 642/1
**play** [5] 642/9 642/14
645/23 646/14 720/1
**playable** [1] 642/8
**played** [13] 644/12
644/23 645/10 645/15
646/2 646/8 646/15
647/12 647/22 647/23
648/7 648/13 648/22
**player** [1] 642/11

**pleasant** [1] 692/24
**please** [23] 632/8
638/18 639/3 639/4
653/16 658/9 658/20
658/22 664/14 665/18
667/1 667/20 668/1
673/4 680/18 683/3
691/10 695/9 710/4
711/3 714/20 717/7
717/15
**pockets** [2] 676/4
691/17
**point** [72] 644/14
645/17 647/17 653/20
654/17 664/17 664/22
667/2 667/9 667/14
670/15 673/23 675/4
675/8 679/21 680/14
680/19 680/20 681/3
681/9 682/24 682/24
683/1 683/4 683/21
683/23 684/2 684/17
685/25 686/1 686/1
686/25 687/5 687/5
687/11 688/10 688/10
690/8 690/13 691/6
692/2 692/11 692/16
693/3 694/10 694/11
694/21 695/1 695/5
696/12 696/17 696/20
697/15 698/11 698/17
699/13 699/14 699/24
700/16 700/18 701/11
701/12 701/16 704/1
704/8 705/11 705/18
707/2 707/8 707/23
708/2 719/16
**points** [3] 643/20
692/25 710/10
**police** [90] 634/9
650/23 650/24 651/3
655/12 657/12 659/7
659/15 660/6 660/16
660/16 660/17 660/21
663/5 663/23 663/24
665/3 665/8 665/10
665/20 665/21 665/22
666/19 667/3 667/5
667/6 667/10 667/10
668/5 668/6 668/9
668/14 668/17 669/9
669/12 669/15 669/16
669/18 669/24 670/1
670/14 671/6 671/8
672/3 672/7 672/8
672/16 672/25 674/25
675/2 675/9 675/11
675/14 676/19 676/24
677/4 677/10 677/13
677/20 678/21 681/3
682/19 682/20 683/11
685/2 687/7 687/9
687/11 687/17 692/9
693/11 693/11 698/23
698/24 699/4 701/13
702/10 704/5 705/14
708/20 709/22 710/1
712/3 713/5 715/9

**715/9** 715/11 715/13
715/19 715/21
**police department** [2]
655/12 657/12
**police-related** [1]
660/6
**policies** [2] 663/24
669/21
**policing** [4] 665/16
665/17 665/18 665/19
**policy** [5] 672/1
693/22 715/1 715/1
715/7
**politely** [1] 691/13
**portions** [1] 657/6
**pose** [1] 664/4
**position** [6] 649/5
674/1 688/3 698/9
698/23 699/10
**positions** [1] 699/11
**possessed** [1] 657/17
**possession** [1]
709/20
**possibility** [2] 653/24
685/11
**possible** [4] 647/4
655/10 670/23 705/10
**Possibly** [1] 655/10
**POST** [21] 660/23
660/25 667/25 668/4
668/21 668/22 668/24
669/25 676/20 680/9
680/9 693/20 693/23
698/22 699/2 701/6
706/7 706/23 709/20
709/21 713/2
**posted** [1] 690/4
**potential** [1] 704/16
**practically** [1] 642/13
**practice** [1] 639/23
**practices** [3] 659/8
663/23 676/24
**precise** [2] 656/6
656/7
**preliminary** [3] 633/4
633/10 636/6
**preparation** [1]
657/15
**prepare** [2] 640/24
661/13
**prepared** [4] 640/14
640/18 640/19 648/16
**presence** [5] 632/5
638/5 710/16 711/5
717/17
**present** [3] 671/15
682/8 698/21
**presentation** [2]
697/18 697/22
**presented** [1] 698/2
**presumably** [1]
711/15
**pretty** [10] 640/8
651/13 663/5 674/12
678/20 683/15 683/16
687/7 688/8 699/25
**prevent** [2] 634/24
666/12

**prevents** [1] 666/21
**primary** [1] 641/20
**printer** [1] 705/21
**printout** [1] 717/19
**prior** [1] 713/6
**private** [1] 667/6
**proactive** [1] 666/12
**probable** [10] 633/20
681/9 681/10 688/13
688/22 689/19 690/12
690/15 691/7 715/4
**probably** [4] 640/13
649/25 655/20 704/1
**probation** [1] 676/9
**problem** [2] 644/4
652/11
**problems** [1] 641/22
**procedurally** [1]
676/21
**procedures** [3]
663/23 669/21 715/8
**proceed** [4] 639/7
659/1 683/17 711/25
**proceedings** [3]
629/15 710/5 721/6
**process** [1] 716/25
**produce** [2] 706/9
712/8
**productive** [1] 702/24
**professionalism** [1]
669/6
**professor** [1] 683/10
**proficiency** [1] 668/18
**profile** [1] 640/5
**program** [3] 642/10
642/14 660/18
**programs** [1] 660/6
**progressed** [1] 715/5
**progressing** [1]
680/20
**projected** [1] 643/24
**promptly** [1] 719/5
**prongs** [1] 705/23
**proper** [3] 663/23
669/22 682/18
**property** [1] 682/5
**proposal** [4] 634/5
634/23 635/4 635/16
**proposed** [2] 633/24
634/18
**prosecution** [1] 642/1
**protocol** [1] 692/8
**prove** [1] 635/18
**provide** [5] 659/9
678/15 695/9 714/20
715/17
**provided** [4] 657/25
700/12 715/17 715/23
**public** [2] 651/5 661/4
**publish** [3] 644/7
644/11 647/17
**pull** [5] 654/23 684/14
693/5 705/13 705/24
**pulled** [3] 688/6
688/12 708/4
**punches** [1] 652/20
700/23 701/1
**punching** [2] 652/17

656/15
**purpose** [5] 667/13
671/17 682/8 699/8
713/4
**purposeful** [1] 672/23
**pursuant** [1] 721/3
**push** [2] 717/2 719/15
**puts** [1] 697/13
**putting** [2] 637/16
706/12

**Q**

**quad** [1] 651/15
**quadrants** [1] 694/23
**qualified** [3] 634/19
634/20 640/9
**qualifies** [1] 668/16
**qualify** [1] 659/13
**quality** [2] 642/20
642/23
**Quantico** [1] 659/23
**quarter** [1] 643/7
**quarterbacking** [1]
714/6
**question** [13] 641/12
653/25 675/13 675/14
675/15 675/16 675/21
678/18 699/1 699/5
707/12 708/24 713/21
**questioning** [1]
718/18
**questions** [10] 635/12
658/5 675/7 675/16
676/13 676/14 676/22
676/24 678/16 717/25
**quickly** [4] 636/4
644/6 644/19 719/15
**quite** [3] 646/12 662/1
673/13

**R**

**racial** [2] 660/9
660/10
**ran** [4] 673/6 673/11
688/6 688/12
**Rancho** [2] 673/15
703/11
**rank** [4] 659/18
659/19 715/16 715/19
**ranking** [1] 715/17
**rate** [3] 643/13 656/7
715/23
**re** [2] 660/17 701/25
**Re-engagement** [1]
701/25
**re-entered** [1] 660/17
**reached** [1] 688/1
**react** [2] 663/24 714/3
**read** [3] 661/17 689/7
698/10
**reading** [4] 663/4
665/5 689/15 689/24
**ready** [2] 637/12
711/17
**real** [9] 648/7 648/9
648/16 649/12 652/16
652/19 656/10 656/13
661/18

**R**

**real-time [1]** 648/16
**really [10]** 633/14
642/12 644/6 666/14
666/14 683/14 687/9
701/18 701/25 702/24
**realm [1]** 691/3
**reason [4]** 654/22
684/13 695/23 716/16
**reasonable [17]** 634/2
634/10 674/6 681/4
683/8 684/23 684/25
685/2 685/3 688/21
690/1 690/2 690/9
690/18 691/1 713/24
714/14
**reasonably [2]** 635/20
714/13
**rebuttal [2]** 637/16
711/16
**recall [10]** 635/19
657/8 667/25 682/24
683/1 686/8 692/13
692/17 698/18 713/13
**recess [7]** 710/13
710/19 711/23 711/24
720/15 720/19 720/20
**recoiled [1]** 686/22
**recommend [1]** 702/5
**reconcile [1]** 661/17
**record [5]** 639/4 641/7
643/17 658/23 703/23
**recorded [3]** 651/18
651/18 656/7
**recorder [1]** 642/16
**recorders [1]** 641/6
**recording [2]** 641/9
647/10
**recordings [1]** 641/5
**records [3]** 673/8
684/14 700/8
**recovered [1]** 655/14
**rectified [1]** 684/14
**red [5]** 664/15 665/6
671/15 673/18 674/7
**redirect [4]** 631/8
637/8 657/3 711/15
**refer [2]** 653/5 718/9
**referred [1]** 680/15
**referring [5]** 647/8
647/14 652/2 653/1
653/23
**regard [2]** 634/14
720/1
**regarding [1]** 663/20
**regardless [3]** 673/2
675/17 678/23
**regards [2]** 675/23
715/20
**regular [1]** 655/24
**regulations [1]** 721/8
**reimbursed [1]** 650/8
**relate [2]** 665/10
668/24
**related [3]** 639/18
660/6 661/12
**relates [3]** 634/12
634/20 670/20

**relating [2]** 639/15
663/24
**relative [2]** 635/18
681/24
**repeats [1]** 644/2
**rephrase [1]** 719/22
**reportable [2]** 696/25
697/6
**reported [1]** 721/5
**REPORTER [1]**
629/23
**REPORTER'S [1]**
629/15
**reports [3]** 663/5
663/13 667/17
**requirements [2]**
668/7 668/8
**requisite [3]** 668/15
668/17 695/16
**research [2]** 710/23
717/10
**resist [2]** 634/7
706/11
**resistance [5]** 634/25
690/14 694/24 697/17
702/2
**resistant [1]** 694/1
**resisting [4]** 688/15
688/18 690/15 706/11
**resolution [3]** 642/23
643/8 693/9
**resorted [1]** 696/15
**respect [13]** 633/5
633/13 633/16 633/19
633/22 634/3 636/24
645/22 657/13 670/3
680/7 699/18 709/13
**responded [2]** 678/18
699/1
**responding [1]**
665/25
**response [2]** 678/16
697/20
**responsibility [1]**
670/13
**responsive [2]** 706/22
712/16
**rest [1]** 637/12
**restrain [2]** 683/25
685/23
**restrained [1]** 686/23
**restraint [1]** 699/12
**restricted [1]** 684/8
**result [2]** 681/2 717/1
**resume [3]** 633/10
638/14 716/21
**retain [1]** 709/23
**retained [4]** 639/19
650/25 651/6 659/9
**retaining [2]** 709/20
709/23
**retention [2]** 709/12
709/16
**retired [1]** 660/14
**retiring [1]** 659/19
**retrieve [2]** 638/17
691/24
**retrieved [1]** 655/12

**reveal [1]** 690/7
**reverse [1]** 690/25
**review [7]** 661/12
662/23 664/3 700/8
715/24 716/6 717/20
**reviewed [6]** 657/15
663/10 663/13 663/16
670/12 670/21
**reviewer [1]** 714/11
**reviewing [2]** 663/18
673/8
**right [38]** 632/13
633/2 636/16 636/22
637/14 637/18 637/19
637/24 644/17 645/20
646/3 646/3 649/18
650/14 651/17 652/8
653/5 653/8 654/4
658/4 664/24 667/6
675/14 681/12 686/15
687/1 696/1 696/4
699/3 701/25 710/14
714/6 716/11 718/20
718/21 718/25 720/15
720/17
**right-hand [2]** 644/17
651/17
**rights [4]** 660/10
661/10 669/20 670/13
**rise [7]** 638/7 677/24
685/6 711/2 711/23
717/13 720/18
**risk [2]** 635/10 666/17
**road [1]** 707/17
**ROBERT [5]** 630/8
630/9 632/20 658/12
658/24
**Robert Conaway [1]**
632/20
**Roger [1]** 663/14
**ROOM [1]** 629/24
**rotated [1]** 651/16
**rough [1]** 720/7
**round [1]** 708/15
**route [1]** 664/12
**Rule [1]** 640/24
**Rule 26 [1]** 640/24
**run [5]** 633/8 636/17
652/5 673/25 674/16
**running [1]** 649/14
671/16 674/14 688/18
691/21
**runs [2]** 643/14 691/8

**S**

**Sacramento [2]**
660/24 667/25
**safe [2]** 666/11 666/23
**safety [5]** 660/6 666/7
669/23 692/7 701/12
**salient [1]** 685/25
**same [17]** 641/16
642/16 642/18 644/2
647/6 655/15 657/12
667/6 669/4 677/19
702/22 702/22 702/23
709/9 714/1 714/2
717/4

**SAN [7]** 629/10 632/7
632/16 657/11 657/12
663/6 672/2
**San Bernardino [5]**
632/16 657/11 657/12
663/6 672/2
**sat [1]** 664/24
**satisfy [1]** 668/6
**satisfying [1]** 675/23
**Saving [1]** 632/23
**Savings [1]** 638/10
**scare [2]** 693/14
707/18
**scatter [1]** 682/12
**scene [6]** 641/8
661/15 661/17 663/19
673/7 703/1
**school [2]** 661/7
669/1
**scope [3]** 641/2 699/5
718/18
**scores [1]** 668/8
**Scott [1]** 663/15
**screen [6]** 637/23
643/2 647/25 648/25
650/12 658/21
**screened [1]** 691/14
**search [2]** 691/14
691/15
**searched [2]** 691/12
691/18
**seated [4]** 639/3
658/20 711/3 717/15
**second [30]** 643/15
643/16 645/5 645/6
646/4 646/12 649/12
649/12 649/15 649/15
652/1 652/4 652/6
652/8 652/13 653/2
653/3 653/4 653/6
653/9 653/9 654/13
654/14 655/18 655/21
665/15 667/18 677/17
694/25 709/8
**second of [1]** 646/12
**secret [1]** 691/25
**section [3]** 691/5
709/22 721/3
**see [49]** 635/25 638/1
638/3 641/4 641/16
643/11 643/24 643/25
644/5 644/18 645/3
645/6 645/12 645/17
645/24 646/10 648/15
648/24 651/20 652/17
652/20 652/22 652/23
652/23 653/4 654/6
655/17 655/24 656/14
656/17 657/20 665/9
670/22 674/14 677/1
688/17 689/5 689/19
691/2 692/12 693/17
698/4 698/10 700/22
705/7 710/25 717/12
719/8 720/12
**seeing [1]** 643/14
643/23 692/13
**seem [2]** 653/18 654/8

**seemed [1]** 680/5
**seems [3]** 634/5 635/4
714/13
**seen [8]** 643/10
647/25 648/11 692/11
696/18 700/4 700/25
703/22
**segment [2]** 645/20
702/9
**segments [2]** 656/4
663/9
**seizure [1]** 633/23
**self [2]** 702/2 704/5
**self-defense [2]** 702/2
704/5
**senior [1]** 660/25
**sensation [1]** 702/23
**sense [1]** 710/6
**senses [1]** 682/2
**sensory [1]** 702/22
**sentence [1]** 653/18
**separate [1]** 642/15
**sequencing [1]** 655/2
**sergeant [3]** 659/19
662/4 672/5
**series [5]** 643/23
676/14 680/24 703/11
703/20
**serious [1]** 634/15
**served [2]** 660/12
660/24
**service [1]** 659/16
**services [1]** 640/7
**set [2]** 645/23 714/1
**seven [3]** 695/22
695/23 696/7
**seven feet [1]** 696/7
**seven-inch [2]** 695/22
695/23
**several [3]** 650/20
703/10 703/19
**severe [2]** 712/11
712/15
**shall [4]** 638/24
638/25 658/16 658/17
**share [1]** 717/3
**sheriff [2]** 661/22
661/23
**Sheriff's [7]** 657/11
659/17 659/22 660/2
660/14 663/7 672/2
**shift [1]** 665/23
**shock [1]** 693/6
**shoot [7]** 701/19
708/21 708/21 712/24
713/14 713/14 713/15
**shooting [2]** 650/23
655/19
**shootings [1]** 650/24
**shop [2]** 664/24
673/12
**shortened [1]** 638/13
**shoulder [2]** 665/2
696/3
**shouting [1]** 671/16
**show [1]** 636/17
**showed [1]** 649/11
**showing [3]** 647/6

**S**

showing... [2]  648/3
694/15
shows [1]  670/23
side [2]  664/20 664/20
sidebar [1]  710/5
sides [1]  689/9
sidewalk [3]  664/18
673/11 708/10
sideways [1]  651/18
sign [2]  682/5 684/6
significant [4]  653/19
678/17 678/20 712/10
similar [3]  663/25
713/20 714/1
similarly [2]  685/3
714/1
simplify [1]  634/25
simply [3]  633/25
635/1 681/18
since [2]  640/4 656/1
SINCICH [2]  630/4
632/11
sip [1]  650/9
sir [8]  658/8 659/11
661/14 662/1 662/10
662/13 664/12 717/18
sit [1]  687/7
sitting [1]  698/9
situated [4]  685/3
707/10 707/13 714/1
situation [9]  666/7
669/7 683/25 693/18
703/16 707/8 714/1
714/8 714/18
situational [1]  694/6
situations [2]  663/25
666/16
six [3]  641/19 659/25
683/10
skip [5]  645/21 646/4
653/3 654/3 654/8
skipping [13]  644/15
644/19 645/2 645/12
645/17 645/24 647/15
648/15 648/18 648/24
649/2 649/9 653/1
skips [4]  645/1 649/10
653/4 654/7
sleep [2]  638/13
666/23
slight [1]  645/4
slightly [1]  653/9
slow [5]  647/18 648/6
648/15 652/23 656/13
slowed [1]  648/4
small [3]  643/8 666/18
680/3
social [2]  669/2
society [1]  671/11
sociology [1]  669/3
software [1]  656/21
solely [1]  700/11
solemnly [2]  638/23
658/15
somebody [12]  648/6
654/10 657/17 687/8
693/14 693/15 701/17

701/19 702/11 702/16
704/4 704/25
somehow [3]  683/24
683/25 692/9
someone [4]  654/12
685/7 685/18 705/25
someplace [1]  691/25
something [12]
649/15 649/16 650/1
653/25 654/3 687/12
687/17 697/4 701/23
704/13 706/9 712/21
sometimes [4]  651/8
651/8 651/10 719/5
somewhat [1]  665/14
somewhere [1]
649/25
Sorry [1]  689/22
sort [14]  640/18
657/20 657/25 661/18
672/22 676/25 681/6
683/19 683/23 694/25
696/24 697/12 702/9
703/9
sound [1]  656/1
Sounds [1]  710/15
source [2]  642/3
642/18
south [1]  664/18
Southern [1]  661/5
southwest [2]  664/24
674/2
space [1]  703/14
speak [1]  718/12
specializing [1]  661/9
specific [1]  635/19
specifically [4]  633/24
635/13 635/17 635/20
spectrum [1]  715/16
speculation [5]  679/3
686/17 697/23 699/21
700/4
speed [5]  639/17
640/1 656/5 656/5
656/9
spell [2]  639/4 658/22
spend [1]  665/22
spots [1]  645/3
spray [14]  662/18
702/4 702/11 702/11
702/12 702/12 702/14
702/16 702/21 702/25
703/6 703/15 703/20
705/6
spread [3]  695/19
695/22 695/23
staff [1]  660/22
stairs [1]  692/12
703/17
stand [2]  685/22
701/20
standard [4]  652/1
652/2 652/4 714/15
standards [4]  660/23
668/3 668/20 699/2
standing [2]  646/11
647/1
start [8]  661/23 664/1

667/3 687/6
689/23 701/24 720/8
started [1]  719/5
Starting [1]  633/12
starts [1]  653/18
state [15]  632/8 639/4
658/22 660/8 660/11
660/22 668/5 668/9
668/11 668/12 668/17
669/19 677/7 678/22
679/22
State Bar [2]  668/11
668/12
State of California [2]
660/22 669/19
stated [4]  670/7
700/10 708/19 714/24
statements [4]  663/10
667/17 708/1 708/1
STATES [6]  629/1
652/3 659/24 669/20
721/4 721/8
station [2]  659/20
672/6
stay [1]  719/25
stenographically [1]
721/5
step [9]  632/8 658/8
682/10 682/10 682/13
682/13 682/13 711/6
717/18
steps [7]  703/9
703/11 703/18 703/19
703/19 703/19 703/20
stick [3]  701/17
705/23 705/24
stipulated [1]  640/21
stomach [1]  698/21
stop [8]  633/23 667/3
667/4 704/14 704/15
708/22 712/24 713/13
stopped [2]  646/15
673/18
stops [1]  706/11
street [10]  629/24
664/9 664/9 664/16
673/17 673/21 674/2
674/9 685/15 703/12
stricken [2]  697/24
706/24
strike [4]  697/20
700/3 706/22 712/16
strikes [2]  700/20
707/8
struck [2]  700/10
708/13
structure [1]  681/21
struggle [2]  699/13
709/9
students [1]  683/12
studies [1]  669/2
study [1]  669/17
stun [4]  705/16
705/19 706/7 706/8
subject [2]  710/24
717/11
subjected [1]  703/15
submitted [3]  710/21

717/8 720/14
subsequent [2]
641/12 641/24
substance [1]  680/10
succession [1]
701/24
SUCCESSOR [1]
629/6
such [5]  639/19
703/21 707/10 707/13
715/17
suddenly [4]  644/3
647/3 648/20 649/4
suffice [1]  690/9
sufficiency [1]  707/20
sufficient [5]  673/20
683/16 684/12 685/16
707/21
SUITE [2]  630/5
630/14
summary [1]  640/8
summation [1]  673/10
673/23 674/4 674/6
suntan [1]  702/13
superior [1]  699/12
supervisor [1]  672/5
sure [9]  635/3 637/11
638/2 643/9 683/15
683/16 711/9 718/22
720/16
surmised [1]  709/10
surprised [1]  719/3
surveillance [7]  641/4
641/14 642/5 642/6
642/7 642/17 652/5
suspect [8]  685/1
696/24 704/9 705/2
706/10 708/11 708/14
710/23
suspicion [8]  680/13
681/4 684/23 688/22
690/1 690/2 690/9
690/18
suspicions [1]  691/2
suspicious [7]  665/14
666/2 677/8 677/22
677/24 681/2 685/5
sustained [7]  687/23
689/17 689/24 697/24
699/6 701/2 708/25
swear [2]  638/23
658/15
swing [1]  704/3
swinging [1]  704/24
sworn [5]  638/21
658/13 663/11 700/12
708/1
swung [1]  700/23
symbol [1]  687/13
symptoms [1]  680/11
synchronization [1]
644/8
synchronize [1]  656/3
synchronized [1]
656/1
synchronizing [1]
636/24
system [21]  642/5

642/6 642/7 642/17
643/13 647/10 655/9
655/13 655/15 655/16
678/24 679/12 679/17
679/20 679/20 679/23
679/24 680/15 681/23
681/25 684/12
systems [6]  640/1
652/5 678/21 684/6
690/3 690/6

**T**

tab [2]  689/21 689/22
table [3]  670/22 689/5
689/7
tactic [2]  705/10
706/15
tactical [1]  700/19
tactics [1]  659/8
take [36]  636/9 641/4
641/9 642/7 642/13
650/9 650/11 650/15
650/18 656/1 669/2
669/2 669/2 669/3
694/7 695/4 697/1
697/2 702/25 705/20
705/22 705/23 706/20
708/14 710/12 710/19
711/11 711/12 711/13
711/22 715/25 716/12
716/14 717/1 719/2
720/15
taken [6]  639/25
707/22 710/3 711/24
714/11 720/20
takes [2]  697/11
697/13
taking [2]  700/14
709/13
talk [23]  665/16 667/4
667/5 669/13 670/10
673/4 674/17 674/19
674/24 675/5 675/6
675/10 677/4 677/20
684/22 705/16 709/12
709/16 710/21 710/22
714/5 717/9 717/10
talked [9]  644/15
667/24 679/12 683/4
683/6 690/3 696/23
701/9 703/8
talking [11]  643/3
643/4 666/8 668/7
672/15 672/21 677/9
677/10 684/22 701/1
715/3
talks [6]  634/9 635/16
670/11 670/12 670/17
671/9
tape [5]  672/11
674/22 675/19 676/15
682/25
tased [2]  692/23
693/2
Taser [24]  662/12
692/17 692/20 692/22
692/23 692/25 693/4
693/19 694/19 695/5

**T**

Taser... [14] 695/7
695/10 695/17 695/17
696/18 697/18 697/21
698/3 701/19 705/4
705/17 705/19 705/22
706/7
taught [3] 683/10
683/12 693/23
teach [1] 683/11
technical [1] 681/18
technically [1] 642/19
technician [1] 640/6
technique [2] 696/19
698/13
tee [1] 635/23
Telecommunication
[1] 679/24
television [1] 652/3
telling [1] 682/14
687/17 698/18
tells [1] 687/12
temporarily [1] 712/9
ten [6] 710/9 710/12
710/19 711/7 711/10
711/22
ten-minute [3] 710/12
710/19 711/10
tend [1] 635/9
tenure [1] 659/21
term [3] 660/4 684/23
688/1
terrible [1] 692/24
Terry [1] 633/23
testified [15] 638/22
640/3 640/13 645/2
645/13 645/18 645/24
658/14 676/1 680/1
680/12 702/4 703/1
715/12 715/13
testify [3] 640/21
659/13 716/5
testifying [1] 666/24
testimony [16] 633/11
635/13 635/20 638/24
650/4 652/25 657/16
658/16 659/10 667/1
673/5 673/9 700/10
700/12 715/12 715/17
Thank [25] 638/4
638/16 638/19 639/3
639/8 644/22 645/9
646/1 647/11 649/17
650/15 656/24 657/2
658/3 658/8 658/10
658/20 661/11 667/23
710/25 711/21 711/22
712/1 717/12 720/17
The -- I [1] 690/8
them [33] 633/3 637/7
636/4 636/5 638/3
645/6 650/15 655/2
665/18 668/3 669/4
676/14 685/9 685/15
685/15 685/19 693/13
697/7 702/6 702/16
702/16 702/17 703/10
706/4 706/4 706/19

706/20 708/21 708/22
717/20 718/14 719/19
719/21
themselves [2]
682/19 701/22
theory [2] 665/17
681/13
thing [14] 654/4 669/4
677/17 678/17 691/16
692/3 693/6 694/17
706/12 713/9 718/3
718/17 719/11 720/4
things [12] 633/24
639/15 639/17 639/19
666/22 676/17 677/14
677/19 685/22 700/21
714/17 719/14
think [43] 632/23
632/3 633/12 633/20
634/1 634/4 634/5
634/8 634/16 634/19
634/22 634/23 634/25
635/2 635/10 636/5
636/9 650/13 650/21
653/5 654/3 655/5
655/20 668/25 674/6
674/21 678/17 684/4
684/4 685/25 687/2
689/15 690/8 692/22
693/2 693/8 698/25
710/7 715/20 718/2
718/17 718/21 719/10
thinking [3] 719/4
719/14 720/8
thinks [1] 633/25
thought [3] 636/7
702/1 708/2
thoughts [3] 633/4
633/10 636/10
threat [9] 666/4 666/4
666/5 692/1 694/8
694/9 694/11 694/19
708/15
threaten [2] 693/14
695/1
threatened [3] 634/15
693/21 698/3
threatening [4]
672/13 693/19 712/9
714/8
three [10] 635/19
638/12 660/3 685/14
688/20 695/21 695/21
703/18 713/13 713/15
three inches [1]
695/21
three-foot [1] 695/21
threshold [2] 683/13
684/4
throat [1] 650/17
throes [1] 714/7
throughout [5] 635/14
644/21 645/19 655/25
662/16
throw [2] 690/17
690/25
timing [3] 661/19
710/6 719/12

tingle [1] 696/1
Title [1] 721/4
today [8] 632/19
636/7 636/11 636/17
657/16 663/25 716/15
719/9
together [2] 695/25
696/1
tomorrow [3] 719/11
719/17 719/18
tone [3] 671/14
672/13 672/24
too [4] 633/25 695/25
696/8 704/4
took [3] 636/13
659/22 660/3
tool [7] 693/13 693/15
696/13 696/14 702/5
704/24 705/1
tools [5] 662/8 700/16
700/18 701/14 707/4
top [5] 665/7 703/3
703/11 707/9 708/11
torture [1] 696/15
totality [2] 681/13
681/18
totally [1] 703/20
touch [1] 702/17
touches [1] 696/22
touching [1] 697/3
towards [1] 660/10
train [1] 672/3
trained [4] 672/7
705/15 715/11 715/21
training [45] 639/22
659/8 659/13 660/19
660/24 663/21 664/5
666/3 666/10 666/14
667/24 668/4 672/3
672/14 672/15 672/17
674/3 676/20 676/25
677/5 677/18 680/6
680/9 680/9 680/18
681/15 686/10 690/16
693/20 695/10 696/12
698/22 700/15 700/19
701/6 702/10 704/5
712/25 713/2 714/2
714/15 714/25 715/1
715/8 715/20
transcript [3] 629/15
721/5 721/7
transition [4] 683/6
704/21 705/13 706/14
transitional [1] 685/10
transitioned [5]
679/22 684/18 688/13
690/14 699/24
transitions [1] 707/9
transpires [1] 686/14
travel [3] 695/18
695/19 695/19
traveling [1] 681/7
tremors [1] 676/1
trespassing [1]
635/22 682/5 684/6
690/4
trial [5] 629/20 635/14

638/14 650/4 667/20
tried [2] 698/7 698/15
trier [2] 676/25
tries [1] 643/15
trigger [2] 693/5
705/24
trip [1] 703/16
true [3] 652/9 652/14
721/4
trust [2] 693/6 717/3
truth [6] 638/25
638/25 639/1 658/17
658/17 658/18
try [6] 655/4 677/23
702/14 717/23 718/14
719/16
trying [3] 632/25
638/12 643/17
tug [1] 708/6
turn [18] 653/16 670/3
670/8 673/20 673/22
675/10 686/7 686/15
686/24 687/17 687/18
689/3 698/7 698/19
698/20 699/8 699/15
699/17
turned [2] 673/19
674/9
TV [2] 643/2 643/14
TVs [1] 643/6
twitching [1] 680/2
two [15] 641/13
641/15 642/15 653/5
653/19 655/14 655/15
656/3 674/8 676/17
677/14 695/20 695/20
705/23 718/21
two inches [1] 695/20
two-foot [1] 695/20
type [2] 704/22 704/23
types [2] 651/21
693/23
typically [2] 653/3
685/19

**U**

U-turn [1] 673/22
UCLA [7] 639/25
660/16 660/17 660/21
661/1 661/6 662/13
ultimately [2] 714/22
717/4
uncommitted [2]
665/20 665/21
undeniable [1] 691/11
under [12] 635/21
680/12 680/13 682/2
683/18 686/2 689/21
690/4 706/20 709/21
714/17 715/22
understand [7]
652/25 680/22 689/25
700/8 700/9 711/9
719/1
understanding [6]
655/11 666/4 666/3
667/12 686/22 696/13
undisputed [1] 692/4

undisputedly [1]
665/7
undivided [1] 671/10
unholstered [1]
709/14
unholsters [1] 692/16
uniform [7] 665/5
665/9 671/6 673/3
675/1 687/8 687/14
uniformed [1] 687/16
UNITED [6] 629/1
652/3 659/24 669/20
721/4 721/8
University [4] 639/24
661/3 661/5 661/9
University of
Southern [1] 661/5
University of Virginia
[1] 661/9
unless [1] 706/5
unreasonable [2]
633/23 634/10
unreasonably [1]
633/19
until [8] 673/19 681/4
684/12 685/15 710/21
716/15 717/8 719/21
untoward [1] 676/20
up [23] 632/25 635/19
635/23 636/11 636/19
637/23 638/13 643/9
643/10 645/5 667/7
671/9 671/16 673/21
674/22 674/23 684/14
685/11 692/13 694/7
697/12 716/23 719/2
upon [3] 674/3 683/3
716/20
upper [2] 644/17
651/17
Uptown [1] 664/23
us [6] 632/19 636/10
636/14 668/1 719/7
719/9
USC [1] 661/5
use [41] 634/8 634/10
662/6 662/8 662/11
662/14 662/17 662/20
693/15 693/16 693/19
693/19 693/21 693/21
694/8 694/19 694/19
695/7 696/25 697/6
698/3 701/5 701/10
701/16 702/24 703/6
703/25 704/2 704/18
706/7 707/3 707/11
707/13 707/24 708/15
709/2 712/3 713/6
714/22 715/13 720/10
used [10] 643/2 643/6
643/14 643/23 656/21
671/1 694/2 694/6
698/13 705/10
uses [1] 634/9
using [5] 642/14
703/23 704/24 706/13
707/7
utilizing [1] 650/12

**U**

**utters [1]** 682/25

**V**

**vague [4]** 686/17
701/1 701/2 713/21
**VALLEY [1]** 630/10
**variable [1]** 643/13
**verbal [1]** 699/8
**verbally [1]** 677/16
**verdict [1]** 719/6
**verifiable [1]** 681/22
**version [3]** 648/4
648/7 648/16
**versions [1]** 641/13
**versus [2]** 632/7
648/3
**vertically [3]** 643/1
643/4 651/19
**viable [1]** 705/17
**vicinity [2]** 691/22
710/2
**video [91]** 636/19
636/25 639/16 639/16
639/18 640/1 640/1
640/4 640/6 640/7
641/4 641/4 641/10
641/13 641/14 641/19
641/25 642/7 642/11
642/18 642/20 642/23
642/24 643/5 643/10
643/11 643/12 643/13
643/14 643/19 643/20
643/23 644/5 644/8
644/14 644/21 644/25
645/13 645/18 645/19
647/18 647/25 648/3
648/8 648/16 648/19
648/24 649/7 651/14
652/16 652/22 653/20
653/25 654/1 654/5
654/6 654/11 654/15
654/24 655/13 655/18
655/22 655/25 656/2
656/3 656/4 656/5
656/6 656/8 656/12
656/14 657/6 657/8
657/21 658/1 670/21
671/21 674/18 674/23
675/25 680/17 686/20
688/4 692/11 696/18
699/14 700/5 700/11
700/22 700/25 712/19
**videos [7]** 641/22
642/4 642/5 648/3
650/12 651/25 657/13
**videotape [2]** 663/8
688/17
**view [7]** 642/25
644/16 645/7 664/23
665/12 673/12 675/24
**views [5]** 641/19
641/20 641/20 645/8
654/25
**Vince [1]** 632/15
**Vince Ewing [1]**
632/15
**VINCENT [1]** 630/13

**violation [4]** 677/25
688/23 690/22 691/2
**violations [2]** 660/10
661/10
**violence [1]** 634/8
**Virginia [2]** 659/24
661/9
**visibility [1]** 703/13
**visit [1]** 663/19
**visualization [1]**
715/7
**visually [1]** 682/1
**voluntarily [2]** 667/11
697/5
**voluntary [2]** 678/2
678/8
**volunteered [1]** 684/9

**W**

**W-a-r-d [1]** 639/6
**wait [2]** 718/13 719/8
**waiting [1]** 717/19
**wake [1]** 632/25
**walk [4]** 663/20 667/7
675/10 683/18
**walk-through [1]**
663/20
**walked [1]** 703/3
**walking [2]** 664/17
664/19
**walks [1]** 671/9
**walkway [3]** 649/5
703/2 703/7
**wall [2]** 681/20 681/23
**wanted [4]** 633/3
635/23 654/11 654/13
**wanting [1]** 686/23
**wants [2]** 693/1 719/9
**Ward [15]** 636/19
636/23 637/2 637/21
637/21 638/17 638/20
639/5 639/6 639/11
644/14 644/25 647/25
649/21 657/5
**warning [2]** 713/4
713/5
**warnings [1]** 713/11
**warrants [1]** 676/11
**watch [4]** 643/19
644/17 652/19 671/20
**watched [5]** 644/25
670/21 675/25 680/17
686/20
**watching [3]** 648/10
652/16 674/18
**water [1]** 650/10
**weakened [1]** 708/8
**weapon [4]** 691/24
693/4 694/15 695/14
**weapons [9]** 671/17
700/19 701/6 701/9
701/14 704/19 705/11
706/13 707/7
**wear [1]** 641/6
**weekend [1]** 638/9
**well-trained [2]**
715/11 715/21
**went [5]** 639/24

664/3 676/12 698/5
703/1
**west [3]** 629/24
664/19 664/21
**westbound [2]** 664/17
673/21
**WESTERN [1]** 629/2
**white [1]** 665/6
**who actually [1]**
695/11
**whole [10]** 638/25
642/13 645/5 645/19
646/12 655/22 658/17
666/7 702/9 709/21
**why [11]** 638/13
650/14 671/3 679/20
685/9 691/10 692/6
701/8 702/8 707/25
709/5
**withdrew [1]** 709/14
**without [9]** 633/19
649/25 666/13 669/24
681/18 689/23 693/10
693/15 693/16
**witness [6]** 638/15
640/9 658/6 658/9
710/8 711/16
**witnesses [3]** 631/5
663/12 716/22
**wonderful [1]** 638/9
**WOODLAND [1]**
630/5
**Woods [100]**
**Woods's [21]** 652/20
664/1 666/25 673/5
673/9 674/19 678/16
678/25 680/7 680/19
693/19 700/9 701/5
703/5 703/24 706/6
707/24 709/2 709/7
713/1 714/20
**word [2]** 675/11
695/14
**words [4]** 656/2 667/3
672/24 706/24
**work [14]** 636/23
639/14 651/5 656/11
656/22 661/3 661/4
662/2 666/19 666/21
694/7 696/8 716/18
716/19
**worked [7]** 640/22
649/23 650/20 652/10
660/3 660/4 662/3
**working [1]** 659/25
**works [1]** 716/7
**world [2]** 661/18
719/11
**wrap [1]** 716/23
**wrist [2]** 697/11
697/12
**write [1]** 653/11
**writing [1]** 660/5
**wrong [4]** 676/18
677/1 689/10 689/22
**wrongdoing [1]** 681/6
**wrote [1]** 653/11

**Y**

**yards [1]** 673/24
**year [1]** 659/21
**years [13]** 650/22
659/15 659/16 659/16
659/25 660/3 660/13
660/15 660/25 662/4
662/5 662/5 683/10
**yell [1]** 672/20
**yelling [1]** 672/22
**young [3]** 632/24
632/25 638/12
**Your Honor [13]**
632/10 632/15 636/13
644/7 647/19 656/18
656/25 658/7 688/24
697/19 698/25 700/24
720/2