1
2
3
4
5
6
7

8        UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA

10   DOMINIC ARCHIBALD, et al.,          Case No. ED CV 16-01128-AB (SPx)

11            Plaintiffs,                ORDER **GRANTING IN PART**
                                         MOTION TO AMEND THE
12   v.                                  JUDGMENT, AND **DENYING**
                                         MOTIONS FOR A NEW TRIAL,
13   COUNTY OF SAN BERNARDINO, et        REMITTITUR, AND/OR FOR
     al.,                                JUDGMENT AS A MATTER OF LAW
14
15            Defendants.

16

17        Before the Court are a Motion for a New Trial or Remittitur, or to Amend the

18   Judgment (Dkt. No. 187), and Renewed Motion Under Rule 50(b) for Judgment as a

19   Matter of Law or In the Alternative, Under Rule 59 For a New Trial (Dkt. No. 188)

20   filed by Defendants County of San Bernardino ("County") and Deputy Sheriff Kyle

21   Hayden Woods ("Woods"). Plaintiffs Dominic Archibald and Nathanael Pickett, I

22   ("Plaintiffs") filed oppositions and Defendants filed replies. The Court heard oral

23   argument on September 14, 2018. For the following reasons, the Court **GRANTS IN**

24   **PART** the motion to amend the judgment, but otherwise **DENIES** the motions.

25   **I.  BACKGROUND**

26        The Court assumes familiarity with this case so will provide only a brief

27   background. This action arises out of a November 19, 2015 encounter between Deputy

28

Sheriff Woods ("Woods") and Nathanael Pickett, II ("Nate").[1] William Kelsey, a volunteer ride-along, was also present. What undisputedly began as a consensual encounter between Woods and Nate in a Motel parking lot escalated into a detention, a failed arrest attempt, and Woods twice shooting Nate in the chest at close range, killing him. The encounter between Woods and Nate was captured by the Motel's security cameras and the audio recorder attached to Woods's belt. The audio and video were synchronized ("video") and admitted into evidence.

Nate's parents Dominic Archibald and Nathanael Picket, I ("Plaintiffs") sued Woods and the County on behalf of themselves and as Nate's successors in interest. The following claims went to trial: claims under 42 U.S.C. § 1983 for violation of Nate's Fourth Amendment rights to be free from unreasonable seizure and excessive force, and for denial of medical care; claims for battery and negligence under state law; a claim for violation of the Bane Act, Cal. Civ. Code § 52.1; and a claim for punitive damages.

The jury returned a verdict for Plaintiffs on all claims, and found no contributory negligence on Nate's part. *See* Special Verdict (Dkt. No. 154). After damages evidence was presented, the jury returned a verdict awarding the following: (1) to Nate, $7 million for loss of enjoyment of life and for pre-death pain and suffering; (2) to Plaintiff Archibald, $6.5 million in past and future damages for loss of Nate's love, companionship, case, assistance, protection, affection, society, and moral support; (3) to Plaintiff Pickett, $2 million in past and future damages for loss of Nate's love, companionship, care, assistance, protection, affection, society, and moral support; and (4) punitive damages to Archibald and Pickett totaling $18 million. *See* Special Verdict Form – Damages (Dkt. No. 156). Following Court-ordered briefing, the Court struck the punitive damages award on the ground that the County

---

[1] Throughout the case the parties have referred to Nathanael Pickett, II, variously as Decedent, Nathanael, or Nate, but at trial, they seemed to prefer "Nate." The Court will therefore use Nate.

1   cannot be liable for punitive damages under either state law or § 1983, and it was not
2   possible to apportion the $18 million punitive damages award between Woods and the
3   County. *See* Minute Order (Dkt. No. 183). The Court entered a Judgment dividing the
4   $7 million awarded to Nate equally between Archibald and Pickett as Nate's
5   successors in interest. As a result, the Judgment awarded $10 million ($3.5 million +
6   $6.5 million) in favor of Archibald, and $5.5 million ($3.5 million + $2 million) in
7   favor of Pickett, against Woods and the County. *See* Judgment (Dkt. No. 184).

8   Defendants now move under Fed. R. Civ. P. 50(b) for judgment as a matter of
9   law or in the alternative under Fed. R. Civ. P. 59(a) for a new trial. Defendants also
10   move under Fed. R. Civ. P. 59(e) to alter or amend the judgment, or for a new trial or
11   remittitur under Fed. R. Civ. P. 59(a).

12   **II. LEGAL STANDARDS**

13   **A. Motion for Judgment As A Matter of Law**

14   Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of
15   law. Where a party wishes to challenge the sufficiency of evidence supporting a verdict
16   in a civil case, the party must bring two separate motions. *Nitco Holding Corp. v.*
17   *Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007). First, the party must move for judgment
18   as matter of law under Rule 50(a) before the case is submitted to the jury. *Id.*; *see also*
19   Fed. R. Civ. P. 50(a)(2). The party must then file a renewed motion for judgment as a
20   matter of law under Rule 50(b) after either the entry of judgment or the jury is
21   discharged. *Nitco Holding*, 491 F.3d at 1089; *see also* Fed. R. Civ. P. 50(b).

22   Rule 50(b) prohibits "a party from moving for judgment as a matter of law after a
23   jury's verdict unless that motion was first presented at the close of evidence." *Image*
24   *Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997). The
25   Ninth Circuit "strictly adhere[s] to the requirements of Rule 50(b)." *Id.* Thus, where a
26   party fails to bring a motion for judgment as a matter of law before the case is submitted
27   to the jury, the party "cannot question the sufficiency of the evidence either before the
28   district court . . . or on appeal." *Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454, 1459

(9th Cir. 1988) (emphasis omitted), *cert. granted, judgment vacated*, 490 U.S. 1087 (1989) and *reinstated*, 886 F.2d 235 (9th Cir. 1989).

"The single exception to this rule is the plain error doctrine." *Id.* "Only where there is such plain error apparent on the face of the record that failure to review would result in a manifest miscarriage of justice" should such a motion, raised for the first time after judgment, be granted. *Id.* Indeed, for a court to grant a motion for judgment as a matter of law where a party failed to file the motion before the case was submitted to the jury, there must be "an absolute absence of evidence to support the jury's verdict." *Image Technical Servs.*, 125 F.3d at 1212 (citation omitted).

"Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion." *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 938–39 (9th Cir. 1999). When analyzing a motion for judgment as a matter of law, a court "must view the evidence in the light most favorable to the non-moving party . . . and draw all reasonable inferences in that party's favor." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149–50 (2000)). The court may not "assess the credibility of witnesses . . ." *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003). The court also may not "substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001); *see also Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004) (noting the court's job "is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict.").

**B. Motion for a New Trial**

Federal Rule of Civil Procedure 59(a) permits the court to grant "a new trial on all or some of the issues and to any party . . . after a jury trial for any reason for which a new trial has [previously] been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although Rule 59(a) "does not specify the grounds for which a new trial may be granted," the Ninth Circuit has recognized that a court may order a new trial

1   where "the verdict is against the weight of the evidence" or "to prevent a miscarriage of

2   justice." *Molski v. M.J.*, F.3d 724, 729 (9th Cir. 2007) (citation omitted).

3       A trial court "enjoys broad discretion with regard to" a motion for a new trial.

4   *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (citing *Allied Chem.*

5   *Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial . . . is

6   confided almost entirely to the exercise of discretion on the part of the trial court.")).

7   When determining whether to grant a motion for a new trial, a court does not have to

8   consider the evidence from the perspective most favorable to the prevailing party.

9   *Landes Const. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987). A court

10   may also "weigh the evidence and assess the credibility of witnesses." *Id.* If after

11   considering all of the evidence and giving "full respect to the jury's findings," the court

12   is left with the "definite and firm conviction that a mistake has been committed," the

13   court should grant the motion. *Id.* at 1371–72; *see also Molski*, 481 F.3d at 729 (noting

14   that a district court has a "duty . . . to weigh the evidence as the court saw it, and to set

15   aside the verdict of the jury, even though supported by substantial evidence, where, in

16   the court's conscientious opinion, the verdict is contrary to the clear weight of

17   evidence") (internal citation, quotations marks, and alterations omitted).

18   **C. Motion to Amend the Judgment Under Rule 59(e)**

19       "There are four grounds upon which a Rule 59(e) motion may be granted: 1) the

20   motion is necessary to correct manifest errors of law or fact upon which the judgment

21   is based; 2) the moving party presents newly discovered or previously unavailable

22   evidence; 3) the motion is necessary to prevent manifest injustice; or 4) there is an

23   intervening change in controlling law." *Turner v. Burlington N. Santa Fe R.R.*, 338

24   F.3d 1058, 1063 (9th Cir. 2003). A motion to alter or amend a judgment "may not be

25   used to relitigate old matters, or to raise arguments or present evidence that could have

26   been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S.

27   471, 485 n.5 (2008).

28

1    **III.      DISCUSSION**

2         **A. Woods Is Not Entitled to Qualified Immunity**

3         In both motions, Defendants argue that Woods is entitled to qualified immunity

4    as to the Fourth Amendment claims for unlawful detention and arrest, and excessive

5    force.[2]

6              **1.  Legal Standard for Qualified Immunity**

7         "Under the qualified immunity doctrine, 'government officials . . . generally are

8    shielded from liability for civil damages insofar as their conduct does not violate

9    clearly established statutory or constitutional rights of which a reasonable person

10   would have known.'" *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d

11   1125, 1129 (9th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

12   A ruling on the issue of qualified immunity should be made as early in the

13   proceedings as possible, "so that the costs and expenses of trial are avoided where the

14   defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

15        "Qualified immunity involves a two-part analysis, requiring the court to

16   determine whether, taken in the light most favorable to Plaintiff, the facts alleged

17   show the officer's conduct violated a constitutional right, and whether the right was

18   clearly established." *Monteilh v. Cty. of Los Angeles*, 820 F. Supp. 2d 1081, 1087

19   (C.D. Cal. 2011) (internal quotations omitted). The critical inquiry in determining

20   whether a right was "clearly established" is "whether it would be clear to a reasonable

21   officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533

22   U.S. at 202. Qualified immunity is designed to shield from liability "all but the plainly

23   incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335,

24   341 (1986). Thus, qualified immunity shields officers who have a reasonable, but

25   mistaken, belief about the facts or about what the law requires in any given situation.

26   *Saucier*, 533 U.S. at 205. "If the law did not put the officer on notice that his conduct

27

28   ───────────

[2] Defendants do not argue that Woods is entitled to qualified immunity as to the denial of medical care claim.

would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id*. at 202.

### 2. Woods Violated Nate's Fourth Amendment Rights

The qualified immunity analysis appears most often at the motion to dismiss or motion for summary judgment stage, and in both instances requires the Court to take the facts alleged in the light most favorable to the plaintiff to determine whether the officer's conduct violated a constitutional right. At summary judgment, after a lengthy oral argument, the Court denied the parties' cross-motions on the issue of qualified immunity, finding that there were disputed facts and that the evidence is subject to different interpretations as to whether Nate's rights were violated—in other words, that a trial was necessary to find the facts.

After considering all of the evidence, the jury determined that Woods violated Nate's Fourth Amendment rights against unlawful detention and arrest, and excessive force. The Court must now consider whether the evidence presented at trial was sufficient to sustain these verdicts under Rule 50(b) or Rule 59(a).

Rule 50(b) sets a high bar to obtaining relief: the Court must draw all inferences in favor of the non-moving party and judgment as a matter of law is appropriate only "when the evidence presented at trial permits only one reasonable conclusion." *Mangum*, 575 F.3d at 938–39.[3] Rule 59(e) sets a lower bar to relief, permitting a new trial if the verdict is against the clear weight of the evidence. Because the Court finds that the trial evidence was sufficient under Rule 59(e), it is also necessarily sufficient under Rule 50(b), so the Court will not address Rule 50(b) separately.

---

[3] The same standard governs summary judgment motions. *See Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 772 (9th Cir. 1981) (so noting). The main difference between motion for summary judgment and a Rule 50 motion is the timing: the former is made before trial, while the latter is made during and after trial. Although both motions employ the same legal standard, the denial of a motion for summary judgment does not mandate that a Rule 50 motion be denied, because the latter tests the sufficiency of evidence actually presented at trial. Furthermore, after trial, "the court [may have] a better basis on which to determine the existence of material issues," including that there was never a true issue of fact at all. *Lies*, 641 F.2d at 772.

7.

### a. The Liability Verdicts on Plaintiffs' Fourth Amendment Claims Were Not Against the Clear Weight of the Evidence.

Under Rule 59(e), the court does not view the evidence in the light most favorable to the prevailing party, but instead weighs the evidence and assesses the credibility of the witnesses to determine if the verdict was against the clear weight of the evidence. Here, the clear weight of the evidence supported the jury's determinations that Woods violated Nate's Fourth Amendment rights.

In arguing that the weight of the evidence did not support these verdicts, Defendants cite only Wood's trial testimony, and only that testimony that arguably weighs against the verdicts. Defendants fail to acknowledge all of the evidence that weighs heavily *in favor* of the verdicts, including the inconsistencies in Woods's testimony, conflicting testimony from other witnesses, photographs of Woods just after the incident, and the video of the encounter. Plaintiff Archibald recites this evidence at length in her opposition to the Rule 50 motion, *see* Opp'n (Dkt. No. 200) 4:4-13:24, and the Court will not recite it in its entirety. Having failed to acknowledge or address this evidence at all, Defendants have necessarily failed to show that the verdicts were against the clear weight of the evidence and their motion fails on that basis. Despite Defendants' failure to make a prima facie showing under the applicable standard, the Court will nevertheless briefly address how the weight of the evidence supports the verdicts.

### i. The Weight of the Evidence Strongly Supports the Jury's Detention and Arrest Verdicts.

Regarding the detention and arrest claims, the main factual issues are whether Woods detained Nate without reasonable suspicion, or attempted to arrest him without probable cause. *See Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993) ("the police may 'seize' citizens for brief, investigatory stops. This class of stops is not consensual, and [] must be supported by 'reasonable suspicion.' Finally, police stops may be full-scale arrests. These stops, of course, are seizures, and must be supported by probable cause."). Here, the weight of the evidence strongly favors the jury verdicts.

1    The weight of the evidence supports a verdict that Woods detained Nate when he

2    prevented Nate from terminating the encounter, pursued Nate as he walked away,

3    continued to ask about the spelling of his name, told him to hold on, and then refused

4    Nate permission to leave. *See United States v. Morgan*, 936 F.2d 1561 (10th Cir. 1991),

5    *cert. denied*, 502 U.S. 1102 (1992) (defendant at least momentarily yielded to officer's

6    apparent show of authority and thus was seized, where officer told him to "hold up" and

7    he responded "What do you want?" while backing away, then fled).

8    The evidence also supports the conclusion that Woods lacked reasonable

9    suspicion to detain Nate. "Reasonable suspicion is formed by 'specific, articulable facts

10   which, together with objective and reasonable inferences, form the basis for suspecting

11   that the particular person detained is engaged in criminal activity.'" *United States v.*

12   *Dorais*, 241 F.3d 1124, 1130 (9th Cir. 2001) (quoting *United States v. Michael R.*, 90

13   F.3d 340, 346 (9th Cir. 1996)). Woods admitted that he initially had no reasonable

14   suspicion to detain Nate and that he was initiating a consensual encounter. Trial

15   Transcript ("TT") 187:3-6, 510:24-511:11. Woods claimed that he developed reasonable

16   suspicion that Nate was trespassing or was under the influence of methamphetamine.

17   But Woods's testimony was contradictory and not credible. For example, Woods's said

18   Nate initially caught his attention because he looked at him 5-10 times in a 5-10 second

19   period while crossing the street, TT 177:20-178:7, but in his initial statement Woods

20   said Nate "kind of looked at me," TT 180:15-17, and the ride-along William Kelsey said

21   he never saw Nate look at Woods that way. TT 599:17-23. Woods initially said that he

22   saw Nate hop the fence, but then admitted at trial that he did not see him hop the fence.

23   TT 183:16-21, 511:20-21. Woods also said that he assumed Nate had run, but then

24   admitted that he did not see him run. TT 182:15-183:21. Woods also said that he

25   believed Nate might have lived at the motel, and indeed Nate told him he was going to

26   his house. TT 192:3-9. Woods also admitted that someone who does not live a motel is

27   not trespassing just by being there. TT 195:18-21. Based on the foregoing the jury could

28   have rejected Woods's assertion that he reasonably suspected Nate of trespassing.

Similarly, Woods's claim that he believed Nate was under the influence of methamphetamine is not supported by the clear weight of the evidence. Woods testified that Nate's fingers were twitchy, he was unable to control his small motor movements, and his tongue had a white coating, all of which Woods said was consistent with being under the influence. But these symptoms could be due to mental illness, certain medications, or some common health conditions like dehydration (TT 290:9-16, 334:16-335:25) so officers are trained to ask questions to develop information, such as whether the person is on any medication or has a mental illness. TT 291:8-292:14. Here, Woods did not ask any such questions, nor did he communicate to dispatch that he was with a person who he suspected of trespassing or being under the influence. TT 516:21-25, 334:16-335:25. Thus, Woods did not take any of the steps he was trained to take when dealing with someone suspected of being under the influence. The jury could have easily determined that Woods did not in fact suspect Nate of being under the influence, or that Woods's claimed belief was simply not reasonable.

As for the arrest, the jury reasonably found Woods arrested Nate when he grabbed him to try to turn him around to handcuff him. Woods's claim that he had probable cause to arrest Nate for violating California Penal Code § 148.9 is not supported by the weight of the evidence. Section 148.9 makes it a misdemeanor for a person to falsely identify himself or herself to a police officer during a lawful detention or arrest, in order to avoid court process or evade proper identification. But § 148.9 only applies to lawful detentions and lawful arrests, not consensual encounters. Nate was not under any obligation to give Woods his name[4] because as discussed above, there was no reasonable suspicion that he had committed any crime. TT 293:6-8, 678:6-9, 785:22-786:1. The jury also could have found Woods escalated the encounter into an arrest when he pursued Nate and pointed his taser at him when he was injured on the ground after a hard fall, *see Johnson v. BART*, 724 F.3d 1159, 1176-78 (9th Cir. 2013) (pointing taser

---

[4] Nate nevertheless did provide his correct birthdate and name, but Woods misspelled it. TT 197:15-19.

1  at non-threatening subject constitutes arrest), and in light of the foregoing analysis, that

2  Woods lacked probable cause to arrest Nate.

3          **ii.**     **The Weight of the Evidence Strongly Supports the**

4                     **Jury's Excessive Force Verdict.**

5       The evidence also strongly supports the jury's excessive force verdict. Woods

6  claims that he shot Nate after Nate punched him multiple times in the face, he felt has

7  was going to black out, and Nate was reaching for Woods's gun, causing Woods to fear

8  for his and Kelsey's lives. But the video, photographs of Woods taken after the incident,

9  and even ride-along Kelsey's testimony tell a different underlying story. The video

10  shows that Woods was the aggressor: Nate "face planted" hard to the concrete walkway

11  and scooted back as if to give up (TT 604:12-25), when Woods pulled out his taser,

12  threatened Nate, then went to the ground to try to get Nate on his stomach to arrest him,

13  but then began punching him about the head 15-20 times. TT 200:2-205:12, 251:13-16.

14  As Woods and other defense witnesses admitted, the video does not show Nate landing

15  any punches on Woods. There was some evidence that the video had "skipped" for a few

16  frames, but the skip appeared too short for Nate to have landed many—if any—punches

17  during that time. Apart from the video, the physical evidence does not support Woods's

18  claim that Nate punched him hard many times: Nate's hands were free of injuries that

19  would have been caused by punching (whereas Woods's hands were injured from him

20  punching Nate); Woods's glasses did not break; and Woods did not sustain injuries

21  typically associated with being punched hard in the face many times, like a split lip,

22  black eye, knocked-out teeth, or general cuts or lacerations. There was some

23  indeterminate evidence that Woods's nose might have been fractured, but no evidence

24  that it actually was fractured, or if so, when. And Plaintiffs' expert testified that Woods's

25  injuries were not consistent with being forcefully punched multiple times in the face. In

26  sum, the overwhelming weight of the evidence was contrary to Woods's claim that Nate

27  was punching him to the point of almost causing him to black out. Likewise, there is no

28  evidence that Nate grabbed for Woods's gun, except Woods's own self-serving

11.

1  testimony. In fact, ride-along Kelsey testified that he did not see Nate go for Woods's
2  gun (TT 598:14-22), and, contrary to his training, Woods's never shouted that someone
3  was going for his gun. TT 601:21-23.

4      Finally, Woods had many other less-than-lethal alternatives available to handle
5  the situation. First, Woods had no probable cause to arrest Nate in the first place, so no
6  level of force was reasonable. But even if Woods mistakenly believed he should arrest
7  Nate, Nate was no threat whatsoever while he was lying on the ground after taking a
8  hard fall, and Woods had many options ranging from giving him clear orders rather than
9  threatening him, to containing him with a taser or pepper spray or even a baton (if he
10  thought force was necessary) and calling for back-up. Instead, Woods took none of these
11  steps; rather, he immediately threatened Nate with his taser, went to the ground and
12  started punching him, and then shot him twice point-blank. The evidence
13  overwhelmingly supported the jury's excessive force verdict.

14      The foregoing notes only some of the inconsistencies in Woods's testimony and
15  some of the other evidence that contradicts his testimony, all of which severely
16  compromised Woods's credibility. Defendants argue in essence that the jury should have
17  accepted Woods's version of events. But whether to accept or reject Woods's testimony
18  was the jury's prerogative, and the jury's apparent rejection of Woods's account—it
19  returned its verdict in less than 2.5 hours—is well-supported by the weight of the
20  evidence.

21      **3. Defendants Waived the Issue of Whether the Relevant Law Was**
22          **Clearly Established.**

23      Whether the relevant law was clearly established is a question of law properly
24  raised in a motion for judgment as a matter of law under Rule 50; it is not a question of
25  fact so it is not properly raised in a motion for a new trial under Rule 59(e). *See Tortu v.*
26  *Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009) (so holding).
27  Therefore, Rule 50 applies. As noted, a Rule 50(b) motion is just a renewed Rule 50(a)
28  motion. As such, "a proper post-verdict Rule 50(b) motion is limited to the grounds

12.

1   asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software,*
2   *Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Thus, a party cannot properly "raise arguments
3   in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not
4   raise in its preverdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752,
5   761 (9th Cir.2003) (citing Rule 50 advisory committee's notes to the 1991 amendments
6   ("A post trial motion for judgment can be granted only on grounds advanced in the pre-
7   verdict motion.")); *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir.1990)
8   ("[Judgment notwithstanding the verdict] is improper if based upon grounds not alleged
9   in a directed verdict [motion]." (brackets in original)).

10      Here, Defendants waived the second prong of the qualified immunity analysis
11   because their Rule 50(a) motion did not present any of their arguments that the law was
12   not clearly established. *See* Rule 50(a) Mot. (Dkt. No. 140). Defendants contend that
13   they made these arguments, but the two lines they reference are the following statement
14   of law: "Law enforcement officers are shielded from suit unless their conduct violates
15   'clearly established statutory or constitutional rights of which a reasonable person would
16   have known.' *Harlow* [ ], 457 U.S. 800, 818 [ ]." Rule 50(a) Mot. 14:18-21.[5] Reciting a
17   general statement of the law is not equivalent to presenting argument on that law. As a
18   backstop, Defendants note that they argued the clearly-established-law prong in their
19   motion for summary judgment, but that is no substitute for raising it in the Rule 50(a)
20   motion. *See Janes v. Wal–Mart Stores Inc.*, 279 F.3d 883, 887 (9th Cir. 2002) (trial brief
21   and summary judgment motion were insufficient to establish a proper Rule 50(a) motion
22   and that "substantial compliance is not enough"). Because Defendants failed to argue in
23   their Rule 50(a) motion that the applicable law was not clearly established, the Court is
24   "prohibited from . . . entertaining [it in their] Rule 50(b) motion." *Tortu*, 556 F.3d at
25   1082. Substantively, Defendants "have not advanced an argument as to why the law is

26

27   [5] The remainder of Defendants' half-page argument on qualified immunity in their
     Rule 50(a) motion addresses the first prong—whether there was a constitutional
28   violation in the first instance—and is silent as to the clearly established law prong.

1   not clearly established *that takes the facts in the light most favorable to [Plaintiffs]*."

2   *George v. Morris*, 736 F.3d 829, 837 (9th Cir. 2013) (emphasis added). Accordingly,

3   even if Defendants had not waived this prong, they have not applied the correct legal

4   framework, and the motion fails for that additional reason.

5          For the foregoing reasons, the Court denies the motions insofar as they argue that

6   Woods is entitled to qualified immunity.

7      **B. The Plaintiffs Have Standing To Bring the Bane Act Claim As Nate's**

8          **Successors In Interest.**

9          Defendants also argue that Plaintiffs lack standing to bring their Bane Act claim

10  because the right to seek damages under the act is a personal one that was limited to

11  Nate himself. But the Plaintiffs have standing to bring Bane Act survival claims

12  against Woods as Nate's successors-in-interest. *See Chaudhry v. City of Los Angeles*,

13  751 F.3d 1096, 1105 (9th Cir. 2014) (decedent's estate could bring a claim under the

14  Bane Act for violations of the decedent's civil rights).[6] The Court finds that they have

15  standing to pursue their Bane Act claims as Nate's successors in interest.

16     **C. Defendants' Rule 50(b) Motion is <u>DENIED</u> as to Plaintiffs' Claims for**

17         **Battery, Negligence, Violations of the Bane Act, and Denial of Medical**

18         **Care.**

19         Defendants move for judgment as a matter of law under Rule 50(b) on Plaintiffs'

20  claims for battery, negligence, violation of the Bane Act, and denial of medical care.

21         Defendants acknowledge that Plaintiffs' battery, negligence, and Bane Act claims

22  are governed by the same inquiry that governs their excessive force claims, and points to

23  their arguments within the qualified immunity analysis contesting the Fourth

24  Amendment liability verdicts. The Court therefore denies the motion as to these claims

25  for the same reasons discussed above as to the excessive force verdicts. Furthermore,

26

27  [6] Plaintiffs concede that in light of California's restrictive survival damages statute,
    the only recovery they can secure under the Bane Act are attorneys' fees and a

28  multiplier thereof.

because this motion is made under Rule 50(b), the Court must construe all evidence in favor of upholding the verdict. *See Josephs*, 443 F.3d at 1062 (9th Cir. 2006) (citing *Reeves*, 530 U.S. at 149–50 (a court "must view the evidence in the light most favorable to the non-moving party . . . and draw all reasonable inferences in that party's favor.")). Here, again, Defendants did not meaningfully apply this standard because they pointed only to the portions of Woods's testimony that tended to weigh against the verdict and disregarded the substantial evidence that supported the verdict.

As to the denial of medical care claim, Defendants argue only that they are entitled to judgment because Deputy Dickey requested medical assistance 30 seconds after arriving at the scene, and he felt no pulse. Claims for excessive force and for failure to render post-arrest medical care are analyzed under the reasonableness standard of the Fourth Amendment. *See Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006). Thus, the Ninth Circuit has held that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment," and that there is no duty to render CPR in all circumstances. *Id.*

Here, Defendants focus on Deputy Dickey calling for medical assistance but ignore other evidence supporting the jury verdict that *Woods* failed to summon the necessary medical assistance. First, the ride-along Kelsey testified that Nate tripped over steps, fell hard on the concrete walkway, and appeared to be scooting back with his hands up as if he were giving up. TT 598:23-599:9. Plaintiffs' expert DeFoe testified that a reasonably trained officer would have asked if Nate was okay and summoned medical assistance under these circumstances. TT 294:14-295:6, 308:13-18. But Woods failed to ask Nate if he was okay and failed to summon medical assistance, and instead threatened to tase him. Second, although officers are trained to call for medical assistance as soon as possible and perform lifesaving techniques on someone who has been seriously injured or shot, TT 321:20-322:3, Woods did neither after shooting Nate in the chest twice. TT 224:18-19. After Woods shot Nate, he used his radio to broadcast that shots were fired and to state his location, but did not call for medical assistance. TT

226-19:24. Medical assistance was called by Deputy Dickey, who arrived about four minutes later. TT 581:19-582:3. Furthermore, the jury reasonably rejected Woods's explanation for why he didn't call for medical help: Woods testified that he did not know whether he had shot Nate (TT 224:7-12, 259:21-33), but this is dubious since the shots were at can't-miss range. TT 569:8-15 (gun 2-3 inches from Nate's torso when Woods fired), 219:8-16 (gun against Nate's chest when Woods fired). For the foregoing reasons, Defendants' limited challenge to the denial of medical care claim fails.

### D. The Judgment Will be Amended In Part, But Defendants' Challenges to the Compensatory and Non-Economic Damages Awards Are Rejected.

Defendants challenge the jury's damages award and the resulting Judgment. The jury awarded $7 million for Nate's "damages for his loss of enjoyment of life, and of his pre-death pain and suffering." *See* Special Verdict – Damages, Question 1. They also awarded Archibald $6.5 million and Picket $2 million for past and future damages. *Id.* The Judgment split the $7 million evenly between Archibald and Pickett as Nate's successors-in-interest, and added the resulting $3.5 million to their respective damages awards. Thus, Archibald was awarded a total of $10 million ($3.5 million + $6.5 million), and Pickett was awarded a total of $5.5 million ($3.5 million + $2 million) against Woods and the County jointly.

#### 1. Defendants' Legal Challenges to the Damages Verdict and the Judgment Fail.

Defendants pose a tangle of legal objections to the damages verdict and the resulting judgment, but none of them has merit.

First, Defendants contend that the County cannot be liable for the $7 million in survival damages awarded to Nate because that award stems in part from the § 1983 claims for which the County cannot be held liable. Plaintiffs concede that the $7 million awarded to Nate derives solely from the § 1983 claims. It follows that because Plaintiffs dropped their *Monell* claims against the County, no § 1983 liability can attach to it and therefore the Judgment must be amended such that these survival

damages are awarded only against Woods and not also the County. Plaintiff Archibald submitted a proposed Amended Judgment reflecting this modification. Plaintiff Pickett joined in the Proposed Amended Judgment. In reply, Defendants complain that the proposed Amended Judgment does not reflect the claim associated with each amount awarded, but they point to no rule requiring that, and have not submitted any alternative proposed Amended Judgment of their own. The Court is satisfied that it is appropriate to amend the Judgment under Rule 59(e) to reflect that only Woods and not the County is liable for the $7 million survival damages award.

Although Plaintiffs' concession moots Defendants' argument that the County cannot be held liable for the § 1983 violations, other issues remain. The Court notes that the parties and the Court went through several iterations of the Special Verdict Forms and there was extensive oral argument on several issues, but Defendants never raised the objections that they raise now, so these objections are waived. Nevertheless, the Court will briefly address then.

First, Defendants fault the Special Verdict Form on liability for not distinguishing between Plaintiffs' Fourth Amendment claims on one hand, and their state law battery and Bane Act claims on the other.[7] Indeed, the Special Verdict Form's first seven liability questions all pose classic Fourth Amendment inquiries. However, the questions do not specifically name the Fourth Amendment, so they were not limited to that application. Furthermore, as the Court and the parties prepared the Special Verdict Form, all agreed that questions on the battery and Bane Act claims would be redundant to the questions on the Fourth Amendment claims, and to avoid confusing the jury, all agreed that the interrogatories would cover not just the Fourth Amendment claims, but also the battery and Bane Act claims. *See* TT 737:16-740:15. The Court rejects Defendants' argument that this approach compromised the verdict.

Second, Defendants complain that the Special Verdict Form for damages does

---

[7] The Special Verdict Form did pose separate questions on negligence. *See* Special Verdict Questions 8-12.

1   not allocate damages between the state law negligence claim and the § 1983 claims, or

2   between damages awarded against Woods as an individual and the damages awarded

3   against the County. But Woods's conduct resulting in Nate's injury and death was a

4   continuous course of action resulting in a single indivisible injury so it would have

5   made no sense to ask the jury to apportion his damages between the claims.

6   Furthermore, the County stipulated that it was vicariously liable for Woods as to the

7   state law negligence and battery claims, and Plaintiffs dropped their § 1983 claims

8   against the County. Therefore, the County's liability was not a fact issue for the jury,

9   but rather a post-verdict legal issue for the Court. As the Seventh Circuit has noted,

10  "damages are not assessed 'by defendant' or 'by claim' but 'for' an injury . . . the

11  jury's task is to award a sum of money to compensate the plaintiff for that injury, not

12  to enter a damages award against each defendant who is or will be liable on the

13  judgment." *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 640 (7th Cir. 2011). Indeed,

14  asking the jury to award damages per claim and per defendant for an indivisible injury

15  can result in reversible error because it arguably invites they jury to award multiple

16  recoveries for a single injury. *Id.*

17              **2.  The Non-Economic Damages Awards Are Not Excessive or**
18                  **Against the Weight of the Evidence.**

19          Defendants argue that the jury's award of $6.5 million and $2 million to

20  Archibald and Pickett respectively in non-economic damages for the loss of Nate's

21  "love, companionship, comfort, care, assistance, protection, affection, society, and

22  moral support" are excessive and against the clear weight of the evidence. However,

23  as to Archibald, Defendants cite only her very brief testimony during the liability

24  phase and utterly ignore her lengthy and unrebutted testimony in the damages phase

25  describing her relationship with Nate, her only son. This testimony is aptly

26  summarized in the Opposition, *see* Dkt. No. 201 6:25-8:26, so the Court will not

27  restate it. Defendants likewise disregard Pickett's testimony describing his

28  relationship with Nate, *see* Opposition (Dkt. No. 198) 2:2-3:11, and instead cherry-

1  pick testimony to minimize that relationship. As a result, Defendants did not address

2  the unrebutted evidence that supports the verdict, so they have failed to meaningfully

3  apply the "clear weight of the evidence" legal standard. Defendants have therefore not

4  shown that these damage awards are excessive and against the weight of the evidence.

5  The Court further finds that the awards are in fact supported by the clear weight of the

6  all of evidence, including the evidence cited in the oppositions.

7      **E. The Court Properly Sustained Plaintiffs' *Batson* Challenge to**

8          **Defendants' Peremptory Strike**

9      Finally, Defendants argue that the Court wrongfully sustained Plaintiffs' *Batson*

10 challenge to one of their peremptory strikes, and that the remedy is a new trial.

11     "The *Batson* analysis involves a three-part inquiry: [1]] the party challenging

12 the peremptory strike must establish a prima facie case of intentional discrimination;

13 [2]] the striking party must give a nondiscriminatory reason for the strike; and [3]

14 the court determines, on the basis of the record, whether the party raising the

15 challenge has shown purposeful discrimination." *SmithKline Beecham Corp. v.*

16 *Abbott Laboratories*, 740 F.3d 471, 476 (9th Cir. 2014). The ultimate question of

17 discriminatory intent will largely turn on the court's evaluation of the striking parties'

18 credibility. *See Hernandez v. New York*, 500 U.S. 352, 365 (1991) ("In the typical

19 peremptory challenge inquiry, the decisive question will be whether counsel's race-

20 neutral explanation for a peremptory challenge should be believed. There will seldom

21 be much evidence bearing on that issue, and the best evidence often will be the

22 demeanor of the attorney who exercises the challenge.").

23     Archibald's opposition quotes the colloquy surrounding this decision and the

24 relevant voir dire of the juror. *See* Opp'n (Dkt. No. 201) 11:6-14:24; *see also* TT (Dkt.

25 No. 170) 94:10-101:13. Defendants sought to exercise their first peremptory strike

26 against Juror 6, and Plaintiffs' counsel objected under *Batson* on the ground that Juror

27 6 was the sole African-American juror in the group and Defendants' first strike. The

28 Court invited defense counsel to respond, but he declined, simply staying he exercised

his peremptory challenge. The Court then pressed counsel to provide a race-neutral basis for exercising that peremptory. Counsel referred to Juror 6's description in voir dire of being briefly detained by law enforcement in New Jersey after he called an ambulance for a friend who was hit by a car: he and others were "a little excited" and wouldn't calm down, so the officers detained him, but released him shortly thereafter with an apology. Defense counsel also pointed to Juror 6's work as a janitor at the Veterans' Administration ("VA") in Long Beach. The Court further pressed counsel, because Juror 6 said that despite his "questionable" encounter with law enforcement, he could be fair to the defense, and this was similar to responses of other jurors with questionable contacts with law enforcement. Counsel simply reiterated that he was concerned that Juror 6 could not be fair to the defense based on his experience with law enforcement in New Jersey. As to Juror 6's job, counsel stated that he worked at the VA, and was a vet or made reference to a vet. Counsel admitted that he did not make any further inquiries of Juror 6 regarding these issues during voir dire. The Court found that counsel did not adequately articulate a nondiscriminatory reason for the peremptory strike: Juror 6 was the only African-American, none of his voir dire responses suggested he would be biased towards the defense, and counsel's proffered race-neutral explanations were not credible.

However, even assuming there was error, Defendants have not shown that they were prejudiced or that the error was not harmless. "Erroneous denial of a [peremptory] challenge is [] subject to Federal Rule of Civil Procedure 61 on harmless error, requiring us to disregard error not affecting 'substantial rights.'" *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 967 (9th Cir. 2013). In their opening brief, Defendants make no attempt to show that they were prejudiced or that their substantial rights were affected. Only in reply did Defendants tack on a statement that they "were prejudiced by the bias of juror number 6's prior negative experiences with law enforcement." Reply (Dkt. No. 204) 11:12-13. Not having presented this argument in their moving papers, Defendants cannot properly raise it in reply. But

20.

regardless, Juror 6 did not describe his prior experience with law enforcement as negative; if anything, he indicated that he understood why he was briefly detained, and the officers released him in short order with an apology. Furthermore, counsel did not move to strike Juror 6 for cause, which they would have been entitled to do had they genuinely suspected him of bias. The Court therefore rejects Defendants' after-the-fact assertion that Juror 6 was biased against law enforcement and that they are entitled to the remedy of a new trial.

## IV.      CONCLUSION

For the foregoing reasons, the Court will amend the judgment to reflect that only Defendant Woods, and not the County, is liable for the damages arising out of the § 1983 claims. The Motions are otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: October 02, 2018

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE